1
2
3
4

Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

5
6

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

7
8
9
10
11
12
13
14

**AARON GREENSPAN**,

    Plaintiff,

      v.

**OMAR QAZI**, **SMICK ENTERPRISES, INC.**, **ELON MUSK**, and **TESLA, INC.**,

    Defendants.

Case No. _____

**COMPLAINT FOR:**

1.   Libel Per Se
2.   Intentional Infliction of Emotional Distress
3.   Declaratory Judgment
4.   Copyright Infringement
5.   Violation of the UCL, Business & Professions Code § 17200
6.   Violation of Federal Securities Laws
7.   Injunctive Relief

JURY TRIAL DEMANDED

15
16
17

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

**INTRODUCTION**

18
19
20

1.     This is a case about whether or not the wealthiest members of society should be permitted to lie with impunity, and the means they sometimes use to silence those who justifiably question them.

21
22
23

2.     Defendant Elon Musk is the billionaire CEO of Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy products.  He has attracted a cult

24

following, both among his customer base and on the Twitter social network, where Defendant Musk has in excess of 30 million followers.

3.      On September 28, 2018, Defendant Musk signed a binding Consent Decree in *United States Securities and Exchange Commission v. Elon Musk*, Southern District of New York Case No. 1:18-cv-08865-AJN.  On April 26, 2019, Defendant Musk signed an Amended Consent Decree in the same case.  Both Consent Decrees regulate his use of social media and all corporate communications.  Defendant Musk also paid a $20 million fine to the United States Securities and Exchange Commission ("SEC"), separate and apart from a $20 million fine paid by Defendant Tesla.

4.      Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick"), has served as an attack dog and ferocious on-line propagandist for Defendants Tesla and Musk.  Defendant Qazi is a Tesla shareholder and customer.  Defendant Qazi also has a criminal record, having been arrested at least twice.  His antics over a period of years have been so overly aggressive that Qazi himself attracted a following of tens of thousands of Musk's supporters, and a considerable following of detractors, before he was banned from and by Twitter for life.

5.      According to the SEC Office of Investor Education and Advocacy Investor Alert on Social Media and Investing, "false claims could be made on social media such as Facebook and Twitter" to effect "pump-and-dump" schemes through "false and misleading statements to the marketplace."  Indeed, social media has been instrumental to the unprecedented artificial elevation of Tesla's stock price, which has yielded a market capitalization for the company, which has never turned an annual profit, of $150 billion: about 2.5 times the worth of Lehman Brothers at its peak.

6.       Defendants Qazi and Musk have at times worked as a tag team, hurling insults and falsehoods concerning Plaintiff, among other topics, to Defendant Musk's approximately 30 million followers in an attempt to discredit Plaintiff's in-depth research on Defendants Tesla and Musk.

7.       Even after being formally banned from and by Twitter, Defendant Qazi returned to Twitter anyway under the guise of a new shared account for a Tesla-focused podcast, until his further provocations triggered a backlash in the same community that had previously been so supportive of his at-times-criminal harassment.

8.       Defendants Qazi's and Smick Enterprises, Inc.'s actions on behalf of Defendants Musk and Tesla are part of a overt pattern of Elon Musk smearing, harassing, and willfully defaming his critics based on any information at all, however obviously false or unreliable.  Each Defendant has routinely displayed a reckless and often proud disregard for the truth, in service of one of the largest securities frauds in American history.

## PARTIES

9.       Plaintiff Aaron Greenspan is an individual residing in San Francisco County in the State of California.  Plaintiff presently holds Tesla put options.  Plaintiff is not a public figure.

10.      Defendant Omar Qazi is an individual residing in Los Angeles County in the State of California and doing business in Santa Clara and San Francisco Counties in the State of California, in this district.  Defendant Qazi purports to have an office on Market Street in San Francisco, California, in this district.

11.     Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the California Secretary of State or Franchise Tax Board, but nevertheless operating in Santa Clara and San Francisco Counties in the State of California, in this district.

12.     Defendant Elon Musk is an individual residing in Los Angeles County in the State of California.  Defendant Musk is a public figure whose activities, however minor, make national news on a near-daily basis.  Defendant Musk works in Santa Clara and Alameda Counties, in this district.

13.     Defendant Tesla, Inc. is a corporation based in Santa Clara County in the State of California, in this district.  Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the state law claims that are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United StatesConstitution.

16.     The securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.     Personal jurisdiction and venue are proper because at least one defendant is a corporation headquartered in this district and/or because the improper conduct alleged herein occurred in, was directed from, and/or emanated or exported from California.  In addition,

substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## **FACTUAL BACKGROUND**

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

18.     Plaintiff is an investor who has held short positions in Tesla, Inc. common stock via put options, among other investments.

19.     Plaintiff is also a data journalist who runs a legal information service called PlainSite (https://www.plainsite.org).  PlainSite hosts over 16 million court dockets and other government documents and contains profiles for over 6 million legal entities, one of which happens to be Defendant Tesla.  PlainSite handles privacy requests on a case-by-case basis. Consequently, Plaintiff has come into contact with a wide variety of individuals who are occasionally upset that their information is in the public domain.

20.     One such individual, Diego MasMarques, Jr., who was convicted of murder and attempted murder in Spain and charged with a number of other crimes in the United States, escalated his displeasure over the fact that his criminal convictions were public to the point where Plaintiff applied for, and was later granted, a "permanent" two-year restraining order against him.  *See* Santa Clara County Superior Court Case No. 18CH008067, *Greenspan v. MasMarques*.

21.     Plaintiff is Jewish and comes from a Jewish family.

22.     On October 27, 2018, a shooter at the Tree of Life synagogue in Pittsburgh, Pennsylvania killed eleven Jewish congregants and wounded six.

23.     On various websites, Mr. MasMarques, who has a documented history of mental illness, posted thousands of libelous diatribes falsely alleging that Plaintiff and his family

members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to hacking his e-mail account.  He and/or someone his posts inspired also posted the name of Plaintiff's parents' synagogue in Cleveland, Ohio, as well as the name of their former synagogue, Plaintiff's home address, Plaintiff's parents' address, a photograph of Plaintiff's parents' house, all of Plaintiff's family's telephone numbers, as well as the contact information of people Plaintiff knows in San Francisco.  Other posts included fabricated images of Plaintiff and his family members wearing swastikas and pasted onto pornographic content.  Mr. MasMarques now faces additional criminal charges in Marlborough District Court in Massachusetts on account of his harassing conduct in violation of the various temporary and permanent restraining orders issued in Santa Clara County Superior Court Case No. 18CH008067.

24.     All of Mr. MasMarques's false and libelous posts, as well as those he inspired, gave Plaintiff cause for great concern, but especially those posts concerning his family's specific synagogue affiliations.

25.     On or about January 14, 2019, apparently disturbed by the allegations against Defendant Tesla surfacing in various court documents posted on PlainSite, a pseudonymous Twitter account, "@tesla_truth" (posing as "Steve Jobs") began re-posting and linking to some of the false and dangerous allegations pseudonymously posted by Mr. MasMarques that were the subject of the (then temporary, later permanent) restraining order, while making additional false allegations of its own.

26.     The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

27. An immediate attempt via Twitter Direct Message ("DM") to discuss the seriousness of the matter, and especially the associated safety concerns, with the owner of the @tesla_truth account was not fruitful. Plaintiff wrote:

> "Hi. What you're writing is libelous and totally untrue. Diego MasMarques is the subject of pending criminal charges for what he wrote, as well as the restraining order case in California that you admit you have not fully researched. You are repeating his lies. Please stop."

28. The owner of the account refused to stop, and continued making public antagonizing statements on Twitter, including, "Jail all shorts," referring to short sellers, repeating a talking point favored by Defendant Musk.

29. Plaintiff then specified the most objectionable content by saving it to a PDF file hosted on his personal website and sending a link to the account owner. When the recipient of this message (the owner of the @tesla_truth account) clicked on the link to the PDF containing the objectionable content, the server logs yielded the DNS hostname and IP address of the account owner: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively. Given the urgent potential safety ramifications of this account's misconduct, Plaintiff took the exceptional step of using this information to search PlainSite's server logs for any associated history, and found that a user with the same IP address had searched for "Smick Enterprises, Inc.," a company run by Omar Qazi of Torrance, California.

30. Plaintiff took the further exceptional step of publicizing this information to warn others of the danger Defendant Qazi posed.

31. Omar Qazi later admitted to owning or at least having access to the @tesla_truth account.

32. The same day, still concerned about the danger posed to his family and others at the synagogues mentioned in the posts, Plaintiff attempted to contact Defendant Qazi by phone

at his employer's office as determined by his LinkedIn profile, but was unable to reach him because in fact, Defendant Qazi did not actually work at the office listed on his LinkedIn profile. Plaintiff then asked the receptionist to speak with a supervisor in Defendant Qazi's department, unaware that he did not work in one.  Plaintiff informed an unknown female employee that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous.

33.     At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually his father's company where Defendant Qazi appears to hold a vanity title, nor did Plaintiff ask to speak with Defendant Qazi's father or any of his family members when he called.  Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately, regardless of his affection for Tesla.

### _Omar Qazi Steps Up His Campaign of Criminal Harassment_

34.     The next day, on January 15, 2019 at 7:01 P.M. (all times in this Complaint are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number.  The caller, who did not specify his name, was a man impersonating a service technician who initially only said he was calling from "the phone company."  The anonymous caller then tried to ascertain Plaintiff's home address.  Since the caller refused to identify the "phone company" he worked for, and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information.  Defendant Qazi later admitted to placing this harassing phone call in a private conversation that was eventually forwarded to Plaintiff months later.

35.     The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually suspended by Twitter for violating its terms of service.  It was permitted to continue operating by renaming itself to "Steve Jobs _[sic]_ Ghost" and clarifying its role as a so-called "parody"

account, even though the account's primary purpose was promoting Defendant Tesla's stock and products, not parody.

36.     In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and his relationship with Diego MasMarques, Jr.  False, misleading and harassing posts continued through late July, and inspired harassment from others.

37.     On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff accurately reported on a public video posted by Defendant Qazi on the @tesla_truth Twitter account purporting to advertise the features of Tesla's so-called "Autopilot" functionality, which requires that drivers keep their hands on the steering wheel.  (Tesla's stock ticker is highlighted on Twitter as $TSLA.)  The @PlainSite posts read as follows:

> "Strange, it would appear that the owner of this $TSLA Model 3—likely Omar Qazi, the owner of the account that posted the video—is improperly using Autopilot hands-free. He even ignores an on-screen warning while driving at 1100 South La Brea Avenue."  https://t.co/6pnADwA8KO

> "The video also appears to show the driver running a red light. Below, a photo of Mr. Qazi's black Tesla Model 3 posted previously, consistent with the vehicle in the video."  https://twitter.com/PlainSite/status/1157538972437901314

38.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net, which represents an internet-connected device in or around Rancho Palos Verdes, California, accessed documents from Plaintiff's restraining order case, Case No. 18CH008067 in Santa Clara County Superior Court, hosted on PlainSite.

39.     Defendant Qazi and/or his family members live in Rancho Palos Verdes, California.

40.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's

---

COMPLAINT                                            9

aforementioned restraining order case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child). The portion of the altered court document image posted also contained Plaintiff's phone number and fax number. Defendant Qazi posted the altered image alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them. Should've known they would fight back."

41.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:



42.     These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer.

43.     Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047.  This anonymous fax purported to be from "Kids R Us" with a fake fax number of "2126644444" and the cover page message, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.

44.     A similar anonymous fax from the same unknown fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat aimed at Mr. Huettner.  *See* https://twitter.com/Paul_M_Huettner/status/1075415917809541121.  The fax cover page in that instance purported to be from "Elon Musk" with a message of, "Paul, Would you prefer to go first or would you prefer your family go first."

45.     Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation.

46.     In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with concerns about Defendant Tesla's relationship with Defendant Qazi.  *See* Exhibit A.  Plaintiff did not receive any response to this message from Defendant Musk or any Tesla Director or representative.

47.     On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

> "I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

*See* Exhibit B.

48.     Defendant Qazi did not explicitly admit to sending the fax, and at one point authored a series of posts explaining that he had been on an airplane at the time the fax was sent, supposedly making it impossible for him to be the author.  He did not explain how a few minutes prior to the fax being sent, a Rancho Palos Verdes IP address accessed the same restraining order document containing Plaintiff's fax number that Defendant Qazi altered and posted from his Twitter account, ultimately leading to the fax to being transmitted.  Nor did he apparently find his own explanation compelling, because he deleted it shortly after it was posted.

49.     On August 8, 2019 at 11:13 P.M., Defendant Musk responded to Plaintiff's e-mailed, on-the-record questions with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

50.     On September 19, 2019, Plaintiff's non-profit organization, Think Computer Foundation, intervened in Delaware Chancery Court Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation*, pursuant to Chancery Local Rule 5.1(f), which permits any member of the public to challenge the designation of confidential material on file with the court.

51.     From early August through October 2019, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff and Plaintiff's family members.  These harassing statements were read by a wide audience of at least 10,000-15,000 Twitter followers.  Many of these statements were published specifically to promote Defendant Tesla's stock, its products, and its CEO, Defendant Musk—all while using Tesla's registered trademark—by making Tesla appear to be the one and only legitimate automotive brand, and cutting down all others.

52.     Defendant Qazi's scorched-earth *modus operandi* is perhaps best illustrated with a series of posts from September 17, 2019, in which he lashed out at Edmunds.com, Inc., a popular

resource for information about cars.  When the @edmunds Twitter account simply blocked him,

Defendant Qazi's public response, far beyond mere dissatisfaction, was as follows:

> "You think this is going to stop me @edmunds ???
>
> I'm only going to troll you harder now"
>
> "troll Edmunds for me! Sign up for notifications on their posts and troll the shit out of them until they apologize to the Tesla community
>
> we won't stand for people insulting us and lying to the public to prop up this *[sic]* own corporate interests. Destroy Edmunds 'impartial' brand"
>
> "people seriously think Edmunds is impartial. I did, which is why i was so surprised to see their hateful tweets against Tesla owners. People need to know Edmunds is in the pocket of dealers.
>
> They will lie to you and screw your *[sic]* over to protect their business."

53.     Defendants Musk and Qazi frequently interacted on Twitter through a variety of accounts.  Defendant Qazi also photographed himself appearing at exclusive, invite-only events where Defendant Musk presented new Tesla products.

54.     On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

55.     On the morning of October 9, 2019, an article in Bloomberg by Zachary Mider entitled, "Tesla's Autopilot Could Save the Lives of Millions, But It Will Kill Some People First" was published referring to Defendant Musk and containing the quote:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi] the same day. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack [sic] you with a baseball bat.' Musk cc'd me on the message. Tesla also declined to comment."

The article, which contained a photo spread of Defendant Qazi next to his Tesla Model 3, also stated that Defendant Qazi has been given special early access to Tesla software features.  *See* Exhibit C.

56.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff on January 15, 2019 from a blocked number.  In this same conversation, Mr. Qazi also made reference to a "Jim" who had written on or provided input for the @tesla_truth account in January 2019.  *See* Exhibit D.

57.     On October 9, 2019 at 3:09 P.M., the @tesla_truth account posted the following on Twitter:

> "All Aaron Greenspan had to do was shut up and I would have forgotten all about that clown.
>
> Now i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is
>
> After he dies I'll keep telling people he sucked"

58.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, the then-general counsels of Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider.  *See* Exhibit E.

59.     At 3:48 P.M., Defendant Qazi replied by e-mail to all parties with the message, "Lol," internet slang for "laughing out loud."

60.     Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." Defendant Musk then replied to all parties, in reference to Defendant Qazi's response, with two laugh/crying emojis.  *See* Exhibit F.

61.     Also at 3:48 P.M., Defendant Qazi posted a screenshot on the @tesla_truth Twitter account containing the Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

62.     At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely, suggesting that Plaintiff resided in a "psych ward."

63.     At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's e-mail and telephone contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

64.     Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plainitff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

65.     Plaintiff received unwanted telephone calls, e-mails and messages as a result of Defendant Qazi's actions.  In addition, at least several dozen libelous messages were posted publicly about Plaintiff and Plaintiff's family members.

### _Omar Qazi Targets Plaintiff's Family for Further Harassment_

66.     The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan, using a photograph of Dr. Greenspan to which Plaintiff owns the copyright.  The Twitter

account's handle, deliberately designed to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account.

67.     Dr. Greenspan is a professor of medicine and an academic researcher at Case Western Reserve University and Director of the Histocompatibility and Immunogenetics Laboratory at University Hospitals Cleveland Medical Center in Cleveland, Ohio.  Accordingly, he qualifies as an "academic researcher" for the purposes of California Penal Code Sections 422.4 and 602.12.  As his son, Plaintiff qualifies as his "immediate family" under these sections.

68.     Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps to receive all e-mails addressed to smick.com, whether or not a corresponding e-mail account existed, including e-mails connected to numerous fake accounts on social media sites such as Twitter.

69.     On Monday, October 10, 2019 at approximately 9:51 P.M., Plaintiff filed a Digital Millennium Copyright Act (DMCA) takedown request with Twitter, Inc. regarding the copyrighted photograph being used by Mr. Qazi to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph of Plaintiff's father from the account.  Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled brother (again, used without permission from the copyright owner, the *Toledo Blade*), and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.

70.     On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan."  In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a parody or actually his brother?" Defendant Qazi wrote from the fake "Simon Greenspan" account, "yeah I'm his little brother haha."

71.     Plaintiff's brother is not active on Twitter and never has been.

72.     On October 11, 2019, Defendant Qazi created websites using servers owned or leased by his company, Defendant Smick Enterprises, Inc., at http://www.plainshit.com, http://www.plainshit.org, and http://www.plainsiite.org (the "Smick Sites") containing copyrighted photographs of Plaintiff, Plaintiff's father, Plaintiff's brother, and Plaintiff's mother, with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT."  The sites (all with identical content) continued:

> "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent "Think Foundation" "Charity", or board members Neil Greenspan or Judy Greenspan? You are not alone.

> The law offices of Lantham *[sic]* & Watkins are collecting testimonies regarding the fraudulent 501(c)(3) non-profit Think Foundation's activities, and the conduct of board members Aaron Greenspan, Neil Greenspan and Judith Greenspan. Please add your contact information to the form below and one of our staff will contact you shortly. Thank you for speaking out.

> 56 people have submitted verified testimonies"

73.     This statement contained numerous false allegations: that Plaintiff's non-profit organization was a "fraudulent charity;" that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals; that Defendant Qazi had engaged the law firm of Latham & Watkins, and that "56 people" had submitted "verified testimonies" to the site(s).

74.     Viewing the website's source code revealed a hidden HTML comment that stated, "<!-- fuck you aaron -->", referring to Plaintiff.

75.     Plaintiff contacted Latham & Watkins by e-mail to inform the firm that its name was likely being misused, and heard back from Matthew K. Roskoski, Deputy General Counsel, who promised to look into the matter.

*Tesla's CEO Weighs In With False Statements Of His Own*

76.     On Saturday, October 12, 2019, alongside numerous false allegations made via his @tesla_truth account, Defendant Qazi posted a link to a pseudonymously authored article on the website Medium entitled, "NonProfit PlainSite Attacks People Online" by "Random Tesla Fan."  The first line of the article was, "There is a guy by the name of Aaron Greenspan who hates Tesla very much," directly referring to Plaintiff.  The next paragraph began, "PlainSite is a joint venture with Think Computer Corporation and Think Computer Foundation (same thing) which is a 501(c)3 nonprofit organization in the United States."  The article contained Plaintiff's parents' home address.

77.     Think Computer Corporation and Think Computer Foundation, both run by Plaintiff, are not the "same thing," and are in fact separately incorporated legal entities with different tax treatment, different Employer Identification Numbers, different bank accounts, different accounting ledgers, and different purposes.

78.     On account of false complaints filed with the IRS by Diego MasMarques, Jr., the IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020, finding that "Your organization continues to qualify for exemption from federal income tax as described in Internal Revenue Code 501(c)(3)."  The Letter 5177 did not identify a single issue of concern. *See* Exhibit G.

79.     Although Plaintiff read the Medium article and found it to contain an overwhelming amount of false and deliberately misleading information, Plaintiff took no action.

80.     In direct response to Defendant Qazi's posting of the article, Defendant Musk wrote on Twitter at 12:46 P.M.: "Super messed up situation!"  Owing to Defendant Musk's fame, this post garnered 104 replies, 112 retweets, and 1,860 "likes," suggesting that many

thousands of people viewed the post in addition to the roughly 2,000 who directly interacted with it.

81.     Thirty-two minutes later, at 1:18 P.M., Defendant Musk wrote another response on Twitter to augment his first response: ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?"  This post garnered 246 replies, 226 retweets, and 1,776 "likes," again suggesting that many thousands of people viewed the post in addition to the roughly 2,000 people who directly interacted with it.

82.     Both of Defendant Musk's responses to Defendant Qazi's post concerning the Medium article about Plaintiff were threaded within the context of the original Twitter post, meaning that they appeared in direct relation to the initial post and would have been readily apparent to anyone reading Defendant Qazi's post and the associated article about Plaintiff. Therefore, an average user on Twitter would have understood the supposedly "fake charity" discussed by Defendant Musk to be Think Computer Foundation, which is a properly registered and legitimate 501(c)(3) non-profit organization, and the supposed "online bully" discussed by Defendant Musk to be Plaintiff.  The $50.00 donation by Russ Mitchell to Think Computer Foundation for the purpose of increasing access to California court records was explicitly discussed in the Medium article at the top of the thread.

83.     Ultimately, Think Computer Foundation used the money it raised in the fundraiser to which Russ Mitchell contributed to file a lawsuit against the Santa Clara County Superior Court on December 9, 2019, Case No. 19CV359896, *Think Computer Foundation v. Rebecca Fleming et al.*  Shortly thereafter, the Santa Clara County Superior Court made all of its civil records electronically available for free, achieving the Foundation's goal.  Think Computer Foundation reached a settlement with the Superior Court in May 2020.

84.     Some time after it was initially posted, Medium disabled the account responsible for the article and removed the article itself without any prompting from Plaintiff, directly or indirectly.

85.     On Monday, October 14, 2019 at 10:47 A.M., in response to the removal of the Medium article, Defendant Qazi used his @tesla_truth Twitter account to vow to "post the content on a server we control" after falsely accusing Plaintiff of having written to "friends at medium."

86.     On Tuesday, October 15, 2019 at 4:56 A.M., Plaintiff received an e-mail from an automotive industry consultant residing in Tokyo, Japan who stated that Omar Qazi had been harassing and impersonating his wife.  Defendant Qazi had also harassed and impersonated this individual himself.

87.     On Tuesday, October 15, 2019 at 7:42 A.M., using his @tesla_truth Twitter account, Defendant Qazi wrote, "to the police: if I am found dead in mysterious circumstances, it was almost certainly aaron greenspan / he killed me for saying he didn't invent facebook / (he didn't)".

88.     On Tuesday, October 15, 2019 at 8:19:54 P.M., Defendant Qazi left Plaintiff's father a voicemail 50 seconds in length on his work telephone number.  The voicemail stated:

> "Hi Neil, uh, this is uh, my, uh, my name is Omar Qazi.  Uh, I, uh, was calling because, uh, you know, your son had been, uh, you know—well, has been, uh, contacting me over the internet, uh, you know, posting information about me, and uh, I wanted to discuss the situation with you.  It seems that he's getting very angry, very frustrated, and, uh, and really, uh, you know, um—def—seems like something that maybe we should, uh, discuss.  If you could give me a call back, my phone number is [redacted].  I'd really appreciate it.  Thanks.  Bye."

89.     Fourteen minutes later, on Tuesday, October 15, 2019 at 8:33:55 P.M., Defendant Qazi sent the following e-mail message to Plaintiff's father's work e-mail address with the subject "Think Foundation & Aaron":

"Hello Dr. Greenspan,

My name is Omar Qazi. I'm writing to you because I noticed that you are on the board of Think Foundation [sic], which operates 'Plainsite'

The Think Foundation non-profit, Plainsite, and your son Arron [sic] seems to be engaged in an emotional vendetta against me. I'm not sure how much you know about what he has going on with his short selling investments and Tesla, but he seems to believe that I am being paid by Elon Musk to post about Tesla on Twitter. In reality I am just a Tesla customer, and am not associated with Elon Musk. My family and myself have received numerous threats, phone calls, etc as a result of verifiably false information that Aaron has posted on his 'Plainsite' Twitter account, which I understand is operated by the Foundation you are on the board of.

The situation has escalated quite alarmingly in the past week as Tesla's stock price has risen somewhat. I know that Aaron is shorting the stock, but I feel that the situation has become more emotional than financial for him with regards to his obsession with retaliating against me and my family. I wanted to reach out and see if we could chat about what's going on. I've reached out to Aaron but he does not want to meet with me or speak to me.

I would appreciate it if you could give me a call sometime so that we could chat about the best way to de-escalate the situation. I worry based on some of Aaron's recent actions that he may break the law in anger and be forced to deal with a situation that could have easily been avoided with a simple phone conversation.

Thank you for your time,
Omar Qazi
[telephone number redacted]"

90.     Plaintiff's father did not respond to Defendant Qazi's communications as they contained numerous false statements and gross mischaracterizations.

91.     Plaintiff never took any action to harass or encourage others to harass Defendant Qazi or his family.

92.    Also on October 15, 2019, the Smick Sites were updated to resemble Plaintiff's PlainSite website, and the misspelled reference to Latham & Watkins was removed.  To achieve the new look, Defendant Qazi copied and pasted the PlainSite home page source code and graphics onto his servers and modified the code.  He also updated the bold headline to expand the list of supposed crimes that he was accusing Plaintiff and his family members of committing: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?"  Defendant Qazi also added 900 to the false number of people who had submitted "testimonies," for a total of 956, because it corresponded to Plaintiff's address.  Finally, he added the text, "Aaron Greenspan Did Not Invent Facebook. He is a failure."

93.    Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting *[sic]* Securities Fraud" and included other hidden comments such as, "I am so mentally derranged *[sic]* that I honestly believe that I invented Facebook. Please email me to tell me that I didn't at help@plainsite.org."

94.    On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi also contacted Plaintiff's disabled brother via Facebook Messenger, writing, "hi simon / how are you?" Planitiff's brother was confused and asked how he knew Defendant Qazi.

95.    On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline implicitly accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

96.    On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—set up to impersonate and disparage Plaintiff's company's brand

and registered trademark, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

97.     PlainSite is a registered trademark of Think Computer Corporation, United States Patent and Trademark Office Registration No. 4,461,598.  Defendant Qazi's fake @PlainShite account used the PlainSite name and logo without permission in an effort to impersonate the real account, @PlainSite.

98.     On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."

99.     On October 18, 2019 at 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow." He never responded further, despite later claiming that Plaintiff had failed to engage.

100.     On Friday, October 25, 2019 at approximately 6:30 P.M., Defendant Qazi registered a new domain name, vagfoundation.org, via Amazon.com to augment the aforementioned Smick Sites.  Though the website at http://www.vagfoundation.org purported to represent "The Victims of Aaron Greenspan Foundation," there is no such non-profit organization registered with the IRS or any state government.  *See* Exhibit H.

101.     Even though Defendant Qazi solicited information about Plaintiff's supposed crimes from his thousands of followers, only two "testimonies" ever appeared on the Smick Sites: "M's TESTIMONY," or an approximate reproduction of the disabled Medium article that Defendant Qazi had resolved to post elsewhere; and "P'S TESTIMONY," a haphazard PDF compilation of Diego MasMarques, Jr.'s false allegations anonymously submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia Tracey, also known

as "Mia," of Sydney and Melbourne, Australia.  Neither of these posts described any actual

crime committed by Plaintiff of his family members, let alone any actual "victim" of Plaintiff.

<u>*With Omar Qazi Banned From Twitter, The Libel and Harassment Continues*</u>

102.    On or about October 24, 2019, Twitter permanently banned Defendant Qazi.  The

company permanently disabled his @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil,

and @SmickTrump accounts.  Defendant Qazi may have deleted another one of his fake Twitter

accounts, @BagHolderQuote, of his own volition.

103.    On Sunday, October 27, 2019 at 10:25 A.M., an unknown individual posted a

"free stuff" listing on Craigslist using Plaintiff's GMail e-mail address, the name "Aaron Musk"

and Plaintiff's telephone number.  Plaintiff received an automated e-mail notification when the

listing was authored.  The listing read, "I have a functional original iPad Air 8GB to give away,

first person to message can have it. You will have to pick it up in BayView."  Plaintiff does not

own an iPad Air 8GB or live in Bayview.

104.    On Thursday, October 31, 2019, Defendant Qazi posted an essay on a domain

name and server controlled by Defendant Smick Enterprises, Inc., wholemars.net, entitled,

"Steve Jobs is dead," referring to the pseudonym used for his @tesla_truth account, "Steve Jobs

Ghost."  In this essay, Defendant Qazi admitted that his @tesla_truth account was suspended

repeatedly for legal violations and impersonating others, and included screenshots showing that

the account was registered to the e-mail address teslatruth@smick.com.  *See* Exhibit I.

105.    On Friday, November 1, 2019 starting at 10:40 A.M., an unknown individual

using the DNS hostname customer.tigerbackbone.com and IP address 178.255.153.77 filled out

the PlainSite Contact Us form 74 times in Plaintiff's name, using Plaintiff's e-mail address, with

the message, "Moron."  The same user presumably filled out the form a 75th time at 12:04 P.M.

with the message, "M0ron."  Defendant Qazi frequently uses the word "moron" in his writing.

106.    On Friday, November 1, 2019 at 12:04 P.M., an unknown individual subscribed

Plaintiff's e-mail address to a mailing list called "Healthline," concerning "wellness," without

Plaintiff's permission.  At 12:10 P.M., an unknown individual subscribed Plaintiff's e-mail

address to a mailing list called the "Psych Central Newsletter" without Plaintiff's permission.  At

12:12 P.M., an unknown individual subscribed Plaintiff's e-mail address to the Scientific

American mailing list without Plaintiff's permission, the implication being that anyone who

criticizes Defendants Musk or Tesla must not understand anything about science.

107.    Unable to reach his audience on Twitter, Defendant Qazi set up open-source

Twitter clone software called Mastodon on a server belonging to Defendant Smick Enterprises,

Inc., hosted by Amazon Web Services, LLC.  On Friday November 1, 2019 around 1:00 P.M.,

Defendant Qazi published an essay on another Smick Enterprises, Inc. website, wholemars.org,

thanking his supporters and inviting them to use his Mastodon installation at

mast.wholemars.com, where he posted false and libelous statements about Plaintiff without fear

of Twitter intervening.  (At various points in time, wholemars.com, wholemars.net and

wholemars.org have redirected to each other.  All are under the control of Defendant Qazi.)

108.    On Saturday, November 2, 2019 at 11:55 A.M., Sascha Pallenberg, Head of

Digital Transformation at Daimler AG (a competitor of Tesla, Inc.), wrote on Twitter from his

verified account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and

dozens of people in the industry over various fake accounts!"  *See*

https://twitter.com/sascha_p/status/1190703993296523264.

109.    On Saturday, November 2, 2019 at 2:58 P.M., without Plaintiff's knowledge or permission, an unknown individual created a profile in Plaintiff's name, "aarongreenspan," using Plaintiff's e-mail address, on the pornographic website Pornhub.

110.    On Sunday, November 3, 2019 at 1:08 P.M., Plaintiff filed another DMCA request with Amazon Web Services, LLC regarding Defendant Qazi's repeated violation of copyright law.  On or about November 6, 2019, Amazon shut down at least four of the Smick Sites in response, causing Defendant Qazi to move those sites to another provider, Linode.

### *Omar Qazi and Elon Musk Echo a Convicted Murderer Subject To a Restraining Order*

111.    Upon information and belief, throughout at least part of this ordeal, Defendant Qazi was coordinating with Diego MasMarques, Jr.—the same individual against whom Plaintiff has an active restraining order through 2021.  Many of the false statements and allegations made by Defendants Qazi and Musk are identical to the false statements and allegations Mr. MasMarques has been making since at least as early as 2017 on various websites and in court: that Plaintiff runs a fake non-profit, that Plaintiff and his family have committed tax fraud, have extorted others, etc.

112.    Defendant Qazi was on notice of the restraining order against Mr. MasMarques as of January 14, 2019.  Via his then-active @OmarQazi Twitter account, on August 7, 2019 at 6:38 P.M., Mr. Qazi also admitted to downloading and modifying the Form CH-100 document containing Mr. MasMarques's name as part of his "joke post."

113.    Furthermore, on Tuesday, September 24, 2019 at 5:45 P.M., Defendant Qazi authored a post using his then-active @tesla_truth Twitter account with the words "Rule breaker / law breaker" alongside an screenshot image of an iPhone that had been sent to him in a private Twitter DM conversation.  The iPhone screenshot showed the sender's copy of a Twitter abuse

report receipt from the previous day concerning Plaintiff's personal Twitter account, @AaronGreenspan, which was locked as a result of the abuse report. In other words, the sender of the image had reported Plaintiff's account to Twitter for "abuse."

114. On the previous day, September 23, 2019, an unknown individual did report Plaintiff's personal account to Twitter—for briefly discussing court proceedings involving Diego MasMarques, Jr., alleging that such discussion constituted "private information," even though no private information was disclosed. At first, this request was deemed valid by Twitter staff and Plaintiff's account was locked. Plaintiff immediately appealed. On September 24, 2019 at 9:49 P.M.—hours after Defendant Qazi branded Plaintiff a "law breaker"—Twitter restored Plaintiff's account and admitted, "…we made an error. We've determined there was no violation and have restored your account to full functionality."

115. The only individual with an interest in making such an abuse report was Diego MasMarques, Jr. If Mr. MasMarques was communicating with Defendant Qazi, this would constitute "indirect communication" under the August 30, 2019 restraining order against Mr. MasMarques and would be a further violation. It would also indicate that Mr. Qazi willingly helped Mr. MasMarques defy a court order, acting as his proxy to effect harassment against Plaintiff. Defendant Musk approved of this conduct.

116. Defendant Qazi's harassing activity and false statements accrued to the benefit of himself, Defendant Smick Enterprises, Inc., Defendant Musk and Defendant Tesla.

117. Defendant Musk's harassing activity and false statements accrued to the benefit of himself, Defendant Tesla, and Tesla shareholders, including Defendant Qazi.

118. For months, Defendants Qazi's and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded hatred and ridicule by countless individuals

with whom Plaintiff had no prior relationship.  Most of these posts cast Plaintiff's sanity in

doubt, displayed an obsession with Plaintiff's role creating the predecessor to Facebook at

Harvard College in 2003 (also called "The Facebook"), ridiculed Plaintiff's career and work,

baselessly accused Plaintiff of crimes, or simply hurled insults.  For example:

a) On October 2, 2019 at 10:19 A.M., Twitter user @ThemeTeamWP wrote, "Aaron
   still butthurt that Zuckerberg got rich while you became a nobody?"  This post was
   deleted by the author.

b) On October 9, 2019 at 3:17 P.M., Twitter user @NotThatTesla wrote, "Aaron
   Greenspan can't even get verified on Twitter, much less verify his fake story about
   creating Facebook. Classic fraudster and grifter. Tied with Jacob Wohl for most
   disgusting fraudster of the decade. @tesla_truth's family is getting harassed. It's time
   to stop."  *See* https://twitter.com/NotThatTesla/status/1182057649501802497.

c) On October 9, 2019 at 7:00 P.M., Twitter user @CleanRevelry threatened to "see
   [Plaintiff] on a dark night," using a song lyric authored by Defendant Musk's
   girlfriend as a warning.  Plaintiff interpreted this as a threat of violence, as did a
   Twitter user who replied, @Kristennetten.  *See*
   https://twitter.com/CleanRevelry/status/1182113766814568449.

d) On November 1, 2019 at 10:55 A.M., Twitter user @romn8tr wrote,
   "@AaronGreenspan you're a piece of shit".  *See*
   https://twitter.com/romn8tr/status/1190326394242252800.

e) On November 3, 2019 at 1:54 P.M., Twitter user @NotAGhost10 wrote, "Are you
   interested in starting a 'legal' charity and use the funds to run a"completely *[sic]*
   legitimate" Disinformation and Fact Distortion campaign? Then look no further than

this article by a human shaped pile of garbage, Aaron Greenspan $tslaq".  *See*

https://twitter.com/NotAGhost10/status/1191111358798057474.  This account's

"ghost" reference refers to Defendant Qazi.

f)   On April 4, 2020 at 7:52 A.M., Twitter user @enn_nafnlaus wrote, "Plainsite? The

fake charity of Tesla short seller Aaron Greenspan? The guy who claims to have

invented Facebook? And who selectively requests and selectively publishes only

things he things will hurt Tesla (e.g. that he can profit from)?"  *See*

https://twitter.com/enn_nafnlaus/status/1246450694749552640.

g)   On May 17, 2020 at 8:30 A.M., Twitter user @ElectroCar wrote, "Wow never

realized @AaronGreenspan and @PlainSite accused Omar of being a pedo after

Omar exposed tax fraud."  *See*

https://twitter.com/ElectroCar/status/1262042756853235714.

h)   On May 17, 2020 at 9:13 A.M., Twitter user @BarkMSmeagol wrote, "Yep. He

belongs in an asylum".  *See*

https://twitter.com/BarkMSmeagol/status/1262053620826005505.

### *The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff*

119.    On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant

Tesla's Q1 2020 earnings call, calling local public health officials "fascist."  At one point,

Defendant Musk was oddly disconnected from his own earnings call along with all of the other

active call participants.

120.    On May 9, 2020, Defendant Musk ignited further controversy by threatening to

sue Alameda County over its implementation of the multi-county Shelter-In-Place Order

concerning COVID-19, which curtailed Tesla's ability to manufacture cars at its Fremont,

California factory.  Tesla did, in fact, sue Alameda County that same day, using a complaint that had been in progress for at least two days before Defendant Musk made his threat public.  See *Tesla Incorporated v. County of Alameda*, California Northern District Court Case No. 3:20-cv-03186-TSH.

121.    Defendant Musk further instructed Tesla employees to violate the Shelter-In-Place Order and return to work, or risk losing unemployment benefits.

122.    While Defendant Musk claimed he would be present on the assembly line, willing to risk arrest, he presented no evidence that he actually ever was on the assembly line.  Flight records indicate that he was not even in Alameda County for the majority of the day on Monday, May 11, 2020, with his private jet reportedly arriving in San Jose, California shortly after 5:00 P.M.  On May 12, 2020 at 9:11 P.M., Defendant Musk posted an image of an ice cream sundae he had copied from another person's Instagram account, and proceeded to actively imply that he had taken the picture while eating out (in contravention of the Shelter-In-Place Order) at a Buca Di Beppo restaurant in the Bay Area, which he had not.

123.    Many long-time supporters of Defendants Tesla and Musk were understandably appalled by Musk's erratic behavior and disregard for human life.  On May 12, 2020, popular electric vehicle blog *Electrek* editor Frederic Lambert wrote an editorial entitled, "Tesla superfandom becomes toxic, negative for electric revolution [op-ed]."  *See* https://electrek.co/2020/05/12/tesla-super-fandom-becomes-toxic-negative-electric-revolution-op-ed/.  The editorial was critical of Defendants Tesla and Musk, as well as a Twitter account called "Third Row Tesla" with the handle @thirdrowtesla, for a podcast of the same name led by Defendant Musk's most ardent cult followers, including Defendant Qazi.

124.    Signaling the vital importance of Defendant Qazi's work harassing Tesla's critics, Defendant Musk appeared on video with Defendant Qazi in a 3.5-hour-long Third Row Tesla podcast filmed at one of Defendant Musk's homes on February 9, 2020. *See* https://www.youtube.com/watch?v=J9oEc0wCQDE.

125.    Although it was at first unclear who had authored the Twitter posts that Mr. Lambert took issue with, as Third Row Tesla contributors refused to admit anything about who used the account, Defendant Qazi ultimately admitted authorship, thereby also admitting that he had deliberately contravened Twitter's lifetime ban. Due to the controversy, three of the six Third Row Tesla members publicly announced that they were severing ties.

126.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as nominally independent cheerleaders for Defendant Tesla, led to Defendant Qazi to authoring a 17,600-word screed on his website hosted by Defendant Smick Enterprises, Inc., published on May 17, 2020 (the "Qazi Screed"). Entitled, "Response to Frederic," it invoked Plaintiff's name at least 47 times over dozens of pages, even though Plaintiff had nothing to do with Defendant Musk's decision to place his workers' lives at risk, nothing to do with *Electrek*'s writing, and nothing to do with Frederic Lambert's independent and exceptionally rare criticism of Defendants Tesla and Musk.

127.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading. In some cases, Defendant Qazi cropped images to deliberately mislead his readers. In other cases, Defendant Qazi linked events that were chronologically impossible. Defendant Qazi also omitted key facts and events of which he was aware, since he was responsible for many of them. Generally, the unprovoked rant made good on Defendant Qazi's October 9, 2019 malicious promise to "drag [Plaintiff's] name through the mud until the day he [dies]."

# CLAIMS FOR RELIEF

## COUNT I
**Libel Per Se**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

128.    Plaintiff incorporates by reference the foregoing allegations.

129.    From approximately January 14, 2019 through the date of his lifetime ban by and from Twitter on October 24, 2019, Defendants Qazi and Smick Enterprises, Inc. made use of the @OmarQazi Twitter account, @tesla_truth Twitter account, and numerous other fake Twitter accounts to publish constant false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

130.    From approximately June 2019 through present day, Defendant Qazi made use of the @thirdrowtesla Twitter account to publish constant false statements and deliberate misinformation about Plaintiff.

131.    From October 11, 2019 through present day, Defendants Qazi and Smick Enterprises, Inc. used a variety of domain names and websites including http://www.plainshit.com, http://www.plainshit.org, http://www.plainsiite.org, and http://www.vagfoundation.org to publish false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

132.    Defendant Qazi made these false statements with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and court filings by unrelated third-parties would increase the value of his Tesla stock.  He was successful at achieving his aims: Tesla's stock increased in value, he was profiled in a major financial media publication, and many of his followers began stating that they refused to believe anything in any court document hosted on PlainSite.

133.    Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. also explicitly encouraged others to spread false statements and misinformation about Plaintiff and Plaintiff's family members.

134.    Defendant Qazi explicitly encouraged others to "harass" Plaintiff.

135.    Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging insults in sufficient quantity over a period of more than one year that it is impossible to enumerate each and every one, select examples include:

| Date | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| January 14, 2019 | Strange how Aaron mentions that he think Diego wants to "get in his pants". Sounds like may be revealing some deeper desires there | Plaintiff never said any such thing in any context or via any medium. |
| August 8, 2019 | How did Aaron Greenspan of Plainsite manage to qualify for non-profit status and avoid paying the government taxes? Is it legal to use a non-profit to stalk and harass people? | This statement, couched in a question, falsely suggests that Plaintiff is guilty of criminal conduct.  Plaintiff pays taxes.  PlainSite's revenue is taxable and taxes are paid by Think Computer Corporation, which is a for-profit corporation.  Think Computer Foundation does not "stalk and harass people." |
| August 23, 2019 | It took a lot of hard work to break every single one of these rules with our fraudulent charity, but we pulled it off | This statement, posted from the fake @PlainShite account with the actual PlainSite logo, states that Plaintiff's work is a "fraudulent charity" |
| September 24, 2019 | Rule breaker / law breaker [Image containing Aaron Greenspan's name and photograph] | This statement again falsely suggests that Plaintiff is guilty of criminal conduct. |
| September 27, 2019 | I didn't worry when Aaron Greenspan said Elon paid me to kill him because it wasn't true | This statement alludes to a statement Plaintiff never made. |
| September 28, 2019 | he did, it's fraudulently registered as a non-profit | This statement, in a Twitter thread explicitly mentioning |

| | charity | "Greenspan," falsely accuses Plaintiff of fraud |
|---|---|---|
| September 30, 2019 | Shorts have been using Aaron Greenspan's fraudulent "Think Foundation" to pool their money and go after Tesla – and they can deduct donations from their income tax!!! | This statement again explicitly mentions Plaintiff and accuses him of fraud. |
| September 30, 2019 | To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to "do something" when you're mad but retaliating against me for reporting your fraud will make it worse | This statement again explicitly mentions Plaintiff and accuses him of fraud, and by referring to short sellers including Plaintiff, "serious crimes." This statement also falsely states that Plaintiff suffers from a medical condition. Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. |
| October 9, 2019 | When his reputation is destroyed, he'll have only himself to blame<br><br>I don't have to make up any bullshit conspiracy theories about him. The facts of his life are so embarrassing it says it all<br><br>he is committing serious crimes in "plain sight" on "plainsite" | This statement is the second part of the thread that begins "All Aaron Greenspan had to do was shut up…"  It again falsely states that Plaintiff has committed "serious crimes" by publishing court documents and public domain materials, many of which cast doubt on Defendant Qazi's investment thesis. |
| October 9, 2019 | It's not libel if it's true. You didn't invent Facebook. You've never accomplished anything in your life.<br><br>There are plain facts.<br><br>You just create negativity and feed off other people. And I can prove your crimes in court. [Image containing Aaron Greenspan's name and photograph] | This post explicitly mentions Plaintiff and falsely attributes "crimes" to him. |
| October 9, 2019 | How will Aaron Greenspan, a criminal guilty of felony tax | This post explicitly mentions Plaintiff and states that he is a |

| | | |
|---|---|---|
| | fraud with no lawyer, do in court against two guys with a lot more money than him? | "criminal guilty of felony tax fraud," which is false. |
| October 9, 2019 | Periodic reminder that Aaron Greenspan, who claims he invented Facebook (he didn't), is running a fake charity that Tesla short sellers use to illegally pool funds for propaganda efforts.

Please report his fake charity to the IRS. he is committing tax fraud. | This post explicitly mentions Plaintiff, accuses him of "running a fake charity," which is a crime, and "illegally" pooling funds. The IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020 indicating that there were no issues found. |
| October 9, 2019 | No, likely just his learning disability due to aspergers | This post was in a thread explicitly referring to Plaintiff by name.  Plaintiff has never been diagnosed with Asperger syndrome or a learning disability. |
| October 11, 2019 | yeah he's this clown who thinks he invented facebook and comited felony tax fraud | This post was in a thread explicitly referring to Plaintiff by name.  It repeats the prior false allegations of "felony tax fraud." |
| October 12, 2019 | i'm not severely disabled! you are lucky you only suffer from aspergers!!! | This post was from the fake account Defendant Qazi created in Plaintiff's brother's name, in reply to an actual post by Plaintiff.  Plaintiff has never been diagnosed with Asperger syndrome. Plaintiff's brother is severely disabled. |
| October 14, 2019 | Am surprised this organizations gets a tax exemption.  Owner previously stole DoD documents | This post appeared in a thread specifically mentioning Plaintiff.  It falsely accuses Plaintiff of stealing Department of Defense documents. |
| October 15, 2019 | to the police: if I am found dead in mysterious circumstances, it was almost certainly aaron greenspan

he killed me for saying he | This post, which explicitly mentions Plaintiff, suggests that Plaintiff is a murderer. |

| | | didn't invent facebook (he didn't) | |
|---|---|---|---|
| | October 19, 2019 | Tesla short sellers: donate to us<br><br>It's tax deductible because we are running a fraudulent non-profit.<br><br>we promise to use the money to try and harm Tesla. that's why so many short sellers donate to us | This post was issued by the fake @PlainShite account, where Plaintiff's name appeared in the account summary.  It repeats the false "fraudulent non-profit" allegation. |
| | May 17, 2020 | As time went on, Greenspan became more and more enraged, and also became worried about my allegations of his tax fraud and misconduct | This portion of the Qazi Screed reiterates his false allegations against Plaintiff of tax-related crimes. |
| | May 17, 2020 | After that, I started tweeting more about Greenspan's attempts to harass, stalk and smear Tesla owners like me. | This portion of the Qazi Screed falsely alleges that Plaintiff committed crimes of harassment and stalking. |

136.    Defendant Qazi willingly, intentionally and maliciously republished a libelous statement concerning Plaintiff contained in an e-mail sent by Defendant Musk.

137.    Defendant Qazi's false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not.

138.    Many if not most of Defendant Qazi's aspersions concerning Plaintiff were made as conclusory statements of fact.  Think Computer Foundation's status with the IRS is easily verifiable on the IRS website.  Think Computer Foundation also offers comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Qazi willfully ignored.

1

**COUNT II**
**Libel Per Se**
**Against Defendants Elon Musk and Tesla**

2

3      139.    Plaintiff incorporates by reference the foregoing allegations.

4      140.    In the initial SEC Consent Decree, Defendant Musk agreed to "comply with all

5   mandatory procedures implemented by Tesla, Inc. [] regarding (i) the oversight of

6   communications relating to the Company made in any format…"  Musk acts on Tesla's behalf.

7      141.    Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever

8   been diagnosed with any mental disorder.

9      142.    On October 9, 2019 at 3:48 P.M., Defendant Musk authored and sent an e-mail on

10   behalf of himself and Defendant Tesla to numerous parties including Defendant Qazi, who

11   Defendant Musk knew or should have known would immediately republish his message

12   publicly, describing Plaintiff as belonging in a "psych ward," falsely suggesting as a statement of

13   fact that Plaintiff suffered from a psychiatric illness or disease.

14      143.    On October 12, 2019 at 1:18 P.M., in the context of a Twitter thread started by

15   Defendant Qazi, Defendant Musk baselessly referred to Plaintiff as an "online bully" running a

16   "fake charity," and included the Twitter handle of the owner of the *Los Angeles Times*, Dr.

17   Patrick Soon-Shiong, in the conversation, such that Dr. Soon-Shiong would receive an alert on

18   his mobile device(s) about the conversation.

19      144.    The post was clearly of and concerning Plaintiff.  Any average Twitter user

20   curious about the "online bully" or "fake charity" mentioned by Defendant Musk would have

21   seen the article explicitly casting "Aaron Greenspan" and "Think Computer Foundation" in a

22   false light at the top of the short thread.

23

24

145.    On or around October 23, 2019 at 7:51 A.M., in reply to an e-mail from Defendant Qazi, Defendant Musk sent an e-mail to Twitter CEO Jack Dorsey, as well as Defendant Qazi among other recipients.  The message, which was likely intended to assist Defendant Qazi with restoring his then-suspended Twitter account—a matter so important to Defendant Tesla as to necessitate its CEO's involvement—stated as follows:

> "Jack, what Omar is saying is accurate to the best of my knowledge. There has been an orchestrated attempt to drive down Tesla stock through social media, particularly Twitter. This always increases around our earnings call, which is this afternoon.
>
> Aaron Greenspan in particular has major issues. He's the same nut but *[sic]* that claimed he was the founder of Facebook and sued Zuckerberg, among many other things.
>
> Never seen anything like it."

146.    In the e-mail, Defendant Musk referred to Plaintiff explicitly by name as a "nut" who suffered from "major issues," once again falsely suggesting as a statement of fact that Plaintiff suffered from a psychiatric illness or disease.

147.    Defendant Musk's false statements were intentional, at least in part as the result of Plaintiff's work to expose his fraudulent conduct.

148.    Defendant Musk's false statements were made with actual malice because Musk knew the statements were false and made the statements with reckless disregard for whether the statements were false or not.

149.    Defendant Musk's aspersions concerning Plaintiff were made as conclusory statements of fact.  For example, Plaintiff's Twitter history is searchable and is devoid of bullying.  In addition, Think Computer Foundation's status with the IRS is easily verifiable on the IRS website.  Think Computer Foundation also offers comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Musk ignored.

**COUNT III**
**Intentional Infliction of Emotional Distress**
**Against Defendant Omar Qazi**

150.    Plaintiff incorporates by reference the foregoing allegations.

151.    Defendant Omar Qazi's conduct—starting with his January 2019 harassing prank call to Plaintiff impersonating "the phone company," to his impersonation of both Plaintiff's father and his disabled brother, to his communications with Plaintiff's actual disabled brother via Facebook, to his unjustified and totally baseless shaming of Plaintiff's entire family on multiple websites and social media accounts set up by Defendant Smick Enterprises, Inc. explicitly for that purpose, to his baseless accusation that Plaintiff was linked to "sexual assault," to his suggestion that Plaintiff might commit murder, to his use of hidden expletives directed at Plaintiff in HTML source code comments, to his deliberate interference with ongoing restraining order proceedings involving a violent criminal, to his transmitting and/or causing to be transmitted false allegations concerning Plaintiff's supposed possession of child pornography, to his eager republication of outrageous and libelous statements by Defendant Musk, to his creation of or encouragement of the creation of an account in Plaintiff's name on a pornographic website, to his unprovoked regurgitation of a stilted version of this history viewed by thousands of individuals six months later—is so extreme as to go beyond all possible bounds of decency.

152.    No citizen in a civilized society should ever be expected to tolerate the kind of behavior from Defendants Qazi and Smick Enterprises, Inc. as Plaintiff was forced to tolerate.

153.    Defendant Qazi's conduct caused initial grave concern and distress for Plaintiff insofar as Defendant Qazi was unwilling to remove false content and related links to content that Plaintiff feared could lead to another violent or fatal attack against Jews at his parents' current and former synagogues.

154.   Defendant Qazi's conduct caused grave concern for Plaintiff insofar as it appeared that Defendant Qazi was communicating with the restrained party in Plaintiff's ongoing civil harassment case, who has a documented history of mental illness and a documented history of violence, and who is already the subject of criminal harassment proceedings in Massachusetts for violating the restraining order.

155.   Defendant Qazi's conduct caused further grave concern for Plaintiff insofar as he was communicating with Plaintiff's brother, whose severe disabilities preclude him from understanding the context for those communications, from defending himself against bad faith actors, and from understanding how to cope with unexpected life disturbances, which in turn causes unneeded stress for Plaintiff's entire family.

156.   Plaintiff contacted his family repeatedly to discuss the best way to handle Defendant Qazi's intrusion into their lives, but could not assure them that he could make these issues stop.

157.   Defendant Qazi's behavior generally increased the daily stress felt by Plaintiff due to the need to constantly be on guard for false statements by Defendant Qazi and/or his followers, and to determine which of thousands of statements absolutely necessitated corrective responses or reports of abuse.

158.   Plaintiff reported Defendants Qazi and Musk to the San Francisco Police Department ("SFPD"), filing two separate declarations under penalty of perjury and visiting three police stations on different occasions.  When the SFPD refused to act despite the at least five California Penal Code violations associated with Defendant Qazi's conduct, Plaintiff contacted his City Supervisor.  Ultimately, in his May 17, 2020 screed, Defendant Qazi admitted that a Sergeant at SFPD placed one phone call to him, warning him to stop.

159.    Plaintiff lost hundreds of productive work hours carefully documenting Defendant Qazi's actions in case pressing criminal charges or filing a civil lawsuit might ultimately be necessary.  Simply by staying up later at night to monitor Defendant Qazi's accounts for the sake of his family's safety and reputation, Plaintiff lost sleep due to Defendant Qazi's actions.

160.    Defendant Qazi's actions and October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate total and complete reckless disregard for the truth.

**COUNT IV**
**Declaratory Judgment That Omar Qazi Is In Contempt Of Court**
**Against Defendant Omar Qazi**

161.    Plaintiff incorporates by reference the foregoing allegations.

162.    On April 4, 2018, Plaintiff filed Form CH-100 in the Superior Court of Santa Clara County requesting a restraining order against Diego MasMarques, Jr. due to a credible threat of violence.  A series of interim Temporary Restraining Orders was granted by the court over the next year and a half restraining Mr. MasMarques until August 30, 2019, when Judge Carol Overton signed Form CH-130: Civil Harassment Restraining Order After Hearing.  This "permanent" restraining order was put in effect through 11:59 P.M. on August 30, 2021.

163.    Upon information and belief, on September 24, 2019, when Defendant Qazi posted the screenshot image of the Twitter abuse report receipt that had led to Plaintiff's personal Twitter account being locked in error on account of mentioning Diego MasMarques, Jr.'s name, the sender of that image was in fact Diego MasMarques, Jr.

164.    Up until that point, Diego MasMarques, Jr. had previously been active on Twitter using a variety of fake accounts to disparage Plaintiff.

165.     To the extent that Defendants Qazi and Smick Enterprises, Inc. repeated false information in public about Plaintiff at the behest of Diego MasMarques, Jr., who was at all points from January 2019 onward a restrained party in the aforementioned civil harassment case, Defendants Omar Qazi and Smick Enterprises, Inc. intentionally assisted Diego MasMarques, Jr. with the violation of an active court order, which prohibited harassment of Plaintiff.

166.     Plaintiff respectfully seeks a declaratory judgment proclaiming Defendant Qazi in contempt of court.

**COUNT V**
**Copyright Infringement (17 U.S.C. § 501, *et seq.*)**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

167.     Plaintiff incorporates by reference the foregoing allegations.

168.     On at least a dozen separate occasions, Defendant Qazi downloaded and/or republished a copyrighted photograph of Plaintiff wearing a purple shirt (the "Purple Shirt Photograph") from the "About" page of Plaintiff's personal website at http://www.aarongreenspan.com for the express purpose of libeling, harassing and ridiculing Plaintiff, well outside the bounds of fair use.  Plaintiff owns the copyright to the Purple Shirt Photograph.

169.     Plaintiff's personal website had and has a clear copyright notice at the bottom of every page.

170.     Defendant Qazi also obtained a photograph of Plaintiff's father from the "About" page of Plaintiff's father's personal website at http://www.neilgreenspan.com, for the express unlawful purpose of impersonating Plaintiff's father.  Plaintiff took the photograph in question and owns the copyright to that photograph.

171.   Plaintiff's father's website had and has a clear copyright notice at the bottom of every page.

172.   Defendant Qazi first published the Purple Shirt Photograph on or around October 8, 2019 on his @tesla_truth Twitter account, adjacent to various false statements and baseless accusations concerning Plaintiff as part of his ceaseless campaign of harassment and libel.

173.   On October 10, 2019, Plaintiff sent a Digital Millennium Copyright Act ("DMCA") takedown notice concerning the image to Twitter.  Twitter complied with the request and the image was removed.

174.   On October 10, 2019, Defendant Qazi pledged, in all capital letters, "I WILL CONTEST.  My full statement by 9 pacific time tomorrow!  Tune in bright and early to Tesla Twitter tomorrow morning for a show you won't want to miss!"

175.   On October 11, 2019 at 2:17 A.M., Defendant Qazi re-posted the copyrighted Purple Shirt Photograph with the caption, "he doesn't want people to see how stupid he looks even though he already put the picture online."

176.   Each time Twitter removed the image in response to Plaintiff's DMCA takedown requests, Defendant Qazi reposted it either in his Twitter feed, or as an enlarged background banner image at the top of his @tesla_truth account.

177.   In all, Plaintiff sent seven DMCA takedown notices to Twitter concerning Defendant Qazi's behavior:

| Date | Twitter DMCA Request | Infringing Omar Qazi Account | Copyrighted Image(s) |
|---|---|---|---|
| October 10, 2019 | 0128820272 | @tesla_truth | Purple Shirt Photograph |
| October 10, 2019 | 0128821585 | @greenspan_neil | Photograph of Neil Greenspan |
| October 11, 2019 | 0128859664 | @tesla_truth | FaceCash Website |
| October 11, 2019 | 0128861040 | @tesla_truth | Purple Shirt Photograph |
| October 11, 2019 | 0128886103 | @tesla_truth | Purple Shirt Photograph |

| | | | and FaceCash Website |
|---|---|---|---|
| October 17, 2019 | 0129465039 | @tesla_truth | Purple Shirt Photograph |
| October 17, 2019 | 0129466543 | @plainshite | PlainSite Logo |

178.    Defendant Qazi did not file a DMCA counter-notice in response to any of the above requests.

179.    On October 22, 2019, Defendant Qazi complained on his personal Twitter account that he had received yet another Digital Millennium Copyright Act ("DMCA") takedown notice concerning the Purple Shirt Photograph, which had been removed by Twitter before he reposted it again only hours later.

180.    On or around October 24, 2019, Twitter banned Defendant Qazi for life from its platform due to his repeat legal violations, including his repeated, willful infringement of Plaintiff's copyright.  The ban went into effect immediately.

181.    Blocked from violating copyright law on Twitter, Defendant Qazi instead posted copyrighted material on his Smick Sites.  Plaintiff's October 15, 2019 DMCA takedown request to Amazon Web Services LLC resulted in Defendant Smick Enterprises, Inc. being terminated as a client by Amazon as well.

182.    Defendant Qazi's rapid re-posting of material he knew to be copyrighted and his October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate that his actions were both willful and not fair use.

183.    Plaintiff suffered irreparable damage to his business reputation and goodwill as a result of Defendant Qazi's repeated infringements.  Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), which should be enhanced in accordance with 17 U.S.C. § 504(c)(2) due to Defendant Qazi's willful conduct.

**COUNT VI**

**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

184.    Plaintiff incorporates by reference the foregoing allegations.

185.    Defendants engaged in unlawful, unfair, and fraudulent acts and practices

committed pursuant to business activity, namely, the promotion of Defendant Tesla's stock and

products in order to financially profit from capital gains and/or referral commissions.  Defendant

Smick Enterprises, Inc. violated California Revenue and Taxation Code § 23151 by failing to

ever register with the California Franchise Tax Board or Secretary of State despite doing

business in California as a Delaware corporation.

186.    Defendant Qazi was aware of the need to register his business with the California

Franchise Tax Board at least as early as April 10, 2018, when he posted on the website Hacker

News as user "omarforgotpwd":

> "Remember that California minumum *[sic]* tax for an LLC is $800. EVERY YEAR…  If
> you really do need to legally form a company to separate out finances and liability,
> depending on what you're doing, you might want to look at starting a Delaware C
> corporation."

This statement garnered the following reply from another user on the same day:

> "You do realize if you do business in CA you have to pay CA taxes, right? You're
> mentioning Delaware but that would be for corporations and dispute management.
> You're not going to get away from taxes..."

*See* https://news.ycombinator.com/item?id=16806444.

187.    The aforementioned actions taken by Defendants Qazi and Smick Enterprises,

Inc. also violated, at minimum, California Penal Code §§ 166(a)(4), 166(a)(7), 422.4, 653m(b),

and 528.5.  Specifically,

a) California Penal Code § 166(a)(4) stipulates:

> "Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the
> following contempts of court is guilty of a misdemeanor: Willful disobedience of the

terms as written of any process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial."

Upon information and belief, Defendant Qazi knowingly assisted Diego MasMarques, Jr. with the violation of an active court order.

b) California Penal Code § 166(a)(7) stipulates:

"Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor: The publication of a false or grossly inaccurate report of the proceedings of a court."

Defendant Qazi knowingly altered and rendered grossly inaccurate a form issued by the Judicial Council of California that was used in court.

c) California Penal Code § 422.4 states in part:

"Any person who publishes information describing or depicting an academic researcher or his or her immediate family member, or the location or locations where an academic researcher or an immediate family member of an academic researcher may be found, with the intent that another person imminently use the information to commit a crime involving violence or a threat of violence against an academic researcher or his or her immediate family member, and the information is likely to produce the imminent commission of such a crime, is guilty of a misdemeanor, punishable by imprisonment in a county jail for not more than one year, a fine of not more than one thousand dollars ($1,000), or by both a fine and imprisonment."

Defendant Qazi published Plaintiff's father's home address as part of a libelous diatribe intended to harm Plaintiff and his family. Plaintiff's father is a medical researcher at an academic institution.

d) California Penal Code § 653m(b) states:

"Every person who, with intent to annoy or harass, makes repeated telephone calls or makes repeated contact by means of an electronic communication device, or makes any combination of calls or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith or during the ordinary course and scope of business."

Defendant Qazi admitted to making the prank call to Plaintiff on January 15, 2019, which was intended to annoy and harass, aside from his other harassing conduct using electronic communication devices.

e) California Penal Code § 528.5 states in part:

"Notwithstanding any other provision of law, any person who knowingly and without consent credibly impersonates another actual person through or on an Internet Web site or by other electronic means for purposes of harming, intimidating, threatening, or defrauding another person is guilty of a public offense punishable pursuant to subdivision (d)."

Defendant Qazi impersonated both Dr. Neil S. Greenspan and Simon Greenspan, Plaintiff's family members, as well as Plaintiff's business.

188.    Defendants engaged in unlawful, unfair, and fraudulent acts and practices by making widely publicized libelous statements to discredit Plaintiff's objective research concerning Defendants Tesla and Musk.

189.    Plaintiff's injuries are in amounts to be determined at trial.

## COUNT VII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Musk and Tesla

190.    Plaintiff incorporates by reference the foregoing allegations.

191.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

  a)  defendants made public misrepresentations or failed to disclose material facts;

  b)  the omissions and misrepresentations were material;

  c)  TSLA securities were and are traded in efficient markets;

  d)  TSLA shares were and are liquid and trade with moderate to heavy volume, with an average volume of 18 million shares traded daily;

  e)  Defendant Tesla traded and trades on the NASDAQ, and was and is covered by multiple analysts;

  f)  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of TSLA securities; and

g)  Plaintiff purchased and/or sold TSLA securities between the time the

defendants failed to disclose or misrepresented material facts and the time the

true facts were disclosed, to the extent they have been, without knowledge of

the omitted or misrepresented facts.

192.    In its roughly seventeen years of existence, Defendant Tesla has never turned an

annual profit.  Instead, the company has subsisted on roughly $19 billion of investor capital, and

it continues to require billions of dollars of outside capital to survive.

193.    Defendant Tesla's constant need for outside investor cash has created a clear

incentive for Defendant Musk, as the company's CEO, to defraud the market and silence critics

through any means necessary in the hope that outside investors might believe his

misrepresentations and continue to fund the company's chronically unprofitable existence.

194.    In a dynamic that has repeated itself numerous times, on November 16, 2018,

Defendant Musk admitted to *Axios* that Defendant Tesla had been "within single-digit weeks" of

bankruptcy, and "[e]ssentially the company was bleeding money like crazy," a statement that

remains true as of the date of this Complaint.

195.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tesla who knew that those statements were false when made.

196.     Defendant Musk signs quarterly SEC Forms 10-Q and 10-K financial statements issued by Defendant Tesla.  These SEC Forms 10-Q and 10-K contain certifications pursuant to the Sarbanes–Oxley Act of 2002, stating that the financial information contained therein is accurate and discloses any material changes to Defendant Tesla's internal control over financial reporting.

197.     Despite these legal safeguards, Defendants Tesla and Musk have repeatedly misled investors about Tesla's cash position in its SEC Form 10-Q and 10-K filings by:

    a)  drawing down credit lines on or around the last day of the quarter to artificially inflate cash balances;

    b)  failing to distinguish between cash accessible for use in the United States of America and cash restricted for use only within the People's Republic of China, subject to strict loan agreements with the Chinese government;

    c)  refusing to pay vendors on-time, as evidenced by numerous vendor lawsuits. *See* https://www.plainsite.org/tags/tesla-vendor-nonpayment/;

    d)  stealing cash from its customers' credit cards and/or bank accounts via its Tesla mobile app, which intentionally allows for accidental one-tap purchases of extremely expensive software add-ons, such as "Full Self Driving" for approximately $4,000.  Once purchased, Tesla typically refuses to refund these large amounts, but recognizes the funds as revenue and cash on hand.

COMPLAINT                                                          49

This dynamic was described by Nassim Nicholas Taleb in a January 15, 2020 Twitter post: "The purchase was non-intentional. I unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with confirmation/password or something of the sort." *See* https://twitter.com/nntaleb/status/1217471369350348807. Although Taleb, who is famous, reportedly received a refund eventually, most less-famous Tesla customers never did.  Twitter user @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us."  Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund."  *See* https://twitter.com/Maykou1st/status/1248833418827194369.  At least one other similar public request was deleted as a condition of receiving a refund;

e)  refusing to discuss the cash balance on any day but the final day of the quarter.  On April 29, 2020, Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Zachary Kirkhorn about the present-day cash balance at the time, not the cash balance as of March 31, 2020.  Kirkhorn declined to answer the question; Jonas did not press him for an answer.  Specifically, Kirkhorn stated, "Yeah.  It's a fair question.  I don't have any additional color to provide.  So $8.1 billion in cash and cash equivalents at the end of Q1, we're managing it very closely."  The statement that, "I don't have any additional

color" was false given that as CFO he had full access to Defendant Tesla's financials.

198.    Defendants Tesla and Musk have repeatedly misled investors about Tesla's sales in its SEC Form 10-Q and 10-K filings by omitting material disclosures.

a)  Tesla does not report sales at all.  Instead, Tesla has reported "deliveries," an undefined, proprietary, non-GAAP term that the market has misinterpreted as equivalent to sales, with Defendants Tesla and Musk encouraging that misinterpretation.  "Deliveries" and sales are not the same.  Defendants Musk and Tesla refuse to specify with any degree of precision what "deliveries" actually are, whether the figures include sales to Tesla's own subsidiaries worldwide, and whether payment of any kind is required for a "delivery" to take place.  The only meaningless hint contained in Tesla's quarterly press releases concerning delivery numbers is the statement, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," though the customer could be a Tesla subsidiary with paperwork correctly reflecting a vehicle purchase for $0.01.  This statement was contained in the press release, which only reported *consolidated* deliveries by model *group*, issued by Defendant Tesla on April 2, 2020.  *See* https://ir.tesla.com/news-releases/news-release-details/tesla-q1-2020-vehicle-production-deliveries.  In early 2020, Plaintiff repeatedly pressed Defendant Musk and the Tesla Board of Directors to define the term "delivery," without success.  *See* Exhibit J;

b)  An analysis by Plaintiff using vehicle registration data from state Departments of Motor Vehicles and international sources suggests that Defendant Tesla has

overstated "deliveries" relative to actual vehicle registrations by roughly 100,000 total vehicles since Q3 2018.  Plaintiff notified the Tesla Board of Directors, including Defendant Musk; Tesla's auditors at PriceWaterhouseCoopers; the SEC; the Federal Trade Commission; and the Public Company Accounting Oversight Board of these findings, and received no substantive response.  *See* Exhibit K;

c) Tesla sells used and demo cars as "new."  This practice has led to litigation from former employees and customers alike.  In a 2018 lawsuit initially filed in the Burlington County, New Jersey Superior Court, former Tesla employee Adam Williams alleged that he had been fired after reporting illegal sales practices to management, including "failing to disclose to consumers high-dollar, pre-delivery damage repairs" and "receiving vehicles designated as 'lemons' and, with this knowledge, reselling these vehicles without branding the titles of these vehicles or offering disclosure, rather than representing the cars as "used" or a "demo/loaner."  In *Woods et al v. Tesla, Inc.*, Plaintiffs sued over a defective Tesla Model S with over 8,000 miles on the odometer that they had bought as a "new" vehicle because it was a demo unit;

d) Tesla sells cars in bulk as part of "fleet sales" to used car vendors such as Carvana and/or CarMax.  CarMax spontaneously stopped selling used Tesla vehicles in or around October 2019.  Former Tesla Finance LLC CEO Leopold Visser, who was also an executive associated with Defendant Tesla's subsidiaries Tesla Insurance, Inc. and TALT Holdings LLC, left Defendant Tesla in early 2020 to work at Carvana as "Director, Special Projects."

Carvana only lists ten Tesla Model 3 vehicles on its web site, many of which are listed at *significantly* inflated prices that are likely useful for inflating Defendant Tesla's Residual Value Guarantee (RVG) calculations that factor into revenue and net income; and are in a locked, non-purchasable status until December 31 of the year 9999 despite not being marked as sold, according to Carvana's API.  For example, on May 14, 2020, Carvana vehicle ID 1430592, a Tesla Model 3, had a "vehicleUnlockDateTime" value of "9999-12-31T23:59:59.9999999Z" and a "lockType" value of "Purchase".

199.   Defendants Tesla and Musk has repeatedly misled investors about Tesla's true balance sheet in its SEC Form 10-Q and 10-K filings by maintaining a minimum balance of approximately $1 billion for its Accounts Receivable line item since Q3 2018, when it jumped from $570 million to $1.155 billion.  Given Tesla's business model, which involves cash payments up-front, this unusually high balance has attracted considerable notice from prominent investors such as David Einhorn, who has publicly questioned Defendant Musk about it twice without ever receiving a clear answer, and from business reporters with accounting degrees and experience, such as Francine McKenna.  *See* Exhibit L.

200.   Defendants Tesla and Musk have repeatedly misled investors about Tesla's gross margin and net income in its SEC Form 10-Q and 10-K filings by deliberately under-booking its warranty reserve for repairs to its vehicles.  Instead, Defendant Tesla has engaged in a scheme to record repairs as "goodwill" for years, thereby artificially inflating gross margin and net income. This scheme is apparent in approximately twenty lemon lawsuits filed by Tesla customers across the United States that include copies of vehicle service histories.  These documents consistently

note warranty repairs billed to "goodwill" that should be billed to the warranty reserve.  *See*

https://www.plainsite.org/tags/tesla-goodwill-service/.

201.  Defendants Tesla and Musk have consistently artificially inflated Tesla's stock price by:

a)  placing and/or encouraging others to place trades before and after standard market trading hours when trading volume is typically lighter, such that unusual bid and ask prices can easily manipulate share price in preparation for the market's opening the following day;

b)  covertly working with social media influencers, some anonymous or pseudonymous, including but not limited to Defendant Qazi; ex-CIA and ex-NSA "security" professionals at firms such as Redacted, Inc. and Nisos Group LLC; and convicted felons such as James Howard-Higgins, all to disseminate positive news stories, discredit or silence critics, and obtain "research" on whistleblowers regardless of veracity;

c)  working with and highly visible television personalities who regularly appear on financial media networks such as CNBC and Bloomberg Television, in order to push a false, overly rosy narrative about Tesla's future prospects. Past narratives have included wild, as-yet-unfulfilled promises about "robotaxis," the "Cybertruck" pickup truck, and new "gigafactories" in various locales.  Media personalities Ross Gerber of Gerber Kawasaki Wealth & Investment Management, Cathie Wood of ARK Investment Management LLC, and Jim Cramer of CNBC have all contributed to this coordinated effort,

often with the explicit approval and cooperation of Defendants Tesla and Musk;

d) incentivizing Wall Street sell-side analysts, such as Adam Jonas of Morgan Stanley (referred to in the New York Times as "The Tesla Cheerleader"), to constantly upgrade Tesla's price target, write analysis with optimistic spin (by, for example, using sky-high software company valuations when convenient, instead of more appropriate automotive company valuations), and avoid difficult questions on earnings calls, in exchange for lucrative deal fee revenue if and when their banks are selected for underwriting;

e) abusing confidentiality procedures in lawsuits, arbitration proceedings, regulatory proceedings and contracts with employees to keep unlawful acts and information crucial to public safety secret;

f) inappropriately recognizing revenue for pre-paid features that are still being developed, such as autonomous driving features that present a public safety hazard when not adequately tested before release or "beta" release;

g) presenting false and misleading financial statements to the SEC and investors, such that figures from one period do not even match the same period's figures reported as the "prior period" figures on the next financial statement;

h) lying to investors about potential future prospects such that there is always a supposedly transformative but ultimately delayed story to look forward to just around the corner. For example, on April 22, 2019, Defendant Musk promised that Defendant Tesla would deploy a robotaxi fleet of 1 million Tesla vehicles by the end of 2020. In his words,

> "I feel very confident predicting that there will be autonomous robotaxis from Tesla next year — not in all jurisdictions because we won't have regulatory approval everywhere. From our standpoint, if you fast forward a year, maybe a year and three months, but next year for sure, we'll have over a million robotaxis on the road."

On April 11, 2020, Defendant Musk reiterated this lie on Twitter, claiming, "Functionality still looking good for this year. Regulatory approval is the big unknown." *See* https://twitter.com/elonmusk/status/1249210220200550405. By that date, it was clear that COVID-19 would make this impossible.

202.     Defendants Tesla and Musk have omitted key material disclosures to investors, including:

    a)  disclosures concerning the amount of scrap or waste materials at Tesla's factories in Nevada and California, which have since been highlighted by whistleblowers and reportedly involve figures near or above $100 million;

    b)  disclosures concerning routine theft and storage of raw materials, sometimes involving lithium-ion batteries left in unrefrigerated trailers in the Nevada desert—issues also highlighted by whistleblowers and reportedly involving figures near or above $37 million;

    c)  disclosures concerning Defendant Tesla's illegal wiretapping of its employees' and contractors' personal devices using IMSI catchers (also known as Stingrays), which could result in enormous legal liability for the company;

    d)  disclosures concerning Defendants Tesla's and Musk's relationship with the brother and wife of deceased drug kingpin Pablo Escobar, as well as "Escobar, Inc.";

e)  disclosures concerning the import of "solar glass" roof tiles from Chinese manufacturers such as Changzhou Almaden Co. Ltd., which according to Department of Homeland Security Customs and Border Protection trade data has been a vendor of Defendant Tesla's for several years;

f)  disclosures concerning the actual purpose and usage of Defendant Tesla's Buffalo, New York factory given the company's reliance on Chinese goods;

g)  disclosures concerning dependence upon key partners such as Panasonic;

h)  disclosures concerning related-party transactions, and whether certain businesses run by former executives are or are not related parties;

i)  disclosures concerning Defendant Musk's health given his key role.

203.  Defendants Tesla and Musk have even misled investors by using a regulated earnings call to distract from other important disclosures.  On October 23, 2019, Defendant Musk used the Q3 2019 Tesla earnings call to bizarrely announce a subsequent announcement, even though he was already on the phone with investors at that very moment.  In his words,

> "And then, one—one last item is that uh, tomorrow afternoon, um, we will be uh, releasing, Version 3 of the Tesla Solar Roof. That's the integrated solar—with it—solar panels integrated with the roof. Um, so that's um—I think this is a great, a great product. Version 1 and 2 we were still sort of figuring things out.  Version 3, I think, is finally ready for, for the big time. Um, and so we're scaling up production of the Version 3, uh solar tower roof at our Buffalo Gigafactory.  And we—I think this product is going to be incredible.  But we'll talk more about that on the official product launch, which will be tomorrow afternoon."

The product did not, in fact, launch the next day.  Instead, Defendants Tesla and Musk moved the announcement again to the day after: Friday, October 25, 2019.  This announcement did not involve any live product demonstration or even video that would have necessitated the product being ready to demonstrate.

204.    On September 24, 2019, in Delaware Chancery Court Case No. 12711-VCS, Defendants Tesla and Musk proposed and moved for a deadline of October 24, 2019 for the publication of public versions of previously sealed and confidential documents concerning the acquisition of SolarCity.  The motion was quickly granted by that court.

205.    Upon information and belief, the solar roof product announcement was not made on the Q3 2019 earnings call, or at its intended time on October 24, 2019, because of a delay at the Delaware Chancery Court involving the clerk's required approval of court filings for public viewing, which took one extra day since the attorneys involved submitted the documents late in Delaware.  By ultimately announcing the new solar roof product after the earnings call and on October 25, 2019, Defendants Tesla and Musk hoped to minimize the press coverage devoted to their fraudulent conduct when news of the SolarCity liquidity crisis cover-up finally broke on the day after they had initially requested and planned for.

206.    For years, Defendant Tesla's Public Relations and Investor Relations teams have steadfastly refused to answer questions concerning any topics at all, whether posed by investors or respected journalists.

207.    Defendant Musk has stood to gain massively from Tesla's artificially inflated stock price thanks to an unprecedented executive compensation package potentially worth billions of dollars, based almost entirely around stock options that vest at pre-determined average market capitalizations when sustained for certain periods of time.  This executive compensation package is already the subject of litigation in the Delaware Chancery Court in the case of *Tornetta v. Elon Musk*, Case No. 2018-0408-JRS.

208.    Defendants Musk and Tesla disseminated, encouraged or approved the false statements and/or material omissions specified above, which they knew or recklessly disregarded

were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

209.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a) Employed devices, schemes, and artifices to defraud;

b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TSLA securities.

210.   Plaintiff has suffered damages in that, by defrauding the market, Defendants Tesla and Musk were able to keep the share price of Tesla common stock artificially inflated for a prolonged period of time, leading to losses on Tesla put options that expired worthless but otherwise would not have.  Plaintiff would not have purchased Tesla put options at the prices he did had been aware that the market price for Tesla stock would be artificially and falsely inflated by Defendants' false and misleading statements and/or actions.

**COUNT VIII**
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 For Market Manipulation Against All Defendants**

211.   Plaintiff incorporates by reference the foregoing allegations.

212.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that

drove the price of TSLA shares to artificially high levels beginning on October 23, 2019, when the stock traded at already-elevated $254.68, and continuing through the present day, when it trades at $815.55 (over 220% higher), having passed $917.42 (over 260% higher) at the peak of manipulation on February 19, 2020.

213.   Defendants' market manipulation caused Plaintiff's losses.

214.   At the time of Defendants' manipulation, Plaintiff was ignorant of Defendants' manipulative acts.

215.   Defendants had actual knowledge of the material facts alleged herein, and knowingly intended to deceive Plaintiff and all investors for the purpose of manipulating the price of Tesla securities.

216.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT IX**
**For Violation of Section 20(a) of the Exchange Act**
**Against Defendant Musk**

217.   Plaintiff incorporates by reference the foregoing allegations.

218.   Defendant Musk acted as a controlling person of Tesla within the meaning of Section 20(a) of the Exchange Act. By virtue of his position and his power to control public statements about Tesla, Defendant Musk had the power and ability to control the actions of Tesla and its employees.  By reason of such conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

219.   As an officer and director of a publicly owned company, Defendant Musk had a duty to disseminate accurate and truthful information with respect to Defendant Tesla's financial

condition and results of operations, and to correct promptly any public statements issued by Tesla which had become materially false or misleading.

220.    Because of his position of control and authority as a senior officer, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace concerning Tesla's financial prospects. Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of TSLA securities.

**COUNT X**
**For Injunctive Relief**
**Against All Defendants**

221.    Plaintiff incorporates by reference the foregoing allegations.

222.    Plaintiff respectfully requests an injunction requiring all Defendants to cease and desist making and/or publishing further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral, and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.  A declaratory judgment holding Defendant Qazi in contempt of court;

B.  A permanent injunction enjoining all Defendants from making further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral, and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff;

C. Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

D. Statutory damages, enhanced to a sum of not more than $150,000 per work infringed, for Defendant Qazi's willful infringement of copyrights pursuant to 17 U.S.C. § 504(c).

E. Punitive damages stemming from Defendants' ongoing and willful disregard for various state and federal laws;

F. Judgment against Defendants on all counts of the Complaint;

G. Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs, in accordance with 42 U.S.C. § 1988 and other applicable law;

H. Such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated: May 20, 2020

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## **CERTIFICATION**

I, Aaron Greenspan, hereby certify as follows:

1.      I have reviewed a complaint filed against Omar Qazi, Smick Enterprises, Inc., Elon Musk

and Tesla, Inc. ("Tesla") alleging violations of the federal securities laws, and generally

adopt its allegations without waiving the right to alter the allegations in a consolidated

and/or amended complaint;

2.      I did not transact in the securities of Tesla at the direction of counsel or in order to

participate in any private action under the federal securities laws;

3.      My transactions in Tesla securities are reflected in Exhibit M, attached hereto;

4.      I have not sought to serve as a lead plaintiff in any class action filed under the federal

securities laws during the last three years;


I declare under penalty of perjury, under the laws of the United States of America, that the

foregoing is true and correct this 20th day of May, 2020.


_Aaron Greenspan_
Aaron Greenspan