1
2
3
4

Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

5
6
7

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

8
9
10
11
12
13
14
15
16
17
18
19
20

AARON GREENSPAN,

    Plaintiff,

      v.

OMAR QAZI, SMICK ENTERPRISES, INC.,
ELON MUSK, and TESLA, INC.,

    Defendants.

Case No. 3:20-cv-03426-JD

**FIRST AMENDED COMPLAINT FOR:**

1.  Libel Per Se
2.  Intentional Infliction of Emotional Distress
3.  Copyright Infringement
4.  Violation of the DMCA (Copyright Management Information Removal)
5.  Violation of the UCL, Business & Professions Code § 17200
6.  Violation of Federal Securities Laws
7.  Injunctive Relief

DEMAND FOR JURY TRIAL

21

    Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

22

## INTRODUCTION

23
24
25

    1.     This is a case about whether or not the wealthiest members of society should be permitted to lie with impunity, and the means they sometimes use to silence those who justifiably question them.

26
27

    2.     Defendant Elon Musk is the billionaire CEO of Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy products.  He has attracted a cult

28

---

following, both among his customer base and on the Twitter social network, where Defendant

Musk has in excess of 30 million followers.



3.      Defendant Tesla has never earned an annual profit, nor has any company run by

Defendant Musk ever earned an annual profit while he was in charge.

4.      Defendant Tesla can be fairly described as a Ponzi scheme that just happens to

produce cars, where new investors cash out old investors while executives, and especially

Defendant Musk, are rewarded ever more handsomely through stock-based compensation as the

company loses ever more money.  This perverse dynamic is why Tesla has often been the most-

shorted stock in the United States.

5.      In 2018, the United States Securities and Exchange Commission ("SEC") charged

Defendant Musk with securities fraud.  On September 28, 2018, Defendant Musk signed a

binding Consent Decree in *United States Securities and Exchange Commission v. Elon Musk*,

Southern District of New York Case No. 1:18-cv-08865-AJN.  On April 26, 2019, Defendant

Musk signed an Amended Consent Decree in the same case.  Both Consent Decrees regulate his

use of social media and all of his corporate communications.  Defendant Musk also paid a $20 million fine to the SEC, separate and apart from a $20 million fine paid by Defendant Tesla.

6.    Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick"), has served as a ferocious on-line propagandist for Defendants Tesla and Musk.  Defendant Qazi is a Tesla shareholder and customer.  Defendant Qazi has also been arrested at least twice for criminal violations of law.  His antics over a period of years have been so overly aggressive that Qazi himself attracted a following of tens of thousands of Musk's supporters, and a considerable following of detractors, before he was banned from and by Twitter for life.

7.    According to the SEC Office of Investor Education and Advocacy's Investor Alert on Social Media and Investing, "false claims could be made on social media such as Facebook and Twitter" to effect "pump-and-dump" schemes through "false and misleading statements to the marketplace."  Indeed, social media has been instrumental to the unprecedented artificial elevation of Tesla's stock price, which has yielded a market capitalization for the company of over $220 billion: more than three times the worth of Enron at its peak.

8.    Defendants Qazi and Musk have at times worked as a tag team, hurling accusations and falsehoods concerning Plaintiff, among other topics, to Defendant Musk's approximately 30 million followers in an attempt to discredit Plaintiff's in-depth research on Defendants Tesla and Musk.

9.    Even after being formally banned from and by Twitter, Defendant Qazi returned to Twitter anyway under the guise of a new shared account for a Tesla-focused podcast, until his further provocations triggered a backlash in the same community that had previously been so supportive of his at-times-criminal harassment.  After that, he resurfaced on even more accounts.

10.    Defendants Qazi's and Smick Enterprises, Inc.'s actions on behalf of Defendants Musk and Tesla are part of an overt pattern of Elon Musk smearing, harassing, and willfully defaming his critics based on any information at all, however obviously false or unreliable.  Each

Defendant has routinely displayed a reckless and often proud disregard for the truth, in service of one of the largest securities frauds in American history.

## PARTIES

11.     Plaintiff Aaron Greenspan is an individual residing in San Francisco County in the State of California, in this district.  Plaintiff is not a public figure.

12.     Defendant Omar Qazi is an individual residing in San Francisco County in the State of California and doing business in Santa Clara and San Francisco Counties in the State of California, in this district.  Defendant Qazi purports to have an office on Market Street in San Francisco, California, in this district.

13.     Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the California Secretary of State or Franchise Tax Board, but nevertheless operating in Santa Clara and San Francisco Counties in the State of California, in this district.

14.     Defendant Elon Musk is an individual residing in Los Angeles County in the State of California.  Defendant Musk is a public figure whose activities make national news on a near-daily basis.  Defendant Musk works in Santa Clara and Alameda Counties, in this district.

15.     Defendant Tesla, Inc. is a corporation based in Santa Clara County in the State of California, in this district.  Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the state law claims that are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

18.     The securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19.     Personal jurisdiction and venue are proper because at least one defendant is a corporation headquartered in this district and/or because the improper conduct alleged herein occurred in, was directed from, and/or emanated or exported from California.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## FACTUAL BACKGROUND

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

20.     Plaintiff is an investor who has held short positions in Tesla, Inc. common stock via put options, among other investments.

21.     Plaintiff is also a data journalist who runs a legal information service called PlainSite (https://www.plainsite.org).  PlainSite hosts over 16 million court dockets and other government documents and contains profiles for over 6 million legal entities, one of which happens to be Defendant Tesla.  PlainSite handles privacy requests on a case-by-case basis.  Consequently, Plaintiff has come into contact with a wide variety of individuals who are occasionally upset that their information is in the public domain.

22.     One such individual, Diego MasMarques, Jr., who was convicted of murder and attempted murder in Spain and charged with a number of other crimes in the United States, escalated his displeasure over the fact that his convictions were public to the point where Plaintiff applied for and was later granted a "permanent" two-year restraining order against him. *See* Santa Clara County Superior Court Case No. 18CH008067, *Greenspan v. MasMarques*.

23.     Plaintiff is Jewish and comes from a Jewish family.

24.     On October 27, 2018, a shooter at the Tree of Life synagogue in Pittsburgh, Pennsylvania killed eleven Jewish congregants and wounded six.

25.     On various websites, Mr. MasMarques, who has a documented history of mental illness, posted thousands of libelous diatribes falsely alleging that Plaintiff and his family members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to hacking his e-mail account.  He and/or someone his posts inspired also posted the name of Plaintiff's parents' synagogue in Cleveland, Ohio, as well as the

name of their former synagogue, Plaintiff's home address, Plaintiff's parents' address, a photograph of Plaintiff's parents' house, Plaintiff's family's telephone numbers, as well as contact information for people Plaintiff knows in San Francisco.  Other posts included fabricated images of Plaintiff and his family members wearing swastikas and pasted onto pornographic content.  Mr. MasMarques now faces additional criminal charges in Marlborough District Court in Massachusetts on account of his harassing conduct in violation of the various temporary and permanent restraining orders issued in the Santa Clara County Superior Court case.

26.    All of Mr. MasMarques's false and libelous posts, as well as those he inspired, greatly concerned Plaintiff, but especially those involving his family's synagogue affiliations.

27.    On or about January 14, 2019, apparently disturbed by the allegations against Defendant Tesla surfacing in various court documents posted on PlainSite, a pseudonymous Twitter account, "@tesla_truth" (posing as "Steve Jobs") began re-posting and linking to some of the false and dangerous allegations that were the subject of the (then temporary, later permanent) restraining order, while making additional false allegations of its own.

28.    The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

29.    An immediate attempt via Twitter Direct Message ("DM") to discuss the seriousness of the matter, and especially the associated safety concerns, with the owner of the @tesla_truth account was not fruitful.  Plaintiff wrote:

"Hi.  What you're writing is libelous and totally untrue.  Diego MasMarques is the subject of pending criminal charges for what he wrote, as well as the restraining order case in California that you admit you have not fully researched.  You are repeating his lies.  Please stop."

30.    The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," referring to short sellers, repeating a talking point favored by Defendant Musk.

31.    Plaintiff then specified the most objectionable content by saving it to a PDF file hosted on his personal website and sending a link to the @tesla_truth account owner.  When the

recipient of this message (the owner of the @tesla_truth account) clicked on the link to the PDF containing the objectionable content, PlainSite's server logs yielded the DNS hostname and IP address of the account owner: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively. Given the urgent potential safety ramifications of this account's misconduct, Plaintiff took the exceptional step of using this information to search PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "Smick Enterprises, Inc.," a company run by Omar Qazi, then of Torrance, California.

32.     Plaintiff took the further exceptional step of publicizing this information, while partially redacting Defendant Qazi's DNS hostname, to warn others of the danger he posed.

33.     Defendant Qazi later admitted to using the @tesla_truth Twitter account.

34.     The same day, still concerned about the danger posed to his family and others at the synagogues mentioned in the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him. Plaintiff then asked the receptionist to speak with a supervisor in Defendant Qazi's department. Plaintiff informed an unknown female employee that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous.

35.     At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually his father's company where Defendant Qazi appears to hold a vanity title. Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called. Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately, regardless of his affection for Tesla.

### *Omar Qazi Steps Up His Campaign of Criminal Harassment*

36.     The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number. The caller, who did not specify his name, was a man impersonating a service technician who initially only said he was calling from "the phone company." The anonymous caller then tried to ascertain Plaintiff's home address. Since the caller refused to identify "the phone

company" he worked for, and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information.  Defendant Qazi later admitted to placing this harassing phone call in a private conversation that was eventually forwarded to Plaintiff months later.

37.     The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually suspended by Twitter for violating its terms of service.  It was permitted to continue operating by renaming itself to "Steve Jobs *[sic]* Ghost" and clarifying its role as a so-called "parody" account, even though the account's primary purpose was promoting Defendant Tesla.

38.     Defendant Qazi explicitly confirmed that his primary goal was to promote Tesla stock by posting, "this is why we do it" above a screenshot of a comment that thanked him for his "funny, informative, thought provoking, & aggressive tweets against Tesla F[ear ]U[ncertainty and ]D[oubt] [that] inspired me to purchase Tesla shares in April & May of 2019." *See* https://mast.wholemars.com/@stevejobs/104185322548795470.

39.     In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and his relationship with Diego MasMarques, Jr.  Such posts continued through late October 2019 and inspired harassment from others.

40.     On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff accurately reported on a public video posted by Defendant Qazi on the @tesla_truth Twitter account purporting to advertise the features of Tesla's so-called "Autopilot" functionality, which requires that drivers keep their hands on the steering wheel.  The video depicted Defendant Qazi driving through a red light on Autopilot without his hands on the steering wheel.

41.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net, representing an internet-connected device in or around Rancho Palos Verdes, California, accessed documents from Plaintiff's restraining order case, Case No. 18CH008067 in Santa Clara County Superior Court, hosted on PlainSite.

42.     Defendant Qazi's parents live 0.1 miles from Rancho Palos Verdes, California.

---

43.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's aforementioned restraining order case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child).  The portion of the altered court document image posted also contained Plaintiff's phone number and fax number.  Defendant Qazi posted the altered image alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them.  Should've known they would fight back."

44.     On August 3, 2019 at 8:16 A.M., the @tesla_truth Twitter account posted, "Aaron, I know you read my Twitter feed so back off. You're a douchebag, a failure, and a bully. Take a hard look at what your life has become. Going after Musk, Zuck, and myself rather than taking care of your own problems[.] If you want to fight let's do it man to man. Fist fight."

45.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:



46.    These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer.

47.    Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047.  This anonymous fax purported to be from "Kids R Us" with a fake fax number of "2126644444" and the cover page message, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.

48.    Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

49.    A similar anonymous fax from the same unknown fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat aimed at Mr. Huettner.  *See* https://twitter.com/Paul_M_Huettner/status/1075415917809541121.  The fax cover page in that instance purported to be from "Elon Musk" with a message of, "Paul, Would you prefer to go first or would you prefer your family go first."

50.    Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation ("FBI").

51.    In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with concerns about Defendant Tesla's relationship with Defendant Qazi.  *See* Exhibit A.  Plaintiff did not receive any response to this message from Defendant Musk or any Tesla Director or representative.

52.    On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

1    *See* Exhibit B.

2       53.      Defendant Qazi did not explicitly admit to sending the fax to Plaintiff, and at one

3 point authored a series of posts explaining that he had been on an airplane at the time the fax to

4 Paul Huettner was sent, supposedly making it impossible for him to be the sender.  He also

5 claimed not to own a fax machine, even though the transmissions were likely sent via an

6 internet-based fax service.  Defendant Qazi deleted the thread shortly after it was posted.

7       54.      In a private Twitter DM conversation with a third party from September 27, 2019

8 forwarded to Plaintiff, Defendant Qazi admitted, "[I] take responsibility for what my followers

9 do too and [I] take it seriously."

10       55.      On August 8, 2019 at 11:13 P.M., Defendant Musk responded to Plaintiff's e-

11 mailed, on-the-record questions with a screenshot of false information stemming from libelous

12 posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

13       56.      On September 19, 2019, Plaintiff's non-profit organization, Think Computer

14 Foundation, intervened in Delaware Chancery Court Case No. 12711-VCS, *In Re Tesla Motors,*

15 *Inc*. *Stockholder Litigation* (the "SolarCity Case"), pursuant to Chancery Local Rule 5.1(f),

16 which permits any member of the public to challenge the designation of confidential material on

17 file with the court.

18       57.      The SolarCity Case involved allegations that Defendant Musk had defrauded

19 investors by bailing out his cousins, who formerly ran SolarCity, and his own self-described

20 "pyramid" of companies, while disguising the transaction as a legitimate merger.

21       58.      Defendant Musk, Defendant Tesla and Space Exploration Technologies

22 Corporation ("SpaceX") were all extremely sensitive about the contents of the documents

23 Plaintiff's non-profit organization sought to publicly disclose, having designated most of them as

24 confidential or under seal.

25       59.      From early August through October 2019, but especially after Plaintiff's non-

26 profit organization intervened in the SolarCity Case, on a nearly daily basis, the @tesla_truth

27 account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff,

28

Plaintiff's family members, and Plaintiff's non-profit organization. These harassing statements were read by a wide audience of at least 10,000-20,000 Twitter followers. Many of these statements were published specifically to promote Defendant Tesla's stock, its products, and its CEO, Defendant Musk—all while using Tesla's registered trademark—by making Tesla appear to be the one and only legitimate automotive brand, while cutting down all others.

60.   Defendant Qazi's scorched-earth *modus operandi* is evident from a series of posts from September 17, 2019, in which he lashed out at Edmunds.com, Inc., a popular resource for information about cars. When the @edmunds Twitter account simply blocked him, Defendant Qazi's public response, far beyond mere dissatisfaction, was as follows:

> "You think this is going to stop me @edmunds ???
>
> I'm only going to troll you harder now"
>
> "troll Edmunds for me! Sign up for notifications on their posts and troll the shit out of them until they apologize to the Tesla community
>
> we won't stand for people insulting us and lying to the public to prop up this *[sic]* own corporate interests. Destroy Edmunds 'impartial' brand"
>
> "people seriously think Edmunds is impartial. I did, which is why i was so surprised to see their hateful tweets against Tesla owners. People need to know Edmunds is in the pocket of dealers.
>
> They will lie to you and screw your *[sic]* over to protect their business."

61.   Defendants Musk and Qazi frequently interacted on Twitter through a variety of accounts. Defendant Qazi also photographed himself appearing at exclusive, invite-only events where Defendant Musk presented new Tesla products.

62.   On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

63.   On the morning of October 9, 2019, an article in Bloomberg by Zachary Mider entitled, "Tesla's Autopilot Could Save the Lives of Millions, But It Will Kill Some People First" was published referring to Defendant Musk, profiling Defendant Qazi, and stating:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi] the same day. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack *[sic]* you with a baseball bat.' Musk cc'd me on the message. Tesla also declined to comment."

The article, which contained a photograph of Defendant Qazi next to his Tesla Model 3, also stated that Defendant Qazi has been given early access to Tesla software features.  *See* Exhibit C.

64.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though he misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to a "Jim" who had written on or provided input for the @tesla_truth account in January 2019.  *See* Exhibit D.

65.     On October 9, 2019 at 3:09 P.M., the @tesla_truth Twitter account posted:

> "All Aaron Greenspan had to do was shut up and I would have forgotten all about that clown.
>
> Now i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is
>
> After he dies I'll keep telling people he sucked"

66.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, the then-general counsels of Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider.  *See* Exhibit E.

67.     Fourteen minutes later, on October 9, 2019 at 3:48 P.M., Defendant Qazi replied by e-mail to all parties with the message, "Lol," internet slang for "laughing out loud."

68.     Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant Qazi's response, with two laugh/crying emojis.  Neither of these responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were

accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter actively under review on the date of transmission.  *See* Exhibit F.

69.    Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

70.    At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely suggesting that Plaintiff resided in a "psych ward."

71.    At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

72.    Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plainitff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

73.    Plaintiff received unwanted telephone calls, e-mails and messages as a result of Defendant Qazi's actions.  In addition, at least several dozen libelous messages were posted publicly about Plaintiff and Plaintiff's family members.

### *Omar Qazi Targets Plaintiff's Family for Further Harassment*

74.    The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan, using a photograph of Dr. Greenspan to which Plaintiff owns the copyright.  The Twitter account's handle, deliberately designed to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account.

75.     Dr. Greenspan is a professor of pathology and an academic researcher at Case Western Reserve University and Director of the Histocompatibility and Immunogenetics Laboratory at University Hospitals Cleveland Medical Center in Cleveland, Ohio.  Accordingly, he qualifies as an "academic researcher" for the purposes of California Penal Code Sections 422.4 and 602.12.  As his son, Plaintiff qualifies as his "immediate family" under these sections.

76.     Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps to receive all e-mails addressed to smick.com, whether or not a corresponding e-mail account existed, including e-mails connected to numerous fake accounts on social media sites such as Twitter.

77.     Defendant Smick Enterprises, Inc. uses the domain name smick.com.

78.     On Monday, October 10, 2019 at approximately 9:51 P.M., Plaintiff filed a Digital Millennium Copyright Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph being used by Mr. Qazi to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph of Plaintiff's father from the account.  Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled brother (again, used without permission from the copyright owner, the *Toledo Blade*), and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.

79.     On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan."  In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a parody or actually his brother?" Defendant Qazi wrote from the fake "Simon Greenspan" account, "yeah I'm his little brother haha."

80.     Plaintiff's brother is not active on Twitter and never has been.

81.     On October 11, 2019, Defendant Qazi created websites using servers owned or leased by his company, Defendant Smick Enterprises, Inc., at http://www.plainshit.com, http://www.plainshit.org, and http://www.plainsiite.org (the "Smick Sites") containing copyrighted photographs of Plaintiff, Plaintiff's father, Plaintiff's brother, and Plaintiff's mother,

with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT." The sites (all with identical content) continued:

> "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil Greenspan or Judy Greenspan? You are not alone.
>
> The law offices of Lantham *[sic]* & Watkins are collecting testimonies regarding the fraudulent 501(c)(3) non-profit Think Foundation's activities, and the conduct of board members Aaron Greenspan, Neil Greenspan and Judith Greenspan. Please add your contact information to the form below and one of our staff will contact you shortly. Thank you for speaking out.
>
> 56 people have submitted verified testimonies"

82.    This statement contained numerous false allegations: that Plaintiff's non-profit organization was a "fraudulent charity;" that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals; that Defendant Qazi had engaged the law firm of Latham & Watkins, and that "56 people" had submitted "verified testimonies" to the site(s).

83.    Viewing the website's source code revealed a hidden HTML comment that stated, "<!-- fuck you aaron -->", referring to Plaintiff.

84.    Plaintiff contacted Latham & Watkins by e-mail to inform the firm that its name was likely being misused, and heard back from Matthew K. Roskoski, Deputy General Counsel, who promised to look into the matter.

### *Tesla's CEO Weighs In With False Statements Of His Own*

85.    On Saturday, October 12, 2019, alongside numerous false allegations made via his @tesla_truth account, Defendant Qazi posted a link to a pseudonymously authored article on the website Medium entitled, "NonProfit PlainSite Attacks People Online" by "Random Tesla Fan." The first line of the article was, "There is a guy by the name of Aaron Greenspan who hates Tesla very much," directly referring to Plaintiff. The next paragraph began, "PlainSite is a joint venture with Think Computer Corporation and Think Computer Foundation (same thing) which is a 501(c)3 nonprofit organization in the United States." The article contained Plaintiff's parents' home address, as well as a section entitled "How To Fight Back" encouraging readers to

send a completed IRS Form 13909, "Tax-Exempt Organization Complaint (Referral)," to the IRS in order to report Plaintiff's supposed "criminal" wrongdoing.

86.     In fact, Think Computer Corporation and Think Computer Foundation, both run by Plaintiff, are not the "same thing," and are separately incorporated legal entities with different tax treatment, different Employer Identification Numbers, different bank accounts, different accounting ledgers, and different purposes.

87.     On account of false IRS Form 13909 complaints already filed by Diego MasMarques, Jr., the IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020, finding that, "Your organization continues to qualify for exemption from federal income tax as described in Internal Revenue Code 501(c)(3)."  The Letter 5177 did not identify a single issue of concern.  *See* Exhibit G.

88.     Although Plaintiff read the Medium article and found it to contain an overwhelming amount of false and deliberately misleading information, Plaintiff took no action.

89.     In direct response to Defendant Qazi's posting of the article, Defendant Musk wrote on Twitter at 12:46 P.M.: "Super messed up situation!"  Owing to Defendant Musk's fame, this post garnered 104 replies, 112 retweets, and 1,860 "likes" by May 2020, suggesting that many thousands of people viewed the post in addition to the roughly 2,000 who directly interacted with it.  *See* https://twitter.com/elonmusk/status/1183106801769697280.

90.     Thirty-two minutes later, at 1:18 P.M., Defendant Musk wrote another response on Twitter to augment his first response: ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?"  This post garnered 246 replies, 226 retweets, and 1,776 "likes" by May 2020, again suggesting that many thousands of people viewed the post in addition to the roughly 2,000 people who directly interacted with it.  *See* https://twitter.com/elonmusk/status/1183114722989621248.

91.     Both of Defendant Musk's responses to Defendant Qazi's post concerning the Medium article about Plaintiff were threaded within the context of the original Twitter post, meaning that they appeared in direct relation to the initial post and would have been readily

apparent to anyone reading Defendant Qazi's post and the associated article about Plaintiff. Therefore, an average user on Twitter would have understood the supposedly "fake charity" discussed by Defendant Musk to be Think Computer Foundation, which is a properly registered and legitimate 501(c)(3) non-profit organization, and the supposed "online bully" discussed by Defendant Musk to be Plaintiff.  The $50.00 donation by Russ Mitchell to Think Computer Foundation for the purpose of increasing access to California court records was explicitly discussed in the Medium article at the top of the thread.

92.     Ultimately, Think Computer Foundation used the money it raised in the fundraiser to which Russ Mitchell contributed to file a lawsuit against the Santa Clara County Superior Court on December 9, 2019, Case No. 19CV359896, *Think Computer Foundation v. Rebecca Fleming et al*.  Shortly thereafter, the Santa Clara County Superior Court made all of its civil records electronically available for free, achieving the Foundation's goal.  Think Computer Foundation reached a settlement with the Santa Clara County Superior Court in May 2020.

93.     Shortly after it was initially posted, Medium disabled the account responsible for the article and removed the article itself without prompting from Plaintiff, directly or indirectly.

94.     On Monday, October 14, 2019 at 10:47 A.M., in response to the removal of the Medium article, Defendant Qazi used his @tesla_truth account to vow to "post the content on a server we control" after falsely accusing Plaintiff of having written to "friends at medium."

95.     On Tuesday, October 15, 2019 at 4:56 A.M., Plaintiff received an e-mail from an automotive industry consultant residing in Tokyo, Japan who stated that Omar Qazi had been harassing and impersonating his wife.  Defendant Qazi had also harassed and impersonated this individual himself.

96.     On Tuesday, October 15, 2019 at 7:42 A.M., using his @tesla_truth Twitter account, Defendant Qazi wrote, "to the police: if I am found dead in mysterious circumstances, it was almost certainly aaron greenspan / he killed me for saying he didn't invent facebook / (he didn't)".

97.     On Tuesday, October 15, 2019 at 8:19:54 P.M., Defendant Qazi left Plaintiff's father a voicemail 50 seconds in length on his work telephone number.  The voicemail stated:

> "Hi Neil, uh, this is uh, my, uh, my name is Omar Qazi.  Uh, I, uh, was calling because, uh, you know, your son had been, uh, you know—well, has been, uh, contacting me over the internet, uh, you know, posting information about me, and uh, I wanted to discuss the situation with you.  It seems that he's getting very angry, very frustrated, and, uh, and really, uh, you know, um—def—seems like something that maybe we should, uh, discuss.  If you could give me a call back, my phone number is [redacted].  I'd really appreciate it.  Thanks.  Bye."

98.     Fourteen minutes later, on Tuesday, October 15, 2019 at 8:33:55 P.M., Defendant Qazi sent the following e-mail message to Plaintiff's father's work e-mail address with the subject "Think Foundation & Aaron":

> "Hello Dr. Greenspan,
>
> My name is Omar Qazi. I'm writing to you because I noticed that you are on the board of Think Foundation [sic], which operates 'Plainsite'
>
> The Think Foundation non-profit, Plainsite, and your son Arron [sic] seems to be engaged in an emotional vendetta against me. I'm not sure how much you know about what he has going on with his short selling investments and Tesla, but he seems to believe that I am being paid by Elon Musk to post about Tesla on Twitter. In reality I am just a Tesla customer, and am not associated with Elon Musk. My family and myself have received numerous threats, phone calls, etc as a result of verifiably false information that Aaron has posted on his 'Plainsite' Twitter account, which I understand is operated by the Foundation you are on the board of.
>
> The situation has escalated quite alarmingly in the past week as Tesla's stock price has risen somewhat. I know that Aaron is shorting the stock, but I feel that the situation has become more emotional than financial for him with regards to his obsession with retaliating against me and my family. I wanted to reach out and see if we could chat about what's going on. I've reached out to Aaron but he does not want to meet with me or speak to me.
>
> I would appreciate it if you could give me a call sometime so that we could chat about the best way to de-escalate the situation. I worry based on some of Aaron's recent actions that he may break the law in anger and be forced to deal with a situation that could have easily been avoided with a simple phone conversation.
>
> Thank you for your time,

Omar Qazi
[telephone number redacted]"

99.    Plaintiff's father did not respond to Defendant Qazi's communications as they contained numerous false statements and gross mischaracterizations.

100.    Plaintiff never took any action to harass or to encourage others to harass Defendant Qazi or his family.

101.    Also on October 15, 2019, the Smick Sites were updated to resemble the PlainSite website, and the misspelled reference to Latham & Watkins was removed.  To achieve the new look, Defendant Qazi copied and pasted the PlainSite home page source code and graphics onto his servers and modified the code.  He also updated the bold headline to expand the list of supposed crimes that he was accusing Plaintiff and his family members of committing: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?"  Defendant Qazi also added 900 to the false number of people who had submitted "testimonies," for a total of 956, because it corresponded to Plaintiff's home address.  Finally, he added the text, "Aaron Greenspan Did Not Invent Facebook. He is a failure."

102.    Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting *[sic]* Securities Fraud" and included other hidden comments such as, "I am so mentally derranged *[sic]* that I honestly believe that I invented Facebook. Please email me to tell me that I didn't at help@plainsite.org."

103.    On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi also contacted Plaintiff's disabled brother via Facebook Messenger, writing, "hi simon / how are you?" Planitiff's brother was confused and asked how he knew Defendant Qazi.

104.    On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline implicitly accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

105.    On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

106.    On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later claiming that Plaintiff had failed to engage.

107.    On Friday, October 25, 2019 at approximately 6:30 P.M., Defendant Qazi registered a new domain name, vagfoundation.org, via Amazon.com to augment the aforementioned Smick Sites.  Though the website at http://www.vagfoundation.org purported to represent "The Victims of Aaron Greenspan Foundation," there is no such non-profit organization registered with the IRS or any state government.  *See* Exhibit H.

108.    Even though Defendant Qazi solicited information about Plaintiff's supposed crimes from his thousands of followers, only two "testimonies" ever appeared on the Smick Sites: "M's TESTIMONY," an approximate reproduction of the disabled Medium article that Defendant Qazi had resolved to post elsewhere; and "P'S TESTIMONY," a haphazard PDF compilation of Diego MasMarques, Jr.'s false allegations anonymously submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia.  Neither of these posts described any actual crime committed by Plaintiff of his family members, let alone any actual "victim" of Plaintiff.

### *With Omar Qazi Banned From Twitter, The Libel and Harassment Continues*

109.    Defendant Qazi's harassment of Plaintiff via Twitter led to Plaintiff filing several DMCA requests concerning Defendant Qazi's @tesla_truth account and other accounts.  On or around October 22, 2019, Defendant Musk wrote an e-mail to Twitter CEO Jack Dorsey in support of Defendant Qazi while disparaging Plaintiff.

110.    Defendant Musk's attempt to intercede on Defendant Qazi's behalf was unsuccessful.  On or about October 24, 2019, Twitter permanently banned Defendant Qazi.  The company permanently disabled his @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil, and @SmickTrump accounts.  Defendant Qazi may have deleted another one of his fake Twitter accounts, @BagHolderQuote, of his own volition.

111.    On Sunday, October 27, 2019 at 10:25 A.M., an unknown individual posted a "free stuff" listing on Craigslist using Plaintiff's GMail address, the name "Aaron Musk" and Plaintiff's telephone number.  Plaintiff received an automated e-mail notice upon publication. The listing read, "I have a functional original iPad Air 8GB to give away, first person to message can have it. You will have to pick it up in BayView."  Plaintiff does not own an iPad Air 8GB or live in the Bayview neighborhood, but does live in the Bayview SFPD reporting district.

112.    On Thursday, October 31, 2019, Defendant Qazi posted an essay on a domain name and server controlled by Defendant Smick Enterprises, Inc., wholemars.net, entitled, "Steve Jobs is dead," referring to the pseudonym used for his @tesla_truth account, "Steve Jobs Ghost."  In this essay, Defendant Qazi admitted that his @tesla_truth account was suspended repeatedly for legal violations and impersonating others, and included screenshots showing that the account was registered to the e-mail address teslatruth@smick.com.  *See* Exhibit I.

113.    On Friday, November 1, 2019 starting at 10:40 A.M., an unknown individual using the DNS hostname customer.tigerbackbone.com and IP address 178.255.153.77 filled out the PlainSite Contact Us form 74 times in Plaintiff's name, using Plaintiff's e-mail address, with the message, "Moron."  The same user presumably filled out the form a 75th time at 12:04 P.M. with the message, "M0ron."  Defendant Qazi frequently uses the word "moron" in his writing.

114.    On Friday, November 1, 2019 at 12:04 P.M., an unknown individual subscribed Plaintiff's e-mail address to a mailing list called "Healthline," concerning "wellness," without Plaintiff's permission.  At 12:10 P.M., an unknown individual subscribed Plaintiff's e-mail address to a mailing list called the "Psych Central Newsletter" without Plaintiff's permission.  At

12:12 P.M., an unknown individual subscribed Plaintiff's e-mail address to the Scientific American mailing list without Plaintiff's permission.

115.    Unable to reach his audience on Twitter, Defendant Qazi set up open-source Twitter clone software called Mastodon on a server belonging to Defendant Smick Enterprises, Inc., hosted by Amazon Web Services, LLC.  On Friday November 1, 2019 around 1:00 P.M., Defendant Qazi published an essay on another Smick Enterprises, Inc. website, wholemars.org, thanking his supporters and inviting them to use his Mastodon installation at mast.wholemars.com, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening.  (At various points in time, wholemars.com, wholemars.net and wholemars.org have redirected to each other.  All are under the control of Defendant Qazi.)

116.    On Saturday, November 2, 2019 at 11:55 A.M., Sascha Pallenberg, Head of Digital Transformation at Daimler AG (a Tesla competitor), wrote from his verified Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!"  *See* https://twitter.com/sascha_p/status/1190703993296523264.

117.    On Saturday, November 2, 2019 at 2:58 P.M., without Plaintiff's knowledge or permission, an unknown individual created a profile in Plaintiff's name, "aarongreenspan," using Plaintiff's e-mail address, on the pornographic website Pornhub.

118.    On Sunday, November 3, 2019 at 1:08 P.M., Plaintiff filed another DMCA request with Amazon Web Services, LLC regarding Defendant Qazi's repeated violation of copyright law.  On or about November 6, 2019, Amazon shut down at least four of the Smick Sites in response, causing Defendant Qazi to move those sites to another provider, Linode.

119.    On November 6, 2019, an unknown individual using the Wikipedia username "Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of the "Criticism of Facebook" article, in order to supposedly "be more impartial and includ[e] additional details."  In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting false claims made by Defendant Qazi

about Plaintiff, such as the false statements that Plaintiff "was enraged" in February 2004 and that Plaintiff "was able to extort about $250,000 from Facebook."

120.    In fact, Plaintiff entered into a settlement agreement with Facebook, Inc. and Mark Zuckerberg in May 2009 about which no financial details have been disclosed.

### *Omar Qazi and Elon Musk Echo a Convicted Murderer Subject To a Restraining Order*

121.    Upon information and belief, Defendant Qazi was at times coordinating with Diego MasMarques, Jr.—the same individual against whom Plaintiff has an active restraining order through 2021. Many of the false statements and allegations made by Defendants Qazi and Musk are identical to the false statements and allegations Mr. MasMarques has been making since at least as early as 2017 on various websites and in court: that Plaintiff runs a fake non-profit and that Plaintiff and his family have committed tax fraud, extorted others, etc.

122.    Defendant Qazi was on notice of the restraining order against Mr. MasMarques as of January 14, 2019. Via his then-active @OmarQazi Twitter account, on August 7, 2019 at 6:38 P.M., Mr. Qazi also admitted to downloading and modifying the Form CH-100 document containing Mr. MasMarques's name as part of his "joke post."

123.    Furthermore, on Tuesday, September 24, 2019 at 5:45 P.M., Defendant Qazi authored a post using his then-active @tesla_truth Twitter account with the words "Rule breaker / law breaker" alongside a screenshot image from an iPhone that had been sent to him in a private Twitter DM conversation. The iPhone screenshot showed the sender's copy of a Twitter abuse report receipt from the previous day concerning Plaintiff's personal Twitter account, @AaronGreenspan, which was locked as a result of the abuse report. In other words, the sender of the image had reported Plaintiff's account to Twitter for "abuse."

124.    On the previous day, September 23, 2019, an unknown individual did report Plaintiff's personal account to Twitter—for briefly discussing court proceedings involving Diego MasMarques, Jr., alleging that such discussion constituted "private information." Plaintiff immediately appealed his account being locked. On September 24, 2019 at 9:49 P.M.—hours after Defendant Qazi branded Plaintiff a "law breaker"—Twitter restored Plaintiff's account and

admitted, "…we made an error.  We've determined there was no violation and have restored your account to full functionality."

125.    Defendant Qazi's harassing activity and false statements accrued to the benefit of himself, Defendant Smick Enterprises, Inc., Defendant Musk and Defendant Tesla.

126.    Defendant Musk's harassing activity and false statements accrued to the benefit of himself, Defendant Tesla, and Tesla shareholders, including Defendant Qazi.

127.    For months, Defendants Qazi's and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded hatred and ridicule by countless individuals with whom Plaintiff had no prior relationship.  Most of these posts cast Plaintiff's sanity in doubt, displayed an obsession with Plaintiff's role creating the predecessor to Facebook at Harvard College in 2003 (also called "The Facebook"), ridiculed Plaintiff's career and work, baselessly accused Plaintiff of crimes, or simply hurled insults.  For example:

a)  On October 2, 2019 at 10:19 A.M., Twitter user @ThemeTeamWP, a vocal proponent of Defendant Musk, wrote, "Aaron still butthurt that Zuckerberg got rich while you became a nobody?"  This post was deleted by the author.

b)  On October 9, 2019 at 3:17 P.M., Twitter user @NotThatTesla wrote, "Aaron Greenspan can't even get verified on Twitter, much less verify his fake story about creating Facebook. Classic fraudster and grifter. Tied with Jacob Wohl for most disgusting fraudster of the decade. @tesla_truth's family is getting harassed. It's time to stop."  *See* https://twitter.com/NotThatTesla/status/1182057649501802497.

c)  On October 9, 2019 at 4:17 P.M., Twitter user @PandraKaka13 wrote, "Sadly Aaron's parents have let him have this sort of support for his revenge tactics. I'm concerned when they die that Aaron will have no one to support his psycho ways and may become even more volatile. Hope he doesn't own any guns. Mass shooter profile."  *See* https://twitter.com/PandraKaka13/status/1182072576924934145.

d)  On October 9, 2019 at 7:00 P.M., Twitter user @CleanRevelry wrote, "Yo @AaronGreenspan, see you on a dark night," using a song lyric authored by

Defendant Musk's girlfriend as a warning.  Plaintiff interpreted this as a threat of violence, as did Twitter user @Kristennetten.  *See* https://twitter.com/CleanRevelry/status/1182113766814568449.

e)  On October 28, 2019 at 1:18 P.M., Twitter user @AaronDweeb ("Erin Greenspam [vomit emoji]") began posting feminized computer-generated images of Plaintiff created using the Russian FaceApp mobile application based on Plaintiff's photographs, used without permission.  *See* https://twitter.com/AaronDweeb.

f)  On November 1, 2019 at 10:55 A.M., Twitter user @romn8tr wrote, "@AaronGreenspan you're a piece of shit".  *See* https://twitter.com/romn8tr/status/1190326394242252800.

g)  On November 3, 2019 at 1:54 P.M., Twitter user @NotAGhost10 wrote, "Are you interested in starting a 'legal' charity and use the funds to run a 'completely *[sic]* legitimate' Disinformation and Fact Distortion campaign? Then look no further than this article by a human shaped pile of garbage, Aaron Greenspan $tslaq".  *See* https://twitter.com/NotAGhost10/status/1191111358798057474.  This account's "ghost" reference refers to Defendant Qazi.

h)  On April 4, 2020 at 7:52 A.M., Twitter user @enn_nafnlaus wrote, "Plainsite? The fake charity of Tesla short seller Aaron Greenspan? The guy who claims to have invented Facebook? And who selectively requests and selectively publishes only things he things *[sic]* will hurt Tesla (e.g. that he can profit from)?"  *See* https://twitter.com/enn_nafnlaus/status/1246450694749552640.

i)  On May 17, 2020 at 8:30 A.M., Twitter user @ElectroCar wrote, "Wow never realized @AaronGreenspan and @PlainSite accused Omar of being a pedo after Omar exposed tax fraud."  *See* https://twitter.com/ElectroCar/status/1262042756853235714.

j)   On May 17, 2020 at 9:13 A.M., Twitter user @BarkMSmeagol wrote, "Yep. He

belongs in an asylum". *See*

https://twitter.com/BarkMSmeagol/status/1262053620826005505.

### The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff

128.   On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant

Tesla's Q1 2020 earnings call, calling local public health officials "fascist."  At one point,

Defendant Musk was oddly disconnected from his own earnings call along with all of the other

active call participants.

129.   On May 9, 2020, Defendant Musk ignited further controversy by threatening to

sue Alameda County over its implementation of the multi-county Shelter-In-Place Order

concerning COVID-19, which curtailed Tesla's ability to manufacture cars at its Fremont,

California factory.  Tesla did, in fact, sue Alameda County that same day, using a complaint that

had been in progress for at least two days before Defendant Musk made his threat public.  See

*Tesla Incorporated v. County of Alameda*, California Northern District Court Case No. 3:20-cv-

03186-TSH.

130.   Defendant Musk further instructed Tesla employees to violate the Shelter-In-

Place Order and return to work, or risk losing unemployment benefits.

131.   While Defendant Musk claimed he would be present on the assembly line willing

to risk arrest, he presented no evidence that he actually ever was on the assembly line.  Flight

records indicate that he was not even in Alameda County for the majority of the day on Monday,

May 11, 2020, with his private jet reportedly arriving in San Jose, California shortly after 5:00

P.M.  On May 12, 2020 at 9:11 P.M., Defendant Musk posted an image of an ice cream sundae

he had copied from another person's Instagram account, and proceeded to actively imply that he

had taken the picture while eating at a Bay Area Buca Di Beppo restaurant in contravention of

the Shelter-In-Place Order—which he had not—adding, "Life should be lived."

132.   Many long-time supporters of Defendants Tesla and Musk were understandably

appalled by Musk's erratic behavior and disregard for human life.  On May 12, 2020, popular

electric vehicle blog *Electrek* editor Frederic Lambert wrote an editorial entitled, "Tesla superfandom becomes toxic, negative for electric revolution [op-ed]." *See* https://electrek.co/2020/05/12/tesla-super-fandom-becomes-toxic-negative-electric-revolution-op-ed/.  The editorial was critical of Defendants Tesla and Musk, as well as a Twitter account called "Third Row Tesla" with the handle @thirdrowtesla, for a podcast of the same name led by Defendant Musk's most ardent cult followers, including Defendant Qazi.

133.    Signaling the vital importance of Defendant Qazi's work harassing Tesla's critics, Defendant Musk appeared on video with Defendant Qazi in a 3.5-hour-long Third Row Tesla podcast filmed at one of Defendant Musk's Los Angeles homes on February 9, 2020.  *See* https://www.youtube.com/watch?v=J9oEc0wCQDE.  The below photograph depicts Defendant Qazi (far right) with other Third Row Tesla members, Defendant Musk (far left) and Tesla Director Kimbal Musk (second from right with cowboy hat) at the recording session:



134.    Although it was at first unclear who had authored the Twitter posts that Mr. Lambert took issue with since Third Row Tesla contributors refused to admit anything about who used its Twitter account, Defendant Qazi ultimately admitted authorship, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.  Due to the controversy, three of the six Third Row Tesla members publicly announced that they were severing ties.

135.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as nominally independent cheerleaders for Defendant Tesla, led Defendant Qazi to

author a 17,600-word screed on his website hosted by Defendant Smick Enterprises, Inc., published on May 17, 2020 (the "Qazi Screed"). Entitled, "Response to Frederic," it invoked Plaintiff's name at least 47 times over dozens of pages, even though Plaintiff had nothing to do with Defendant Musk's decision to place his workers' lives at risk, nothing to do with *Electrek*'s writing, and nothing to do with Frederic Lambert's independent and exceptionally rare criticism of Defendants Tesla and Musk.

136.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading. In some cases, Defendant Qazi cropped images to deliberately mislead his readers. In other cases, Defendant Qazi linked events that were chronologically impossible. Defendant Qazi also omitted key facts and events of which he was aware, since he was responsible for many of them. Generally, the unprovoked rant made good on Defendant Qazi's October 9, 2019 malicious promise to "drag [Plaintiff's] name through the mud until the day he [dies]."

137.    On or around May 23, 2020, after the filing of the Complaint in this case, Defendant Qazi returned to Twitter once more via a proxy account, @wholemarslog, later renamed @wholemarsblog, allegedly set up for him by another user to evade his lifetime ban.

138.    On May 24, 2020, Third Row Tesla published "Episode 17" of its video podcast series (recorded on May 15, 2020), depicting Defendant Qazi wearing a T-shirt imprinted with a partial graph of TSLA stock next to the text "Tesla $420.00," referring to the false claim that required Defendants Musk and Tesla to each pay a $20 million fine to the SEC and sign Consent Decrees regulating Defendant Musk's use of Twitter.



139.    On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID.  The male caller identified himself only as working for the law firm Quinn Emanuel in connection with the instant lawsuit and calling on behalf of Defendants Musk and Tesla.  The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his home address.  Upon information and belief, the caller was actually Defendant Qazi impersonating a lawyer in an attempt to extract information.  At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant Qazi's @wholemarslog Twitter account posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

140.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short sellers, he had decided to become one himself.

## CLAIMS FOR RELIEF

### COUNT I
### Libel Per Se
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

141.    Plaintiff incorporates by reference the foregoing allegations.

142.    From approximately January 14, 2019 through the date of his lifetime ban by and from Twitter on October 24, 2019, Defendants Qazi and Smick Enterprises, Inc. made use of the @OmarQazi Twitter account, @tesla_truth Twitter account, and numerous other fake Twitter accounts to publish constant false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

143.    From approximately May 2019 through present day, Defendant Qazi made use of the @thirdrowtesla, @wholemarslog and @wholemarsblog Twitter accounts to publish constant false statements and deliberate misinformation about Plaintiff.

144.    From October 11, 2019 through present day, Defendants Qazi and Smick Enterprises, Inc. used a variety of domain names and websites including http://www.plainshit.com, http://www.plainshit.org, http://www.plainsiite.org, and

http://www.vagfoundation.org to publish false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

145.   Defendant Qazi made and repeated these false statements with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-parties' court filings located by Plaintiff would increase or prevent any decrease in the value of his TSLA stock.  He was successful at achieving his aims: Tesla's stock increased in value, he was profiled in a major financial media publication, and many of his followers began repeating his false claims about Plaintiff and stating that they refused to believe anything in any court document merely published by Plaintiff.

146.   Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. also explicitly encouraged others to spread false statements and misinformation about Plaintiff and Plaintiff's family members.

147.   Defendant Qazi explicitly encouraged others to "harass" Plaintiff.

148.   Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging accusations in sufficient quantity over a period of more than one year that it is impossible to enumerate each and every one, select examples include:

| Statement No. / Date | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1<br><br>January 14, 2019 | "Strange how Aaron mentions that he think *[sic]* Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium. This statement falsely suggests a sexual attraction to Plaintiff's stalker. |
| 2<br><br>August 8, 2019 | "How did Aaron Greenspan of Plainsite manage to qualify for non-profit status and avoid paying the government taxes? Is it legal to use a non-profit to stalk and harass people?" | This statement, posed as a question, falsely suggests that Plaintiff is guilty of criminal conduct.  Plaintiff pays taxes. PlainSite's revenue is taxable and taxes are paid by Think Computer Corporation, which is a for-profit corporation.  Think Computer Foundation does not "stalk and harass people." |
| 3<br><br>August 23, 2019 | "It took a lot of hard work to break every single one of these rules with our fraudulent charity, but we pulled | This statement, posted from the fake @PlainShite account with the actual PlainSite logo, falsely states |

| | | |
|---|---|---|
| | it off" | that Plaintiff's work is a "fraudulent charity." |
| 4<br><br>September 24, 2019 | "Rule breaker / law breaker"<br>[Image containing Aaron Greenspan's name and photograph] | This statement again falsely suggests that Plaintiff is guilty of criminal conduct. |
| 5<br><br>September 27, 2019 | "I didn't worry when Aaron Greenspan said Elon paid me to kill him because it wasn't true" | This statement alludes to a statement Plaintiff never made. |
| 6<br><br>September 28, 2019 | "he did, it's fraudulently registered as a non-profit charity" | This statement, in a Twitter thread explicitly mentioning "Greenspan," falsely accuses Plaintiff of fraud. |
| 7<br><br>September 28, 2019 | "I don't even have a fax machine. The only thing that has been revealed here is that Aaron Greenspan has child pornography at his house. I do not." | This statement explicitly and falsely accuses Plaintiff of possessing child pornography, which would be a crime. |
| 8<br><br>September 30, 2019 | "Shorts have been using Aaron Greenspan's fraudulent 'Think Foundation' to pool their money and go after Tesla – and they can deduct donations from their income tax!!!" | This statement again explicitly mentions Plaintiff and falsely accuses him of fraud.  Think Computer Foundation operates independently of short sellers. |
| 9<br><br>September 30, 2019 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentions Plaintiff and falsely accuses him of fraud, and by referring to short sellers including Plaintiff, "serious crimes."  This statement also falsely states that Plaintiff suffers from a medical condition.  Plaintiff has never been diagnosed with "anger issues" or any similar medical condition.  Defendant Qazi twisted a remark Plaintiff made at a memorial service for his deceased friend. |
| 10<br><br>October 9, 2019 | "When his reputation is destroyed, he'll have only himself to blame<br><br>I don't have to make up any bullshit conspiracy theories about him. The facts of his life are so embarrassing it says it all<br><br>he is committing serious crimes in | This statement is the second part of the thread that begins "All Aaron Greenspan had to do was shut up…"  It again falsely states that Plaintiff has committed "serious crimes" by publishing court documents and public domain materials, many of which cast doubt on Defendant Qazi's |

| | | |
|---|---|---|
| | 'plain sight' on 'plainsite'" | investment thesis. |
| 11<br><br>October 9, 2019 | "It's not libel if it's true. You didn't invent Facebook. You've never accomplished anything in your life.<br><br>There are plain facts.<br><br>You just create negativity and feed off other people. And I can prove your crimes in court."<br>[Image containing Aaron Greenspan's name and photograph] | This post explicitly mentions Plaintiff and falsely attributes "crimes" to him.  It is true that Plaintiff developed "The Facebook" at Harvard College in August and September, 2003, which Plaintiff's CS91r classmate Mark Zuckerberg later signed up for and effectively copied.  Defendant Qazi explicitly states that his views are "plain facts." |
| 12<br><br>October 9, 2019 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentions Plaintiff and states that he is a "criminal guilty of felony tax fraud," which is false. |
| 13<br><br>October 9, 2019 | "I welcome the chance to discuss Aaron Greenspan's conduct and crimes in front of a court and / or jury." | This post explicitly mentions Plaintiff and falsely accuses him of "crimes."  Defendant Qazi did not respond to the initial Complaint. |
| 14<br><br>October 9, 2019 | "Periodic reminder that Aaron Greenspan, who claims he invented Facebook (he didn't), is running a fake charity that Tesla short sellers use to illegally pool funds for propaganda efforts.<br><br>Please report his fake charity to the IRS. he is committing tax fraud." | This post explicitly mentions Plaintiff, accuses him of "running a fake charity," which is possibly a crime, and "illegally" pooling funds.  The IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020 indicating that there were no issues found. |
| 15<br><br>October 9, 2019 | "No, likely just his learning disability due to aspergers" | This post was in a thread explicitly referring to Plaintiff by name. Plaintiff has never been diagnosed with Asperger syndrome or a learning disability. |
| 16<br><br>October 11, 2019 | "yeah he's this clown who thinks he invented facebook and comited felony tax fraud" | This post was in a thread explicitly referring to Plaintiff by name.  It repeats the prior false allegations of "felony tax fraud." |
| 17<br><br>October 12, 2019 | "i'm not severely disabled! you are lucky you only suffer from aspergers!!!" | This post was from the fake account Defendant Qazi created in Plaintiff's brother's name, in reply to an actual post by Plaintiff. Plaintiff has never been diagnosed with Asperger syndrome. Plaintiff's brother is severely |

| | | disabled. |
|---|---|---|
| 18<br><br>October 14, 2019 | "Am surprised this organizations gets a tax exemption.  Owner previously stole DoD documents" | This post appeared in a thread specifically mentioning Plaintiff.  It falsely accuses Plaintiff of stealing Department of Defense documents. |
| 19<br><br>October 15, 2019 | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?<br><br>You are not alone.  The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice" | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes. |
| 20<br><br>October 15, 2019 | "to the police: if I am found dead in mysterious circumstances, it was almost certainly aaron greenspan<br><br>he killed me for saying he didn't invent facebook<br><br>(he didn't)" | This post, which explicitly mentions Plaintiff, falsely suggests that Plaintiff is a murderer. |
| 21<br><br>October 19, 2019 | "Tesla short sellers: donate to us<br><br>It's tax deductible because we are running a fraudulent non-profit.<br><br>we promise to use the money to try and harm Tesla. that's why so many short sellers donate to us" | This post was issued by the fake @PlainShite account, where Plaintiff's name appeared in the account summary.  It repeats the false "fraudulent non-profit" allegation. |
| 22<br><br>November 1, 2019 | "he extorted $250,000 from Mark Zuckerburg [sic]" | This statement is part of an essay on Defendant Qazi's website that explicitly names Plaintiff.  Plaintiff did not extort Mark Zuckerberg or anyone else. |
| 23<br><br>November 1, 2019 | [The URL https://wholemars.com/thinkfraud/zuckerburg-extortion.pdf] | This URL corresponds to a copy of Plaintiff's non-profit organization's IRS Form 990 from 2009, falsely linking Plaintiff with "extortion" as a search engine keyword. |
| 24<br><br>May 17, 2020 | "As time went on, Greenspan became more and more enraged, and also became worried about my allegations of his tax fraud and misconduct" | This portion of the Qazi Screed reiterates his false allegations against Plaintiff of tax-related crimes. |

| | | |
|---|---|---|
| 25<br><br>May 17, 2020 | "After that, I started tweeting more about Greenspan's attempts to harass, stalk and smear Tesla owners like me." | This portion of the Qazi Screed falsely alleges that Plaintiff committed crimes of harassment and stalking. |
| 26<br><br>May 25, 2020 | "It's time for the board of Plainsite to face justice for their crimes." | Posted on the @wholemarslog Twitter account, this statement conflates two different Boards of Directors and effectively accuses both of committing "crimes" for posting public records that Defendant Qazi does not like. |
| 27<br><br>May 25, 2020 | "non-profit status will be revoked when it's discovered the brand, server logs, and resources were misappropriated to inure private benefit to Aaron Greenspan" | Also posted on the @wholemarslog Twitter account, this statement omits both the result of the IRS audit of Think Computer Foundation and falsely suggests that posting public records on the internet is a "private benefit" that only helps Plaintiff, when on net Plaintiff has not even benefited financially from publishing the public documents in question. |
| 28<br><br>May 25, 2020 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @wholemarslog Twitter account, this statement falsely accuses Plaintiff and his parents of various crimes. |
| 29<br><br>June 15, 2020 | "Damn, this is litterally [sic] exactly what Aaron Greenspan did to Omar, Earl, Viv, Johnna.<br><br>Maybe one day he'll be charged too<br><br>…<br><br>he is a criminal" | By this point, Defendant Qazi renamed his Twitter account to @wholemarsblog, and posted this series of false statements explicitly naming Plaintiff as a "criminal" in reference to the FBI Boston Division's announcement that several eBay security executives had been charged with harassment of corporate critics. |
| 30<br><br>June 23, 2020 | "Why does Aaron Greenspan threaten his critics, and Tesla customers?<br><br>To spread false stories about Tesla in the media, while suppressing positive voices through intimidation. | From the @wholemarsblog Twitter account, Defendant Qazi again falsely accused Plaintiff of securities fraud and harassment and intimidation. |

| | | |
|---|---|---|
| | The SEC must investigate and prosecute the perpetrators of this short and distort fraud." | |
| 31<br><br>June 23, 2020 | "Aaron Greenspan abuses his charity to inure private benefit to himself.<br><br>His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | From the @wholemarsblog Twitter account, Defendant Qazi again falsely alleged that Plaintiff has committed tax crimes.  The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation. |
| 32<br><br>June 23, 2020 | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | From the @wholemarsblog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff. |

149.    In addition, on October 9, 2019, on Twitter, a public forum, Defendant Qazi willingly, intentionally and maliciously republished the libelous statement concerning Plaintiff originally contained in the Musk Reply e-mail, in a manner not in any way connected to the substance of this litigation.

150.    Defendant Qazi's persistent lies kicked off a chain of additional libel by his followers, who publicly referred to Plaintiff as a "psychopathic incel" and likely "mass shooter."

151.    Defendant Qazi's false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of the initial Complaint in this case.

152.    Many if not most of Defendant Qazi's aspersions concerning Plaintiff, including all of the above statements, were presented as conclusory statements of fact.  In addition to using a Twitter account containing the word "truth" to make the majority of statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on Twitter and via the Smick

Sites to complete IRS Form 13909 in order to make formal false reports echoing his posts regarding Plaintiff and Think Computer Foundation to the IRS.  Communications with the IRS are regulated by federal law and are required to be factual.  Furthermore, Think Computer Foundation's status with the IRS was and is easily verifiable on the IRS website.  Think Computer Foundation also openly publishes comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Qazi willfully ignored.

153.    Defendant Qazi's false and misleading statements concerning Plaintiff were not in service of and failed to further any public debate.

154.    Defendant Qazi's false and misleading statements have irreparably harmed Plaintiff's reputation.

**COUNT II**
**Libel Per Se**
**Against Defendants Elon Musk and Tesla**

155.    Plaintiff incorporates by reference the foregoing allegations.

156.    Defendant Musk is vicariously liable for all libelous statements published by Defendant Qazi concerning Plaintiff through at least October 9, 2019, the date that Defendant Musk was quoted in *Bloomberg Businessweek* as having told Defendant Qazi, "Your Twitter is awesome!"  This wholesale endorsement of Defendant Qazi's statements up to that point amplified their effect and encouraged untold thousands of readers to correctly believe that Defendant Qazi's statements, positive and negative, were completely supported by Defendant Musk—a billionaire perceived by many to be at the pinnacle of success.

157.    To the extent that Defendant Musk was aware of Defendant Qazi's Twitter account(s), but especially the @tesla_truth account, it would have been impossible for Defendant Musk not to be aware of the libelous and harassing content so frequently posted on a daily basis. Defendant Musk was already aware of the controversy surrounding Defendant Qazi as he and the Tesla Board of Directors had received an e-mail from Plaintiff about Defendant Qazi on August 7, 2019.  It also would have been impossible for the @tesla_truth Twitter account to continue using the TESLA trademark in its name without Defendant Musk's implicit or explicit consent.

1
2
3
4
5
6
7
8
9
10

158.    To the extent that Defendant Musk was unaware that his communications with Defendant Qazi would be quoted in the *Bloomberg Businessweek* article, he was given the opportunity to comment by its author, Zachary Mider.  As the article states, "Tesla has legions of die-hard fans, many of them well-to-do, tech-obsessed, and male.  Qazi is pretty close to the archetype.  His Twitter handle, @tesla_truth, is a bottomless font of Muskolatry.  Before we met in August, he'd emailed Musk to give him a heads-up and encourage him to speak with me."  Therefore, Defendant Musk was aware that the potential article would involve Defendant Qazi and at least one of Defendant Qazi's libel-spewing Twitter accounts, @tesla_truth.  Yet Defendant Musk made absolutely no effort to distance himself from Defendant Qazi's statements or to qualify them in any way.  Instead, he called them "awesome."

11
12
13

159.    In the initial SEC Consent Decree, Defendant Musk agreed to "comply with all mandatory procedures implemented by Tesla, Inc. [] regarding (i) the oversight of communications relating to the Company made in any format…"

14
15
16

160.    As an officer and director of Defendant Tesla, Musk routinely acts on Tesla's behalf.  The October 9, 2019 Musk Reply e-mail was sent on behalf of both Defendants Musk and Tesla.

17
18
19
20

161.    Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever been diagnosed with any mental disorder.  Plaintiff does not live in and has never been admitted to a psychological unit for clinical evaluation, nor has Plaintiff ever visited with a mental health professional in a clinical setting except to assist with his brother's acute condition.

21
22

162.    In addition to those statements for which Defendant Musk is vicariously liable, Defendant Musk himself published the following libelous statements about Plaintiff:

23
24
25

26
27
28

| Statement No. / Date / Medium | Written Statement by Defendant Musk | Related to Proceeding or Matter Pending Legal Review | Public Forum | Public Interest |
|---|---|---|---|---|
| 33<br><br>October 9, 2019<br><br>E-Mail | "Does the psych ward know you have a cell phone? Just curious." | No | No | No |

| 34<br><br>October 9, 2019<br><br>Twitter via Qazi | "Does the psych ward know you have a cell phone? Just curious." | No | Yes | No |
|---|---|---|---|---|
| 35<br><br>October 12, 2019<br><br>Twitter | ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" | No | Yes | No |
| 36<br><br>October 22, 2019<br><br>E-Mail | "Jack, what Omar is saying is accurate to the best of my knowledge. There has been an orchestrated attempt to drive down Tesla stock through social media, particularly Twitter. This always increases around our earnings call, which is this afternoon.<br><br>Aaron Greenspan in particular has major issues. He's the same nut but *[sic]* that claimed he was the founder of Facebook and sued Zuckerberg, among many other things.<br><br>Never seen anything like it." | No | No | No |

163.    On October 9, 2019 at 3:48 P.M., Defendant Musk authored and sent the Musk Reply e-mail on behalf of himself and Defendant Tesla to numerous parties including Defendant Qazi, who Defendant Musk knew or should have known would immediately republish his message publicly, describing Plaintiff as residing in a "psych ward," falsely suggesting that Plaintiff suffered from a psychiatric illness or disease.

164.    Due to Defendant Musk's recklessness, the Musk Reply and his subsequent response was copied to an official at the SEC—a federal government agency that had already fined Defendant Musk tens of millions of dollars for making false statements—suggesting to any objective reader that the communication should be interpreted as a statement of fact.

165.    Whether Plaintiff resided then or at any point in a "psych ward" is a provable statement; Plaintiff did not.

166.    Defendant Musk's statement was interpreted as factual by an enormous number of his and Defendant Qazi's followers, who have continued to harass Plaintiff and repeat false claims calling Plaintiff's mental health into question ever since.

167.    On October 12, 2019 at 1:18 P.M., in the context of a Twitter thread started by Defendant Qazi, Defendant Musk baselessly referred to Plaintiff as an "online bully" running a "fake charity," and included the Twitter handle of the owner of the *Los Angeles Times*, Dr. Patrick Soon-Shiong, in the conversation, such that Dr. Soon-Shiong would receive an alert on his mobile device(s) about the conversation.

168.    Deliberately bringing the owner of a major newspaper into the conversation falsely suggested that the substance of the statement was factual and worth reporting on.

169.    Defendant Musk's Twitter account is "verified," meaning that Twitter, Inc. has confirmed that Elon Musk is in fact the owner of the @ElonMusk account.  As a result, the account and its posts feature a small white check mark in a blue seal wherever it appears.  Many Twitter users incorrectly interpret this icon to mean that an account's content is more factually accurate and/or endorsed by Twitter itself.  *See* https://twitter.com/twittersupport/status/928654369771356162.

170.    The "online bully" post was of and concerning Plaintiff.  Any average Twitter user curious about the "online bully" or "fake charity" mentioned by Defendant Musk would have seen the article explicitly describing "Aaron Greenspan" and "Think Computer Foundation" at the top of the short thread directly connected to the post.

171.    As running a "fake charity" would presumably be a crime, Defendant Musk accused Plaintiff of committing a crime.

172.    Defendant Musk's aspersions concerning Plaintiff were made as conclusory statements of fact.  For example, although Plaintiff frequently asks questions and raises substantive issues involving public figures and businesses, Plaintiff's Twitter history is

searchable and is devoid of bullying.  In addition, Think Computer Foundation's status with the IRS is easily verifiable on the IRS website.  Think Computer Foundation also openly publishes comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Musk ignored.

173.     Many of Defendant Musk's followers reacted as though Defendant Musk's false statements concerning Plaintiff were completely factual.  @sara_boutall wrote, "This fake charity is terrifying."  *See* https://twitter.com/sara_boutall/status/1183114999956422656.  Third Row Tesla contributor Viven Hantusch wrote, "Lots of resemblance to political troll networks as well."  *See* https://twitter.com/flcnhvy/status/1183116410291183617.  Twitter user @TTwfake wrote, "I've submitted a complaint to the IRS. This is not ok."  *See* https://twitter.com/TTwfake/status/1183165610450194432.

174.     On or around October 22, 2019 at 2:51 P.M., in reply to an e-mail from Defendant Qazi, Defendant Musk sent an e-mail to Twitter CEO Jack Dorsey, as well as Defendant Qazi among other recipients.  The message, which was likely intended to assist Defendant Qazi with restoring his then-suspended Twitter account—a matter so important to Defendant Tesla as to necessitate its CEO's involvement—referred to Plaintiff explicitly by name as a "nut" who suffered from "major issues," once again falsely suggesting that Plaintiff suffered from a psychiatric illness or disease.

175.     The e-mail from Defendant Musk to Jack Dorsey began by immediately discussing whether Defendant Qazi's unknown statements were "accurate," leading any reader to believe what followed—including the false and disparaging remarks directly concerning Plaintiff—would involve factual matters.

176.     The statement that Plaintiff "sued [Mark] Zuckerberg," the CEO of Facebook, Inc. and Plaintiff's Harvard classmate, is both false and misleading in what it omits.  It is false because to date, Plaintiff has never sued Mark Zuckerberg.  In 2008 and 2009, Plaintiff's company filed two trademark cancellation proceedings against Facebook, Inc. before the United States Patent and Trademark Office Trademark Trial and Appeal Board, in which Plaintiff's

company was found to have standing.  It is misleading because it omits that as a result, Facebook, Inc. and Mark Zuckerberg reached a confidential settlement with Plaintiff and Plaintiff's company in May 2009, and Facebook, Inc. and Mark Zuckerberg admitted in a public press release that Plaintiff's work on the houseSYSTEM Facebook at Harvard College had indeed inspired Mark Zuckerberg, who was a member of Plaintiff's site as he developed his own while communicating with Plaintiff.  *See* https://about.fb.com/news/2009/05/facebook-and-think-computer-corporation-resolve-trademark-dispute/.

177.    Defendant Musk's provably false statements concerning Plaintiff were not in service of and failed to further any public debate.

178.    Defendant Musk's false and misleading statements were not made as part of a heated or volatile debate with Plaintiff (or anyone) that might be prone to hyperbole.  Plaintiff was not an active participant in any of the above discussions initiated by Defendant Musk at all.

179.    Defendant Musk's false statements were made with actual malice because Musk knew the statements were false, made the statements with reckless disregard for whether the statements were false or not, and with the awareness that he is frequently given the benefit of the doubt by tens of millions of his followers due to his immense wealth.

180.    Defendant Musk's false statements concerning Plaintiff are part of a pattern.  In 2018, Defendant Musk was sued for libel after publicly and falsely referring to a different critic as a "pedo guy" and a "child rapist" who had supposedly moved to Thailand "for a child bride." *See* California Central District Court Case No. 2:18-cv-08048-SVW-JC, *Vernon Unsworth v. Elon Musk*.

181.    On or around August 21, 2018, Defendant Musk e-mailed his former public relations consultant, Juleanna Glover—CCing his brother (and fellow Tesla Director) Kimbal Musk and former Tesla Global Communications Director Dave Arnold—"Will Tweet as I wish and suffer the consequences. So it goes."  This statement affirms the intentional nature of Defendant Musk's statements and his reckless disregard for the truth.  *See* Nevada District Court Case No. 3:18-cv-00296-LRH-CLB, Document 177-1, Page 124.

182.    None of Defendant Musk's statements concerning Plaintiff were ever deleted, retracted, or the subject of an apology.  The fact that Defendant Musk disparaged Plaintiff before government agents and the CEO of Twitter alike indicates that his statements were intentional.

183.    Defendant Musk's false and misleading statements, in some cases disseminated to tens of millions, have irreparably harmed Plaintiff's reputation.

<div align="center">

**COUNT III**
**Intentional Infliction of Emotional Distress**
**Against Defendant Omar Qazi**

</div>

184.    Plaintiff incorporates by reference the foregoing allegations.

185.    Defendant Omar Qazi's conduct—starting with his January 2019 harassing prank call to Plaintiff impersonating "the phone company," to his impersonation of both Plaintiff's father and his disabled brother, to his communications with Plaintiff's actual disabled brother via Facebook, to his unjustified and totally baseless shaming of Plaintiff's immediate family on multiple websites and social media accounts set up by Defendant Smick Enterprises, Inc. explicitly for that purpose, to his baseless accusation that Plaintiff was linked to "sexual assault," to his suggestion that Plaintiff might commit murder, to his use of hidden expletives directed at Plaintiff in HTML source code comments, to his deliberate interference with ongoing restraining order proceedings involving a violent criminal, to his transmitting and/or causing to be transmitted false allegations concerning Plaintiff's supposed possession of child pornography, to his eager republication of outrageous and libelous statements by Defendant Musk, to his creation of or encouragement of the creation of an account in Plaintiff's name on a pornographic website, to his unprovoked regurgitation of a stilted version of this history viewed by thousands of individuals six months later, to his insistence that Plaintiff would be referred to criminal law enforcement on false pretenses as at least one of Defendant Musk's other critics has been—is so extreme as to go beyond all possible bounds of decency.

186.    No citizen in a civilized society should ever be expected to tolerate the kind of behavior from Defendants Qazi and Smick Enterprises, Inc. as Plaintiff was forced to tolerate.

187.    Defendant Qazi's conduct caused initial grave concern and distress for Plaintiff insofar as Defendant Qazi was unwilling to remove false content and related links to content that Plaintiff feared could lead to another violent or fatal attack against Jews at Plaintiff's family's current and/or former synagogue.

188.    Defendant Qazi's conduct caused grave concern for Plaintiff insofar as it appeared that Defendant Qazi was communicating with the restrained party in Plaintiff's ongoing civil harassment case, who has a documented history of mental illness and a documented history of violence, and who is already the subject of criminal harassment proceedings in Massachusetts for violating the underlying restraining order.

189.    Plaintiff was horrified that others, including law enforcement, might believe Defendant Qazi's false allegations regarding child pornography.

190.    Defendant Qazi's conduct caused further grave concern for Plaintiff insofar as he was communicating with Plaintiff's brother, whose severe disabilities preclude him from understanding the context for those communications, from defending himself against bad faith actors, and from understanding how to cope with unexpected life disturbances, which in turn causes unneeded stress for Plaintiff's entire family.

191.    Defendant Qazi's conduct caused chagrin and fear for Plaintiff due to the possibility, which ultimately materialized, that Defendant Qazi's misconduct would be used in court by Diego MasMarques, Jr. against Plaintiff.

192.    Defendant Qazi's conduct caused chagrin and fear for Plaintiff due to the possibility, voiced by his father, that his father's career or relationships with his colleagues might be adversely affected by his parents' names and photographs being posted on Defendant Qazi's "Victims of Aaron Greenspan Foundation" website, and therefore, on search engine results.

193.    Plaintiff contacted his family repeatedly to discuss the best way to handle Defendant Qazi's intrusions, but could not assure them that he could make his harassment stop.

194.    Defendant Qazi's behavior greatly increased the daily stress felt by Plaintiff due to the need to constantly be on guard for false statements by Defendant Qazi and/or his

followers, to determine which of thousands of statements absolutely necessitated corrective responses or reports of abuse, and to attempt to avoid entanglement between Defendant Qazi and the ongoing Santa Clara County Superior Court restraining order case.

195.    Plaintiff reported Defendants Qazi and Musk to the San Francisco Police Department ("SFPD"), filing two separate declarations under penalty of perjury and visiting three police stations on different occasions.  When the SFPD refused to act despite the at least five California Penal Code violations associated with Defendant Qazi's conduct, Plaintiff contacted his City Supervisor.  Ultimately, in his May 17, 2020 screed, Defendant Qazi admitted that a Sergeant at SFPD placed one phone call to him, warning him to stop.  *See* Exhibit J.

196.    Plaintiff reported the August 3, 2019 text messages and fax, which Defendant Qazi at least caused to be sent, to the FBI.

197.    Plaintiff lost hundreds of productive work hours carefully documenting Defendant Qazi's actions in case pressing criminal charges or filing a civil lawsuit might ultimately be necessary.  Simply by staying up later at night to monitor Defendant Qazi's accounts for the sake of his family's safety and reputation, Plaintiff lost sleep due to Defendant Qazi's actions.

198.    Plaintiff was contacted by a number of individuals expressing genuine concern for Plaintiff's well-being as a result of Defendant Qazi's actions, and spent many hours talking through the situation with these supporters.

199.    Defendant Qazi's actions and October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate total and complete reckless disregard for the truth and for Plaintiff's well-being.

### COUNT IV
### Copyright Infringement (17 U.S.C. § 501, *et seq.*)
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

200.    Plaintiff incorporates by reference the foregoing allegations.

201.    In 2008, Plaintiff authored a book, *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era*, ISBN 978-1-60669-000-0 ("Authoritas").  Authoritas is

an original, creative, copyrighted work whose copyright was registered with the United States Copyright Office on June 7, 2008 and assigned Registration No. TX 6-890-602. *See* Exhibit K.

202.    Without permission, starting on or around October 4, 2019, Defendant Qazi repeatedly posted photographs of the front and back covers and inside pages of Authoritas on his @tesla_truth Twitter account, along with willfully misinterpreted and out-of-context quotes from what Defendant Qazi considered to be the most important parts of Authoritas, with the intent of defaming Plaintiff and harming the market for the book.

203.    Defendant Qazi posted at least six photographs and a dozen passages from the hardcover edition of Authoritas.  The photographs were of pages 149, 150, 151, and 187.  The quotes, mostly verbatim, were from pages 9 (three quotes), 20, 31, 33 (two quotes), 34 (two quotes), 39, 194, 203, and 271.

204.    The heart of Authoritas is the portion of the book that focuses on the circumstances at Harvard College that gave rise to Plaintiff's development of "The Facebook" in 2003, approximately covering pages 146-285.  All of Defendant Qazi's Authoritas photographs of actual pages and three of the typed quotations came from this page range.

205.    To the extent that Defendant Qazi altered the quotations, he made them fit into Twitter's limit of 280 characters per post, but added no new creative aspect whatsoever.

206.    By posting segments of Authoritas on the @tesla_truth account and generally ridiculing the book, Defendant Qazi sought to use Plaintiff's own words against him for commercial gain by decreasing the likelihood that Plaintiff's research on Defendant Tesla would be taken seriously, in turn mitigating any negative impact to the value of his TSLA shares.  He also sought to harm the market for Authoritas.

207.    Apart from the posts and photographs, Defendant Qazi's deliberately misleading commentary about Authoritas offered nothing apart from hatred and ridicule.  His analysis (for example, "sucks at math / blames math teacher" to describe an economics professor who was relieved of teaching duties by the head of the Harvard economics department, or "had to use [a

vomit bag] when I saw his face on the jacket") did not report on any newsworthy information, teach, research, or offer legitimate criticism.

208.     Despite supposedly being repulsed by Plaintiff's face, on at least a dozen separate occasions, Defendant Qazi downloaded and/or republished a copyrighted photograph of Plaintiff wearing a purple shirt (the "Purple Shirt Photograph") from the "About" page of Plaintiff's personal website at http://www.aarongreenspan.com for the express purpose of libeling, harassing and ridiculing Plaintiff, well outside the bounds of fair use.  Plaintiff owns the copyright to the Purple Shirt Photograph.

209.     Plaintiff's personal website had and has a clear copyright notice at the bottom of every page.

210.     Defendant Qazi also obtained a photograph of Plaintiff's father from the "About" page of Plaintiff's father's personal website at http://www.neilgreenspan.com, for the express unlawful purpose of impersonating Plaintiff's father.  Plaintiff took the photograph in question and owns the copyright to that photograph.

211.     Plaintiff's father's website had and has a clear copyright notice at the bottom of every page.

212.     Defendant Qazi first published the Purple Shirt Photograph on or around August 7, 2019 on his @tesla_truth Twitter account, adjacent to various false statements and baseless accusations concerning Plaintiff as part of his ceaseless campaign of harassment and libel.

213.     On October 10, 2019, Plaintiff sent a DMCA takedown notice concerning the image to Twitter.  Twitter complied with the request and the image was removed.

214.     On October 10, 2019, Defendant Qazi pledged, in all capital letters, "I WILL CONTEST.  My full statement by 9 pacific time tomorrow!  Tune in bright and early to Tesla Twitter tomorrow morning for a show you won't want to miss!"

215.     On October 11, 2019 at 2:17 A.M., Defendant Qazi re-posted the copyrighted Purple Shirt Photograph with the caption, "he doesn't want people to see how stupid he looks even though he already put the picture online."

216.    Each time Twitter removed the image in response to Plaintiff's DMCA takedown requests, Defendant Qazi reposted it either in his Twitter feed, or as an enlarged background banner image at the top of his @tesla_truth account.

217.    In all, Plaintiff sent seven DMCA takedown notices to Twitter concerning Defendant Qazi's behavior:

| Date | Twitter DMCA Request No. | Infringing Omar Qazi Account | Copyrighted Image(s) |
|---|---|---|---|
| October 10, 2019 | 0128820272 | @tesla_truth | Purple Shirt Photograph |
| October 10, 2019 | 0128821585 | @greenspan_neil | Photograph of Neil Greenspan |
| October 11, 2019 | 0128859664 | @tesla_truth | FaceCash Website |
| October 11, 2019 | 0128861040 | @tesla_truth | Purple Shirt Photograph |
| October 11, 2019 | 0128886103 | @tesla_truth | Purple Shirt Photograph and FaceCash Website |
| October 17, 2019 | 0129465039 | @tesla_truth | Purple Shirt Photograph |
| October 17, 2019 | 0129466543 | @plainshite | PlainSite Logo |

218.    No DMCA counter-notice was filed in response to any of the above requests.

219.    On October 22, 2019, Defendant Qazi complained on his personal Twitter account, @OmarQazi, that he had received yet another DMCA takedown notice concerning the Purple Shirt Photograph, which had been removed by Twitter before he reposted it again only hours later.

220.    On or around October 24, 2019, Twitter banned Defendant Qazi for life from its platform due to his repeat legal violations, including his repeated, willful infringement of Plaintiff's copyright.  The ban went into effect immediately.

221.    Blocked from violating copyright law on Twitter, Defendant Qazi instead posted copyrighted material on his Smick Sites.  Plaintiff's October 15, 2019 DMCA takedown request to Amazon Web Services LLC resulted in Defendant Smick Enterprises, Inc. being terminated as a client by Amazon as well.

222.    Defendant Qazi's rapid re-posting of material he knew to be copyrighted and his October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate that his actions were both willful and not fair use.

223.    Plaintiff suffered irreparable damage to his business reputation and goodwill as a result of Defendant Qazi's repeated infringements.  Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), which should be enhanced in accordance with 17 U.S.C. § 504(c)(2) due to Defendant Qazi's willful conduct.

<div align="center">

**COUNT V**
**Removal of Copyright Management Information in Violation of the DMCA**
**(17 U.S.C. § 1202(b))**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

</div>

224.    Plaintiff incorporates by reference the foregoing allegations.

225.    Section 1202(b) of the DMCA prohibits removal or alteration of copyright management information ("CMI").  CMI includes "[t]he name of, and other identifying information about, the author of a work," as well as "links to such information." 17 U.S.C. § 1202(c).

226.    Without permission, and after receiving several DMCA takedown notices, Defendant Qazi posted the Purple Shirt Photograph depicting Plaintiff repeatedly on his various Twitter accounts and Smick Sites without the accompanying copyright notice clearly found on the page where he obtained it.  Each republishing of the photograph constituted a separate violation of the DMCA.

227.    The copyright notice at http://www.aarongreenspan.com/about/ read "Copyright © 2001-2017 Aaron Greenspan. All Rights Reserved."  This notice constitutes CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

228.    Without permission, and after receiving at least one DMCA takedown notice, Defendant Qazi posted a photograph of Plaintiff's father on his fake @greenspan_neil account, impersonating Dr. Greenspan.

229.    The copyright notice at http://www.neilgreenspan.com/about/ read "Copyright © 2013 Neil S. Greenspan. Photograph copyright © 2013 Aaron Greenspan. All Rights Reserved." This notice constitutes CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

230.    Plaintiff seeks statutory damages for Defendants' DMCA violations.

**COUNT VI**
**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**Against Defendants Omar Qazi, Smick Enterprises, Inc. and Elon Musk**

231.    Plaintiff incorporates by reference the foregoing allegations.

232.    Plaintiff, Defendant Qazi and Defendant Musk are all technology entrepreneurs and individual investors who run technology companies, work on enterprise software, and generally compete for resources and investment opportunities in the Bay Area in California.

233.    Defendants engaged in unlawful, unfair, and fraudulent acts and practices committed pursuant to business activity, namely, the promotion of Defendant Tesla's stock and products in order to financially profit from capital gains and/or referral commissions.

234.    Defendant Smick Enterprises, Inc. violated California Revenue and Taxation Code § 23151 by failing to ever register with the California Franchise Tax Board or Secretary of State despite doing business in California as a Delaware corporation.  Defendant Qazi was aware of the need to register his business with the California Franchise Tax Board at least as early as April 10, 2018, when he posted on the website Hacker News as user "omarforgotpwd":

> "Remember that California minumum [*sic*] tax for an LLC is $800. EVERY YEAR…  If you really do need to legally form a company to separate out finances and liability, depending on what you're doing, you might want to look at starting a Delaware C corporation."

This statement garnered the following reply from another user on the same day:

> "You do realize if you do business in CA you have to pay CA taxes, right? You're mentioning Delaware but that would be for corporations and dispute management. You're not going to get away from taxes..."

*See* https://news.ycombinator.com/item?id=16806444.

235.    The aforementioned actions taken by Defendants Qazi and Smick Enterprises, Inc. also violated a variety of California statutes.  Specifically,

a)  California Penal Code § 166(a)(4) stipulates:

> "Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor: Willful disobedience of the

terms as written of any process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial."

Upon information and belief, Defendant Qazi knowingly assisted Diego

MasMarques, Jr. with the violation of an active court order.

b)  California Penal Code § 166(a)(7) stipulates:

"Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor: The publication of a false or grossly inaccurate report of the proceedings of a court."

Defendant Qazi knowingly altered and rendered grossly inaccurate a form issued by

the Judicial Council of California that was used in court.

c)  California Penal Code § 422.4 states in part:

"Any person who publishes information describing or depicting an academic researcher or his or her immediate family member, or the location or locations where an academic researcher or an immediate family member of an academic researcher may be found, with the intent that another person imminently use the information to commit a crime involving violence or a threat of violence against an academic researcher or his or her immediate family member, and the information is likely to produce the imminent commission of such a crime, is guilty of a misdemeanor, punishable by imprisonment in a county jail for not more than one year, a fine of not more than one thousand dollars ($1,000), or by both a fine and imprisonment."

Using resources belonging to Defendant Smick Enterprises, Inc., Defendant Qazi

published Plaintiff's family's home address to tens of thousands of people, amplified

by Defendant Musk to potentially millions, as part of a libelous diatribe intended to

harm Plaintiff and his family, which included false allegations that Plaintiff's father

had committed serious crimes.  Plaintiff's father is a medical researcher at an

academic institution.

d)  California Penal Code § 653m(b) states:

"Every person who, with intent to annoy or harass, makes repeated telephone calls or makes repeated contact by means of an electronic communication device, or makes any combination of calls or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith or during the ordinary course and scope of business."

Defendant Qazi admitted to making the prank call to Plaintiff on January 15, 2019, which was intended to annoy and harass, aside from his other harassing conduct using electronic communication devices.  In connection with this case, Defendant Qazi placed a second harassing call to Plaintiff's father on May 25, 2020, in which he falsely suggested that he worked for Quinn Emanuel, a major law firm that has represented Defendant Musk in the past.

e)  California Penal Code § 528.5 states in part:

> "Notwithstanding any other provision of law, any person who knowingly and without consent credibly impersonates another actual person through or on an Internet Web site or by other electronic means for purposes of harming, intimidating, threatening, or defrauding another person is guilty of a public offense punishable pursuant to subdivision (d)."

Defendant Qazi impersonated both Dr. Neil S. Greenspan and Simon Greenspan, Plaintiff's family members, as well as Plaintiff's business using resources belonging to Defendant Smick Enterprises, Inc.

236.    The aforementioned actions taken by Defendants Qazi, Smick Enterprises, Inc. and Musk also violated a variety of federal statutes.  Specifically,

f)  Defendants Qazi, Smick Enterprises, Inc. and Musk violated 18 U.S.C. § 371, "Conspiracy to commit offense or to defraud United States," and 18 U.S.C. § 2261A(2)(B), "Stalking," by coordinating with each other, individuals working for Defendant Musk directly and/or indirectly, and various social media followers with the explicitly-stated goal of harassing Plaintiff, and participating in that harassment. Among the manner and means by which they carried out these unlawful, criminal acts were:

i.      Creating Twitter accounts in false names and Plaintiff's family's names and using them to send harassing messages to and about Plaintiff and Plaintiff's company and non-profit;

ii.     Using profile photos of Plaintiff's family members;

iii.     Causing photographs of Plaintiff to be uploaded without permission to
         FaceApp, a Russian application with potential links to Russian intelligence;

iv.      Personally making prank phone calls impersonating a telephone company
         technician and a law firm employee to Plaintiff and his family members;

v.       Personally sending Plaintiff's disabled brother messages via Facebook;

vi.      Encouraging others to call, fax, e-mail, send text messages to, send Twitter
         DMs to, and attempt to disable Plaintiff's Twitter accounts;

vii.     Publicly posting Plaintiff's family's home address on numerous websites
         alongside false information about Plaintiff and Plaintiff's family;

viii.    Causing a text message and pornographic fax to be sent to Plaintiff falsely
         accusing Plaintiff of harboring child pornography;

ix.      Causing an account on at least one pornographic website to be created in
         Plaintiff's name;

x.       Causing the posting of at least one online false advertisement involving
         Plaintiff;

xi.      Signing up Plaintiff for unwanted e-mails and newsletters;

xii.     Threatening to make false reports regarding Plaintiff to law enforcement
         authorities and actively encouraging others to make false reports;

xiii.    Disguising their role in the conspiracy and harassment through the use of
         VPN and/or proxy services;

xiv.     Publicly encouraging the firing of any journalist supportive of Plaintiff.

g)   Defendant Musk violated 18 U.S.C. § 1512(b)(2)(A) and/or (B), "Tampering with a
     witness, victim, or an informant," by attempting to intimidate Plaintiff into
     withdrawing and/or halting Think Computer Foundation's Chancery Rule 5.1(f)
     Challenge to Confidential Treatment in the SolarCity Case (an "official proceeding"
     pursuant to 18 U.S.C. § 1515(A)(1)(D) as it involves Tesla Insurance Services, Inc., a
     regulated insurance company providing insurance for "solar system installation" in

interstate commerce and/or its predecessor) and/or ceasing communication with the SEC regarding an official proceeding.  Think Computer Foundation filed the Challenge at Plaintiff's direction on September 19, 2019.  On September 24, 2019, Vice Chancellor Joseph R. Slights III ruled that the "Director Defendants" in the case had until October 10, 2019 to "provide to the other Producing Parties proposed public versions of the sealed exhibits filed in support of their Motion for Summary Judgment."  On October 12, 2019, two days after that deadline, but before the documents were publicly released on October 24, 2019—and three days after CCing SEC Regional Director Erin Schneider on an e-mail to Defendant Musk—Defendant Musk responded to Defendant Qazi's Twitter post to publicly accuse Plaintiff's non-profit organization of being a "fake charity" and Plaintiff of being an "online bully" in view of over 30 million followers, while publicly supporting Defendant Qazi's efforts to have Plaintiff reported to the IRS for vague and imagined "crimes."

237.    Additionally, Defendants engaged in unlawful, unfair, and fraudulent acts and practices by making widely publicized libelous statements to discredit Plaintiff's research (most of which involves court and government records) concerning Defendants Tesla and Musk.

238.    Plaintiff paid a total of $4.25 to the City and County of San Francisco in two separate transactions for street parking on October 10, 2019 in order to make a police report regarding Defendants' conduct at the SFPD Richmond station.  SFPD assigned the report Case No. 190764227.  Defendants' unlawful conduct caused Plaintiff's expenditure.  Plaintiff had no other reason to pay for parking near the SFPD Richmond station, and no other reason to file a police report on that day.

239.    Plaintiff paid for gasoline necessary to drive to various SFPD police stations to file police reports regarding Defendants' unlawful conduct, which cannot be filed electronically per SFPD policy.  On October 7, 2019, Plaintiff spent $31.31 on gasoline at a 76 Gas Station in San Jose, California, a portion of which was used to drive to and from the SFPD Richmond

station three days later.  On October 29, 2019, Plaintiff drove to and spoke with a Lieutenant at the Bayview station regarding Case No. 190764227, which also required gasoline.

240.    Plaintiff expended at least 100 hours documenting Defendants' misconduct which would have otherwise been productive time.

241.    Plaintiff's injuries are in amounts to be determined at trial.

### COUNT VII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Musk and Tesla

242.    Plaintiff incorporates by reference the foregoing allegations.

243.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)  defendants made public misrepresentations or failed to disclose material facts;

b)  the omissions and misrepresentations were material;

c)  TSLA securities were and are traded in efficient markets;

d)  TSLA shares were and are liquid and trade with moderate to heavy volume, with an average volume of 13.2 million shares traded daily according to NASDAQ.  *See* https://www.nasdaq.com/market-activity/stocks/tsla;

e)  Defendant Tesla traded and trades on the NASDAQ, and was and is covered by multiple analysts;

f)  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of TSLA securities; and

g)  Plaintiff purchased, sold, or endured the expiration of TSLA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed (if ever), without knowledge of the omitted or misrepresented facts.

244.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Many of

the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tesla who knew that those statements were false when made.

245.   On a quarterly basis, Defendant Musk signs SEC Forms 10-Q and 10-K, including financial statements issued by Defendant Tesla.  These SEC Forms 10-Q and 10-K also contain certifications pursuant to the Sarbanes-Oxley Act of 2002, stating that the financial information contained therein is accurate and discloses any material changes to Defendant Tesla's internal control over financial reporting.  *See* Exhibit R.

246.   Despite these legal safeguards, Defendants Tesla and Musk have repeatedly misled investors about Tesla's cash position in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 1<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Tesla was repeatedly drawing down its credit lines on or around the last day of the quarter to artificially inflate its cash balances for the purposes of publication in each SEC Form 10-Q or 10-K, as appropriate.<br><br>*Supporting Evidence:* According to a March 5, 2019 *Financial Times* article entitled, "How much does Tesla have in the bank?" the actual cash interest yield reported in Defendant Tesla's financial statements suggests that the company began exaggerating its cash balances starting in Q4 2016, and continued exaggerating them up to roughly $1.5 billion by the end of 2018.  *See* https://ftalphaville.ft.com/2019/03/05/1551787633000/How-much-does-Tesla-have-in-the-bank-/.  The article's conclusions are further supported by Defendant Musk's own videotaped admission to *Axios* on November 26, 2018 that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die"—disclosures totally absent from the Q3 2018 SEC Form 10-Q filed just 26 days prior, which misleadingly reported an ample |

| | |
|---|---|
| | "$2,967,504[,000]" of unrestricted cash on hand.  *See* https://www.axios.com/elon-musk-tesla-death-bleeding-cash-a7928b06-3aae-43d7-bdde-5b9c41ef298f.html. |
| 2<br><br>February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to distinguish between cash accessible for use in the United States of America and cash restricted for use only within the People's Republic of China, subject to strict loan agreements with the Chinese government.<br><br>*Supporting Evidence:* Exhibit EX-10.85 attached to the 2019 SEC Form 10-K filed February 13, 2020, the "English Convenience Translation" of the Tesla (Shanghai) Co., Ltd. Fixed Asset Syndication Loan Agreement dated December 18, 2019 with numerous Chinese banks, includes clause 11, translated as "Revenue Collection Account Management," which restricts transfers of revenue collected in China to any other account unless the "transfer is used for the purpose of repaying any of its working capital loans" from the Chinese banks.  In effect, Defendant Tesla cannot move cash collected in China to the United States until the loans are repaid unless the Chinese bank lenders pre-approve such a transfer. |
| 3<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A) | *Omission:* failing to note Defendant Tesla's refusal to pay vendors and/or government agencies on-time as evidenced by numerous lawsuits for non-payment, as well as failing to note the lawsuits themselves as material litigation.  To the extent these balances were reported as "Accounts Payable," it was misleading to imply that vendors and/or government agencies had actually agreed to Defendant Tesla's payment terms.<br><br>*Supporting Evidence:* The lawsuits are a matter of public record.  *See* https://www.plainsite.org/tags/tesla-vendor-nonpayment/. |
| 4<br><br>February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* using the terms "customer deposits" or "cash" to describe funds resulting from the deliberate conversion of cash from customers' credit cards and/or bank accounts via the Tesla mobile app, which was intentionally designed to encourage accidental one-tap purchases of extremely expensive software add-ons, such as "Full Self Driving" for approximately $4,000 or more.  Once purchased, Tesla typically refuses to refund these large amounts and recognizes the funds as revenue.<br><br>*Supporting Evidence:* This dynamic was described by several Tesla customers on social media.  On January 15, 2020, Nassim Nicholas Taleb wrote in a Twitter post: "The purchase was non-intentional. I |

unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with[out] confirmation/password or something of the sort." *See* https://twitter.com/nntaleb/status/1217471369350348807.  Although Taleb, who is famous, reportedly received a refund after complaining publicly, many less-famous Tesla customers did not. *See* https://electrek.co/2020/01/15/tesla-owners-unintentionally-buying-software-upgrades-musk/.

Twitter user @CamBirch wrote on January 28, 2020, "I just had this happen. Called Tesla (hard to do) and talked to a support person. It took them a week and the refund is now displayed on my card. Getting the free mud flaps had more confirmations and proof of purchase than a nearly $10k purchase." *See* https://twitter.com/CamBirch/status/1222256448555515904.

Twitter user @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us." *See* https://twitter.com/mpj510/status/1237205195626401792.

Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund." *See* https://twitter.com/Maykou1st/status/1248833418827194369.

At least one other similar public request was deleted as a condition of receiving a refund. *See* https://twitter.com/BeckyQuick/status/1222334373502115840.

These purchases took place because Defendant Tesla updated its mobile app to add the expensive software "upgrades" to each user's shopping cart *by default*, and further because Defendant Tesla designed the "purchase" button not to look like a button at all.

| 5 | |
|---|---|
| April 29, 2020 | *Omission:* refusing to discuss the cash balance on any day but the final day of the quarter. |
| | *Supporting Evidence:* On the April 29, 2020 earnings call, Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Zachary Kirkhorn about the present-day cash balance at the time, not the cash balance as of March 31, 2020.  Kirkhorn declined to answer the question and Jonas did not press him for an answer.  Specifically, Kirkhorn stated, "Yeah.  It's a fair question.  I don't have any additional color to provide.  So $8.1 billion in cash and cash equivalents at the end of Q1, we're managing it very closely."  The statement that, "I don't have any |

| | |
|---|---|
| additional color" was false given that as CFO he had full access to Defendant Tesla's financials. | |

247.   Defendants Tesla and Musk have repeatedly misled investors about Tesla's sales in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 6<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission and Misleading Statement:* failing to report sales at all. Instead, Tesla has reported "deliveries," an undefined, proprietary, non-GAAP term that the market has misinterpreted as equivalent to sales, with Defendants Tesla and Musk encouraging that misinterpretation through their passive and active silence.  "Deliveries" and sales are not the same.  Defendants Musk and Tesla refuse to specify with any degree of precision what "deliveries" actually are, whether the figures include sales to Tesla's own subsidiaries worldwide, and whether payment of any kind is required for a "delivery" to take place.<br><br>*Supporting Evidence:* The only meaningless hint contained in Tesla's quarterly press releases as to the definition of "deliveries" is the statement, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," though the customer could be a Tesla subsidiary with paperwork correctly reflecting a vehicle purchase for $0.01. This statement was contained in Defendant Tesla's April 2, 2020 press release, which only reported consolidated deliveries by model group.  *See* https://ir.tesla.com/news-releases/news-release-details/tesla-q1-2020-vehicle-production-deliveries.  Also unclear is whether a returned vehicle could be "delivered" again in the future.  According to public records, Tesla Norway A/S has registered dozens of cars to itself, and the *Vancouver Sun* reported that Defendant Tesla purchased at least one of its own cars to qualify for a tax rebate.  In early 2020, Plaintiff repeatedly pressed Defendant Musk and the Tesla Board of Directors to define the term "delivery," without success.  *See* Exhibit L. |
| 7<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 | *Misleading Statement:* overstating vehicle "deliveries" by tens of thousands of vehicles per quarter since Q3 2018.<br><br>*Supporting Evidence:* Plaintiff compiled public record vehicle registration data from state Departments of Motor Vehicles and international sources.  The data covered 8 of the 10 states where Defendant Tesla sells the most cars: CA, FL, TX, NJ, WA, NY, CO, and MA, plus 7 more through at least Q1 2020.  Using estimates for the remaining states and various international data sources, Plaintiff found that Defendant Tesla had overstated "deliveries" relative to recorded vehicle registrations by roughly 100,000 total vehicles since Q3 2017, with significant overstatements beginning in Q3 2018.  Plaintiff notified the Tesla Board of Directors, including Defendant Musk; Tesla's |

59

| | |
|---|---|
| (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | auditors at PriceWaterhouseCoopers; the SEC; the Federal Trade Commission; and the Public Company Accounting Oversight Board of these findings, and received no substantive response. *See* Exhibit M. |
| 8<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose Defendant Tesla's practice of selling used and demo cars as "new," inflating "deliveries."<br><br>*Supporting Evidence:* This practice has led to litigation from former employees and customers alike.  In a 2018 lawsuit initially filed in the Burlington County, New Jersey Superior Court and later removed to New Jersey District Court, Case No. 1:18-cv-04120-JHR-AMD, former Tesla employee Adam Williams alleged that he had been fired after reporting illegal sales practices to management, including "failing to disclose to consumers high-dollar, pre-delivery damage repairs" and "receiving vehicles designated as 'lemons' and, with this knowledge, reselling these vehicles without branding the titles of these vehicles or offering disclosure, rather than representing the cars as 'used' or a 'demo/loaner.'"  In *Woods et al v. Tesla, Inc.*, the plaintiffs sued over a defective Tesla Model S with over 8,000 miles on the odometer that they had bought as a "new" vehicle because it was a demo unit. |
| 9<br><br>October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Tesla has worked with vendors such as Carvana and CarMax to artificially inflate various used Tesla vehicle price-based metrics through engineered prices far above actual market rates for those vehicles.<br><br>*Supporting Evidence:* CarMax spontaneously stopped selling used Tesla vehicles in or around October 2019.  Former Tesla Finance LLC CEO Leopold Visser, who was also an executive associated with Defendant Tesla's subsidiaries Tesla Insurance, Inc. and TALT Holdings LLC, left Defendant Tesla in early 2020 to work at Carvana as "Director, Special Projects."  Carvana only lists about ten Tesla Model 3 vehicles on its web site, some of which are listed at significantly inflated prices *above new vehicle prices* that are likely useful for inflating Defendant Tesla's Residual Value Guarantee (RVG) calculations that factor into revenue and net income and may influence Kelley Blue Book values; and are in a locked, non-purchasable status until December 31 of the year 9999 despite not being marked as sold, according to Carvana's API.  For example, on May 14, 2020, Carvana vehicle ID 1430592, a Tesla Model 3, had a "vehicleUnlockDateTime" value of "9999-12-31T23:59:59.9999999Z" and a "lockType" value of "Purchase". |

248.   Defendants Tesla and Musk have repeatedly misled investors about Tesla's true financial condition in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 10<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* maintaining a minimum balance of approximately $1 billion for its Accounts Receivable line item since Q3 2018, when Accounts Receivable jumped from $570 million to $1.155 billion.<br><br>*Supporting Evidence:* Given Tesla's business model, which involves cash payments up-front, this unusually high and persistent balance has attracted considerable notice from prominent investors such as David Einhorn, who has publicly questioned Defendant Musk about it twice without ever receiving a clear answer, and from business reporters with accounting degrees and experience, such as Francine McKenna.  In Ms. McKenna's words, "They should not have this big of an accounts receivable balance."  *See* Exhibit N and https://feeds.buzzsprout.com/758369/3800531-episode-26-francine-mckenna at 56:56. |
| 11<br><br>October 29, 2019 (Q3 2019 10-Q) | *Misleading Statement/Omission:* failing to specifically enumerate vendor rebates, payment deferrals, and other negotiated one-time allowances and instead lumping them into broader line items, e.g. Cost of Goods Sold, causing investors to believe that costs are artificially low, and profits, artificially high.<br><br>*Supporting Evidence:* One of the rare allusions to the existence of vendor-related allowances is the opaque phrase, "including commercial negotiations with suppliers" on the bottom of page 44 of Defendant Tesla's Q3 2019 SEC Form 10-Q.  There is no clarification as to which vendors were involved with "commercial negotiations," what the negotiations entailed, or what the resulting outcome was.  Defendant Tesla simply states, "Cost of automotive sales revenue decreased $392 million." |
| 12<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), | *Misleading Statement:* deliberately under-booking its warranty reserve for repairs to its vehicles.  Instead, Defendant Tesla has engaged in a scheme to record repairs as "goodwill" for years, thereby artificially inflating gross margin and net income.<br><br>*Supporting Evidence:* This scheme is apparent in approximately twenty lemon lawsuits filed by Tesla customers across the United States that happen to include copies of vehicle service invoices.  These documents consistently note warranty repairs billed to "goodwill" that should be billed to the warranty reserve.  *See* https://www.plainsite.org/tags/tesla- |

| | |
|---|---|
| October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | goodwill-service/ and Exhibit O. |

249.   Defendants Tesla and Musk artificially inflated Tesla's stock price by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 13<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Musk placed and/or encouraged others to place trades during extended market trading hours, or weekdays from 4:00 P.M. - 8:00 P.M. Eastern Time and 4:00 A.M. - 9:30 A.M. Eastern Time, to deliberately exploit lighter trading volume despite TSLA shares being traded in efficient markets during standard trading hours, such that unusual bid and ask prices would manipulate share price in advance of the market's next open.<br><br>*Supporting Evidence:* It is established that Defendant Musk trades during extended hours.  Footnote 1 in Defendant Musk's SEC Form 4 filed May 7, 2018 disclosed "multiple transactions at prices ranging from $294.79 to $295.69" on that day, but the lowest price recorded during standard trading hours on May 7, 2018 was $295.17.  In fact, there were only two trades in TSLA shares on May 7, 2018 at a price of $294.79, both executed prior to market open.  Based on analysis of the number of shares traded, Defendant Musk's disclosed purchases took place starting at 7:35:47 A.M. Eastern Time.  Further analysis indicates that on several occasions, Defendant Musk and/or entities known to him purchased millions of dollars worth of TSLA stock with the explicit goal of manipulating the share price. *See* https://twitter.com/SheepleAnalytic/status/994233358346530816.<br><br>Below is a TSLA stock graph showing extended hours trading from about 7:00 P.M. Eastern Time on March 19, 2020 through 5:30 A.M. Eastern Time on March 20, 2020.  The gap between the last red bar at 8:00 P.M. on March 19 and the large green bar at 4:00 A.M. on March 20 represents a trader purchasing shares far above the asking price, starting at $420.00, the same price Defendant Musk falsely claimed he would take the company private at, leading to a Consent Decree. |



In addition, on March 20, 2020—one day after Defendant Tesla announced its Fremont, California factory would be shutting down—an unknown individual bought 8,000 shares of TSLA at prices between $420 and $456 per share (worth over $3.3 million) starting at approximately 4:00 A.M. Eastern Time. At $456 per share early in the morning on March 20th, TSLA traded approximately $59 (or roughly 15%) above the asking price from 8:00 P.M. the previous night on devastatingly bad news regarding the main factory.

| 14 | *Omission:* failing to disclose to investors that Defendants Tesla and Musk were working to unlawfully disseminate misleading news stories, discredit or silence critics, and obtain "research" on whistleblowers regardless of veracity, by engaging: |
|---|---|
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | a) social media influencers, some anonymous or pseudonymous, including but not limited to Defendant Qazi, Bonnie Norman, Galileo Russell, Sofiaan Fraval, Zac and Jesse Cataldo, and Frederic Lambert, all Tesla shareholders and content creators; <br> b) ex-CIA and ex-NSA "security" professionals at firms such as Redacted, Inc. (throughout 2020 concerning XMotors.ai in China, among other matters) and Nisos Group LLC (throughout mid- to late-2018 concerning Martin Tripp in Nevada and *Business Insider* in New York); <br> c) public relations firms such as Milltown Partners, Ridgely Walsh, Strategies 360, and Forza Communications; and <br> d) convicted felons such as James Howard-Higgins (in July-August 2018 concerning Vernon Unsworth in Thailand). <br><br> *Supporting Evidence:* Evidence that Defendants Tesla and Musk have |

| | |
|---|---|
| | hired numerous firms to handle crisis communications and silence critics, sometimes via Defendant Musk's "family office" company Excession LLC, has emerged through litigation and other public records such as California lobbyist disclosures.  Furthermore, on March 27, 2019, Plaintiff was one of many Tesla-focused targets of someone posing as a "Senior Journalist at Bloomberg" supposedly named "Maisy Kinsley" with a computer-generated composite photograph, a fake LinkedIn profile, fake Twitter account (username @msmaisymade), and a fake personal website at http://www.msmaisymade.com hosted by Namecheap, Inc. |
| 15<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendants Tesla and Musk were working with highly visible television personalities who regularly appear on financial media networks such as CNBC and Bloomberg Television, in order to push a false and misleading narrative about Tesla's future prospects.<br><br>*Supporting Evidence:* Since 2019, narratives have included wild, as-yet-unfulfilled promises about "robotaxis," the "Cybertruck" pickup truck, and new "gigafactories" in various locales.  Media personalities Ross Gerber of Gerber Kawasaki Wealth & Investment Management, Cathie Wood of ARK Investment Management LLC, and Jim Cramer of CNBC (among others) have all contributed to this coordinated effort, often with the explicit cooperation of Defendants Tesla and Musk.<br><br>Both Jim Cramer and Ross Gerber have openly referred to illegal stock manipulation as a "game."  In 2008, Jim Cramer said, "A lot of times when I was short at my hedge fund ... meaning I needed (a stock) down, I would create a level of activity beforehand that could drive the futures… It's a fun game and it's a lucrative game."  *See* https://www.youtube.com/watch?v=gMShFx5rThI.  On June 13, 2020 at 9:50 A.M., Ross Gerber wrote on Twitter, "I can move stocks all over the place. By myself. Think about it. I have $1.1 bil. I've got $100 mil in cash. I could buy all of hertz. Push it any way I want. I don't play that game… but I can crush people all day if I want… don't they get it. It's like poker."  He later deleted the post.  Defendant Musk has provided Tesla factory tours to Wood and Gerber and appeared on a podcast hosted by Wood on February 19, 2019.  *See* https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/. |
| 16<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), | *Omission:* failing to disclose that Defendant Tesla was incentivizing Wall Street sell-side analysts, such as Adam Jonas of Morgan Stanley (referred to in the *New York Times* as "The Tesla Cheerleader"), to repeatedly and baselessly upgrade Tesla's price target and earnings projections in public, and write public analysis with optimistic spin in possible exchange for lucrative banking deal fee revenue, while referring to Tesla in private in far more negative terms. |

| | |
|---|---|
| July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Supporting Evidence:* In at least one private call with investors on May 22, 2019 that was eventually leaked, Jonas admitted that Tesla is a "distressed credit and restructuring story."  *See* https://www.forbes.com/sites/alanohnsman/2019/05/22/tesla-shifts-from-growth-to-distressed-credit-story-morgan-stanley-says/.  Jonas has publicly used sky-high software company valuations when convenient, instead of more appropriate automotive company valuations.  On October 30, 2019 on Bloomberg Television, Jonas even stated, "We think Tesla is a software company…that, in an ideal world, would be covered by a tech hardware analyst rather than the auto analyst community."  That sentiment did not stop him, around March 2020, from starting to write notes about TSLA as an automotive analyst almost daily, an unheard-of practice for sell-side analysts who typically release notes about companies they cover once or twice per quarter. |
| 17<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Tesla was abusing confidentiality provisions (including protective orders) in lawsuits, arbitration proceedings, regulatory proceedings and contracts with employees to keep unlawful acts and public safety information secret.<br><br>*Supporting Evidence:* Examples include the overzealous redaction of court materials in Delaware Court of Chancery Case No. 12711-VCS from 2016-2019; Defendant Tesla's unlawful refusal to allow the Nevada Department of Industrial Relations to inspect its factory on May 21, 2019 even with a valid search warrant signed by a judge (*see* https://www.youtube.com/watch?v=cSlHfyfY8Wk); Tesla Associate General Counsel Erin Bradley's November 6, 2019 request to the California Alternative Energy and Advanced Transportation Financing Authority ("CAEATFA") regarding requested redactions and so-called "trade secrets;" and Tesla lobbyist Dan Chia's misleading insistence in March-April 2020 that federal copyright law governs public records concerning Defendant Tesla's mishandling of COVID-19 procedures when it does not. |
| 18<br><br>October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* inappropriately recognizing revenue for pre-paid features still being developed, such as autonomous driving features that present a public safety hazard when not adequately tested before release or "beta" release.<br><br>*Supporting Evidence:* "Smart Summon" was released without adequate testing at the end of September 2019, in time to allow Defendant Tesla to recognize approximately $30 million of deferred revenue during Q3 2019.  According to a California Public Records Act request response, the California Department of Motor Vehicles sent Defendant Tesla a letter on March 6, 2020 highlighting failures observed during a demonstration on November 1, 2019, including but not limited to, "The vehicle did not recognize a stop sign and proceeded without stopping." |
| 19 | *Misleading Statement:* presenting false and misleading financial |

| | | |
|---|---|---|
| | November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | statements to the SEC and investors.<br><br>*Supporting Evidence:* Several figures from one period do not match the same period's figures when reported as the "prior period" figures on the next financial statement.  For example, in Q3 2018, Defendant Tesla reported "Selling, general and administrative" (SG&A) expenses of "113,973" thousand dollars, or about $114 million.  In Q4 2018, that number for Q3 2018 was implicitly revised downward to $109 million.  In Q3 2018, "Cost of sales" (COGS) was reported as "25,037" thousand dollars, or about $25 million.  By Q4 2018, that same number for Q3 2018 was implicitly revised upward to $30 million.  This type of unexplained shift from SG&A to COGS appears to take place every quarter from Q2 2018 through at least Q1 2019. |
| 20<br><br>January 30, 2019 | *Misleading Statement:* On the Q4 2018 Tesla earnings call, Defendant Musk stated, "I mean, my best guess, this is just a guess, my best guess for demand of Model 3 worldwide is something — in a strong economy, it's something on the order of 700,000 or 800,000 units a year.  That's my best guess for demand of Model 3 in a strong economy.  If the economy goes into a recession, then I think that could be something under 40% less.  But I think even in a recession, worldwide demand is still something in the order of 500,000 for Model 3."  These estimates are directly contradicted by projections Defendant Tesla provided to the State of California under penalty of perjury on January 18, 2019, only twelve days prior to the Q4 2018 earnings call.<br><br>*Supporting Evidence*: Tesla applied for a CAEATFA sales and use tax subsidy on January 18, 2019.  Part of the application was submitted on a Microsoft Excel spreadsheet containing a tab entitled "Data Set," shown in part below:<br><br><br><br>CAEATFA was instructed by Defendant Tesla to redact the information in this tab prior to release under the California Public Records Act, but failed to do so by accident.  The CAEATFA application data reveal that |

| | |
|---|---|
| | Tesla never expected to deliver more than 250,000 Model 3 vehicles per year in any year up to 2021.  "Deliveries" necessarily reflect demand even if they are not the same as sales.  Defendant Musk's exaggerated claims about Model 3 demand ranging from 500,000 to 800,000 units per year are shown to be false by these internal documents. |
| 21<br><br>April 12, 2019 | *Misleading Statement:* In a videotaped interview, Defendant Musk stated, "I think the most profound thing is that if you buy a Tesla today, I believe you are buying an appreciating asset—not a depreciating asset."  *See* https://www.youtube.com/watch?v=dEv99vxKjVI.<br><br>*Supporting Evidence:* This false statement was intended to spark a speculative frenzy for Tesla vehicles and even deposits on vehicles.  In fact, Defendant Tesla pays customers trading in their old Tesla vehicles *less* than their initial purchase price, not more.  Defendant Tesla has attempted to artificially inflate resale values to make Defendant Musk's false statement appear true, as described in Issue 9.  In August 2018, in a different videotaped interview, Defendant Musk stated, "[W]ith each successive design iteration, uh, you can add more capability, you can design—you can integrate more things.  You can figure out, uh, better ways to produce it, so it actually gets better and cheaper. But, it's like, a natural progression of any new technology."  *See* https://www.youtube.com/watch?v=MevKTPN4ozw&t=6m8s. |
| 22<br><br>April 22, 2019,<br>April 11, 2020 | *Misleading Statement:* lying to investors about potential future prospects such that there is always a supposedly transformative but ultimately delayed story to look forward to just around the corner.  For example, at "Autonomy Investor Day" on April 22, 2019, Defendant Musk promised that Defendant Tesla would deploy a robotaxi fleet of 1 million Tesla vehicles by the end of 2020.  In his words,<br><br>    "I feel very confident predicting that there will be autonomous robotaxis from Tesla next year—not in all jurisdictions because we won't have regulatory approval everywhere.  From our standpoint, if you fast forward a year, maybe a year and three months, but next year for sure, we'll have over a million robotaxis on the road."<br><br>On April 11, 2020, Defendant Musk reiterated this claim on Twitter, stating, "Functionality still looking good for this year.  Regulatory approval is the big unknown."  *See* https://twitter.com/elonmusk/status/1249210220200550405.<br><br>*Supporting Evidence:* By April 11, 2020, it was clear that COVID-19 would make this impossible.  Furthermore, in a June 3, 2020 e-mail to Plaintiff, the California Department of Motor Vehicles confirmed that Defendant Tesla had never actually raised the matter of "robotaxis" with its autonomous driving regulators. |

| | |
|---|---|
| 23<br><br>July 29, 2019 | *Misleading Statement:* Defendant Musk wrote on his Twitter account, "Spooling up production line rapidly. Hoping to manufacture ~1000 solar roofs/week by end of this year."<br><br>*Supporting Evidence:* Federal import records show that Defendant Tesla had long since started importing solar roof tiles from Changzhou Almaden Co. Ltd. in China by July 2019, leaving little to "manufacture" in the United States.  In May and June 2020, Defendant Tesla began informing solar roof customers in certain markets that their orders were cancelled.  *See* https://electrek.co/2020/06/11/tesla-cancelling-solar-roof-orders-after-years-deposits/. |
| 24<br><br>November 12, 2019 | *Misleading Statement:* During a podcast interview pertaining largely to Defendant Tesla, Defendant Musk stated, "So, Neuralink, I think at first, will solve a lot of brain-related diseases.  So could be anything from like autism, schizophrenia, memory loss…like everyone experiences memory loss at certain points in age."  In so doing, Defendant Musk falsely suggested that he could soon cure autism.  This statement, viewed by nearly one million people, was at least in part intended to convey that Defendant Musk's companies are worthy of investment.  *See* https://www.youtube.com/watch?v=smK9dgdTl40&t=18m2s.<br><br>*Supporting Evidence:* The statement is totally and completely false.  Neither Neuralink or any other device imagined by Defendant Musk can "solve" or clinically treat autism.  Defendant Musk is not a physician, let alone a neurologist or a neurosurgeon.  Neuralink has no Food and Drug Administration (FDA) approval of any kind and has published a total of zero peer-reviewed articles.  "Autism" is not a single discrete disease, nor is it even a spectrum of diseases (as is widely believed), that could be cured through the implant of a microchip as proposed by Neuralink.  Serious research efforts involving autism, such as the Simons Foundation Autism Research Initiative gene database, encompass a wide range of genetic factors and specific neurological conditions completely ignored by Defendant Musk.  *See* Exhibit P. |
| 25<br><br>November 23-24, 2019 | *Misleading Statement:* On November 23, 2019, Defendant Musk posted on Twitter that the "Cybertruck" had generated significant demand, stating, "146k Cybertruck orders so far, with 42% choosing dual, 41% tri & 17% single motor."  The following day, he posted "187k" in the same conversation thread.  At 7:18 P.M., he then posted "200k" in a separate thread.  *See* https://twitter.com/elonmusk/status/1198344195317985280, https://twitter.com/elonmusk/status/1198693994194014208, and https://twitter.com/elonmusk/status/1198788116372344832.<br><br>*Supporting Evidence:* The deposits made for the Cybertruck were not, in fact, firm "orders."  Multiple press accounts reported individuals making multiple reservations due to the low deposit amount of $100.00.  According to a November 25, 2019 CNBC article, "Given the minimal |

$100 payment, it's impossible to say how many pre-orders will eventually convert to sales." *See* https://www.cnbc.com/2019/11/25/elon-musk-tweets-on-cybertruck-orders-say-little-about-actual-sales.html.  Some depositors believed that they would be able to resell their deposit to others for a higher price, based on Defendant Musk's false representations about Tesla vehicles appreciating in value, as described in Issue 21.  Defendant Musk also deliberately failed to communicate the number of deposits made by *unique* depositors, offering absolutely no context for many of his purely numeric and intentionally vague and misleading posts.

On June 25, 2020, Twitter user @MatchasmMatt wrote, "So I did this three more times today. I'm at 15 now. I've lost all control, somebody stop me!!! [laugh-crying emoji][laugh-crying emoji]."  The post included a screenshot of a Cybertruck reservation confirmation page for order number RN113576660.  *See* https://twitter.com/MatchasmMatt/status/1276251737855229952.

Twitter user @Ben_310 responded, "You are a bad influence sir, I just ordered 2 more, I'm now at 4. Would have never thought of this idea before you floated it, it does make a lot of sense." *See* https://twitter.com/Ben_310/status/1276270854561644544.

@MatchasmMatt then clarified his reason for placing 15 Cybertruck reservations: "It's a free option on autonomy. If Elon was somehow correct and robotaxis are a thing by next year, these trucks will be worth much more than the price I have locked in by my reservation. If autonomy doesn't pan out, I can just cancel and get my money back."

| 26 | *Misleading Statement:* On Twitter, Defendant Musk wrote, "There is considerable conflation of diagnosis & contraction of 'corona'. Actual virality is much lower than it would seem. I think this will turn out to be comparable to other forms of influenza. World War Z it is not." *See* https://twitter.com/elonmusk/status/1223172311546724352. He then downplayed the threat of coronavirus even further, clarifying, "Meant to say other forms of 'the cold', not influenza [link to Wikipedia]." |
|---|---|
| January 31, 2020 | |

*Supporting Evidence:* Defendant Musk made these flatly unscientific statements and others dismissing the seriousness of COVID-19 in the context of operating factories densely packed with workers in Shanghai, China and Fremont, California—both of which were eventually shut down by concerns related to the global coronavirus pandemic.  The Shanghai factory was shut down by the Chinese government on or around January 29, 2020, two days before Defendant Musk's above posts.  *See* https://www.theverge.com/2020/1/29/21114377/tesla-coronavirus-delay-production-factory-china.  For months, Defendant Musk presented this false optimism to quell investor fears regarding the

| | |
|---|---|
| | impact the pandemic might have on demand for and sales of Tesla vehicles, while privately castigating those who had merely *potentially* exposed his teenage son to the coronavirus, per the Stanford student newsletter *The Fountain Hopper*. *See* https://mailchi.mp/fountainhopper/foho-104despite-mandatory-reporting-obligations-stanford-asks-students-to-report-dangerous-items-offering-fundamental-standard-amnesty. *See also* Exhibit P. |
| 27<br><br>March 19, 2020 | *Misleading Statement:* Referring to COVID-19, Defendant Musk posted on Twitter, "Based on current trends, probably close to zero new cases in US too by end of April." He followed up with, "Kids are essentially immune, but elderly with existing conditions are vulnerable. Family gatherings with close contact between kids & grandparents probably most risky." *See* https://twitter.com/elonmusk/status/1240754657263144960 and https://twitter.com/elonmusk/status/1240758710646878208.<br><br>*Supporting Evidence: See* supporting evidence for Issue 26 and Exhibit P. |
| 28<br><br>June 10, 2020 | *Misleading Statement:* Referring to the "Tesla Semi" truck, Defendant Musk wrote in a "leaked" e-mail that, "Production of the battery and powertrain will take place at Giga Nevada," according to Reuters. *See* https://www.reuters.com/article/us-tesla-truck/tesla-shares-surge-past-1000-as-musk-revs-up-the-semi-idUSKBN23H1PE.<br><br>*Supporting Evidence:* There are no concrete plans to develop the Tesla Semi, with a production schedule that has been pushed back for years. Only two demo Tesla Semi trucks exist. The persistent promise of the future product has been used to pump Defendant Tesla's stock price and secure very large deposits from interested customers. In addition, Defendant Musk has used deliberately "leaked" e-mails to intentionally disclose positive narratives (while evading Regulation FD) in order to manipulate Defendant Tesla's stock price. *See* https://drivetribe.com/p/yet-another-one-of-elon-musks-emails-L9xYYr1oSM-qqgBoNtAnhw. |
| 29<br><br>June 11, 2020 | *Misleading Statement:* Tesla Vice President of Environment, Health and Safety Laurie Shelby wrote in a letter to employees intentionally leaked to the press, "Since we restarted operations, we have had zero COVID-19 workplace transmissions." *See* https://www.cnbc.com/2020/06/12/tesla-laurie-shelby-email-on-covid-19-fremont-workers-worried.html.<br><br>*Supporting Evidence:* Ms. Shelby is not a physician. Even if she were a physician, it is not possible for anyone to know precisely how or when COVID-19 was transmitted from person to person. Both Defendant Tesla and the Alameda County Department of Public Health have refused to disclose any details regarding COVID-19 infections at any Tesla facility, even anonymized, which is now the subject of litigation. |

250.     Defendants Tesla and Musk have omitted material disclosures to investors that would have likely lowered the TSLA stock price, including:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 30<br><br>April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning lease accounting metrics pursuant to FASB ASC 842, despite being present the prior quarter in Tesla's 2019 SEC Form 10-K filed February 13, 2020.<br><br>*Supporting Evidence:* The section is missing in the Q1 2020 Form 10-Q. |
| 31<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A) | *Omission:* disclosures concerning the amount of scrap and/or waste materials at Tesla's factories in Nevada and California since 2018, which have since been highlighted by whistleblower-litigants Martin Tripp and Karl Hansen, and reportedly involve figures near or above $100 million.<br><br>*Supporting Evidence:* Deposition testimony from Tripp and Hansen indicates that the amounts of scrap and waste were financially material, multi-million dollar figures that were important enough to attract Defendant Musk's direct involvement in phone calls and e-mails. *See* Exhibit Q. |
| 32<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K) | *Omission:* disclosures concerning routine theft and storage of raw materials since 2018, sometimes involving lithium-ion batteries left in unrefrigerated trailers in the Nevada desert—issues also highlighted by Hansen and reportedly involving figures near or above $37 million.<br><br>*Supporting Evidence:* Deposition testimony from Tripp and Hansen indicates that the amount of stolen goods, especially copper wiring, was a financially material, multi-million dollar figure that was important enough to attract Defendant Musk's direct involvement in phone calls and e-mails. *See* Exhibit Q. |
| 33<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K) | *Omission:* disclosures concerning Defendant Tesla's illegal wiretapping of employees' and contractors' personal devices using IMSI catchers (also known as Stingrays), which could result in material legal liability for the company.<br><br>*Supporting Evidence:* Deposition testimony from Hansen strongly suggests that Defendant Tesla used a special device, commonly known as an IMSI catcher or Stringray, to unlawfully monitor personal cellular communications of employees, contractors, and those generally in the vicinity of its Nevada factory. |
| 34<br><br>July 29, 2019 (Q2 2019 10-Q), October 29, 2019 | *Omission:* disclosures concerning Defendants' relationship with the family of deceased drug kingpin Pablo Escobar, as well as "Escobar, Inc.;" as well as disclosures concerning Defendants' relationship (especially via Tesla Director and friend of Defendant Musk, Antonio Gracias) with the family of Joaquín "El Chapo" Archivaldo Guzmán |

| | |
|---|---|
| (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | Loera (especially Emma Coronel Aispuro).<br><br>*Supporting Evidence:* Numerous July 2019 articles in *Newsweek*, *Business Insider* and other publications detail a relationship between Defendants Tesla and Musk and the Escobar family, with reports that Defendant Musk instructed at least one Tesla engineer to travel to Mexico on Tesla business for the benefit of the Escobar family and/or its enterprises. *See* https://www.newsweek.com/escobar-elon-musk-flamethrower-1449338 and https://www.businessinsider.com/elon-musk-fights-with-pablo-escobars-brother-on-twitter-2019-7. Additional sources allege a connection between Defendant Musk, a Tesla Director and the "still married wife of a permanent A list criminal." The same sources have repeatedly linked Defendant Musk and Emma Coronel Aispuro, the wife of El Chapo Guzmán.<br><br>Defendant Musk's company SpaceX owns land in Boca Chica, Texas 2.5 miles from the Mexican border. Drug smuggling is an active problem in the Boca Chica area. *See* https://www.cbp.gov/newsroom/local-media-release/border-patrol-hinders-smuggling-attempts-rio-grande-valley. In late 2018, the United States Department of Homeland Security Customs and Border Patrol (CBP) requested access to the SpaceX facility in Boca Chica. *See* https://www.themonitor.com/2019/01/03/dhs-cbp-want-access-survey-spacex-property/. |
| 35<br><br>October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning the import of "solar glass" roof tiles from Chinese manufacturers such as Changzhou Almaden Co. Ltd., whose shipping labels have appeared on boxes at numerous Tesla roofing work sites in California (pictured below), and which according to United States Customs and Border Protection data has been a vendor of Defendant Tesla's since at least 2017.<br><br>*Supporting Evidence:* Numerous photographs, including but not limited to the following, show Tesla roofing work sites with tiles imported from China and shipped directly to a Tesla warehouse in Hayward, California:<br><br> |
| 36<br><br>October 29, 2019 | *Omission:* disclosures concerning the actual purpose and usage of Defendant Tesla's Buffalo, New York factory given the company's statement on page 9 of its "Q4 '19 Update" (see |

| | |
|---|---|
| (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | https://ir.tesla.com/static-files/b3cf7f5e-546a-4a65-9888-c928b914b529) that, "Solarglass tiles are made in our Gigafactory New York, and we are hiring hundreds of employees at this facility," while it simultaneously imports solar glass roof tiles from China. <br><br> *Supporting Evidence:* See above supporting evidence for Issue 35. |
| 37 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 | *Omission:* disclosures concerning "Project Titan," a stealth recall of fire-prone solar panel parts. <br><br> *Supporting Evidence:* Project Titan was revealed to the public by *Business Insider* reporter Linette Lopez. *See* https://www.businessinsider.com/tesla-project-titan-replace-bad-solar-panel-parts-2019-8. |
| 38 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 | *Omission:* disclosures concerning Defendant Tesla's concealment of flaws jeopardizing passenger safety in the Model S since 2012. <br><br> *Supporting Evidence:* Known faults with the Model S battery were revealed to the public by *Business Insider* reporter Linette Lopez. *See* https://www.businessinsider.com/tesla-faulty-battery-cooling-systems-design-model-s-2012-2019-6. |
| 39 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 | *Omission:* disclosures concerning related-party transactions and whether businesses run by Defendant Musk that have paid for Tesla-related matters in the past, including but not limited to Excession LLC and Falcon Landing LLC, as well as businesses run by former executives, are or are not related parties. |

| (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Supporting Evidence:* Deposition testimony by Defendant Musk in the Unsworth litigation indicates that he used Excession LLC to finance research into a critic's background, and that Excession LLC manages at least some of Musk's Tesla holdings.  Public records indicate that Falcon Landing LLC owns at least one of the private jets that Defendant Musk uses for Tesla business.  Tesla co-founder J.B. Straubel now runs a company called Redwood Materials, Inc. that has been referred to as both a related and unrelated entity at various points in time. |
| 40<br><br>February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning Defendant Musk's health given his key role.<br><br>*Supporting Evidence:* On November 27, 2019, counsel for Defendant Musk filed a document before the Delaware Court of Chancery indicating that Defendant Musk wished to redact "Medical Information" from Volume II of his deposition transcript in Case No. 12711-VCS. Defendant Musk has appeared in public with scars on his neck. Defendants Tesla and Musk are in possession of information pertaining to these omissions that is not available at present to the general public. |

251.    Defendants Tesla and Musk even misled investors by using a regulated earnings call to distract from other damaging disclosures that were likely to impact the value of TSLA stock negatively.  On October 23, 2019, Defendant Musk used the Q3 2019 Tesla earnings call to bizarrely announce a subsequent announcement, even though he was already on the phone with investors at that very moment.  In his words,

> "And then, one—one last item is that uh, tomorrow afternoon, um, we will be uh, releasing, Version 3 of the Tesla Solar Roof. That's the integrated solar—with it—solar panels integrated with the roof.  Um, so that's um—I think this is a great, a great product. Version 1 and 2 we were still sort of figuring things out.  Version 3, I think, is finally ready for, for the big time.  Um, and so we're scaling up production of the Version 3, uh solar tower roof at our Buffalo Gigafactory.  And we—I think this product is going to be incredible.  But we'll talk more about that on the official product launch, which will be tomorrow afternoon."

The product did not, in fact, launch the next day.  Instead, Defendants Tesla and Musk moved the announcement again to the day after: Friday, October 25, 2019.  This announcement did not

involve any live product demonstration or even video that would have necessitated the product being ready to demonstrate on any particular day.

252.   On September 24, 2019, in Delaware Chancery Court Case No. 12711-VCS, Defendants Tesla and Musk proposed and moved for a deadline of October 24, 2019 for the publication of public versions of previously sealed and confidential documents concerning the acquisition of SolarCity.  The motion was quickly granted by that court.

253.   Upon information and belief, the solar roof product announcement was not made on the Q3 2019 earnings call, or at its intended time on October 24, 2019, because of a delay at the Delaware Chancery Court involving the clerk's required approval of court filings for public viewing, which took one extra day since the attorneys in Delaware submitted the documents late at night.  By ultimately announcing the new solar roof product after the earnings call and on October 25, 2019, Defendants Tesla and Musk minimized the press coverage devoted to their fraudulent conduct when news of the SolarCity liquidity crisis cover-up finally broke on the day after the one they had initially requested and planned for.

254.   On May 1, 2020 at 8:11 A.M., Defendant Musk wrote "Tesla stock price is too high i[n ]m[y ]o[pinion]" with no explanation given, admitting inflation in TSLA's stock price. *See* https://twitter.com/elonmusk/status/1256239815256797184.  On that day, TSLA stock traded at a high of $772.77 and a low of $683.04 per share.  Yet TSLA stock had traded higher several times before, without any such pronouncement from Defendant Musk: from February 3-4, 2020; from February 12-26, 2020; and from April 27-30, 2020.

255.   For years, Defendant Tesla's Public Relations and Investor Relations teams have steadfastly refused to answer questions concerning any topics at all, whether posed by investors or respected journalists.

256.   As of October 31, 2019, Tesla listed only two names as company "Management" on the Corporate Governance section of its Investor Relations website: Elon Musk and Zachary J. Kirkhorn.  *See* https://web.archive.org/web/20191031124241/https://ir.tesla.com/corporate-governance/management.  At all times since approximately March 2019 when Mr. Kirkhorn

became Tesla's CFO, both of these individuals have had complete access to Tesla's financials and sales records.  Accordingly, Defendant Musk knew that his statements on earnings calls, on Twitter, and via other media were false and/or misleading.

257.    Defendants Musk and Tesla have acted with scienter.  In its roughly seventeen years of existence, Defendant Tesla has never turned an annual profit.  Instead, the company has subsisted on roughly $19 billion of investor capital, and it continues to require billions of dollars of outside capital to survive.  Defendant Tesla's constant need for outside investor cash has created a clear incentive for Defendant Musk as the company's CEO to defraud the market and silence critics in the hope that outside investors might believe his misrepresentations and continue to fund the company's chronically unprofitable existence.  In a dynamic that has repeated itself numerous times, on November 16, 2018, Defendant Musk admitted to *Axios* that Defendant Tesla had been "within single-digit weeks" of bankruptcy, and "[e]ssentially the company was bleeding money like crazy," a statement that remains true as of the date of this First Amended Complaint.

258.    Defendant Musk's fraudulent conduct was motivated by several factors:

a)  Tesla's constantly precarious cash situation;

b)  his belief that lying is necessary for survival, voiced at the National Press Club in relation to the collapse of Solyndra, another cash-poor energy company.  In his words, "[Solyndra's executives] presented a better face to the situation than should have been presented in the final few months, but then, if they didn't do that, it would have become a self-fulfilling prophecy of—as soon as a CEO says 'I'm not sure if we'll survive,' [slit throat gesture] you're dead."  *See* https://www.youtube.com/watch?v=QL_Jv9xJm18&t=44m34s;

c)  his belief that lying is "cute," as evidenced by his February 8, 2020 re-publication of an image of a T-shirt featuring the Central Intelligence Agency seal and the bold text, "ADMIT NOTHING / DENY EVERYTHING."  *See* https://twitter.com/elonmusk/status/1226053049820446720;

d)  his belief that laws and rules do not apply to him, as evidenced by his behavior leading up to the signing of the SEC Consent Decree, and after, including his infamous, "I do not respect the SEC.  I do not respect them," quote during his December 9, 2018 CBS *60 Minutes* interview, and the fact that Defendant Musk was also subjected to contempt of court proceedings. *See* https://www.youtube.com/watch?v=cRNypdYQoWk;

e)  his animosity toward short sellers, including but not limited to Plaintiff, as evidenced by such statements as his May 4, 2018 Twitter post, "Oh and uh short burn of the century comin soon. Flamethrowers should arrive just in time," as well as his referring to the SEC as the "Shortseller Enrichment Commission" on October 4, 2018.  *See* https://twitter.com/elonmusk/status/992388944774938626 and https://twitter.com/elonmusk/status/1047943670350020608;

f)  his unprecedented executive compensation package potentially worth billions of dollars, based almost entirely around stock options that vest when pre-determined average market capitalizations (in turn based upon share price) are sustained for certain periods of time.  Defendant Musk's executive compensation is already the subject of litigation in the Delaware Chancery Court in the case of *Tornetta v. Elon Musk*, Case No. 2018-0408-JRS; and

g)  his possible connections to Mexican drug cartels.

259.    In a deposition on August 22, 2019, Defendant Musk admitted to frequently changing and discarding mobile devices.  *See* California Central District Court Case No. 2:18-cv-08048-SVW-JC, Document 86-1, Pages 54-56.  Defendant Musk also uses encrypted communications applications such as WhatsApp and Telegram.  SpaceX IT Support Lead Alex Bradford Stillings further signed an "iCloud Search Certification" on October 1, 2019 stating, "For security purposes, Mr. Musk regularly changes his cellular device, at which time his old device is imaged, wiped clean, and stored or destroyed." *Id*. at 115.

260.   Defendants Musk and Tesla were found to have acted with scienter in similar circumstances in this Court in Case No. 3:18-cv-04865-EMC, *In Re Tesla, Inc. Securities Litigation*.

261.   Defendants Musk and Tesla disseminated, encouraged or approved the false statements and/or material omissions specified above, with knowledge of or reckless disregard for their false or misleading nature, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

262.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by:

a)   Employing devices, schemes, and artifices to defraud;

b)   Making untrue statements of material facts or failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)   Engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TSLA securities.

263.   Plaintiff has suffered damages in that, by defrauding the market, Defendants Tesla and Musk were able to keep the share price of TSLA common stock artificially inflated for a prolonged period of time, leading to losses on TSLA put options that expired worthless but otherwise would not have.  Plaintiff would not have purchased TSLA put options at the prices he did had been aware that the market price for Tesla stock would be artificially and falsely inflated by Defendants' false and misleading statements and/or actions.

## COUNT VIII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 For Market Manipulation Against All Defendants

264.   Plaintiff incorporates by reference the foregoing allegations.

265.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that

drove the price of TSLA shares to artificially high levels beginning on October 23, 2019, when the stock traded at an already-elevated $254.68 per share, and continuing through the present day, when it trades at or near $1,228.00 per share (over 380% higher), the stock's all-time high.



266.    Defendants' market manipulation caused Plaintiff's losses.

267.    At the time of each instance of Defendants' manipulation, Plaintiff was ignorant of those manipulative acts.

268.    Defendants had actual knowledge of the material facts alleged herein, and knowingly intended to deceive Plaintiff and all investors for the purpose of manipulating the price of Tesla securities.

269.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT IX
### For Violation of Section 20(a) of the Exchange Act
### Against Defendant Musk

270.    Plaintiff incorporates by reference the foregoing allegations.

271.    Defendant Musk acted as a controlling person of Tesla within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position and his power to control public statements about Tesla, Defendant Musk had the power and ability to control the actions of Tesla

and its employees.  By reason of such conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

272.    In the televised CBS *60 Minutes* interview broadcast on December 9, 2018, with reference to Defendant Tesla, Defendant Musk admitted, "I am the largest shareholder in the company.  And I can just call for a shareholder vote and get anything done that I want."

273.    As an officer and director of a publicly owned company, Defendant Musk had a duty to disseminate accurate and truthful information with respect to Defendant Tesla's financial condition and results of operations, and to correct promptly any public statements issued by Tesla that had become materially false or misleading.

274.    Because of his position of control and authority as a senior officer, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace concerning Tesla's financial prospects. Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of TSLA securities.

## COUNT X
## For Injunctive Relief
## Against All Defendants

275.    Plaintiff incorporates by reference the foregoing allegations.

276.    Plaintiff respectfully requests an injunction requiring all Defendants to cease and desist making and/or publishing further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; contacting Plaintiff or his family members; impersonating others; and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. A permanent injunction enjoining all Defendants from making further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral, contacting Plaintiff or his family members, impersonating others, and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff;

B. Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

C. Statutory damages, enhanced to a sum of not more than $150,000 per work infringed, for Defendant Qazi's willful infringement of copyrights pursuant to 17 U.S.C. § 504(c) and 17 U.S.C. § 1202(b).

D. Punitive damages stemming from Defendants' ongoing and willful disregard for various state and federal laws;

E. Judgment against Defendants on all counts of the Complaint;

F. Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs, in accordance with 42 U.S.C. § 1988 and other applicable law;

G. Such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: July 2, 2020

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on July 2, 2020, he caused this **FIRST AMENDED COMPLAINT** to be served via First Class Mail by depositing this document, postage pre-paid, in the U.S. Mail addressed to:

> Omar Qazi
> 2625 Hyde Street
> San Francisco, CA  94109
> *Defendant and Officer of Defendant Smick Enterprises, Inc.*

All other parties are registered for the CM/ECF system and have been served electronically.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 2, 2020.

Dated: July 2, 2020

Aaron Greenspan