1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

AARON GREENSPAN,

    Plaintiff,

       v.

OMAR QAZI, SMICK ENTERPRISES, INC.,
ELON MUSK, and TESLA, INC.,

    Defendants.

Case No. 3:20-cv-03426-JD

**SECOND AMENDED
COMPLAINT FOR:**

1.  Libel Per Se
2.  Intentional Infliction of Emotional Distress
3.  Violation of Anti-Stalking Statute, Civil Code § 1708.7, *et seq*.
4.  Copyright Infringement
5.  Violation of the DMCA (Copyright Management Information Removal, Misrepresentation)
6.  Violation of the UCL, Business & Professions Code § 17200
7.  Violation of Federal Securities Laws

DEMAND FOR JURY TRIAL

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

## INTRODUCTION

1.      This is a case about whether or not the wealthiest members of society should be permitted to lie with impunity, and the means they sometimes use to silence those who justifiably question them.

2.      Defendant Elon Musk is the billionaire CEO of Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy products.  He has attracted a cult

following, both among his customer base and on the Twitter social network, where Defendant

Musk has in excess of 30 million followers.



3.     Defendant Tesla has never earned an annual profit, nor has any company run by

Defendant Musk ever earned an annual profit while he was in charge.

4.     Defendant Tesla can be fairly described as a Ponzi scheme that just happens to

produce cars, where new investors cash out old investors while executives, and especially

Defendant Musk, are rewarded ever more handsomely through stock-based compensation as the

company loses ever more money.  In effect, Defendant Tesla's main product *is* its stock.  This

perverse dynamic is why Tesla has often been the most-shorted stock in the United States.

5.     In 2018, the United States Securities and Exchange Commission ("SEC") charged

Defendant Musk with securities fraud.  On September 28, 2018, Defendant Musk signed a

binding Consent Decree in *United States Securities and Exchange Commission v. Elon Musk*,

Southern District of New York Case No. 1:18-cv-08865-AJN.  On April 26, 2019, Defendant

Musk signed an Amended Consent Decree in the same case.  Both Consent Decrees regulate his

use of social media and all of his corporate communications.  Defendant Musk also paid a $20 million fine to the SEC, separate and apart from a $20 million fine paid by Defendant Tesla.

6.      Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick"), has served as a ferocious on-line propagandist for Defendants Musk and Tesla, authoring and/or coordinating approximately 80,000 tweets across numerous accounts praising Tesla and attacking its critics.  For the sake of comparison, according to an August 14, 2020 article by investigators at Bellingcat, Yevgeny Prigozhin (also known as "Putin's Chef") employed a "troll-factory" that "generated one of the largest known online disinformation campaigns, churning out 71,000 tweets aimed at presenting Russia's version of events in the downing of flight MH17."  *See* https://www.bellingcat.com/news/uk-and-europe/2020/08/14/pmc-structure-exposed/.

7.      Defendant Qazi is a Tesla shareholder and customer.  Defendant Qazi has also been arrested at least twice for criminal violations of law.  His antics over a period of years have been so overly aggressive that Qazi himself attracted a following of tens of thousands of Musk's supporters, and a considerable following of detractors, before he was banned from and by Twitter for life.

8.      According to the SEC Office of Investor Education and Advocacy's Investor Alert on Social Media and Investing, "false claims could be made on social media such as Facebook and Twitter" to effect "pump-and-dump" schemes through "false and misleading statements to the marketplace."  Indeed, social media has been instrumental to the unprecedented artificial elevation of Tesla's stock price, which has yielded a market capitalization for the company of over $400 billion: more than six times the worth of Enron at its peak.

9.      Defendants Qazi and Musk have at times worked as a tag team, hurling accusations and falsehoods concerning Plaintiff, among other topics, to Defendant Musk's approximately 38 million followers in an attempt to discredit Plaintiff's in-depth research on Defendants Musk and Tesla.

10.     Even after being formally banned from and by Twitter, Defendant Qazi returned to Twitter anyway under the guise of a new shared account for a Tesla-focused podcast, until his further provocations triggered a backlash in the same community that had previously been so supportive of his at-times-criminal harassment.  After that, he resurfaced on even more accounts.

11.     Together, through tens of thousands of false and misleading statements and material omissions broadcast directly to tens of millions, and indirectly to millions more through the media, Defendants have successfully and unlawfully pumped the stock price of TSLA common shares from an average of $167.66 per share during the period of June 29, 2010 (the date of Defendant Tesla's Initial Public Offering) through September 23, 2018 (the day before Plaintiff first purchased put options) to $2,153.17 per share as of August 26, 2020, a 1,184% increase.



12.     Defendants Qazi's and Smick Enterprises, Inc.'s actions on behalf of Defendants Musk and Tesla are part of an overt pattern of Elon Musk smearing, harassing, and willfully defaming his critics based on any information at all, however obviously false or unreliable.  Each Defendant has routinely displayed a reckless and often proud disregard for the truth, in service of one of the largest securities frauds in American history.

1

**PARTIES**

2

13.    Plaintiff Aaron Greenspan is an individual residing in San Francisco County in

3

the State of California, in this district.  Plaintiff is not a public figure.

4

14.    Defendant Omar Qazi is an individual residing in San Francisco County in the

5

State of California and doing business in Santa Clara and San Francisco Counties in the State of

6

California, in this district.  Defendant Qazi purports to have an office on Market Street in San

7

Francisco, California, in this district.

8

15.    Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the

9

California Secretary of State or Franchise Tax Board, but nevertheless operating in Santa Clara

10

and San Francisco Counties in the State of California, in this district.

11

16.    Defendant Elon Musk is an individual residing in Los Angeles County in the State

12

of California.  Defendant Musk is a public figure whose activities make national news on a near-

13

daily basis.  Defendant Musk works in Santa Clara and Alameda Counties, in this district.

14

17.    Defendant Tesla, Inc. is a corporation based in Santa Clara County in the State of

15

California, in this district.  Its common stock trades on the NASDAQ Global Select Market

16

under the ticker symbol "TSLA."

17

**JURISDICTION AND VENUE**

18

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28

19

U.S.C. §§ 1331, 1337, 1338(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20

19.    Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367

21

over the state law claims that are so related to the federal claims in this action that they form part

22

of the same case or controversy under Article III of the United States Constitution.

23

20.    The securities claims asserted herein arise under Sections 10(b) and 20(a) of the

24

Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the

25

SEC, 17 C.F.R. § 240.10b-5.

26

21.    Personal jurisdiction and venue are proper because at least one defendant is a

27

corporation headquartered in this district and/or because the improper conduct alleged herein

28

---

SECOND AMENDED COMPLAINT                           5                                3:20-cv-03426-JD

occurred in, was directed from, and/or emanated or exported from California.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## FACTUAL BACKGROUND

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

22.     Plaintiff is an investor who has held short positions in Tesla, Inc. common stock via put options, among other investments.

23.     Plaintiff is also a data journalist who runs a legal information service called PlainSite (https://www.plainsite.org).  PlainSite hosts over 16 million court dockets and other government documents and contains profiles for over 6 million legal entities, one of which happens to be Defendant Tesla.  PlainSite handles privacy requests on a case-by-case basis.  Consequently, Plaintiff has come into contact with a wide variety of individuals who are occasionally upset that their information is in the public domain.

24.     One such individual, Diego MasMarques, Jr., who was convicted of murder and attempted murder in Spain and charged with a number of other crimes in the United States, escalated his displeasure over the fact that his convictions were public to the point where Plaintiff applied for and was later granted a "permanent" two-year restraining order against him. *See* Santa Clara County Superior Court Case No. 18CH008067, *Greenspan v. MasMarques* (the "Civil Harassment Case").

25.     Plaintiff is Jewish and comes from a Jewish family.

26.     On October 27, 2018, a shooter at the Tree of Life synagogue in Pittsburgh, Pennsylvania killed eleven Jewish congregants and wounded six.

27.     On various websites, Mr. MasMarques, who has a documented history of mental illness, posted thousands of libelous diatribes falsely alleging that Plaintiff and his family members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to hacking his e-mail account.  He and/or someone his posts inspired also posted the name of Plaintiff's parents' synagogue in Cleveland, Ohio, as well as the name of their former synagogue, Plaintiff's home address, Plaintiff's parents' address, a

photograph of Plaintiff's parents' house, Plaintiff's family's telephone numbers, as well as contact information for people Plaintiff knows in San Francisco.  Other posts included fabricated images of Plaintiff and his family members wearing swastikas and pasted onto pornographic content.  Mr. MasMarques now faces additional criminal charges in Marlborough District Court in Massachusetts on account of his harassing conduct in violation of the various temporary and permanent restraining orders issued in the Civil Harassment Case.

28.     All of Mr. MasMarques's false and libelous posts, as well as those he inspired, greatly concerned Plaintiff, but especially those involving his family's synagogue affiliations.

29.     On or about January 14, 2019, apparently disturbed by the allegations against Defendant Tesla surfacing in various court documents posted on PlainSite, a pseudonymous Twitter account, "@tesla_truth" (posing as "Steve Jobs") began re-posting and linking to some of the false and dangerous allegations that were the subject of the (then temporary, later permanent) restraining order, while making additional false allegations of its own.

30.     The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

31.     An immediate attempt via Twitter Direct Message ("DM") to discuss the seriousness of the matter, and especially the associated safety concerns, with the owner of the @tesla_truth account was not fruitful.  Plaintiff wrote:



32.     The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," referring to short sellers, repeating a talking point favored by Defendant Musk.

33.     Plaintiff then specified the most objectionable content by saving it to a PDF file hosted on his personal website and sending a link to the @tesla_truth account owner.  When the recipient of this message (the owner of the @tesla_truth account) clicked on the link to the PDF containing the objectionable content, PlainSite's server logs yielded the DNS hostname and IP address of the account owner: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively. Given the urgent potential safety ramifications of this account's misconduct, Plaintiff took the exceptional step of using this information to search PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "Smick Enterprises, Inc.," a company run by Omar Qazi, then of Torrance, California.

34.     Plaintiff took the further exceptional step of publicizing this information, while partially redacting Defendant Qazi's DNS hostname, to warn others of the danger he posed.

35.     Defendant Qazi later admitted to using the @tesla_truth Twitter account.

36.     The same day, still concerned about the danger posed to his family and others at the synagogues mentioned in the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him. Plaintiff then asked the receptionist to speak with a supervisor in Defendant Qazi's department. Plaintiff informed an unknown female employee that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous.

37.     At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually his father's company where Defendant Qazi appears to hold a vanity title.  Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called.  Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately, regardless of his affection for Tesla.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## *Omar Qazi Steps Up His Campaign of Criminal Harassment*

38.     The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number.  The caller, who did not specify his name, was a man impersonating a service technician who initially only said he was calling from "the phone company."  The anonymous caller then tried to ascertain Plaintiff's home address.  Since the caller refused to identify "the phone company" he worked for, and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information.  Defendant Qazi later admitted to placing this harassing phone call in a private conversation that was eventually forwarded to Plaintiff months later.

39.     The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually suspended by Twitter for violating its terms of service.  It was permitted to continue operating by renaming itself to "Steve Jobs *[sic]* Ghost" and clarifying its role as a so-called "parody" account, even though the account's primary purpose was promoting Defendant Tesla.

40.     In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and his relationship with Diego MasMarques, Jr.  Such posts continued through late October 2019 and inspired harassment from others.

41.     On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff accurately reported on a public video posted by Defendant Qazi on the @tesla_truth Twitter account purporting to advertise the features of Tesla's so-called "Autopilot" functionality, which requires that drivers keep their hands on the steering wheel.  The video depicted Defendant Qazi driving through a red light on Autopilot without his hands on the steering wheel.

42.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net, representing an internet-connected device in or around Rancho Palos Verdes, California, accessed documents from Plaintiff's Civil Harassment Case, hosted on PlainSite.

43.     Defendant Qazi's parents live 0.1 miles from Rancho Palos Verdes, California.

44.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's Civil Harassment Case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child).  The portion of the altered court document image posted also contained Plaintiff's phone number and fax number.  Defendant Qazi posted the altered image alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them.  Should've known they would fight back."

45.     On August 3, 2019 at 8:16 A.M., the @tesla_truth Twitter account posted, "Aaron, I know you read my Twitter feed so back off. You're a douchebag, a failure, and a bully. Take a hard look at what your life has become. Going after Musk, Zuck, and myself rather than taking care of your own problems[.] If you want to fight let's do it man to man. Fist fight."

46.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:



47.     These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer.

48.     Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047.  This anonymous fax purported to be from "Kids R Us" with a fake fax number of "2126644444" and the cover page message, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.

49.     Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

50.     A similar anonymous fax from the same unknown fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat aimed at Mr. Huettner.  *See* https://twitter.com/Paul_M_Huettner/status/1075415917809541121.  The fax cover page in that instance purported to be from "Elon Musk" with a message of, "Paul, Would you prefer to go first or would you prefer your family go first."

51.     Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation ("FBI").

52.     In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with concerns about Defendant Tesla's relationship with Defendant Qazi.  *See* Exhibit A.  Plaintiff did not receive any response to this message from Defendant Musk or any Tesla Director or representative.

53.     On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted [*sic*] about me.  Deleted it later that day.  Nothing personal against Aaron."

*See* Exhibit B.

54.     Defendant Qazi did not explicitly admit to sending the fax to Plaintiff, and at one point authored a series of posts explaining that he had been on an airplane at the time the fax to Paul Huettner was sent, supposedly making it impossible for him to be the sender.  He also claimed not to own a fax machine, even though the transmissions were likely sent via an internet-based fax service.  Defendant Qazi deleted the thread shortly after it was posted.

55.     In a private Twitter DM conversation with a third party from September 27, 2019, forwarded to Plaintiff, Defendant Qazi admitted, "[I] take responsibility for what my followers do too and [I] take it seriously."

56.     On August 8, 2019 at 11:13 P.M., Defendant Musk responded to Plaintiff's e-mailed, on-the-record questions with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

57.     On September 19, 2019, Plaintiff's non-profit organization, Think Computer Foundation, intervened in Delaware Chancery Court Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation* (the "SolarCity Case"), pursuant to Chancery Local Rule 5.1(f), which permits any member of the public to challenge the designation of confidential material on file with the court.

58.     The SolarCity Case involved allegations that Defendant Musk had defrauded investors by bailing out his cousins, who formerly ran SolarCity, and his own self-described "pyramid" of companies, while disguising the transaction as a legitimate merger.

59.     Defendant Musk, Defendant Tesla and Space Exploration Technologies Corporation ("SpaceX") were all extremely sensitive about the contents of the documents Plaintiff's non-profit organization sought to publicly disclose, having designated most of them as confidential or under seal.

60.     From early August through October 2019, but especially after Plaintiff's non-profit organization intervened in the SolarCity Case, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff,

Plaintiff's family members, and Plaintiff's non-profit organization. These harassing statements were read by a wide audience of at least 10,000-20,000 Twitter followers. Many of these statements were published specifically to promote Defendant Tesla's stock, its products, and its CEO, Defendant Musk—all while using Tesla's registered trademark—by making Tesla appear to be the one and only legitimate automotive brand, while cutting down all others.

61.     Defendant Qazi's scorched-earth *modus operandi* is evident from a series of posts from September 17, 2019, in which he lashed out at Edmunds.com, Inc., a popular resource for information about cars. When the @edmunds Twitter account simply blocked him, Defendant Qazi's public response, far beyond mere dissatisfaction, was as follows:

"You think this is going to stop me @edmunds ???

I'm only going to troll you harder now"

"troll Edmunds for me! Sign up for notifications on their posts and troll the shit out of them until they apologize to the Tesla community

we won't stand for people insulting us and lying to the public to prop up this *[sic]* own corporate interests. Destroy Edmunds 'impartial' brand"

"people seriously think Edmunds is impartial. I did, which is why i was so surprised to see their hateful tweets against Tesla owners. People need to know Edmunds is in the pocket of dealers.

They will lie to you and screw your *[sic]* over to protect their business."

62.     Defendants Musk and Qazi frequently interacted on Twitter through a variety of accounts. Defendant Qazi also photographed himself appearing at exclusive, invite-only events where Defendant Musk presented new Tesla products.

63.     On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

64.     On the morning of October 9, 2019, an article in Bloomberg by Zachary Mider entitled, "Tesla's Autopilot Could Save the Lives of Millions, But It Will Kill Some People First" was published referring to Defendant Musk, profiling Defendant Qazi, and stating:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi] the same day [in August 2019]. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack *[sic]* you with a baseball bat.' Musk cc'd me on the message. Tesla also declined to comment."

The article, which contained a photograph of Defendant Qazi next to his Tesla Model 3 and referred to the @tesla_truth account as a "bottomless font of Muskolatry," also stated that Defendant Qazi has been given early access to Tesla software features: "Qazi got [the experimental Smart Summon feature] after begging Musk on Twitter; the feature rolled out to regular customers in September." *See* Exhibit C.

65.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though he misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to a "Jim" who had written on or provided input for the @tesla_truth account in January 2019.  *See* Exhibit D.

66.     On October 9, 2019 at 3:09 P.M., the @tesla_truth Twitter account posted:

> "All Aaron Greenspan had to do was shut up and I would have forgotten all about that clown.
>
> Now i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is
>
> After he dies I'll keep telling people he sucked"

67.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, the then-general counsels of Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider. *See* Exhibit E.

68.     Fourteen minutes later, on October 9, 2019 at 3:48 P.M., Defendant Qazi replied by e-mail to all parties with the message, "Lol," internet slang for "laughing out loud."

69.   Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant Qazi's response, with two laugh/crying emojis.  Neither of these responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter actively under review on the date of transmission. *See* Exhibit F.

70.   Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

71.   At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely suggesting that Plaintiff resided in a "psych ward."

72.   At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

73.   Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plainitff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

74.   Plaintiff received unwanted telephone calls, e-mails and messages as a result of Defendant Qazi's actions.  In addition, at least several dozen libelous messages were posted publicly about Plaintiff and Plaintiff's family members.

*Omar Qazi Targets Plaintiff's Family for Further Harassment*

75.     The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan, using a photograph of Dr. Greenspan to which Plaintiff owns the copyright.  The Twitter account's handle, deliberately designed to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account.

76.     Dr. Greenspan is a professor of pathology and an academic researcher at Case Western Reserve University and Director of the Histocompatibility and Immunogenetics Laboratory at University Hospitals Cleveland Medical Center in Cleveland, Ohio.  Accordingly, he qualifies as an "academic researcher" for the purposes of California Penal Code Sections 422.4 and 602.12.  As his son, Plaintiff qualifies as his "immediate family" under these sections.

77.     Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps to receive all e-mails addressed to smick.com, whether or not a corresponding e-mail account existed, including e-mails connected to numerous fake accounts on social media sites such as Twitter.

78.     Defendant Smick Enterprises, Inc. uses the domain name smick.com.

79.     On Monday, October 10, 2019 at approximately 9:51 P.M., Plaintiff filed a Digital Millennium Copyright Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph being used by Mr. Qazi to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph of Plaintiff's father from the account.  Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled brother (again, used without permission from the copyright owner, the *Toledo Blade*), and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.

80.     On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan."  In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a

parody or actually his brother?" Defendant Qazi wrote from the fake "Simon Greenspan" account, "yeah I'm his little brother haha."

81.    Plaintiff's brother is not active on Twitter and never has been.

82.    On October 11, 2019, Defendant Qazi created websites using servers owned or leased by his company, Defendant Smick Enterprises, Inc., at http://www.plainshit.com, http://www.plainshit.org, and http://www.plainsiite.org (the "Smick Sites") containing copyrighted photographs of Plaintiff, Plaintiff's father, Plaintiff's brother, and Plaintiff's mother, with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT."  The sites (all with identical content) continued:

> "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil Greenspan or Judy Greenspan? You are not alone.
>
> The law offices of Lantham *[sic]* & Watkins are collecting testimonies regarding the fraudulent 501(c)(3) non-profit Think Foundation's activities, and the conduct of board members Aaron Greenspan, Neil Greenspan and Judith Greenspan. Please add your contact information to the form below and one of our staff will contact you shortly. Thank you for speaking out.
>
> 56 people have submitted verified testimonies"

83.    This statement contained numerous false allegations: that Plaintiff's non-profit organization was a "fraudulent charity;" that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals; that Defendant Qazi had engaged the law firm of Latham & Watkins, and that "56 people" had submitted "verified testimonies" to the site(s).

84.    Viewing the website's source code revealed a hidden HTML comment that stated, "<!-- fuck you aaron -->", referring to Plaintiff.

85.    Plaintiff contacted Latham & Watkins by e-mail to inform the firm that its name was likely being misused, and heard back from Matthew K. Roskoski, Deputy General Counsel, who promised to look into the matter.

### *Tesla's CEO Weighs In With False Statements Of His Own*

86.    On Saturday, October 12, 2019, alongside numerous false allegations made via his @tesla_truth account, Defendant Qazi posted a link to a pseudonymously authored article on

the website Medium entitled, "NonProfit PlainSite Attacks People Online" by "Random Tesla Fan." The first line of the article was, "There is a guy by the name of Aaron Greenspan who hates Tesla very much," directly referring to Plaintiff. The next paragraph began, "PlainSite is a joint venture with Think Computer Corporation and Think Computer Foundation (same thing) which is a 501(c)3 nonprofit organization in the United States." The article contained Plaintiff's parents' home address, as well as a section entitled "How To Fight Back" encouraging readers to send a completed Internal Revenue Service ("IRS") Form 13909, "Tax-Exempt Organization Complaint (Referral)," to the IRS in order to report Plaintiff's supposed "criminal" wrongdoing.

87.     In fact, Think Computer Corporation and Think Computer Foundation, both run by Plaintiff, are not the "same thing," and are separately incorporated legal entities with different tax treatment, different Employer Identification Numbers, different bank accounts, different accounting ledgers, and different purposes.

88.     On account of false IRS Form 13909 complaints already filed by Diego MasMarques, Jr., the IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020, finding that, "Your organization continues to qualify for exemption from federal income tax as described in Internal Revenue Code 501(c)(3)." The Letter 5177 did not identify a single issue of concern. *See* Exhibit G.

89.     Although Plaintiff read the Medium article and found it to contain an overwhelming amount of false and deliberately misleading information, Plaintiff took no action.

90.     In direct response to Defendant Qazi's posting of the article, Defendant Musk wrote on Twitter at 12:46 P.M.: "Super messed up situation!" Owing to Defendant Musk's fame, this post garnered 104 replies, 112 retweets, and 1,860 "likes" by May 2020, suggesting that many thousands of people viewed the post in addition to the roughly 2,000 who directly interacted with it. *See* https://twitter.com/elonmusk/status/1183106801769697280.

91.     Thirty-two minutes later, at 1:18 P.M., Defendant Musk wrote another response on Twitter to augment his first response: ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" This

post garnered 246 replies, 226 retweets, and 1,776 "likes" by May 2020, again suggesting that many thousands of people viewed the post in addition to the roughly 2,000 people who directly interacted with it. *See* https://twitter.com/elonmusk/status/1183114722989621248.

92.     Both of Defendant Musk's responses to Defendant Qazi's post concerning the Medium article about Plaintiff were threaded within the context of the original Twitter post, meaning that they appeared in direct relation to the initial post and would have been readily apparent to anyone reading Defendant Qazi's post and the associated article about Plaintiff. Therefore, an average user on Twitter would have understood the supposedly "fake charity" discussed by Defendant Musk to be Think Computer Foundation, which is a properly registered and legitimate 501(c)(3) non-profit organization, and the supposed "online bully" discussed by Defendant Musk to be Plaintiff.  The $50.00 donation by Russ Mitchell to Think Computer Foundation for the purpose of increasing access to California court records was explicitly discussed in the Medium article at the top of the thread.

93.     Ultimately, Think Computer Foundation used the money it raised in the fundraiser to which Russ Mitchell contributed to file a lawsuit against the Santa Clara County Superior Court on December 9, 2019, Case No. 19CV359896, *Think Computer Foundation v. Rebecca Fleming et al.*  Shortly thereafter, the Santa Clara County Superior Court made all of its civil records electronically available for free, achieving the Foundation's goal.  Think Computer Foundation reached a settlement with the Santa Clara County Superior Court in May 2020.

94.     Shortly after it was initially posted, Medium disabled the account responsible for the article and removed the article itself without prompting from Plaintiff, directly or indirectly.

95.     On Monday, October 14, 2019 at 10:47 A.M., in response to the removal of the Medium article, Defendant Qazi used his @tesla_truth account to vow to "post the content on a server we control" after falsely accusing Plaintiff of having written to "friends at medium."

96.     On Tuesday, October 15, 2019 at 4:56 A.M., Plaintiff received an e-mail from an automotive industry consultant residing in Tokyo, Japan who stated that Omar Qazi had been

harassing and impersonating his wife.  Defendant Qazi had also harassed and impersonated this

individual himself.

97.     On Tuesday, October 15, 2019 at 8:19:54 P.M., Defendant Qazi left Plaintiff's

father a voicemail 50 seconds in length on his work telephone number.  The voicemail stated:

> "Hi Neil, uh, this is uh, my, uh, my name is Omar Qazi.  Uh, I, uh, was calling
> because, uh, you know, your son had been, uh, you know—well, has been, uh,
> contacting me over the internet, uh, you know, posting information about me,
> and uh, I wanted to discuss the situation with you.  It seems that he's getting
> very angry, very frustrated, and, uh, and really, uh, you know, um—def—seems
> like something that maybe we should, uh, discuss.  If you could give me a call
> back, my phone number is [redacted].  I'd really appreciate it.  Thanks.  Bye."

98.     Fourteen minutes later, on Tuesday, October 15, 2019 at 8:33:55 P.M., Defendant

Qazi sent the following e-mail message to Plaintiff's father's work e-mail address with the

subject "Think Foundation & Aaron":

> "Hello Dr. Greenspan,
>
> My name is Omar Qazi. I'm writing to you because I noticed that you are on the
> board of Think Foundation *[sic]*, which operates 'Plainsite'
>
> The Think Foundation non-profit, Plainsite, and your son Arron *[sic]* seems to
> be engaged in an emotional vendetta against me. I'm not sure how much you
> know about what he has going on with his short selling investments and Tesla,
> but he seems to believe that I am being paid by Elon Musk to post about Tesla
> on Twitter. In reality I am just a Tesla customer, and am not associated with
> Elon Musk. My family and myself have received numerous threats, phone calls,
> etc as a result of verifiably false information that Aaron has posted on his
> 'Plainsite' Twitter account, which I understand is operated by the Foundation
> you are on the board of.
>
> The situation has escalated quite alarmingly in the past week as Tesla's stock
> price has risen somewhat. I know that Aaron is shorting the stock, but I feel that
> the situation has become more emotional than financial for him with regards to
> his obsession with retaliating against me and my family. I wanted to reach out
> and see if we could chat about what's going on. I've reached out to Aaron but he
> does not want to meet with me or speak to me.
>
> I would appreciate it if you could give me a call sometime so that we could chat
> about the best way to de-escalate the situation. I worry based on some of
> Aaron's recent actions that he may break the law in anger and be forced to deal
> with a situation that could have easily been avoided with a simple phone

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

conversation.

Thank you for your time,
Omar Qazi
[telephone number redacted]"

99.     Plaintiff's father did not respond to Defendant Qazi's communications as they contained numerous false statements and gross mischaracterizations.

100.     Plaintiff never took any action to harass or to encourage others to harass Defendant Qazi or his family.

101.     Also on October 15, 2019, the Smick Sites were updated to resemble the PlainSite website, and the misspelled reference to Latham & Watkins was removed.  To achieve the new look, Defendant Qazi copied and pasted the PlainSite home page source code and graphics onto his servers and modified the code.  He also updated the bold headline to expand the list of supposed crimes that he was accusing Plaintiff and his family members of committing: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice."  The supposed "Victims of Aaron Greenspan Foundation" does not exist and never has; it is, ironically, a "fake charity."  Defendant Qazi also added 900 to the false number of people who had submitted "testimonies," for a total of 956, because it corresponded to Plaintiff's home address.  Finally, he added the text, "Aaron Greenspan Did Not Invent Facebook. He is a failure."

102.     Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting *[sic]* Securities Fraud" and included other hidden comments such as, "I am so mentally derranged *[sic]* that I honestly believe that I invented Facebook. Please email me to tell me that I didn't at help@plainsite.org."

103.     On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi also contacted Plaintiff's disabled brother via Facebook Messenger, writing, "hi simon / how are you?" Planitiff's brother was confused and asked how he knew Defendant Qazi.

104.     On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline implicitly accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

105.     On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

106.     On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later claiming that Plaintiff had failed to engage.

107.     On Friday, October 25, 2019 at approximately 6:30 P.M., Defendant Qazi registered a new domain name, vagfoundation.org, via Amazon.com to augment the aforementioned Smick Sites.  Though the website at http://www.vagfoundation.org purported to represent the Victims of Aaron Greenspan Foundation, there continued to be no such non-profit organization registered with the IRS or any state government.  *See* Exhibit H.

108.     Even though Defendant Qazi solicited information about Plaintiff's supposed crimes from his thousands of followers, only two "testimonies" initially appeared on the Smick Sites: "M's TESTIMONY," an approximate reproduction of the disabled Medium article that Defendant Qazi had resolved to post elsewhere; and "P'S TESTIMONY," a haphazard PDF compilation of Diego MasMarques, Jr.'s false allegations submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia, but posted anonymously.  Neither of these posts described any actual crime committed by Plaintiff of his family members, let alone any actual "victim" of Plaintiff.

1

*With Omar Qazi Banned From Twitter, The Libel and Harassment Continues*

2

      109.    Defendant Qazi's harassment of Plaintiff via Twitter led to Plaintiff filing several

3

DMCA requests concerning Defendant Qazi's @tesla_truth account and other accounts.  On or

4

around October 22, 2019, Defendant Musk wrote an e-mail to Twitter CEO Jack Dorsey in

5

support of Defendant Qazi while disparaging Plaintiff.

6

      110.    Defendant Musk's attempt to intercede on Defendant Qazi's behalf was

7

unsuccessful.  On or about October 24, 2019, Twitter permanently banned Defendant Qazi.  The

8

company permanently disabled his @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil,

9

and @SmickTrump accounts.  Defendant Qazi may have deleted another one of his fake Twitter

10

accounts, @BagHolderQuote, of his own volition.

11

      111.    On Sunday, October 27, 2019 at 10:25 A.M., an unknown individual posted a

12

"free stuff" listing on Craigslist using Plaintiff's GMail address, the name "Aaron Musk" and

13

Plaintiff's telephone number.  Plaintiff received an automated e-mail notice upon publication.

14

The listing read, "I have a functional original iPad Air 8GB to give away, first person to message

15

can have it. You will have to pick it up in BayView."  Plaintiff does not own an iPad Air 8GB or

16

live in the Bayview neighborhood, but does live in the Bayview SFPD reporting district.

17

      112.    On Thursday, October 31, 2019, Defendant Qazi posted an essay on a domain

18

name and server controlled by Defendant Smick Enterprises, Inc., wholemars.net, entitled,

19

"Steve Jobs is dead," referring to the pseudonym used for his @tesla_truth account, "Steve Jobs

20

Ghost."  In this essay, Defendant Qazi admitted that his @tesla_truth account was suspended

21

repeatedly for legal violations and impersonating others, and included screenshots showing that

22

the account was registered to the e-mail address teslatruth@smick.com.  *See* Exhibit I.

23

      113.    On Friday, November 1, 2019 starting at 10:40 A.M., an unknown individual

24

using the DNS hostname customer.tigerbackbone.com and IP address 178.255.153.77 filled out

25

the PlainSite Contact Us form 74 times in Plaintiff's name, using Plaintiff's e-mail address, with

26

the message, "Moron."  The same user presumably filled out the form a 75th time at 12:04 P.M.

27

with the message, "M0ron."  Defendant Qazi frequently uses the word "moron" in his writing.

28

114.    On Friday, November 1, 2019 at 12:04 P.M., an unknown individual subscribed Plaintiff's e-mail address to a mailing list called "Healthline," concerning "wellness," without Plaintiff's permission.   At 12:10 P.M., an unknown individual subscribed Plaintiff's e-mail address to a mailing list called the "Psych Central Newsletter" without Plaintiff's permission.   At 12:12 P.M., an unknown individual subscribed Plaintiff's e-mail address to the Scientific American mailing list without Plaintiff's permission.

115.    Unable to reach his audience on Twitter, Defendant Qazi set up open-source Twitter clone software called Mastodon on a server belonging to Defendant Smick Enterprises, Inc., hosted by Amazon Web Services, LLC.   On Friday November 1, 2019 around 1:00 P.M., Defendant Qazi published an essay on another Smick Enterprises, Inc. website, wholemars.org, thanking his supporters and inviting them to use his Mastodon installation at mast.wholemars.com, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening.   (At various points in time, wholemars.com, wholemars.net and wholemars.org have redirected to each other.   All are under the control of Defendant Qazi.)

116.    On Saturday, November 2, 2019 at 11:55 A.M., Sascha Pallenberg, Head of Digital Transformation at Daimler AG (a Tesla competitor), wrote from his verified Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!"  *See* https://twitter.com/sascha_p/status/1190703993296523264.

117.    On Saturday, November 2, 2019 at 2:58 P.M., without Plaintiff's knowledge or permission, an unknown individual created a profile in Plaintiff's name, "aarongreenspan," using Plaintiff's e-mail address, on the pornographic website Pornhub.

118.    On Sunday, November 3, 2019 at 1:08 P.M., Plaintiff filed another DMCA request with Amazon Web Services, LLC regarding Defendant Qazi's repeated violation of copyright law.   On or about November 6, 2019, Amazon shut down at least four of the Smick Sites in response, causing Defendant Qazi to move those sites to another provider, Linode.

119.     On November 6, 2019, an unknown individual using the Wikipedia username "Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of the "Criticism of Facebook" article, in order to supposedly "be more impartial and includ[e] additional details."  In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting false claims made by Defendant Qazi about Plaintiff, such as the false statements that Plaintiff "was enraged" in February 2004 and that Plaintiff "was able to extort about $250,000 from Facebook."

120.     In fact, Plaintiff entered into a settlement agreement with Facebook, Inc. and Mark Zuckerberg in May 2009 about which no financial details have been disclosed.

_Omar Qazi and Elon Musk Echo a Convicted Murderer Subject To a Restraining Order_

121.     Upon information and belief, Defendant Qazi was at times coordinating with Diego MasMarques, Jr.—the same individual against whom Plaintiff has an active restraining order through 2021.  Many of the false statements and allegations made by Defendants Qazi and Musk are identical to the false statements and allegations Mr. MasMarques has been making since at least as early as 2017 on various websites and in court: that Plaintiff runs a fake non-profit and that Plaintiff and his family have committed tax fraud, extorted others, etc.

122.     Defendant Qazi was on notice of the restraining order against Mr. MasMarques as of January 14, 2019.  Via his then-active @OmarQazi Twitter account, on August 7, 2019 at 6:38 P.M., Mr. Qazi also admitted to downloading and modifying the Form CH-100 document containing Mr. MasMarques's name as part of his "joke post."

123.     Furthermore, on Tuesday, September 24, 2019 at 5:45 P.M., Defendant Qazi authored a post using his then-active @tesla_truth Twitter account with the words "Rule breaker / law breaker" alongside a screenshot image from an iPhone that had been sent to him in a private Twitter DM conversation.  The iPhone screenshot showed the sender's copy of a Twitter abuse report receipt from the previous day concerning Plaintiff's personal Twitter account, @AaronGreenspan, which was locked as a result of the abuse report.  In other words, the sender of the image had reported Plaintiff's account to Twitter for "abuse."

SECOND AMENDED COMPLAINT                          25                          3:20-cv-03426-JD

124.    On the previous day, September 23, 2019, an unknown individual did report Plaintiff's personal account to Twitter—for briefly discussing court proceedings involving Diego MasMarques, Jr.—alleging that such discussion constituted "private information."  Plaintiff immediately appealed his account being locked.  On September 24, 2019 at 9:49 P.M.—hours after Defendant Qazi branded Plaintiff a "law breaker"—Twitter restored Plaintiff's account and admitted, "…we made an error.  We've determined there was no violation and have restored your account to full functionality."

125.    Defendant Qazi's harassing activity and false statements accrued to the benefit of himself, Defendant Smick Enterprises, Inc., Defendant Musk and Defendant Tesla.

126.    Defendant Musk's harassing activity and false statements accrued to the benefit of himself, Defendant Tesla, and Tesla shareholders, including Defendant Qazi.

127.    Plaintiff reasonably believed that Defendants Qazi and Smick Enterprises, Inc. performed work as agents, ostensible or otherwise, of Defendants Musk and Tesla.

128.    For months, Defendants Qazi's and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded hatred and ridicule by countless individuals with whom Plaintiff had no prior relationship.  Most of these posts cast Plaintiff's sanity in doubt, displayed an obsession with Plaintiff's role creating the predecessor to Facebook at Harvard College in 2003 (also called "The Facebook"), ridiculed Plaintiff's career and work, baselessly accused Plaintiff of crimes, or simply hurled insults.  For example:

a)  On October 2, 2019 at 10:19 A.M., Twitter user @ThemeTeamWP, a vocal proponent of Defendant Musk, wrote, "Aaron still butthurt that Zuckerberg got rich while you became a nobody?"  This post was deleted by the author.

b)  On October 9, 2019 at 3:17 P.M., Twitter user @NotThatTesla wrote, "Aaron Greenspan can't even get verified on Twitter, much less verify his fake story about creating Facebook. Classic fraudster and grifter. Tied with Jacob Wohl for most disgusting fraudster of the decade. @tesla_truth's family is getting harassed. It's time to stop."  *See* https://twitter.com/NotThatTesla/status/1182057649501802497.

c) On October 9, 2019 at 4:17 P.M., Twitter user @PandraKaka13 wrote, "Sadly Aaron's parents have let him have this sort of support for his revenge tactics. I'm concerned when they die that Aaron will have no one to support his psycho ways and may become even more volatile. Hope he doesn't own any guns. Mass shooter profile." *See* https://twitter.com/PandraKaka13/status/1182072576924934145.

d) On October 9, 2019 at 7:00 P.M., Twitter user @CleanRevelry wrote, "Yo @AaronGreenspan, see you on a dark night," using a song lyric authored by Defendant Musk's girlfriend as a warning.  Plaintiff interpreted this as a threat of violence, as did Twitter user @Kristennetten. *See* https://twitter.com/CleanRevelry/status/1182113766814568449.

e) On October 28, 2019 at 1:18 P.M., Twitter user @AaronDweeb ("Erin Greenspam [vomit emoji]") began posting feminized computer-generated images of Plaintiff created using the Russian FaceApp mobile application based on Plaintiff's photographs, used without permission. *See* https://twitter.com/AaronDweeb.

f) On November 1, 2019 at 10:55 A.M., Twitter user @romn8tr wrote, "@AaronGreenspan you're a piece of shit". *See* https://twitter.com/romn8tr/status/1190326394242252800.

g) On November 3, 2019 at 1:54 P.M., Twitter user @NotAGhost10 wrote, "Are you interested in starting a 'legal' charity and use the funds to run a 'completely *[sic]* legitimate' Disinformation and Fact Distortion campaign? Then look no further than this article by a human shaped pile of garbage, Aaron Greenspan $tslaq". *See* https://twitter.com/NotAGhost10/status/1191111358798057474.  This account's "ghost" reference refers to Defendant Qazi.

h) On April 4, 2020 at 7:52 A.M., Twitter user @enn_nafnlaus wrote, "Plainsite? The fake charity of Tesla short seller Aaron Greenspan? The guy who claims to have invented Facebook? And who selectively requests and selectively publishes only

things he things *[sic]* will hurt Tesla (e.g. that he can profit from)?" *See* https://twitter.com/enn_nafnlaus/status/1246450694749552640.

i)   On May 17, 2020 at 8:30 A.M., Twitter user @ElectroCar wrote, "Wow never realized @AaronGreenspan and @PlainSite accused Omar of being a pedo after Omar exposed tax fraud." *See* https://twitter.com/ElectroCar/status/1262042756853235714.

j)   On May 17, 2020 at 9:13 A.M., Twitter user @BarkMSmeagol wrote, "Yep. He belongs in an asylum". *See* https://twitter.com/BarkMSmeagol/status/1262053620826005505.

*The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff*

129.   On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant Tesla's Q1 2020 earnings call, calling local public health officials "fascist." At one point, Defendant Musk was oddly disconnected from his own earnings call along with all of the other active call participants.

130.   On May 9, 2020, Defendant Musk ignited further controversy by threatening to sue Alameda County over its implementation of the multi-county Shelter-In-Place Order concerning COVID-19, which curtailed Tesla's ability to manufacture cars at its Fremont, California factory. Tesla did, in fact, sue Alameda County that same day, using a complaint that had been in progress for at least two days before Defendant Musk made his threat public. *See Tesla Incorporated v. County of Alameda*, California Northern District Court Case No. 3:20-cv-03186-TSH.

131.   Defendant Musk further instructed Tesla employees to violate the Shelter-In-Place Order and return to work, or risk losing unemployment benefits.

132.   While Defendant Musk claimed he would be present on the assembly line willing to risk arrest, he presented no evidence that he actually ever was on the assembly line. Flight records indicate that he was not even in Alameda County for the majority of the day on Monday, May 11, 2020, with his private jet reportedly arriving in San Jose, California shortly after 5:00

P.M.  On May 12, 2020 at 9:11 P.M., Defendant Musk posted an image of an ice cream sundae he had copied from another person's Instagram account, and proceeded to actively imply that he had taken the picture while eating at a Bay Area Buca Di Beppo restaurant in contravention of the Shelter-In-Place Order—which he had not—adding, "Life should be lived."

133.   Many long-time supporters of Defendants Musk and Tesla were understandably appalled by Musk's erratic behavior and disregard for human life.  On May 12, 2020, popular electric vehicle blog *Electrek* editor Frederic Lambert wrote an editorial entitled, "Tesla superfandom becomes toxic, negative for electric revolution [op-ed]."  *See* https://electrek.co/2020/05/12/tesla-super-fandom-becomes-toxic-negative-electric-revolution-op-ed/.  The editorial was critical of Defendants Musk and Tesla, as well as a Twitter account called "Third Row Tesla" with the handle @thirdrowtesla, for a podcast of the same name led by Defendant Musk's most ardent cult followers, including Defendant Qazi.

134.   Signaling the vital importance of Defendant Qazi's work harassing Tesla's critics, Defendant Musk appeared on video with Defendant Qazi in a 3.5-hour-long Third Row Tesla podcast filmed at one of Defendant Musk's Los Angeles homes and published on February 9, 2020.  *See* https://www.youtube.com/watch?v=J9oEc0wCQDE.  The below photograph depicts Defendant Qazi (far right) with other Third Row Tesla members, Defendant Musk (far left) and Tesla Director Kimbal Musk (second from right with cowboy hat) at the recording session:



135.    Although it was at first unclear who had authored the Twitter posts that Mr. Lambert took issue with since Third Row Tesla contributors refused to admit anything about who used its Twitter account, Defendant Qazi ultimately admitted authorship, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.  Due to the controversy, three of the six Third Row Tesla members publicly announced that they were severing ties.

136.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as nominally independent cheerleaders for Defendant Tesla, led Defendant Qazi to author a 17,600-word screed on his website hosted by Defendant Smick Enterprises, Inc., published on May 17, 2020 (the "Qazi Screed").  Entitled, "Response to Frederic," it invoked Plaintiff's name at least 47 times over dozens of pages, even though Plaintiff had nothing to do with Defendant Musk's decision to place his workers' lives at risk, nothing to do with *Electrek*'s writing, and nothing to do with Frederic Lambert's independent and exceptionally rare criticism of Defendants Musk and Tesla.

137.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading.  In some cases, Defendant Qazi cropped images to deliberately mislead his readers. In other cases, Defendant Qazi linked events that were chronologically impossible.  Defendant Qazi also omitted key facts and events of which he was aware, since he was responsible for many of them.  Generally, the unprovoked rant made good on Defendant Qazi's October 9, 2019 malicious promise to "drag [Plaintiff's] name through the mud until the day he [dies]."

138.    On or around May 23, 2020, after the filing of the Complaint in this case, Defendant Qazi returned to Twitter once more via a proxy account, @WholeMarsLog, later renamed @WholeMarsBlog, allegedly set up for him by Scott Woods to evade his lifetime ban.

139.    On May 24, 2020, Third Row Tesla published "Episode 17" of its video podcast series (recorded on May 15, 2020), depicting Defendant Qazi wearing a T-shirt imprinted with a partial graph of TSLA stock next to the text "Tesla $420.00," referring to the false claim that required Defendants Musk and Tesla to each pay a $20 million fine to the SEC and sign Consent Decrees regulating Defendant Musk's use of Twitter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



140.    On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID.  The male caller identified himself only as working for the law firm Quinn Emanuel in connection with the instant lawsuit and calling on behalf of Defendants Musk and Tesla.  The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his home address.  Upon information and belief, the caller was actually Defendant Qazi impersonating a lawyer in an attempt to extract information.  At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant Qazi's @WholeMarsLog Twitter account posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

141.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short sellers, he had decided to become one himself.

142.    On or around July 25, 2020, Defendant Qazi posted a third document entitled "F'S TESTIMONY" and link thereto on his Smick Sites purporting to be "testimony" from a "victim" of Plaintiff.  In fact, the document was another PDF compilation of Diego MasMarques, Jr.'s posts about Plaintiff, and the document's metadata confirmed that the author was again "Amelia Tracey," who had also authored "P'S TESTIMONY."

143.    On August 17, 2020, on his @WholeMarsBlog Twitter account, Defendant Qazi wrote, "What's better than making boatloads of money on TSLA stonk?  Knowing it came directly out of the bank accounts of those arrogant asshole shorts.  Suck our balls Aaron! @elonmusk".  His final reference to Defendant Musk's Twitter account, present in hundreds of

Defendant Qazi's other posts, was intended to seek the approval of and/or a response from his master in their agency relationship.

**CLAIMS FOR RELIEF**

**COUNT I**
**Libel Per Se**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

144.    Plaintiff incorporates by reference the foregoing allegations.

145.    From approximately January 14, 2019 through the date of his lifetime ban by and from Twitter on October 24, 2019, Defendants Qazi and Smick Enterprises, Inc. made use of the @OmarQazi Twitter account, @tesla_truth Twitter account, and numerous other fake Twitter accounts to publish constant false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

146.    From approximately May 2019 through present day, Defendant Qazi made use of the @thirdrowtesla, @WholeMarsLog and @WholeMarsBlog Twitter accounts to publish constant false statements and deliberate misinformation about Plaintiff.

147.    From October 11, 2019 through present day, Defendants Qazi and Smick Enterprises, Inc. used a variety of domain names and websites including http://www.plainshit.com, http://www.plainshit.org, http://www.plainsiite.org, http://www.wholemars.com, http://blog.wholemars.com, http://www.wholemars.net, http://www.vagfoundation.org, and http://kidneystone.vagfoundation.org to publish false statements and deliberate misinformation about Plaintiff and Plaintiff's family members.

148.    Defendant Qazi made and repeated these false statements with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-parties' court filings located by Plaintiff would increase or prevent any decrease in the value of his TSLA stock.  He was successful at achieving his aims: Tesla's stock increased in value, he was profiled in a major financial media publication, and many of his followers began repeating his false claims about Plaintiff and stating that they refused to believe anything in any court document merely published by Plaintiff.

149.    Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. also explicitly encouraged others to spread false statements and misinformation about Plaintiff and Plaintiff's family members.

150.    Defendant Qazi explicitly encouraged others to "harass" Plaintiff.

151.    Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging accusations in sufficient quantity over a period of more than one year that it is impossible to enumerate each and every one, select examples include:

| Statement No. / Date / Location | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1<br><br>January 14, 2019<br><br>Exhibit B at 2 | "Strange how Aaron mentions that he think [sic] Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium. This statement falsely suggested a sexual attraction to Plaintiff's stalker.  That "Aaron mention[ed]" this statement on the particular website discussed in the post is provably false. |
| 2<br><br>August 8, 2019<br><br>Exhibit B at 4 | "How did Aaron Greenspan of Plainsite manage to qualify for non-profit status and avoid paying the government taxes? Is it legal to use a non-profit to stalk and harass people?" | This statement, posed as a question, falsely suggested that Plaintiff is guilty of criminal conduct.  Plaintiff pays taxes.  PlainSite's revenue is taxable and taxes are paid by Think Computer Corporation, which is a for-profit corporation. Think Computer Foundation does not "stalk and harass people." |
| 3<br><br>August 23, 2019<br><br>Exhibit B at 5 | "It took a lot of hard work to break every single one of these rules with our fraudulent charity, but we pulled it off" | This statement, posted from the fake @PlainShite account with the actual PlainSite logo, falsely stated that Plaintiff's work is a "fraudulent charity," which is provably false. |
| 4<br><br>September 24, 2019<br><br>Exhibit B at 9 | "Rule breaker / law breaker" [Image containing Aaron Greenspan's name and photograph in supposed report about "Violating our rules against posting private information"] | This statement again falsely suggested that Plaintiff is guilty of criminal conduct.  The report cited was retracted as erroneous by Twitter, making the statement provably false. |
| 5<br><br>September 27, 2019 | "I didn't worry when Aaron Greenspan said Elon paid me to kill him because it wasn't true" | This statement alluded to a statement Plaintiff never made, making the statement provably false. |

| | | |
|---|---|---|
| Exhibit B at 10 | | |
| 6<br><br>September 28, 2019<br><br>Exhibit B at 11 | "I don't even have a fax machine. The only thing that has been revealed here is that Aaron Greenspan has child pornography at his house. I do not." | This statement explicitly and falsely accused Plaintiff of possessing child pornography, which would be a crime.  The statement is provably false. |
| 7<br><br>September 28, 2019<br><br>Exhibit B at 12 | "he did, it's fraudulently registered as a non-profit charity" | This statement, in a Twitter thread explicitly mentioning "Greenspan," falsely accused Plaintiff of fraud. The statement is provably false. |
| 8<br><br>September 28, 2019<br><br>Exhibit B at 13 | "Who do you trust: Someone like Elon who has delivered a handful of disruptive innovations to the global marketplace<br><br>or someone like Aaron Greenspan who has done nothing except lie, cheat, extort others, and claim he invented Facebook?<br><br>(guess who the media trusts more [laugh/crying emoji])" | This statement explicitly and falsely accused Plaintiff of the crime of extortion and goes to the crux of Defendant Qazi's goal of defending Defendant Musk against the damning facts revealed by Plaintiff.  The statement is provably false. |
| 9<br><br>September 30, 2019<br><br>Exhibit B at 14 | "Shorts have been using Aaron Greenspan's fraudulent 'Think Foundation' to pool their money and go after Tesla – and they can deduct donations from their income tax!!!" | This statement again explicitly mentions Plaintiff and falsely accused him of fraud. Think Computer Foundation operates independently of short sellers whether or not they choose to donate. |
| 10<br><br>September 30, 2019<br><br>Exhibit B at 15 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentioned Plaintiff and falsely accused him of fraud, and by referring to short sellers including Plaintiff, "serious crimes."  This statement also falsely stated that Plaintiff suffers from a medical condition.  Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. Defendant Qazi twisted a remark Plaintiff made at a memorial service for his deceased friend. |

| | | |
|---|---|---|
| 11<br><br>October 9, 2019<br><br>Exhibit B at 16 | "Periodic reminder that Aaron Greenspan, who claims he invented Facebook (he didn't), is running a fake charity that Tesla short sellers use to illegally pool funds for propaganda efforts.<br><br>Please report his fake charity to the IRS. he is committing tax fraud." | This post explicitly mentioned Plaintiff, accused him of "running a fake charity," which is possibly a crime, and "illegally" pooling funds.  The IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020 indicating that there were no issues found. |
| 12<br><br>October 9, 2019<br><br>Exhibit B at 17 | "when his reputation is destroyed, he'll have only himself to blame<br><br>I don't have to make up any bullshit conspiracy theories about him. The facts of his life are so embarrassing it says it all<br><br>he is committing serious crimes in 'plain sight' on 'plainsite'" | This statement, referencing "facts," is the second part of the thread that begins "All Aaron Greenspan had to do was shut up…"  It again falsely stated that Plaintiff has committed "serious crimes" by publishing court documents and public domain materials, many of which cast doubt on Defendant Qazi's investment thesis. |
| 13<br><br>October 9, 2019<br><br>Exhibit B at 18 | "I welcome the chance to discuss Aaron Greenspan's conduct and crimes in front of a court and / or jury." | This post explicitly mentioned Plaintiff and falsely accused him of "crimes."  Defendant Qazi did not respond to the initial Complaint. |
| 14<br><br>October 9, 2019<br><br>Exhibit B at 20 | "It's not libel if it's true. You didn't invent Facebook. You've never accomplished anything in your life.<br><br>There are plain facts.<br><br>You just create negativity and feed off other people. And I can prove your crimes in court."<br>[Image containing Aaron Greenspan's name and photograph] | This post explicitly mentioned Plaintiff and falsely attributed "crimes" to him.  It is true that Plaintiff developed "The Facebook" at Harvard College in August and September, 2003, which Plaintiff's CS91r classmate Mark Zuckerberg later signed up for and effectively copied.  Defendant Qazi explicitly stated that his views are "plain facts." |
| 15<br><br>October 9, 2019<br><br>Exhibit B at 21 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentioned Plaintiff and stated that he is a "criminal guilty of felony tax fraud," which is false. |
| 16<br><br>October 9, 2019<br><br>Exhibit B at 22 | "no, likely just his learning disability due to aspergers" | This post was in a thread explicitly referring to Plaintiff by name.  Plaintiff has never been diagnosed with Asperger syndrome or a learning disability. |
| 17 | "yeah he's this clown who thinks he | This post was in a thread explicitly |

| | | |
|---|---|---|
| October 11, 2019<br><br>Exhibit B at 23 | invented facebook and comited *[sic]* felony tax fraud" | referring to Plaintiff by name.  It repeated the prior false allegations of "felony tax fraud." |
| 18<br><br>October 12, 2019 | "i'm not severely disabled! you are lucky you only suffer from aspergers!!!" | This post was from the fake account Defendant Qazi created in Plaintiff's brother's name using a photograph of Plaintiff's brother without permission, in reply to an actual post by Plaintiff.  Plaintiff has never been diagnosed with Asperger syndrome.  Plaintiff's brother is severely disabled, making this statement provably false. |
| 19<br><br>October 14, 2019<br><br>Exhibit B at 26 | "Today I received an identity theft alert from Experian.<br><br>An employee also alerted me to the fact that @AaronGreenspan 's fake charity has been sending email to our mail servers.<br><br>Presumably this is some kind of retaliation attempt. Aaron, remember that if you break the law…" | From the @tesla_truth account, this post falsely implied that Plaintiff had committed "identity theft" and again accused him of running a "fake charity."  Plaintiff sent three blank test e-mails to arbitrary addresses at the smick.com domain name to see if they would bounce in order to determine if Defendant Qazi was behind various fake accounts on Twitter.  Here, he confirmed that he was.  Sending these e-mails broke no laws. |
| 20<br><br>October 14, 2019<br><br>Exhibit B at 26 | "hey @IRSnews @IRStaxpros @SEC_Enforcement is it normal for a 501(c)(3) non-profit that is pooling donations from Tesla short sellers to retaliate against critics by committing wire fraud?<br><br>am surprised this organizations *[sic]* gets a tax exemption.  Owner previously stole DoD documents" | From the @tesla_truth account, this post appeared in a thread specifically mentioning Plaintiff.  It falsely accused Plaintiff of stealing Department of Defense documents and committing wire fraud.  This statement is provably false. |
| 21<br><br>October 15, 2019<br><br>Exhibit H at 3, 5, 7, 9, 11 | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?<br><br>You are not alone.  The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes.  That the Smick Sites have *zero* actual accounts of Plaintiff committing any of the listed crimes indicates that the statements are false. |

| | | |
|---|---|---|
| | this criminal to justice" | |
| 22<br><br>October 15, 2019<br><br>Exhibit B at 28 | "to the police: if I am found dead in mysterious circumstances, it was almost certainly aaron greenspan<br><br>he killed me for saying he didn't invent facebook<br><br>(he didn't)" | From the @tesla_truth account, this post, which explicitly mentions Plaintiff, falsely suggested that Plaintiff is a murderer. |
| 23<br><br>October 19, 2019<br><br>Exhibit B at 29 | "Tesla short sellers: donate to us<br><br>It's tax deductible because we are running a fraudulent non-profit.<br><br>we promise to use the money to try and harm Tesla. that's why so many short sellers donate to us @SEC_Enforcement" | This post was issued by the fake @PlainShite account, where Plaintiff's name appeared in the account summary. It repeated the false "fraudulent non-profit" allegation. |
| 24<br><br>November 1, 2019<br><br>Exhibit I at 11 | "he extorted $250,000 from Mark Zuckerburg [sic]" | This statement is part of an essay on Defendant Qazi's website that explicitly names Plaintiff. Plaintiff did not extort Mark Zuckerberg or anyone else, making this statement provably false. |
| 25<br><br>November 1, 2019 | [The URL https://wholemars.com/thinkfraud/zuckerburg-extortion.pdf] | This URL corresponds to a copy of Plaintiff's non-profit organization's IRS Form 990 from 2009, falsely linking Plaintiff with "extortion" as a search engine keyword. |
| 26<br><br>May 17, 2020<br><br>Exhibit I at 52 | "As time went on, Greenspan became more and more enraged, and also became worried about my allegations of his tax fraud and misconduct" | This portion of the Qazi Screed reiterated his false allegations against Plaintiff of tax-related crimes. |
| 27<br><br>May 17, 2020<br><br>Exhibit I at 63 | "After that, I started tweeting about Greenspan's attempts to harass, stalk and smear Tesla owners like me." | This portion of the Qazi Screed falsely alleged that Plaintiff committed crimes of harassment and stalking. |
| 28<br><br>May 25, 2020<br><br>Exhibit B at 33 | "It's time for the board of Plainsite to face justice for their crimes." | Posted on the @WholeMarsLog Twitter account, this statement conflated two different Boards of Directors and effectively accused both of committing "crimes" for posting public records that Defendant Qazi does not like. Two |

| | | minutes later, Plaintiff's father received a phone call from a blocked number about this lawsuit. |
|---|---|---|
| 29<br><br>May 25, 2020<br><br>Exhibit B at 33 | "non-profit status will be revoked when it's discovered the brand, server logs, and resources were misappropriated to inure private benefit to Aaron Greenspan" | Also posted on the @WholeMarsLog Twitter account, this statement omitted both the result of the IRS audit of Think Computer Foundation and falsely suggested that posting public records on the internet is a "private benefit" that only helps Plaintiff, when on net Plaintiff has not even benefited financially from publishing the public documents in question. On July 22, 2020, Defendant Qazi posted a Santa Clara County Superior Court document from Case No. 20CV368472—made electronically available because of Think Computer Foundation's litigation—on his own website, making this statement provably false. |
| 30<br><br>May 25, 2020<br><br>Exhibit B at 34 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @WholeMarsLog Twitter account, this statement falsely accused Plaintiff and his parents of various crimes. |
| 31<br><br>June 15, 2020<br><br>Exhibit B at 35 | "Damn, this is litterally [sic] exactly what Aaron Greenspan did to Omar, Earl, Viv, Johnna.<br><br>Maybe one day he'll be charged too<br><br>…<br><br>he is a criminal" | By this point, Defendant Qazi renamed his Twitter account to @WholeMarsBlog, and posted this series of false statements explicitly naming Plaintiff as a "criminal" in reference to the FBI Boston Division's announcement that several eBay corporate security executives had been charged with harassment of critics. |
| 32<br><br>June 23, 2020<br><br>Exhibit B at 37 | "Why does Aaron Greenspan threaten his critics, and Tesla customers?<br><br>To spread false stories about Tesla in the media, while suppressing | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely accused Plaintiff of securities fraud, harassment and intimidation. That Plaintiff has ever threatened "Tesla customers" |

| | | | |
|---|---|---|---|
| | | positive voices through intimidation.<br><br>The SEC must investigate and prosecute the perpetrators of this short and distort fraud." | is provably false. |
| 33<br><br>June 23, 2020<br><br>Exhibit B at 38 | | "Aaron Greenspan abuses his charity to inure private benefit to himself.<br><br>His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff has committed tax crimes.  The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation, making the statement provably false. |
| 34<br><br>June 23, 2020<br><br>Exhibit B at 39 | | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff.  That Plaintiff has ever threatened Defendant Qazi with anything other than the instant litigation is provably false. |
| 35<br><br>July 7, 2020<br><br>Exhibit B at 47 | | "that's a yes<br><br>Legal troll who extorted Mark Zuckerberg for $250,000 and then donated it to his fraudulent charity to evade taxes.<br><br>When we have his tax exempt status revoked, he'll owe about $100,000 in back taxes." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crimes of extortion and tax evasion.  That Plaintiff extorted Mark Zuckerberg and runs a "fraudulent charity" are both provably false. |
| 36<br><br>July 7, 2020<br><br>Exhibit B at 48 | | "Aaron Greenspan is a criminal.<br><br>Pass it on." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff is a criminal. |
| 37<br><br>July 8, 2020<br><br>Exhibit B at 49 | | "no, only money he had is the money he extorted from Zuckerburg [sic]<br><br>He can't afford a lawyer so he represents himself" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of extortion in response to a question that specifically named Plaintiff.  That |

| | | Plaintiff extorted Mark Zuckerberg and "can't afford a lawyer" are both provably false. |
|---|---|---|
| 38<br><br>July 10, 2020<br><br>Exhibit B at 50 | "I'm sad. Greenspan has stalked me and tried to hurt me so much, it can't even fit in a tweet. He rapes his victims, entering their mind and shattering their peace when they least expect it. You can't imagine it unless you've seen it first hand." | From the @WholeMarsBlog Twitter account, Defendant Qazi falsely claimed that Plaintiff is a rapist. |
| 39<br><br>July 11, 2020<br><br>Exhibit B at 52 | "Huh, interesting.<br><br>Aaron Greenspan had servers in New Jersey.<br><br>The same place the death threat @JohnnaCrider0 got this week came from." | From the @WholeMarsBlog Twitter account, Defendant Qazi falsely implied that Plaintiff had sent Tesla fan Johnna Crider a death threat across state lines, a criminal act, because Plaintiff's company once maintained a long-since- decommissioned co-located server in New Jersey in 2003.  That Plaintiff's company's server has not been located in New Jersey for over a decade and a half is a provable fact. |
| 40<br><br>July 17, 2020<br><br>Exhibit B at 54 | "Aaron Greenspan is a serial rapist.<br><br>He enters his victims [sic] lives unannounced and unexpected, and rapes them while they're going about their lives, with their friends<br><br>You can't understand it unless you've been targeted by him. I will fight for all his victims — past and future." | From the @WholeMarsBlog Twitter account, Defendant Qazi falsely claimed that Plaintiff is a serial rapist. |
| 41<br><br>July 17, 2020<br><br>Exhibit B at 56 | "saying that he harasses and threatens people just doesn't communicate the kind of person he is<br><br>he's a rapist<br><br>and the world will know the truth, no matter how hard he fights to keep it quiet" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely claimed that Plaintiff is a rapist. |
| 42 | "Aaron Greenspan stalks and harasses colleged [sic] aged girls! | From the @WholeMarsBlog Twitter account, Defendant Qazi |

| | | |
|---|---|---|
| July 18, 2020<br><br>Exhibit B at 58 | Creepy!  Leave her alone!<br><br>@jack @Twitter Safety" | accused Plaintiff of harassment and stalking and flagged Twitter's safety team because Plaintiff wrote a single comment on the absurdity of a Third Row Tesla member publicly defending Jack Dorsey, a billionaire, against public outrage over Twitter being hacked. |
| 43<br><br>August 3, 2020<br><br>Exhibit B at 60 | "Scary. someone tried to hack into Omar's iCloud account, so it got locked and he had to reset the password.<br><br>Added to the Greenspan criminal activity file…" | From the @WholeMarsBlog Twitter account, Defendant Qazi accused Plaintiff of breaking into his iCloud account and of being a "criminal" as a result.  Plaintiff has never made any attempt of any kind to break into Defendant Qazi's accounts on any platform.  This statement is provably false via server logs. |
| 44<br><br>August 21, 2020<br><br>Exhibit B at 62 | "Motives and profile of a Cyberstalker like Aaron Greenspan" [image of excerpt from "Motives and profile" section of Wikipedia article at https://en.wikipedia.org/wiki/Cyberstalking] | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely accused Plaintiff of the crime of "stalking" for a variety of completely inapplicable reasons. This is yet another example of Defendant Qazi projecting his own pathological obsession with and stalking of Plaintiff. |
| 45<br><br>August 21, 2020<br><br>Exhibit B at 63 | "Based on his cyberstalking and false police reports we have a good case to put him away for 5 and a half years" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely accused Plaintiff of the crimes of "stalking" and filing a false police report, suggesting that Plaintiff would be incarcerated as a result.  No criminal case against Plaintiff even exists. |

152.    In addition, on October 9, 2019, on Twitter, a public forum, Defendant Qazi willingly, intentionally and maliciously republished the libelous statement concerning Plaintiff originally contained in the Musk Reply e-mail, in a manner not in any way connected to the substance of this litigation.

153.    Defendant Qazi's persistent lies kicked off a chain of additional libel by his followers, who publicly referred to Plaintiff as a "psychopathic incel" and likely "mass shooter."

154.    Defendant Qazi's false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of the initial Complaint in this case.

155.    On August 24, 2020, Defendant Qazi admitted that he frequently posts factual material on his Twitter accounts, writing, "I trust you guys to be smart enough to figure out what's fact and speculation."

156.    Many if not most of Defendant Qazi's roughly 1,000 aspersions concerning Plaintiff, including all of the above statements, were presented as conclusory statements of fact. In addition to using a Twitter account containing the word "truth" to make statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on Twitter and via the Smick Sites to complete IRS Form 13909 in order to make formal false reports echoing his posts regarding Plaintiff and Think Computer Foundation to the IRS.  Communications with the IRS are regulated by federal law and are required to be factual.  Defendant Qazi also frequently tagged government agencies' Twitter accounts, such as those belonging to the FBI, IRS, and SEC, in connection with his posts about Plaintiff.  Furthermore, Think Computer Foundation's status with the IRS was and is easily verifiable on the IRS website.  Think Computer Foundation also openly publishes comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Qazi willfully ignored.

157.    Defendant Qazi's false and misleading statements concerning Plaintiff were not in service of and failed to further any public debate.

158.    Defendant Qazi's false and misleading statements have irreparably harmed Plaintiff's reputation.

## COUNT II
## Libel Per Se
## Against Defendants Elon Musk and Tesla, Inc.

159.    Plaintiff incorporates by reference the foregoing allegations.

160.    Defendant Musk is vicariously liable for all libelous statements published by Defendant Qazi concerning Plaintiff from at least as early as August, 2019, the date that

Defendant Musk was quoted in *Bloomberg Businessweek* as having told Defendant Qazi, "Your Twitter is awesome!"  This wholesale endorsement of Defendant Qazi's statements up to that point amplified their effect and encouraged untold thousands of readers to correctly believe that Defendant Qazi's statements, positive and negative, were completely supported by Defendant Musk—the fourth richest man on Earth, perceived by many to be at the pinnacle of success.

161.    To the extent that Defendant Musk was aware of Defendant Qazi's Twitter account(s), but especially the @tesla_truth account, it would have been impossible for Defendant Musk not to be aware of the libelous and harassing content so frequently posted on a daily basis. Defendant Musk was already aware of the controversy surrounding Defendant Qazi as he and the Tesla Board of Directors had received an e-mail from Plaintiff about Defendant Qazi on August 7, 2019.  It also would have been impossible for the @tesla_truth Twitter account to continue using the TESLA trademark in its name without Defendant Musk's implicit or explicit consent.

162.    To the extent that Defendant Musk was unaware that his communications with Defendant Qazi would be quoted in the *Bloomberg Businessweek* article, he was given the opportunity to comment by its author, Zachary Mider.  As the article states, "Tesla has legions of die-hard fans, many of them well-to-do, tech-obsessed, and male.  Qazi is pretty close to the archetype.  His Twitter handle, @tesla_truth, is a bottomless font of Muskolatry.  Before we met in August, he'd emailed Musk to give him a heads-up and encourage him to speak with me." Therefore, Defendant Musk was aware that the potential article would involve Defendant Qazi and at least one of Defendant Qazi's libel-spewing Twitter accounts, @tesla_truth.  Yet Defendant Musk made absolutely no effort to distance himself from Defendant Qazi's statements or to qualify them in any way.  Instead, he called them "awesome."

163.    Defendant Musk's @ElonMusk Twitter account is disclosed as a source of factual "material information" in Defendant Tesla's SEC Form 8-K filed November 5, 2013.  *See* Exhibit S.

164.    In the initial SEC Consent Decree, Defendant Musk agreed to "comply with all mandatory procedures implemented by Tesla, Inc. [] regarding (i) the oversight of communications relating to the Company made in any format…"

165.    As an officer and director of Defendant Tesla, Musk routinely acts on Tesla's behalf.  The October 9, 2019 Musk Reply e-mail was sent on behalf of both Defendants Musk and Tesla.

166.    Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever been diagnosed with any mental disorder.  Plaintiff does not live in and has never been admitted to a psychological unit for clinical evaluation, nor has Plaintiff ever visited with a mental health professional in a clinical setting except to assist with his brother's acute condition.

167.    In addition to those statements for which Defendant Musk is vicariously liable, Defendant Musk himself published the following libelous statements about Plaintiff:

| Statement No. / Date / Medium | Written Statement by Defendant Musk | Related to Proceeding or Matter Pending Legal Review | Public Forum | Public Interest |
|---|---|---|---|---|
| 46<br><br>October 9, 2019<br><br>E-Mail | "Does the psych ward know you have a cell phone? Just curious." | No | No | No |
| 47<br><br>October 9, 2019<br><br>Twitter via Qazi | "Does the psych ward know you have a cell phone? Just curious." | No | Yes | No |
| 48<br><br>October 12, 2019<br><br>Twitter | ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" | No | Yes | No |
| 49<br><br>October 22, 2019<br><br>E-Mail | "Jack, what Omar is saying is accurate to the best of my knowledge. There has been an orchestrated attempt to drive down Tesla stock through social media, particularly Twitter. This always increases around our | No | No | No |

| | earnings call, which is this afternoon.<br><br>Aaron Greenspan in particular has major issues. He's the same nut but *[sic]* that claimed he was the founder of Facebook and sued Zuckerberg, among many other things.<br><br>Never seen anything like it." | | | |
|---|---|---|---|---|
| 50<br><br>July 3, 2020<br><br>Twitter | "Greenspan is crackers, bananas, barky & ten cards short of a full deck" | No | Yes | No |

168.   On October 9, 2019 at 3:48 P.M., Defendant Musk authored and sent the Musk Reply e-mail on behalf of himself and Defendant Tesla to numerous parties including Defendant Qazi, who Defendant Musk knew or should have known would immediately republish his message publicly, describing Plaintiff as residing in a "psych ward," falsely suggesting that Plaintiff suffered from a psychiatric illness or disease.

169.   Due to Defendant Musk's recklessness, the Musk Reply and his subsequent response was copied to an official at the SEC—a federal government agency that had already fined Defendant Musk tens of millions of dollars for making false statements—suggesting to any objective reader that the communication should be interpreted as a statement of fact.

170.   Whether Plaintiff resided then or at any point in a "psych ward" is a provable statement; Plaintiff did not.

171.   Defendant Musk's statement was interpreted as factual by an enormous number of his and Defendant Qazi's followers, who have continued to harass Plaintiff and repeat false claims calling Plaintiff's mental health into question ever since.

172.   On October 12, 2019 at 1:18 P.M., in the context of a Twitter thread started by Defendant Qazi, Defendant Musk baselessly referred to Plaintiff as an "online bully" running a "fake charity," and included the Twitter handle of the owner of the *Los Angeles Times*, Dr.

Patrick Soon-Shiong, in the conversation, such that Dr. Soon-Shiong would receive an alert on his mobile device(s) about the conversation.

173.    Deliberately bringing the owner of a major newspaper into the conversation falsely suggested that the substance of the statement was factual and worth reporting on.

174.    Defendant Musk's Twitter account is "verified," meaning that Twitter, Inc. has confirmed that Elon Musk is in fact the owner of the @ElonMusk account.  As a result, the account and its posts feature a small white check mark in a blue seal wherever it appears.  Many Twitter users incorrectly interpret this icon to mean that an account's content is more factually accurate and/or endorsed by Twitter itself.  *See* https://twitter.com/twittersupport/status/928654369771356162.

175.    The "online bully" post was of and concerning Plaintiff.  Any average Twitter user curious about the "online bully" or "fake charity" mentioned by Defendant Musk would have seen the article explicitly describing "Aaron Greenspan" and "Think Computer Foundation" at the top of the short thread directly connected to the post.

176.    As running a "fake charity" would presumably be a crime, Defendant Musk accused Plaintiff of committing a crime.

177.    Defendant Musk's aspersions concerning Plaintiff were made as conclusory statements of fact.  For example, although Plaintiff frequently asks questions and raises substantive issues involving public figures and businesses, Plaintiff's Twitter history was searchable until July 18, 2020, when Defendant Qazi falsely accused him of "stalk[ing] and harass[ing] college[] aged girls," and is devoid of bullying.  In addition, Think Computer Foundation's status with the IRS is easily verifiable on the IRS website.  Think Computer Foundation also openly publishes comprehensive disclosures about its limited involvement with PlainSite on the PlainSite website, which Defendant Musk ignored.

178.    Many of Defendant Musk's followers reacted as though Defendant Musk's false statements concerning Plaintiff were completely factual.  @sara_boutall wrote, "This fake charity is terrifying."  *See* https://twitter.com/sara_boutall/status/1183114999956422656.  Third

Row Tesla contributor Viven Hantusch wrote, "Lots of resemblance to political troll networks as well." *See* https://twitter.com/flcnhvy/status/1183116410291183617.  Twitter user @TTwfake wrote, "I've submitted a complaint to the IRS. This is not ok." *See* https://twitter.com/TTwfake/status/1183165610450194432.

179.    One of Defendant Musk's followers, Iqtidar Ali, quickly wrote an article on a website called Xautoworld based directly on Defendant Musk's response, entitled, "Nonprofit involved in cyberbullying Tesla community is being funded by journalists, Elon Musk responds to the situation."  This article encouraged readers to report Plaintiff to the IRS and provided a link to do so. *See* https://www.xautoworld.com/news/tesla-fans-attacked/.

180.    On or around October 22, 2019 at 2:51 P.M., in reply to an e-mail from Defendant Qazi, Defendant Musk sent an e-mail to Twitter CEO Jack Dorsey, as well as Defendant Qazi among other recipients.  The message, which was likely intended to assist Defendant Qazi with restoring his then-suspended Twitter account—a matter so important to Defendant Tesla as to necessitate its CEO's involvement—referred to Plaintiff explicitly by name as a "nut" who suffered from "major issues," once again falsely suggesting that Plaintiff suffered from a psychiatric illness or disease.

181.    The e-mail from Defendant Musk to Jack Dorsey began by immediately discussing whether Defendant Qazi's unknown statements were "accurate," leading any reader to believe what followed—including the false and disparaging remarks directly concerning Plaintiff—would involve factual matters.

182.    The statement that Plaintiff "sued [Mark] Zuckerberg," the CEO of Facebook, Inc. and Plaintiff's Harvard classmate, is both false and misleading in what it omits.  It is false because to date, Plaintiff has never sued Mark Zuckerberg.  In 2008 and 2009, Plaintiff's company filed two trademark cancellation proceedings against Facebook, Inc. before the United States Patent and Trademark Office Trademark Trial and Appeal Board, in which Plaintiff's company was found to have standing.  It is misleading because it omits that as a result, Facebook, Inc. and Mark Zuckerberg reached a confidential settlement with Plaintiff and

Plaintiff's company in May 2009, and Facebook, Inc. and Mark Zuckerberg admitted in a public press release that Plaintiff's work on the houseSYSTEM Facebook at Harvard College had indeed inspired Mark Zuckerberg, who was a member of Plaintiff's site as he developed his own while communicating with Plaintiff.  *See* https://about.fb.com/news/2009/05/facebook-and-think-computer-corporation-resolve-trademark-dispute/.

183.    Defendant Musk's provably false statements concerning Plaintiff were not in service of and failed to further any public debate.

184.    Defendant Musk's false and misleading statements were not made as part of a heated or volatile debate with Plaintiff (or anyone) that might be prone to hyperbole.  Plaintiff was not an active participant in any of the above discussions initiated by Defendant Musk at all.

185.    Defendant Musk's false statements were made with actual malice because Musk knew the statements were false, made the statements with reckless disregard for whether the statements were false or not, and with the awareness that he is frequently given the benefit of the doubt by tens of millions of his followers due to his immense wealth.

186.    Defendant Musk's false statements concerning Plaintiff are part of a pattern.  In 2018, Defendant Musk was sued for libel after publicly and falsely referring to a different critic as a "pedo guy" and a "child rapist" who had supposedly moved to Thailand "for a child bride."  *See* California Central District Court Case No. 2:18-cv-08048-SVW-JC, *Vernon Unsworth v. Elon Musk*.

187.    On or around August 21, 2018, Defendant Musk e-mailed his former public relations consultant, Juleanna Glover—CCing his brother (and fellow Tesla Director) Kimbal Musk and former Tesla Global Communications Director Dave Arnold—"Will Tweet as I wish and suffer the consequences. So it goes."  This statement affirms the intentional nature of Defendant Musk's statements and his reckless disregard for the truth.  *See* Nevada District Court Case No. 3:18-cv-00296-LRH-CLB, Document 177-1, Page 124.

188.     None of Defendant Musk's statements concerning Plaintiff were ever deleted, retracted, or the subject of an apology.  The fact that Defendant Musk disparaged Plaintiff before government agents and the CEO of Twitter alike indicates that his statements were intentional.

189.     On July 3, 2020, one day after the First Amended Complaint was filed in this lawsuit, Defendant Musk doubled down on promoting the narrative that Plaintiff is mentally ill by posting that Plaintiff is, "crackers, bananas, barky & ten cards short of a full deck" at https://twitter.com/elonmusk/status/1279239670870597632.  He posted this message in direct response to Defendant Qazi's solicitation for cash for his GoFundMe legal defense fund, with the effects of endorsing Defendant Qazi's actions, supporting his fundraising efforts, and libeling Plaintiff.  The post garnered at least 317 replies, 297 retweets, and 5,671 "likes" on Twitter.

190.     Many individuals reading Defendant Musk's post on July 3, 2020 interpreted it as a statement of fact meaning that Plaintiff is mentally ill.  After July 3, 2020, a search for Plaintiff's name on Twitter began yielding one auto-complete suggestion other than his name itself: "aaron greenspan crazy."  Responses to Defendant Musk's libelous post from various followers included "He needs medical help" (https://twitter.com/BarkMSmeagol/status/1279259381217939458), references to Plaintiff as "psychotic" (https://twitter.com/OppayahTwitR/status/1279279894766198791), and multiple suggestions that Plaintiff should be used as "practice" for Defendant Musk's non-FDA approved, non-peer-reviewed Neuralink brain implant device (https://twitter.com/coskier61/status/1279300710945812481).

191.     Defendant Musk's false and misleading statements, in some cases disseminated to tens of millions, have irreparably harmed Plaintiff's reputation.

### COUNT III
### Intentional Infliction of Emotional Distress
### Against Defendant Omar Qazi

192.     Plaintiff incorporates by reference the foregoing allegations.

193.    On August 7, 2019, Defendant Omar Qazi posted on Twitter, "I miss when I had 12 followers and could write the most  fucked up tweets possible without anyone caring / those were the good old days".

194.    Defendant Qazi's conduct—starting with his January 2019 harassing prank call to Plaintiff impersonating "the phone company," to his impersonation of both Plaintiff's father and his disabled brother, to his communications with Plaintiff's actual disabled brother via Facebook, to his unjustified and totally baseless shaming of Plaintiff's immediate family on multiple websites and social media accounts set up by Defendant Smick Enterprises, Inc. explicitly for that purpose, to his baseless (and still visible) accusation that Plaintiff has been linked to "sexual assault," to his suggestion that Plaintiff might commit murder, to his use of hidden expletives directed at Plaintiff in HTML source code comments, to his deliberate interference with ongoing restraining order proceedings involving a violent criminal, to his transmitting and/or causing to be transmitted false allegations concerning Plaintiff's supposed possession of child pornography, to his eager republication of outrageous and libelous statements by Defendant Musk, to his creation of or encouragement of the creation of an account in Plaintiff's name on a pornographic website, to his unprovoked regurgitation of a stilted version of this history viewed by thousands of individuals six months later, to his insistence that Plaintiff would be referred to criminal law enforcement on false pretenses as at least one of Defendant Musk's other critics has been, to his hundreds of other lies about Plaintiff not mentioned herein—is so extreme as to go beyond all possible bounds of decency.

195.    No citizen in a civilized society should ever be expected to tolerate the kind of behavior from Defendants Qazi and Smick Enterprises, Inc. as Plaintiff was forced to tolerate.

196.    Defendant Qazi's conduct caused initial grave concern and distress for Plaintiff insofar as Defendant Qazi was unwilling to remove false content and related links to content that Plaintiff feared could lead to another violent or fatal attack against Jews at Plaintiff's family's current and/or former synagogue.

197.    Defendant Qazi's conduct caused grave concern for Plaintiff insofar as it appeared that Defendant Qazi was communicating with the restrained party in Plaintiff's Civil Harassment Case, who has a documented history of mental illness and a documented history of murder and attempted murder, and who is already the subject of criminal harassment proceedings in Massachusetts for violating the underlying restraining order.

198.    Plaintiff was horrified that others, including law enforcement, might believe Defendant Qazi's false allegations regarding child pornography.

199.    Defendant Qazi deliberately hyperlinked a photograph of Plaintiff on the Smick Sites to a third-party website called "Cheater Reports" containing Plaintiff's home address as well as pornographic content with Plaintiff's face pasted on top.  The "Cheater Reports" website, which features no contact information, is one of many "revenge porn" websites that are part of a syndicated network operated by an international extortion racket.

200.    As an experienced programmer, Defendant Qazi knew that linking to the "Cheater Reports" site would increase the chances of pornographic content appearing in internet search results for Plaintiff's name.

201.    Defendant Qazi created or caused the creation of an account in Plaintiff's name and e-mail address on a pornographic website, which also would increase the chances of pornographic content appearing in internet search results for Plaintiff's name.

202.    Plaintiff was horrified that visitors to the Smick Sites would click on Defendant Qazi's link on his Smick Sites to pornographic material involving Plaintiff.

203.    Defendant Qazi's conduct caused further grave concern for Plaintiff insofar as he was communicating with Plaintiff's brother, whose severe disabilities stemming from two rare, concurrent genetic mutations that manifest as Dandy Walker Variant and FG Syndrome preclude him from understanding the context for those communications, from defending himself against bad faith actors, and from understanding how to cope with unexpected life events.

204.    At present, Plaintiff's parents care for Plaintiff's brother.  Due to the lack of reliable and safe care options in the United States for adults with severe disabilities (even prior to

the COVID-19 pandemic), the level of stress and anxiety Plaintiff's entire family endures to responsibly care for Plaintiff's brother at home is literally unfathomable for the average person. Sadly, on a frequent basis, Plaintiff and his family experience an extreme level of anxiety and worry due to these inescapable circumstances.  Like many who suffer from various neurological impairments, Plaintiff's brother's condition is *significantly* impacted by unexpected events, and communications from hostile or ill-intentioned parties have in the past necessitated the involvement of local police.  Plaintiff was therefore incredibly alarmed by the fact that Defendant Qazi was communicating with his brother with malicious intent.

205.    Plaintiff calls his family nearly every day to check on the status of his brother, and often on days when his condition is especially acute, multiple times per day.  Plaintiff began raising the issue of Defendant Qazi's actions on these calls regularly to ensure that his family members were safe.

206.    Defendant Qazi knew that Plaintiff's brother was severely disabled when he chose to post Plaintiff's brother's name and photograph on numerous websites, impersonate him, humiliate him, and communicate with him on Facebook.

207.    Defendant Qazi's actions added to the already enormous amount of stress associated with Plaintiff's brother's care, which no one in society should be forced to live with.

208.    Defendant Qazi's conduct caused chagrin and fear for Plaintiff due to the possibility, which ultimately materialized, that Defendant Qazi's misconduct would be used against Plaintiff in court by Diego MasMarques, Jr. in the Civil Harassment Case.

209.    Defendant Qazi's conduct caused chagrin and fear for Plaintiff due to the possibility, voiced by his father, that his father's career or relationships with his colleagues might be adversely affected by his parents' names and photographs being posted on Defendant Qazi's Smick Sites, and therefore, on search engine results.

210.    Plaintiff contacted his family repeatedly to discuss the best way to handle Defendant Qazi's intrusions, but could not assure them that he could make his harassment stop.

211.    Plaintiff felt as though he could not protect himself or his family from Defendant Qazi's harmful acts or the potential acts of Defendant Qazi's followers.

212.    Defendant Qazi's behavior greatly increased the daily stress felt by Plaintiff due to the need to constantly be on guard for false statements by Defendant Qazi and/or his followers, to determine which of thousands of statements absolutely necessitated corrective responses or reports of abuse, and to attempt to avoid entanglement between Defendant Qazi and the ongoing Civil Harassment Case.

213.    Plaintiff reported Defendants Qazi and Musk to the San Francisco Police Department ("SFPD"), filing two separate declarations under penalty of perjury and visiting three police stations on different occasions.  When the SFPD refused to act despite the at least five California Penal Code violations associated with Defendant Qazi's conduct, Plaintiff contacted his City Supervisor.  Ultimately, in his May 17, 2020 screed, Defendant Qazi admitted that a Sergeant at SFPD placed one phone call to him, warning him to stop.  *See* Exhibit J.

214.    Plaintiff reported the August 3, 2019 text messages and fax, which Defendant Qazi at least caused to be sent, to the FBI.

215.    Plaintiff lost hundreds of productive work hours carefully documenting Defendant Qazi's actions in case pressing criminal charges or filing a civil lawsuit might ultimately be necessary.  Simply by staying up later at night to monitor Defendant Qazi's accounts for the sake of his family's safety and reputation, Plaintiff lost sleep due to Defendant Qazi's actions.

216.    Plaintiff was contacted by a number of individuals expressing genuine concern for Plaintiff's well-being as a result of Defendant Qazi's actions, and spent many hours talking through the situation with these friends and supporters, who were kind enough to offer their time.

217.    Defendant Qazi's actions and October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate total and complete reckless disregard for the truth and for Plaintiff's well-being.

COUNT IV
**Violation of the California Civil Anti-Stalking Statute
(California Civil Code § 1708.7, et seq.)
Against Defendants Omar Qazi, Elon Musk and Tesla, Inc.**

218.    Plaintiff incorporates by reference the foregoing allegations.

219.    Starting on or about January 14, 2019, Defendant Qazi began following, alarming, and harassing Plaintiff through a pattern of conduct involving his use of multiple accounts on the Twitter social network, prank telephone calls, false accusations regarding possession of child pornography, and republication of deliberately altered documents from the Civil Harassment Case.  These actions also led to the transmission of additional false allegations regarding child pornography via text message and the transmission of a pornographic fax to Plaintiff.

220.    As early as January 14, 2019, Plaintiff requested that Defendant Qazi stop his harassing conduct, writing "Please stop." at 12:36 P.M.  Plaintiff also asked Defendant Qazi to stop by leaving a message for him to stop at his nominal employer's office on the same day.

221.    As early as January 17, 2019, Defendant Qazi admitted his intent to "fuck with" Plaintiff to an unknown third party.

222.    Upon information and belief, Defendant Qazi personally communicated with the restrained party in the Civil Harassment Case, and agreed to assist him by serving as a conduit for the restrained party's harassment toward Plaintiff, in violation of the various restraining orders in that case, which prohibit indirect harassment and communication.

223.    As a result of Defendant Qazi's public conduct and his apparent contact with the restrained party in the Civil Harassment Case, Plaintiff reasonably feared for his and his family's safety after receiving messages, text messages and telephone calls that he and others perceived as threats.

224.    Since at least as early as August 2019, Defendant Qazi acted as the ostensible agent of Defendants Musk and/or Tesla.

225.    After October 2019, Defendant Qazi posted harassing messages on social media regarding Plaintiff and Plaintiff's family on the order of 1,000 times from different accounts.  In

contrast, Plaintiff has posted about Defendant Qazi about 40 times to document the most egregious instances of his conduct.

226.   Defendant Musk is an officer, director and employee of Defendant Tesla.  Under *respondeat superior* doctrine, Defendant Tesla is liable for the actions of Defendant Musk performed in connection with its business.

227.   Defendant Tesla, directly and through Defendant Musk's shell companies including but not limited to Excession LLC, employs and contracts with numerous individuals with prior experience in the intelligence community to monitor those it perceives to be security "threats," including critics and whistleblowers.  For example, Defendant Tesla employed Karl Wagner, a 29-year Central Intelligence Agency ("CIA") veteran who was previously the CIA's chief of Counter-Intelligence Operations.  Defendant Tesla also employs Lisa Rager as its Manager of Information Security Risk Management.  Before that, Ms. Rager was a Targeting Officer at the CIA for 10 years; according to an on-line biographical sketch, her current mission at Defendant Tesla is to "to help lead a 10x growth plan for of *[sic]* Tesla's Global Security Org."  Julia Jolie, Defendant Tesla's Emergency Management Global Program Manager, was a Special Agent with the Federal Bureau of Investigation for nearly 24 years.  Max Kelly, CEO of Redacted, Inc., a contractor of Defendant Tesla, previously worked at the National Security Agency and U.S. Cyber Command.  Sean Gouthro and Karl Hansen, now whistleblowers suing Defendant Tesla, each came to the company with years of military experience.

228.   Defendant Tesla hired Nicolas Gicinto and Jacob Nocon after they left the security team at ride-sharing company Uber due to conduct that ultimately led to a number of civil lawsuits and a criminal probe over Uber's "Greyball" project, which involved illegal surveillance of politicians, competitors, and law enforcement.

229.   Defendant Tesla has a history of hiring private investigators to monitor critics and whistleblowers in person and on social media.

230.   Defendants Musk and Tesla have a history of relying upon individuals with no clear formal affiliation with the company, such as Bonnie Norman, as well as convicted felons

posing as investigators, such as James Howard-Higgins, to provide intelligence on critics (whether reliable or not) to Defendant Musk and the company's legal team.

231.    Upon information and belief, Defendants Musk and Tesla have ordered that Plaintiff be surveilled, investigated and/or baselessly referred to criminal law enforcement.

232.    Defendants Musk and Tesla approved of and encouraged Defendant Qazi's harassing actions.

233.    Plaintiff seeks equitable relief, including but not limited to damages in the form of general damages, special damages and punitive damages pursuant to California Civil Code § 3294.

**COUNT V**
**Copyright Infringement (17 U.S.C. § 501, *et seq*.)**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

234.    Plaintiff incorporates by reference the foregoing allegations.

235.    In 2008, Plaintiff authored a book, *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era*, ISBN 978-1-60669-000-0 ("Authoritas").  Authoritas is an original, creative, copyrighted work whose copyright was registered with the United States Copyright Office on June 7, 2008 and assigned Registration No. TX 6-890-602.  *See* Exhibit K.

236.    Without permission, starting on or around October 4, 2019, Defendant Qazi repeatedly posted photographs of the front and back covers and inside pages of Authoritas on his @tesla_truth Twitter account, along with willfully misinterpreted and out-of-context quotes from what Defendant Qazi considered to be the most important parts of Authoritas, with the intent of defaming Plaintiff and harming the market for the book.

237.    Defendant Qazi posted at least six photographs and a dozen passages from the hardcover edition of Authoritas.  The photographs were of pages 149, 150, 151, and 187.  The quotes, mostly verbatim, were from pages 9 (three quotes), 20, 31, 33 (two quotes), 34 (two quotes), 39, 194, 203, and 271.

238.    The heart of Authoritas is the portion of the book that focuses on the circumstances at Harvard College that gave rise to Plaintiff's development of "The Facebook" in

2003, approximately covering pages 146-285.  All of Defendant Qazi's Authoritas photographs of actual pages and three of the typed quotations came from this page range.

239.    To the extent that Defendant Qazi altered the quotations, he made them fit into Twitter's limit of 280 characters per post, but added no new creative aspect whatsoever.

240.    By posting segments of Authoritas on the @tesla_truth account and generally satirizing Plaintiff, Defendant Qazi sought to use Plaintiff's own words against him for commercial gain by decreasing the likelihood that Plaintiff's research on Defendant Tesla would be taken seriously, in turn mitigating any negative impact to the value of his TSLA shares.  He also sought to harm the market for Authoritas.

241.    Defendant Qazi's sparse but deliberately misleading satire alongside Authoritas offered nothing apart from pointed attacks on Plaintiff.  His analysis was not written in the same style as Authoritas or even in complete sentences, e.g. "sucks at math / blames math teacher" to describe an economics professor who was relieved of teaching duties by the head of the Harvard economics department, or "had to use [a vomit bag] when I saw his face on the jacket."  Defendant Qazi's satire also did not report on any newsworthy information, teach, research, or offer legitimate criticism.

242.    Despite supposedly being repulsed by Plaintiff's face, on at least a dozen separate occasions, Defendant Qazi downloaded and/or republished a copyrighted photograph of Plaintiff wearing a purple shirt (the "Purple Shirt Photograph") from the "About" page of Plaintiff's personal website at http://www.aarongreenspan.com for the express purpose of libeling, harassing and ridiculing Plaintiff, well outside the bounds of fair use.  Plaintiff owns the copyright to the Purple Shirt Photograph.

243.    Plaintiff filed Application No. 1-9035669125 for copyright protection on the Purple Shirt Photograph with the United States Copyright Office on July 17, 2020 (noted as July 18, 2020 by the Copyright Office due to the time zone difference).

244.    Plaintiff's personal website had and has a clear copyright notice at the bottom of every page.

245.    Defendant Qazi also obtained a photograph of Plaintiff's father from the "About" page of Plaintiff's father's personal website at http://www.neilgreenspan.com, for the express unlawful purpose of impersonating Plaintiff's father.  Plaintiff took the photograph in question and owns the copyright to that photograph.

246.    Plaintiff's father's website had and has a clear copyright notice at the bottom of every page.

247.    Defendant Qazi first published the Purple Shirt Photograph on or around August 7, 2019 on his @tesla_truth Twitter account, adjacent to various false statements and baseless accusations concerning Plaintiff as part of his ceaseless campaign of harassment and libel.

248.    On October 10, 2019, Plaintiff sent a DMCA takedown notice concerning the Purple Shirt Photograph to Twitter.  Twitter complied with the request; the image was removed.

249.    On October 10, 2019, Defendant Qazi pledged, in all capital letters, "I WILL CONTEST.  My full statement by 9 pacific time tomorrow!  Tune in bright and early to Tesla Twitter tomorrow morning for a show you won't want to miss!"

250.    On October 11, 2019 at 2:17 A.M., Defendant Qazi re-posted the copyrighted Purple Shirt Photograph with the caption, "he doesn't want people to see how stupid he looks even though he already put the picture online."

251.    Each time Twitter removed the image in response to Plaintiff's DMCA takedown requests, Defendant Qazi reposted it either in his Twitter feed, or as an enlarged background banner image at the top of his @tesla_truth account.

252.    Plaintiff has not licensed use of the Authoritas or the Purple Shirt Photograph to Defendants or assigned any of his exclusive rights in his copyrights to Defendants.

253.    In all, Plaintiff sent seven DMCA takedown notices to Twitter concerning Defendant Qazi's behavior:

| Date | Twitter DMCA Request No. | Infringing Omar Qazi Account | Copyrighted Image(s) |
|------|--------------------------|------------------------------|----------------------|
| October 10, 2019 | 0128820272 | @tesla_truth | Purple Shirt Photograph |
| October 10, 2019 | 0128821585 | @greenspan_neil | Photograph of Neil Greenspan |

| October 11, 2019 | 0128859664 | @tesla_truth | FaceCash Website |
| October 11, 2019 | 0128861040 | @tesla_truth | Purple Shirt Photograph |
| October 11, 2019 | 0128886103 | @tesla_truth | Purple Shirt Photograph and FaceCash Website |
| October 17, 2019 | 0129465039 | @tesla_truth | Purple Shirt Photograph |
| October 17, 2019 | 0129466543 | @plainshite | PlainSite Logo |

254.    No DMCA counter-notice was filed in response to any of the above requests.

255.    On October 22, 2019, Defendant Qazi complained on his personal Twitter account, @OmarQazi, that he had received yet another DMCA takedown notice concerning the Purple Shirt Photograph, which had been removed by Twitter before he reposted it again only hours later.

256.    On or around October 24, 2019, Twitter banned Defendant Qazi for life from its platform due to his repeat legal violations, including his repeated, willful infringement of Plaintiff's copyright.  The ban went into effect immediately.

257.    Blocked from violating copyright law on Twitter, Defendant Qazi instead posted copyrighted material on his Smick Sites.  Plaintiff's October 15, 2019 DMCA takedown request to Amazon Web Services LLC resulted in Defendant Smick Enterprises, Inc. being terminated as a client by Amazon as well.

258.    On or around July 10, 2020, Defendant Qazi began posting screenshots from the Amazon Kindle edition of Authoritas on the @WholeMarsBlog Twitter account.  In all, he posted at least 14 images of pages or parts of pages from the book with minimal commentary on each, such as, "From Aaron Greenspan's biography" and "Imagine having Aaron Greenspan as your son."

259.    On or around July 11, 2020, Defendant Qazi posted a purported "book review" of Authoritas on his personal website entitled, "Choice Moments from Aaron Greenspan's Autobiography" (the "Fake Review").  *See* Exhibit U.  He shared the link to Fake Review on Twitter with the caption, "I read Aaron Greenspan's life story so you don't have to.  Here are the best moments: @elonmusk".

260.    The Fake Review consisted of 31 screenshots from Authoritas, some containing entire pages, and at least one containing two full pages, with a photograph of Plaintiff at the top which changed depending on the server being accessed.  As of August 20, 2020 Defendant Qazi posted the Purple Shirt Photograph on the version at http://kidneystone.vagfoundation.org, and a different photograph on the version at http://blog.wholemars.com/2020/07/11/choice-moments-from-aaron-greenspans-autobiography/.  Originally, the post was accessible at a third URL: https://wholemars.net/2020/07/11/choice-moments-from-aaron-greenspans-autobiography/.

261.    The Fake Review itself consisted mostly of short headings describing each image of Authoritas.  Without images it read, in full:

"CHOICE MOMENTS FROM AARON GREENSPAN'S AUTOBIOGRAPHY
Sun Tzu said 'know your enemy', so I read Aaron Greenspan's autobiography. I learned a lot of interesting things about who he is and how he thinks. Here's *[sic]* are some of the most interesting moments, clipped for you so you don't have to read the whole book. If you are up to it though, the whole book is a pretty hilarious read.
AARON GREENSPAN ON HIS HAIR [2 Authoritas images]
ELEMENTARY SCHOOL [2 Authoritas images]
UNLEASHING ANGER ON MOM [1 Authoritas image]
ON HATRED OF EVERYTHING [1 Authoritas image]
EARLY COVERAGE [1 Authoritas image]
FRAUD IN ELEMENTARY SCHOOL CHATROOM [2 Authoritas images]
Yeah, out of country on an undercover mission for three years. Totally. Don't call me Aaron, I'll call you.
HOW TO NEVER GET LAID [2 Authoritas images]
MEETING HARVARD PRESIDENT LARRY SUMMERS [2 Authoritas images]
ON APPLYING FOR CREDIT CARDS [1 Authoritas image]
ON GETTING BAD GRADES [2 Authoritas images]
YER A WIZARD AARON [2 Authoritas images]
ON REACTIONS TO HIS HATEFUL EMAILS [1 Authoritas image]
ON STEALING HARVARD STUDENTS *[sic]* USERNAMES AND PASSWORDS [3 Authoritas images]
TURNING DOWN THE OPPORTUNITY TO START FACEBOOK WITH MARK ZUCKERBURG *[sic]* [2 Authoritas images]
ON DATING GIRLS [1 Authoritas image]
BEGGING ZUCKERBURG *[sic]* FOR A JOB YEARS AFTER TURNING DOWN THE OPPURTUNITY TO BE A FOUNDER [2 Authoritas images]
CALLING THE FBI... AGAIN [1 Authoritas image]
SEEING A GIRL USE FACEBOOK, HE FINALLY REALIZES ZUCKERBURG *[sic]* STOLE HIS IDEA [1 Authoritas image]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WHEN GREENSPAN ALMOST WENT TO JAIL FOR STEALING
GOVERNMENT DOCUMENTS AFTER EXPLOITING A SECURITY FLAW
[1 Authoritas image]
ON MEETING WITH SILICON VALLEY VCS [1 Authoritas image]
The sad story of a smart coder who failed time and time again because of his
terrible social skills. He has never changed. He doesn't know how to talk to
people, only threaten them. That's why he'll always be a huge loser, in my
opinion."

262.    Out of the 20 capitalized headings in this text, 8 (40%) are purely descriptive and

12 (60%) misrepresent the text in Authoritas to satirize Plaintiff.  The introduction and

conclusion are eight short sentences intended only to harm Plaintiff's reputation, and which

reflect the fact that the purpose of the Fake Review is to damage the market for Authoritas by

highlighting and publishing the most interesting portions of the book.

263.    The Fake Review is not parody, not written in the style of Authoritas, barely

engages at all with any of the book's content, and not in any way transformative.  It is merely a

vehicle to further attack and attempt to embarrass Plaintiff, reflecting Defendant Qazi's desire to

do as little creative work as possible and to harm the market for Authoritas by making its

purchase unnecessary.

264.    Defendant Qazi's re-publication of Plaintiff's copyrighted works was not in any

way intended for classroom use as evidenced by his use of expletives, such as "Holy shit. I'm

learning so much from Aaron Greenspan's autobiography."

265.    The bulk of the Fake Review is taken wholesale from approximately 10% of

Authoritas's pages.

266.    Actual reviews of books occasionally quote sentences from books, but rarely if

ever include entire pages of text, images of pages of text, or 10% of the book as a whole.

267.    In sequence, the Fake Review was removed pursuant to Plaintiff's requests under

the DMCA from servers owned by Automattic, Inc. (on or around July 16, 2020), after which

Defendant Qazi reposted it on servers owned by Linode (on or around July 18, 2020), after

which Defendant Qazi reposted it on servers owned by hostkey.ru in Moscow, Russia

"protected" by Cloudflare (July 19, 2020), after which Defendant Qazi reposted it on servers

owned by Neterra Telecommunications, a Bulgarian company with servers in or around Kiev, Ukraine.  The images of Authoritas embedded in the Fake Review have moved from place to place and are as of August 20, 2020 hosted by Automattic, Inc. at different URLs than their initial locations.

268.    Defendant Qazi's cat-and-mouse game using material he knew to be copyrighted and his October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate that his actions were both willful and not fair use.

269.    Between the photographs of the hardcover edition, screenshots of the Kindle edition, and verbatim quotations from Authoritas, Defendant Qazi re-published material from at least pages 9, 20, 30, 31, 33, 34, 39, 40, 89, 90, 100, 101, 121, 130, 131, 132, 137, 149, 150, 151, 187, 194, 203, 204, 239, 240, 271, 290, 291, 300, 302, 303, 306, 311, 314, and 315 of Authoritas—36 pages in all, more than 10% of the book, and far in excess of 1,000 words.

270.    Plaintiff suffered irreparable damage to his reputation and goodwill as a result of Defendant Qazi's repeated infringements.  Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), which should be enhanced in accordance with 17 U.S.C. § 504(c)(2) due to Defendant Qazi's willful conduct.

## COUNT VI
### Removal of Copyright Management Information in Violation of the DMCA
### (17 U.S.C. § 1202(b))
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

271.    Plaintiff incorporates by reference the foregoing allegations.

272.    Section 1202(b) of the DMCA prohibits removal or alteration of copyright management information ("CMI").  CMI includes "[t]he name of, and other identifying information about, the author of a work," as well as "links to such information." 17 U.S.C. § 1202(c).

273.    Without permission, and after receiving several DMCA takedown notices, Defendant Qazi posted the Purple Shirt Photograph depicting Plaintiff repeatedly on his various Twitter accounts and Smick Sites without the accompanying copyright notice clearly found on

the page where he obtained it.  Each republishing of the photograph constituted a separate violation of the DMCA.

274.    The copyright notice at http://www.aarongreenspan.com/about/ read "Copyright © 2001-2017 Aaron Greenspan. All Rights Reserved."  This notice constitutes CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

275.    As of July 19, 2020, the Purple Shirt Photograph posted at http://www.aarongreenspan.com/about/ contained a small text block in the bottom right corner reading "Copyright © 2016 Aaron Greenspan."

276.    As of July 19, 2020, the Purple Shirt Photograph posted at http://www.aarongreenspan.com/about/ contained hidden, embedded International Press Telecommunications Council (IPTC) XMP metadata concerning the image's copyright status reading, "Copyright Notice: Copyright © 2016 Aaron Greenspan. All Rights Reserved."

277.    On or around July 29, 2020, Defendant Qazi willfully re-posted the Purple Shirt Photograph without any copyright notice, embedded text block or metadata on a server and website hosted in or around Kiev, Ukraine at http://kidneystone.vagfoundation.org.

278.    Without permission, and after receiving at least one DMCA takedown notice, Defendant Qazi posted a photograph of Plaintiff's father on his fake @greenspan_neil account, impersonating Dr. Greenspan.

279.    The copyright notice at http://www.neilgreenspan.com/about/ read "Copyright © 2013 Neil S. Greenspan. Photograph copyright © 2013 Aaron Greenspan. All Rights Reserved." This notice constitutes CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

280.    Plaintiff seeks statutory damages for Defendants' DMCA violations.

## COUNT VII
### DMCA Misrepresentation (17 U.S.C. § 512(f))
### Against Defendant Omar Qazi

281.    Plaintiff incorporates by reference the foregoing allegations.

282.     As the First Amended Complaint was filed in this action on July 2, 2020, and the First Amended Complaint contained a claim concerning copyright infringement involving Authoritas, Defendant Qazi knew that his further re-publications of Authoritas on a server in or around Moscow, Russia on or around July 17, 2020; and on a server in or around Kiev, Ukraine on or around July 29, 2020 each constituted an infringement of Plaintiff's copyright.

283.     In Defendant Qazi's July 16, 2020 DMCA Counter-Notice delivered via Automattic, Inc., issued under the authority of 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented under penalty of perjury that he had a "good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled."

284.     In Defendant Qazi's July 16, 2020 DMCA Counter-Notice delivered via Automattic, Inc., issued under the authority of 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented his current mailing address.

285.     In Defendant Qazi's July 18, 2020 DMCA Counter-Notice delivered via Linode, issued under the authority of 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented under penalty of perjury that the publication of his infringing work was "fair use" when, in fact, it was not.

286.     In Defendant Qazi's July 18, 2020 DMCA Counter-Notice delivered via Linode, issued under the authority of 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented his current mailing address.

287.     Plaintiff seeks statutory damages for Defendants' DMCA violations.

## COUNT VIII
### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 Against Defendants Omar Qazi, Smick Enterprises, Inc. and Elon Musk

288.     Plaintiff incorporates by reference the foregoing allegations.

289.     Plaintiff, Defendant Qazi and Defendant Musk are all technology entrepreneurs and individual investors who run technology companies, work on enterprise software, and generally compete for resources and investment opportunities in the Bay Area in California.

290.     Defendants engaged in unlawful, unfair, and fraudulent acts and practices committed pursuant to business activity, namely, the promotion of Defendant Tesla's stock and products in order to financially profit from capital gains and/or referral commissions.

291.     Defendant Smick Enterprises, Inc. violated California Revenue and Taxation Code § 23151 by failing to ever register with the California Franchise Tax Board or Secretary of State despite doing business in California as a Delaware corporation.  Defendant Qazi was aware of the need to register his business with the California Franchise Tax Board at least as early as April 10, 2018, when he posted on the website Hacker News as user "omarforgotpwd":

> "Remember that California minumum *[sic]* tax for an LLC is $800. EVERY YEAR…  If you really do need to legally form a company to separate out finances and liability, depending on what you're doing, you might want to look at starting a Delaware C corporation."

This statement garnered the following reply from another user on the same day:

> "You do realize if you do business in CA you have to pay CA taxes, right? You're mentioning Delaware but that would be for corporations and dispute management. You're not going to get away from taxes..."

*See* https://news.ycombinator.com/item?id=16806444.

292.     The aforementioned actions taken by Defendants Qazi and Smick Enterprises, Inc. also violated a variety of California statutes.  Specifically,

a)   California Penal Code § 166(a)(4) stipulates:

> "Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor: Willful disobedience of the terms as written of any process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial."

Upon information and belief, Defendant Qazi knowingly assisted a restrained party with the violation of an active court order in the Civil Harassment Case.

b)   California Penal Code § 166(a)(7) stipulates:

> "Except as provided in subdivisions (b), (c), and (d), a person guilty of any of the following contempts of court is guilty of a misdemeanor: The publication of a false or grossly inaccurate report of the proceedings of a court."

Defendant Qazi knowingly altered and rendered grossly inaccurate a form issued by the Judicial Council of California that was used in court.

c) California Penal Code § 422.4 states in part:

"Any person who publishes information describing or depicting an academic researcher or his or her immediate family member, or the location or locations where an academic researcher or an immediate family member of an academic researcher may be found, with the intent that another person imminently use the information to commit a crime involving violence or a threat of violence against an academic researcher or his or her immediate family member, and the information is likely to produce the imminent commission of such a crime, is guilty of a misdemeanor, punishable by imprisonment in a county jail for not more than one year, a fine of not more than one thousand dollars ($1,000), or by both a fine and imprisonment."

Using resources belonging to Defendant Smick Enterprises, Inc., Defendant Qazi published Plaintiff's family's home address to tens of thousands of people, amplified by Defendant Musk to potentially millions, as part of a libelous diatribe intended to harm Plaintiff and his family, which included false allegations that Plaintiff's father had committed serious crimes.  Plaintiff's father is a medical researcher at an academic institution.

d) California Penal Code § 653m(b) states:

"Every person who, with intent to annoy or harass, makes repeated telephone calls or makes repeated contact by means of an electronic communication device, or makes any combination of calls or contact, to another person is, whether or not conversation ensues from making the telephone call or contact by means of an electronic communication device, guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith or during the ordinary course and scope of business."

Defendant Qazi admitted to making the prank call to Plaintiff on January 15, 2019, which was intended to annoy and harass, aside from his other harassing conduct using electronic communication devices.  In connection with this case, Defendant Qazi placed a second harassing call to Plaintiff's father on May 25, 2020, in which he falsely suggested that he worked for Quinn Emanuel, a major law firm that has represented Defendant Musk in the past.

e) California Penal Code § 528.5 states in part:

"Notwithstanding any other provision of law, any person who knowingly and without consent credibly impersonates another actual person through or on an Internet Web site or by other electronic means for purposes of harming, intimidating, threatening, or defrauding another person is guilty of a public offense punishable pursuant to subdivision (d)."

Defendant Qazi impersonated both Dr. Neil S. Greenspan and Simon Greenspan, Plaintiff's family members, as well as Plaintiff's business using resources belonging to Defendant Smick Enterprises, Inc.

293.    The aforementioned actions taken by Defendants Qazi, Smick Enterprises, Inc. and Musk also violated a variety of federal statutes.  Specifically,

f)    Defendants Qazi, Smick Enterprises, Inc. and Musk violated 18 U.S.C. § 371, "Conspiracy to commit offense or to defraud United States," and 18 U.S.C. § 2261A(2)(B), "Stalking," by coordinating with each other, individuals working for Defendant Musk directly and/or indirectly, and various social media followers with the explicitly-stated goal of harassing Plaintiff, and participating in that harassment. Among the manner and means by which they carried out these unlawful, criminal acts were:

i.    Creating Twitter accounts in false names and Plaintiff's family's names and using them to send harassing messages to and about Plaintiff and Plaintiff's company and non-profit;

ii.    Using profile photos of Plaintiff's family members;

iii.    Causing photographs of Plaintiff to be uploaded without permission to FaceApp, a Russian application with potential links to Russian intelligence;

iv.    Personally making prank phone calls impersonating a telephone company technician and a law firm employee to Plaintiff and his family members;

v.    Personally sending Plaintiff's disabled brother messages via Facebook;

vi.    Encouraging others to call, fax, e-mail, send text messages to, send Twitter DMs to, and attempt to disable Plaintiff's Twitter accounts;

vii.   Publicly posting Plaintiff's family's home address on numerous websites alongside false information about Plaintiff and Plaintiff's family;

viii.   Causing a text message and pornographic fax to be sent to Plaintiff falsely accusing Plaintiff of harboring child pornography;

ix.   Causing an account on at least one pornographic website to be created in Plaintiff's name;

x.   Causing the posting of at least one online false advertisement involving Plaintiff;

xi.   Signing up Plaintiff for unwanted e-mails and newsletters;

xii.   Threatening to make false reports regarding Plaintiff to law enforcement authorities and actively encouraging others to make false reports;

xiii.   Disguising their role in the conspiracy and harassment through the use of VPN and/or proxy services;

xiv.   Publicly encouraging the firing of any journalist supportive of Plaintiff.

g)   Defendant Musk violated 18 U.S.C. § 1512(b)(2)(A) and/or (B), "Tampering with a witness, victim, or an informant," by attempting to intimidate Plaintiff into withdrawing and/or halting Think Computer Foundation's Chancery Rule 5.1(f) Challenge to Confidential Treatment in the SolarCity Case (an "official proceeding" pursuant to 18 U.S.C. § 1515(A)(1)(D) as it involves Tesla Insurance Services, Inc., a regulated insurance company providing insurance for "solar system installation" in interstate commerce and/or its predecessor) and/or ceasing communication with the SEC regarding an official proceeding.  Think Computer Foundation filed the Challenge at Plaintiff's direction on September 19, 2019.  On September 24, 2019, Vice Chancellor Joseph R. Slights III ruled that the "Director Defendants" in the case had until October 10, 2019 to "provide to the other Producing Parties proposed public versions of the sealed exhibits filed in support of their Motion for Summary Judgment."  On October 12, 2019, two days after that deadline, but before the

documents were publicly released on October 24, 2019—and three days after CCing SEC Regional Director Erin Schneider on an e-mail to Defendant Musk—Defendant Musk responded to Defendant Qazi's Twitter post to publicly accuse Plaintiff's non-profit organization of being a "fake charity" and Plaintiff of being an "online bully" in view of over 30 million followers, while publicly supporting Defendant Qazi's efforts to have Plaintiff reported to the IRS for vague and imagined "crimes."

h) Defendants Qazi and Smick Enterprises, Inc. and third parties Scott Woods, Amelia Tracey and Diego MasMarques, Jr. violated 18 U.S.C. § 371, "Conspiracy to commit offense or to defraud United States," by conspiring to harass Plaintiff on behalf of a restrained party, in violation of the Civil Harassment Case restraining order(s).

294.    Additionally, Defendants engaged in unlawful, unfair, and fraudulent acts and practices by making widely publicized libelous statements to discredit Plaintiff's research (most of which involves court and government records) concerning Defendants Musk and Tesla.

295.    Plaintiff paid a total of $4.25 to the City and County of San Francisco in two separate transactions for street parking on October 10, 2019 in order to make a police report regarding Defendants' conduct at the SFPD Richmond station.  SFPD assigned the report Case No. 190764227.  Defendants' unlawful conduct caused Plaintiff's expenditure.  Plaintiff had no other reason to pay for parking near the SFPD Richmond station, and no other reason to file a police report on that day.

296.    Plaintiff paid for gasoline necessary to drive to various SFPD police stations to file police reports regarding Defendants' unlawful conduct, which cannot be filed electronically per SFPD policy.  On October 7, 2019, Plaintiff spent $31.31 on gasoline at a 76 Gas Station in San Jose, California, a portion of which was used to drive to and from the SFPD Richmond station three days later.  On October 29, 2019, Plaintiff drove to and spoke with a Lieutenant at the Bayview station regarding Case No. 190764227, which also required gasoline.

297.    Plaintiff expended at least 100 hours documenting Defendants' misconduct which would have otherwise been productive time spent improving and maintaining PlainSite, in which

Plaintiff has a direct property interest through his 100% ownership of Think Computer Corporation, and through which Plaintiff derives a substantial portion of his income.

298.   Plaintiff lost income due to Defendants' actions taking time that would have been spent adding content and features to PlainSite, resulting in additional subscription and/or advertising revenue.

299.   Plaintiff suffered injury from Defendant Smick Enterprises, Inc. failing to remit at least $4,000.00 worth of tax payments to the State of California Franchise Tax Board since 2015, given that Plaintiff lives in California and depends on public services financed by tax revenues.

300.   Plaintiff's injuries are in amounts to be determined at trial.

301.   Plaintiff respectfully requests an injunction requiring all Defendants to cease and desist making and/or publishing further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; contacting Plaintiff or his family members; impersonating others; and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff.

## COUNT IX
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Elon Musk and Tesla, Inc.

302.   Plaintiff incorporates by reference the foregoing allegations.

303.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

   a)   defendants made public misrepresentations or failed to disclose material facts;

   b)   the omissions and misrepresentations were material;

   c)   TSLA securities were and are traded in efficient markets;

   d)   TSLA shares were and are liquid and trade with moderate to heavy volume, with an average volume of 13.2 million shares traded daily according to NASDAQ. *See* https://www.nasdaq.com/market-activity/stocks/tsla;

e)   Defendant Tesla traded and trades on the NASDAQ, and was and is covered by multiple analysts;

f)   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of TSLA securities; and

g)   Plaintiff purchased, sold, or endured the expiration of TSLA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed (if ever), without knowledge of the omitted or misrepresented facts.

304.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tesla who knew that those statements were false when made.

305.   On a quarterly basis, Defendant Musk signs SEC Forms 10-Q and 10-K, including financial statements issued by Defendant Tesla.  These SEC Forms 10-Q and 10-K also contain certifications pursuant to the Sarbanes-Oxley Act of 2002, stating that the financial information contained therein is accurate and discloses any material changes to Defendant Tesla's internal control over financial reporting.  *See* Exhibit R.

306.   Despite these legal safeguards, Defendants Musk and Tesla have repeatedly misled investors about Tesla's cash position in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 1<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Tesla was repeatedly drawing down its credit lines on or around the last day of the quarter to artificially inflate its cash balances for the purposes of publication in each SEC Form 10-Q or 10-K, as appropriate.<br><br>*Statement(s) Made Misleading:* All figures associated with "cash" and "cash and cash equivalents" in investor disclosures.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* According to a March 5, 2019 *Financial Times* article entitled, "How much does Tesla have in the bank?" the actual cash interest yield reported in Defendant Tesla's financial statements suggests that the company began exaggerating its cash balances starting in Q4 2016, and continued exaggerating them up to roughly $1.5 billion by the end of 2018. *See* https://ftalphaville.ft.com/2019/03/05/1551787633000/How-much-does-Tesla-have-in-the-bank-/. The article's conclusions are further supported by Defendant Musk's own videotaped admission to *Axios* on November 26, 2018 that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die"—disclosures totally absent from the Q3 2018 SEC Form 10-Q filed just 26 days prior, which misleadingly reported an ample "$2,967,504[,000]" of unrestricted cash on hand. *See* https://www.axios.com/elon-musk-tesla-death-bleeding-cash-a7928b06-3aae-43d7-bdde-5b9c41ef298f.html.<br><br>*Scienter:* When SolarCity had cash flow problems in 2015 and 2016, corporate management scheduled weekly in-person meetings, made weekly cash flow forecasts shared among employees in "datarooms," and informed the Board of Directors as to the company's cash position. Defendant Musk was Chairman of the Board of Directors. At the same time, investors were left in the dark with no knowledge of the crisis. There is no reason to think that business practices at Defendant Tesla are any different, in which case Defendants Musk and Tesla have always had current knowledge of cash position with weekly resolution at least. |
| 2<br><br>February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to distinguish between cash accessible for use in the United States of America and cash restricted for use only within the People's Republic of China, subject to strict loan agreements with the Chinese government, as well as failing to disclose the full extent of Defendant Tesla's agreements with the Chinese government affecting cash balances.<br><br>*Statement(s) Made Misleading:* All figures associated with "cash" and |

"cash and cash equivalents" in investor disclosures.

*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn

*Supporting Evidence:* Exhibit EX-10.85 attached to the 2019 SEC Form 10-K filed February 13, 2020, the "English Convenience Translation" of the Tesla (Shanghai) Co., Ltd. Fixed Asset Syndication Loan Agreement dated December 18, 2019 with numerous Chinese banks, includes clause 11, translated as "Revenue Collection Account Management," which restricts transfers of revenue collected in China to any other account unless the "transfer is used for the purpose of repaying any of its working capital loans" from the Chinese banks. In effect, Defendant Tesla cannot move cash collected in China to the United States until the loans are repaid unless the Chinese bank lenders pre-approve such a transfer.

*Scienter:* On behalf of Defendant Tesla, Defendant Musk met in person with top Chinese Communist Party officials and would have necessarily understood the restrictions on the company's ability to take cash out of China for use in the United States.

| 3 | |
|---|---|

November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A)

*Omission:* failing to note Defendant Tesla's refusal to pay vendors and/or government agencies on-time as evidenced by numerous lawsuits for non-payment, failing to note Defendant Tesla's business practice of "losing" and/or forging vendor-related paperwork, as well as failing to note the resulting lawsuits and criminal indictments stemming from these practices as material litigation. To the extent these balances were reported as "accounts payable," it was misleading to imply that vendors and/or government agencies had actually agreed to Defendant Tesla's payment terms.

*Statement(s) Made Misleading:* All figures associated with "cash," "cash and cash equivalents" and "accounts payable" in investor disclosures.

*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja

*Supporting Evidence:* The lawsuits and criminal cases are a matter of public record. *See* https://www.plainsite.org/tags/tesla-vendor-nonpayment/, which at present identifies 29 legal actions involving Defendant Tesla's failure to pay vendors and tax agencies several millions of dollars in aggregate. In the criminal matter of *USA v. Parulekar*, Northern District of California Case No. 5:18-cr-00550-LHK, former Tesla Group Manager, Global Supply Management Salil Parulekar was able to forge signatures on vendor payment documents without any internal controls preventing the erroneous payment of $9.3 million to the wrong vendor.

| | |
|---|---|
| | *Scienter:* Defendant Musk promised to "personally review and sign every 10th page" of Defendant Tesla's expenses in a "leaked" May 16, 2019 e-mail to the "everybody" e-mail list, indicating his personal awareness. |
| 4<br><br>February 13, 2020 (2019 10-K),<br>April 28, 2020 (2019 10-K/A),<br>April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* using the terms "customer deposits" or "cash" to describe funds resulting from the deliberate conversion of cash from customers' credit cards and/or bank accounts via the Tesla mobile app, which was intentionally designed to encourage accidental one-tap purchases of extremely expensive software add-ons, such as "Full Self Driving" for approximately $4,000 or more.  Once purchased, Tesla typically refuses to refund these large amounts and recognizes the funds as revenue.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn<br><br>*Supporting Evidence:* This dynamic was described by several Tesla customers on social media.  On January 15, 2020, Nassim Nicholas Taleb wrote in a Twitter post: "The purchase was non-intentional. I unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with[out] confirmation/password or something of the sort."  *See* https://twitter.com/nntaleb/status/1217471369350348807.  Although Taleb, who is famous, reportedly received a refund after complaining publicly, many less-famous Tesla customers did not.  *See* https://electrek.co/2020/01/15/tesla-owners-unintentially-buying-software-upgrades-musk/.<br><br>Twitter user @CamBirch wrote on January 28, 2020, "I just had this happen. Called Tesla (hard to do) and talked to a support person. It took them a week and the refund is now displayed on my card. Getting the free mud flaps had more confirmations and proof of purchase than a nearly $10k purchase." *See* https://twitter.com/CamBirch/status/1222256448555515904.<br><br>Twitter user @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us."  *See* https://twitter.com/mpj510/status/1237205195626401792.<br><br>Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund."  *See* https://twitter.com/Maykou1st/status/1248833418827194369.<br><br>At least one other similar public request was deleted as a condition of receiving a refund.  *See* |

| | |
|---|---|
| | https://twitter.com/BeckyQuick/status/1222334373502115840.<br><br>*Scienter:* These purchases took place because Defendant Tesla updated its mobile app to add the expensive software "upgrades" to each user's shopping cart *by default*, and further because Defendant Tesla designed the "purchase" button not to look like a button at all.<br><br>The product nominally being paid for, "Full Self Driving," does not exist.  On August 19, 2020, Defendant Musk admitted that despite starting to accept customer deposits in or around 2016, "Dojo V1.0 isn't done yet. About a year away. Not just about the chips. Power & cooling problem is hard."  *See* https://twitter.com/elonmusk/status/1296148766714560512. |
| 5<br><br>April 29, 2020 | *Omission:* refusing to discuss the cash balance on any day but the final day of the quarter.<br><br>*Statement(s) Made Misleading:* All figures associated with "cash" and "cash and cash equivalents" in investor disclosures.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn<br><br>*Supporting Evidence:* On the April 29, 2020 earnings call, Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Zachary Kirkhorn about the present-day cash balance at the time, not the cash balance as of March 31, 2020.  Kirkhorn declined to answer the question and Jonas did not press him for an answer.  Specifically, Kirkhorn stated, "Yeah.  It's a fair question.  I don't have any additional color to provide. So $8.1 billion in cash and cash equivalents at the end of Q1, we're managing it very closely."<br><br>*Scienter:* The statement that, "I don't have any additional color" was false given that as CFO he had full access to Defendant Tesla's financials.  Defendant Musk promised to "personally review and sign every 10th page" of Defendant Tesla's expenses in a "leaked" May 16, 2019 e-mail to the "everybody" e-mail list.  *See also* Issue No 1. |
| 6<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 | *Omission:* failing to disclose Defendant Tesla's routine practice of abusing temporary registration documents to evade tax obligations and payments associated with the sale of vehicles at the end of a given quarter.<br><br>*Statement(s) Made Misleading:* All figures associated with "cash," "cash and cash equivalents" and "accounts payable" in investor disclosures.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja |

| | |
|---|---|
| (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A) | *Supporting Evidence:* Each quarter, according to vehicle registration data from multiple states, the vast majority of Defendant Tesla's vehicle sales take place in the second half of the third month of the quarter. Widespread consumer complaints on Defendant Tesla's own on-line forums and on social media document vehicle buyers initially receiving temporary registration documents in lieu of permanent registration documents. In many cases, Defendant Tesla has offered to reimburse consumers for any citations due to driving with expired registration, as temporary registration documents expire quickly. In addition, the New Jersey Motor Vehicle Commission investigated Defendant Tesla's operations in New Jersey on a number of occasions and found that numerous customers had received temporary registrations "improperly" and that Tesla was routinely misrepresenting the locations where transactions were taking place. *See* New Jersey Superior Court Case No. MER-L-001836-19, Document No. LCV20191688448 dated September 18, 2019. <br><br> *Scienter:* Defendant Tesla knew that its practices were illegal and likely to cause its customers to break various state laws, which is why it had to promise to cover the expenses associated with citations. |

307.    Defendants Musk and Tesla have repeatedly misled investors about Tesla's sales in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 7 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to report sales at all. Instead, Tesla has reported "deliveries," an undefined, proprietary, non-GAAP term that the market has misinterpreted as equivalent to sales, with Defendants Musk and Tesla encouraging that misinterpretation through their passive and active silence. "Deliveries" and sales are not the same. Defendants Musk and Tesla refuse to specify with any degree of precision what "deliveries" actually are, whether the figures include sales to Tesla's own subsidiaries worldwide, and whether payment of any kind is required for a "delivery" to take place. <br><br> *Statement(s) Made Misleading:* All mentions of and figures associated with "deliveries" in investor disclosures. <br><br> *Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja <br><br> *Supporting Evidence:* The only meaningless hint contained in Tesla's quarterly press releases as to the definition of "deliveries" is the statement, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," though the customer could be a Tesla subsidiary with paperwork correctly reflecting a vehicle purchase |

| | |
|---|---|
| | for \$0.01 or \$0.00. This statement was contained in Defendant Tesla's April 2, 2020 press release, which only reported consolidated deliveries by model group.  *See* https://ir.tesla.com/news-releases/news-release-details/tesla-q1-2020-vehicle-production-deliveries.  Also unclear is whether a returned vehicle could be "delivered" again in the future.  According to public records, Tesla Norway A/S has registered dozens of cars to itself, and the *Vancouver Sun* reported that Defendant Tesla purchased at least one of its own cars to qualify for a tax rebate.  In early 2020, Plaintiff repeatedly pressed Defendant Musk and the Tesla Board of Directors to define the term "delivery," without success.  *See* Exhibit L.<br><br>*Scienter:* The choice not to report sales was clearly deliberate on behalf of Defendants Musk and Tesla.  Every other publicly traded automobile manufacturer reports sales. |
| 8<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* overstating vehicle "deliveries" by tens of thousands of vehicles per quarter since Q3 2018 and grouping "deliveries" in a manner that makes it impossible to discern details regarding sales by specific product lines or geographic regions.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* Plaintiff compiled public record vehicle registration data from state Departments of Motor Vehicles and international sources.  The data covered 8 of the 10 states where Defendant Tesla sells the most cars: CA, FL, TX, NJ, WA, NY, CO, and MA, plus 7 more through at least Q1 2020.  Using estimates for the remaining states and various international data sources, Plaintiff found that Defendant Tesla had overstated "deliveries" relative to recorded vehicle registrations by roughly 100,000 total vehicles since Q3 2017, with significant overstatements beginning in Q3 2018.  Plaintiff notified the Tesla Board of Directors, including Defendant Musk; Tesla's auditors at PriceWaterhouseCoopers; the SEC; the Federal Trade Commission; and the Public Company Accounting Oversight Board of these findings, and received no substantive response.  *See* Exhibit M.<br><br>*Scienter:* Defendant Tesla is fully aware of the number of each model of its cars sold and registered in each state, yet refuses to disclose these metrics to investors.  In addition, the New Jersey Motor Vehicle Commission investigated Defendant Tesla's operations in New Jersey on a number of occasions and found that numerous customers had received temporary registrations "improperly" and that Tesla was routinely misrepresenting the locations where transactions were taking place.  *See* New Jersey Superior Court Case No. MER-L-001836-19, Document No. LCV20191688448 dated September 18, 2019.  Defendant Tesla's failure |

| | | |
|---|---|---|
| | | to clearly define one of the most important terms in its investor disclosures cannot be a mere oversight. |
| 9 | November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose Defendant Tesla's practice of selling used and demo cars as "new," inflating "deliveries."<br><br>*Statement(s) Made Misleading:* All mentions of and figures associated with "deliveries" in investor disclosures.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Jerome Guillen<br><br>*Supporting Evidence:* This practice has led to litigation from former employees and customers alike. In a 2018 lawsuit initially filed in the Burlington County, New Jersey Superior Court and later removed to New Jersey District Court, Case No. 1:18-cv-04120-JHR-AMD, former Tesla employee Adam Williams alleged that he had been fired after reporting illegal sales practices to "his supervisor, and Jerome Guillen," such as "failing to disclose to consumers high-dollar, pre-delivery damage repairs" and "receiving vehicles designated as 'lemons' and, with this knowledge, reselling these vehicles without branding the titles of these vehicles or offering disclosure, rather than representing the cars as 'used' or a 'demo/loaner.'" In another lawsuit, *Woods et al v. Tesla, Inc.*, Massachusetts District Court Case No. 1:20-cv-10162-FDS, the plaintiffs sued over a defective Tesla Model S with over 8,000 miles on the odometer that they had bought as a "new" vehicle because it was a demo unit.<br><br>*Scienter:* Litigation records indicate that Defendant Tesla knew about and encouraged this unlawful practice for years. |
| 10 | October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Tesla has worked with vendors such as Carvana and CarMax to artificially inflate various "used" Tesla vehicle price-based metrics through fleet sales, engineered prices far above actual market rates for those vehicles, and the sales of *new* vehicles to straw man buyers.<br><br>*Statement(s) Made Misleading:* All mentions of and figures associated with "residual value" in investor disclosures.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja, Leopold Visser<br><br>*Supporting Evidence:* CarMax spontaneously stopped selling used Tesla vehicles in or around October 2019. Former Tesla Finance LLC CEO Leopold Visser, who was also an executive associated with Defendant Tesla's subsidiaries Tesla Insurance, Inc. and TALT Holdings LLC, left Defendant Tesla in early 2020 to work at Carvana as "Director, Special |

| | |
|---|---|
| | Projects."  Through approximately June 2020, Carvana listed only about ten Tesla Model 3 vehicles on its web site, some at significantly inflated prices *above new vehicle prices* that were likely useful for inflating Defendant Tesla's Residual Value Guarantee (RVG) calculations that factor into revenue and net income and may influence Kelley Blue Book values; and are in a locked, non-purchasable status until December 31 of the year 9999 despite not being marked as sold, according to Carvana's API.  For example, on May 14, 2020, Carvana vehicle ID 1430592, a Tesla Model 3, had a "vehicleUnlockDateTime" value of "9999-12-31T23:59:59.9999999Z" and a "lockType" value of "Purchase". |
| | *Scienter:* Defendant Musk has made numerous false statements about Tesla vehicles appreciating in value. |

308.    Defendants Musk and Tesla have repeatedly misled investors about Tesla's true financial condition in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 11<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* maintaining a minimum balance of approximately $1 billion for its "accounts receivable" line item since Q3 2018, when accounts receivable jumped from $570 million to $1.155 billion.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* Given Defendant Tesla's business model, which involves up-front cash payments for physical products, this unusually high and persistent balance has attracted considerable notice from prominent investors such as David Einhorn, who has publicly questioned Defendant Musk about it twice without ever receiving a clear answer, and from journalists with accounting degrees and experience, such as Francine McKenna.  In Ms. McKenna's words, "They should not have this big of an accounts receivable balance."  *See* Exhibit N and https://feeds.buzzsprout.com/758369/3800531-episode-26-francine-mckenna at 56:56.<br><br>*Scienter:* Over time, Defendant Tesla has provided multiple conflicting stories to attempt to explain away its Accounts Receivable line item, none of which are believable or consistent.  Examples of such excuses include fiscal quarters ending on weekends and slow European payment systems, even though SEPA and SWIFT payments are processed instantly.  Most recently, Defendant Tesla attributed the high balance to regulatory credit payments, without divulging detail or explaining why these payments belonged in accounts receivable in the first place. |
| 12 | *Omission:* failing to specifically enumerate vendor rebates, payment deferrals, and other negotiated one-time allowances and instead lumping |

| | |
|---|---|
| October 29, 2019 (Q3 2019 10-Q) | them into broader line items, e.g. Cost of Goods Sold, causing investors to believe that costs are artificially low, and profits, artificially high.<br><br>*Statement(s) Made Misleading:* All figures associated with "cost of revenues" and/or "cost of sales."<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* One of the rare allusions to the existence of vendor-related allowances is the opaque phrase, "including commercial negotiations with suppliers" on the bottom of page 44 of Defendant Tesla's Q3 2019 SEC Form 10-Q.  There is no clarification as to which vendors were involved with "commercial negotiations," what the negotiations entailed, or what the resulting outcome was.  Defendant Tesla simply states, "Cost of automotive sales revenue decreased $392 million."  Other SEC filings may be affected but due to the omission it is unclear which ones.<br><br>*Scienter:* Defendant Tesla has been sued by vendors and tax agencies approximately 30 times for failure to pay on agreed-upon terms, but has not disclosed these lawsuits to investors in any SEC Form. |
| 13<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* deliberately under-booking the "warranty reserve" for repairs to Tesla vehicles.  Instead, Defendant Tesla has engaged in a scheme to record repairs as "goodwill" for years, thereby reducing the required warranty reserve and artificially inflating gross margin and net income.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* This scheme is apparent in approximately twenty lemon lawsuits filed by Tesla customers across the United States that happen to include copies of vehicle service invoices.  These documents consistently note warranty repairs billed to "goodwill" that should be billed to the warranty reserve.  *See* https://www.plainsite.org/tags/tesla-goodwill-service/ and Exhibit O.<br><br>*Scienter:* The billing designation on service invoices is determined at each Tesla service center at the time of repair.  Technicians must have received deliberate instruction from Defendant Tesla at some point to use the non-obvious designation of "goodwill" instead of "warranty service" for warranty repairs. |

309.    Defendants Musk and Tesla artificially inflated Tesla's stock price by:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 14<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* failing to disclose that Defendant Musk placed and/or encouraged others to place trades during extended market trading hours, or weekdays from 4:00 P.M. - 8:00 P.M. Eastern Time and 4:00 A.M. - 9:30 A.M. Eastern Time, to deliberately exploit lighter trading volume despite TSLA shares being traded in efficient markets during standard trading hours, such that unusual bid and ask prices would manipulate share price in advance of the market's next open.<br><br>*Statement(s) Made Misleading:* On June 15, 2018, Defendant Musk wrote, "My 'pay' is in options, which only matter if stock goes up & I sell."  On May 1, 2020, Defendant Musk wrote, "Tesla stock price is too high imo" on his Twitter account.<br><br>*Supporting Evidence:* Obviously, Defendant Musk's pay in options would also matter if he deliberately manipulated the stock price upward to make them matter.  It is established that Defendant Musk trades during extended hours.  Footnote 1 in Defendant Musk's SEC Form 4 filed May 7, 2018 disclosed "multiple transactions at prices ranging from $294.79 to $295.69" on that day, but the lowest price recorded during standard trading hours on May 7, 2018 was $295.17.  In fact, there were only two trades in TSLA shares on May 7, 2018 at a price of $294.79, both executed prior to market open.  Based on analysis of the number of shares traded, Defendant Musk's disclosed purchases took place starting at 7:35:47 A.M. Eastern Time.  Further analysis indicates that on several occasions, Defendant Musk and/or entities known to him purchased millions of dollars worth of TSLA stock with the explicit goal of manipulating the share price. *See* https://twitter.com/SheepleAnalytic/status/994233358346530816.<br><br>Below is a TSLA stock graph showing extended hours trading from about 7:00 P.M. Eastern Time on March 19, 2020 through 5:30 A.M. Eastern Time on March 20, 2020.  The gap between the last red bar at 8:00 P.M. on March 19 and the large green bar at 4:00 A.M. on March 20 represents a trader purchasing shares far above the asking price, starting at $420.00, the same price Defendant Musk falsely claimed he would take the company private at, leading to two SEC consent decrees. |

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17

In addition, on March 20, 2020—one day after Defendant Tesla announced its Fremont, California factory would be shutting down—an unknown individual bought 8,000 shares of TSLA at prices between $420 and $456 per share (worth over $3.3 million) starting at approximately 4:00 A.M. Eastern Time.  At $456 per share early in the morning on March 20th, TSLA traded approximately $59 (or roughly 15%) above the asking price from 8:00 P.M. the previous night on devastatingly bad news regarding the main factory.

18
19
20

*Scienter:* The fact that the arbitrary, elevated price chosen on March 20, 2020 was $420 per share—a reference to the same marijuana joke that cost Defendants Musk and Tesla $20 million each in SEC penalties—suggests that these extended hours transactions were not legitimate. There is no conceivable reason why an executive trading according to a pre-determined 10b-5 Plan would need to use extended hours trading.

21

15

22

November 2, 2018

23

(Q3 2018 10-Q),
February 19, 2019

24

(2018 10-K),
April 29, 2019 (Q1

25

2019 10-Q),
July 29, 2019 (Q2

26

2019 10-Q),
October 29, 2019

27

(Q3 2019 10-Q),

28

*Omission:* failing to disclose to investors that Defendants Musk and Tesla were working to unlawfully disseminate misleading news stories, discredit or silence critics, and obtain "research" on whistleblowers regardless of veracity, by engaging:
a)  social media influencers, some anonymous or pseudonymous, including but not limited to Defendant Qazi, Bonnie Norman, Galileo Russell, Sofiaan Fraval, Zac and Jesse Cataldo, and Frederic Lambert, all Tesla shareholders and content creators;
b)  ex-CIA and ex-NSA "security" professionals at firms such as Redacted, Inc. (throughout 2020 concerning XMotors.ai in China, among other matters) and Nisos Group LLC (throughout mid- to late-2018 concerning Martin Tripp in Nevada and *Business Insider* in

| | |
|---|---|
| February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | New York);<br>c)  public relations firms such as Milltown Partners, Ridgely Walsh, Strategies 360, and Forza Communications; and<br>d)  convicted felons such as James Howard-Higgins (in July-August 2018 concerning Vernon Unsworth in Thailand).<br><br>*Statement(s) Made Misleading:* On June 17, 2018, in a deliberately leaked e-mail to the Tesla "everybody" e-mail list, Defendant Musk wrote, "I was dismayed to learn this weekend about a Tesla employee who had conducted quite extensive and damaging sabotage to our operations."  In addition, each statement made by a proxy for Defendants Musk and Tesla who did not disclose their full relationship to investors was misleading.<br><br>*Directly Responsible Parties:* Elon Musk, Jared Birchall, Dave Arnold, Sarah O'Brien, Erica Chen, Gina Antonini, Aarti Reddy, Juleanna Glover<br><br>*Supporting Evidence:* On June 22, 2018 in an internal e-mail, Tesla Communications employee Sarah O'Brien wrote, "Does it look to you like our messaging is coming through?"  On August 16, 2018, in an internal e-mail, Tesla Vice President of Communications Dave Arnold wrote, "let's crank out some official messaging asap."  Evidence that Defendants Musk and Tesla have hired numerous firms to handle crisis communications and silence critics, sometimes via Defendant Musk's "family office" company Excession LLC, has emerged through litigation and other public records such as California lobbyist disclosures. Furthermore, on March 27, 2019, Plaintiff was one of many Tesla-focused targets of someone posing as a "Senior Journalist at Bloomberg" supposedly named "Maisy Kinsley" with a computer-generated composite photograph, a fake LinkedIn profile, fake Twitter account (username @msmaisymade), and a fake personal website at http://www.msmaisymade.com hosted by Namecheap, Inc.<br><br>*Scienter:* Under oath, Sarah O'Brien admitted that even though she had communicated with numerous media outlets warning them of the supposed violent thread posed by Martin Tripp, she had no knowledge of the circumstances of the anonymous phone call that started the chain of events.  Previously confidential deposition testimony also revealed that Tesla hid information from law enforcement and that the Storey County Sheriff's Office had determined Tripp to pose no threat, but Tesla continued communicating with journalists as though he did. |
| 16<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 | *Omission:* failing to disclose that Defendants Musk and Tesla were working with highly visible television personalities who regularly appear on financial media networks such as CNBC and Bloomberg Television, as well as entertainment personalities such as Joe Rogan, in order to push a false and misleading narrative about Tesla's future prospects and |

| | |
|---|---|
| (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | distract from negative news releases.<br><br>*Statement(s) Made Misleading:* Each statement made by a proxy for Defendants Musk and Tesla who did not disclose their full relationship to investors was misleading.  For example, on February 5, 2020, CNBC published an article reporting that Cathie Wood held 2024 price targets of $7,000 per share to $15,000 per share for TSLA common shares, far beyond of the most extreme range of price targets held by other Wall Street analysts.<br><br>*Directly Responsible Parties:* Elon Musk, Dave Arnold, Martin Viecha, Juleanna Glover<br><br>*Supporting Evidence:* Since 2019, narratives have included wild, as-yet-unfulfilled promises about "robotaxis," the "Cybertruck" pickup truck, and new "gigafactories" in various locales.  Media personalities Ross Gerber of Gerber Kawasaki Wealth & Investment Management, Cathie Wood of ARK Investment Management LLC, and Jim Cramer of CNBC (among others) have all contributed to this coordinated effort, often with the explicit cooperation of Defendants Musk and Tesla.<br><br>Both Jim Cramer and Ross Gerber have openly referred to illegal stock manipulation as a "game."  In 2008, Jim Cramer said, "A lot of times when I was short at my hedge fund ... meaning I needed (a stock) down, I would create a level of activity beforehand that could drive the futures… It's a fun game and it's a lucrative game."  *See* https://www.youtube.com/watch?v=gMShFx5rThI.  On June 13, 2020 at 9:50 A.M., Ross Gerber wrote on Twitter, "I can move stocks all over the place. By myself. Think about it. I have $1.1 bil. I've got $100 mil in cash. I could buy all of hertz. Push it any way I want. I don't play that game… but I can crush people all day if I want… don't they get it. It's like poker."  He later deleted the post.  Defendant Musk has provided Tesla factory tours to Wood and Gerber and appeared on a podcast hosted by Wood on February 19, 2019.  *See* https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/.<br><br>*Scienter:* Conservative media consultant Juleanna Glover provided Defendants Musk and Tesla with media relations advice over a period of years, including the advice that Defendant Musk deliberately schedule media appearances to distract from negative publicity.  For example, specifically to distract from his "pedo guy" insult, Defendant Musk appeared on the popular Joe Rogan podcast on or around September 7, 2018, where he smoked marijuana on video.  Glover approved of this strategy. |
| 17 | *Omission:* failing to disclose that Defendant Tesla was incentivizing Wall Street sell-side analysts, such as Adam Jonas of Morgan Stanley |

| | |
|---|---|
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | (referred to in the *New York Times* as "The Tesla Cheerleader"), to repeatedly and baselessly upgrade Tesla's price target and earnings projections in public, and write public analysis with optimistic spin in possible exchange for lucrative banking deal fee revenue, while referring to Tesla in private in far more negative terms; as well as providing Wall Street analysts with deliberately low "delivery" estimates in advance such that the company could easily "beat" them when released.<br><br>*Statement(s) Made Misleading:* Each statement made by a proxy for Defendants Musk and Tesla who did not disclose their full relationship to investors was misleading.<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Martin Viecha<br><br>*Supporting Evidence:* In at least one private call with investors on May 22, 2019 that was eventually leaked, Jonas admitted that Tesla is a "distressed credit and restructuring story." *See* https://www.forbes.com/sites/alanohnsman/2019/05/22/tesla-shifts-from-growth-to-distressed-credit-story-morgan-stanley-says/. Jonas has publicly used sky-high software company valuations when convenient, instead of more appropriate automotive company valuations. On October 30, 2019 on Bloomberg Television, Jonas even stated, "We think Tesla is a software company…that, in an ideal world, would be covered by a tech hardware analyst rather than the auto analyst community." That sentiment did not stop him, around March 2020, from starting to write notes about TSLA as an automotive analyst almost daily, an unheard-of practice for sell-side analysts who typically release notes about companies they cover once or twice per quarter.<br><br>*Scienter:* Defendants Musk and Tesla have themselves held private "invitation-only" calls with investors in direct violation of Regulation FD, such as the call on February 28, 2019 reported on by the *Los Angeles Times*: "Tesla Chief Executive Elon Musk, who is scheduled to defend himself Monday against contempt charges in a federal district court, may find his defense complicated by a semi-secret teleconference Tesla held Thursday with a small number of investors and members of the media." *See* https://www.latimes.com/business/autos/la-fi-hy-tesla-musk-mistake-20190305-story.html. When asked about the clandestine nature of the call, where Defendant Musk reversed his prior profit forecast, he responded on Twitter, "Tesla comms is fixing. That was a mistake." |
| 18<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 | *Omission:* failing to disclose that Defendant Tesla was using and abusing confidentiality provisions (including protective orders) in lawsuits, arbitration proceedings, regulatory proceedings and contracts with employees to keep unlawful acts and public safety information secret. |

| | |
|---|---|
| (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Statement(s) Made Misleading:* On page 66 of Defendant Tesla's Q3 2018 SEC Form 10-Q, the company wrote, "Although we intend to comply with the terms and requirements of the settlement, if there is a lack of compliance, additional enforcement actions or other legal proceedings may be instituted against us." Defendants Musk and Tesla have repeatedly violated with the terms and conditions of the SEC settlement agreements and never actually intended to comply, which Defendant Musk explicitly stated during his CBS *60 Minutes* interview. |
| | *Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Martin Viecha, Al Prescott, Dan Chia, Erin Bradley |
| | *Supporting Evidence:* Examples include the overzealous redaction of court materials in Delaware Court of Chancery Case No. 12711-VCS from 2016-2019; Defendant Tesla's unlawful refusal to allow the Nevada Department of Industrial Relations to inspect its factory on May 21, 2019 even with a valid search warrant signed by a judge (*see* https://www.youtube.com/watch?v=cSlHfyfY8Wk); Tesla Associate General Counsel Erin Bradley's November 6, 2019 request to the California Alternative Energy and Advanced Transportation Financing Authority ("CAEATFA") regarding requested redactions and so-called "trade secrets;" and Tesla lobbyist Dan Chia's misleading insistence in March-April 2020 that federal copyright law governs public records concerning Defendant Tesla's mishandling of COVID-19 procedures when it does not. |
| | *Scienter:* The above examples concealed at least one federal investigation that had not been disclosed to investors; perjury; misleading investor disclosures at issue in this lawsuit; harm to hundreds of employees from COVID-19; and fraud involving the SolarCity merger, which continues to be litigated, including but not limited to failure to inform investors of a cash "crisis" at SolarCity. |
| 19 <br><br> October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* inappropriately recognizing revenue for pre-paid features still being developed, such as autonomous driving features that present a public safety hazard when not adequately tested before release or "beta" release. |
| | *Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja |
| | *Supporting Evidence:* "Smart Summon" was released without adequate testing at the end of September 2019, in time to allow Defendant Tesla to recognize approximately $30 million of deferred revenue during Q3 2019. According to a California Public Records Act request response, the California Department of Motor Vehicles sent Defendant Tesla a letter on March 6, 2020 highlighting failures observed during a |

| | |
|---|---|
| | demonstration on November 1, 2019, including but not limited to, "The vehicle did not recognize a stop sign and proceeded without stopping." *See* Exhibit T. |
| | *Scienter:* Knowing that regulators had concerns that the company failed to disclose (let alone who the regulators involved might be), Defendants Musk and Tesla were willing to put lives at risk in order to recognize slightly more revenue to give the illusion of profitability. |
| 20<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Misleading Statement:* presenting inconsistent, false and misleading financial statements to the SEC and investors involving "Selling, general and administrative" expenses, "Cost of sales," and "marketing, promotional and advertising costs."<br><br>*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja<br><br>*Supporting Evidence:* Several figures from one period do not match the same period's figures when reported as the "prior period" figures on the next financial statement.  For example, in Q3 2018, Defendant Tesla reported "Selling, general and administrative" (SG&A) expenses of "113,973" thousand dollars, or about $114 million.  In Q4 2018, that number for Q3 2018 was implicitly revised downward to $109 million.  In Q3 2018, "Cost of sales" (COGS) was reported as "25,037" thousand dollars, or about $25 million.  By Q4 2018, that same number for Q3 2018 was implicitly revised upward to $30 million.  This type of unexplained shift from SG&A to COGS appears to take place every quarter from Q2 2018 through at least Q1 2019.<br><br>*Scienter:* Defendants Musk and Tesla were charged with securities fraud by the SEC. |
| 21<br><br>January 30, 2019 | *Misleading Statement:* On the Q4 2018 Tesla earnings call, Defendant Musk stated, "I mean, my best guess, this is just a guess, my best guess for demand of Model 3 worldwide is something—in a strong economy, it's something on the order of 700,000 or 800,000 units a year.  That's my best guess for demand of Model 3 in a strong economy.  If the economy goes into a recession, then I think that could be something under 40% less.  But I think even in a recession, worldwide demand is still something in the order of 500,000 for Model 3."  These estimates are directly contradicted by projections Defendant Tesla provided to the State of California under penalty of perjury on January 18, 2019, only twelve days prior to the Q4 2018 earnings call.<br><br>*Directly Responsible Parties:* Elon Musk, Mark Olson, Erin Bradley, Dan Chia, Danielle Matsumoto, Sunaina Seelam, Sendil Palani, Chris Jenny, Dhruv Batura |

*Supporting Evidence*: Tesla applied for a CAEATFA sales and use tax subsidy on January 18, 2019, which was ultimately granted as Application No. 19-SM008.  Part of the application was submitted on a Microsoft Excel spreadsheet containing a tab entitled "Data Set," shown in part below:



CAEATFA was instructed by Defendant Tesla to redact the information in this tab prior to release under the California Public Records Act, but failed to do so by accident.  The CAEATFA application data reveal that Tesla never expected to deliver more than 250,000 Model 3 vehicles per year in any year up to 2021.  "Deliveries" necessarily reflect demand even if they are not the same as sales.  Defendant Musk's exaggerated claims about Model 3 demand ranging from 500,000 to 800,000 units per year are shown to be false by these internal documents.  Defendants Musk and Tesla knew or should have known of these internal projections because unlike other automobile manufacturers, Defendant Tesla operates its own sales centers and does not use third party dealerships.  All sales information is immediately available to Defendants Musk and Tesla.  Defendant Tesla did know of these projections because according to documents from CAEATFA, they were "owned" by Danielle Matsumoto (Director, Finance), Sunaina Seelam (Senior Manager - Financial Planning and Analysis), Sendil Palani (Senior Director, Finance), Chris Jenny (Manager, Business Operations), and Dhruv Batura (Senior Manager, Finance and Business Operations).

*Scienter:* Defendant Musk routinely makes up false figures and has a notable tendency to rely on the number "500,000" when he actually has no reliable data.  *See* "Tesla and the number 500,000, again" at https://ftalphaville.ft.com/2020/01/30/1580377703000/Tesla-and-the-number-500-000--again/ and "A brief history of Tesla and the number 500,000" at https://ftalphaville.ft.com/2018/07/12/1531368000000/A-brief-history-of-Tesla-and-the-number-500-000/.  Government subsidies are important enough to Defendant Musk that he has discussed them repeatedly on his Twitter account, including on May 11, 2018 when he wrote, "Our giant auto co competitors have much greater access to incentives than Tesla, which means Tesla has prospered in spite of govt subsidies, not because of them."  *See*

| | | |
|---|---|---|
| | | https://twitter.com/elonmusk/status/995028864672788480 .  Yet no other car company has received money from CAEATFA according to public disclosures. |
| 22<br><br>April 12, 2019 | | *Misleading Statement:* In a videotaped April 2019 interview, Defendant Musk stated, "I think the most profound thing is that if you buy a Tesla today, I believe you are buying an appreciating asset—not a depreciating asset."  *See* https://www.youtube.com/watch?v=dEv99vxKjVI.<br><br>*Directly Responsible Parties:* Elon Musk<br><br>*Supporting Evidence:* This false statement was intended to spark a speculative frenzy for Tesla vehicles and even deposits on vehicles.  In fact, Defendant Tesla pays customers trading in their old Tesla vehicles *less* than their initial purchase price, not more.  Defendant Tesla has attempted to artificially inflate resale values to make Defendant Musk's false statement appear true, as described in Issue 10.  In August 2018, in a different videotaped interview, Defendant Musk stated, "[W]ith each successive design iteration, uh, you can add more capability, you can design—you can integrate more things.  You can figure out, uh, better ways to produce it, so it actually gets better and cheaper. But, it's like, a natural progression of any new technology."  *See* https://www.youtube.com/watch?v=MevKTPN4ozw&t=6m8s.<br><br>*Scienter:* Defendant Musk's August 2018 statement directly contradicts his April 2019 statement, as well as the direct experience of Tesla customers who routinely receive less money for their Tesla vehicle trade-ins than they paid for them. |
| 23<br><br>April 22, 2019,<br>April 11, 2020 | | *Misleading Statement:* At "Autonomy Investor Day" on April 22, 2019, Defendant Musk promised that Defendant Tesla would deploy a robotaxi fleet of 1 million Tesla vehicles by the end of 2020.  *See* https://www.youtube.com/watch?v=Ucp0TTmvqOE.  In his words,<br><br>"I feel very confident predicting that there will be autonomous robotaxis from Tesla next year—not in all jurisdictions because we won't have regulatory approval everywhere.  From our standpoint, if you fast forward a year, maybe a year and three months, but next year for sure, we'll have over a million robotaxis on the road."<br><br>On April 11, 2020, Defendant Musk reiterated this claim on Twitter, stating, "Functionality still looking good for this year.  Regulatory approval is the big unknown."  *See* https://twitter.com/elonmusk/status/1249210220200550405.<br><br>*Directly Responsible Parties:* Elon Musk |

*Supporting Evidence:* By April 11, 2020, it was clear that COVID-19 would make this impossible. Furthermore, in a June 3, 2020 e-mail to Plaintiff, the California Department of Motor Vehicles confirmed that Defendant Tesla had never actually raised the matter of "robotaxis" with its autonomous driving regulators. *See* Exhibit T.

*Scienter:* The April 22, 2019 Autonomy Investor Day presentation—where Defendant Musk called LiDAR and HD maps "obviously false and foolish" "crutches" "that should not be used"—included a number of images of a supposed Tesla vehicle "calculating" the path forward without using those features at 2:14:41 and 2:14:48 where the projected path completely diverged from the road and into the adjacent hillside. It is impossible that a properly functioning image recognition algorithm alone would have produced such results, meaning that either Defendants Musk and Tesla' was dangerously deficient, or that Defendants Musk and Tesla had already mapped the terrain for the presentation, contradicting Defendant Musk's representations.

| 24 | *Misleading Statement:* On July 29, 2019, Defendant Musk wrote on his Twitter account, "Spooling up production line rapidly. Hoping to |
|----|---|
| July 29, 2019 | manufacture ~1000 solar roofs/week by end of this year." *See* https://twitter.com/elonmusk/status/1156005185656782848. |

*Directly Responsible Parties:* Elon Musk

*Supporting Evidence:* Federal import records show that Defendant Tesla had long since started importing solar roof tiles from Changzhou Almaden Co. Ltd. in China by July 2019, leaving little to "manufacture" in the United States. In May and June 2020, Defendant Tesla began informing solar roof customers in certain markets that their orders were cancelled. *See* https://electrek.co/2020/06/11/tesla-cancelling-solar-roof-orders-after-years-deposits/.

*Scienter:* Defendant Tesla never manufactured 1,000 solar roofs per week, nor is it clear that Defendant Tesla manufactures solar roofs at all. On or around August 21, 2020, the Office of the New York State Comptroller released Audit Report 2017-S-60, detailing the manner in which Defendant Tesla have strung along the State of New York, which used the public's tax dollars to finance the Buffalo factory where solar roofs are supposedly manufactured. It states in part:

"Since 2017, publicly available Tesla reports have indicated potential setbacks with Tesla's solar roof – a product it anticipated it would produce at the RiverBend facility. For example, Tesla reported on several occasions it had developed a residential solar roof in October 2016 that was ready for production. In March 2017, Tesla reported it planned to begin

| | | |
|---|---|---|
| | | production of the solar roof in summer 2017 at RiverBend.  In September 2017, it reported that solar roof installations would ramp up slowly in the fourth quarter of 2017 and increase considerably in 2018 as the production and installation process became standardized.  However, in November 2018, Tesla reported it was still refining the product design and installation processes and, as a result, production would not significantly increase until the first half of 2019.  During the first quarter of 2019, Tesla reported that solar roof deployments had significantly declined." |
| 25 | October 9, 2019 | _Misleading Statement:_ Defendant Musk wrote on his Twitter account, "All Tesla Supercharger stations in regions affected by California power outages will have Tesla Powerpacks within next few weeks. Just waiting on permits."  He then added, "Also adding Tesla Solar to our Supercharger stations as fast as possible. Goal is 24/7 clean power with no blackouts." |
| | | _Directly Responsible Parties:_ Elon Musk |
| | | _Supporting Evidence:_ Adding solar functionality to charging stations in an economical manner (not requiring multiple football fields worth of solar panels) would defy the laws of physics. |
| | | _Scienter:_ Defendant Tesla never equipped its Supercharger stations with permanent batteries or solar power. |
| 26 | November 6, 2019 | _Misleading Statement:_ On or around November 6, 2019, Andrej Karpathy publicly stated, "Famously, perhaps, we don't use LiDAR and we don't use high definition maps, so everything that we built for the Autopilot is basically based on the computer vision, machine learning, on the raw video streams that come from the eight cameras that surround the vehicle."  _See_ https://www.youtube.com/watch?v=oBklltKXtDE. |
| | | _Directly Responsible Parties:_ Elon Musk, Andrej Karpathy |
| | | _Supporting Evidence:_ Portions of Tesla's software reportedly do rely on data previously generated from high definition maps. |
| | | _Scienter:_ Defendants Musk and Tesla have misrepresented their autonomous driving capabilities for years.  A German court recently banned Defendant Tesla's use of the term "Autopilot" for misrepresenting its capabilities to consumers. |
| 27 | November 12, 2019 | _Misleading Statement:_ During a podcast interview pertaining largely to Defendant Tesla, Defendant Musk stated, "So, Neuralink, I think at first, will solve a lot of brain-related diseases.  So could be anything from like autism, schizophrenia, memory loss…like everyone experiences memory loss at certain points in age."  In so doing, Defendant Musk falsely |

suggested that he could soon cure autism.  This statement, viewed by nearly one million people, was at least in part intended to convey that Defendant Musk's companies are worthy of investment.  *See* https://www.youtube.com/watch?v=smK9dgdTl40&t=18m2s.

*Directly Responsible Parties:* Elon Musk

*Supporting Evidence:* The statement is totally and completely false. Neither Neuralink or any other device imagined by Defendant Musk can "solve" or clinically treat autism.  Defendant Musk is not a physician, let alone a neurologist or a neurosurgeon.  Neuralink has no Food and Drug Administration (FDA) approval of any kind and has published a total of zero peer-reviewed articles.  "Autism" is not a single discrete disease, nor is it even a spectrum of diseases (as is widely believed), that could be cured through the implant of a microchip as proposed by Neuralink. Serious research efforts involving autism, such as the Simons Foundation Autism Research Initiative gene database, encompass a wide range of genetic factors and specific neurological conditions completely ignored by Defendant Musk.  *See* Exhibit P.

*Scienter:* There is absolutely no evidence to support any of these statements.

| 28 | |
|---|---|

November 23-24, 2019

*Misleading Statement:* On November 23, 2019, Defendant Musk posted on Twitter that the "Cybertruck" had generated significant demand, stating, "146k Cybertruck orders so far, with 42% choosing dual, 41% tri & 17% single motor."  The following day, he posted "187k" in the same conversation thread.  At 7:18 P.M., he then posted "200k" in a separate thread.  *See* https://twitter.com/elonmusk/status/1198344195317985280, https://twitter.com/elonmusk/status/1198693994194014208, and https://twitter.com/elonmusk/status/1198788116372344832.

*Directly Responsible Parties:* Elon Musk

*Supporting Evidence:* The deposits made for the Cybertruck were not, in fact, firm "orders."  Multiple press accounts reported individuals making multiple reservations due to the low deposit amount of $100.00. According to a November 25, 2019 CNBC article, "Given the minimal $100 payment, it's impossible to say how many pre-orders will eventually convert to sales."  *See* https://www.cnbc.com/2019/11/25/elon-musk-tweets-on-cybertruck-orders-say-little-about-actual-sales.html.  Some depositors believed that they would be able to resell their deposit to others for a higher price, based on Defendant Musk's false representations about Tesla vehicles appreciating in value, as described in Issue 22.  Defendant Musk also deliberately failed to communicate the number of deposits made by *unique* depositors, offering absolutely no context for many of his purely

numeric and intentionally vague and misleading posts.

On June 25, 2020, Twitter user @MatchasmMatt wrote, "So I did this three more times today. I'm at 15 now. I've lost all control, somebody stop me!!! [laugh-crying emoji][laugh-crying emoji]." The post included a screenshot of a Cybertruck reservation confirmation page for order number RN113576660. *See* https://twitter.com/MatchasmMatt/status/1276251737855229952.

Twitter user @Ben_310 responded, "You are a bad influence sir, I just ordered 2 more, I'm now at 4. Would have never thought of this idea before you floated it, it does make a lot of sense." *See* https://twitter.com/Ben_310/status/1276270854561644544.

@MatchasmMatt then clarified his reason for placing 15 Cybertruck reservations: "It's a free option on autonomy. If Elon was somehow correct and robotaxis are a thing by next year, these trucks will be worth much more than the price I have locked in by my reservation. If autonomy doesn't pan out, I can just cancel and get my money back."

*Scienter:* Defendant Musk's numeric tweets were deliberately free of any context to promote the most optimistic and misleading interpretation of the data possible to investors.

| 29 January 31, 2020 | *Misleading Statement:* On Twitter, Defendant Musk wrote, "There is considerable conflation of diagnosis & contraction of 'corona'. Actual virality is much lower than it would seem. I think this will turn out to be comparable to other forms of influenza. World War Z it is not." *See* https://twitter.com/elonmusk/status/1223172311546724352. He then downplayed the threat of coronavirus even further, clarifying, "Meant to say other forms of 'the cold', not influenza [link to Wikipedia]."

*Directly Responsible Parties:* Elon Musk

*Supporting Evidence:* Defendant Musk made these flatly unscientific statements and others dismissing the seriousness of COVID-19 in the context of operating factories densely packed with workers in Shanghai, China and Fremont, California—both of which were eventually shut down by concerns related to the global coronavirus pandemic. The Shanghai factory was shut down by the Chinese government on or around January 29, 2020, two days before Defendant Musk's above posts. *See* https://www.theverge.com/2020/1/29/21114377/tesla-coronavirus-delay-production-factory-china. For months, Defendant Musk presented this false optimism to quell investor fears regarding the impact the pandemic might have on demand for and sales of Tesla vehicles, while privately castigating those who had merely *potentially* exposed his teenage son to the coronavirus, per the Stanford student |

| | |
|---|---|
| | newsletter *The Fountain Hopper*.  *See* https://mailchi.mp/fountainhopper/foho-104despite-mandatory-reporting-obligations-stanford-asks-students-to-report-dangerous-items-offering-fundamental-standard-amnesty.  *See also* Exhibit P.<br><br>*Scienter:* If Defendant Musk actually believed what he had written publicly about COVID-19, he would not have had any concern about his son being potentially exposed. |
| 30<br><br>March 19, 2020 | *Misleading Statement:* Referring to COVID-19, Defendant Musk posted on Twitter, "Based on current trends, probably close to zero new cases in US too by end of April."  He followed up with, "Kids are essentially immune, but elderly with existing conditions are vulnerable. Family gatherings with close contact between kids & grandparents probably most risky."  *See* https://twitter.com/elonmusk/status/1240754657263144960 and https://twitter.com/elonmusk/status/1240758710646878208.<br><br>*Directly Responsible Parties:* Elon Musk<br><br>*Supporting Evidence: See* supporting evidence for Issue 29 and Exhibit P.<br><br>*Scienter:* Defendant Musk had no legitimate basis for making these statements but considerable economic interest in diminishing the apparent threat of COVID-19. |
| 31<br><br>June 10, 2020 | *Misleading Statement:* Referring to the "Tesla Semi" truck, Defendant Musk wrote in a "leaked" e-mail that, "Production of the battery and powertrain will take place at Giga Nevada," according to Reuters.  *See* https://www.reuters.com/article/us-tesla-truck/tesla-shares-surge-past-1000-as-musk-revs-up-the-semi-idUSKBN23H1PE.<br><br>*Directly Responsible Parties:* Elon Musk<br><br>*Supporting Evidence:* There are no concrete plans to develop the Tesla Semi, with a production schedule that has been pushed back for years. Only two demo Tesla Semi trucks exist.  The persistent promise of the future product has been used to pump Defendant Tesla's stock price and secure very large deposits from interested customers.  In addition, Defendant Musk has used deliberately "leaked" e-mails to intentionally disclose positive narratives (while evading Regulation FD) in order to manipulate Defendant Tesla's stock price.  *See* https://drivetribe.com/p/yet-another-one-of-elon-musks-emails-L9xYYr1oSM-qqgBoNtAnhw.<br><br>*Scienter:* Defendants Musk and Tesla have made promises about the Tesla Semi for years, but so far the product remains a prop for investor |

| | | presentations. |
|---|---|---|
| 32 <br><br> June 11, 2020 | | *Misleading Statement:* On or around June 11, 2020, Tesla Vice President of Environment, Health and Safety Laurie Shelby wrote in a letter to employees intentionally leaked to the press, "Since we restarted operations, we have had zero COVID-19 workplace transmissions." *See* https://www.cnbc.com/2020/06/12/tesla-laurie-shelby-email-on-covid-19-fremont-workers-worried.html. <br><br> *Directly Responsible Parties:* Laurie Shelby <br><br> *Supporting Evidence:* Ms. Shelby is not a physician. Even if she were a physician, it is not possible for anyone to know precisely how or when COVID-19 was transmitted from person to person. Both Defendant Tesla and the Alameda County Department of Public Health have refused to disclose any details regarding COVID-19 infections at any Tesla facility, even anonymized, which is now the subject of litigation. <br><br> *Scienter:* Internal Tesla data published by Electrek on July 14, 2020 shows that Ms. Shelby was lying. Hundreds of Tesla employees were known to have been exposed to COVID-19 by mid-June, and exposures were tracked internally on a dashboard. *See* https://electrek.co/2020/07/14/tesla-spike-covid-19-cases-data-leak/. |
| 33 <br><br> November 28, 2018 | | *Misleading Statement:* On November 28, 2018, Defendant Tesla wrote on the @Tesla Twitter account, "As of today Tesla owners have driven 1 billion (!) miles with Autopilot engaged." The implication encouraged by the company was that each mile driven would help "train" Tesla's "neural network." <br><br> *Directly Responsible Parties:* Elon Musk <br><br> *Supporting Evidence:* The same day, *Bloomberg* reported, "The resulting trove of real-world miles acts as a feedback loop to the algorithms that are constantly training the fleet of Tesla vehicles on the road how to behave." *See* https://www.bloomberg.com/news/articles/2018-11-28/tesla-customers-rack-up-1-billion-miles-driven-on-autopilot. <br><br> *Scienter:* There is no indication in any publicly available document or video that driving any distance in a Tesla vehicle actually sends back video data to Defendant Tesla to help supposedly train neural networks. Nor is there any evidence that algorithmic behavior in one vehicle is affected in real-time—or without a manual software update, ever—by additional driving in other vehicles. While transmission of log data derived from video feeds would be more practical, it is not clear that log data from the entire so-called "fleet" of Tesla vehicles feeds into training algorithms, either. |

310.    Defendants Musk and Tesla have omitted material disclosures to investors that would have likely lowered the TSLA stock price, including:

| Issue No. / Date(s) | Description / Supporting Evidence |
|---|---|
| 34<br><br>April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning lease accounting metrics pursuant to FASB ASC 842, despite being present the prior quarter in Tesla's 2019 SEC Form 10-K filed February 13, 2020.<br><br>*Statement(s) Made Misleading:* All figures associated with "Automotive leasing."<br><br>*Directly Responsible Parties:* Zachary Kirkhorn<br><br>*Supporting Evidence:* The section is missing in the Q1 2020 Form 10-Q.<br><br>*Scienter:* Defendants Musk and Tesla were charged with securities fraud by the SEC. |
| 35<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A) | *Omission:* disclosures concerning the amount of scrap and/or waste materials at Tesla's factories in Nevada and California since 2018, which have since been highlighted by whistleblower-litigants Martin Tripp and Karl Hansen, and reportedly involve figures near or above $100 million. *See* Exhibit V.  Specifically, according to internal documents:<br>a)    disclosures concerning Containment AR622 (Tesla "Thing Name" AR0000000622), where a training pin left in a picker robot led to battery cells being punctured, affecting 1,173 battery modules that were ultimately "reworked" and knowingly placed into 723 Model 3 vehicles for sale to consumers despite the potential safety hazard;<br>b)    disclosures concerning the poor and constantly-changing design of Defendant Tesla's internal database systems used to "virtually scrap," or record, Non-Conforming Material (NCM) that could not be used in production, leading to discrepancies between actual scrap on the factory floor and financial reporting;<br>c)    disclosures concerning company practices of using MySQL Workbench and/or similar tools to directly edit databases underlying internal systems, thereby bypassing internal financial controls;<br>d)    disclosures concerning company practices of changing status flags for materials from "SCRAP" to "TEST" to artificially reduce totals for NCM financial reports;<br>e)    disclosures concerning company practices of requiring approval from the finance team before being permitted to "virtually scrap" actual NCM material on the factory floor;<br>f)    disclosures concerning company practices of deliberately hiding NCM figures from Defendant Tesla's CFO;<br>g)    disclosures concerning each Model 3 generating $1,920 worth of NCM per vehicle as of April 2018 according to internal documents;<br>h)    disclosures concerning internal financial analysts asking "Is this |

real?" and generally disbelieving Defendant Tesla's own financial reports when presented with overly optimistic NCM figures;

i)   disclosures concerning current Vice President of Internal Audit Swapnil Bhatnagar stating that Defendant Tesla's inventory accuracy was "very concerning" in April 2018;

j)   disclosures concerning company practices of storing car parts in unrefrigerated trailers in the Nevada desert.

*Statement(s) Made Misleading:* All figures associated with "inventory," "Work in progress," and "Cost of revenues (Automotive sales)," and all figures dependent thereon, in investor disclosures from Q3 2018 forward and possibly earlier.  In addition, Defendant Musk wrote "Being cautious for max safety" on his Twitter account on November 8, 2018 and "After safety, our goal is to make a Tesla the most fun you could possibly have in a car" on November 29, 2018.

*Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak Ahuja, Swapnil Bhatnagar

*Supporting Evidence:* Deposition testimony from former employees Martin Tripp and Karl Hansen indicates that the amounts of NCM and waste were financially material, multi-million dollar figures that were important enough to attract Defendant Musk's direct involvement in phone calls and e-mails.  *See* Exhibit Q.

*Scienter:* In materials disclosed starting on August 7, 2020, Defendants Musk and Tesla admit that they misled law enforcement and journalists regarding the supposed fact that Martin Tripp posed a threat to safety. E-mails marked "Attorneys' Eyes Only" reveal that NCM reports for CFO Deepak Ahuja were deliberately modified to minimize the appearance of any problems, while internal financial analysts could not determine if reported figures were "real" and the current Vice President of Internal Audit expressed alarm.  In addition, Tripp identified actual punctured battery cells that made their way into vehicles without Defendant Tesla disclosing anything to investors regarding NCM or safety issues at any time.

| 36 | *Omission:* disclosures concerning routine theft and storage of raw materials since 2018, sometimes involving lithium-ion batteries left in unrefrigerated trailers in the Nevada desert—issues also highlighted by Karl Hansen and reportedly involving figures near or above $37 million. |
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K) | *Statement(s) Made Misleading:* All figures associated with "inventory," "Work in progress," and "Cost of revenues (Automotive sales)" in investor disclosures from Q3 2018 forward and possibly earlier. |
| | *Directly Responsible Parties:* Elon Musk, Zachary Kirkhorn, Deepak |

| | | |
|---|---|---|
| | | Ahuja |
| | | *Supporting Evidence:* Deposition testimony from Tripp and Hansen indicates that the amount of stolen goods, especially copper wiring, was a financially material, multi-million dollar figure that was important enough to attract Defendant Musk's direct involvement in phone calls and e-mails. *See* Exhibit Q. |
| | | *Scienter:* In materials disclosed starting on August 7, 2020, Defendants Musk and Tesla admit that they track inventory parts stored in various trailers in the Nevada desert in internal databases. |
| 37<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K) | | *Omission:* disclosures concerning Defendant Tesla's illegal wiretapping of employees', contractors', and/or nearby civilians' personal devices using IMSI catchers (also known as Stingrays) or comparable network monitoring hardware, which could result in material legal liability for the company.<br><br>*Statement(s) Made Misleading:* Investor disclosures have frequently included the phrase "…we take steps to protect the security of our customers' personal information…" without addressing unlawful wiretapping activity. In addition, Defendant Musk wrote, "Nothing stopping Tesla team at our car plant from voting union" on his Twitter account on May 20, 2018.<br><br>*Directly Responsible Parties:* Elon Musk, Sean Gouthro, Nick Gicinto<br><br>*Supporting Evidence:* Deposition testimony from Hansen strongly suggests that Defendant Tesla used a special device, commonly known as an IMSI catcher or Stringray, to unlawfully monitor personal cellular communications of employees, contractors, and those generally in the vicinity of its Nevada factory.<br><br>*Scienter:* Sean Gouthro admitted under oath in a May 29, 2019 videotaped deposition that "I was in the room while" "we were looking and reading into" "if [Martin Tripp] is talking to his wife or he was talking to other people, yes, that was a matter." He also stated, "while [Martin Tripp] was in the room they were monitoring outgoing information to see if he was talking to those other individuals…" |
| 38<br><br>July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), | | *Omission:* disclosures concerning Defendants' relationship with the family of deceased drug kingpin Pablo Escobar, as well as "Escobar, Inc.;" as well as disclosures concerning Defendants' relationship (especially via Tesla Director and friend of Defendant Musk, Antonio Gracias) with the family of Joaquín "El Chapo" Archivaldo Guzmán Loera (especially Emma Coronel Aispuro).<br><br>*Statement(s) Made Misleading:* On page 66 of Defendant Tesla's Q3 |

| | |
|---|---|
| April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | 2018 SEC Form 10-Q, the company wrote, "Although we intend to comply with the terms and requirements of the settlement, if there is a lack of compliance, additional enforcement actions or other legal proceedings may be instituted against us."<br><br>*Directly Responsible Parties:* Elon Musk, Kimbal Musk, Antonio Gracias, Al Prescott, Zachary Kirkhorn<br><br>*Supporting Evidence:* Numerous July 2019 articles in *Newsweek*, *Business Insider* and other publications detail a relationship between Defendants Musk and Tesla and the Escobar family, with reports that Defendant Musk instructed at least one Tesla engineer to travel to Mexico on Tesla business for the benefit of the Escobar family and/or its enterprises.  *See* https://www.newsweek.com/escobar-elon-musk-flamethrower-1449338 and https://www.businessinsider.com/elon-musk-fights-with-pablo-escobars-brother-on-twitter-2019-7.  Additional sources allege a connection between Defendant Musk, a Tesla Director and the "still married wife of a permanent A list criminal."  The same sources have repeatedly linked Defendant Musk and Emma Coronel Aispuro, the wife of El Chapo Guzmán.<br><br>Defendant Musk's company SpaceX owns land in Boca Chica, Texas 2.5 miles from the Mexican border.  Drug smuggling is an active problem in the Boca Chica area.  *See* https://www.cbp.gov/newsroom/local-media-release/border-patrol-hinders-smuggling-attempts-rio-grande-valley.  In late 2018, the United States Department of Homeland Security Customs and Border Patrol (CBP) requested access to the SpaceX facility in Boca Chica.  *See* https://www.themonitor.com/2019/01/03/dhs-cbp-want-access-survey-spacex-property/.<br><br>*Scienter:* Any undisclosed associations with narcotrafficking organizations would indicate an obvious intent to deceive. |
| 39<br><br>October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning the import of "solar glass" roof tiles from Chinese manufacturers such as Changzhou Almaden Co. Ltd., whose shipping labels have appeared on boxes at numerous Tesla roofing work sites in California (pictured below), and which according to United States Customs and Border Protection data has been a vendor of Defendant Tesla's since at least 2017.<br><br>*Statement(s) Made Misleading:* Page 9 of Defendant Tesla's "Q4 '19 Update" (see https://ir.tesla.com/static-files/b3cf7f5e-546a-4a65-9888-c928b914b529) states that, "Solarglass tiles are made in our Gigafactory New York, and we are hiring hundreds of employees at this facility."<br><br>*Directly Responsible Parties:* Elon Musk |

| | |
|---|---|
| | *Supporting Evidence:* Numerous photographs, including but not limited to the following, show Tesla roofing work sites with tiles imported from China and shipped directly to a Tesla warehouse in Hayward, California: <br><br>  <br><br> *Scienter:* Defendants Musk and Tesla clearly knew that they were importing materials from China, but have consistently represented that the Tesla Solar Roof is manufactured in New York. The company has provided little to no transparency regarding what is actually manufactured at its Buffalo factory. |
| 40 <br><br> October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | *Omission:* disclosures concerning the actual purpose and usage of Defendant Tesla's Buffalo, New York factory. <br><br> *Statement(s) Made Misleading:* Page 9 of Defendant Tesla's "Q4 '19 Update" (see https://ir.tesla.com/static-files/b3cf7f5e-546a-4a65-9888-c928b914b529) states that, "Solarglass tiles are made in our Gigafactory New York, and we are hiring hundreds of employees at this facility." <br><br> *Directly Responsible Parties:* Elon Musk <br><br> *Supporting Evidence: See* above supporting evidence for Issue No. 39. <br><br> *Scienter:* According to the Office of the New York State Comptroller in Audit Report 2017-S-60, "based on the annual reports of employment provided by ESD, the facility had 25 full-time employees as of December 31, 2016. In 2017, the facility was operating and production appeared to have increased, growing from 32 employees in March 2017 to 467 employees (279 Panasonic and 188 Tesla) at RiverBend as of December 2017," and, "As of the 2017 employment report, Panasonic – a company with no agreement with the State – employed more personnel at the facility than Tesla." *See also* Issue No. 39. |
| 41 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), | *Omission:* disclosures concerning "Project Titan," a stealth recall of fire-prone solar panel connector and optimizer parts manufactured by Amphenol Corporation. <br><br> *Statement(s) Made Misleading:* Defendant Musk wrote "Being cautious for max safety" on his Twitter account on November 8, 2018 and "After |

| | |
|---|---|
| April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 | safety, our goal is to make a Tesla the most fun you could possibly have in a car" on November 29, 2018. <br><br> _Directly Responsible Parties:_ Elon Musk <br><br> _Supporting Evidence:_ Project Titan was revealed to the public by _Business Insider_ reporter Linette Lopez.  _See_ https://www.businessinsider.com/tesla-project-titan-replace-bad-solar-panel-parts-2019-8.  Several lawsuits have been filed against Defendant Tesla and Amphenol Corporation regarding fire damage, most of which have never been disclosed to investors. <br><br> _Scienter:_ Any recall of solar panel parts that could have resulted in customers' houses or businesses burning down should have been immediately made public. |
| 42 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 | _Omission:_ disclosures concerning Defendant Tesla's deliberate concealment of flaws in metal alloys and battery pack components jeopardizing passenger safety in the Model S up through 2012. <br><br> _Statement(s) Made Misleading:_ Defendant Musk wrote "Being cautious for max safety" on his Twitter account on November 8, 2018 and "After safety, our goal is to make a Tesla the most fun you could possibly have in a car" on November 29, 2018. <br><br> _Directly Responsible Parties:_ Elon Musk <br><br> _Supporting Evidence:_ Known faults with the Model S battery were revealed to the public by _Business Insider_ reporter Linette Lopez.  _See_ https://www.businessinsider.com/tesla-faulty-battery-cooling-systems-design-model-s-2012-2019-6. <br><br> _Scienter:_ Any safety issue that could have resulted in vehicles catching on fire should have immediately been made public and forced a recall of affected parts. |
| 43 <br><br> November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), | _Omission:_ disclosures concerning related-party transactions and whether businesses run by Defendant Musk that have paid for Tesla-related matters in the past, including but not limited to Excession LLC and Falcon Landing LLC, as well as businesses run by former executives, are or are not related parties. <br><br> _Directly Responsible Parties:_ Elon Musk, Jared Birchall <br><br> _Supporting Evidence:_ Deposition testimony by Defendant Musk in the Unsworth litigation indicates that he used Excession LLC to finance research into a critic's background, and that Excession LLC manages at least some of Musk's Tesla holdings.  Public records indicate that Falcon |

| | |
|---|---|
| February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | Landing LLC owns at least one of the private jets that Defendant Musk uses for Tesla business.  Tesla co-founder J.B. Straubel now runs a company called Redwood Materials, Inc. that has been referred to as both a related and unrelated entity at various points in time. <br><br> _Scienter:_ Defendant Musk used Excession LLC to hire a convicted felon who provided false information as supposed research on one of Defendant Musk's critics. |
| 44 <br><br> February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | _Omission:_ disclosures concerning Defendant Musk's health given his key role. <br><br> _Directly Responsible Parties:_ Elon Musk <br><br> _Supporting Evidence:_ On November 27, 2019, counsel for Defendant Musk filed a document before the Delaware Court of Chancery indicating that Defendant Musk wished to redact "Medical Information" from Volume II of his deposition transcript in Case No. 12711-VCS.  Defendant Musk has appeared in public with scars on his neck.  Defendants Musk and Tesla are in possession of information pertaining to these omissions that is not available at present to the general public. <br><br> _Scienter:_ Defendant Musk has clearly been aware of his own health problems to the extent they have already required surgical intervention. |

311.    Defendants Musk and Tesla even misled investors by using a regulated earnings call to distract from other damaging disclosures that were likely to impact the value of TSLA stock negatively.  On October 23, 2019, Defendant Musk used the Q3 2019 Tesla earnings call to bizarrely announce a subsequent announcement, even though he was already on the phone with investors at that very moment.  In his words:

> "And then, one—one last item is that uh, tomorrow afternoon, um, we will be uh, releasing, Version 3 of the Tesla Solar Roof.  That's the integrated solar—with it—solar panels integrated with the roof.  Um, so that's um—I think this is a great, a great product. Version 1 and 2 we were still sort of figuring things out.  Version 3, I think, is finally ready for, for the big time.  Um, and so we're scaling up production of the Version 3, uh solar tower roof at our Buffalo Gigafactory.  And we—I think this product is going to be incredible.  But we'll talk more about that on the official product launch, which will be tomorrow afternoon."

The product did not, in fact, launch the next day.  Instead, Defendants Musk and Tesla moved the announcement again to the day after: Friday, October 25, 2019.  This announcement did not

involve any live product demonstration or even video that would have necessitated the product being ready to demonstrate on any particular day.

312.    On September 24, 2019, in Delaware Chancery Court Case No. 12711-VCS, Defendants Musk and Tesla proposed and moved for a deadline of October 24, 2019 for the publication of public versions of previously sealed and confidential documents concerning the acquisition of SolarCity.  The motion was quickly granted by that court.

313.    Upon information and belief, the solar roof product announcement was not made on the Q3 2019 earnings call, or at its intended time on October 24, 2019, because of a delay at the Delaware Chancery Court involving the clerk's required approval of court filings for public viewing, which took one extra day since the attorneys in Delaware submitted the documents late at night.  By ultimately announcing the new solar roof product after the earnings call and on October 25, 2019, Defendants Musk and Tesla minimized the press coverage devoted to their fraudulent conduct when news of the SolarCity liquidity crisis cover-up finally broke on the day after the one they had initially requested and planned for.

314.    On May 1, 2020 at 8:11 A.M., Defendant Musk wrote "Tesla stock price is too high i[n ]m[y ]o[pinion]" with no explanation given, admitting inflation in TSLA's stock price. *See* https://twitter.com/elonmusk/status/1256239815256797184.  On that day, TSLA stock traded at a high of $772.77 and a low of $683.04 per share.  Yet TSLA stock had traded higher several times before, without any such pronouncement from Defendant Musk: from February 3-4, 2020; from February 12-26, 2020; and from April 27-30, 2020.

315.    For years, Defendant Tesla's Public Relations and Investor Relations teams have steadfastly refused to answer questions concerning any topics at all, whether posed by investors or respected journalists.

316.    As of October 31, 2019, Tesla listed only two names as company "Management" on the Corporate Governance section of its Investor Relations website: Elon Musk and Zachary J. Kirkhorn.  *See* https://web.archive.org/web/20191031124241/https://ir.tesla.com/corporate-governance/management.  At all times since approximately March 2019 when Mr. Kirkhorn

became Tesla's CFO, both of these individuals have had complete access to Tesla's financials and sales records.  Accordingly, Defendant Musk knew that his statements on earnings calls, on Twitter, and via other media were false and/or misleading.

317.    Defendants Musk and Tesla have acted with scienter.  In its roughly seventeen years of existence, Defendant Tesla has never turned an annual profit.  Instead, the company has subsisted on roughly $19 billion of investor capital, and it continues to require billions of dollars of outside capital to survive.  Defendant Tesla's constant need for outside investor cash has created a clear incentive for Defendant Musk as the company's CEO to defraud the market and silence critics in the hope that outside investors might believe his misrepresentations and continue to fund the company's chronically unprofitable existence.  In a dynamic that has repeated itself numerous times, on November 16, 2018, Defendant Musk admitted to *Axios* that Defendant Tesla had been "within single-digit weeks" of bankruptcy, and "[e]ssentially the company was bleeding money like crazy," a statement that remains true as of the date of this First Amended Complaint.

318.    Defendant Musk's scienter was motivated by several factors:

a)   Tesla's constantly precarious cash situation;

b)   his belief that lying is necessary for survival, voiced at the National Press Club in relation to the collapse of Solyndra, another cash-poor energy company.  In his words, "[Solyndra's executives] presented a better face to the situation than should have been presented in the final few months, but then, if they didn't do that, it would have become a self-fulfilling prophecy of—as soon as a CEO says 'I'm not sure if we'll survive,' [slit throat gesture] you're dead."  *See* https://www.youtube.com/watch?v=QL_Jv9xJm18&t=44m34s;

c)   his belief that lying is "cute," as evidenced by his February 8, 2020 re-publication of an image of a T-shirt featuring the Central Intelligence Agency seal and the bold text, "ADMIT NOTHING / DENY EVERYTHING."  *See* https://twitter.com/elonmusk/status/1226053049820446720;

d)  his belief that laws and rules do not apply to him, as evidenced by his behavior leading up to the signing of the SEC Consent Decree, and after, including his infamous, "I do not respect the SEC.  I do not respect them," quote during his December 9, 2018 CBS *60 Minutes* interview, and the fact that Defendant Musk was also subjected to contempt of court proceedings. *See* https://www.youtube.com/watch?v=cRNypdYQoWk;

e)  his animosity toward short sellers, including but not limited to Plaintiff, as evidenced by such statements as his May 4, 2018 Twitter post, "Oh and uh short burn of the century comin soon. Flamethrowers should arrive just in time," as well as his referring to the SEC as the "Shortseller Enrichment Commission" on October 4, 2018.  *See* https://twitter.com/elonmusk/status/992388944774938626 and https://twitter.com/elonmusk/status/1047943670350020608;

f)  his unprecedented executive compensation package potentially worth billions of dollars, based almost entirely around stock options that vest when pre-determined average market capitalizations (in turn based upon share price) are sustained for certain periods of time.  Defendant Musk's executive compensation is already the subject of litigation in the Delaware Chancery Court in the case of *Tornetta v. Elon Musk*, Case No. 2018-0408-JRS; and

g)  his possible connections to Mexican drug cartels.

319.   In a deposition on August 22, 2019, Defendant Musk admitted to frequently changing and discarding mobile devices.  *See* California Central District Court Case No. 2:18-cv-08048-SVW-JC, Document 86-1, Pages 54-56.  Defendant Musk also uses encrypted communications applications such as WhatsApp and Telegram.  SpaceX IT Support Lead Alex Bradford Stillings further signed an "iCloud Search Certification" on October 1, 2019 stating, "For security purposes, Mr. Musk regularly changes his cellular device, at which time his old device is imaged, wiped clean, and stored or destroyed." *Id.* at 115.

320.     Defendants Musk and Tesla were found to have acted with scienter in similar circumstances in this Court in Case No. 3:18-cv-04865-EMC, *In Re Tesla, Inc. Securities Litigation*.

321.     Defendants Musk and Tesla disseminated, encouraged or approved the false statements and/or material omissions specified above, with knowledge of or reckless disregard for their false or misleading nature, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

322.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by:

    a)  Employing devices, schemes, and artifices to defraud;

    b)  Making untrue statements of material facts or failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c)  Engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TSLA securities.

323.     Plaintiff has suffered damages in that, by defrauding the market, Defendants Musk and Tesla were able to keep the share price of TSLA common stock artificially inflated for a prolonged period of time, leading to losses on TSLA put options that expired worthless but otherwise would not have.

324.     Plaintiff would not have purchased TSLA put options at the prices he did had been aware that the market price for Tesla stock would be artificially and falsely inflated by Defendants' false and misleading statements and/or actions.  Plaintiff's knowledge of the above issues was acquired gradually over time such that at no point when he purchased TSLA put options was he fully aware of the extent of Defendants' fraudulent actions:

| Date of Put Option Purchase | Listed Issues Known to Plaintiff (New in Bold) |
|---|---|
| September 24, 2018 | None |
| October 29, 2018 | **1, 3** |
| December 26, 2018 | 1, 3, **9**, **14**, **18**, **33** |
| March 8, 2019 | 1, 3, **6**, 9, 14, 18, **21**, 33 |
| March 19, 2019 | 1, 3, 6, 9, 14, **16**, 18, 21, 33, **40** |
| May 23, 2019 | 1, 3, 6, 9, **13**, 14, 16, **17**, 18, 21, **22**, **23**, 33, 40 |
| September 3, 2019 | 1, 3, 6, 9, 13, 14, 16, 17, 18, 21, 22, 23, **24**, 33, **36**, **38**, 40, **41** |
| September 27, 2019 | 1, 3, 6, 9, 13, 14, **15**, 16, 17, 18, **19**, 21, 22, 23, 24, 33, 36, 38, 40, 41, **43** |
| March 12, 2020 | 1, 3, **4**, **5**, 6, **7**, 9, **11**, 13, 14, 15, 16, 17, 18, 19, **20**, 21, 22, 23, 24, **25**, **27**, **28**, **29**, 33, 36, 38, 39, 40, 41, 43, **44** |
| March 19, 2020 | 1, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, **30**, 33, 36, 38, 39, 40, 41, 43, 44 |
| March 23, 2020 | 1, 3, 4, 5, 6, 7, 9, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 33, 36, 38, 39, 40, 41, 43, 44 |

Accordingly, Plaintiff did not learn of Issue Nos. 2, 8, 10, 12, 25, 31, 32, 34, 35, 37 and 42 until after March 23, 2020.

## COUNT X
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 For Market Manipulation Against All Defendants

325.     Plaintiff incorporates by reference the foregoing allegations.

326.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that drove the price of TSLA shares to artificially high levels beginning in 2018, when the stock traded near an already-elevated $250.00 per share, and continuing through the present day, when it trades at or near $2,166.00 per share, the stock's all-time high.

327.     Defendants Qazi and Smick Enterprises, Inc. posted thousands of messages on social media such as:

"TESLA SHAREHOLDERS

Buy FSD. Buy acceleration boost. Buy accessories for your car. Place a $100 order for a Cybertruck or other new vehicle. Buy solar, powerwall, a freaking t-shirt I don't care!

Let's push Tesla over the edge to profitability!!!"

*See* Exhibit B at 42.  FSD refers to "Full Self-Driving," a "feature" sold by Defendant Tesla based on the promise of future delivery of a product that does not exist.  Other such messages generally promoted TSLA stock, Tesla Autopilot, various other features, and Defendant Musk.

328.    Defendant Qazi explicitly confirmed that his primary goal was to promote Tesla stock by posting "this is why we do it" above a screenshot of a comment that thanked him for his "funny, informative, thought provoking, & aggressive tweets against Tesla F[ear ]U[ncertainty and ]D[oubt] [that] inspired me to purchase Tesla shares in April & May of 2019."  *See* Exhibit B at 31.

329.    Defendants' market manipulation caused Plaintiff's losses.

330.    At the time of each instance of Defendants' manipulation, Plaintiff was ignorant of those manipulative acts.

331.    Defendants had actual knowledge of the material facts alleged herein, and knowingly intended to deceive Plaintiff and all investors for the purpose of manipulating the price of Tesla securities.

332.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT XI
### For Violation of Section 20(a) of the Exchange Act
### Against Defendant Elon Musk

333.    Plaintiff incorporates by reference the foregoing allegations.

334.    Defendant Musk acted as a controlling person of Tesla within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position and his power to control public statements about Tesla, Defendant Musk had the power and ability to control the actions of Tesla and its employees.  By reason of such conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

335.    In the televised CBS *60 Minutes* interview broadcast on December 9, 2018, with reference to Defendant Tesla, Defendant Musk admitted, "I am the largest shareholder in the company.  And I can just call for a shareholder vote and get anything done that I want."

336.     Defendant Musk demonstrated his power to unilaterally control the Board of Directors of Defendant Tesla by pushing through the acquisition of SolarCity Corporation even when it was initially rejected by the Board, disfavored by multiple investment banks, disfavored by major institutional investors, and legally problematic.

337.     As an officer and director of a publicly owned company, Defendant Musk had a duty to disseminate accurate and truthful information with respect to Defendant Tesla's financial condition and results of operations, and to correct promptly any public statements issued by Tesla that had become materially false or misleading.

338.     Because of his position of control and authority as a senior officer, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace concerning Tesla's financial prospects. Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of TSLA securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. A permanent injunction enjoining all Defendants from making further libelous statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral, contacting Plaintiff or his family members, impersonating others, and requiring the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Sites to Plaintiff;

B. Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial;

C.  Statutory damages, enhanced to a sum of not more than $150,000 per work infringed, for Defendant Qazi's willful infringement of copyrights pursuant to 17 U.S.C. §§ 504(c) and 1202(b);

D.  Actual and punitive damages, including costs and attorneys' fees, pursuant to 17 U.S.C. § 512(f);

E.  Compensatory, consequential and punitive damages resulting from Defendant's violation of California Civil Code §§ 1708.7 and 3294;

F.  Punitive damages stemming from Defendants' ongoing and willful disregard for various state and federal laws;

G.  Judgment against Defendants on all counts of the Complaint;

H.  Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs (should Plaintiff engage counsel), in accordance with applicable law;

I.  Such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 26, 2020

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org