Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AARON GREENSPAN,<br><br>Plaintiff,<br><br>v.<br><br>OMAR QAZI, SMICK ENTERPRISES, INC., ELON MUSK, and TESLA, INC.,<br><br>Defendants. | Case No. 3:20-cv-03426-JD<br><br>**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**<br><br>Judge: Hon. James Donato<br>SAC Filed: August 26, 2020 |

1

2 **TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3      Plaintiff Aaron Greenspan lodges this Notice of Supplemental Authority in support of his

4 Motion For Order To Show Cause Why Kronenberger Rosenfeld LLP and Defendants Omar

5 Qazi and Smick Enterprises, Inc. Should Not Be Held In Contempt Of Court, for which the

6 hearing has recently been vacated.  ECF No. 84.  Attached hereto is:

7      1.  Exhibit A: *Just Goods, Inc.* v. *Just, Inc.*, Case No. 3:18-cv-02198-WHO (N.D. Cal.

8          September 11, 2020).  This opinion by Judge Orrick concerns social media posts and

9          the relevance of a litigant's First Amendment rights in the context of contempt

10          sanctions.

11      2.  Exhibit B: *Gens* v. *Colonial Savings, F.A.*, Case No. 5:11-cv-05526-RMW (N.D. Cal.

12          March 27, 2014).  This opinion by Judge Whyte concerns tactics to pressure a

13          plaintiff to drop a lawsuit that "could constitute obstruction of justice and/or

14          intimidating a witness" under various federal criminal statutes.

15

16 Dated: November 2, 2020            Respectfully submitted,

17

18

19

20                                    Aaron Greenspan
                                     956 Carolina Street
21                                    San Francisco, CA  94107-3337
                                     Phone: +1 415 670 9350
22                                    Fax: +1 415 373 3959
                                     E-Mail: aaron.greenspan@plainsite.org
23

24

25

26

27

28

**<u>EXHIBIT A</u>**

*Just Goods, Inc*. *v*. *Just, Inc*., Case No. 3:18-cv-02198-WHO (N.D. Cal. September 11, 2020)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JUST GOODS, INC.,

        Plaintiff,

    v.

JUST, INC., et al.,

        Defendants.

Case No. 3:18-cv-02198-WHO

**ORDER ON MOTION FOR ORDER TO SHOW CAUSE RE: CONTEMPT AND SANCTIONS**

Re: Dkt. No. 158

Despite mutually agreeing to terms to end this trademark and breach-of-contract case, the struggles continue for plaintiff Just Goods, Inc. ("JGI") and defendants Eat Just, Inc. (fka Just, Inc., fka Hampton Creek, Inc.) and founder Joshua Tetrick (collectively, "EJ"). Before me is JGI's motion for an order to show cause why EJ should not be held in contempt or sanctioned given EJ's failures to comply with my order enforcing the Term Sheet. As explained below, I hold EJ in contempt of that order for multiple violations. I also prescribe corrective actions that EJ must take within 14 days of the date this order issues or face further sanctions.

## BACKGROUND

My March 30, 2020 Order (the "March 30 Order") sets out the background of this case and the parties' August 13, 2019 settlement under the provisions of their binding Term Sheet. Dkt. No. 142. As relevant here, in the March 30 Order I granted JGI's motion to enforce the Term Sheet. I determined:

> The Term Sheet permits EJ to use the term Just in the following ways: (1) in the Frame Logo, (2) as part of the names/phrases "Eat Just" and "Make it Just," and (3) in text in conjunction with a generic product name (e.g., Just Egg). Other uses of the term violate the parties' agreement.

March 30 Order 5. I further ordered EJ to comply with the Term Sheet by changing its corporate

name to "Eat Just, Inc." rather than "Eat JUST, Inc." *Id.* 6. On May 15, 2020, I denied EJ's motion to stay that Order. Dkt. No. 156. On June 23, 2020, the Ninth Circuit denied EJ's emergency motion to stay. Dkt. No. 157.

On July 10, 2020, JGI moved for an order to show cause why EJ should not be held in contempt and sanctioned for continued failure to comply with the Term Sheet and the March 30 Order. Plaintiff's Motion for an Order to Show Cause re: Contempt and Sanctions ("Mot.") [Dkt. No. 158]. JGI asks that I find EJ in contempt, order compliance, impose a fine of $5,000 per day until it demonstrates compliance, and grant JGI attorney fees related to the pending motion.

At a hearing on the motion on August 19, 2020, JGI raised continued violations, including some not addressed in its Motion. EJ described its efforts to comply with the Term Sheet and the March 30 Order and its commitment to doing so. I instructed that the parties meet and confer over any continuing violations and submit a joint letter outlining any further disagreements. Prior to the parties' meeting, JGI raised another set of alleged violations. The parties have now submitted their Joint Letter, which indicates that many alleged violations have been resolved but that many others remain in dispute. Joint Letter [Dkt. No. 169].

## LEGAL STANDARD

"Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (internal quotation marks, citation, and formatting omitted). The standard for a civil contempt finding is "well settled":

> The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.

*F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (internal quotation marks and citation omitted). Although good faith does not constitute an exception a party's obligation to comply with a court order, "a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1018 (N.D. Cal. 2013) (quoting *In re Dual–Deck Video Cassette Recorder*

United States District Court
Northern District of California

*Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir.1993)).

"Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986). "Compensatory awards are limited to actual losses sustained as a result of the contumacy." *Id.* (internal quotations and emphasis removed).

## DISCUSSION

### I.  IMPROPER USES OF "JUST"

JGI recites numerous uses of the word "Just" that allegedly violate the Term Sheet and the March 30 Order, including references to EJ as "JUST" or "Eat JUST, Inc." on its website, in job postings, on Tetrick's LinkedIn, and on EJ's Wikipedia page. Bost Decl. [Dkt. No. 158-1] ¶ 2 (displaying screenshots from July 10, 2020); Joint Letter 6–10, Ex. C. On May 18, 2020, just three days after I denied EJ's motion to stay its compliance with the March 30 Order, EJ referred to itself as JUST in press about a new business deal, and third-party press did the same.[1] Bost Decl. ¶ 3. At the hearing, EJ described its efforts to comply but also attempted to slough off areas of non-compliance because it was known as Just for many years and lacks control over third parties who continue to refer to it by its former name. As this Order describes, EJ has been less than diligent and its own waffling (to put it charitably) with respect to its new name has prevented progress on that name being more broadly adopted.

At this point, many of the alleged violations have been resolved. What follows are my determinations on the remaining disputed issues.

#### a.  Instagram Videos

JGI represents that EJ has posted a number of videos on its Instagram account in which EJ employees refer to themselves as appearing on behalf of "Just." Joint Letter 6; Joint Letter Ex. C at 20. EJ disputes the exact number of these videos but does not dispute that some contain the reference to Just. Joint Letter Ex. C at 20. Additionally, JGI alleges, and EJ does not dispute, that

---

[1] EJ's attempts to distance itself from the third-party press is unpersuasive in light of the fact that the materials it prepared, distributed, and re-posted about the deal were clear violations.

3

1    one person appearing in the videos often wears a "Just for All" shirt, which violates the trademark

2    assigned to JGI under the Term Sheet.  *Id.*  These videos were posted from March 26, 2020 to

3    September 3, 2020.  *Id.*  The September 3 video was, according to EJ, removed "within an hour"

4    of EJ's legal department becoming aware of it.  Joint Letter 3.  EJ does not address the remaining

5    videos, other than to say that it "is reviewing each video to assess it . . . to remove the allegedly

6    improper use of 'Just.'"  Joint Letter Ex. C at 20.

7        I find EJ in CONTEMPT OF COURT for posting these videos and keeping them up.

8    Many of the videos were posted after the March 30 Order and unambiguously state that those

9    appearing in them are there on behalf of "Just."  As the March 30 Order makes clear, that use

10   violates the Term Sheet.  March 30 Order 5.  Further, instead of removing the videos (and, if EJ

11   wishes, reposting them edited to comply with the March 30 Order and the Term Sheet), EJ has left

12   the videos up to "assess" them.  Joint Letter Ex. C at 20.  EJ is, therefore, not taking "all

13   reasonable steps" to comply with my March 30 Order.

14       No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting

15   that the violations in the videos have been removed.  If EJ fails to do so within this time limit, I

16   will impose sanctions in addition to those required by this Order.

17       **b.  #MakeItJUST**

18       The March 30 Order made clear that EJ may use "Just" in the phrase "Make it Just."

19   March 30 Order 5.  JGI argues that the use of the hashtag "#MakeItJUST" with only the word

20   "just" appearing in uppercase violates my March 30 Order.  Joint Letter 10.  That hashtag, with

21   that capitalization, has been used on EJ's LinkedIn, Twitter, Instagram, and Facebook and Andrew

22   Noyes's Twitter.  Joint Letter Ex. C at 6–23.

23       The Term Sheet does not permit this choice of capitalization.  EJ correctly notes that the

24   Term Sheet allows it to use both "Make it Just" and "MAKE IT JUST."  Term Sheet ¶¶ 1, 15.  It

25   does not follow, however, that it can emphasize only "Just."  As EJ well knows, capitalization

26   matters a great deal in this dispute.  EJ is permitted to call itself "Eat Just" but not "Eat JUST."

27   March 30 Order 5–6.  As I made clear in the March 30 Order, "capitalization varies throughout the

28   Term Sheet, depending on the provision, term or product."  *Id.* 6.  That variation, I explained,

4

1    "indicate[d] that the absence of capitalization in Paragraph 5 of the Term Sheet was intentional."

2    *Id.*  Although "Make it Just" is not governed by Paragraph 5, the same principles apply.  The

3    uniform capitalization of "Make it Just" and "MAKE IT JUST" preclude a finding that the

4    emphasis on only "Just" is permitted.  EJ's emphasis of "Just" in "Make it Just," if permitted,

5    would be a backdoor to re-associating itself with the uppercase "JUST" in violation of the Term

6    Sheet.

7        The March 30 Order did not explicitly address this issue.  Today's Order does.  EJ is on

8    notice that only emphasizing "just" in "Make it Just" is not permitted by the Term Sheet.

9        **c.  Reposting and Retweeting Third Party Articles**

10        The lion's share of JGI's remaining alleged violations are situations in which EJ, Tetrick,

11    or Noyes shared third parties' articles on LinkedIn or Twitter that referred to EJ as "JUST."  Joint

12    Letter 8–9, Ex. C at 5–18.  Some of these articles appear in LinkedIn posts or in tweets while other

13    are "retweets."

14        Contrary to EJ's arguments, reposting or retweeting a third party's article on EJ's (or

15    Tetrick's or Noyes's) social media accounts plainly qualifies as a "use" of "JUST" under the

16    March 30 Order and the Term Sheet.  As illustrated in the Joint Letter, when EJ posts third party

17    articles on LinkedIn, the headlines for those articles—which, here, refer to EJ as "JUST"—appear

18    beneath the text of the post.  *See id.* 8.  To take one typical example, a LinkedIn post by Tetrick

19    contained the text, "An egg made from plants is selling better in stores around the country than

20    many egg products made by chickens. Read more in VegNews" followed by a link to the article.

21    *Id.*  The article's headline then appears beneath that post: "JUST Sells the Vegan Equivalent of 50

22    Million Eggs."  *Id.*  In this example, a reference to EJ as "JUST" bears Tetrick's imprimatur.  So

23    too with the other posts and retweets.  A reasonable consumer who sees these posts from EJ or its

24    officers would conclude that EJ is or can be called "JUST."  In response, EJ argues that it does not

25    control these third parties' use of "JUST" in their articles.  But it does control whether it

26    approvingly shares those articles.

27        EJ's cursory argument that preventing it from sharing these articles might implicate the

28    First Amendment is unpersuasive.  *Id.* 3.  EJ relies exclusively on *Bland v. Roberts*, 730 F.3d 368

United States District Court
Northern District of California

(4th Cir. 2013), *as amended* (Sept. 23, 2013), which held that "liking" a political Facebook post was political speech. *Id.* at 386. Here, this trademark dispute is about commercial source identifiers, not expressive or communicative speech. *See, e.g.*, *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) ("Limited to this core purpose—avoiding confusion in the marketplace—a trademark owner's property rights play well with the First Amendment.") EJ is not permitted by the Term Sheet to refer to itself as "JUST" to identify itself in commerce.

If EJ were permitted to end-run the Term Sheet and the March 30 Order by simply reposting content from Third Parties instead of writing the headline themselves, the Term Sheet and March 30 Order would mean little. I hold that these reposts and retweets place EJ in CONTEMPT OF COURT.

No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting that all violations of my Order have been removed from these posts and tweets.

### d. Employees' LinkedIn Profiles

Many of EJ's employees' profiles on LinkedIn state that they work at "Just" or "Eat JUST." Joint Letter Ex. C at 7, Ex. F. EJ represents that it has "asked its employees" to change their LinkedIn profiles but that it does not control its employees' social media accounts. Joint Letter 2. In response, JGI argues that EJ should "mandate" that its officers, directors, and brand managers change their profiles because they "often use their LinkedIn profiles on behalf of and to promote EJ, and are therefore acting on behalf of EJ." Joint Letter Ex. C at 7.

EJ is required to take all reasonable steps to comply with the March 30 Order. That does not include controlling employees' conduct outside the scope of their employment and many of these employees' use of LinkedIn is likely outside the scope of employment. But some of EJ's employees likely are using LinkedIn within the scope of employment, if use it to promote EJ. To the extent that an employee's LinkedIn use is within the scope of employment, EJ must ensure that the employee adheres to the March 30 Order and the Term Sheet. As EJ knows or should know, it cannot get around a court order by permitting its employees, within the scope of their employment, to violate that order. Because the record does not indicate whether any such employees' profiles are still in violation, it is not possible to determine whether EJ is in contempt.

United States District Court
Northern District of California

6

1   The burden is on EJ, not JGI or me, to identify those employees that qualify and take necessary

2   corrective steps.

3         No later than 14 days after this Order issues, EJ is ORDERED to file an affidavit attesting

4   that all employees of the class I describe here have been identified and that their LinkedIn profiles

5   have been brought into compliance with this Order.

6         **e.  eCommerce Pages**

7         JGI argues that EJ has failed to revise its seller pages on Amazon, Walmart, and Whole

8   Foods' websites to remove references to "Just" alone or "Eat JUST."  Joint Letter 5 & n.3, Ex. C

9   at 3–4.  EJ represents that those companies, not EJ, control the content of the pages, but that it has

10  submitted requests to them to remove or change the pages at issue.  *Id.* 2.  JGI asserts that EJ has

11  the power to make the changes unilaterally.  *Id.* 5 & n.3.  It is not possible to assess whether EJ

12  can or cannot make the changes on its own based on the evidence the parties have provided.

13        No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit that

14  either (1) attests that the violations have been removed from all pages or (2) describes the process

15  for altering the pages at issue and detailing its attempts to change them.

16        **f.  Wikipedia**

17        JGI argues that EJ has not taken reasonable steps to alter the page about it on Wikipedia,

18  which still refers to it as "Eat JUST" and "JUST" in several places.  *Id.* 7.  EJ responds that it does

19  not control Wikipedia.  *Id.* 2.  It represents that it has, for months, requested that Wikipedia make

20  the relevant changes.  Joint Letter Ex. C at 10.  JGI points out, however, that "[a]s long as the edit

21  is neutral and verifiable, Wikipedia allows users to edit its entries."  Joint Letter 7.  Further, JGI

22  contends that there is another reasonable step available to EJ: providing Wikipedia with the March

23  30 Order to facilitate the change.  *Id.*  At the hearing, EJ indicated it did not wish to do so because

24  the March 30 Order might then be posted on Wikipedia.  Although publication on Wikipedia

25  might lead to greater awareness, the March 30 Order is already a publicly available document.  If

26  EJ cannot directly edit the Wikipedia page as it claims, it is more than reasonable to provide

27  Wikipedia with a copy of the March 30 Order.  I find, consequently, that EJ has not taken all

28  reasonable steps to comply with my March 30 Order and is in CONTEMPT OF COURT.

United States District Court
Northern District of California

7

No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit that either states the changes at issue have been made or that (1) details all of EJ's efforts to make those changes and (2) indicates that EJ has provided Wikipedia with a copy of my March 30 Order. If EJ fails to do so within this time limit, I will impose further sanctions. If EJ cannot directly edit the page, Wikipedia refuses its requests to make the changes, and provision of the March 30 Order does not change this, EJ will no longer be in contempt because it will have exhausted its reasonable steps.

**g. Business Wire Press Release**

On May 18, 2020, just three days after I denied EJ's motion to stay its compliance with my March 30 Order, EJ referred to itself as "JUST" in press about a new business deal, and third-party press did the same. Bost Decl. ¶ 3. EJ represents that it has contacted Business Wire several times and Business Wire has refused to remove the press release. Joint Letter Ex. C at 11. Of course, EJ is responsible for this predicament because it drafted the press release—months after the March 30 Order and mere days after I refused it a stay—in the first place. That aside, EJ has not presented Business Wire with a copy of the March 30 Order to facilitate removal of the press release—a step that, as I explain above, is reasonable. Both disseminating the press release and not taking this reasonable step violated my March 30 Order. I hold EJ in CONTEMPT OF COURT.

No later than 14 days after this order issues, EJ is ORDERED to submit an affidavit attesting either that the violation in the press release has been removed or that it provided the March 30 Order to Business Wire to facilitate removal or editing. If EJ fails to do so within this time limit, I will impose sanctions until such an affidavit is filed. If Business Wire refuses to remove the press release despite receiving the March 30 Order, I will not further sanction EJ for the press release remaining up—though disseminating it in the first place was a clear violation of the March 30 Order.

**h. Miscellaneous Occurrences**

Finally, JGI alleges several other violations: (1) photos on a page on EJ's website that include the word "JUST," (2) the use of "justfoods" in a URL for a store locator on EJ's website,

1    (3) uses of "JUST" in metadata on LinkedIn posts, and (4) the just of "JUST" on a single

2    Facebook event. Joint Letter Ex C. at 1, 2, 5, 21. The photos appear to have been removed. EJ

3    has represented it is doing all it can to remedy the second and third violations, and JGI does not

4    dispute that; it simply states that EJ remains out of compliance. *See id.* at 2, 5. Based on EJ's

5    unrebutted representations, I will not hold it in contempt because it is taking reasonable steps to

6    comply.

7        It is unclear how much control EJ has over the Facebook event. It represents the event

8    "appears" to have been created by a third party, *id.* at 21, but Eat Just is listed as the "host" of the

9    event. No later than 14 days after this Order issues, EJ is ORDERED to submit an affidavit

10    attesting either that the violation has been removed or (1) that EJ does not and cannot control the

11    post and (2) to the steps EJ has taken to remedy the violation.

12    **II.    CORPORATE NAME**

13        I unequivocally ordered EJ to change its corporate name from "Eat JUST, Inc." to "Eat

14    Just, Inc." March 30 Order 6. In response to JGI's motion, EJ did not dispute that it had failed to

15    do so. It instead argued that changing its corporate name with the States of California and

16    Delaware would be futile because both states' secretary of state websites display corporate names

17    with all capital letters. Defendants' Opposition to Mot. ("Oppo.") [Dkt. No. 159] 10–11. It is not

18    up to EJ to decide whether compliance with the March 30 Order is futile; its job is to comply with

19    that unambiguous order. At the hearing, I instructed EJ to provide JGI with proof that it has

20    submitted amendments to its articles of incorporation with both states within two weeks. It has

21    now done so. Joint Letter Ex. D, E.

22    **III.    JU.ST DOMAIN NAME**

23        JGI argues that EJ's use of the ju.st domain name violates the Term Sheet. Mot. 12.

24    Neither the Term Sheet nor JGI's motion to enforce nor the March 30 Order refers to that domain

25    name, which EJ represents it has used since 2016. Oppo. 5. The use is distinct enough that JGI

26    needed to request specific relief in the underlying litigation. As noted at the hearing, I will not

27    order EJ to discontinue its use of ju.st.

28

United States District Court<br>Northern District of California

## IV.   ATTORNEY FEES

### a.  Past Order Granting Attorney Fees

EJ does not dispute that it has not paid the attorney fees I ordered on March 30 in the amount stipulated to by the parties on April 20, 2020.  Dkt. Nos. 144, 148.  Instead it argues that the Term Sheet provides that payment is not owed until a "final determination on the merits that there has been a breach" and that such a final determination will not occur until the Ninth Circuit resolves its appeal of my March 30 Order.  Oppo. 8–9.  JGI asserts that "final determination on the merits" in this context means the trial court's final decision.  The issue is therefore one of interpreting the Term Sheet.

The parties do not present much authority for either interpretation, but the better reading of the Term Sheet is that "final determination on the merits" does not mean that appeals need to be exhausted.  The decisions of district courts that leave no issues to be resolved are often referred to as "final." *See, e.g.*, 28 U.S.C. § 1291.  A "final decision" under that appellate jurisdiction statute is "typically one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Parsons v. Ryan*, 912 F.3d 486, 502 (9th Cir. 2018).  Moreover, the time to move for attorney fees under the Federal Rules of Civil Procedure is tied to the district court's issuance of its judgment.  FED. R. CIV. P. 54(d)(2).  For a time, in fact, the courts of appeals disagreed about whether a district court decision resolving the merits could be a final judgment if it did *not* include a fee award because it reserved consideration for later. *Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Ironworkers' Local Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 658–59 (9th Cir. 1984) (surveying the differing approaches).  In the absence of any other evidence of the parties' intent, I hold that the Term Sheet does not require appellate exhaustion.  Whether or not the Ninth Circuit agrees with the March 30 Order, it was a final determination on the merits.

EJ has pointed to no authority to the contrary.  Its only citation is an unpublished Ninth Circuit decision in which the court affirmed in part, reversed in part, vacated, and remanded a district court decision. *Eastwood Ins. Servs., Inc. v. Titan Auto Ins. of N.M., Inc.*, 469 Fed. App'x 596, 599 (9th Cir. 2012).  In doing so, it vacated the attorney fees because, under the parties'

10

United States District Court
Northern District of California

agreement, attorney fees could only be awarded to the "prevailing party." *Id.* The court explained that "attorneys' fees should thus be deferred until there has been a final determination on the merits." *Id.* EJ argues that this statement shows that a final determination on the merits "include[es] appeals and remands." Oppo. 8. Even if *Eastwood* supported that proposition generally, it would not necessarily shed light on ordinary usage or on the parties' intent in drafting the Term Sheet. And *Eastwood* does not support EJ. There, the Ninth Circuit reversed the district court's grant of summary judgment and vacated the district court's decision—there was no final determination after the Ninth Circuit's mandate issued. *See Eastwood*, 469 Fed. App'x at 598–99. Notably, the Ninth Circuit did not indicate that it violated the parties' agreement to award attorney fees after a district court judgment. *See id.* at 599. If the Ninth Circuit vacates the March 30 Order, there will no longer be a final determination on the merits. Unless and until that time, there is.

I determined that EJ breached the parties' Term Sheet and, consequently, that JGI was entitled to attorney fees, which the parties stipulated would be in the amount of $37,500. EJ is ORDERED to pay JGI within fourteen days or obtain a bond to cover that amount, and not wait for the Ninth Circuit's resolution of its appeal.

### b. Fees for this Motion

JGI asks that I order EJ to pay the attorney fees it incurred for the present dispute. I agree in part. EJ's behavior has been problematic. EJ committed itself to the Term Sheet more than a year ago. The March 30 Order is more than five months old. EJ dragged its feet, only to make a number of changes with alacrity when faced with the threat of contempt and sanctions. At least some of EJ's violations appear to be willful. EJ continued posting violative videos on Instagram for months after the March 30 Order—including as recently as September 3. EJ's press release that referred to itself as "JUST" was published three days after I denied a stay of my March 30 Order.

JGI asks in its motion for $10,370, based on attorneys billing 15.3 hours at $400/hr and 8.5 hours at $500/hour. I find that the hourly rates, the amount of time expended and the total amount sought are reasonable in light of the work performed, the prevailing hourly rates in the district and

the experience and skill of the attorneys who did the work, and GRANT that request as a civil contempt sanction to coerce compliance and compensate JGI in part for injuries suffered as a result of EJ's noncompliance with the Term Sheet. That amount shall be paid or covered by a bond within fourteen days.

Of course, JGI made its fee request before the prior hearing and all of the back and forth since the hearing, which has resulted in more work for its lawyers. I am not allowing additional fees, at least at the moment, because JGI did not try to meet and confer before filing its motion for an order to show cause. While ferreting out violations is not JGI's burden, I expect parties to solve problems collaboratively and informally when possible. In the future, JGI should meet and confer and attempt to resolve specific violations with EJ prior to filing a contempt motion. That said, I may impose additional sanctions if the affidavit required by this Order shows inadequate compliance.

## V.    THE COEXISTENCE AGREEMENT

The Term Sheet provides, "The 2014 Coexistence Agreement will be terminated and replaced by this term sheet or the long form settlement agreement incorporating this term sheet after receipt of the payment provided for in Paragraph 4 and Defendants' compliance with Paragraphs 7, 14, and 15." Term Sheet ¶ 26. Among other things, the Coexistence Agreement bars EJ from using the frame logo.

JGI briefly argued in its motion that EJ had not complied with Paragraph 15, which required that EJ change its "social media handles and online platforms" and "its Wikipedia and LinkedIn pages" to align with the new corporate name. Mot. 11–12; Term Sheet ¶ 15. In the Joint Letter, JGI added the argument that EJ is out of compliance with Paragraph 14 of the Term Sheet as well, which requires EJ to transfer domain names that include "Just for All" to JGI by Sep. 6, 2019. Joint Letter 10; Term Sheet ¶ 14. It also indicated in the Joint Letter that EJ is in breach of Paragraph 7, which requires EJ to transfer the JUST FOR ALL trademark to JGI by Sep. 6, 2019. Joint Letter 10; Term Sheet ¶ 7.

This issue was barely discussed in the parties' briefs. I will not now find, as JGI requests, that EJ remains bound by the Coexistence Agreement. Among many other issues that may need to

12

be addressed to make that finding are whether EJ substantially performed; whether any or all of these concerns are now or soon will be moot; whether JGI's conduct constitutes a waiver; whether failure to adhere to the deadlines is a material breach; whether JGI can elect to enforce both the Term Sheet and the Coexistence Agreement; whether the Term Sheet is a novation; whether the failure to notarize and send six out of 76 trademarks is a material breach; and whether I can order any relief despite the case closing and EJ's appeal of the March 30 Order.

Full compliance with the March 30 Order and this Order would make this question moot. I deny this portion of JGI's motion without prejudice to it making a fully briefed argument at a later date if EJ's material noncompliance remains a problem.

### CONCLUSION

It has been more than five months since I ordered EJ to comply with the Term Sheet to which it agreed. EJ has violated the March 30 Order many times in many ways. As a result, I hold EJ in CONTEMPT OF COURT. EJ is ORDERED to immediately comply with the Term Sheet, the March 30 Order, and this Order. EJ shall submit the affidavit that I have outlined above. If it fails to do within 14 days after this Order issues, I will impose additional sanctions until it demonstrates that it is no longer in contempt.

EJ's affidavit must demonstrate that: (1) it has removed all violations in the Instagram videos discussed; (2) it has removed all violative third party articles discussed from the relevant LinkedIn and Twitter accounts; (3) it has identified all employees who use LinkedIn profiles within the scope of their employment and that all such employees' LinkedIn profiles do not include violations; (4) either (i) all violations have been removed from EJ's Amazon, Whole Foods, and Walmart pages, or (ii) it must describe the process for altering these pages and their attempts to do so; (5) either (i) EJ's Wikipedia page is no longer in violation, or (ii) it must describe its efforts to alter the page and attest that it provided Wikipedia with a copy of the March 30 Order to facilitate removal or editing; (6) either (i) the Business Wire press release has been removed or edited to remove the violations or (ii) it provided Business Wire with a copy of the March 30 Order to facilitate removal or editing; (7) it does not control the Facebook post discussed above and describes its efforts to have the violation in it removed; and (8) it either paid

1    JGI $47,870 or posted a bond in that amount. JGI shall not file any counter-affidavit or other

2    pleading in response unless I ask for it.

3      EJ is ORDERED to pay JGI the sum of $47,870 as assessed in the March 30 Order and this

4    Order, or to post a bond in favor of JGI in that amount.

5      This Order should not embolden JGI to demand unreasonable interpretations of the Term

6    Sheet, the March 30 Order, or this Order, nor should it ignore unforeseen difficulties EJ

7    encounters while it redoubles its focus and efforts on compliance. I expect cooperation and

8    collaboration to overcome any remaining difficulties. Prior to filing a contempt motion about

9    specific alleged violations of my orders in the future, JGI shall meet and confer with EJ about the

10   alleged violations and both parties should work to resolve them in good faith.

11     **IT IS SO ORDERED.**

12     Dated: September 11, 2020



William H. Orrick
United States District Judge

United States District Court
Northern District of California

**<u>EXHIBIT B</u>**

*Gens v. Colonial Savings, F.A.*, Case No. 5:11-cv-05526-RMW (N.D. Cal. March 27, 2014)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LAURA ANN GENS and TIMOTHY GENS, | Case No. C-11-05526-RMW |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART MOTION OF DEFENDANTS COLONIAL SAVINGS, F.A. AND MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. MOTIONS TO DISMISS** |
| COLONIAL SAVINGS, F.A.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. | |
| Defendants. | [Re Docket Nos. 100, 101] |

In the prior order on defendants' motions to dismiss ("MTD"), Dkt. No. 113, the court required Colonial Savings, F.A. ("Colonial") and Mortgage Electronic Registration Systems, Inc. ("MERS") to re-serve their motions to dismiss on plaintiffs. Dkt. No. 100 (Colonial MTD); Dkt. No. 101 (MERS MTD).[1] Plaintiffs opposed Colonial's motion to dismiss but did not file an opposition to MERS' motion to dismiss. Dkt. No. 118. The court addresses the motions on the papers.

## ANALYSIS

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must make "factual allegations [that are sufficient] to raise a right to relief above a

---

[1] The prior order dismissed the 1st, 2nd, 3rd, 8th, and 9th causes of action with prejudice and dismissed all claims against defendant Associated Bank with prejudice. Dkt. No. 113, 117.

ORDER
Case No. C-11-05526-RMW
LM

- 1 -

speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). On a motion to dismiss, a court must take all of the factual allegations in a complaint as true, but the court need not accept as true "[t]hreadbare recitals of the elements of a cause of action," or legal conclusions presented as facts. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). A trial court may also dismiss a claim *sua sponte* under Rule 12(b)(6) if it determines that a claimant clearly cannot win relief. *See Omar v. Sea-Land Service, Inc.*, 813 F.2d 986, 991 (9th Cir. 1987).

### A. Colonial Motion to Dismiss

Plaintiffs assert four causes of action against Colonial in the Second Amended Complaint (SAC): trespass, conversion, RICO, and violations of the Wisconsin Deceptive Trade Practices Act.

#### 1. Trespass

Plaintiff alleges that an unknown agent of Colonial forcibly entered their residence and caused property damages. SAC ¶ 16 (trespass in March 2009), ¶ 19 (trespass in January 2010). Colonial's response is that as a servicer of the Gens' mortgage they were entitled to "make reasonable entries upon and inspections of the Property." Dkt. No. 100 at 12. Taking the plaintiffs' allegations as true, the court has no doubt that kicking in a door or forcibly removing locks on the property is not a "reasonable entry." *See* SAC ¶¶ 16, 19. Gens has plausibly alleged that an agent of Colonial committed a trespass, and Colonial's motion to dismiss count 4, trespass, is denied.

#### 2. Conversion

Plaintiff alleges that when their house was vandalized in March 2009 by the unknown Colonial agent, "computers, cameras, and other electronics including a professional/scientific low-light camera" were converted. SAC ¶¶ 17, 54. Plaintiff also alleges "personal possessions were stolen" in the January 2010 break-in. SAC ¶¶ 19, 54. Colonial argues that plaintiff has failed to plead that Colonial intended to permanently deprive plaintiffs of their property, which is a required element of conversion under Wisconsin law. Wis. Stat. § 943.20. Plaintiff's response is that they inadvertently removed the "intent to permanently deprive" allegation, which was present in their First Amended Complaint. *See* Dkt. No. 56, ¶ 54. Plaintiff requests leave to amend their complaint to re-allege the removed facts.

Because plaintiff did not adequately plead conversion, the fifth cause of action against Colonial is dismissed, but the court grants leave to add paragraph 54 of the First Amended Complaint to a Third Amended Complaint.

### 3. RICO

Plaintiff alleges that Colonial violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(c). To state a civil RICO claim, a plaintiff must allege: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima, S.P.R.L v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 473 (7th Cir. 1997). A pattern of racketeering activity is defined as at least two instances of such activity. *See* 18 U.S.C. § 1961(5). To adequately plead a RICO claim, a plaintiff must do more than merely "restate[ ] the elements of [the relevant RICO subsection] in boilerplate fashion." *Roa v. BP Products N. Am., Inc.*, 589 F.3d 389, 399 (7th Cir. 2009).

Racketeering activity can include obstruction of justice, 18 U.S.C. § 1503, and tampering with or intimidating a witness, 18 U.S.C. §§ 1512, 1513. *See* 18 U.S.C. § 1961(1). Plaintiff alleges that at each of two break-ins described above, and at a third attempted break-in in 2013, a Colonial agent left a note saying things like "DROP LAWSUIT OR ELSE MORE TO COME" and "PAYBACK FOR SUING A TEXAS BANK." SAC ¶¶ 60, 61. These statements could constitute obstruction of justice and/or intimidating a witness.

Colonial's only argument against the RICO claim is that they do not believe plaintiffs' allegations about the notes. Because the court must accept the facts alleged in the complaint as true, and Colonial has not provided any substantive reason to dismiss the RICO claims, the motion to dismiss is denied.

### 4. Wisconsin Unfair and Deceptive Trade Practices Act

A claim under the Wisconsin Unfair and Deceptive Trade Practices Act (UDAP) requires that: "(1) the defendant made a representation to 'the public' with the intent to induce an obligation; (2) the representation was 'untrue, deceptive, or misleading'; and (3) the representation materially caused a pecuniary loss to the plaintiff." *Grice Engineering v. JG Innovations, Inc.*, 691 F. Supp. 2d

915, 922 (W.D. Wis. 2010) (citing *Novell v. Migliaccio*, 749 N.W.2d 554, 553 (Wis. 2008)); Wis. Stat. § 100.18. UDAP prohibits claims filed "more than three years after the occurrence of the unlawful act or practice which is the subject of the action." Wis. Stat. § 100.18(11)(b)(3).

Plaintiffs allege that transfer of the mortgage from MERS to Colonial in 2010 was fraudulent because the Assignment was improperly signed. SAC ¶ 68. Colonial responds that the Wisconsin Court already decided that the assignment from MERS to Colonial was valid and therefore there was no "untrue, deceptive, or misleading" representation. *Grice*, 691 F. Supp. 2d at 922. Furthermore, Colonial argues that the July 22, 2010 assignment is still outside the three-year statute of limitations because it does not relate back to the filing of the original complaint.

Claims asserted in amended pleadings are relate back to the date of the filing of the original pleading if they "arose out of the transaction, occurrence, or event set forth or attempted to be set forth in the original pleading." Wis. Stat. § 802.09(c). Here, the prior complaint alleged that Associated and MERS "failed to undergo a diligent underwriting process, properly adjust and disclose facts and a circumstance relating to Plaintiffs' Note and Mortgage and placed Plaintiffs in a loan in which Defendants MERS and Associated would add outrageous fees, costs, charges etc. while concealing these fees/charges." Dkt. No. 56, FAC ¶ 63. This allegation failed to put defendant Colonial on notice that its actions in 2010 could form the basis of a UDAP claim and therefore does not relate back to the original complaint or FAC. *Biggart v. Barstad*, 182 Wis. 2d 421, 430 (Ct. App. 1994) ("Adequate notice in the original complaint of the transaction, events or occurrence out of which the amended claims arise is essential if a party's statutory right to the protections of the statutes of limitations are to be guaranteed."). Because the UDAP claim in the SAC does not relate back to the earlier-filed complaints, it is barred by the three-year statute of limitations. *See* Dkt. No. 98 (SAC filed Nov. 15, 2013). The UDAP claim against Colonial is dismissed without leave to amend.

### B. MERS Motion to Dismiss

The only claim remaining against MERS in the SAC is the Seventh Cause of Action, violations of the UDAP. Like Colonial, MERS argues that this claim is barred by the three-year statute of limitations, Wis. Stat. § 100.18(11)(b)(3). While the prior complaint did put MERS on

notice that the Gens' believed they could state a UDAP claim against MERS, nothing in the prior complaint alleged that the 2010 transfer from MERS to Colonial was fraudulent or that the document was improperly signed. As above, this failed to place MERS on notice of the claim now being asserted. *Biggart v. Barstad*, 182 Wis. 2d at 430. Because the UDAP claim in the SAC does not relate back to the earlier-filed complaints, it is barred by the three-year statute of limitations. The UDAP claim against MERS is dismissed without leave to amend.

### ORDER

For the reasons explained above, the court orders as follows with respect to each of the remaining causes of action at issue:

- Fourth Cause of Action - Trespass against Colonial: motion to dismiss denied.

- Fifth Cause of Action - Conversion against Colonial: dismissed without prejudice.

- Sixth Cause of Action - RICO against Colonial: motion to dismiss denied.

- Seventh Cause of Action - Wisconsin Deceptive Trade Practices Act against Colonial and MERS: dismissed with prejudice as to both Colonial and MERS.

- First, Second, Third, Eighth, and Ninth Causes of Action—previously dismissed with prejudice.[2]

The court grants plaintiffs leave to add paragraph 54 of the First Amended Complaint to a Third Amended Complaint. The Third Amended Complaint must be filed on or before April 10, 2014. This will be the "one last leave to amend" as requested by the Gens. Dkt. No. 118 at 3.

Dated: March 27, 2014

*Ronald M. Whyte*

Ronald M. Whyte
United States District Judge

---

[2] The Gens are not required to re-plead these causes of action in their amended complaint. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (overruling prior rule that claims not re-alleged are waived and holding that "[f]or claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal.").