Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AARON GREENSPAN, | Case No. 3:20-cv-03426-JD |
| Plaintiff, | **THIRD SUPPLEMENTAL AND AMENDED COMPLAINT FOR:** |
| v. | 1.  Defamation Per Se |
| OMAR QAZI, SMICK ENTERPRISES, INC., ELON MUSK, and TESLA, INC., | 2.  Violation of Anti-Stalking Statute, Civil Code § 1708.7, *et seq.* |
| Defendants. | 3.  Copyright Infringement |
|  | 4.  Violation of the DMCA (CMI Removal, Misrepresentation) |
|  | 5.  Violation of Federal Securities Laws |
|  | DEMAND FOR JURY TRIAL |

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

### INTRODUCTION

1.      Defendant Elon Musk is the centi-billionaire CEO of Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy and battery products.  He has attracted a literal cult following, both among his customer base and on the Twitter social network, where Defendant Musk has in excess of 46 million followers.

2.      Defendant Tesla has never earned an annual profit despite the company's false claims to the contrary.  In December 2020, compounded accounting tricks allowed Tesla to qualify for S&P 500 inclusion, further boosting the price of its already artificially inflated stock. No company run by Defendant Musk ever earned an annual profit while he was in charge.

Tesla, Inc. Cumulative Financial Metrics
As Reported in SEC Filings Since 2010

3.     Defendant Tesla is the largest Ponzi scheme in history—one that just happens to produce cars.  New investors cash out the old while executives, such as Defendant Musk, are rewarded ever more handsomely through stock-based compensation as the company loses ever more money and covers it up.  In effect, Defendant Tesla's main product *is* its stock, which by 2018 made it of particular interest to Defendant Musk's arch-nemesis: short-sellers.

4.     After waging a public war against short-sellers, the precipitous increase in Tesla's stock price in 2020 made Defendant Musk the wealthiest person in the world, with a net worth of over $200 billion.  It was therefore shocking when he admitted on the record in late 2020 that the short-sellers had been right all along: that Tesla had been on the verge of bankruptcy from "mid 2017 to mid 2019," rendering its investor disclosures, showing adequate cash, totally fraudulent.  Musk told investors lies to avoid a "self-fulfilling prophecy" that would cause Tesla's "death."

5.     Not all of Musk's lies went unnoticed.  In 2018, the United States Securities and Exchange Commission ("SEC") charged Defendant Musk with securities fraud.  Defendants Musk and Tesla signed binding Consent Decrees and each paid $20 million fines to the SEC.

6.     Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick"), has served as a ferocious propagandist for Defendants Musk and Tesla, authoring and/or coordinating over 110,000 tweets praising Tesla and scapegoating its critics—plus essays, podcasts, and promotional videos.  For the sake of comparison, Yevgeny Prigozhin ("Putin's Chef") employed a "troll-factory" that "generated one of the largest known

online disinformation campaigns, churning out 71,000 tweets" according to Bellingcat in 2020.

7.      Defendant Musk is an officer, director and employee of Defendant Tesla.  Under *respondeat superior* doctrine, Defendant Tesla is liable for the actions of Defendant Musk performed in connection with its business.  Similarly, Defendant Smick is liable for Omar Qazi.

8.      Defendant Qazi is a Tesla shareholder and customer who has been criminally charged in at least two cases.  His antics attracted a following of tens of thousands of Musk's supporters and numerous detractors before he was banned from and by Twitter for life.

9.      Internal Tesla documents corroborate that Defendants made false and misleading statements—such as by glossing over hundreds of millions of dollars worth of factory waste in SEC filings—to effect a pump-and-dump scheme.  *See* Exhibit A.  Social media has also been instrumental to the unprecedented artificial elevation of Tesla's stock price, yielding a market capitalization of over $850 billion: well more than ten times the worth of Enron at its peak, and more than the *combined* valuation of the rest of the automotive industry, e.g. Toyota, Volkswagen, Mercedes, General Motors, BMW, Honda, Fiat-Chrysler, Ford, Nissan and Suburu.

10.     Defendants Qazi and Musk have at times worked as a tag team, hurling accusations and falsehoods concerning Plaintiff, among other topics, to Defendant Musk's millions of followers in order to discredit Plaintiff's research on Defendants Tesla and Musk.

11.     Even after being formally banned from Twitter, Defendant Qazi returned to Twitter anyway under the guise of a new shared account for a Tesla-focused podcast, until his further provocations triggered a backlash in the same community that had previously been so supportive of his at-times-criminal harassment.  After that, he resurfaced on even more accounts.

12.     Through thousands of false and misleading statements and material omissions broadcast directly to millions, and indirectly to millions more through the media, Defendants successfully and unlawfully pumped the stock price of TSLA common shares from an average of $167.66 per share during the period of June 29, 2010 (the date of Defendant Tesla's Initial Public Offering) through September 23, 2018 (the day before Plaintiff first purchased put options) to $4,502.00 per share (split-adjusted) as of January 25, 2021, a 2,585% increase.



13.     Despite its enterprise value of approximately $1 trillion, Defendant Tesla has no permanent General Counsel.  Three of its prior General Counsels resigned from November 2018 through December 2019, as did four prior Chief Financial Officers or Chief Accounting Officers.

14.     Defendants' collective actions are part of an overt and disturbing pattern in which Elon Reeve Musk has repeatedly incited an on-line mob against anyone who dares question or criticize him, smearing the target as mentally ill, a rapist, a pedophile and/or a likely murderer, all in service of what is now a trillion-dollar securities fraud: the largest in American history.

### PARTIES

15.     Plaintiff Aaron Greenspan is an individual residing in San Francisco County in the State of California, in this district.  Plaintiff is not a public figure.

16.     Defendant Omar Qazi is an individual residing at least part-time in San Francisco County in the State of California and doing business in Santa Clara and San Francisco Counties in the State of California, in this district.

17.     Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the California Secretary of State or Franchise Tax Board, but nevertheless operating in Santa Clara and San Francisco Counties in the State of California, in this district.

18.     Defendant Elon Musk is an individual working in Santa Clara and Alameda Counties, in this district.  Defendant Musk is a public figure whose statements on Twitter and

otherwise make national news and materially affect financial markets on a near-daily basis.

19.     Defendant Tesla, Inc. is a corporation based in Santa Clara County in the State of California, in this district.  Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, 1338(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the state law claims that are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

22.     The securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

23.     Personal jurisdiction and venue are proper because at least one defendant is a corporation headquartered in this district and/or because the improper conduct alleged herein occurred in, was directed from, and/or emanated or exported from California.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## FACTUAL BACKGROUND

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

24.     Plaintiff is an investor who has held put options in Tesla, Inc. common stock. Plaintiff invested in TSLA put options because he believed that Defendant Tesla's business was fundamentally overvalued by the market.  When Plaintiff began purchasing Tesla, Inc. securities he had no knowledge of any alleged fraud involving Defendant Tesla except for limited knowledge from news reports of Defendant Musk's August 2018 false "funding secured" tweet.

25.     Plaintiff is also a data journalist who runs a legal information service called PlainSite, which hosts tens of millions of dockets, documents, and profiles.  PlainSite handles privacy requests on a case-by-case basis.  Consequently, a variety of individuals are occasionally

upset that their information is in the public domain.

26.     One individual, Diego MasMarques, Jr., convicted of murder and attempted murder in Spain and charged with other crimes domestically, escalated his displeasure over the fact that his convictions were public to the point where Plaintiff applied for and was granted a two-year restraining order against him.  *See Greenspan v. MasMarques*, Santa Clara County Superior Court Case No. 18CH008067 (the "Civil Harassment Case").  *See also* Exhibit B.

27.     On various websites, Mr. MasMarques, who has a documented history of mental illness, posted thousands of libelous fabrications falsely alleging that Plaintiff and his family members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to extortion, to the hacking of his e-mail account.

28.     On January 13, 2019, Plaintiff posted on Twitter from the @PlainSite account warning Defendants Musk and Tesla that a customer had recorded a video of a Tesla Model 3 center console that was unresponsive while driving.  Defendants Musk and Tesla did not respond, but the next day, a Twitter account, "@tesla_truth" (posing as "Steve Jobs") did, falsely writing, "Aaron, the center touch screen has nothing to do with driving the car," and ending with, "Good luck in court on Tuesday for violating that restraining order," even though Plaintiff had not violated any order.  The @tesla_truth account then began re-posting and linking to the dangerous false allegations that were the subject of the unrelated Civil Harassment Case.

29.     At no point prior to this interaction did Plaintiff write about or otherwise solicit feedback from @tesla_truth.  Its owner began attacking Plaintiff over a public safety issue.

30.     The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

31.     An attempt via Direct Message ("DM") to discuss the seriousness of the matter and the associated safety concerns with @tesla_truth's owner was not fruitful.  The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," echoing Defendant Musk's notorious scapegoating of short-sellers.

32.     Plaintiff then specified the most objectionable content by saving it to a PDF file

hosted on his personal website and sending a link to the @tesla_truth account owner.  When the account's owner clicked on the link, PlainSite's server logs yielded the DNS hostname and IP address c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively.  Given the urgent potential safety ramifications of this account's misconduct, Plaintiff searched PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "Smick Enterprises, Inc.," a company run by Defendant Qazi.

33.    Plaintiff took the further exceptional step of publicizing this information, while partially redacting Defendant Qazi's DNS hostname, to warn others of the danger he posed.

34.    Defendant Qazi later admitted to using the @tesla_truth Twitter account.

35.    The same day, still concerned about the danger posed to his family and others at synagogues mentioned in the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him.  Plaintiff then asked the receptionist to speak with a supervisor in Defendant Qazi's department.  Plaintiff informed an unknown female employee that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous.  At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually Qazi's father's company.  Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called.  Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately.

### Omar Qazi Steps Up His Campaign of Criminal Harassment

36.    The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number.  The anonymous male caller impersonated a service technician who initially only said he was calling from "the phone company," and asked for Plaintiff's home address.  Since the caller refused to identify "the phone company," and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information.  Defendant Qazi later admitted to placing this harassing phone call both privately and publicly.

37.    The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually

suspended by Twitter for violating its terms of service.  It was permitted to continue operating only by renaming itself to "Steve Jobs *[sic]* Ghost" and by falsely identifying as a so-called "parody" account, even though the account's primary purpose was not to parody Steve Jobs, but to promote Defendants Musk and Tesla by abusing the imprimatur of Apple, Inc.'s co-founder.

38.     In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and the Civil Harassment Case.  Such posts continued through late October 2019 and inspired harassment from others.

39.     On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff reported on a public video posted by Defendant Qazi on the @tesla_truth account advertising Tesla's so-called "Autopilot" functionality.  The video depicted a black Tesla Model 3 driving through a red stoplight on Autopilot without the driver's hands on the steering wheel as required (the "Autopilot Moving Violation Video").  Although Defendant Qazi later claimed not to be the driver of the vehicle, which resembles his own, he did claim to own the video's copyright.

40.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net in or around Rancho Palos Verdes, California accessed documents hosted on PlainSite from Plaintiff's Civil Harassment Case.

41.     Defendant Qazi's parents live 0.1 miles from Rancho Palos Verdes, California.

42.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's Civil Harassment Case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child).  The altered document also contained Plaintiff's phone and fax number alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them.  Should've known they would fight back."

43.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:

These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer. *See* Exhibit C.

44.     Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047, purporting to be from "Kids R Us" with a cover page message of, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.  Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation ("FBI").

45.     Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

46.     A similar anonymous fax from the same fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat purporting to be from "Elon Musk."

47.     In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with concerns about Defendant Tesla's relationship with Defendant Qazi.  Plaintiff never received a response.

48.     On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

49.     In a DM conversation with a third party from September 27, 2019, Defendant Qazi admitted, "[I] take responsibility for what my followers do too and [I] take it seriously."

50.     On August 8, 2019 at 11:13 P.M., Defendant Musk responded to e-mailed, on-the-record questions from Plaintiff with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

51.     On September 19, 2019, Plaintiff's non-profit organization, Think Computer Foundation, intervened in Delaware Chancery Court Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation* (the "SolarCity Case") pursuant to Chancery Local Rule 5.1(f), which permits any person to challenge the designation of confidential material on file.

52.     The SolarCity Case involved allegations by third parties that Defendant Musk had defrauded investors by bailing out both his cousins who formerly ran SolarCity and his own self-described "pyramid" of companies while disguising the bailout as a legitimate merger.

53.     Defendants Musk and Tesla and Space Exploration Technologies Corporation ("SpaceX") designated all of the documents Plaintiff's non-profit organization sought to publicly disclose as "confidential" or under seal, reflecting their sensitivity and importance.

54.     From early August through October 2019, but especially after Plaintiff's non-profit organization intervened in the SolarCity Case, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff, his family, and his non-profit organization.  These harassing statements were read by a wide audience of at least 10,000-20,000 followers.  Many were published to promote Defendant Tesla's stock, its products, and Defendant Musk—all while using Tesla's registered trademark—by making Tesla appear to be the one and only legitimate automotive brand.

55.     Defendants Musk and Qazi frequently interacted on Twitter through a variety of accounts, and continue to do so.  Defendant Qazi also photographed himself appearing at exclusive, invite-only Tesla events where Defendant Musk presented new products.

56.     On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

57.     On the morning of October 9, 2019, *Bloomberg Businessweek* published an article

by Zachary Mider referring to Defendant Musk, profiling Defendant Qazi, and stating:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi] the same day [in August 2019]. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack *[sic]* you with a baseball bat.' Musk cc'd me on the message. Tesla also declined to comment."

The article contained a photograph of Defendant Qazi next to his black Tesla Model 3 and referred to the @tesla_truth account as a "bottomless font of Muskolatry."

58.     Defendant Qazi is one of a select group of individuals that has early access to Tesla beta software, such as "Full Self-Driving," and has accordingly agreed to a contract with Defendant Tesla that, for example, restricts discussions with the media about the software.

59.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though Defendant Qazi misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to a "Jim" who had written on or provided input for the @tesla_truth account in January 2019.

60.     On October 9, 2019 at 3:09 P.M., the @tesla_truth Twitter account posted:  "All Aaron Greenspan had to do was shut up and I would have forgotten all about that clown.  Now i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is  After he dies I'll keep telling people he sucked."

61.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, attorneys at Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider.  *See* Exhibit D.

62.     Fourteen minutes later, on October 9, 2019 at 3:48 P.M., Defendant Qazi replied by e-mail to all parties with the message, "Lol," internet slang for "laughing out loud."

63.     Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant

Qazi's response, with two laugh/crying emojis.  None of the responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter then under review.

64.     Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

65.     At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely suggesting that Plaintiff resided in a "psych ward."

66.     At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

67.     Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plaintiff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

68.     Plaintiff received unwanted telephone calls, e-mails and messages as a result of Defendant Qazi's actions, and several dozen libelous messages were also posted publicly.

### *Omar Qazi Targets Plaintiff's Family for Further Harassment*

69.     The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan.  The Twitter account's handle, deliberately intended to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account.

70.     Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps (since renamed to G Suite and Google Workspace) to receive all e-mails

1   addressed to smick.com, including e-mails connected to numerous fake accounts on Twitter.

2       71.    Defendant Smick uses the domain name smick.com.

3       72.    On Thursday, October 10, 2019, Plaintiff filed a Digital Millennium Copyright

4   Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph Mr.

5   Qazi used to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph.

6   Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled

7   brother and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.

8   Plaintiff reported Defendants' harassment to the San Francisco Police Department ("SFPD").

9       73.    On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I

10  hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan."  In

11  a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a

12  parody or actually his brother?" Defendant Qazi wrote, "yeah I'm his little brother haha."

13      74.    Plaintiff's brother is not active on Twitter and never has been.

14      75.    On October 11, 2019, Defendant Qazi created websites using servers owned or

15  leased by Defendant Smick Enterprises, Inc., at http://www.plainshit.com,

16  http://www.plainshit.org, and http://www.plainsiite.org (the "Smick Sites") containing

17  copyrighted photographs of Plaintiff and his family members with the bold headline, "It's plain

18  to see: This fraudulent charity is FULL OF SHIT."  The text continued in part:

19          "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron
            Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil
20          Greenspan or Judy Greenspan? You are not alone."

21  The website's source code contained the hidden HTML, "<!-- fuck you aaron -->".

22      76.    The Smick Sites' text contained numerous false allegations: that Plaintiff's non-

23  profit organization was a "fraudulent charity;" that Plaintiff and his family "harassed,

24  intimidated, or targeted for extortion" individuals; that Defendant Qazi had engaged the law firm

25  of Latham & Watkins; and that "56 people" had submitted "verified testimonies" to the site(s).

26              *Tesla's CEO Attacks Another Critic on Twitter*

27      77.    On Saturday, October 12, 2019, alongside numerous false allegations made via

28

THIRD SUPPLEMENTAL AND AMENDED          13                          3:20-cv-03426-JD
COMPLAINT

his @tesla_truth account, Defendant Qazi posted a link to a pseudonymously authored article on the website Medium entitled, "NonProfit PlainSite Attacks People Online" by "Random Tesla Fan." The article contained Plaintiff's parents' home address, as well as a section entitled "How To Fight Back" encouraging readers to send a completed Internal Revenue Service ("IRS") Form 13909, "Tax-Exempt Organization Complaint (Referral)," to the IRS in order to report Plaintiff's supposed "criminal" wrongdoing and Think Computer Foundation, his non-profit organization.

78. On account of false IRS Form 13909 forms filed by Diego MasMarques, Jr., the IRS audited Think Computer Foundation and issued a Letter 5177, finding, "Your organization continues to qualify for exemption from federal income tax as described in Internal Revenue Code 501(c)(3)." The Letter 5177 did not identify even one issue of concern. *See* Exhibit E.

79. Although Plaintiff read the Medium article and found it to contain an overwhelming amount of false and deliberately misleading information, Plaintiff took no action.

80. In direct response to Defendant Qazi's posting of the article, Defendant Musk wrote on Twitter at 12:46 P.M.: "Super messed up situation!"

81. Thirty-two minutes later, at 1:18 P.M., Defendant Musk wrote another response on Twitter to augment his first response: ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" This post garnered at least 246 replies, 226 retweets, and 1,776 "likes."

82. Both of Defendant Musk's responses to Defendant Qazi's post concerning the Medium article about Plaintiff were threaded within the context of the original Twitter post and would have been readily apparent to anyone reading Defendant Qazi's post and the associated article about Plaintiff. Therefore, an average user on Twitter would have understood the supposedly "fake charity" discussed by Defendant Musk to be Think Computer Foundation, which is a properly registered and legitimate 501(c)(3) non-profit organization, and the supposed "online bully" discussed by Defendant Musk to be Plaintiff. Russ Mitchell's $50.00 donation to Think Computer Foundation was explicitly discussed in the article at the top of the thread.

83. In December 2019, Think Computer Foundation used Mitchell's donation and

others to file a lawsuit against the Santa Clara County Superior Court seeking public availability of all of its electronic civil records.  These records were made available on-line for free shortly thereafter, achieving the Foundation's goal.  The parties reached a settlement in May 2020.

84.     Shortly after it was initially posted, Medium disabled the account responsible for the article and removed the article itself without prompting from Plaintiff, directly or indirectly.

85.     On Monday, October 14, 2019 at 10:47 A.M., in response to the removal of the Medium article, Defendant Qazi used his @tesla_truth account to vow to "post the content on a server we control" after falsely accusing Plaintiff of having written to "friends at medium."

86.     On Tuesday, October 15, 2019 at 4:56 A.M., Plaintiff received an e-mail from an automotive industry consultant residing in Tokyo, Japan who stated that Omar Qazi had been harassing and impersonating him and his wife.

87.     On Tuesday, October 15, 2019 at 8:19:54 P.M., Defendant Qazi left Plaintiff's father a voicemail 50 seconds in length on his work telephone number.  Fourteen minutes later, at 8:33:55 P.M., Defendant Qazi sent an e-mail message to Plaintiff's father's work e-mail address with the subject "Think Foundation & Aaron" containing numerous false statements and mischaracterizations.  Plaintiff's father did not respond to Defendant Qazi's communications.

88.     Plaintiff never took any action to harass or to encourage others to harass Defendant Qazi or his family and asked others to stop ridiculing Defendant Qazi more than once.

89.     Also on October 15, 2019, the Smick Sites were updated to resemble the PlainSite website and the misspelled reference to Latham & Watkins was removed.  Defendant Qazi updated the bold headline to: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice."  The supposed "Victims of Aaron Greenspan Foundation" does not exist and never has.  Defendant Qazi changed the false number of people who had submitted "testimonies" to "956" because it corresponded to Plaintiff's home address.  Finally, he added the text, "Aaron Greenspan Did Not Invent Facebook. He is a failure."  *See* Exhibit F.

90.    Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting [sic] Securities Fraud" and included other libelous hidden comments.

91.    On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi contacted Plaintiff's disabled brother via Facebook Messenger.

92.    On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

93.    On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

94.    On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later falsely claiming in public that Plaintiff had failed to engage.

95.    On Friday, October 25, 2019 at approximately 6:30 P.M., Defendant Qazi registered a new domain name, vagfoundation.org, via Amazon.com.

96.    Even though Defendant Qazi solicited information about Plaintiff's supposed "crimes" from his thousands of followers, only two "testimonies" initially appeared on the Smick Sites: "M's TESTIMONY," an approximate reproduction of the disabled Medium article that Defendant Qazi had resolved to post elsewhere; and "P'S TESTIMONY," a haphazard PDF compilation of Diego MasMarques, Jr.'s false allegations submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia, but posted anonymously.  Neither of these posts described any actual crime committed by Plaintiff or his family members, let alone any actual "victim" of Plaintiff.

*Even With Omar Qazi Banned From Twitter, His Libel and Harassment Continues*

97.     Defendant Qazi's harassment of Plaintiff via Twitter using copyrighted materials led to Plaintiff filing several DMCA requests that partially led to the temporary suspension of Defendant Qazi's accounts.  On or around October 22, 2019, Defendant Musk wrote an e-mail to Twitter, Inc. CEO Jack Dorsey in support of Defendant Qazi while disparaging Plaintiff.

98.     Defendant Musk's attempt to intercede on Defendant Qazi's behalf was unsuccessful.  On or about October 24, 2019, Twitter permanently banned Defendant Qazi, disabling @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil, and @SmickTrump.

99.     On October 31, 2019, Defendant Qazi posted an essay on wholemars.net, a domain name and server controlled by Defendant Smick, entitled, "Steve Jobs is dead."  In this essay, Defendant Qazi admitted that his @tesla_truth account was suspended repeatedly for legal violations and impersonation, and that it was registered to teslatruth@smick.com.  *See* Exhibit G.

100.     In response, Defendant Qazi set up open-source software called Mastodon on a server belonging to Defendant Smick hosted by Amazon Web Services, LLC.  On November 1, 2019, Defendant Qazi published an essay on another Smick website, wholemars.org, thanking his supporters and inviting them to use his Mastodon social network, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening.  (At various points in time, Defendant Qazi's "wholemars" domain names have redirected to each other.)

101.     On Saturday, November 2, 2019, Sascha Pallenberg, formerly of Daimler AG, wrote from his Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!"

102.     The same day at 2:58 P.M., an unknown individual created a profile using Plaintiff's name and e-mail address without permission on the pornographic website Pornhub.

103.     On Sunday, November 3, 2019 at 1:08 P.M., Plaintiff filed another DMCA request with Amazon Web Services, LLC regarding Defendant Qazi's repeated violation of copyright law.  On or about November 6, 2019, Amazon shut down at least four of the Smick Sites in response, causing Defendant Qazi to move those sites to another provider: Linode, LLC.

104.    On November 6, 2019, an unknown individual using the Wikipedia username "Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of the "Criticism of Facebook" article, in order to supposedly "be more impartial and includ[e] additional details."  In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting his false claims about Plaintiff, such as the false statement that Plaintiff "was able to extort about $250,000 from Facebook."

105.    In fact, Plaintiff entered into a settlement agreement with Facebook, Inc. and Mark Zuckerberg in May 2009 about which no financial details have been disclosed.

106.    Upon information and belief, Defendant Qazi was at times coordinating with Diego MasMarques, Jr.—the same individual restrained in the Civil Harassment Case.  Many of the false statements and allegations made by Defendants Qazi and Musk are identical to those Mr. MasMarques has been making since at least as early as 2017.  Defendant Qazi also authored Twitter posts containing content that appeared to come from Mr. MasMarques.

107.    For months, Defendants Qazi and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded hatred and ridicule by countless individuals with whom Plaintiff had no prior relationship.  For example:

a)  On October 2, 2019, Twitter user @ThemeTeamWP, a vocal proponent of Defendant Musk, wrote, "Aaron still butthurt that Zuckerberg got rich while you became a nobody?"  This post was deleted by the author.

b)  On October 9, 2019, @PandraKaka13 wrote, "Sadly Aaron's parents have let him have this sort of support for his revenge tactics. I'm concerned when they die that Aaron will have no one to support his psycho ways and may become even more volatile. Hope he doesn't own any guns. Mass shooter profile."

c)  On October 9, 2019, @CleanRevelry wrote, "Yo @AaronGreenspan, see you on a dark night," using a song lyric authored by Defendant Musk's girlfriend as a warning. Plaintiff interpreted this as a threat of violence, as did another user.

d)  On November 1, 2019, @romn8tr wrote, "@AaronGreenspan you're a piece of shit."

e)  On May 17, 2020, @ElectroCar wrote, "Wow never realized @AaronGreenspan and @PlainSite accused Omar of being a pedo after Omar exposed tax fraud."

f)  On May 17, 2020, @BarkMSmeagol wrote, "Yep. He belongs in an asylum."

*The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff*

108.    On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant Tesla's Q1 2020 earnings call, calling local public health officials "fascist."  At one point, Defendant Musk was disconnected from his own earnings call.

109.    On May 9, 2020, Defendant Musk ignited further controversy by threatening to sue Alameda County over its implementation of the multi-county Shelter-In-Place Order concerning COVID-19, which curtailed Tesla's ability to manufacture cars at its Fremont, California factory.  Defendant Tesla did, in fact, sue Alameda County, and later settled.

110.    Defendant Musk further instructed Tesla employees to violate the Shelter-In-Place Order and return to work, or risk losing unemployment benefits.

111.    While Defendant Musk claimed he would be present on the assembly line willing to risk arrest, flight records indicate that he was not even in Alameda County for the majority of the day on Monday, May 11, 2020, with his private jet reportedly arriving in San Jose, California shortly after 5:00 P.M.  On May 12, 2020 at 9:11 P.M., Defendant Musk posted an image falsely implying that he had been eating at a Bay Area restaurant to defy the Shelter-In-Place Order.

112.    Many supporters of Defendants Musk and Tesla were, for once, appalled by Musk's erratic behavior and disregard for human life.  On May 12, 2020, *Electrek* editor Frederic Lambert wrote an editorial critical of Musk and the "toxic" Twitter account @thirdrowtesla: a video podcast led by Defendant Musk's most ardent supporters, including Defendant Qazi.

113.    Defendant Musk signed the interior of Defendant Qazi's Tesla Model 3.

114.    Signaling the vital importance of his work harassing Tesla's critics, Defendant Musk appeared with Defendant Qazi in a 3.5-hour Third Row Tesla video interview filmed at one of Defendant Musk's Los Angeles homes and published on February 9, 2020.  The below photograph depicts Defendant Qazi (far right) with Defendant Musk (far left) and Tesla Director

Kimbal Musk (second from right with cowboy hat) at the recording session:



115.    For these reasons and others, Plaintiff reasonably believed that Defendants Qazi and Smick performed work as agents, ostensible or otherwise, of Defendants Musk and Tesla.

116.    Although it was at first unclear who had authored the Twitter posts that Mr. Lambert took issue with since Third Row Tesla contributors provided conflicting and inaccurate information about who used its Twitter account, Defendant Qazi ultimately admitted authorship, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.

117.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as cheerleaders for Defendant Tesla, led Defendant Qazi to author a 17,600-word screed on his website hosted by Defendant Smick, published on May 17, 2020 (the "Qazi Screed"). Entitled "Response to Frederic," it invoked Plaintiff's name at least 47 times over dozens of pages, even though Plaintiff no relation at all to *Electrek* or Frederic Lambert.

118.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading. In some cases, Defendant Qazi cropped images to deliberately mislead his readers. Defendant Qazi also linked events that were chronologically impossible and omitted key facts.

119.    On or around May 23, 2020, Defendant Qazi returned to Twitter once more via a proxy account, @WholeMarsLog, later renamed @WholeMarsBlog, set up for him by third party Scott Woods to assist with evasion of his lifetime ban. Defendant Qazi repeatedly made half-baked attempts to deflect blame onto Mr. Woods for his posts in the months that followed.

120.    On May 24, 2020, Third Row Tesla published "Episode 17" recorded on May 15, 2020, depicting Defendant Qazi wearing a shirt imprinted with a graph of TSLA's share price next to the text "Tesla $420.00," referring to Defendant Musk's false "funding secured" claim.



121.    On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID.  The male caller identified himself only as working for the law firm Quinn Emanuel in connection with the instant lawsuit and calling on behalf of Defendants Musk and Tesla.  The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his address.

122.    Upon information and belief, the caller was Defendant Qazi impersonating a lawyer in an attempt to extract information.  At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant Qazi's @WholeMarsLog Twitter account had posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

123.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short-sellers, he had decided to become one himself.

124.    On July 16, 2020, Defendant Qazi referred to the mugshot (below right) associated with his arrest in Brevard County, Florida in connection with Case No. 05-2018-CF-010519-AXXX-XX for felony possession of a controlled substance (LSD) and misdemeanor possession of cannabis—as "my photo" from the @WholeMarsBlog account (below left), which established that Defendant Qazi controlled @WholeMarsBlog, and not Scott Woods.





**MisterAnon**
@MisterAnon10

I'm a clever ghost booohhoooo

🗓 Joined June 2020



125.    On or around July 25, 2020, Defendant Qazi posted a third document entitled "F'S TESTIMONY" and a link thereto on his Smick Sites purporting to be "testimony" from a "victim" of Plaintiff.  The document was yet another compilation of Diego MasMarques, Jr.'s posts authored once again by Amelia Tracey, who had also fabricated "P'S TESTIMONY."

126.    On August 5, 2020, Defendant Qazi falsely and publicly accused Plaintiff of posting Defendant Qazi's phone number and e-mail address on the "Dark Web."

127.    On August 22, 2020, in order to cause Plaintiff worry and anxiety, Defendant Qazi began posting by name on his @WholeMarsBlog account about a female Harvard University dean who Defendant Qazi erroneously believed was a college classmate of Plaintiff's.

128.    On August 25, 2020, Defendant Qazi made a photograph of Plaintiff's parents from a newspaper article the banner image for his @WholeMarsBlog account.

129.    After Plaintiff filed his Second Amended Complaint in this action on August 26, 2020, Defendant Qazi began a full-scale assault on Plaintiff's reputation to "drag his name through the mud" as promised, using at least twelve different websites over the next several months: among them, Twitter, Hacker News, Mastadon, Quora, Reddit, Wikipedia, Amazon.com, SoundCloud, Anchor.fm, wholemars.net, vagfoundation.org, and heyamifat.com.

130.    On August 28, 2020, Defendant Qazi appeared on the "Inside Transportation" podcast.  As of January 30, 2021, the podcast had been listened to approximately 1,700 times. The interview contained a litany of lies about Plaintiff and the admission at 13:30 that Defendant Musk was "very pissed" about Defendant Qazi being banned by Twitter in October 2019.

131.    On September 19, 2020, attempting to cause Plaintiff worry and anxiety, Defendant Qazi posted threats concerning law enforcement on his @WholeMarsBlog account, warning that Plaintiff's house was "completely bugged" due to a "warrant for a wiretap."

132.    On September 22, 2020, Defendant Qazi referred to Plaintiff as "twice as evil as Trevor [Milton]" on the @WholeMarsBlog account, twelve minutes after he had referred to Milton as someone who had "mollested *[sic]* his 15 year old cousin after a funeral."

133.    On September 24, 2020, Defendant Qazi posted links on his @WholeMarsBlog

Twitter account to dangerous content authored by Diego MasMarques, Jr. and others on various gripe sites.  Plaintiff had previously informed both Defendant Qazi and his counsel of the serious danger associated with the Civil Harassment Case, and again notified counsel accordingly.

134.    On September 26, 2020, the @WholeMarsBlog Twitter account wrote "what aaron does to people is worse than murder IMHO", followed by a suggestion that Defendant Qazi was contemplating suicide.  Three days later, another cryptic suggestion appeared on @WholeMarsBlog falsely stating that Plaintiff would be responsible for Defendant Qazi's death.

135.    On October 1, 2020, a photograph of Plaintiff's mother appeared as the background image on the @WholeMarsBlog Twitter account.

136.    On October 2, 2020, Plaintiff reported Defendant Qazi to SFPD a second time for internet harassment as the frequency of his harassing posts increased.

137.    On October 4, 2020, Defendant Qazi wrote that Plaintiff was "10x worse than [alleged child molester] Trevor Milton" and called him a "Truly sick person."  Defendant Qazi's Third Row Tesla colleague and confidant, Kristen Yamamoto, echoed Defendant Qazi's false allegations, writing, "—so you're *[sic]* daughter comes to you saying Trevor molested her & you tell her 'I have a bigger problem, Aaron Greenspan.' 🙁."  Defendant Qazi also posted a photograph of Plaintiff's disabled brother as the banner image of his @WholeMarsBlog account.

138.    On October 6, 2020, it was widely reported that at the direction of Defendant Musk, Defendant Tesla had shut down its entire Public Relations department months prior, leaving Defendant Musk and Qazi's Twitter accounts as the primary sources of information on social media about Defendant Tesla, a company nominally valued at hundreds of billions of dollars.  Yet even when the Tesla Public Relations department had been "open," it frequently actively refused to answer or even acknowledge questions from journalists.

139.    On October 8, 2020, Ms. Yamamoto and Defendant Qazi recorded a podcast on the Anchor.fm platform in which Defendant Qazi referred to Plaintiff as "a giant piece of shit," "just insane," "crazy stalker guy," "delusional" and "loser."

140.    On October 9, 2020 at 11:43 P.M., from the @WholeMarsBlog Twitter account,

Defendant Qazi wrote, "So it turns out nobody is really suspicious of a Tesla driving around Fremont / someone actually nodded and waved from security" as he photographed Defendant Tesla's factory, which is private property.  In contrast, on April 19, 2019, Randeep Hothi, a researcher of similar age and skin tone to Defendant Qazi, was subject to a Workplace Violence Civil Harassment Order filed by Defendant Tesla for observing the exact same factory by day.

141.    On October 17, 2020, Defendant Qazi retweeted a post by the @OfficialABQ Twitter account containing the text "Here's a message for Greenspam" above a cartoon image of one stick figure kicking another in the groin, causing it to collapse.  Twitter later removed this post for violating its rules prohibiting users from advocating violent conduct.

142.    On October 19, 2020, an unknown party created an unverified Anchor.fm account in Plaintiff's name using Plaintiff's e-mail address, and then used the unverified account to send Defendant Qazi a recorded message *not* from Plaintiff, which Defendant Qazi then falsely and publicly cited as evidence of "harassment" by Plaintiff on his @WholeMarsBlog account.

143.    On October 26, 2020, Defendant Qazi retweeted a post referring to Plaintiff by @tesla_grl stating, "His rants are starting to sound like that of a Mass Shooter *[sic]*."

144.    In late October 2020, Twitter, Inc. published a "Ban evasion policy" at https://help.twitter.com/en/rules-and-policies/ban-evasion, clarifying that Defendant Qazi was violating the Twitter Terms of Service by continuing to use the platform, directly or indirectly.

145.    On December 6, 2020, Defendant Qazi attempted to contact a friend of Plaintiff's via LinkedIn for an unknown reason.

146.    Upon information and belief, on December 8, 2020, Defendant Qazi used the Cihwcihw Wikipedia account to exclusively edit three pages involving Plaintiff: the "PlainSite," "TSLAQ" and "Lawsuits involving Facebook" pages.  The edits contained the same misspelling of Zuckerberg as "Zuckerburg" that frequently appears in Defendant Qazi's writing.

147.    Also on or about December 8, 2020, Defendant Qazi created a new page on his personal website for "The Story," referring to his involvement with Plaintiff.  He promised readers that the saga would be told in installments, starting with an introduction that he published

on December 15, 2020.  Between December 8th and 15th, Defendant Qazi published nine additional posts he referred to as "Apetizers" *[sic]* containing false and misleading statements about Plaintiff.  Each post, whether an "Apetizer" or formally part of "The Story," contained banner advertisements intended to produce financial gain for Defendant Qazi, as well as prominent links encouraging readers to donate to Defendant Qazi's legal defense funds via GoFundMe and PayPal.  The "Apetizers" alone were collectively 200 printed pages long.

148.    From December 9-11, 2020, the Cihwcihw Wikipedia account continued to smear Plaintiff on various Wikipedia articles by inserting false and misleading changes.

149.    On December 10, 2020, Defendant Qazi left a comment on an Amazon.com review of Plaintiff's book stating in part, "The author of this book is completely nuts."

150.    On December 13, 2020, Defendant Qazi began publishing his series, "The Story," full of innumerable false and misleading statements and material omissions concerning Plaintiff.  By January 11, 2021, the existing portions of "The Story" required 303 pages to print.

151.    Above and beyond those already enumerated, Defendant Qazi wrote over 100 pages of *additional* essays containing countless false statements about Plaintiff, including but not limited to the grotesque falsehood that Plaintiff incited violence against Defendant Qazi.

152.    On January 7, 2021, with the price of TSLA common shares at or near all-time highs, Defendant Qazi celebrated his work, posting, "holy fucking shit we're all rich as fuck!!!"

## CLAIMS FOR RELIEF

### COUNT I
### Defamation Per Se
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

153.    Plaintiff incorporates by reference the foregoing allegations.

154.    Starting on January 14, 2019 and even after the date of his ban by and from Twitter, Defendants Qazi and Smick Enterprises, Inc. made use of several Twitter accounts to publish constant, deliberate misinformation about Plaintiff and Plaintiff's family.

155.    From October 11, 2019 through present day, Defendants Qazi and Smick employed a variety of domain names and websites including plainshit.com, plainshit.org,

plainsiite.org, wholemars.com, wholemars.net, wholemars.org, vagfoundation.org, and heyamifat.com to publish deliberate misinformation about Plaintiff and Plaintiff's family.

156.   Defendant Qazi made these false statements thousands of times with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-party court filings located by Plaintiff would increase or prevent any decrease in the value of TSLA shares.  He was successful: TSLA shares increased in value, he was profiled in a major financial publication in connection with Defendant Musk, many of his followers began repeating his false claims about Plaintiff, and many refused to believe anything published by Plaintiff or PlainSite.

157.   Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. explicitly encouraged others to spread false statements and disinformation about Plaintiff.

158.   Defendant Qazi explicitly encouraged others to "harass" and "prank" Plaintiff.

159.   Defendant Qazi threatened, "any attempts to silence us will only make us louder."

160.   Defendants Qazi and Smick placed banner advertisements alongside their libelous statements about Plaintiff in order to derive further profits from their lies.

161.   Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging accusations over a period of more than two years such that it is impossible to enumerate each and every one, select representative examples include:

| Statement No. / Date / Location | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1<br><br>January 14, 2019<br><br>Exhibit C at 2 | "Strange how Aaron mentions that he think *[sic]* Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium.  This statement falsely suggested a sexual attraction to Plaintiff's stalker.  That "Aaron mention[ed]" this statement on the particular website discussed in the post is provably false. |
| 2<br><br>August 8, 2019<br><br>Exhibit C at 5 | "How did Aaron Greenspan of Plainsite manage to qualify for non-profit status and avoid paying the government taxes? Is it legal to use a non-profit to stalk and harass people?" | This statement, posed as a question, falsely suggested that Plaintiff is guilty of criminal conduct.  Plaintiff pays taxes.  PlainSite's revenue is taxable and taxes are paid by Think Computer Corporation, which is a for-profit corporation.  Think Computer Foundation does not "stalk and harass |

| | | people." |
|---|---|---|
| 3<br><br>September 28, 2019<br><br>Exhibit C at 11 | "I don't even have a fax machine.  The only thing that has been revealed here is that Aaron Greenspan has child pornography at his house. I do not." | This statement explicitly and falsely accused Plaintiff of possessing child pornography, which would be a crime. The statement is provably false. |
| 4<br><br>September 28, 2019<br><br>Exhibit C at 13 | "Who do you trust: Someone like Elon who has delivered a handful of disruptive innovations to the global marketplace<br><br>or someone like Aaron Greenspan who has done nothing except lie, cheat, extort others, and claim he invented Facebook?<br><br>(guess who the media trusts more [laugh/crying emoji])" | This statement explicitly and falsely accused Plaintiff of the crime of extortion (mimicking the false allegations from the Civil Harassment Case) and goes to the crux of Defendant Qazi's goal of defending Defendant Musk against the damning facts revealed by Plaintiff.  The statement is provably false. |
| 5<br><br>September 30, 2019<br><br>Exhibit C at 15 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentioned Plaintiff and falsely accused him of fraud, and by referring to short-sellers including Plaintiff, "serious crimes."  This statement also falsely stated that Plaintiff suffers from a medical condition.  Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. Defendant Qazi twisted a lone remark Plaintiff made at a memorial service for his deceased friend, Aaron Swartz. |
| 6<br><br>October 9, 2019<br><br>Exhibit C at 16 | "Periodic reminder that Aaron Greenspan, who claims he invented Facebook (he didn't), is running a fake charity that Tesla short sellers use to illegally pool funds for propaganda efforts.<br><br>Please report his fake charity to the IRS. he is committing tax fraud." | This post explicitly mentioned Plaintiff, accused him of "running a fake charity," which is possibly a crime, and "illegally" pooling funds.  The IRS audited Think Computer Foundation and issued a Letter 5177 on March 4, 2020 indicating that there were no issues found.  Further, Plaintiff developed the initial version of "The Facebook" at Harvard College in 2003, of which Mark Zuckerberg was a user. |
| 7 | "I welcome the chance to discuss Aaron Greenspan's | This post explicitly mentioned Plaintiff and falsely accused him of "crimes." |

| | | |
|---|---|---|
| October 9, 2019<br><br>Exhibit C at 18 | conduct and crimes in front of a court and / or jury." | |
| 8<br><br>October 9, 2019<br><br>Exhibit C at 21 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentioned Plaintiff and stated that he is a "criminal guilty of felony tax fraud," which is false. Plaintiff has hired lawyers in various contexts over many years. |
| 9<br><br>October 9, 2019<br><br>Exhibit C at 22 | "no, likely just his learning disability due to aspergers" | This post was in a thread explicitly referring to Plaintiff by name. Plaintiff has never been diagnosed with Asperger syndrome or a learning disability. |
| 10<br><br>October 14, 2019<br><br>Exhibit C at 26 | "Today I received an identity theft alert from Experian.<br><br>An employee also alerted me to the fact that @AaronGreenspan's fake charity has been sending email to our mail servers.<br><br>Presumably this is some kind of retaliation attempt. Aaron, remember that if you break the law…" | From the @tesla_truth account, this post falsely implied that Plaintiff had committed "identity theft" and again accused him of running a "fake charity." Plaintiff sent three blank test e-mails to arbitrary addresses at the smick.com domain name to see if they would bounce in order to determine if Defendant Qazi was behind various fake accounts on Twitter. The test messages confirmed that he was. Sending these e-mails broke no laws. |
| 11<br><br>October 14, 2019<br><br>Exhibit C at 26 | "hey @IRSnews @IRStaxpros @SEC_Enforcement is it normal for a 501(c)(3) non-profit that is pooling donations from Tesla short sellers to retaliate against critics by committing wire fraud?<br><br>am surprised this organizations [sic] gets a tax exemption. Owner previously stole DoD documents" | From the @tesla_truth account, this post appeared in a thread specifically mentioning Plaintiff. It falsely accused Plaintiff of stealing Department of Defense documents and committing wire fraud. This statement is provably false. |
| 12<br><br>October 15, 2019<br><br>Exhibit F *passim* | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?<br><br>You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes. That the Smick Sites have *zero* actual accounts of Plaintiff committing any of the listed crimes indicates that the statements are false. Nor has Plaintiff ever committed any of the crimes listed. |

| | | |
|---|---|---|
| | Greenspan's crimes to finally bring this criminal to justice" | |
| 13<br><br>November 1, 2019<br><br>Exhibit G at 2 | "he extorted $250,000 from Mark Zuckerburg [sic]" | This statement is part of an essay on Defendant Qazi's website that explicitly names Plaintiff.  Plaintiff did not extort Mark Zuckerberg or anyone else, making this statement provably false. |
| 14<br><br>May 17, 2020<br><br>Exhibit G at 42 | "After that, I started tweeting more about Greenspan's attempts to harass, stalk and smear Tesla owners like me." | This portion of the Qazi Screed falsely alleged that Plaintiff committed crimes of harassment and stalking. |
| 15<br><br>May 25, 2020<br><br>Exhibit C at 33 | "It's time for the board of Plainsite to face justice for their crimes." | Posted on the @WholeMarsLog Twitter account, this statement conflated two different Boards of Directors and effectively accused both of committing "crimes" for posting public records that Defendant Qazi does not like.  Two minutes later, Plaintiff's father received a phone call from a blocked number about this lawsuit. |
| 16<br><br>May 25, 2020<br><br>Exhibit C at 33 | "non-profit status will be revoked when it's discovered the brand, server logs, and resources were misappropriated to inure private benefit to Aaron Greenspan" | This statement omitted both the result of the IRS audit of Think Computer Foundation and falsely suggested that posting public records is a "private benefit" to Plaintiff, when on net Plaintiff has not benefited financially from publishing public records.  On July 22, 2020, Defendant Qazi posted a court filing made available on-line because of Think Computer Foundation's litigation on his personal website, proving his own statement false. |
| 17<br><br>May 25, 2020<br><br>Exhibit C at 34 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @WholeMarsLog Twitter account, this statement falsely accused Plaintiff and his parents of various crimes. |
| 18<br><br>June 23, 2020 | "Aaron Greenspan abuses his charity to inure private benefit to himself. | From the @WholeMarsBlog Twitter account, where Defendant Qazi again falsely alleged that Plaintiff has |

| | | |
|---|---|---|
| Exhibit C at 37 | His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | committed tax crimes.  The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation, making the statement provably false. |
| 19<br><br>June 23, 2020<br><br>Exhibit C at 38 | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff.  That Plaintiff has ever threatened Defendant Qazi with anything other than the instant litigation is provably false. |
| 20<br><br>July 7, 2020<br><br>Exhibit C at 45 | "Aaron Greenspan is a criminal.<br><br>Pass it on." | From the @WholeMarsBlog Twitter account, where Defendant Qazi again falsely alleged that Plaintiff is a criminal. |
| 21<br><br>July 10, 2020<br><br>Exhibit C at 47 | "I'm sad. Greenspan has stalked me and tried to hurt me so much, it can't even fit in a tweet. He rapes his victims, entering their mind and shattering their peace when they least expect it. You can't imagine it unless you've seen it first hand." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a rapist. |
| 22<br><br>July 11, 2020<br><br>Exhibit C at 48 | "Huh, interesting.<br><br>Aaron Greenspan had servers in New Jersey.<br><br>The same place the death threat @JohnnaCrider0 got this week came from." | Here, Defendant Qazi falsely implied that Plaintiff had sent a Tesla super-fan a death threat across state lines, a criminal act, because Plaintiff's company once maintained a co-located server in New Jersey *in 2003*, which was provably de-commissioned and disconnected in March 2007. |
| 23<br><br>July 12, 2020<br><br>Exhibit G at 47 | "Even though Greenspan himself published the book, he didn't like people reading what he has to say because it establishes that he's been angry at the world and suffering from paranoid delusions since high | From Defendant Qazi's personal website in his "Aaron Greenspan Tries To Remove Book Review: How Evil People Abuse The DMCA To Silence Critics" post, in which he falsely describes Plaintiff as mentally ill. |

| | | |
|---|---|---|
| | school (or perhaps earlier)." | |
| 24<br><br>July 17, 2020<br><br>Exhibit C at 49 | "Aaron Greenspan is a serial rapist.<br><br>He enters his victims *[sic]* lives unannounced and unexpected, and rapes them while they're going about their lives, with their friends<br><br>You can't understand it unless you've been targeted by him. I will fight for all his victims — past and future." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a serial rapist. |
| 25<br><br>July 17, 2020<br><br>Exhibit C at 50 | "saying that he harasses and threatens people just doesn't communicate the kind of person he is<br><br>he's a rapist<br><br>and the world will know the truth, no matter how hard he fights to keep it quiet" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely claimed that Plaintiff is a rapist and insisted that it was the "truth." |
| 26<br><br>July 18, 2020<br><br>Exhibit C at 51 | "Aaron Greenspan stalks and harasses colleged *[sic]* aged girls!  Creepy!  Leave her alone!<br><br>@jack @Twitter Safety" | In this post, Defendant Qazi accused Plaintiff of harassment and stalking and flagged Twitter's safety team because Plaintiff wrote a single comment on the absurdity of a Third Row Tesla member publicly defending billionaire Jack Dorsey against outrage over Twitter (and @ElonMusk) being hacked. |
| 27<br><br>August 3, 2020<br><br>Exhibit C at 52 | "Scary. someone tried to hack into Omar's iCloud account, so it got locked and he had to reset the password.<br><br>Added to the Greenspan criminal activity file…" | Defendant Qazi falsely accused Plaintiff of breaking into his iCloud account and of being a "criminal" as a result. Plaintiff has never made any attempt of any kind to break into Defendant Qazi's accounts on any platform.  This statement is provably false via server logs. |
| 28<br><br>August 21, 2020<br><br>Exhibit C at 54 | "Motives and profile of a Cyberstalker like Aaron Greenspan" [image of excerpt from "Motives and profile" section of Wikipedia article at https://en.wikipedia.org/wiki/ | In this post, Defendant Qazi again falsely accused Plaintiff of the crime of "stalking" for a variety of completely inapplicable reasons.  This is yet another example of Defendant Qazi projecting his own pathological obsession with and |

| | Cyberstalking] | stalking of Plaintiff. |
|---|---|---|
| 29<br><br>August 21, 2020<br><br>Exhibit C at 55 | "Based on his cyberstalking and false police reports we have a good case to put him away for 5 and a half years" | In this post, Defendant Qazi again falsely accused Plaintiff of the crimes of "stalking" and filing a false police report, suggesting that Plaintiff would be incarcerated as a result. No criminal case against Plaintiff even exists. |
| 30<br><br>November 30, 2020<br><br>Exhibit G at 56 | "Recently Martin Tripp has been working with Aaron Jacob Greenspan to threaten, harass and doxx Tesla customers." | This statement is baseless and false in several ways: Plaintiff has not ever "worked" with Martin Tripp, nor has Plaintiff ever taken any action against "Tesla customers." |
| 31<br><br>December 7, 2020<br><br>Exhibit C at 57-58 | "While researching the Aaron Greenspan story we've uncovered shocking evidence of massive fraud."<br><br>"we're talking about major organized criminal activity… this is some messed up stuff" | In two separate posts, both of which readers understood to refer to Plaintiff, Defendant Qazi falsely accused Plaintiff of unspecified "major organized criminal activity" and "massive fraud." |
| 32<br><br>December 8, 2020<br><br>Exhibit G at 57 | "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" | Defendant Qazi falsely claimed that Plaintiff was stealing passwords, a possible violation of 18 U.S.C. § 1030. In reality, Plaintiff's product was secure and Harvard administrators were misinformed by an overzealous student. |
| 33<br><br>December 8, 2020<br><br>Exhibit G at 60, 70, 74 | "I am trying to diagnose his various mental conditions, and believe he may have narcissistic personality disorder…"<br><br>"What a psychopath."<br><br>"Aaron Greenspan clearly has serious mental health and anger issues that continue to this day." | From Defendant Qazi's personal website in his "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" post, in which Defendant Qazi, who is neither a doctor nor qualified to offer a diagnosis in any way, again falsely portrays Plaintiff as mentally ill. |
| 34<br><br>December 8, 2020<br><br>Exhibit G at 63 | "Given what we know about Aaron obsessively logging and storing all activity on his servers to try and use as blackmail, you can bet students were compromised the minute they signed up." | In this post, Defendant Qazi falsely accuses Plaintiff of having committed the crime of blackmail. |
| 35 | "Aaron Greenspan has been lying to everyone for decades... | In this post, Defendant Qazi again falsely accuses Plaintiff of committing |

| December 8, 2020<br><br>Exhibit G at 66 | When he denies the crimes he's committing today, remember how he acted when the school asked him to **simply stop collecting student's** *[sic]* **login credentials.**" (emphasis in original) | "crimes" and "lying to everyone for decades." |
|---|---|---|
| 36<br><br>December 9, 2020<br><br>Exhibit G at 76 | "Greenspan has also admitted to anger issues that are completely out of control, driving him to seek revenge for even small or imagined slights." | In this post, Defendant Qazi again falsely portrays Plaintiff as mentally ill. This is textbook projection based on Defendant Qazi's self-described "out of control revenge impulse." There was no such admission by Plaintiff. |
| 37<br><br>December 9, 2020<br><br>Exhibit G at 76 | "…FaceCash was shut down for violating financial regulations." | Here, Defendant Qazi falsely suggests that Plaintiff violated 18 U.S.C. § 1960. In fact, Plaintiff's company voluntarily shut down FaceCash *before* any violation could occur to ensure compliance with the law. |
| 38<br><br>January 13, 2021<br><br>Exhibit G at 80 | "Aaron Greenspan has admitted that he is willing to resort to violence to silence us if his attempts at non-violent retaliation fail." | This assertion is completely false as no such admission or anything resembling such an admission was ever made. |

162.     In addition, on October 9, 2019, on a public forum, Defendant Qazi intentionally and maliciously republished the Musk Reply e-mail, in a manner divorced from this litigation.

163.     Defendant Qazi's persistent lies kicked off a chain of libel by his followers, who publicly referred to Plaintiff as a "psychopathic incel" and a likely "mass shooter."

164.     Defendant Qazi's written and verbal false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of this action.

165.     On October 19, 2019, Defendant Qazi stated, "I want everyone to know the true facts about who he really is," and on August 24, 2020, Defendant Qazi admitted that he frequently posts material on his Twitter accounts intended to be interpreted as fact, writing, "I trust you guys to be smart enough to figure out what's fact and speculation."

166.     Defendant Qazi's thousands of aspersions demonizing Plaintiff—none of which addressed a single one of Plaintiff's substantive concerns regarding Defendant Tesla's business

practices—were interpreted by readers statements of fact.  On October 9, 2020, one reader even
replied to a @WholeMarsBlog post with a video clip of man holding up a sign that simply reads
"#FACTS."  In addition to using a Twitter account containing the word "truth" to make
statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on
Twitter and via the Smick Sites to complete IRS Form 13909 in order to file false reports
echoing the conspiracy theories already submitted by Diego MasMarques, Jr.  *See* Exhibit E.

167.    Communications with the IRS are regulated by federal law and are required to be
factual.  Defendant Qazi also frequently tagged government agencies' Twitter accounts in posts.

168.    Think Computer Foundation's status with the IRS was and is easily verifiable on
the IRS website.  Think Computer Foundation also publishes comprehensive disclosures about
its involvement with PlainSite on the PlainSite website, which Defendant Qazi willfully ignored.

169.    On January 29, 2021, Defendant Qazi posted a heavily altered photograph of
Plaintiff that elicited replies from readers such as "ugly as shit" and "Stay safe out there!"

170.    From Twitter and his Smick Sites, Defendant Qazi published links to libelous
and/or pornographic material with the intent of poisoning search results concerning Plaintiff.

171.    Defendant Qazi's false and misleading statements concerning Plaintiff, whether
written or verbal, were not in service of and failed to further any public debate.

172.    Defendant Qazi's false and misleading statements, written and verbal, have
irreparably harmed Plaintiff's reputation, which Plaintiff had worked to rebuild for years on
account of the Civil Harassment Case and past libel involving the origins of Facebook, Inc.

**COUNT II**
**Libel Per Se**
**Against Defendants Elon Musk and Tesla, Inc.**

173.    Plaintiff incorporates by reference the foregoing allegations.

174.    In his December 9, 2018 CBS *60 Minutes* interview (the "60 Minutes Interview"),
Defendant Musk admitted on air to journalist Lesley Stahl that he did at times "use [his] tweeting
to kind of get back at critics" and that "I guess we might make some mistakes.  Who knows?"

175.    Defendant Musk is vicariously liable for all libelous statements published by

Defendant Qazi concerning Plaintiff from at least as early as August, 2019, the date that Defendant Musk was quoted in *Bloomberg Businessweek* as having told Defendant Qazi, "Your Twitter is awesome!"  This wholesale endorsement of Defendant Qazi's statements up to that point amplified their effect and encouraged untold thousands of readers to correctly believe that Defendant Qazi's statements, positive and negative, were completely supported by Defendant Musk—now the richest man on Earth and perceived by many to be the definition of success.

176.    To the extent that Defendant Musk was aware of Defendant Qazi's Twitter account(s), but especially the @tesla_truth account, it would have been impossible for Defendant Musk not to be aware of the libelous and harassing content it frequently posted on a daily basis.

177.    Defendant Musk was already aware of the controversy surrounding Defendant Qazi as he and Tesla's Board of Directors had received an e-mail from Plaintiff about Defendant Qazi on August 7, 2019.  It also would have been impossible for the @tesla_truth Twitter account to continue using the TESLA trademark in its name without Defendant Musk's consent.

178.    To the extent that Defendant Musk was unaware that his communications with Defendant Qazi would be quoted in the *Bloomberg Businessweek* article, he was given the opportunity to comment by its author, Zachary Mider.  As the article states, "Tesla has legions of die-hard fans, many of them well-to-do, tech-obsessed, and male.  Qazi is pretty close to the archetype.  His Twitter handle, @tesla_truth, is a bottomless font of Muskolatry.  Before we met in August, he'd emailed Musk to give him a heads-up and encourage him to speak with me."  Therefore, Defendant Musk was aware that the potential article would involve Defendant Qazi and at least one of Defendant Qazi's libel-spewing Twitter accounts, @tesla_truth.  Yet Defendant Musk made absolutely no effort to distance himself from Defendant Qazi's statements or to qualify them in any way.  Instead, he called them "awesome."

179.    The @ElonMusk Twitter account is disclosed as a source of factual "material information" in Defendant Tesla's SEC Form 8-K filed November 5, 2013.  *See* Exhibit K.

180.    The October 9, 2019 Musk Reply was sent on behalf of Defendants Tesla and Musk.  In the initial SEC Consent Decree, Defendant Musk agreed to "comply with all

mandatory procedures implemented by Tesla, Inc. [] regarding (i) the oversight of communications relating to the Company made in any format…"

181.    Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever been diagnosed with any mental disorder.  Plaintiff provably does not live in and has never been admitted to a psychological unit for clinical evaluation, nor has Plaintiff ever visited with a mental health professional in a clinical setting except to assist with his brother's acute condition.

182.    In addition to those statements for which Defendant Musk is vicariously liable, Defendant Musk himself published the following libelous statements about Plaintiff:

| Statement No. / Date / Medium | Written Statement by Defendant Musk | Pending Legal Review | Public Forum / Interest |
|---|---|---|---|
| 39<br><br>October 9, 2019 / E-Mail and Twitter via Qazi | "Does the psych ward know you have a cell phone? Just curious." | No | Twitter Only / No |
| 40<br><br>October 12, 2019 / Twitter | ".@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" | No | Yes / No |
| 41<br><br>October 22, 2019 / E-Mail | "Jack, what Omar is saying is accurate to the best of my knowledge. There has been an orchestrated attempt to drive down Tesla stock through social media, particularly Twitter. This always increases around our earnings call, which is this afternoon.<br><br>Aaron Greenspan in particular has major issues. He's the same nut but *[sic]* that claimed he was the founder of Facebook and sued Zuckerberg, among many other things." | No | No / No |
| 42<br><br>July 3, 2020 / Twitter | "Greenspan is crackers, bananas, barky & ten cards short of a full deck" | No | Yes / No |

183.    On October 9, 2019 at 3:48 P.M., Defendant Musk authored and sent the Musk Reply e-mail on behalf of himself and Defendant Tesla to numerous parties including Defendant Qazi, who Defendant Musk knew or should have known would immediately republish his message publicly, falsely describing Plaintiff as residing in a "psych ward."

184.    Due to Defendant Musk's recklessness, the Musk Reply and his subsequent response was copied to an official at the SEC—a federal government agency that had already fined Defendant Musk $20 million dollars for making false statements—suggesting to any objective reader that the communication should be interpreted as a statement of fact.

185.    Defendant Musk's statement was interpreted as factual by an enormous number of his and Defendant Qazi's followers, who have continued to harass Plaintiff and repeat false claims calling Plaintiff's mental health into question ever since.

186.    By including the Twitter handle of the owner of the *Los Angeles Times*, Dr. Patrick Soon-Shiong, in his October 12, 2019 post, Defendant Musk ensured that Dr. Soon-Shiong would receive an alert about the post on his mobile device(s).  Deliberately bringing the owner of a major newspaper into the conversation falsely suggested that the substance of the statement was factual and worth reporting on.

187.    Defendant Musk's Twitter account is "verified."  As a result, the account and its posts feature a small white check mark in a blue seal wherever it appears.  Many Twitter users incorrectly interpret this icon to mean that an account's content is factually accurate.

188.    As running a "fake charity" is a crime under certain statutes, Defendant Musk accused Plaintiff of committing a crime.

189.    Defendant Musk's aspersions concerning Plaintiff were made as conclusory statements of fact.  In addition, Think Computer Foundation's status with the IRS is easily verifiable on the IRS website and the Foundation publishes comprehensive disclosures.

190.    Many of Defendant Musk's followers reacted as though Defendant Musk's false statements concerning Plaintiff were completely factual.  @sara_boutall wrote, "This fake charity is terrifying."  Twitter user @TTwfake wrote, "I've submitted a complaint to the IRS."

191.    One of Defendant Musk's followers, Iqtidar Ali, quickly wrote an entire article on Xautoworld based directly on Defendant Musk's response.  This article encouraged and provided a link to readers to report Plaintiff to the IRS.

192.    With his October 22, 2019 reply to an e-mail from Defendant Qazi, Defendant

1   Musk likely intended to assist Defendant Qazi with restoring his then-suspended Twitter

2   account—a matter so important to Defendant Tesla as to necessitate its CEO's involvement—

3   referring to Plaintiff explicitly by name as a "nut" who suffered from "major issues," falsely

4   suggesting that Plaintiff suffered from a psychiatric illness.

5          193.    The e-mail from Defendant Musk to Jack Dorsey began by immediately

6   discussing whether Defendant Qazi's unknown statements were "accurate," leading any reader to

7   believe what followed would involve factual matters.

8          194.    The statement that Plaintiff "sued [Mark] Zuckerberg," the CEO of Facebook,

9   Inc. and Plaintiff's Harvard classmate, is both false and misleading in what it omits.  It is false

10  because to date, Plaintiff has never sued Mark Zuckerberg.  In 2008 and 2009, Plaintiff's

11  company filed two trademark cancellation proceedings against Facebook, Inc. before the United

12  States Patent and Trademark Office Trademark Trial and Appeal Board, in which Plaintiff's

13  company was found to have standing.  It is misleading because it omits that as a result,

14  Facebook, Inc. and Mark Zuckerberg reached a confidential settlement with Plaintiff.

15         195.    Defendant Musk's provably false and misleading statements concerning Plaintiff

16  were not in service of and failed to further any public debate, or part of any debate at all.

17         196.    Defendant Musk's false statements were made with actual malice because Musk

18  knew the statements were false and/or made the statements with reckless disregard for the truth.

19         197.    Defendant Musk's false statements about Plaintiff are part of a clear pattern.  In

20  2018, Defendant Musk was sued for libel after publicly referring to a critic as a "pedo guy" and a

21  "child rapist" who had supposedly moved to Thailand "for a child bride."  In January 2021, an

22  Alameda County judge refused to dismiss Randeep Hothi's libel claim against Defendant Musk.

23         198.    On or around August 21, 2018, Defendant Musk e-mailed his former public

24  relations consultant, Juleanna Glover—CCing his brother and co-Director Kimbal and former

25  Global Communications Director Dave Arnold—"Will Tweet as I wish and suffer the

26  consequences. So it goes."  Defendant Musk thus affirmed his reckless disregard for the truth.

27         199.    None of Defendant Musk's statements concerning Plaintiff were ever deleted,

28

retracted, or the subject of an apology.  The fact that Defendant Musk disparaged Plaintiff before government agents and the CEO of Twitter alike indicates that his statements were intentional.

200.     On July 3, 2020, in order to draw attention to Defendant Qazi's solicitation for legal defense funds, Defendant Musk doubled down on the false narrative that Plaintiff is mentally ill by posting that Plaintiff is, "crackers, bananas, barky & ten cards short of a full deck."  The post garnered at least 317 replies, 297 retweets, and 5,671 Twitter "likes."

201.     *The Verge* has described Defendant Musk's followers as an "army of irregulars waiting to be marshaled," and Defendant Musk exploits this fact.  If he tweets about a crypto-currency or a stock, his followers buy it.  When he tweets about a person he dislikes, they attack.

202.     Many individuals reading Defendant Musk's July 3, 2020 post interpreted it as a statement of fact meaning that Plaintiff is mentally ill.  Responses included "He needs medical help," references to Plaintiff as "psychotic," and multiple suggestions that Plaintiff should be used as "practice" for Defendant Musk's non-FDA approved, non-peer-reviewed Neuralink brain implant device.  After July 3, 2020, a search for Plaintiff's name on Twitter began yielding one auto-complete suggestion other than his name itself: "aaron greenspan crazy."

203.     Defendant Musk's false and misleading statements, in some cases disseminated to over 30 million Twitter accounts, have irreparably harmed Plaintiff's reputation.

**COUNT III**
**Violation of the California Civil Anti-Stalking Statute**
**(California Civil Code § 1708.7, et seq.)**
**Against Defendants Omar Qazi, Elon Musk and Tesla, Inc.**

204.     Plaintiff incorporates by reference the foregoing allegations.

205.     Starting on January 14, 2019, Defendant Qazi began following, alarming, and harassing Plaintiff through a pattern of conduct involving his use of multiple Twitter accounts, prank telephone calls, false accusations regarding rape and possession of child pornography, and republication of deliberately altered court documents.  These actions also led to the transmission of additional false allegations regarding child pornography via text message and fax to Plaintiff.

206.     As early as January 14, 2019, Plaintiff requested that Defendant Qazi stop his harassing conduct, writing "Please stop." at 12:36 P.M.  Plaintiff also asked Defendant Qazi to

stop by leaving a message for him to stop at his nominal employer's office on the same day.

207.    As early as January 17, 2019, Defendant Qazi admitted his intent to "fuck with" Plaintiff to an unknown third party.

208.    On February 9, 2021, Twitter found that the @WholeMarsBlog account had violated the Twitter Rules "against promoting or encouraging suicide or self-harm" regarding Plaintiff.  Previously, Twitter had removed content the account posted as it advocated violence.

209.    Defendant Qazi literally "violated" Plaintiff's civil harassment restraining order, having admitted to altering, misconstruing and publicly posting Form CH-100 from the Civil Harassment Case for the express purpose of "harassing" Plaintiff, in which he was successful.

210.    Upon information and belief, Defendant Qazi personally communicated with both the restrained party in the Civil Harassment Case and Defendant Musk and agreed to assist them by serving as a conduit for harassment toward Plaintiff, forming a conspiracy to violate the temporary and permanent restraining orders therein which prohibit indirect harassment.

211.    As a result of Defendant Qazi's public conduct and his apparent contact with the restrained party in the Civil Harassment Case, Plaintiff reasonably feared for his and his family's safety after receiving messages, text messages and calls that he and others perceived as threats. As a result, Plaintiff reported Defendant Qazi to the FBI and to SFPD twice.

212.    Since at least as early as August 2019, Defendant Qazi has acted as the ostensible agent of Defendants Musk and/or Tesla, enjoying special treatment from Defendant Musk.

213.    Even after Plaintiff restricted his personal Twitter account in July 2020 due to Defendant Qazi's ceaseless harassment—the digital equivalent of locking a door—Defendant Qazi still used a fake account to follow it and to post screenshots and metadata to his followers, brazenly displaying the padlock icon next to Plaintiff's name in numerous images.

214.    Defendant Qazi posted harassing messages on social media regarding Plaintiff and Plaintiff's family on the order of 1,000 times from different accounts, causing a cascade of harassment that has yet to cease.  With tens of millions of followers, Defendant Musk achieved the same effect with only a few posts on social media.

215.     Defendant Tesla, directly and through Excession LLC, employs and contracts with numerous individuals with prior experience in the intelligence community to monitor those the company perceives to be "threats," including critics and whistleblowers.  For example, Defendant Tesla employed Karl Wagner, a 29-year Central Intelligence Agency ("CIA") veteran who was previously the Agency's chief of Counter-Intelligence Operations.  Defendant Tesla also employs Lisa Rager, who was previously a CIA Targeting Officer.  Julia Jolie, Emergency Management Global Program Manager at Tesla, was a Special Agent with the FBI.

216.     Defendants Musk and Tesla have a history of relying upon private investigators, super-fans with no formal corporate affiliation, and even convicted felons to provide intelligence on critics—often fabricated nonsense—to Defendant Musk and the company's legal team.

217.     Upon information and belief, Defendants Musk and Tesla have ordered that Plaintiff be surveilled, investigated and/or baselessly referred to law enforcement.

218.     Defendants Musk and Tesla incited, explicitly encouraged, approved of, and personally contributed to Defendant Qazi's harassing actions on multiple occasions.

219.     Defendant Musk personally e-mailed the CEO of Twitter, Inc. on behalf of Defendant Qazi, his agent, to ensure that harassment of Plaintiff would continue unabated.

220.     Defendant Musk ensured that Plaintiff's message to the Board of Directors of Defendant Tesla regarding Defendant Qazi's harassment received no response.

221.     Upon information and belief, had Defendants Musk or Tesla instructed Defendant Qazi to stop harassing Plaintiff and others, Defendant Qazi would have listened to them and stopped.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

222.     Plaintiff seeks equitable relief, including but not limited to damages in the form of general damages, special damages and punitive damages pursuant to Cal. Civil Code § 3294.

223.     Plaintiff respectfully requests an injunction requiring: a) all Defendants to cease and desist making and/or publishing further harassing statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; b) all Defendants to cease and desist contacting or trying to contact Plaintiff, his family members, his friends, and any person

mentioned by name as having known Plaintiff in Plaintiff's public writing; c) all Defendants to cease and desist impersonating others; d) the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Site domain names to Plaintiff; e) Defendant Qazi to cease and desist using Twitter, directly or indirectly; and f) Defendant Qazi to permanently remove any and all of his content mentioning Plaintiff from any and all websites under his control.

<div align="center">

**COUNT IV**
**Copyright Infringement (17 U.S.C. § 501, *et seq.*)**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

</div>

224.    Plaintiff incorporates by reference the foregoing allegations.

225.    In 2008, Plaintiff authored a book, *Authoritas: One Student's Harvard Admissions and the Founding of the Facebook Era*, ISBN 978-1-60669-000-0 ("Authoritas").  Authoritas is an original, creative, copyrighted work whose copyright was registered with the United States Copyright Office on June 7, 2008 and assigned Registration No. TX 6-890-602.  *See* Exhibit H.

226.    Without permission, Defendant Qazi posted photographs of pages and extended passages from Authoritas on his Twitter accounts and websites, taken from the most important parts of Authoritas, with the intent of defaming Plaintiff and harming the market for the book.

227.    The heart of Authoritas is the portion of the book that focuses on the circumstances at Harvard College that gave rise to Plaintiff's development of "The Facebook" in late 2003, approximately covering pages 146-285 in the hardcover edition.

228.    Defendant Qazi infringed Plaintiff's rights in Authoritas willfully and repeatedly:

| Date / Medium | Defendant Qazi's Actions |
|---|---|
| October 4, 2019<br><br>Twitter | Posted at least six photographs from pages 149, 150, 151, and 187, as well as about a dozen quotes, mostly verbatim, from pages 9 (three quotes), 20, 31, 33 (two quotes), 34 (two quotes), 39, 194, 203, and 271. |
| July 10, 2020<br><br>Twitter | Posted at least 14 images of full pages or parts of pages from the Kindle edition of the book with minimal commentary on each, such as, "Imagine having Aaron Greenspan as your son." |
| July 11, 2020 ("First Fake Review")<br><br>Website | Posted a purported "review" of Authoritas entitled, "Choice Moments from Aaron Greenspan's Autobiography" and shared a link on Twitter with the caption, "I read Aaron Greenspan's life story so you don't have to.  Here are the best moments: @elonmusk".  Over time, Defendant Qazi posted the First Fake Review at three different URLs to evade copyright law.  The First Fake Review consisted of 31 screenshots of Authoritas, some |

| | containing 1-2 entire pages, with a photograph of Plaintiff at the top.  The bulk of the First Fake Review constituted about 10% of Authoritas's pages. |
|---|---|
| December 8, 2020 ("Second Fake Review")<br><br>Website | Posted a false and misleading 8,524-word essay on his personal website entitled, "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" containing over 30 verbatim passages—over 5,000 words, or approximately 60% of the essay—copied and pasted from the heart of Authoritas. |
| January 11, 2021 ("Third Fake Review")<br><br>Website | Published a false and misleading 45,406-word essay entitled, "Chapter 7: Who Is Aaron Greenspan?" containing 93 mentions of "Authoritas" and 73 block quote citations, many spanning several paragraphs from the book, such that readers would find its purchase completely unnecessary. |

229.    Defendant Qazi's infringing content was not parody, not written in the style of Authoritas, often barely engaged at all with any of the book's content, was not in any way transformative, and was not in any way intended for educational use as evidenced by his use of expletives.  It was merely a vehicle to attack and attempt to shame Plaintiff, reflecting Defendant Qazi's desire to do as little creative work as possible and to harm the market for Authoritas.

230.    Defendant Qazi's sparse and misleading satire alongside Authoritas offered nothing apart from pointed attacks on Plaintiff and was often not even written in full sentences.

231.    To the extent that Defendant Qazi altered quotations, he fit them into Twitter's limit of 280 characters per post, but added no new creative aspect whatsoever.

232.    By posting segments of Authoritas and satirizing Plaintiff, Defendant Qazi sought to use Plaintiff's own words against him for commercial gain by smearing Plaintiff's research on Defendant Tesla, in turn mitigating any potential negative impact to the value of TSLA shares.

233.    Plaintiff has not licensed use of Authoritas to Defendants or assigned any of his exclusive rights in his copyrights to Defendants.

234.    Defendant Qazi willfully moved his infringing content outside of the United States to evade compliance with copyright law.  In sequence, the First Fake Review was hosted on servers owned by Automattic, Inc.; Linode LLC; hostkey.ru in Moscow, Russia ("protected" by Cloudflare); and Neterra Telecommunications, a Bulgarian company with servers in or around Kiev, Ukraine.  Some images of Authoritas are still hosted by Automattic, Inc.

235.    Defendant Qazi's cat-and-mouse game using material he knew to be copyrighted

and his October 9, 2019 statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" collectively demonstrate that his actions were both willful and not fair use.

236.    Defendant Qazi re-published material from at least pages 9, 20, 30, 31, 33, 34, 39, 40, 89, 90, 100, 101, 121, 130, 131, 132, 137, 149, 150, 151, 187, 194, 203, 204, 239, 240, 271, 290, 291, 300, 302, 303, 306, 311, 314, and 315 of Authoritas (as measured by the hardcover edition)—36 pages in all, more than 10% of the book, and far in excess of 1,000 words.

237.    Plaintiff suffered irreparable damage to his reputation and goodwill as a result of Defendant Qazi's repeated, willful infringements.  Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), which should be enhanced in accordance with 17 U.S.C. § 504(c)(2) due to Defendant Qazi's willful conduct.

<div align="center">

**COUNT V**
**Removal of Copyright Management Information in Violation of the DMCA**
**(17 U.S.C. § 1202(b))**
**Against Defendants Omar Qazi and Smick Enterprises, Inc.**

</div>

238.    Plaintiff incorporates by reference the foregoing allegations.

239.    17 U.S.C. § 1202(b) prohibits removal or alteration of copyright management information ("CMI").  CMI includes "[t]he name of, and other identifying information about, the author of a work," as well as "links to such information." 17 U.S.C. § 1202(c).

240.    Without permission, and after receiving several DMCA takedown notices, Defendant Qazi repeatedly posted a photograph of Plaintiff wearing a purple shirt (the "Purple Shirt Photograph") without the copyright notice clearly found where he obtained it.  Each republication of the photograph constituted a separate violation of the DMCA.

241.    The Purple Shirt Photograph is an original copyrighted work whose copyright was registered with the United States Copyright Office on July 18, 2020 and assigned Registration No. VA-2-215-227.  *See* Exhibit H.

242.    The copyright notice at http://www.aarongreenspan.com/about/ read "Copyright © 2001-2017 Aaron Greenspan. All Rights Reserved."  This notice constituted CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

243.    As of July 19, 2020, the Purple Shirt Photograph itself posted at

http://www.aarongreenspan.com/about/ contained a small text block in the bottom right corner of the photograph itself reading "Copyright © 2016 Aaron Greenspan." and International Press Telecommunications Council (IPTC) XMP metadata concerning the image's copyright status reading, "Copyright Notice: Copyright © 2016 Aaron Greenspan. All Rights Reserved."

244. On July 29, 2020, Defendant Qazi willfully re-posted the Purple Shirt Photograph without any CMI on a server and WordPress-powered website hosted in or around Kiev, Ukraine at http://kidneystone.vagfoundation.org.

245. WordPress presents website publishers with fields for image metadata, including a field called "copyright." These fields are presented on many WordPress sites, including Defendant Qazi's sites, in a Hypertext Markup Language (HTML) attribute called "data-image-meta." That attribute at http://kidneystone.vagfoundation.org included a null "copyright" field.

246. On January 6, 2021, Defendant Qazi willfully published additional copies of the Purple Shirt Photograph on his website without any CMI on two pages: one page entitled, "Aaron Greenspan Wearing A Purple Shirt;" and another entitled "Worst Guy Ever."

247. On or about January 9, 2021, and yet again on January 13, 2021, Defendant Qazi willfully re-posted the Purple Shirt Photograph without any CMI on servers outside the United States, the second time on a page also containing confidential proposed settlement materials.

**COUNT VI**
**DMCA Misrepresentation (17 U.S.C. § 512(f))**
**Against Defendant Omar Qazi**

248. Plaintiff incorporates by reference the foregoing allegations.

249. On November 4, 2019, as CEO of Defendant Smick, Defendant Qazi submitted a false DMCA Takedown Notice issued under the authority of 17 U.S.C. § 512 to Twitter, Inc. regarding an August 7, 2019 post authored by Plaintiff on the @PlainSite Twitter account. The post contained a hyperlink to the Autopilot Moving Violation Video.

250. Defendant Qazi created a website also on November 4, 2019 to purportedly show that the Autopilot Moving Violation Video was subject to copyright. In his false DMCA Takedown Notice he stated in part, "This user has been cyberstalking and harassing me since

---

THIRD SUPPLEMENTAL AND AMENDED
COMPLAINT

45

3:20-cv-03426-JD

January. In the linked tweet, he admits to illegally downloading and redistributing my copyrighted work." This statement was false. No stalking, harassment or admission took place.

251. Plaintiff's hyperlink on Twitter to the Autopilot Moving Violation Video was part of a journalistic endeavor that falls squarely under fair use doctrine, consistent with Plaintiff's prior reporting on and Freedom of Information Act requests involving Tesla Autopilot.

252. Defendant Qazi's false November 4, 2019 DMCA Takedown Notice contained an invalid physical address, contained a false characterization of Plaintiff's post, and falsely stated, "I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law" as well as, "The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner," even though the information was not accurate for all of the above reasons.

253. Plaintiff sent DMCA Notices regarding Defendant Qazi's willful re-publication of Authoritas on a server controlled by Automattic, Inc. on or around July 12, 2020; and on a server controlled by Linode LLC on or around July 17, 2020. Defendant Qazi sent Counter-Notices.

254. In his July 16, 2020 DMCA Counter-Notice delivered via Automattic, Inc. pursuant to 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented under penalty of perjury that he had a "good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled."

255. Defendant Qazi's July 18, 2020 DMCA Counter-Notice delivered via Linode LLC, issued under the authority of 17 U.S.C. § 512, knowingly and materially misrepresented under penalty of perjury that the publication of his infringing content was "fair use."

256. On September 18, 2020, as CEO of Defendant Smick, Defendant Qazi again filed a false DMCA Takedown Notice with Twitter, Inc. involving the Autopilot Moving Violation Video. He claimed that "A photograph of my car" posted on the @PlainSite account on August 2, 2019—over a year prior—was suddenly subject to copyright despite no notice to that effect.

257. As before, Plaintiff's re-publication of the photograph of Defendant Qazi's Tesla Model 3, which matched the vehicle depicted in the Autopilot Moving Violation Video, was a

journalistic endeavor regarding public safety that falls squarely under fair use doctrine.

258.    Defendant Qazi's September 18, 2020 DMCA Takedown Notice falsely stated, "I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law" as well as, "The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner," even though the information was not accurate for all of the above reasons.

259.    On January 5, 2021, as CEO of "Whole Mars Catalog," Defendant Qazi filed a false DMCA Takedown Notice with Twitter, Inc.  The image, depicting a shareholder fundraising website for Defendant Smick, contained no copyright notice and is not registered with the United States Copyright Office.  The false DMCA Takedown Notice, stated in part:

> "I am providing this notice in good faith and with the reasonable belief that rights I own are being infringed.

> Under the penalty of perjury I certify that the information contained in the notification is both true and accurate, and I have the authority to act on behalf of the owner of the copyright(s) involved."

260.    Yet again, Plaintiff's publication of news concerning Defendant Qazi's attempt to raise funds for Defendant Smick fell squarely under fair use doctrine.

261.    Defendant Qazi's aforementioned works were not copyrighted, or if they were, the copyright of each was not infringed, making his certifications under penalty of perjury false.

262.    On multiple occasions, Twitter, Inc. removed content from the @PlainSite account based on Defendant Qazi's false representations and failed to process Counter-Notices.

263.    Plaintiff seeks statutory damages for Defendants' DMCA violations.

## COUNT VII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Elon Musk and Tesla, Inc.

264.    Plaintiff incorporates by reference the foregoing allegations.

265.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: a) defendants made public misrepresentations or failed to disclose facts; b) the omissions and misrepresentations were material; c) TSLA securities were

and are traded in efficient markets; d) TSLA shares were and are liquid and trade with moderate to heavy volume, with an average volume of over 40 million shares traded daily according to NASDAQ; e) Defendant Tesla traded and trades on the NASDAQ, and was and is covered by multiple analysts; f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of TSLA securities; and g) Plaintiff purchased, sold, or endured the expiration of TSLA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed (if ever), without knowledge of the omitted or misrepresented facts.

266.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tesla who knew that those statements were false when made.

267.   On a quarterly basis, Defendant Musk and/or Tesla's Chief Financial Officer signs SEC Forms 10-Q and 10-K, including financial statements issued by Defendant Tesla. These SEC Forms 10-Q and 10-K also contain certifications pursuant to the Sarbanes-Oxley Act of 2002, stating that the financial information contained therein is accurate and discloses any material changes to Defendant Tesla's internal control over financial reporting.  *See* Exhibit K.

268.   Despite these legal safeguards, Defendants Musk and Tesla have repeatedly misled investors about Tesla's cash position in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Dates / Liable Parties | Description / Supporting Evidence |
|---|---|
| 1<br><br>November 2, 2018<br>(Q3 2018 10-Q),<br>February 19, 2019<br>(2018 10-K),<br>April 29, 2019<br>(Q1 2019 10-Q),<br>July 29, 2019<br>(Q2 2019 10-Q),<br>October 29, 2019<br>(Q3 2019 10-Q),<br>February 13, 2020<br>(2019 10-K),<br>April 28, 2020<br>(2019 10-K/A),<br>April 30, 2020<br>(Q1 2020 10-Q)<br><br>Elon Musk,<br>Zachary Kirkhorn, Deepak Ahuja | *Omission:* failing to disclose that Defendant Tesla was using a variety of accounting tricks, such as repeatedly drawing down its credit lines on or around the last day of the quarter, to artificially inflate its cash balances for disclosure purposes in each SEC Form 10-Q or 10-K, as appropriate.<br><br>*Statement(s) Made Misleading:* All balance sheet, income statement and statement of cash flows ("financial statement") figures and references thereto associated with "cash and cash equivalents" in disclosures.<br><br>*Supporting Evidence:* According to a March 5, 2019 *Financial Times* article, the actual cash interest yield reported in Defendant Tesla's financial statements suggests that the company began exaggerating its cash balances starting in Q4 2016, and continued exaggerating them up to roughly $1.5 billion by the end of 2018.  The article's conclusions are further supported by Defendant Musk's own videotaped admission to *Axios* on November 26, 2018 that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die"—disclosures totally absent from the Q3 2018 SEC Form 10-Q filed just 26 days prior, which misleadingly reported an ample "$2,967,504[,000]" of unrestricted cash on hand.  On November 3, 2020, ***Defendant Musk further admitted via Twitter that the closest Defendant Tesla had come to bankruptcy "was about a month" from "mid 2017 to mid 2019"***—an admission that Defendant Tesla filed and Defendant Musk signed false financial statements in violation of the Sarbanes-Oxley Act of 2002 since the company's disclosures at no point offered any suggestion of bankruptcy or disclosed "going concern" warnings.  On December 22, 2020, Defendant Musk further admitted via Twitter that "[d]uring the darkest days of the Model 3 program" he had even e-mailed Apple, Inc. CEO Tim Cook offering to sell Tesla to Apple—a fact also never disclosed to investors—but that Defendant Musk never received a response.  On January 3, 2021, Goldman Sachs published an investor briefing noting Defendant Tesla's "internal control environment" as a risk factor.<br><br>*Scienter:* When SolarCity had cash flow problems in 2015 and 2016, corporate management scheduled weekly in-person meetings, made weekly cash flow forecasts shared among employees in "datarooms," and informed the Board of Directors as to the company's cash position.  Defendant Musk was Chairman of SolarCity's Board of Directors.  At the same time, investors were left in the dark with no knowledge of the crisis.  There is no reason to think that business practices at Defendant Tesla are any different, in which case Defendants Musk and Tesla have always had current knowledge of cash position with weekly resolution at least.  Just as with SolarCity, Defendant Musk was ready to sell Tesla to another |

| | |
|---|---|
| | company, but did not inform investors, indicating that he knew exactly how dire the situation was but actively chose to conceal that fact. |
| 2<br><br>February 13, 2020<br>(2019 10-K),<br>April 28, 2020<br>(2019 10-K/A),<br>April 30, 2020<br>(Q1 2020 10-Q)<br><br>Elon Musk,<br>Zachary Kirkhorn | *Omission:* failing to distinguish between cash accessible for use in the United States and cash restricted for use only within the People's Republic of China, subject to strict loan agreements with the Chinese government, as well as failing to disclose the full extent of Defendant Tesla's agreements with the Chinese government affecting cash balances.<br><br>*Statement(s) Made Misleading:* All financial statement figures and references thereto associated with "cash and cash equivalents" in investor disclosures.<br><br>*Supporting Evidence:* Exhibit EX-10.85 attached to the 2019 SEC Form 10-K filed February 13, 2020, the "English Convenience Translation" of the Tesla (Shanghai) Co., Ltd. Fixed Asset Syndication Loan Agreement dated December 18, 2019 with numerous Chinese banks, includes clause 11, translated as "Revenue Collection Account Management," which restricts transfers of revenue collected in China to any other account unless the "transfer is used for the purpose of repaying any of its working capital loans" from the Chinese banks.  In effect, Defendant Tesla cannot move cash collected in China to the United States until the loans are repaid unless the Chinese bank lenders pre-approve such a transfer.<br><br>*Scienter:* On behalf of Defendant Tesla, Defendant Musk met in person with top Chinese Communist Party officials and would have necessarily understood the restrictions on the company's ability to take cash out of China for use in the United States. |
| 3<br><br>November 2, 2018<br>(Q3 2018 10-Q),<br>February 19, 2019<br>(2018 10-K),<br>April 29, 2019<br>(Q1 2019 10-Q),<br>July 29, 2019<br>(Q2 2019 10-Q),<br>October 29, 2019<br>(Q3 2019 10-Q),<br>February 13, 2020<br>(2019 10-K),<br>April 28, 2020<br>(2019 10-K/A) | *Omission:* failing to note Defendant Tesla's refusal to pay vendors and/or government agencies in a timely manner as evidenced by numerous undisclosed lawsuits for non-payment; failing to note Defendant Tesla's business practice of "losing" and/or forging vendor-related paperwork; as well as failing to note the resulting lawsuits and criminal indictments stemming from these practices as material litigation.<br><br>*Statement(s) Made Misleading:* All financial statement figures and references thereto associated with "cash and cash equivalents" and "accounts payable."  To the extent these balances were reported as "accounts payable" on financial statements, it was misleading to imply that vendors and/or government agencies had actually agreed to Defendant Tesla's delinquent payment terms.<br><br>*Supporting Evidence:* 30 lawsuits and criminal cases involving Defendant Tesla's failure to pay vendors and tax agencies many millions of dollars in aggregate are a matter of public record.  In the criminal matter of *USA v. Parulekar*, N.D. Cal. Case No. 5:18-cr-00550-LHK, a former Tesla Group Manager, Global Supply Management was able to forge signatures on |

| | |
|---|---|
| Elon Musk, Zachary Kirkhorn, Deepak Ahuja | payment documents without any internal controls leading to the payment of $9.3 million to the wrong vendor.<br><br>*Scienter:* Defendant Musk promised to "personally review and sign every 10<sup>th</sup> page" of Defendant Tesla's expenses in a "leaked" May 16, 2019 e-mail to the "everybody" e-mail list, indicating personal awareness. |
| 4<br><br>February 13, 2020<br>(2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn | *Misleading Statement:* using the terms "customer deposits" or "cash" to describe funds resulting from the deliberate conversion of cash from customers' credit cards and/or bank accounts via the Tesla mobile app, which was intentionally designed to encourage accidental one-tap purchases of extremely expensive software add-ons, such as "Full Self-Driving" for approximately $4,000 or more.  Once purchased, Tesla typically refuses to refund these amounts and recognizes revenue.<br><br>*Supporting Evidence:* This dynamic was described by several Tesla customers on social media.  On January 15, 2020, Nassim Nicholas Taleb wrote in a Twitter post: "The purchase was non-intentional. I unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with[out] confirmation/password or something of the sort."  Although Taleb, who is famous, reportedly received a refund after complaining publicly, many less-famous Tesla customers did not.  @CamBirch wrote on January 28, 2020, "I just had this happen. Called Tesla (hard to do) and talked to a support person. It took them a week and the refund is now displayed on my card. Getting the free mud flaps had more confirmations and proof of purchase than a nearly $10k purchase."  @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us."  Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund."  At least one other similar public request was deleted as a condition of receiving a refund.<br><br>*Scienter:* These purchases took place because Defendant Tesla updated its mobile app to add the expensive software "upgrades" to each user's shopping cart *by default*, and further because Defendant Tesla designed the "purchase" button not to look like a button at all.  The product being paid for, "Full Self-Driving," does not actually exist as described.  On August 19, 2020, Defendant Musk admitted that despite starting to accept customer deposits in 2016, "Dojo V1.0 isn't done yet. About a year away. Not just about the chips. Power & cooling problem is hard." |
| 5<br><br>April 29, 2020 | *Omission:* refusing to discuss the cash balance on any day but the final day of the quarter. |

| | |
|---|---|
| Elon Musk, Zachary Kirkhorn | _Statement(s) Made Misleading:_ All financial statement figures and references thereto associated with "cash and cash equivalents." |
| | _Supporting Evidence:_ On the April 29, 2020 earnings call, Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Zachary Kirkhorn about the present-day cash balance at the time, not the cash balance as of March 31, 2020.  Kirkhorn declined to answer the question and Jonas did not press him for an answer.  Specifically, Kirkhorn stated, "Yeah.  It's a fair question.  I don't have any additional color to provide.  So $8.1 billion in cash and cash equivalents at the end of Q1, we're managing it very closely." |
| | _Scienter:_ The statement that, "I don't have any additional color" was false given that as CFO he had full access to Defendant Tesla's financials.  Defendant Musk promised to "personally review and sign every 10th page" of Defendant Tesla's expenses in a "leaked" May 16, 2019 e-mail to the "everybody" e-mail list.  _See also_ Issue No 1. |
| 6<br><br>November 2, 2018<br>(Q3 2018 10-Q),<br>February 19, 2019<br>(2018 10-K),<br>April 29, 2019<br>(Q1 2019 10-Q),<br>July 29, 2019<br>(Q2 2019 10-Q),<br>October 29, 2019<br>(Q3 2019 10-Q),<br>February 13, 2020<br>(2019 10-K),<br>April 28, 2020<br>(2019 10-K/A)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | _Omission:_ failing to disclose Defendant Tesla's routine practice of abusing temporary registration documents to evade tax obligations and payments associated with the sale of vehicles at the end of a given quarter. |
| | _Statement(s) Made Misleading:_ All financial statement figures and references thereto associated with "cash and cash equivalents" and "accounts payable." |
| | _Supporting Evidence:_ Each quarter, according to vehicle registration data, the vast majority of Defendant Tesla's vehicle sales take place in the second half of the third month of the quarter.  Widespread consumer complaints on Defendant Tesla's own on-line forums and on social media document vehicle buyers initially receiving temporary registration documents in lieu of permanent registration documents.  In many cases, Defendant Tesla has offered to reimburse consumers for any citations due to driving with expired registration, as temporary registration documents expire quickly.  In addition, the New Jersey Motor Vehicle Commission investigated Defendant Tesla's operations in New Jersey on a number of occasions and found that numerous customers had received temporary registrations "improperly" and that Tesla was routinely misrepresenting the locations where transactions were taking place. |
| | _Scienter:_ Defendant Tesla knew that its practices were illegal and likely to cause its customers to break various state laws, which is why it had to promise to cover the expenses associated with citations and signed a settlement agreement with the New Jersey Motor Vehicle Commission. |

269.   Defendants Musk and Tesla have repeatedly misled investors about Tesla's sales in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Dates / Liable Parties | Description / Supporting Evidence |
|---|---|
| 7<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | *Omission:* failing to report sales at all.  Instead, Tesla has reported "deliveries," an undefined, proprietary, non-GAAP term that the market has misinterpreted as equivalent to sales, with Defendants Musk and Tesla encouraging that misinterpretation through their passive and active silence, such as by refusing to answer related inquiries from journalists.  "Deliveries" and sales are not the same.  Defendants Musk and Tesla refuse to specify with any degree of precision what "deliveries" actually are, whether the figures include sales to Tesla's own subsidiaries worldwide, and whether payment is required for a "delivery" to occur.<br><br>*Statement(s) Made Misleading:* All mentions of and figures associated with "deliveries" in investor disclosures.<br><br>*Supporting Evidence:* The only meaningless hint contained in Tesla's quarterly press releases as to the definition of "deliveries" is the statement, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," though the customer could be a Tesla subsidiary with paperwork correctly reflecting a vehicle purchase for $0.01 or $0.00.  This statement was contained in Defendant Tesla's April 2, 2020 press release, which only reported consolidated deliveries by model group.  Also unclear is whether a returned vehicle could be "delivered" multiple times per quarter.  According to public records, Tesla Norway A/S has registered dozens of cars to itself, and the *Vancouver Sun* reported that Defendant Tesla purchased at least one of its cars to qualify for a tax rebate.  Defendant Tesla has also registered hundreds of its own new vehicles to itself in Sweden.  In early 2020, Plaintiff repeatedly pressed Defendant Musk and the Tesla Board of Directors to define the term "delivery," without success.<br><br>*Scienter:* The choice not to report sales is clearly deliberate on behalf of Defendants Musk and Tesla.  Every other publicly traded automobile manufacturer reports sales. |
| 8<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), | *Misleading Statement:* each and every vehicle "deliveries" figure in quarterly press releases and SEC Forms 10-Q and 10-K since Q3 2018.<br><br>*Supporting Evidence:* These figures are overstated by tens of thousands of vehicles per quarter, and grouped in a manner that makes it impossible to discern details regarding sales by specific product lines or geographic regions.  Public record vehicle registration data from state Departments of Motor Vehicles and international sources covering 8 of the 10 states where Tesla sells the most cars (CA, FL, TX, NJ, WA, NY, CO, and MA), plus 7 more through at least Q1 2020, supports the finding that Defendant Tesla disclosed inflated "deliveries" relative to recorded vehicle registrations by roughly 100,000 total vehicles since Q3 2017, |

53

| | |
|---|---|
| February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | with significant overstatements beginning in Q3 2018.  In addition, on June 17, 2019, in an article entitled, "Tesla's delivery numbers change multiple times between filings," journalist Francine McKenna noted, "Tesla, Inc. publicizes updated vehicle production and delivery data more than once at the end of each quarter and those numbers change frequently, raising questions about the quality of the company's accounting function amid a wave of turnover in the department."  The figures are also misleading in that they imply that each delivered vehicle is safe to drive.  Yet in December 2020, China-based *PingWest* noted, "Tesla is doing whatever it can to hit the production goal, including lowering its quality standards," by loading "defective parts…onto production vehicles."  Per the article, "'Let's say, in the past, our vehicles need 80 points in order to leave the factory, now it's only 60.'"<br><br>*Scienter:* Defendant Tesla has refused to respond to any inquiries about its use of the term "deliveries" and how its disclosures compare to vehicle registrations.  The company is fully aware of the number of each model of its cars sold and registered in each state, yet refuses to disclose these metrics to investors.  In addition, the New Jersey Motor Vehicle Commission investigated Defendant Tesla's operations in New Jersey on a number of occasions and found that numerous customers had received temporary registrations "improperly" and that Tesla was routinely misrepresenting the locations where transactions were taking place.  Defendant Tesla's failure to clearly define one of the most important terms in its investor disclosures cannot be a mere oversight. |
| 9<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, | *Omission:* failing to disclose Defendant Tesla's practice of selling used and demo cars as "new," inflating "deliveries."<br><br>*Statement(s) Made Misleading:* Each and every vehicle "deliveries" figure in investor disclosures.<br><br>*Supporting Evidence:* This practice has led to litigation from former employees and customers alike.  In a 2018 lawsuit initially filed in the Burlington County, New Jersey Superior Court and later removed to New Jersey District Court, Case No. 1:18-cv-04120-JHR-AMD, former Tesla employee Adam Williams alleged that he had been fired after reporting illegal sales practices to "his supervisor, and Jerome Guillen," such as "failing to disclose to consumers high-dollar, pre-delivery damage repairs" and "receiving vehicles designated as 'lemons' and, with this knowledge, reselling these vehicles without branding the titles of these vehicles or offering disclosure, rather than representing the cars as 'used' or a 'demo/loaner.'"  In another lawsuit, *Woods et al v. Tesla, Inc.*, D. Mass. Case No. 1:20-cv-10162-FDS, the plaintiffs sued over a defective Tesla Model S with over 8,000 miles on the odometer that they had bought as a "new" vehicle because it was a demo unit. |

| Jerome Guillen | *Scienter:* Litigation records indicate that Defendant Tesla knew about and encouraged this unlawful practice for years. |
|---|---|
| 10<br><br>October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja, Leopold Visser | *Omission:* failing to disclose that Defendant Tesla has conspired with vendors such as Carvana and CarMax to artificially inflate various "used" Tesla vehicle price-based metrics through fleet sales, engineered prices far above actual market rates for those vehicles, and arranged for the sales of *new* vehicles to straw man buyers.<br><br>*Statement(s) Made Misleading:* All mentions of and figures associated with "residual value" in investor disclosures.<br><br>*Supporting Evidence:* CarMax spontaneously stopped selling used Tesla vehicles in or around October 2019. Former Tesla Finance LLC CEO Leopold Visser, who was also an executive associated with Defendant Tesla's subsidiaries Tesla Insurance, Inc. and TALT Holdings LLC, left Defendant Tesla in early 2020 to work at Carvana as "Director, Special Projects." Through approximately June 2020, Carvana listed only about ten Tesla Model 3 vehicles on its web site, some at significantly inflated prices *above new vehicle prices* that were likely useful for inflating Defendant Tesla's Residual Value Guarantee (RVG) calculations that factor into revenue and net income and may influence Kelley Blue Book values; and are in a locked, non-purchasable status until December 31 of the year "9999" despite not being marked as sold, per Carvana's API.<br><br>*Scienter:* Defendant Musk has made numerous false statements about Tesla vehicles appreciating in value. |

270. Defendants Musk and Tesla have repeatedly misled investors about Tesla's true financial condition in its SEC Form 10-Q and 10-K filings by:

| Issue No. / Dates / Liable Parties | Description / Supporting Evidence |
|---|---|
| 11<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), | *Misleading Statement:* maintaining a minimum balance of approximately $1 billion for its "accounts receivable" line item since Q3 2018, when accounts receivable jumped from $570 million to $1.155 billion.<br><br>*Supporting Evidence:* Given Defendant Tesla's business model, which involves up-front cash payments for physical products, this unusually high and persistent balance has attracted considerable notice from prominent investors such as David Einhorn, who has publicly questioned Defendant Musk about it twice without ever receiving a clear answer, and from journalists with accounting degrees and experience, such as Francine McKenna. In Ms. McKenna's words, "They should not have this big of an accounts receivable balance."<br><br>*Scienter:* Over time, Defendant Tesla has provided multiple conflicting |

| | | |
|---|---|---|
| April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | | stories to attempt to explain away its Accounts Receivable line item, none of which are believable or consistent.  Examples of such excuses include fiscal quarters ending on weekends and slow European payment systems, even though SEPA and SWIFT payments are processed instantly.  Most recently, Defendant Tesla attributed the high balance to regulatory credit payments, without divulging detail or explaining why these payments belonged in accounts receivable in the first place. |
| 12<br><br>October 29, 2019 (Q3 2019 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | | *Omission:* failing to specifically enumerate vendor rebates, payment deferrals, and other negotiated one-time allowances and instead lumping them into broader line items, e.g. Cost of Goods Sold, causing investors to believe that costs are artificially low, and profits, artificially high.<br><br>*Statement(s) Made Misleading:* All figures associated with "cost of revenues" and/or "cost of sales" in investor disclosures.<br><br>*Supporting Evidence:* One of the rare allusions to the existence of vendor-related allowances is the phrase, "including commercial negotiations with suppliers" on the bottom of page 44 of Defendant Tesla's Q3 2019 SEC Form 10-Q.  There is no clarification as to which vendors were involved with "commercial negotiations," or what the negotiations entailed.  Defendant Tesla simply states, "Cost of automotive sales revenue decreased $392 million."  Other SEC filings may be affected but due to the omission it is unclear which ones.<br><br>*Scienter:* Defendant Tesla has been sued by vendors and tax agencies at least 30 times for failure to pay, but has not disclosed these lawsuits. |
| 13<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q) | | *Misleading Statement:* "Our current and future warranty reserves may be insufficient to cover future warranty claims which could adversely affect our financial performance."<br><br>*Supporting Evidence:* Defendant Tesla has engaged in a scheme to record warranty repairs as "goodwill" for years, thereby reducing the required warranty reserve and artificially inflating gross margin and net income.  This scheme is apparent in at least twenty lemon lawsuits filed by Tesla customers across the United States that happen to include copies of vehicle service invoices.  These documents consistently note warranty repairs billed to "goodwill" that should be billed to the warranty reserve.  *See* Exhibit I.  Defendant Tesla's disclosures in its SEC filings fail to note its scheme, and misleadingly suggest that reserves *could* be insufficient even while the company deliberately instructs its service centers to avoid recording warranty expenses.<br><br>*Scienter:* Defendant Tesla *knew* that its reserves were "insufficient" because the company took deliberate and material measures to reduce them, but merely disclaimed that they "may" be.  The billing designation |

| Elon Musk, Zachary Kirkhorn, Deepak Ahuja | on service invoices is determined at each Tesla service center at the time of repair.  Technicians must have received deliberate instruction from Defendant Tesla to use the unusual designation of "goodwill" instead of "warranty service" for warranty repairs. |
|---|---|

271.    Defendants Musk and Tesla artificially inflated Tesla's stock price by:

| Issue No. / Dates / Liable Parties | Description / Supporting Evidence |
|---|---|
| 14<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk | *Omission:* failing to disclose that Defendant Musk placed and/or encouraged others to place trades during extended market trading hours, or weekdays from 4:00 P.M. - 8:00 P.M. Eastern Time and 4:00 A.M. - 9:30 A.M. Eastern Time, to deliberately exploit lighter trading volume, such that unusual bid and ask prices would manipulate share price in advance of the market's next open.<br><br>*Statement(s) Made Misleading:* In June 2018, Defendant Musk wrote, "My 'pay' is in options, which only matter if stock goes up & I sell."<br><br>*Supporting Evidence:* Defendant Musk's bonus tranches of stock options depended upon TSLA shares remaining elevated regardless of whether he sold his shares.  It is established that Defendant Musk trades during extended hours.  Footnote 1 in Defendant Musk's SEC Form 4 filed May 7, 2018 disclosed "multiple transactions at prices ranging from $294.79 to $295.69" on that day, but the lowest price recorded during standard trading hours on May 7, 2018 was $295.17.  In fact, there were only two trades in TSLA shares on May 7, 2018 at a price of $294.79, both executed prior to market open.  Based on analysis of the number of shares traded, Defendant Musk's disclosed purchases took place starting at 7:35:47 A.M. Eastern Time.  On several occasions, Defendant Musk and/or entities known to him purchased millions of dollars worth of TSLA stock with the explicit goal of manipulating the share price.<br><br> On a TSLA stock graph showing extended hours trading from about 7:00 P.M. Eastern Time on March 19, 2020 through 5:30 A.M. Eastern Time on March 20, 2020, the gap between the last red bar at 8:00 P.M. on March 19 and the large green bar at 4:00 A.M. on March 20 represents a trader purchasing shares far above the asking price, starting at $420.00, the same price Defendant Musk falsely claimed he would take the company private at.<br><br>In addition, on March 20, 2020—one day after Defendant Tesla announced its |

| | |
|---|---|
| | Fremont, California factory would be shutting down—an unknown individual bought 8,000 shares of TSLA at prices between $420 and $456 per share (worth over $3.3 million) starting at approximately 4:00 A.M. Eastern Time. At $456 per share early in the morning on March 20th, TSLA traded approximately $59 (or roughly 15%) above the asking price from 8:00 P.M. the previous night on devastatingly bad news regarding the main factory.<br><br>*Scienter:* The fact that the arbitrary, elevated price chosen on March 20, 2020 was $420 per share—a reference to the same marijuana joke that cost Defendants Musk and Tesla $20 million each in SEC penalties—suggests that these extended hours transactions were not legitimate. There is no conceivable reason why an executive trading according to a pre-set Rule 10b-5 plan would need to use extended hours trading. |
| 15<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Jared Birchall, Dave Arnold, Sarah O'Brien, Erica Chen, Gina Antonini, Aarti Reddy, Juleanna Glover | *Omission:* failing to disclose to investors that Defendants Musk and Tesla were conspiring to unlawfully disseminate false and misleading news stories, and to discredit or silence critics, with:<br>a) social media influencers, some anonymous or pseudonymous, including but not limited to Defendant Qazi, Bonnie Norman, Galileo Russell, Sofiaan Fraval, Zac Cataldo, and Frederic Lambert;<br>b) ex-CIA and ex-NSA "security" professionals at firms such as Redacted, Inc. and Nisos Group LLC;<br>c) public relations firms such as Milltown Partners, Ridgely Walsh, Strategies 360, and Forza Communications; and<br>d) convicted felons such as James Howard-Higgins.<br><br>*Statement(s) Made Misleading:* On January 7, 2021, Defendant Musk wrote on Twitter, "Btw, critical feedback is always super appreciated, as well as ways to donate money that really make a difference (way harder than it seems)".<br><br>*Supporting Evidence:* In reality, Defendants Tesla and Musk use critical feedback to identify targets for firing and/or harassment while the company's proxies push corporate propaganda and disinformation:<br>a) On July 8, 2019, Zac Cataldo published a video entitled "Tesla Time News – Tesla Crushes Delivery Record!" containing the false and misleading statement, "Their numbers are fantastic. A total of 95,200 were delivered in Q2. Wow!" Yet Cataldo's "Creative Director" is Tesla Massachusetts Regional Manager Steven Salowsky.<br>b) On October 23, 2019, super-fan Bonnie Norman wrote on Twitter, "But where do you get the whole 'Elon's fixer' stuff? You think that's who I contact?" In fact, Ms. Norman contacted both Defendant Musk and Defendant Tesla's former General Counsel on a regular basis as revealed in court documents filed on May 5, 2020.<br>c) Also on October 23, 2019, Ms. Norman wrote, "What hasn't helped credibility is buying into TSLAQ conspiracy theories: Every pro- |

TSLA acct is a paid shill, Jack/twitter are in cahoots…"  Defendant Musk e-mailed Jack Dorsey asking for assistance with Omar Qazi.

d) In a video published on September 20, 2019 entitled "Model 3: The Self-Driving Electric Smartcar," Galileo Russell predicted, "hundreds of millions in annual revenue, and extremely high profit margins, or even billions," based on nothing except his own unfounded speculation, while Defendant Tesla lost money on every car sold despite being equipped with the features he was referring to;

e) Former Tesla Senior Director, Global Communications Dave Arnold quit immediately when litigation revealed that he had planted a false story in the *Huffington Post* accusing former Tesla engineer Cristina Balan of having engaged in "criminal conduct."

*Scienter:* In order to discredit critic Vern Unsworth, Defendant Musk routed payments to convicted felon James Howard-Higgins for information, which ultimately turned out to be fabricated, through Excession LLC, his "family office;" asked Jared Birchall, his money manager, to use a pseudonym, "James Brickhouse," so that payments would not easily be traced back to Musk; and recklessly relied on the false information to discredit Unsworth in public.

| 16 | |
|---|---|
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)  Elon Musk, Martin Viecha, Juleanna Glover | *Omission:* failing to disclose that Defendants Musk and Tesla conspired with highly visible television personalities who regularly appear on financial media networks such as CNBC and Bloomberg Television in order to push a false and misleading narrative about Tesla's future prospects and distract from negative news releases.  *Statement(s) Made Misleading:* Each statement made by a proxy for Defendants Musk and Tesla who did not disclose their full relationship to investors was misleading.  For example: <br> a) on June 19, 2019, Ross Gerber of Gerber Kawasaki Wealth & Investment Management, who lists false academic credentials on his firm's website, accused unspecified actors of "manipulating the internet, manipulating the media, and doing whatever they can to help their short positions," echoing Defendant Musk's vitriol on short sellers, and even blaming "Wall Street," of which he is a part; <br> b) on December 11, 2019, influential CNBC showman Jim Cramer acknowledged that while he, an "agnostic skeptic," had "gone back and forth" on Defendant Tesla as a "cult-like" "battleground stock," he was suddenly "taking a stand" as an "outright bull."  He further described Tesla's solar roof tiles as comparable in price to "normal roof tiles," which is false, and demand as "off the charts" for the Cybertruck.  *See* Issue No. 26.  Cramer also exclaimed, "Sound balance sheet?  Check!" although this was completely false, and Defendant Tesla would need to raise billions more dollars from investors while it continued losing money on every vehicle sold; <br> c) on February 5, 2020, CNBC published an article and television video |

clip reporting that Cathie Wood of ARK Investment Management LLC held 2024 price targets of $7,000 per share to $15,000 per share for TSLA shares, beyond the most extreme range of price targets held by other analysts—possibly in part because her firm's "open-source" valuation model included Microsoft Excel formatting choices that hid errors causing numerical inputs to be off by a factor of *one million*, among other problems. Wood's "model" reportedly valued Defendant Tesla at $42 billion even if the company sold 0 cars.

*Supporting Evidence:* Since 2019, narratives have included wild, as-yet-unfulfilled promises about "robotaxis," the "Cybertruck" pickup truck, and new "gigafactories" in various locales. Media personalities Ross Gerber, Cathie Wood, and Jim Cramer of CNBC (among others) have all contributed to this coordinated effort in numerous interviews, often with the explicit cooperation of Defendants Musk and Tesla.

Both Jim Cramer and Ross Gerber have openly referred to illegal stock manipulation as a "game." In 2008, Jim Cramer said, "A lot of times when I was short at my hedge fund ... meaning I needed (a stock) down, I would create a level of activity beforehand that could drive the futures… It's a fun game and it's a lucrative game." On June 13, 2020 at 9:50 A.M., Ross Gerber wrote on Twitter, "I can move stocks all over the place. By myself." and "I can crush people all day if I want… don't they get it. It's like poker." He later deleted the post. Defendant Musk has provided Tesla factory tours to Wood and Gerber and appeared on a podcast hosted by Wood on February 19, 2019.

*Scienter:* Media consultant Juleanna Glover provided Defendants Musk and Tesla with media relations advice over a period of years, including that Defendant Musk deliberately schedule media appearances to distract from negative publicity. For example, to distract from his "pedo guy" insult, Defendant Musk appeared on the popular Joe Rogan podcast on or around September 7, 2018, where he smoked marijuana on video.

| 17 | *Omission:* failing to disclose that Defendant Tesla was incentivizing Wall Street sell-side analysts with sharply negative views in private, such as Adam Jonas of Morgan Stanley (whom *The New York Times* called "The Tesla Cheerleader") to a) repeatedly and baselessly upgrade Tesla's price target and earnings projections; and b) to write analysis with optimistic spin, all in exchange for lucrative banking deal fee revenue; as well as providing Wall Street analysts with deliberately low estimates in advance such that they could easily be "beat" when released. |
| --- | --- |
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 | *Statement(s) Made Misleading:* Each statement made by a proxy for Defendants Musk and Tesla who did not disclose their full relationship to investors was misleading. |

| | |
|---|---|
| (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Martin Viecha | *Supporting Evidence:* In at least one private call with investors on May 22, 2019 that was eventually leaked, Jonas admitted that Tesla is a "distressed credit and restructuring story." Jonas has publicly used sky-high software company valuations when convenient, instead of more appropriate automotive company valuations. On October 30, 2019 on Bloomberg Television, Jonas even stated, "We think Tesla is a software company…that, in an ideal world, would be covered by a tech hardware analyst rather than the auto analyst community." That sentiment did not stop him from starting to write notes about TSLA as an automotive analyst almost daily around March 2020, an unheard-of practice.<br><br>Jonas's optimistic coverage of Defendant Tesla was often followed within 1-20 days by Tesla equity and/or bond offerings in 2012, 2013, 2014, 2016, 2017, and 2020 (twice). Although some investment banks disclose their conflicts with Defendant Tesla to those clients who pay for their research, Defendant Tesla does not disclose its conflicts with banks that recommend the purchase of its stock. For example, Goldman Sachs discloses seven conflicts with Defendant Tesla, but only to subscribers of its paid "research" materials. Similarly, to its paying customers only, Morgan Stanley discloses, "Morgan Stanley does and seeks to do business with companies covered in Morgan Stanley Research. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of Morgan Stanley Research." Morgan Stanley's research notes also contain a "Disclosure Section" containing disclosures similar to those offered by Goldman Sachs.<br><br>*Scienter:* Defendants Musk and Tesla have themselves held private "invitation-only" calls with investors in direct violation of Regulation FD, such as the call on February 28, 2019 reported on by the *Los Angeles Times*: "Tesla Chief Executive Elon Musk, who is scheduled to defend himself Monday against contempt charges in a federal district court, may find his defense complicated by a semi-secret teleconference Tesla held Thursday with a small number of investors and members of the media." |
| 18<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 | *Omission:* failing to disclose that Defendant Tesla was using confidentiality provisions (including protective orders) in lawsuits, arbitration proceedings, regulatory proceedings and contracts to keep unlawful acts and public safety information secret.<br><br>*Statement(s) Made Misleading:* On October 8, 2018, the @Tesla Twitter account wrote, "There is no safer car in the world than a Tesla."<br><br>*Supporting Evidence:* Defendant Tesla has repeatedly required that its customers sign contracts with confidentiality provisions to hide potential safety issues from the public. As early as 2014, Defendant Tesla required many customers to sign an agreement entitled, "Goodwill Agreement & Release" that included the clause, "You agree to keep |

| | |
|---|---|
| (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Martin Viecha, Al Prescott, Dan Chia, Erin Bradley | confidential our provision of the Goodwill, the terms of this agreement and the incidents or claims leading or related to our provision of the Goodwill." A January 17, 2018 Settlement Agreement over a vehicle issue publicly filed in *Iris Legum v. Tesla Motors Inc. et al*, Supreme Court of the State of New York, Nassau County, Case No. 000001/2017, contains similar verbiage. Other examples include the overzealous redaction of court materials in the SolarCity Case from 2016-2019; Defendant Tesla's unlawful refusal to allow the Nevada Department of Industrial Relations to inspect its factory on May 21, 2019 even with a valid search warrant signed by a judge; Tesla Associate General Counsel Erin Bradley's November 6, 2019 request to the California Alternative Energy and Advanced Transportation Financing Authority ("CAEATFA") regarding requested redactions of "trade secrets;" and Tesla lobbyist Dan Chia's insistence in March-April 2020 that federal copyright law governs public records concerning Defendant Tesla's mishandling of COVID-19 procedures when it does not.<br><br>Defendant Tesla frequently manufactures vehicles with missing crucial bolts, internal cracks patched with electrical tape, parts made of substandard metal alloys, and parts described as "Home Depot-grade fake wood." On October 17, 2018, NHTSA wrote a letter addressed to Defendant Musk as CEO of Defendant Tesla informing him that Defendant Tesla was being referred to the Federal Trade Commission's Bureau of Consumer Protection "to investigate…unfair or deceptive acts or practices." On or about November 27, 2020, NHTSA opened a separate formal investigation into 114,761 Tesla vehicles with a potentially fatal front suspension issue dating back to 2015 that also led to a 2020 recall of 29,193 Tesla vehicles in China. On January 13, 2021, NHTSA ordered Defendant Tesla to recall approximately 158,000 Model S and X vehicles due to a "defect related to motor vehicle safety" affecting vehicles manufactured between 2012 and 2018 and known to Defendant Tesla to *guarantee* failure. Defendant Tesla had blamed Chinese "driver abuse" when NHTSA finally inquired after the Chinese government forced a recall.<br><br>*Scienter:* The above examples are material to at least three federal investigations where the underlying facts were concealed from investors; perjury; harm to hundreds of employees and contractors from COVID-19; and fraud involving the SolarCity merger, which continues to be litigated, including but not limited to failure to inform investors of a cash "crisis" at SolarCity about which investors were never informed. |
| 19<br><br>October 23, 2019<br><br>Elon Musk, | *Misleading Statement:* On the Q3 2019 earnings call, Tesla Chief Financial Officer Zachary Kirkhorn stated, "Note that with the release of Smart Summon in the U.S., we were able to recognize $30 million of deferred revenue." |

| Zachary Kirkhorn, Deepak Ahuja | *Supporting Evidence:* "Smart Summon" was deliberately released without adequate testing at the end of September 2019 specifically to recognize deferred revenue during Q3 2019. Yet the California Department of Motor Vehicles sent Defendant Tesla a letter on March 6, 2020 highlighting failures observed during a *November* 2019 demonstration, *after* the revenue had been recognized, stating, "The vehicle did not recognize a stop sign and proceeded without stopping." *See* Exhibit J. |
|---|---|
| | *Scienter:* On October 2, 2019, NHTSA issued a statement clarifying that it was "aware of reports related to Tesla's Summon feature." Defendants Musk and Tesla were willing to put lives at risk in order to recognize slightly more revenue for the quarter to give the illusion of profitability. |
| 20<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), February 13, 2020 (2019 10-K)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | *Misleading Statement:* Several figures from one period's financial statements do not match the same period's figures when reported as the "prior period" figures on the next financial statement. For example:<br>  a) in Q3 2018, Defendant Tesla reported "Selling, general and administrative" (SG&A) expenses of "113,973" thousand dollars, or about $114 million. In Q4 2018, that number for Q3 2018 was implicitly revised downward to $109 million. In Q3 2018, "Cost of sales" (COGS) was reported as "25,037" thousand dollars, or about $25 million. By Q4 2018, that same number for Q3 2018 was implicitly revised upward to $30 million.<br>  b) on page 88 of its 2018 SEC Form 10-K, Defendant Tesla disclosed "marketing, promotional and advertising costs of $70.0 million, $66.5 million and $48.0 million in the years ended December 31, 2018, 2017 and 2016, respectively." On page 80 of its 2019 SEC Form 10-K, it disclosed "marketing, promotional and advertising costs of $27 million, $32 million and $37 million in the years ended December 31, 2019, 2018 and 2017, respectively, of which the majority is related to promotional activities." The figures for 2017 and 2018 do not match.<br><br>*Supporting Evidence:* The unexplained shift from SG&A to COGS appears to take place every quarter from Q2 2018 through at least Q1 2019. Inconsistency is a recurring theme throughout Tesla's financials.<br><br>*Scienter:* Defendants Musk and Tesla were charged with securities fraud. On page 66 of its 2020 SEC Form 10-K, Defendant Tesla disclosed that "Marketing, promotional and advertising costs were immaterial for the years ended December 31, 2020, 2019 and 2018" (six extra spaces in original). This is inconsistent with the company's prior filings, in which the same figures were material per the same auditor. |
| 21<br><br>January 30, 2019 | *Misleading Statement:* On the Q4 2018 Tesla earnings call, Defendant Musk stated, "I mean, my best guess, this is just a guess, my best guess for demand of Model 3 worldwide is something—in a strong economy, |

| | Elon Musk, Mark Olson, Marc Cerda, Erin Bradley, Dan Chia, Danielle Matsumoto, Sunaina Seelam, Sendil Palani, Chris Jenny, Dhruv Batura | it's something on the order of 700,000 or 800,000 units a year.  That's my best guess for demand of Model 3 in a strong economy.  If the economy goes into a recession, then I think that could be something under 40% less.  But I think even in a recession, worldwide demand is still something in the order of 500,000 for Model 3." |
|---|---|---|

*Supporting Evidence*: Tesla applied for a CAEATFA sales and use tax subsidy on January 18, 2019, twelve days prior to the Q4 2018 earnings call, which was ultimately granted as Application No. 19-SM008.  Part of the application was submitted on a spreadsheet, shown in part below:

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 2 | Model 3 | | | | | | | | |
| 4 | Build Plan Model 3 | | | | | | | | |
| 5 | Year | 1 | 2 | 3 | 4 | 5 | | Total | Avg 5 years |
| 6 | | 2017 | 2018 | 2019 | 2020 | 2021 | | | |
| 7 | Delivery Plan Model 3 | 1,770 | 152,977 | 250,000 | 250,000 | 250,000 | | 904,747 | 180,949.40 |
| 8 | Average Model 3 ASP | $ 56,031.00 | $ 57,690.00 | $ 50,345.00 | $ 42,355.00 | $ 41,719.68 | | $ 248,140.68 | 49,628.14 |
| 9 | Material Cost | $ 26,384.58 | $ 23,257.29 | $ 20,130.00 | $ 19,727.40 | $ 19,530.13 | | $ 109,029.39 | 20,394.00 |
| 10 | % Vendors in CA | 10.9% | 10.7% | 10.7% | 10.5% | 10.3% | | 53% | 11% |
| 11 | Labor Cost per Vehicle (excl OH) | $ 32,426 | $ 3,799 | $ 1,955 | $ 1,935 | $ 1,916 | | $ 42,030.62 | 2,309.99 |
| 12 | CA % sales | 27% | 30% | 25% | 20% | 20% | | 122.00% | 24.40% |
| 16 | GAAP revenue -Model 3 Only | $ 99,174,870.00 | $ 8,825,243,130.00 | $ 12,586,250,000.00 | $ 10,588,750,000.00 | $ 10,429,918,750.00 | | $ 42,529,336,750.00 | |
| 18 | Material cost | 46,700,702 | 3,557,830,253 | 5,032,500,000 | 4,931,850,000 | 4,882,531,500 | | 18,451,412,455 | 20,394.00 |
| 20 | Labor Cost per Vehicle | 57,394,020 | 581,159,623 | 488,672,500 | 483,785,000 | 478,947,500 | | 2,089,958,643 | 2,309.99 |

Defendant Tesla never expected to deliver more than 250,000 Model 3 vehicles per year in any year up to 2021.  "Deliveries" necessarily reflect demand even if they are not the same as sales.  Defendants Musk and Tesla knew or should have known of these internal projections because unlike other automobile manufacturers, Defendant Tesla operates its own sales centers, does not use third party dealerships and because these figures were "owned" by Tesla employees Danielle Matsumoto, Sunaina Seelam, Sendil Palani, Chris Jenny, and Dhruv Batura.  Furthermore, Defendant Musk was personally aware of the CAEATFA program and Defendant Tesla's applications.  As Tesla attorney Erin Bradley wrote to CAEATFA analyst Xee Moua by e-mail on October 20, 2020 referring to CAEATFA application fees, which Tesla paid late, "I know that Elon is personally approving all POs, which can cause a delay."

*Scienter:* Defendant Musk routinely makes up false figures and has a notable tendency to rely on the number "500,000" when he actually has no reliable data.  Government subsidies are important enough to Defendant Musk that he has discussed them repeatedly on his Twitter account, including on May 11, 2018 when he wrote, "Our giant auto co competitors have much greater access to incentives than Tesla, which means Tesla has prospered in spite of govt subsidies, not because of them."  In several instances, Defendant Tesla provided CAEATFA with false, misleading and incomplete information under penalty of perjury.

| 22 | *Misleading Statement:* In an April 2019 interview, Defendant Musk stated, "I think the most profound thing is that if you buy a Tesla today, I believe you are buying an appreciating asset—not a depreciating asset." |
|---|---|
| April 12, 2019 | |

| | |
|---|---|
| Elon Musk | *Supporting Evidence:* This false statement was intended to spark a speculative frenzy for Tesla vehicles and even deposits on vehicles. In fact, Defendant Tesla pays customers trading in their old Tesla vehicles *less* than their initial purchase price, not more. Its "Full Self-Driving" feature is valued at $0 on trade-in, depreciating 100%. Defendant Tesla has attempted to artificially inflate resale values, as described in Issue 10. In August 2018, in a different interview, Defendant Musk stated, "[W]ith each successive design iteration…it actually gets better and cheaper. But, it's like, a natural progression of any new technology."<br><br>*Scienter:* Defendant Musk's August 2018 statement directly contradicts his April 2019 statement, as well as the fact that Tesla customers receive less money for trading in their Tesla vehicles than they paid for them. |
| 23<br><br>April 22, 2019, April 11, 2020<br><br>Elon Musk | *Misleading Statement:* At "Autonomy Investor Day" on April 22, 2019, as cash levels were once again dwindling, Defendant Musk claimed that, "[T]here will be autonomous robotaxis from Tesla next year…next year for sure, we'll have over a million robotaxis on the road."<br><br>*Supporting Evidence:* There were no "forward-looking statement" disclosures or meaningful cautionary statements, only a passing reference to the *idea* of disclosures in a joke that Defendant Musk used to falsely suggest that his predictions always come true. Yet by April 11, 2020, it was clear that COVID-19 rendered public "robotaxis" impossible, and on December 1, 2020, Defendant Musk admitted at the Alex Springer Award 2020 ceremony in Berlin that he was "extremely confident of achieving full autonomy and releasing it to the Tesla customer base *next* year." Indeed, by December 31, 2020, Defendant Tesla had not produced even a single "autonomous robotaxi" anywhere in the world, let alone secured any kind of regulatory approval in California. In a June 3, 2020 e-mail to Plaintiff, the California Department of Motor Vehicles confirmed that Defendant Tesla had never actually raised the matter of "robotaxis" with its autonomous driving regulators. *See* Exhibit J.<br><br>*Scienter:* Two weeks after lying yet again about Defendant Tesla's autonomous driving abilities, the company announced its intent to raise $2.0 billion, later increased to $2.7 billion, of fresh capital from investors on the basis of these false claims that Defendants knew to be false. |
| 24<br><br>January 29, 2020<br><br>Elon Musk | *Misleading Statement:* On page 9, Defendant Tesla's "Q4 '19 Update" states, "Solarglass tiles are made in our Gigafactory New York."<br><br>*Supporting Evidence:* Federal import records show that Defendant Tesla had started importing solar roof tiles from Changzhou Almaden Co. Ltd. in China by July 2019, leaving little to manufacture or "make" in the United States. Then, in February and March 2020, Defendant Tesla boxed up the manufacturing equipment in its Buffalo factory and put it in storage due to COVID-19. In May and June 2020, Tesla began |

<u>informing</u> certain solar roof customers that their orders were cancelled.

Photographs from Tesla work sites show tiles imported from China and shipped directly to Tesla in Hayward, CA, not New York:



*Scienter:* Defendants Musk and Tesla knew that they were importing materials from China, but have consistently represented that the Tesla Solar Roof is manufactured in New York.  It is not clear that Defendant Tesla ever manufactured anything in Buffalo at all.  On or around August 21, 2020, the Office of the New York State Comptroller released <u>Audit Report 2017-S-60</u>, detailing the manner in which Defendant Tesla has strung along the State of New York, which used the public's tax dollars to finance Tesla's Buffalo factory.  It states in part, "Since 2017, publicly available Tesla reports have indicated potential setbacks with Tesla's solar roof…  However, in November 2018, Tesla reported it was still refining the product design and installation processes and, as a result, production would not significantly increase until the first half of 2019."

| 25 October 9, 2019 Elon Musk | *Misleading Statement:* Defendant Musk <u>wrote</u> on Twitter, "All Tesla Supercharger stations in regions affected by California power outages will have Tesla Powerpacks within next few weeks. Just waiting on permits."  He then added, "Also adding Tesla Solar to our Supercharger stations as fast as possible. Goal is 24/7 clean power with no blackouts." *Supporting Evidence:* Adding solar functionality to charging stations in a practical and economical manner (not requiring multiple football fields worth of solar panels per station) would defy the laws of physics. *Scienter:* Defendant Musk has a degree in physics.  The Supercharger stations were never equipped with permanent batteries or solar power. |
|---|---|
| 26 November 23-24, 2019 Elon Musk | *Misleading Statement:* On November 23, 2019, Defendant Musk <u>posted</u> on Twitter that the "Cybertruck" had generated significant demand, stating, "146k Cybertruck orders so far, with 42% choosing dual, 41% tri & 17% single motor."  The following day, he <u>posted</u> "187k" in the same conversation thread.  He then <u>posted</u> "200k" in a separate thread. *Supporting Evidence:* The deposits made for the Cybertruck were not, in fact, firm "orders."  Multiple press accounts reported individuals making |

| | |
|---|---|
| | multiple reservations due to the low deposit amount of $100.00. According to a November 25, 2019 CNBC article, "Given the minimal $100 payment, it's impossible to say how many pre-orders will eventually convert to sales."  Some depositors believed that they would be able to resell their deposits to others for a higher price, based on Defendant Musk's false representations about Tesla vehicles appreciating in value.  *See* Issue No. 22.  Defendant Musk also deliberately failed to communicate the number of deposits made by *unique* depositors.<br><br>On June 25, 2020, Twitter user @MatchasmMatt wrote, "So I did this three more times today. I'm at 15 now. I've lost all control, somebody stop me!!! [laugh-crying emoji][laugh-crying emoji]."  Twitter user @Ben_310 responded, "You are a bad influence sir, I just ordered 2 more, I'm now at 4."  @MatchasmMatt then clarified his reason for placing 15 reservations: "It's a free option on autonomy. If Elon was somehow correct and robotaxis are a thing by next year, these trucks will be worth much more than the price I have locked in by my reservation. If autonomy doesn't pan out, I can just cancel and get my money back."<br><br>*Scienter:* Defendant Musk's numeric tweets were deliberately free of any context to promote the most optimistic and misleading interpretation of the data possible to investors and the media. |
| 27<br><br>January 31, 2020<br><br>Elon Musk | *Misleading Statement:* On Twitter, Defendant Musk wrote, "There is considerable conflation of diagnosis & contraction of 'corona'. Actual virality is much lower than it would seem. I think this will turn out to be comparable to other forms of influenza. World War Z it is not."  He then added, "Meant to say other forms of 'the cold', not influenza [link to Wikipedia]."  He further wrote, "Based on current trends, probably close to zero new cases in US too by end of April" and followed up, "Kids are essentially immune, but elderly with existing conditions are vulnerable."<br><br>*Supporting Evidence:* In fact, COVID-19 has now killed more Americans than World War II.  Influenza has killed "between 12,000 - 61,000 deaths annually since 2010" according to the Centers for Disease Control and Prevention.  The common cold kills practically no one at all.  Defendant Musk made these stunningly inaccurate statements, and others dismissing the seriousness of COVID-19—***all of which made the pandemic more widespread and dangerous***—in the context of operating factories densely packed with workers in Shanghai, China and Fremont, California—both of which were eventually shut down by concerns related to the global coronavirus pandemic.  The Chinese government shut down the Shanghai factory in January 2020 two days before Defendant Musk's above posts.  For months, Defendant Musk presented false optimism to quell investor fears, while privately castigating those who had *potentially* exposed his son to the coronavirus. |

| | |
|---|---|
| | *Scienter:* If Defendant Musk actually believed what he had written publicly about COVID-19, he would not have had any concern about his son being potentially exposed. COVID-19 has infected thousands of Tesla workers, though Defendants have provided no disclosures containing specifics to investors. |
| 28<br><br>June 10, 2020<br><br>Elon Musk | *Misleading Statement:* The Tesla Semi would enter production in 2019.<br><br>*Supporting Evidence:* The Tesla Semi's production schedule has been pushed back for years. When announced in 2017, Defendant Musk stated that it was scheduled to begin production in 2019. It did not. It was then supposed to begin production in the second half of 2020. Again, it did not. In September 2020, Dorian West, the lead engineer on the Tesla Semi team, left Tesla, noting on his LinkedIn profile that the team had been "[r]edeployed…as needed to support urgent hands-on efforts" that had no connection whatsoever to the Tesla Semi. Now, Defendant Musk has suggested that the Tesla Semi will not enter production until at least 2022. Only two demo Tesla Semi trucks exist. The persistent promise of the future product has been used to pump Defendant Tesla's stock price and secure large deposits from interested customers. In addition, Defendant Musk has used deliberately "leaked" e-mails to intentionally disclose positive narratives about the Semi (while evading Regulation FD) in order to manipulate the price of TSLA shares.<br><br>*Scienter:* Defendants Musk and Tesla have made false promises about the Tesla Semi for years, actively using the two prototypes as props. |
| 29<br><br>November 28, 2018,<br>April 5, 2019<br><br>Elon Musk | *Misleading Statements:* On November 28, 2018, Defendant Tesla wrote on the @Tesla Twitter account, "As of today Tesla owners have driven 1 billion (!) miles with Autopilot engaged." The implication was that each mile driven would help "train" Tesla's "neural network."<br><br>On April 5, 2019, citing a paper by Lex Fridman, Defendant Musk wrote from his @ElonMusk Twitter account, "'…drivers in this dataset use Autopilot for 34.8% of their driven miles, and yet appear to maintain a relatively high degree of functional vigilance.'"<br><br>*Supporting Evidence:* On November 28, 2018, *Bloomberg* reported, "The resulting trove of real-world miles acts as a feedback loop to the algorithms that are constantly training the fleet of Tesla vehicles..."<br><br>*Scienter:* There is no indication in any investor disclosure or other public source that driving in a Tesla vehicle sends continuous video data back to Defendant Tesla to help train neural networks. Nor is there any evidence that algorithmic behavior in one vehicle is affected in real-time—or without a manual software update, ever—by driving in other vehicles. Manual (human) feature tagging is necessary to utilize much of the still-image data needed for training algorithms. The widely-criticized |

| | |
|---|---|
| | Fridman paper cited by Defendant Musk, entitled "Human Side of Tesla Autopilot: Exploration of Functional Vigilance in Real-World Human-Machine Collaboration," was removed from MIT's websites on an unknown date after May 2020. All references were removed from Fridman's personal website between May 12, 2020 and August 11, 2020. The Fridman paper's findings were contradicted by subsequent MIT research, which Defendant Musk did not share. |

272.    Defendants Musk and Tesla have omitted material disclosures to investors that would have likely lowered the price of TSLA shares, including:

| Issue No. / Dates / Liable Parties | Description / Supporting Evidence |
|---|---|
| 30<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja, Swapnil Bhatnagar | *Omission:* disclosures concerning the amount of scrap and/or waste materials at Tesla's factories in Nevada and California since 2018, which have since been highlighted by whistleblower-litigants Martin Tripp and Karl Hansen, and explicitly describe $197,835,756.89 of scrapped parts. *See* Exhibits A, J. Specifically, omitted disclosures describe:<br>a)  that in 2018, Defendant Tesla scrapped 314,504 bandoliers worth $114,630,417.92; 11,405 modules worth $31,477,001.65; 330,515 stators worth $42,305,920.00; 1,064 drive units worth $622,844.32; and 8,453 inverters worth $8,799,573.00, ***for a grand total of $197,835,756.89 of scrapped parts not disclosed to investors***.<br>b)  containment AR622 (Tesla "Thing Name" AR0000000622), where a training pin left in a picker robot led to battery cells being punctured, affecting 1,173 battery modules that were ultimately "reworked" and knowingly placed into 723 Model 3 vehicles;<br>c)  the poor design of Defendant Tesla's internal database systems used to "virtually scrap," or record, Non-Conforming Material (NCM) that could not be used in production, leading to discrepancies between actual scrap on the factory floor and financial reporting;<br>d)  the practice of using MySQL Workbench and/or similar tools to directly edit databases, thereby bypassing internal financial controls;<br>e)  the practice of changing status flags for materials from "SCRAP" to "TEST" to artificially reduce totals for NCM financial reports;<br>f)  the practice of requiring approval from the finance team before being permitted to "virtually scrap" actual NCM material;<br>g)  the practice of deliberately hiding NCM figures from Tesla's CFO;<br>h)  each Model 3 generating $1,920 worth of NCM per vehicle as of April 2018 according to internal documents;<br>i)  internal financial analysts asking "Is this real?" and generally disbelieving Defendant Tesla's own financial reports when presented with overly optimistic NCM figures;<br>j)  current Vice President of Internal Audit Swapnil Bhatnagar stating that Defendant Tesla's inventory accuracy was "very concerning;"<br>k)  storing volatile materials and parts, including lithium-ion batteries, |

| | |
|---|---|
| | in unrefrigerated trailers in the Nevada desert.<br><br>*Statement(s) Made Misleading:* All figures associated with "inventory," "Work in progress," and "Cost of revenues (Automotive sales)," and all figures dependent thereon, in investor disclosures from Q3 2018 forward and possibly earlier.  In addition, Defendant Musk wrote "Being cautious for max safety" on his Twitter account on November 8, 2018.<br><br>*Supporting Evidence:* Deposition testimony from former employees Tripp and Hansen indicates that the amounts of NCM and waste were financially material, multi-million dollar figures that were important enough to attract Defendant Musk's direct involvement.  *See* Exhibit L.<br><br>*Scienter:* E-mails marked "Attorneys' Eyes Only" reveal that NCM reports for CFO Deepak Ahuja were deliberately modified to minimize the appearance of any problems, while internal financial analysts could not determine if reported figures were "real" and the current Vice President of Internal Audit expressed alarm.  Punctured battery cells made their way into vehicles without Defendant Tesla disclosing anything to investors regarding NCM or safety issues at any time. |
| 31<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | *Omission:* disclosures concerning routine theft and storage of raw materials since 2018, as highlighted by whistleblower Karl Hansen and reportedly involving figures near or above $37 million.<br><br>*Statement(s) Made Misleading:* All figures associated with "inventory," "Work in progress," and "Cost of revenues (Automotive sales)" in investor disclosures from Q3 2018 forward and possibly earlier.<br><br>*Supporting Evidence:* Deposition testimony indicates that the amount of stolen goods was a financially material figure necessitating Defendant Musk's direct involvement in phone calls and e-mails.  *See* Exhibit L.<br><br>*Scienter:* In documents disclosed starting on August 7, 2020, Defendants Musk and Tesla admit that they track inventory stored in desert trailers and were aware of the thefts of materials, especially copper wire. |
| 32<br><br>April 30, 2020 (Q1 2020 10-Q)<br><br>Zachary Kirkhorn | *Omission:* disclosures concerning lease accounting metrics pursuant to FASB ASC 842, despite being present the prior quarter in Tesla's 2019 SEC Form 10-K filed February 13, 2020.<br><br>*Statement(s) Made Misleading:* All figures associated with "Automotive leasing."<br><br>*Supporting Evidence:* The section is missing in the Q1 2020 Form 10-Q.<br>*Scienter:* Defendants Musk and Tesla were charged with securities fraud. |
| 33 | *Omission:* disclosures concerning Defendants' relationship with the family of deceased drug kingpin Pablo Escobar, as well as "Escobar, |

| | |
|---|---|
| July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 30, 2020 (Q1 2020 10-Q)<br><br>Elon Musk, Kimbal Musk, Antonio Gracias, Al Prescott, Zachary Kirkhorn | Inc.;" as well as disclosures concerning Defendants' relationship with the family of Joaquín "El Chapo" Archivaldo Guzmán Loera.<br><br>*Statement(s) Made Misleading:* "Risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial condition and operating results."<br><br>*Supporting Evidence:* Numerous July 2019 articles in *Newsweek*, *Business Insider* and other publications detail a relationship between Defendants Musk and Tesla and the Escobar family, with reports that Defendant Musk instructed at least one Tesla engineer to travel to Mexico on Tesla business for the benefit of the Escobar family. Additional sources allege a connection between Defendant Musk, a Tesla Director, and Emma Coronel Aispuro, the wife of El Chapo Guzmán.<br><br>*Scienter:* Defendant Musk frequently travels to Mexico and regularly abuses illicit drugs according to those who know him and have sold him drugs. In late 2018, the United States Department of Homeland Security Customs and Border Patrol (CBP) asked to inspect to the SpaceX facility in Boca Chica, Texas, 2.5 miles from the Mexican border. The risks involving Defendant Musk's involvement with drugs and drug cartels are known and material given the disclosure that, "We are highly dependent on the services of Elon Musk, our Chief Executive Officer." |
| 34<br><br>November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 (2019 10-K/A), April 30, 2020<br><br>Elon Musk | *Omission:* disclosures concerning "Project Titan," a stealth recall of fire-prone solar panel connector and optimizer parts used in Tesla products.<br><br>*Statement(s) Made Misleading:* Defendant Musk wrote "Being cautious for max safety" on his Twitter account on November 8, 2018 and "After safety, our goal is to make a Tesla the most fun you could possibly have in a car" on November 29, 2018.<br><br>*Supporting Evidence:* Project Titan was revealed to the public by *Business Insider* reporter Linette Lopez. Several undisclosed lawsuits have been filed against Defendant Tesla and Amphenol Corporation regarding related fires. On November 9, 2020, former SolarCity/Tesla Field Quality Manager (M3) Steven Henkes filed a lawsuit, Alameda County Superior Court Case No. RG20080233, against a subsidiary of Defendant Tesla alleging that he had filed (1) "internal reports to TESLA management and attorneys" in April 2019 regarding "the fire risks associated with continued use of the defective solar systems;" (2) a formal complaint to the United States Consumer Product Safety Commission ("USCPSC") on April 19, 2019; and (3) a formal complaint to the SEC in May 2019. In response, Defendant Tesla fired Mr. Henkes. The lawsuit explicitly refers to "Project Titan." A USCPSC investigation, never disclosed by Defendant Tesla, is ongoing. |

| | |
|---|---|
| | *Scienter:* Any recall of solar panel parts that could have resulted in customers' houses or businesses burning down should have been immediately made public, and associated investigations disclosed. |
| 35<br><br>February 13, 2020<br>(2019 10-K)<br><br>Elon Musk,<br>Zachary Kirkhorn,<br>Jared Birchall | *Omission:* disclosures concerning related-party transactions and whether businesses run by Defendant Musk that have paid for Tesla-related matters in the past, including but not limited to Excession LLC, as well as businesses run by former executives, are or are not related parties.<br><br>*Statements Made Misleading:* The contents of "Note 20 – Related Party Transactions" on page 124 of Tesla's 2019 SEC Form 10-K.<br><br>*Supporting Evidence:* Defendant Musk used Excession LLC to finance research into a critic's background, and Excession LLC manages at least some of Musk's TSLA equity holdings.  Public records indicate that Falcon Landing LLC owns at least one of the private jets that Defendant Musk uses for Tesla business.  Tesla co-founder J.B. Straubel now runs Redwood Materials, Inc., which has been referred to as both a related and unrelated entity at various points in time.  SpaceX has also hired Defendant Tesla's auditor, PwC, to perform non-audit tasks, raising a serious undisclosed conflict that incentivizes PwC to ignore problems at Tesla in order to maintain its relationship with both companies.<br><br>*Scienter:* Defendant Musk used Excession LLC to hire a convicted felon who provided false information as "research" on one of his critics. |

273.    Defendants Musk and Tesla even misled investors by using a regulated earnings call to distract from other damaging disclosures that were likely to impact the value of TSLA stock negatively.  On October 23, 2019, Defendant Musk used the Q3 2019 Tesla earnings call to announce an announcement "tomorrow afternoon," even though he was already on the phone with investors.  The announcement did not, in fact, come the next day.  Instead, Defendants Musk and Tesla moved the announcement again to the day after: Friday, October 25, 2019.

274.    On September 24, 2019, in the SolarCity Case, Defendants Musk and Tesla proposed and moved for a deadline of October 24, 2019 for the publication of public versions of previously sealed and confidential documents concerning the acquisition of SolarCity.  The motion was quickly granted by that court.

275.    Upon information and belief, the solar roof product announcement was not made on the Q3 2019 earnings call, or at its intended time on October 24, 2019, because of a delay at the Delaware Chancery Court involving the clerk's approval of court filings for public viewing,

1
2
3
4

which unexpectedly took one extra day.  By ultimately announcing a new solar roof product after the earnings call and on October 25, 2019, Defendants Musk and Tesla minimized the national press coverage devoted to their fraudulent conduct when news of their SolarCity liquidity crisis cover-up finally broke on the day after the one they had initially expected.

5
6
7
8
9

276.    As of October 31, 2019, Tesla listed only two names as company "Management" on the Corporate Governance section of its Investor Relations website: Elon Musk and Zachary J. Kirkhorn.  At all times since approximately March 2019 when Mr. Kirkhorn became Tesla's CFO, both of these individuals have had complete access to Tesla's financials and sales records. Accordingly, Defendant Musk knew that his statements herein were false and/or misleading.

10
11
12
13

277.    Defendants Musk and Tesla have acted with scienter.  In its roughly seventeen years of existence, Defendant Tesla has required over $20 billion of investor capital to survive. Defendant Tesla's constant need for outside cash has created a clear incentive for Defendant Musk—who has admitted that Tesla is barely profitable—to defraud the market.

14
15
16
17
18

278.    Such scienter was motivated by several factors: Tesla's constantly precarious cash situation; his belief that laws and rules do not apply to him; his belief that lying is necessary for survival; his animosity toward short-sellers; his executive compensation package worth tens of billions of dollars based almost entirely upon stock options that depend upon TSLA's share price being elevated for certain periods of time; and his links to Mexican drug cartels.

19
20
21
22

279.    Defendant Musk's scienter is evidenced by:

    a)    the fact that Defendants Musk and Tesla were found to have acted with
          scienter in similar circumstances in this Court in Case No. 3:18-cv-04865-
          EMC, *In Re Tesla, Inc. Securities Litigation*;

23
24
25

    b)    his statements voiced at the National Press Club in relation to the collapse of
          Solyndra, e.g. "it would have become a self-fulfilling prophecy of—as soon as
          a CEO says 'I'm not sure if we'll survive,' [slit throat gesture] you're dead.";

26
27

    c)    his February 8, 2020 re-publication of an image of a T-shirt featuring the CIA
          seal and the bold text, "ADMIT NOTHING / DENY EVERYTHING.";

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

d)  his statement, "I do not respect the SEC.  I do not respect them," during the 60 Minutes Interview, as well as his statement that it was "not realistic" for him to abide his SEC consent decree because "I am the largest shareholder in the company.  And I can just call for a shareholder vote and get anything done that I want," and his statement that paying the SEC fines was "worth it;"

e)  his hanging up on the Chairman of the National Transportation Safety Board;

f)  the fact that Defendant Musk personally approves every Tesla purchase order;

g)  Defendant Musk's admission in a sworn deposition on August 22, 2019 to frequently changing, discarding and destroying mobile devices;

h)  statements such as his May 4, 2018 Twitter post, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time," as well as his referring to the SEC as the "Shortseller Enrichment Commission" on October 4, 2018 and "[Suck] Elon's [Cock]" on July 2, 2020;

i)  his admissions regarding Defendant Tesla's artificially inflated stock price, such as, "Tesla stock price is too high i[n ]m[y ]o[pinion]" on May 1, 2020 at 8:11 A.M. and, "If, at any point, they conclude [future profits are] not going to happen, our stock will immediately get crushed like a soufflé under a sledgehammer!" in an e-mail sent to his employees on December 1, 2020; and

j)  on February 8, 2021, five Chinese regulatory bodies jointly requiring Defendant Tesla "to strictly abide by Chinese laws and regulations, strengthen internal management, implement corporate responsibility for quality and safety, effectively maintain social public safety, and effectively protect consumers rights and interests."

280.   Defendants Musk and Tesla disseminated, encouraged or approved the false statements and/or material omissions specified above, with knowledge of or reckless disregard for their false or misleading nature, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

281.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by: a) employing devices, schemes, and artifices to defraud; b) making untrue statements of material facts or failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TSLA securities.

282.   Plaintiff has suffered damages in that, by defrauding the market, Defendants Musk and Tesla were able to keep the share price of TSLA common stock artificially inflated for years, causing the expiration of TSLA put options that otherwise would have been valuable.

283.   Plaintiff would not have purchased TSLA put options at the prices he did had he been aware that the market price for Tesla stock would be artificially and falsely inflated by Defendants' false and misleading statements and/or actions.  Plaintiff's knowledge of the above Issues was acquired gradually over time:

| Date of Put Option Purchase | Listed Issues First Known to Plaintiff |
| --- | --- |
| September 24, 2018 | None |
| October 29, 2018 | 1, 3 |
| December 26, 2018 | 9, 14, 18, 29 |
| March 8, 2019 | 6, 21 |
| March 19, 2019 | 16 |
| May 23, 2019 | 13, 17, 22, 23 |
| September 3, 2019 | 24, 31, 33, 34 (partial) |
| September 27, 2019 | 15, 19, 35 |
| March 12, 2020 | 4, 5, 7, 11, 20, 25, 26, 27, 28, 29 |
| March 19, 2020 | None |
| March 23, 2020 | None |

Plaintiff learned of Issue Nos. 2, 8, 10, 12, 28, 30, and 32 after March 23, 2020.  Therefore, at no time when Plaintiff purchased TSLA put options was Plaintiff fully aware of Defendants' fraud.

## COUNT VIII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 For Market Manipulation Against All Defendants

284.   Plaintiff incorporates by reference the foregoing allegations.

285.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that drove the price of TSLA shares to artificially high levels beginning in 2018, when the stock traded near an already-elevated $250.00 per share, and continuing through the present day, when it trades at or near $4,502.00 per share (split-adjusted), the stock's all-time high.

286.   Defendants Qazi and Smick posted thousands of social media messages addressed to "TESLA SHAREHOLDERS" such as, "Buy FSD. Buy acceleration boost. Buy accessories for your car. Place a $100 order for a Cybertruck or other new vehicle. Buy solar, powerwall, a freaking t-shirt I don't care!  Let's push Tesla over the edge to profitability!!!"  *See* Exhibit C at 41.  Other such messages generally promoted TSLA stock.

287.   Defendant Qazi confirmed that his primary goal was to promote Tesla stock by posting "this is why we do it" above a comment that thanked him for his "funny, informative, thought provoking, & aggressive tweets against Tesla F[ear ]U[ncertainty and ]D[oubt] [that] inspired me to purchase Tesla shares in April & May of 2019."  *See* Exhibit C at 31.

288.   Defendants Musk and Tesla were charged with securities fraud by the SEC.

289.   After being charged with securities fraud, in January 2021 Defendants Musk and Tesla openly manipulated the price of GameStop Corporation's stock and the cryptocurrencies dogecoin and bitcoin, with Tesla even disclosing a $1.5 billion bitcoin purchase.

290.   On January 31, 2021, in a discussion on Clubhouse, Defendant Musk admitted, "I gotta watch what I say here because some of these things can really move the market."

291.   Defendants' market manipulation caused Plaintiff's losses.

292.   At the time of each instance of Defendants' manipulation, Plaintiff was ignorant of those manipulative acts.

293.   Defendants had actual knowledge of the material facts alleged herein, and knowingly intended to deceive investors in order to manipulate the price of Tesla securities.

**COUNT IX**
**For Violation of Section 20(a) of the Exchange Act**
**Against Defendant Elon Musk**

294.     Plaintiff incorporates by reference the foregoing allegations.

295.     Defendant Musk acted as a controlling person of Tesla within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position and his power to control public statements, Defendant Musk had the ability to control the actions of Tesla and its employees. Accordingly, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

296.     Defendant Musk demonstrated his power to unilaterally control the Tesla Board of Directors by pushing through the acquisition of SolarCity Corporation even when it was rejected by the Board and disfavored by multiple investment banks and major investors.

297.     As an officer and director of a publicly owned company, Defendant Musk had a duty to disseminate accurate and truthful information with respect to Defendant Tesla's financial condition and results of operations, and to correct promptly any public statements issued by Tesla that had become materially false or misleading.

298.     Because of his position of control and authority as a senior officer, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace concerning Tesla's financial prospects. Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of TSLA securities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Judgment against Defendants on all counts of the Complaint;

B.   A permanent injunction enjoining all Defendants from making further libelous statements, contacting Plaintiff or his family, impersonating others, and requiring the immediate cessation of the operation of and/or transfer of the Smick Sites to Plaintiff;

C.  Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount not yet known, to be assessed at the time of trial;

D.  Statutory damages, enhanced to a sum of not more than $150,000 per work infringed, for willful infringement of copyrights pursuant to 17 U.S.C. §§ 504(c) and 1202(b);

E.  Actual and punitive damages, including costs and attorneys' fees (should Plaintiff engage counsel), pursuant to 17 U.S.C. § 512(f);

F.  Compensatory, consequential and punitive damages resulting from Defendant's violation of California Civil Code §§ 1708.7 and 3294;

G.  Punitive damages stemming from Defendants' disregard for state and federal laws;

H.  Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs (should Plaintiff engage counsel), in accordance with applicable law;

I.  Such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.


Dated: February 12, 2021

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org