Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AARON GREENSPAN,<br><br>    Plaintiff,<br><br>        v.<br><br>OMAR QAZI, SMICK ENTERPRISES, INC.,<br>ELON MUSK, and TESLA, INC.,<br><br>    Defendants. | Case No. 3:20-cv-03426-JD<br><br>**DECLARATION OF AARON GREENSPAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S THIRD SUPPLEMENTAL AND AMENDED COMPLAINT AND QAZI DEFENDANTS' SPECIAL MOTION TO STRIKE CLAIMS UNDER CALIFORNIA'S ANTI-SLAPP STATUTE, CIV. PROC. CODE § 425.16** |

I, Aaron Greenspan, declare as follows:

1.    As an investor, I have consistently focused on valuation to identify investment opportunities, whether in regard to Tesla, Inc. or other companies.  When I began investing in TSLA securities, I believed that Tesla, Inc. would have trouble ever turning a profit from operations and that the company was overvalued.

2.    My belief that fundamental metrics, such as profitability, matter to stock price is reflected in a number of posts I have made on Twitter from 2018 to the present from the @PlainSite account and from my personal account.

3.    In the Special Motion to Strike Claims Under California's Anti-SLAPP Statute, Civ. Proc. Code § 425.16 (the "Anti-SLAPP Motion," ECF No. 107), Defendants Omar Qazi and Smick Enterprises, Inc. (together, "Qazi Defendants") state on page 2 that "…the Smick Defendants dispute Plaintiff's factual allegations, including claims that Qazi posted certain

statements…"  I interpret this statement as a factual challenge to the Third Supplemental and Amended Complaint ("TAC").

4.     I have been forbidden from conducting any discovery in this case to date on account of the Court's August 7, 2020 Order (ECF No. 63).  Although that Order specifically refers to "an order on the motion to dismiss, Dkt. No. [56]," which was ultimately entered on August 31, 2020 as ECF No. 71 regarding the motion(s) to dismiss the First Amended Complaint, I interpreted the Order to mean that discovery would be stayed until any *substantive* ruling on defendants' motion(s) to dismiss was entered, as the Court and parties were not initially aware that subsequent iterations of the complaint would be filed.

5.     The Court has not yet ruled on any motion to dismiss in this action.

6.     I have been diligent in attempting to pursue discovery.  Even prior to the entry of the Court's Order in ECF No. 63, all defendants in this case repeatedly refused to cooperate with my written discovery requests pursuant to Federal Rule of Civil Procedure 34 and have refused to participate in a Federal Rule of Civil Procedure 26(f) conference.

7.     I cannot prepare an informed opposition to the contested facts without discovery.  Discovery is necessary in order to establish uncontested facts surrounding:

    a)  authorship of various posts from Qazi Defendants' numerous social media accounts, many of which have been deliberately operated in such a manner as to obfuscate the identity of any given post's author or authors;

    b)  Omar Qazi's use of Wikipedia;

    c)  the full extent of the relationship between Qazi Defendants (one or both) and Tesla, Inc., who appear to be parties to at least one contract unrelated to the sale of Mr. Qazi's Tesla vehicle and who remain in frequent communication by e-mail, on social media, and through an attorney who has not formally appeared in this action;

    d)  the degree to which all Defendants have been in communication with Diego MasMarques, Jr. with the intent of working with him to violate, directly or

1    indirectly, the Civil Harassment Orders entered against him starting in 2018.

2    8.    The evidence that I seek exists.  Omar Qazi is personally aware of the

3    circumstances that have led to publication of various posts on the social media accounts he has

4    controlled since 2019.  Mr. Qazi is aware of his own use of Wikipedia.  Mr. Qazi is also aware of

5    communications he has had with numerous third parties, possibly including Diego MasMarques,

6    Jr.  As to his relationship with Tesla, Inc. and Elon Musk, on February 19, 2021, a week after the

7    filing of the TAC, Qazi Defendants' @WholeMarsBlog Twitter account posted two images that

8    appear to be partially redacted screenshots of e-mails accessed from an Apple iPhone, which are

9    reproduced below:





The top image appears to be Quinn Emanuel attorney Alex Spiro's response to Omar Qazi

regarding an e-mail I sent both of them on May 25, 2020, after an unknown individual with a blocked telephone number, identifying himself as working at Quinn Emanuel, called my father at home that same day purporting to represent Elon Musk and Tesla, Inc. in this action, as described in TAC ¶ 121.  The bottom image appears to be an e-mail, date unknown, from Elon Musk to Omar Qazi and Alex Spiro, threatening legal action against me.

9.    The above images and the Twitter post they were attached to were all subsequently deleted, despite constituting evidence pertaining to this action.

10.   I believe that Omar Qazi was aware that deleting evidence was wrong and/or unlawful at the time the post and images were deleted, as a Twitter account with which he frequently communicates, @LudaLisl, asked in direct response to the post in question, "What'll happen if Aaron deletes tweets?"

11.   Thus far, opposing counsel has refused to substantively answer my questions about the deletion and/or attempted deletion of the aforementioned post and images.  Even when asked directly, opposing counsel has not called the authenticity of the e-mails into question.

12.   Prior to deletion, the text of the post read, "Looks like Aaron Greenspan finally found out Alex Spiro is coming for him 🤣."  Consistent with this claim, there is evidence that Alex Spiro has been conducting research on me.  On August 27, 2020, Quinn Emanuel attorney Hope Skibitsky narrowed Freedom of Information Act Request No. 20-00592-FOIA, submitted to the United States Securities and Exchange Commission by Alex Spiro on December 26, 2019, to a specific list of keywords including but not limited to: "Plainsite", "Greenspan", "@AaronGreenspan", "@Plainsite", "PlainSite" (again), and "Think Computer", all of which pertain to me.

13.   For these reasons, under Ninth Circuit precedent and Federal Rule of Civil Procedure 56(d), I believe the Anti-SLAPP Motion must be denied or postponed for ruling until such time as I can conduct discovery regarding the factual disputes involved.

14.   I have felt threatened by Omar Qazi's conduct on numerous occasions, but especially on August 3, 2019 upon receiving false allegations via text message and fax relating to

supposed possession of child pornography, minutes after he posted an altered version of a court document containing my telephone and fax numbers from the civil harassment case involving Diego MasMarques, Jr. referenced in TAC ¶ 26. These communications stated, for example, "We will call the police tomorrow." Although I could not be certain whether or not that threat was true or whether law enforcement had been contacted already, in my experience, law enforcement personnel are required to investigate any claims brought before them in case they have merit. Even a baseless investigation regarding child pornography in connection with my name could be damaging and deliberately used against me.

15.     I have been the victim of similar acts in the past, which made these threats seem credible to me. In late 2018, an individual—whom I have reason to believe was Diego MasMarques, Jr.—filed a false complaint with the California Department of Motor Vehicles ("DMV") alleging that I had provided a false physical address for my vehicle, even though there was no factual basis for this report. Without contacting me, the DMV placed a "Vehicle License Transfer," commonly referred to as a "stop," on my vehicle registration, such that in 2019 I was never notified about the need to re-register my vehicle, and in fact, could not re-register my vehicle. Upon receiving various errors on the DMV website and at a DMV in-store registration kiosk in late 2019, I contacted the DMV Investigations Division, whose personnel realized that the malicious complaint was meritless and released the "stop," allowing me to complete the required vehicle registration steps. In the interim period, the false report exposed me to potential legal jeopardy even though the information I provided to the DMV was accurate.

16.     Omar Qazi has also threatened that my reporting of factual material pertaining to Tesla, Inc. is "now a criminal matter that's being investigating [sic] by the FBI, SEC, and  local police" as recently as March 26, 2021, echoing his threats referenced in TAC ¶ 131. I continue to take threats of malicious prosecution and abuse of process seriously.

17.     Beyond the threats to my reputation and livelihood posed by meritless law enforcement investigations, Omar Qazi has repeatedly falsely portrayed me as someone seeking to commit physical acts of violence against him, as described in TAC Statement No. 38. On

February 25, 2021, after the filing of the TAC, he also wrote an essay on his website entitled "I'm Afraid Of What Aaron Greenspan And His Charity Will Do To Silence Me," which stated, "I am forced to write about what's happening for my own safety and protection.  If anything happens to me or anyone else Aaron Greenspan has been threatening, I want people to know what was going on."  This post appeared shortly after I contacted Mr. Qazi's counsel about another baseless post I believe he authored, falsely referring to me as a "killer."

18.    I do not know why Mr. Qazi has posted altered photographs of me or insisted on promoting the false narrative that I advocate violence, but such strategies are consistent with on-line attacks on prominent journalists such as Maria Ressa, who has stated, "The end goal of these attacks is to dehumanize the target.  That sets the stage for violence."  I agree with her reasoning, and I do fear that a reader of Omar Qazi's false statements might physically attack me because of the numerous lies he has told, as described in the TAC ¶ 107.

19.    I reported Omar Qazi to the San Francisco Police Department and the Federal Bureau of Investigation as described in TAC ¶¶ 44, 72 and 136 both because I feared for my safety and my family's safety (especially after Mr. Qazi posted photographs of my family on his website and Twitter accounts, impersonated my family members, and attempted to contact my brother on Facebook) and because his actions were causing me substantial emotional distress.

20.    On March 5, 2021, after the filing of the TAC, I received a response to a California Public Records Act request I had submitted to the California DMV.  The response contained several previously unpublished letters from Eric C. Williams, whose title is Associate General Counsel, Regulatory at Tesla, Inc., to Miguel Acosta, Chief, Autonomous Vehicles Branch at the California DMV.  Referring to Tesla's autonomous driving capabilities (including "Full Self-Driving" or "FSD," which is a necessary prerequisite for autonomous "robotaxis") by the formal product name "City Streets," the letters stated that "City Streets continues to firmly root the vehicle in SAE Level 2 capability and does not make it autonomous" and "a final release of City Streets will continue to be an SAE Level 2, advanced driver-assistance feature."  These statements were notable as they directly contradict several statements made by Tesla, Inc. CEO

Elon Musk.  For example, at "Autonomy Investor Day" on April 22, 2019, UBS analyst Colin Langan asked, "Just so we understand the definitions, when you refer to feature complete self-driving, it sounds like you're talking Level 5, no geofence.  Is that what's expected by the end of the year, just so we're all on the same page?"  Mr. Musk replied, "Yes."  This exchange can be found in the record in ECF No. 108-7 on page 48.

21.     On the basis of Elon Musk's assurance of SAE Level 5 capability by the end of 2019, Tesla, Inc. was able to charge customers for product upgrades that did not perform as promised (TAC Issue No. 4) and raise several billion dollars from investors (TAC Issue No. 23).

22.     In TAC Issue No. 28, I referenced an article by *Reuters* dated June 10, 2020 concerning an e-mail by Mr. Musk regarding the Tesla Semi.  According to a different publication, that e-mail stated, "It's time to go all out and bring the Tesla Semi to volume production.  It's been in limited production so far, which has allowed us to improve many aspects of the design."  Prior to that e-mail, a separate e-mail by the "Tesla Truck Team" published on January 9, 2020 "confirmed that we are on track to produce limited volumes of the Tesla Semi in the second half of 2020."  Prior to that, on November 16, 2017 Mr. Musk announced, "production begins 2019" with a video banner above him reading, "PRODUCTION BEGINS 2019."  *See* https://www.youtube.com/watch?v=5RRmepp7i5g&t=1487s.

23.     To the best of my knowledge, all of these statements regarding the Tesla Semi were false and misleading as aside from prototypes, the Tesla Semi is still not in production even in 2021 so far.  In addition, the Tesla Careers website only lists two Semi-related job openings.

24.     As Exhibit A, I have attached true and correct copies of various posts on Twitter that demonstrate my interest in investing based on fundamentals, such as valuation.

25.     As Exhibit B, I have attached a true and correct copy of a printout of a March 26, 2021 *Washington Post* article by Hannah Denham entitled "Elon Musk tweets, deletes brag that Tesla will be biggest company 'in a few months.'"  This article describes likely violations of Elon Musk's and Tesla, Inc.'s consent decrees with the United States Securities and Exchange Commission, and well as laws pertaining to the destruction of evidence, committed in direct

response to Omar Qazi's @WholeMarsBlog account on Twitter, which is quoted in the article alongside Mr. Musk.

26.    As Exhibit C, I have attached a true and correct copy of a printout of a February 19, 2021 post that was later deleted on Omar Qazi's @WholeMarsBlog Twitter account.

27.    As Exhibit D, I have attached a true and correct copy of two letters from Eric C. Williams to the California DMV concerning Tesla, Inc.'s SAE Level 2 non-autonomous driving features.

28.    As Exhibit E, I have attached a true and correct copy of a printout of an April 2, 2021 *Bloomberg* article by Dana Hull entitled "Tesla Deliveries Smash Expectations on Reception in China."

29.    As Exhibit F, I have attached a true and correct copy of the Tesla Careers website at https://www.tesla.com/careers/search/?country=US&query=semi as of April 4, 2021, showing only two results for a search involving the word "Semi."

30.    As Exhibit G, I have attached a true and correct copy of excerpts from two depositions in Delaware Court of Chancery Case No. 12711-VCS made public in October 2019 involving the acquisition of SolarCity Corporation, in which Kimbal Musk and Lyndon Rive respectively discuss concerns with margin calls and Goldman Sachs.

31.    As Exhibit H, I have attached a true and correct copy of a printout of the Oxford Languages definition of the word "aware" as of August 19, 2020.

32.    As Exhibit I, I have attached a true and correct copy of e-mail correspondence with opposing counsel regarding their views on Federal Rule of Civil Procedure 8 in this action.

33.    As Exhibit J, I have attached a true and correct copy of e-mail correspondence with opposing counsel regarding what appears to be their clients' attempted deletion of evidence in this action.

34.    Pages with no substantive content due to the manner in which Twitter pages are rendered for printing have been omitted.

1    I declare under penalty of perjury under the laws of the United States that the above

2  statements are true and correct and that this declaration was executed on April 8, 2021 in San

3  Francisco, California.

4

5  Dated: April 8, 2021

6

7

8  Aaron Greenspan

**<u>EXHIBIT A</u>**

Various Twitter Posts by Aaron Greenspan Regarding Stock Valuation

🐦

# Explore

⚙ Settings

← **Thread**



**PlainSite**
@PlainSite                    ···

According to Goldman Sachs research out today, there is no bubble, and this pace of stock market gains is completely sustainable.



5:51 PM · Jun 4, 2018 · Twitter Web Client

**2** Likes

💬          🔁          ♡          ⬆

**PlainSite** @PlainSite · Jun 5, 2018    ···
Replying to @PlainSite
No joke. Technology is useful, therefore any and all valuations are justified regardless of underlying fundamentals. bloomberg.com/news/videos/20…

💬          🔁          ♡          ⬆

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own per

[ **Sign up** ]

## Relevant people

**PlainSite**
@PlainSite
The law in plain sigl
tips@plainsite.org.
may hold long/shor
companies discuss
investment advice.

## What's happening

NCAA Men's Basketball · LIVE
**UCLA Bruins at Gonzaga Bulldogs**
Trending with  Zags

Sports · Trending
**ARE YOU KIDDING ME**
10.7K Tweets

Trending in United States
**WHAT A SHOT**
16K Tweets

COVID-19 · LIVE
**COVID-19: News and upda
for California**

NBA · 48 minutes ago
**Timberwolves at 76ers**
Trending with  Embiid,  Tobias Ha

Show more

Terms of Service   Privacy Polic
Ads info   More ···   © 2021 Twit





PlainSite - With the Shiller P/E ratio at 33.99, a 50% drop in markets would still result in markets being overvalued relative to the mean since ...



 Twitter

# Explore

# Settings

← **Thread**

**PlainSite**
@PlainSite                                    ···

With the Shiller P/E ratio at 33.99, a 50% drop in markets would still result in markets being overvalued relative to the mean since ~1870 of 16.77. Source: multpl.com.



9:39 AM · Dec 28, 2020 · TweetDeck

**9** Retweets   **2** Quote Tweets   **38** Likes

        ♡        ⭕        ♡        ⬆

**PlainSite** @PlainSite · Dec 28, 2020                ···
Replying to @PlainSite
The Shiller P/E ratio is now 34.00, in case anyone was wondering if we'd actually hit another arbitrary round number.
♡ 1        ⭕        ♡ 6        ⬆

**Themarketisrigged** @Themarketisrig1 · Dec 28, 2020    ···
Replying to @PlainSite
TINA.  rates have never been this low, this long.  bubble keeps blowing.
♡        ⭕        ♡        ⬆

**Themarketisrigged** @Themarketisrig1 · Dec 28, 2020    ···
Replying to @PlainSite
TINA.  will go much higher. could hit 100 if interest rates go negative in a big way. we are in uncharted water
♡        ⭕        ♡        ⬆

Search Twitter

**New to Twitter?**
Sign up now to get your own per

**Sign up**

**Relevant people**

**PlainSite**
@PlainSite
The law in plain sig
tips@plainsite.org.
may hold long/shor
companies discuss
investment advice.

**What's happening**

NCAA Men's Basketball · LIVE
**UCLA Bruins at Gonzaga Bulldogs**
Trending with  WHAT A FINISH,

Trending in United States
**ARE YOU KIDDING ME**
Trending with  WHAT A SHOT, Ir

Trending in United States
**WITH A KISS**
9,240 Tweets

COVID-19 · LIVE
**COVID-19: News and upda for California**

NBA · 48 minutes ago
**Timberwolves at 76ers**
Trending with  Embiid, Tobias Ha

**Show more**

Terms of Service   Privacy Polic
Ads info   More ···   © 2021 Twit

4/4/2021
Case 3:20-cv-03426-JD Document 11-1 Filed 04/08/21 Page 15 of 53
Aaron Greenspan on Twitter: "Can someone help me understand $SAM's valuation? Are margins on beer really that high?" / Twitter







# Tweet

**Aaron Greenspan** 🔒
@AaronGreenspan

Can someone help me understand $SAM's valuation?
Are margins on beer really that high?

11:06 AM · Apr 28, 2020 · TweetDeck

View Tweet activity

**2** Likes

### Relevant people

**Aaron Greenspan** 🔒
@AaronGreenspan
"Je pense, donc je
Opinions of an inde

### What's happening

MLB · 1 hour ago
**Braves at Phillies**
Trending with Phillies, Braves

Trending in California
**Pete**
63.9K Tweets

Politics · Trending
**HE IS ALIVE**
42.1K Tweets

COVID-19 · LIVE
**COVID-19: News and upda
for California**

∧ Axios ✓ · Yesterday
**Deep Dive: The growing ro
the U.S. Federal Reserve**

Show more

Terms of Service · Privacy Polic
Ads info · More ··· · © 2021 Twit

**Aaron Greensp...** 🔒 ···
@AaronGreenspan

**Messages** ✉ ∧

**<u>EXHIBIT B</u>**

March 26, 2021 *Washington Post* Article by Hannah Denham Entitled "Elon Musk tweets, deletes brag that Tesla will be biggest company 'in a few months'"

# The Washington Post

*Democracy Dies in Darkness*

# Elon Musk tweets, deletes brag that Tesla will be biggest company 'in a few months'

Shares tumbled after the CEO's Twitter posts, which have been the subject of SEC and shareholder scrutiny before

By **Hannah Denham**

March 26, 2021 at 1:59 p.m. PDT

Tesla stock spiraled in Friday's trading, shedding 3.4 percent by market close following a flurry of news about chief executive Elon Musk's Twitter activity.

Musk boasted early Friday to his nearly 50 million Twitter followers that his company could be "the biggest" in a few months. It came less than a day after the National Labor Review Board upheld a 2019 ruling that determined Tesla engaged in unfair labor practices and called on the company to have Musk delete a tweet from 2018.

After a subdued morning, shares shed as much as 5.6 percent Friday before inching back. Tesla closed at $618.71, down 3.4 percent, and its market cap tumbled more than $19 billion to $593.8 billion.

Tesla's performance ran counter to the broader market's advance. The Dow Jones industrial average added 453 points, or nearly 1.4 percent; the S&P 500 climbed 65 points, or almost 1.7 percent; while the tech-heavy Nasdaq jumped 161 points, or 1.2 percent.

At 4:18 a.m. Friday, Musk tweeted, "I think there is a >0% chance Tesla could become the biggest company," in response to a Twitter user who stated that the electric car manufacturer could be bigger than Apple and tagged Musk.

Another user responded, "I love the direction of that arrow!" To which Musk replied: "Probably within a few months."

That tweet has since been deleted, but screenshots from multiple users who posted Musk's tweets showed the early morning declarations.

Tesla fans quickly reacted, urging other Twitter users to delete screenshots of those tweets over fears the U.S. Securities and Exchange Commission might take notice. Others called for Tesla fans to buy more stock.

The federal regulator declined to comment. A Tesla representative did not respond to a request for comment.

Dan Ives, the managing director of equity research for Wedbush Securities, called Musk's Twitter barrages a frustration for investors, though he said he's not anticipating any action from regulators.

"Elon is Elon, and that's part of his interaction with his followers and commenting on a range of issues. But when it comes to some of these tweets, it's like a kid that keeps playing with firecrackers," he said. "Right now, investors don't want to see any noise or sideshows from Tesla and Musk. They just want to see results, deliveries and ultimately something that would drive the stock higher."

Harvey Pitt, the CEO of consulting firm Kalorama Partners who served as SEC chairman from 2001 to 2003, said the regulator has a few options in such cases, including seeking the appointment of a corporate monitor to curb Twitter activity. "As to how far the SEC is willing to go, that's a very different question," he said in an email. "It's not clear how strong a case the SEC can make against this latest round of tweets."



Musk's tweets have been the subject of amusement, investor lawsuits and a securities fraud charge by the SEC.

In September 2018, the agency charged Musk with securities fraud after he tweeted to his followers that he could take Tesla private at $420 per share and that he already had the funding to do so — just pending a shareholder vote. The SEC alleged that the "series of false and misleading tweets" caused Tesla's stock price to jump more than 6 percent that day and significantly disrupted the market. Musk and Tesla ultimately reached a settlement with the SEC, with each paying a $20 million penalty, and Musk had to step down from his position as chairman of the board for three years.

In April 2019, that settlement was amended to establish oversight for Musk's Twitter activity, in which Tesla's securities lawyers would need to preapprove any communication about the company's financial condition.

Earlier this month, Tesla investor Chase Gharrity filed a lawsuit over Musk's "erratic" tweets that he said influenced the markets and cost shareholders billions of dollars in losses, Reuters reported. One of the tweets named in the complaint was from May 2020, when Musk tweeted "Tesla stock price is too high imo" and Tesla's stock price fell by 10 percent.

And Musk's latest Twitter spiel comes just one day after the National Labor Relations Board called on Tesla to have Musk delete a tweet from 2018 discouraging unionization and rehire a former employee the company fired, upholding a 2019 administrative law judge ruling that stated the company engaged in unfair labor practices.

As of Friday afternoon, the tweet was still up. It reads: "Nothing stopping Tesla team at our car plant from voting union. Could do so tmrw if they wanted. But why pay union dues & give up stock options for nothing? Our safety record is 2X better than when plant was UAW & everybody already gets 22."



Ives pointed to Tesla's rising competition in the electric vehicle market — with automakers General Motors, Volkswagen and Ford now jumping into production — as a reason for the company to focus on its products instead of boasting about expectations for growth.

"When the stock's moving up on a parabolic run and Musk has the golden touch, he can't do anything wrong. But it's also understanding right now the environment for EVs," he said. "It's no longer just Tesla running the show. It's a 'prove me' time, not only for Tesla but for Musk."

Tesla is expected to release its quarterly earnings in late April or early May. David Whiston, U.S. autos equity analyst for Morningstar, said in an emailed note that investors should look at the company's performance long-term.

"I think what matters for Tesla is what does the company look like 5, 10, 20 years from now rather than what the stock does over the next few months," he said. "As for scrutiny, I'm not concerned as long as Elon behaves enough to not have the SEC ban him from being an officer in a public company."

**<u>EXHIBIT C</u>**

Deleted @WholeMarsBlog Twitter Thread Dated February 19, 2021

Case 3:20-cv-03426-JD    Document 111    Filed 04/08/21    Page 22 of 53

🐦

\# Explore

⚙ Settings

← **Tweet**

🔍 Search Twitter



**Whole Mars Catalog** @WholeMarsBlog · 1h    ···

Looks like Aaron Greenspan finally found out Alex Spiro is coming for him 🤣

Wonder how Think Conputer Foundation will like the taste of their own medicine?

💬 8     ⟲ 5     ♡ 41     ⬆

⟲ **Whole Mars Catalog Retweeted**

**Lisa G-Punkt**    ···
@LudaLisl

Replying to @WholeMarsBlog

Aaron'll have to pay a shit ton of money (which he doesn't have) & won't be allowed to talk bs anymore (like Tripp.) Finally, Elon will make an exemple of him and other liars will shit their pants and stfu. We've all been waiting for this.

What'll happen if Aaron deletes tweets?

10:24 PM · Feb 19, 2021 · Twitter for Android

**1** Retweet    **10** Likes

💬      ⟲      ♡      ⬆

**Lisa G-Punkt** @LudaLisl · 18m    ···
Replying to @LudaLisl and @WholeMarsBlog

(I don't know how I feel about you tweeting Elon's emails though. Just a thought here.)

💬      ⟲      ♡      ⬆

**New to Twitter?**

Sign up now to get your own per…

**Sign up**

**Relevant people**

**Lisa G-Punkt**
@LudaLisl

My Twitter account…
#FrunkPuppyFriday
Board Member #Lo…
#ProChoice #ProVa…
#ProScience #Gam…

**Whole Mars Catalo…**
@WholeMarsBlog

part 24 hour EV new…
shitty stand up com…
unofficial fan accou…
commentary fan pa…

**What's happening**

Television · 3 hours ago
**RuPaul's Drag Race on VH1**
Trending with Anne Hathaway,
#DragRace 👑

Trending in United States
**Arby**
The Meat Mountain Sandwic…
sandwich Arby's has ever so…
some discussion
Trending with Meat Mountain

Entertainment · Trending
**I Care A Lot**
Trending with Rosamund Pike

COVID-19 · LIVE
**COVID-19: News and upda…**
for California

Ⓦ The Wall Street J… ✓ · Ye…
**Ferret badgers, rabbits am…**
prime suspects in hunt for…
Covid-19 spread to human…

Show more

Terms of Service   Privacy Policy
Ads info   More ···   © 2021 Twitt…



## **<u>EXHIBIT D</u>**

Letters from Tesla, Inc. Associate General Counsel, Regulatory Eric C. Williams to the
California Department of Motor Vehicles



November 20, 2020                                                                    *Via Email Only*

Miguel Acosta
Chief, Autonomous Vehicles Branch
California Department of Motor Vehicles
Registration Operations Division
P.O. Box 825393 (MS S441)
Sacramento, CA 94232-5393

**Re: City Streets – Pilot Release**

Dear Mr. Acosta:

Thank you for your letter on November 10 that posed questions about the FSD – City Streets feature.
Your letter builds off several discussions with your office, including a recent demo of the feature on
November 13. We address your questions below.

For context, and as we've previously discussed, City Streets continues to firmly root the vehicle in
SAE Level 2 capability and does not make it autonomous under the DMV's definition. City Streets'
capabilities with respect to the object and event detection and response (OEDR) sub-task are limited,
as there are circumstances and events to which the system is not capable of recognizing or
responding. These include static objects and road debris, emergency vehicles, construction zones,
large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather,
complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver
maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must
supervise the system, monitoring both the driving environment and the functioning of City Streets, and
he is responsible for responding to inappropriate actions taken by the system. The feature is not
designed such that a driver can rely on an alert to draw his attention to a situation requiring response.
There are scenarios or situations where an intervention from the driver is required but the system will
not alert the driver. In the case of City Streets (and all other existing FSD features), because the
vehicle is not capable of performing the entire DDT, a human driver must participate, as evidenced in
part through torque-based steering wheel monitoring, or else the system will deactivate.

In addition, as with all other existing FSD features, prior to piloting City Streets to customers, the
feature went through rigorous internal development, testing, and validation to ensure that it operates
in a manner that is completely controllable by the driver. This includes accounting for appropriate
driver engagement. The same hands-on-wheel requirements to use Autopilot carryover to using City
Streets. If the driver ignores the prompts to remain attentive, the alerts will escalate until the driver



Tesla, Inc.
3500 Deer Creek Road, Palo Alto, CA 94304

strikes out and Autopilot disengages. Before opening the pilot, we explained to each non-employee driver the feature's capability, how to use it, its limitations, and their responsibility when using it.

1. *For this release of Tesla Navigate on Autopilot on City Streets, is the default approach of the vehicle slowing and stopping at an intersection until the driver approves continuing forward maintained for surface streets?*

No. The vehicle is designed to stop for traffic lights, stop signs, and other road markings at controlled intersections. The vehicle will not slow or stop at every intersection by default, and the driver is expected to supervise the crossing of such intersections.

2. *If the above default has been maintained, what constraint is in place to limit how early the driver's approval is given, to minimize the danger that a driver authorizes the vehicle to go through a light that changes to red after the authorization signal is given?*

In the pilot release, the driver does not approve travel through each intersection. The vehicle will approach controlled intersections as explained in the Traffic Light and Stop Sign Control ("Stops") section in the owner's manual, which is attached for convenience.

3. *Is a constraint in place when driving on surfaces streets that requires the driver to steer around a corner at an intersection, rather than the vehicle?*

When City Streets is engaged, the feature, together with Autosteer, will center the vehicle in the lane of travel through the intersection, whether straight through or as a left- or right-turn. If the driver does not apply steering wheel torque, the system will not continue to operate.

4. *What would happen in an urban street environment if Autopilot goes through an uncontrolled intersection where other road users (vehicles, cyclists, or pedestrians) may be crossing? Does Tesla apply any speed reductions to give the system a better possibility of detecting and responding to such hazards?*

By default, Autopilot is limited to 5 mph over the detected or mapped speed limit of the road. Applying additional speed reductions does not necessarily improve object detection because speed and detection are dependent on a multitude of factors. More importantly, we designed Autopilot to brake for objects in the vehicle's driving path to mitigate the kind of risk that your question suggests. If a cyclist or pedestrian veers into the vehicle's driving path, Autopilot is designed to react accordingly irrespective of speed. In addition, the driver is expected to continuously monitor the environment and act as a fallback in the case of a system performance failure.

2

5. *The owner's manual states that with the Traffic Light and Stop Sign Control system enabled, the vehicle assumes it has the right of way and proceeds through an intersection with a side road without hesitation. Does the system have a sufficient field of view to detect vehicles or cyclists who could be entering its path from the side road, the way an attentive driver would?*

Autopilot's field of view is 360˚. When Stops is engaged, the vehicle will assume right of way and not slow or stop at intersections with no traffic control unless the vehicle detects an object in its driving path. Autopilot is designed to predict the paths of other objects and respond to those in path or expected to be in path, including stationary and crossing objects; however, path prediction is complex and can be incorrect, which is why the driver is expected to supervise and intervene when necessary.

6. *The owner's manual states that the Traffic Light and Stop Sign Control system may not recognize a T-junction that does not have a stop sign or stop line. What is being done to force driver engagement or attentiveness in this scenario?*

In the Stops section in the owner's manual, we are very explicit about the feature's limitations and the driver's responsibility. If Stops cannot recognize a T-junction because the junction does not have a stop sign or stop line or is not identified as a T-junction in the map data, then the vehicle may not stop. As such, the owner's manual correctly warns the driver that the vehicle may not stop at an unknown or unrecognizable T-junction and to be attentive and ready to intervene if necessary.

7. *The owner's manual states to not use Autosteer on city streets, in construction zones, or in areas where bicyclists or pedestrians may be present. This indicates that the Traffic Light and Stop Sign Control system should not be used with Autosteer, since the former's use cases would be on urban and residential streets with cyclists and pedestrians. Based on this information, why does the description of the Navigation on Autopilot system contain several references to Autosteer usage?*

Updating the owner's manual to account for the small handful of non-employee drivers in the pilot would have created unnecessary confusion for the rest of our customer fleet. Instead, we contacted each non-employee driver in the pilot and explained how to use City Streets, its limitations, and their responsibility when using it. When the pilot is complete and we are ready to release City Streets to all qualifying customer vehicles, then we will update the owner's manual accordingly.

*       *       *

We look forward to continued collaboration with the DMV on this and other matters. If you have any questions or wish to discuss further, please feel free to contact me at erwilliams@tesla.com.

Sincerely,

Eric C. Williams

Associate General Counsel, Regulatory

3



December 14, 2020                                                        *Via Email Only*

Miguel Acosta
Chief, Autonomous Vehicles Branch
California Department of Motor Vehicles
Registration Operations Division
P.O. Box 825393 (MS S441)
Sacramento, CA 94232-5393

**Re: City Streets – Pilot Release**

Dear Mr. Acosta:

Thank you for your follow-up letter on December 7. We appreciate the opportunity to answer DMV's questions about the FSD – City Streets feature. Your letter builds on several recent communications with your office, including a demo of the feature on November 13, and our response to your initial inquiry on this topic, which we submitted on November 20. We address your questions below.

1. *Please provide additional details on the information that has been provided to drivers currently participating in the pilot regarding FSD City Streets' capabilities, intended use, limitations, and driver responsibilities.*

City Streets' capabilities, limitations, and driver responsibilities have been communicated to drivers in the pilot release in several ways. After selecting non-employee participants based on the quality of their prior feedback in the Early Access Program (EAP) as well as their safe driving record, we invited them to participate in the limited release of City Streets via email. The email informed participants that their vehicle would be sent an over-the-air (OTA) software update containing the feature and explained that, when the feature is enabled, their vehicle will make lane changes off highway, select forks to follow a set navigation route, navigate around other vehicles and objects, and make left and right turns. We also cautioned participants that they should only use the feature if they will pay constant attention to the road and to be prepared to act immediately, especially around blind corners, crossing intersections, and in narrow driving situations.

These details were also provided verbally. In advance of the software update, we phoned each non-employee participant, walked them through the behaviors they should expect to see, and confirmed that they understood their responsibilities as the driver. We covered this same information in a dedicated session with employee participants. In the email, non-employee phone discussions, and



Tesla, Inc.
3500 Deer Creek Road, Palo Alto, CA 94304

employee sessions, we made abundantly clear that City Streets does not make the vehicle autonomous and that the driver is responsible for being fully attentive at all times.

Last week, we added approximately 88 additional participants to the pilot release, 25 of whom are non-employees. The non-employee participants were selected using the same criteria as described above and, also same as before, were personally phoned to discuss feature behaviors and driver responsibilities. In total, the pilot is currently comprised of about 200 participants, 54 of whom are non-employees. With the population slowly growing, we are exploring more practical methods of sharing operational information with new non-employee participants in lieu of calling each participant directly. We are internally trialing with new employee participants an introductory video that explains the feature limitations, gives examples of vehicle behavior, instructs the driver on how to engage and disengage the feature, and reminds them that they are in control at all times. If we choose to use the video externally at a later date, most likely we will send it electronically to each new participant through an individualized, password-protected link. At that time, we will be sure to share the video with you for your reference.

Finally, when enabling City Streets for the first time, all participants receive and must accept a pop-up in the center display that explains the feature capabilities and cautions them that the feature may not perform in the way they expect, so it is critical to pay close attention and be able to take action quickly.

2.  *Please describe and provide any relevant documentation reflecting Tesla's intended functionality for the final release of FSD City Streets to the general public. Specifically, which of the limitations associated with the OEDR described in the letter dated November 20, 2020 will continue to be part of the final release of FSD City Streets to the general public?*

While the current pilot version of City Streets is still in a validation and review stage, we expect the functionality to remain largely unchanged in a future, full release to the customer fleet. We are analyzing the data obtained in the pilot and using it to refine the feature's operation and customer experience. We will continue to make refinements as necessary, and only after we are fully satisfied with performance, integrity, and safety will we release the feature to the customer fleet. That said, we do not expect significant enhancements in OEDR or other changes to the feature that would shift the responsibility for the entire DDT to the system. As such, a final release of City Streets will continue to be an SAE Level 2, advanced driver-assistance feature.

Please note that Tesla's development of true autonomous features (SAE Levels 3+) will follow our iterative process (development, validation, early release, etc.) and any such features will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals.

3. *Please describe and provide any relevant documentation reflecting how Tesla is currently communicating the limitations of FSD City Streets to the general public. In addition, what information is being communicated to the general public about the intended capabilities of FSD City Streets, once the pilot is complete and the feature is released to all qualifying vehicles?*

The FSD Capability feature suite, which includes City Streets, is explained on our website at https://www.tesla.com/support/autopilot. Among other information, our website explains that FSD Capability features are intended for use only with a fully attentive driver who has his or her hands on the wheel and is prepared to take over at any moment. It further explains that FSD Capability features do not make the vehicle autonomous.

With a future, full release of City Streets to the customer fleet, we expect that information on feature capabilities and limitations will continue to be communicated on our website and through updates to our owner's manuals, in addition to some or all of the other communications described above (customer email, introductory video, pop-up prompts, etc.).

4. *Please describe and provide any relevant documentation reflecting how Tesla will ensure that its customers understand the limitations of FSD City Streets and remain fully engaged in the dynamic driving task when using the final public release version of the system.*

Again, a full deployment of City Streets to the customer fleet is not expected in the immediate future. However, when that deployment happens, we expect that communication of feature capabilities and limitations will be similar to how we currently communicate about other FSD features (*i.e.*, through our website, our delivery associates (who are all Tesla corporate employees), and our owner's manuals). In addition, we anticipate supplementing the full deployment with an introductory video that explains feature limitations and driver responsibilities, with examples that illustrate how to use the feature and vehicle behaviors to expect when the feature is engaged. We also anticipate that when City Streets is activated in the touchscreen the first time, there will be a pop-up message to customers with feature information and instructions that the driver must pay attention. Finally, we anticipate that drivers will receive warnings when they do not maintain hands on the wheel with appropriate steering torque while City Streets is engaged. Tesla also anticipates that it will continue to review significant events received through vehicle logging and follow up with the drivers.

\*          \*          \*

We look forward to continued collaboration with the DMV on this and other matters. If you have any questions or wish to discuss further, please feel free to contact me at erwilliams@tesla.com.

[Signature block on Page 4.]

3

Sincerely,

Eric C. Williams
Associate General Counsel, Regulatory

**<u>EXHIBIT E</u>**

April 2, 2021 *Bloomberg* Article by Dana Hull Entitled "Tesla Deliveries Smash Expectations on Reception in China."

Green

# Tesla Deliveries Smash Expectations on Reception in China

By Dana Hull

April 2, 2021, 6:10 AM PDT  *Updated on April 2, 2021, 7:26 AM PDT*

► Company says Models S and X were exceptionally well received

► Wedbush analyst Ives calls the report a 'massive home run'



A customer sits inside a Tesla Inc. Model Y electric vehicle in Shanghai. *Photographer: Qilai Shen/Bloomberg*

Tesla Inc. delivered more cars than expected in the first quarter, a strong start to a year in which Chief Executive Officer Elon Musk will be scaling global operations and building two more factories.

The maker of electric vehicles delivered 184,800 cars worldwide in the first three months of the year, up from 180,570 in the fourth quarter, the company said in a statement Friday.

"We are encouraged by the strong reception of the Model Y in China and are quickly progressing to full production capacity," the company said. The new Model S and Model X have also been "exceptionally well received," it said, adding that it's in the early stages of ramping production.

Tesla currently makes the Model S and X only at its factory in Fremont, California, and the smaller Model 3 and Y both there and at its plant in Shanghai. The company doesn't break out sales by geography, but the U.S.

and China are its largest markets and nearly all the sales were of the Model 3 and Y.

The Palo Alto, California-based company recently refreshed the Model S sedan and the X, an SUV. No Model S and X vehicles were made in the quarter, and only 2,000 were delivered in total.

### 'Home Run'

**More from**

**Bloomberg Green**

**In a World of Big Wind, There's Still a Place for Tiny Turbines**

**Future of 'Broken' Oil Program Under Review, Interior Head Says**

**Saudi Arabia of Cobalt: Congo Eyes Battery-Metal Price Power**

**California Reservoirs Are Half-Empty, Recalling Historic Drought**

Chief Financial Officer Zachary Kirkhorn warned in January that production would be low due to the transition to the revamped products, while the global semiconductor shortage and delays at ports were also expected to weigh on the quarter. Analysts surveyed by Bloomberg had expected deliveries of 169,850 -- Dan Ives at Wedbush said Wall Street was penciling in a number as low as 160,000.

The quarter was "a massive home run in the eyes of the bulls," Ives said in a research note Friday. "We believe China and Europe were particularly robust this quarter as the trajectory now puts Musk & Co. to exceed 850k for the year which is well ahead of whisper expectations."

Tesla said its delivery count should be viewed as slightly conservative and final numbers could vary by as much as 0.5% or more.

The quarterly delivery figure is widely seen as a barometer of demand for both Tesla's vehicles and consumer interest in electric vehicles worldwide as legacy automakers roll out electric cars of their own.

After a remarkable run in 2020, Tesla's shares are down roughly 6% this year. Friday is a market holiday in the U.S.

*– With assistance by Yueqi Yang*

*(Adds reaction in seventh paragraph)*

Have a confidential tip for our reporters?

GET IN TOUCH

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy
©2021 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices    Contact Us  Help

**EXHIBIT F**
Tesla Careers Website "Semi" Search Results



# TESLA

# Careers

**Search**

semi

**Job Category**

- Select -

**Region**

- Select -

**Location**

United States of America

**State**

- Select -

RESET FILTERS

Production Supervisor - <mark>Semi</mark>, Gigafactory, Nevada

Manufacturing

Sparks, Nevada

Process Technician, <mark>Semi</mark>, Gigafactory Nevada

Manufacturing

Sparks, Nevada

Tesla © 2021

Privacy & Legal

**EXHIBIT G**
Delaware Court of Chancery Case No. 12711-VCS Deposition Excerpts

```
                                              Page 1
```

```
                    * CONFIDENTIAL *
 1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE
 2    IN RE TESLA MOTORS, INC.          Consolidated
      STOCKHOLDER LITIGATION            C.A. No. 12711-VCS
 3    _____
 4        CONFIDENTIAL VIDEO DEPOSITION OF KIMBAL JAMES MUSK
                        April 23, 2019
 5    _____
 6    APPEARANCES:
 7    ON BEHALF OF THE STOCKHOLDERS OF TESLA MOTORS, INC.:
              JUSTIN O. RELIFORD, ESQ.
 8            Kessler Topaz Meltzer Check, LLP
              280 King of Prussia Road
 9            Radnor, Pennsylvania  19087
              Phone: 484-270-1494
10            Email: jreliford@ktmc.com
11    ON BEHALF OF THE TESLA MOTORS, INC. BOARD OF DIRECTORS:
              DANIEL SLIFKIN, ESQ.
12            RYAN SILA, ESQ.
              Cravath, Swaine & Moore, LLP
13            825 Eighth Avenue
              New York, New York  10019
14            Phone: 212-474-1438
              Email: dslifkin@cravath.com
15            Email: rsila@cravath.com
      and
16            RYAN A. McLEOD, ESQ.
              Wachtell, Lipton, Rosen & Katz
17            51 West 52nd Street
              New York, New York  10019
18            Phone:  212-403-1000
              Email:  ramcleod@wlrk.com
19
      Also Present:
20            Lynn Miller, Esq., Tesla Motors, Inc.
              Jerry DeBoer, videographer
21
22
23
24
25
```

Page 18

* CONFIDENTIAL *

1  SolarCity?
2      A.  It does.
3      Q.  And what did you mean by "a rough few weeks
4  for the stocks"?
5      A.  I don't recall this period of time, but
6  from my words in this email, it would be, I imagine, a
7  volatile few weeks.
8      Q.  A volatile few weeks for SolarCity stock;
9  correct?
10     A.  I think that refers to two stocks, just
11  because there's an "S" after the stock.  Or at least more
12  than one.
13     Q.  You meant the stock for Tesla?
14     A.  I believe so, based on Karen's response.
15     Q.  You say here, "I can draw the loan from Elon
16  whenever and then some of the funds from the Tesla November
17  sale could also pay down some of the SolarCity loan if
18  needed."
19         Do you see that?
20     A.  Yep.
21     Q.  All right.  What did you mean when you
22  referenced the loan from Elon?
23     A.  ==I discussed a loan from Elon so that I did==
24  ==not have to sell SpaceX stock for a margin call.==  I never
25  ended up calling the loan.

Page 19

* CONFIDENTIAL *

1      Q.  Ms. Winkelman responds by noting where the
2  stock prices would be for there to be calls on your margin
3  line; correct?
4      A.  Yep.
5      Q.  And for SolarCity, that stock price would be
6  $34.48 per share; correct?
7      A.  Yeah.
8      Q.  At that time it had closed at $39.39;
9  correct?
10     A.  Yep.
11     Q.  Ms. Winkelman notes, "You currently would
12  not be able to do a new draw on the SolarCity line, but it
13  wouldn't trigger a call until price is at $34.48."
14         Do you see that?
15     A.  Yep.
16     Q.  All right.  What did you understand
17  Ms. Winkelman to be explaining to you there?
18     A.  This is standard business for me.  So for
19  me, this is an email I would expect from my CFO to help me
20  manage my liquidity across my different stocks and assets.
21     Q.  And that was one of Ms. Winkelman's
22  responsibilities was managing your liquidity; correct?
23     A.  Yeah.
24     Q.  When did you discuss the loan from Elon?
25     A.  It would have been sometime before this

Page 20

* CONFIDENTIAL *

1  email, so I'm guessing prior to October 20th, 2015.
2      Q.  Was that an in-person conversation, over the
3  telephone?
4      A.  It would have been one of the two, I think.
5  I cannot remember.
6      Q.  And was the loan at that time specifically
7  to cover any SolarCity calls that might happen?
8      A.  I don't think it would have been related to
9  SolarCity.  It would have been just liquidity in general.
10  But I think -- if I recall, it actually was more related
11  to an investment in The Kitchen, my -- my restaurant
12  business.
13         So I needed to either get liquidity
14  somewhere else or get a loan from my brother.  And I ended
15  up getting liquidity somewhere else.
16     Q.  Around this time, you were engaging in a
17  private offering for The Kitchen; correct?
18     A.  Yep.
19     Q.  How much of The Kitchen do you own?
20     A.  I believe I own about ▆▆▆▆ of the
21  company.
22     Q.  Who owns the other ▆▆▆▆?
23     A.  A very large group of small investors.  So
24  they have all invested a relatively small amount, but own
25  ▆▆▆▆▆▆▆▆▆▆.

Page 21

* CONFIDENTIAL *

1      Q.  Is Elon invested in The Kitchen?
2      A.  He did very early on.
3      Q.  And what was the size of that investment?
4      A.  I believe his total investment -- I think
5  he stopped investing in 2011.  I'm guessing on the years,
6  but around then.  I think it was ▆▆▆▆.
7      Q.  Did he participate in the offering --
8      A.  In this offering?
9      Q.  -- around this time?
10     A.  Not that I -- not that I recall.
11     Q.  Your cousin, Lyndon, is also an investor in
12  The Kitchen; is that correct?
13     A.  That's correct.
14     Q.  How much does he have invested in The
15  Kitchen?
16     A.  I believe he has ▆▆▆▆ invested in The
17  Kitchen.
18     Q.  Did he participate in the offering?
19     A.  I do not recall if he participated in this
20  one.  I don't think so, though.
21     Q.  Your cousin, Peter Rive, is an investor in
22  The Kitchen; correct?
23     A.  That's correct.
24     Q.  Did he participate in The Kitchen's
25  offering?

6 (Pages 18 - 21)

CONFIDENTIAL

Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2    ----------------------------------------------

3    IN RE: TESLA MOTORS, INC.      Consolidated

4    STOCKHOLDER LITIGATION         C.A. No. 12711-VCS

5

6    ----------------------------------------------

7

8

9

10

11                   CONFIDENTIAL

12

13

14        VIDEO-RECORDED DEPOSITION OF LYNDON RIVE

15                WEDNESDAY, MAY 15, 2019

16

17

18

19

20

21

22    Reported by:

23    Anrae Wimberley

24    CSR No. 7778

25    Job No. NY 3276314

CONFIDENTIAL

Page 146

1 BY MR. BERGER:
2    Q.   Mr. Rive, just to follow up on something
3 that you said before, you said ==what you remembered==
4 ==was that one of the two banks, Goldman Sachs or==
5 ==Morgan Stanley, refused to fund you== -- your request
6 for funding at this time in August because of the
7 shareholder vote.
8         That was the shareholder vote by Tesla
9 shareholders to approve the acquisition with
10 SolarCity; right?
11    A.   No.  So the choice of doing an acquisition
12 doesn't always have to be a shareholder vote; it can
13 be a management board decision.  You don't have to
14 get shareholder approval to do an acquisition.
15        So when Morgan Stanley or Goldman -- I
16 forget, whichever one it is -- when they started the
17 process, they thought that our board and their board
18 has to -- if it's an agreed, then it's all fine.
19        Only later on in the process did they
20 realize, oh, we're not going board-level sign-off
21 for the acquisition; we are actually going to ask
22 for shareholder approval.  So the deal is not done,
23 you still have to get shareholder approval.  So,
24 therefore, we -- and so it's -- ==both sides were==
25 ==concerned.==

Page 147

1    Q.   So in other words, whichever bank it was
2 was concerned about lending money to SolarCity as a
3 standalone entity, they only wanted to lend it if it
4 was going to be combined with Tesla?
5    A.   I don't know if it's a concern.
6    Q.   Wasn't that the takeaway from why
7 they're -- what you're saying about they're being
8 concerned about a shareholder vote?
9    A.   Well, they just didn't know what the
10 outcome was going to be.
11    Q.   Well, their concern wasn't if the outcome
12 was going to be positive, right, their concern was
13 if the outcome was going to be negative.
14    A.   I don't know --
15    Q.   That's what you just told me.
16    A.   I don't know what their -- I don't know
17 what their concern is.  I'm telling you why they
18 didn't do it.
19    Q.   Isn't that the logical takeaway from not
20 doing it because they're waiting for a shareholder
21 vote, they're worried that the vote would be no?
22    A.   You would have to ask them.
23    Q.   A little bit earlier when you told me that
24 in the third quarter or fourth quarter you got a
25 billion dollars of funding from banks -- I've seen

Page 148

1 that referred to.
2    A.   Yes.
3    Q.   Okay.  Was that the fourth quarter?
4    A.   Some in Q3 -- I think it was a little bit
5 in October, yeah.  So September/October was the
6 primary months for that -- for that capital.
7    Q.   So October would have been the fourth
8 quarter.
9         You think some was in September?
10    A.   I think about half and half, if I were to
11 guess.
12    Q.   And all of that was after July 31st, when
13 Tesla and SolarCity signed the agreement for Tesla
14 to buy SolarCity; correct?
15    A.   No.  It was actually despite that.
16    Q.   I didn't ask despite; I asked you if it
17 was after.
18    A.   Yes, it happened --
19    Q.   It happened after.
20    A.   It happened after.
21        It's also important to know that when they
22 went to credit committee, they underwrite it as
23 SolarCity only.
24    Q.   And you know that?
25    A.   Yes.

Page 149

1    MR. BERGER:  We didn't mark these yet, did we?
2        Okay.  What's the next exhibit, please?
3 THE REPORTER:  26.
4    MR. BERGER:  Let's do this as 26.  I think I
5 did mark one of these, but I can't remember which
6 one.  Maybe I did mark this one.  I did.
7    MS. MACKINTOSH:  Was it this one?
8    MR. BERGER:  Yes.  Was it 9?
9    MR. UPADHYA:  Yep -- it was 7.
10 BY MR. BERGER:
11    Q.   Okay.  So let me put back in front of you
12 Exhibit 7, please, or if you could grab it out of
13 the pile, that would be great.  Thank you.  It's the
14 third quarter shareholder letter.
15        Could you look at page 15, please.
16 Actually, take a look back at page 14, which is the
17 first page.
18        This is your statement of cash flows,
19 meaning SolarCity's statement of cash flows;
20 correct?
21    A.   Correct.
22    Q.   So if you look at the next page, page
23 15 -- are you on page 15?
24    A.   Yes, I'm on page 15.
25    Q.   So you'll see there's a line here three up

38 (Pages 146 - 149)

**<u>EXHIBIT H</u>**
Dictionary Definition of "Aware"



www.thefreedictionary.com › aware ▾

**Aware - definition of aware by The Free Dictionary**

**Define aware**. aware synonyms, aware pronunciation, aware translation, English dictionary definition of aware. adj. 1. Having knowledge or discernment of ...

www.lexico.com › definition › aware ▾

**Aware | Definition of Aware by Oxford Dictionary on Lexico ...**

adjective. predicative. 1Having knowledge or perception of a situation or fact. 'most people are **aware** of the dangers of sunbathing'. More example sentences: 'he ...

www.yourdictionary.com › aware ▾

**Aware dictionary definition | aware defined - YourDictionary**

**aware definition**: The **definition** of **aware** is someone who knows or realizes something. (adjective) If you are up-to-date on the latest news then that is an ...

www.collinsdictionary.com › dictionary › english › aware ▾

**Aware definition and meaning | Collins English Dictionary**

If you are **aware** of something, you realize that it is present or is happening because you hear it, see it, smell it, or feel it. She was acutely **aware** of the noise of the ...

www.thesaurus.com › browse › aware ▾

**Aware Synonyms, Aware Antonyms | Thesaurus.com**

Synonyms for **aware** at Thesaurus.com with free online thesaurus, antonyms, and ... **aware**. [ uh-wair ]. SEE **DEFINITION** OF **aware**. adj.knowledgeable ...

## People also search for



Most popular dictionaries

Oxford English Dictionary | The Free Dictionary | Macmillan English Dictionary... | Oxford Dictionary of English | Merriam... | Urban Dictionary

→    See more

*Feedback*

## Searches related to define aware

define aware **synonym**      aware **verb**

define **conscious**      aware **sentence**

define **awareness**      be **aware** **meaning in hindi**

how to pronounce aware      **cognizant definition**



Goooooooooogle ›

1   2   3   4   5   6   7   8   9   10    Next

● **Mission District, San Francisco, CA** - From your Internet address - Use precise location - Learn more

Help    Send feedback    Privacy    Terms

## **EXHIBIT I**

E-Mail Correspondence with Opposing Counsel Regarding Federal Rule of Civil Procedure 8

From: **Reddy, Aarti** areddy@cooley.com
Subject: RE: [Attempted] Rule 26(f)/ADR Call Recap
Date: March 17, 2021 at 12:28 PM
To: Aaron Greenspan aaron.greenspan@plainsite.org
Cc: Trevor, Reece rtrevor@cooley.com, Karl Kronenberger karl@krinternetlaw.com, Jeff Rosenfeld jeff@krinternetlaw.com, Liana Chen liana@krinternetlaw.com, Leah Vulic leah@krinternetlaw.com, Dwyer, John C. DWYERJC@cooley.com

Aaron,

Thank you for your email.  Under the PSLRA's plain text and as the Court has confirmed, discovery in this case is stayed pending the Tesla Defendants' motion to dismiss, so both a Rule 26(f) conference and proceeding with written discovery would be premature. *See* ECF No. 63.

We do not agree that there is an inconsistency between that fact and our citation of *Hatch v. Reliance Insurance Co.*'s holding regarding Rule 8. The PSLRA's passage did not affect Rule 8's applicability to private securities actions. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012) ("*In addition to* the pleading requirements of Rule 8, there are more demanding pleading requirements for certain causes of action, especially securities fraud." (emphasis added)). Moreover, *Hatch* did not involve securities claims, so the PSLRA would have had no effect on its reasoning or holding regardless. *See* 758 F.2d 409, 415 (9th Cir. 1985).

Best,
Aarti


Aarti Reddy
Cooley LLP
+1 415 693 2103 office

**From:** Aaron Greenspan <aaron.greenspan@plainsite.org>
**Sent:** Monday, March 15, 2021 7:42 PM
**To:** Reddy, Aarti <areddy@cooley.com>
**Cc:** Trevor, Reece <rtrevor@cooley.com>; Karl Kronenberger <karl@krinternetlaw.com>; Jeff Rosenfeld <jeff@krinternetlaw.com>; Liana Chen <liana@krinternetlaw.com>; Leah Vulic <leah@krinternetlaw.com>
**Subject:** Re: [Attempted] Rule 26(f)/ADR Call Recap

**[External]**

Aarti,

I've had an opportunity to read your latest motion to dismiss, and I thought we should get started on the Rule 26(f) conference and discovery given your apparent change in position.

Section II of your brief, entitled "THE TAC VIOLATES THIS COURT'S ORDER MANDATING COMPLIANCE WITH RULE 8" (which by the way, is false) relies on *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 415 (9th Cir. 1985), but as you surely know, the PSLRA was passed in 19**95**, which would make such a citation bad law in violation of Paragraph 23 of Judge Donato's Standing Order for Civil Cases. ("All case citations and

factual statements must be completely accurate. A citation to a case, statute or other authority is counsel's representation to the Court that the authority stands for the proposition asserted and is good law.") I cannot imagine that someone with your depth of experience—who has been warned repeatedly about previous Paragraph 23 violations— would be so bold as to brazenly violate the Standing Order yet again, so I interpret this to mean that your client's position is that the PSLRA no longer controls this case, in which a citation from 1985 would make sense. Accordingly, you have waived any objections to discovery. So let's begin.

I believe you still have my Rule 34 requests served on July 27, 2020. I am available for the Rule 26(f) conference at your convenience any time this week.

Regards,

Aaron

PlainSite | [https://www.plainsite.org](https://www.plainsite.org)

**<u>EXHIBIT J</u>**
E-Mail Correspondence with Opposing Counsel Regarding Attempted Deletion of Evidence

**From:** **Aaron Greenspan** aaron.greenspan@PLAINSITE.ORG
**Subject:** Re: Sanctions
**Date:** April 6, 2021 at 4:32 PM
**To:** Aarti Reddy areddy@cooley.com
**Cc:** Karl Kronenberger karl@krinternetlaw.com, Dwyer, John C. DWYERJC@cooley.com, Trevor, Reece rtrevor@cooley.com,
Jeff Rosenfeld jeff@krinternetlaw.com, Liana Chen liana@krinternetlaw.com, Alex Spiro alexspiro@quinnemanuel.com

Aarti,

Thank you for the response, but you can answer at least the fourth question as well. Did Tesla, Inc. or Elon Musk request the deletion of the Materials, and if so, who, when, and by what means?

Aaron

PlainSite I https://www.plainsite.org

> On Apr 6, 2021, at 11:16 AM, Reddy, Aarti <areddy@cooley.com> wrote:
>
> Aaron,
>
> As you know, discovery in this action remains stayed pending resolution of the motion to dismiss. As such, the Tesla Defendants do not agree to produce any documents at this time.
>
> Thank you,
> Aarti
>
>
> Aarti Reddy
> Cooley LLP
> +1 415 693 2103 office
>
> **From:** Aaron Greenspan <aaron.greenspan@plainsite.org>
> **Sent:** Tuesday, April 6, 2021 10:15 AM
> **To:** Reddy, Aarti <areddy@cooley.com>
> **Cc:** Karl Kronenberger <karl@krinternetlaw.com>; Dwyer, John C. <DWYERJC@cooley.com>; Trevor, Reece <rtrevor@cooley.com>; Jeff Rosenfeld <jeff@krinternetlaw.com>; Liana Chen <liana@krinternetlaw.com>; Alex Spiro <alexspiro@quinnemanuel.com>
> **Subject:** Re: Sanctions
>
> **[External]**
>
> Aarti,
>
> My fifth question addresses the e-mails that were originally shared. Are you claiming that the messages Omar shared are not authentic? Otherwise, your clients retain them—unless they were deleted from Tesla's Exchange server—so you can certainly address the question about whether or not you will now provide them.
>
> Aaron
>
> PlainSite I https://www.plainsite.org

On Apr 6, 2021, at 10:10 AM, Reddy, Aarti <areddy@cooley.com> wrote:

Aaron,

The Tesla Defendants do not exercise control over the @WholeMarsBlog Twitter account, and thus we cannot address your questions below. We continue to comply with all applicable rules and obligations governing the preservation of evidence.

Regards,

Aarti Reddy
Cooley LLP
+1 415 693 2103 office

**From:** Aaron Greenspan <aaron.greenspan@plainsite.org>
**Sent:** Tuesday, April 6, 2021 9:30 AM
**To:** Karl Kronenberger <karl@krinternetlaw.com>; Dwyer, John C. <DWYERJC@cooley.com>
**Cc:** Reddy, Aarti <areddy@cooley.com>; Trevor, Reece <rtrevor@cooley.com>; Jeff Rosenfeld <jeff@krinternetlaw.com>; Liana Chen <liana@krinternetlaw.com>; Alex Spiro <alexspiro@quinnemanuel.com>
**Subject:** Re: Sanctions

**[External]**

All,

Are you planning to respond to this, or will you just have Omar post misleading portions of the e-mail on Twitter a few more times?

See https://twitter.com/WholeMarsBlog/status/1379387789561696256.

Alex, would you like to explain your role in all of this?

Aaron

PlainSite | https://www.plainsite.org

On Apr 2, 2021, at 3:09 PM, Aaron Greenspan <aaron.greenspan@PLAINSITE.ORG> wrote:

All,

I am preparing my respective opposition briefs to your motions to dismiss

to dismiss.

As you know, the TAC raises allegations that Omar Qazi is an agent of Elon Musk and/or Tesla, Inc. and that they are in frequent communication. Accordingly, I am interested in a Twitter post and the attached screenshots of at least two e-mails (the "Materials") that were posted on the @WholeMarsBlog account on February 19, 2021 involving Omar Qazi. Strangely, these seem to have been deleted since then (see https://twitter.com/WholeMarsBlog/status/1362987413912526848, the deleted post, and https://twitter.com/WholeMarsBlog/status/1362988110162714626, connected to that post but stating "This Tweet was deleted by the Tweet author.").

It is indisputable that these Materials constitute material evidence that is crucial in this case. My questions for you:

1. Why were these Materials deleted?

2. When were these Materials deleted?

3. Who deleted the Materials?

4. Did anyone request the deletion of the Materials and if so, who, when, and by what means?

5. Although you may not have the content of the original tweet itself, all parties in this case retain copies of the original e-mails that were the subject of the screenshots. In light of this apparent attempt to destroy evidence—a serious matter as you surely know—will you provide those e-mails now?

One message is from Alex Spiro to Omar Qazi on or around May 25, 2020. The other is from Elon Musk to Omar Qazi and Alex Spiro.

Thank you,

Aaron

PlainSite | https://www.plainsite.org
<20210219.qazi-deleted.pdf>

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are

the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.