UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON JACOB GREENSPAN,

        Plaintiff,

      v.

OMAR QAZI, et al.,

        Defendants.

Case No.  20-cv-03426-JD

**ORDER RE MOTIONS TO DISMISS AND MOTION TO STRIKE**

Re: Dkt. Nos. 107, 108

Pro se plaintiff Aaron Greenspan has filed a third amended complaint (TAC) against defendants Elon Musk and Tesla, Inc., and Omar Qazi and his company, Smick Enterprises, Inc. (Smick), for securities and copyright law violations, defamation, and civil stalking.  Dkt. No. 103. The Tesla and Qazi defendants, who are represented by separate counsel, have each filed motions to dismiss the TAC under Federal Rule of Civil Procedure 12(b)(6).  Dkt. Nos. 107, 108.  The Qazi defendants also ask to strike Greenspan's state-law claims under California's anti-strategic lawsuits against public participation (anti-SLAPP) statute, Cal. Code Civ. P. § 425.16.  Dkt. No. 107.  The motions are suitable for submission without oral argument.  Civil L.R. 7-1(b).

This flood of pleadings motions is part and parcel of the deeply acrimonious interactions between Greenspan and Qazi, and to a lesser degree Greenspan and the Tesla defendants. Greenspan regards Tesla as a "cult" and a "Ponzi scheme," and sees himself as its short-seller "arch-nemesis."  Dkt. No. 103 ¶ 3 and at 19.  Greenspan considers Qazi to be a "ferocious propagandist" for Tesla who has engaged in a "campaign of criminal harassment" against him.  *Id.* ¶ 6 and at 7.  The parties, mainly Greenspan and Qazi, have relentlessly lobbed filings at each other, resulting in a docket that already exceeds 100 entries even though discovery has been stayed and the Court has yet to rule on a motion to dismiss.

United States District Court
Northern District of California

Disappointingly, the content and tone of many of these filings have been personally disparaging and inconsistent with the standards of civility and professionalism that all litigants and counsel are expected to meet in this District. Early on, the Court tried to restore at least some measure of good conduct with a "civility" order, Dkt. No. 72, but the parties have not embraced the message. *See* Dkt. No. 102 at 1 ("Overall, the parties' inability to handle their business in a professional manner has created a mountain of work that does nothing to promote the fair and efficient resolution of this lawsuit.").

Greenspan's complaints have been a significant challenge in themselves. He has filed over 4,000 pages of pleadings. *See* Dkt. No. 1 (original complaint of 264 pages, including attached exhibits); Dkt. No. 20 (first amended complaint of 1,606 pages with exhibits); Dkt. No. 70 (second amended complaint of 1,889 pages with exhibits); Dkt. No. 103 (the operative TAC of 428 pages with exhibits). Such massive complaints are antithetical to the "short and plain statement of the claim" mandated by Rule 8 of the Federal Rules of Civil Procedure, and they impose unfair burdens on the defendants who are called to answer them. The Court has cautioned Greenspan about this problem and the possible consequence of a summary dismissal. *See* Dkt. No. 101.

It would be perfectly appropriate to dismiss the 428-page TAC for flouting this order and Rule 8, but the Court will decide the plausibility of the federal claims in the interest of moving this case along. The Court's subject matter jurisdiction is premised on questions of federal law. *See* Dkt. No. 103 ¶¶ 20-22. There is no allegation of diversity of citizenship, and most of the parties are citizens of California. *See id.* ¶¶ 15-19. Consequently, the Court will focus on the federal claims in the motions to dismiss. The Court also resolves the challenges to the state law claims against Tesla and Musk, but declines to exercise supplemental jurisdiction over the state law claims against Qazi and Smick pending further order.

All of the federal claims in the TAC are dismissed with leave to amend as governed by the instructions given at the end of the order. The requests for judicial notice, Dkt. Nos. 108-10, 112, 119, are denied. The anti-SLAPP motion is terminated without prejudice.

# BACKGROUND

As alleged in the TAC, and as is widely known, Tesla is a publicly traded electric vehicle manufacturer, and Musk is its chief executive officer.  *See* Dkt. No. 103 ¶¶ 1-2, 18-19.  Greenspan is "an investor who has held put options" in Tesla's stock,[1] and a "data journalist" who operates an online "legal information service called PlainSite."  *Id.* ¶¶ 24-25.  He says that he created an early version of Facebook, a claim that is the focus of his autobiography.  *See id.* ¶ 225, 227; *see also id.* ¶ 161, issue #6.  Greenspan bought put options in Tesla stock based on his belief that it was "fundamentally overvalued by the market."  *Id.* ¶ 24.  Tesla experienced a "precipitous increase" in its share price that made Musk "the wealthiest person in the world."  *Id.* ¶ 4.  The flip side was that Greenspan lost the value of his put options.  *Id.* ¶ 282.  Greenspan operates the Think Computer Foundation, which is said to be registered with the Internal Revenue Service (IRS) as a tax-exempt organization. *See id.* ¶¶ 51, 78.  Qazi is a Tesla shareholder who has authored many social media posts praising the company and denigrating its critics, both individually and through his company, Smick.  *See id.* ¶¶ 6, 8.

Greenspan characterizes Tesla as "the largest Ponzi scheme in history -- one that just happens to produce cars."  *Id.* ¶ 3; *see also id.* ¶ 14 (referring to Tesla as "a trillion-dollar securities fraud: the largest in American history").  He says that Musk and Tesla have made "thousands of false and misleading statements and material omissions" to boost Tesla's stock price.  *Id.* ¶ 12.  Greenspan alleges 35 "issues" that are said to evince a scheme to mislead investors about Tesla's value, in violation of the securities laws.  *See id.* ¶¶ 268-72.  These include allegations that Musk posted a tweet stating that "critical feedback is always super appreciated," when Musk was "conspiring" with "ex-CIA and ex-NSA officials," "convicted felons," "social media influencers," and others to "unlawfully disseminate false and misleading news stories, and to discredit or silence critics."  *Id.* ¶ 271, issue #15.  Another allegation is that Tesla and Musk had

---

[1] As relevant here, the holder of a put option has a time-limited right to sell stock at a fixed price. Put options generally increase in value when the market price of the stock decreases, and vice-versa.  Consequently, put options are purchased by those who believe the underlying stock is overvalued by the market, and who wish either to protect against the risk of a decline in the stock price or to profit from it.

undisclosed dealings with the families of the notorious drug kingpins, Pablo Escobar and Joaquín "El Chapo" Archivaldo Guzmán Loera.  *Id.* ¶ 272, issue #33.  More mundanely, Greenspan also alleges that Tesla used "accounting tricks" to inflate its cash balance, *id.* ¶ 268, issue #1; reported "deliveries" of cars rather than "sales," *id.* ¶ 269, issue # 7; reported an inflated accounts receivable balance, *see id.* ¶ 270, issue #11; and that in January 2020, Musk made inaccurate forecasts about COVID-19, *see id.* ¶ 271, issue # 27.  Greenspan says he continued to purchase put options even as the allegedly misleading nature of the Tesla Defendants' statements or omissions was exposed to the public.  *See id.* ¶ 283.  He has posted comments on social media about perceived problems with Tesla products.  *See id.* ¶ 28.

The allegations against Qazi border on the lurid.  They begin with Greenspan's assertion that he posted on PlainSite, his website, a report about a convicted murderer in Spain named Diego MasMarques Jr., who retaliated by "falsely alleging" on various websites that Greenspan and his family had "committed a wide variety of crimes ranging from setting up a 'fraudulent' nonprofit organization, to tax evasion, to extortion, to the hacking of his e-mail account."  *Id*. ¶¶ 25-27.  Greenspan obtained a restraining order against MasMarques.  *Id.* ¶ 26.  While not clearly explained in the TAC, this incident appears to be relevant to the defamation claims because Greenspan believes it drew the attention of Qazi, who started criticizing Greenspan by re-posting Diego's allegations on a Twitter account called "@tesla_truth."  *See id.* ¶ 28.

The TAC then alleges a torrent of nasty exchanges between Greenspan and Qazi in the Twitterverse and similar forums.  There is no reason to catalog these communications here, especially since the Court will not take up the state law defamation claims against Qazi at this time.  For present purposes, it is enough to note that Greenspan accuses Qazi of conduct ranging from impersonating an AT&T service technician to get Greenspan's home address, to tweeting a doctored version of the restraining order against MasMarques to suggest that Greenspan was seeking protection from a five-year-old child named "Little Billy Watkins," with the comment, "BREAKING: Aaron Greenspan of PlainSite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction.  The kids ended up doing a number on him and now he has filed a restraining order against them.  Should've known they would fight back."

*See id.* ¶¶ 36, 42.  Greenspan also appears to allege that Qazi was associated with an anonymous
text message stating, in pertinent part, "we know about all the child pornography and images of
underage kids on your computer."  *Id.* ¶¶ 43-45.  Greenspan adds that Qazi created fake Twitter
accounts named after Greenspan's family members, *see id.* ¶¶ 69, 73, and an account called
"@PlainShite," *see id.* ¶¶ 56, 93.

Greenspan alleges that Twitter permanently banned Qazi and shut down his accounts.  *Id.* ¶
98.  Qazi is said to have circumvented the ban by setting up a new account through a third party,
*id.* ¶ 119, which he used to publish more comments about Greenspan, *see, e.g., id.* ¶¶ 125-29.

Tesla and Musk also feature in the allegations against Qazi.  Greenspan says that Qazi used
his Twitter accounts to promote Tesla products and attack investors seeking to profit from
decreases in Tesla's stock.  *See, e.g., id.* ¶¶ 31, 57.  Musk was aware of Qazi's Twitter presence,
and praised Qazi in a news story.  *Id.* ¶ 57.  Greenspan describes them as a "tag team" lined up
against him.  *Id.* ¶ 10.  When Greenspan emailed a notice of intent to sue, Musk replied with the
comment, "Does the psych ward know you have a cell phone?  Just curious."  *Id.* ¶¶ 61-63.
Greenspan says he "has never suffered from any psychiatric illness" or "mental disorder," and he
"provably does not live in and has never been admitted to a psychological unit for clinical
evaluation."  *Id.* ¶ 181.  Musk is also said to have made other statements in emails and on Twitter
that Greenspan says were defamatory, such as "Greenspan is crackers, bananas, barky & ten cards
short of a full deck."  *Id.* ¶ 182, issue #42.

Greenspan alleges that Qazi has acted as the agent of Tesla and Musk, and that they are
vicariously liable for his conduct.  *Id.* ¶¶ 115, 175.  He bases this proposition mainly on the
allegations that Musk told Qazi, "Your Twitter is awesome!," *id.* ¶ 175, and that "Musk made
absolutely no effort to distance himself from Defendant Qazi's statements or to qualify them in
any way," *id.* ¶ 178.

Greenspan seeks to allege nine claims in the TAC for:  defamation per se (against Qazi and
Smick), libel per se (against Musk and Tesla), civil stalking (against all defendants), copyright
infringement (against Qazi and Smick), two counts of violating the Digital Millennium Copyright

Act (DMCA) (both against Qazi), two counts of securities fraud (one against Musk and Tesla, and one against all defendants), and market manipulation (against Musk),

## DISCUSSION

## I.   LEGAL STANDARDS

Well-established standards govern the motions to dismiss. *See McLellan v. Fitbit, Inc.*, No. 3:16-CV-00036-JD, 2018 WL 2688781, at *1 (N.D. Cal. June 5, 2018). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint make "a short and plain statement of the claim showing that the pleader is entitled to relief." To meet that rule, and survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This calls for "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility analysis is "context-specific" and not only invites but "requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In evaluating a motion to dismiss, the Court assumes that the plaintiff's allegations are true and draws all reasonable inferences in his or her favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The Court need not, however, "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a pro se plaintiff, Greenspan gets a liberal construction of his complaint and the benefit of any doubts, but he still must satisfy the requirements of Rule 8 and state facts sufficient to allege a plausible claim. *See Nguyen Gardner v. Chevron Capital Corp.*, No. 15-cv-01514-JD, 2015 WL 12976114, at *1 (N.D. Cal. Aug. 27, 2015).

Greenspan's securities fraud claims come within the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4, which has demanding pleading standards. *See, e.g.*, *In re Stitch Fix, Inc. Sec. Litig.*, No. 18-CV-06208-JD, 2020 WL 5847506, at *2 (N.D. Cal. Sept. 30, 2020); *In re Invensense, Inc. Sec. Litig.*, No. 15-CV-00084-JD, 2016 WL 1182063, at *2 (N.D. Cal. Mar. 28, 2016). In a securities fraud action, the circumstances constituting the alleged fraud must be stated with particularity under Federal Rule of Civil Procedure 9(b). *See Oregon Pub.*

United States District Court
Northern District of California

*Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014).  The "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  For each alleged misstatement or omission, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).

## II.      THE CLAIMS AGAINST TESLA AND MUSK

Counts II and III of the TAC allege that Tesla and Musk are liable for libel and civil stalking, and that they are vicariously liable for libel and civil stalking by Qazi and Smick.  Counts VII and VIII of the TAC allege that the Tesla defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

### A.      Preliminary Issue

As an initial matter, the Tesla defendants say that the TAC should be dismissed because it violates Rule 8's requirement of a "short and plain statement" of the claims.  The point carries some weight.  As noted, Greenspan's complaints have been extremely long, peaking with the second amended complaint at more than 1,800 pages with exhibits.  The Court granted Greenspan's request to amend his complaint a third time with the proviso that "[c]omplaints running to 80 or more pages and accompanied by hundreds of pages of exhibits are typically not well-taken under Rule 8, and may be summarily dismissed on that basis."  Dkt. No. 101 (stating that the TAC must be "consistent with this Order").  Despite that, the TAC runs to 78 pages and is accompanied by 350 pages of exhibits.  Dkt. No. 103.

Dismissing the TAC as in violation of Rule 8 and the Court's order is a viable option.  *See, e.g.*, *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 673-74 (9th Cir.1981); *Jacob v. Trump*, No. 21-CV-00261-JD, 2021 WL 121189, at *1 (N.D. Cal. Jan. 13, 2021).  Even so, public policy

1    favors disposition of cases on their merits, *see Hearns v. San Bernardino Police Dep't*, 530 F.3d

2    1124, 1132 (9th Cir. 2008), and this case needs to move forward to a resolution.  Consequently,

3    the Court will focus on the adequacy of the federal claims, as they are the basis of the Court's

4    jurisdiction in this case.

5    **B.      The State Law Claims**

6              The TAC has not stated facts plausibly demonstrating that Qazi or Smick were agents of

7    Tesla or Musk, or that Tesla and Musk may be vicariously liable for their conduct.  Greenspan's

8    main allegations on this score are that Musk called Qazi's Twitter "awesome," Dkt. No. 103 ¶¶

9    175, 178, that "Musk signed the interior of Defendant Qazi's Tesla Model 3" car, *id.* ¶ 113, and

10   that Qazi named his Twitter account "@tesla_truth," *id.* ¶¶ 176-77.  These facts might indicate a

11   friendly vibe between Musk, Tesla, and Qazi, but warm words and kind gestures do not create an

12   agency relationship in the eyes of the law.  That requires factual allegations which plausibly

13   demonstrate that Musk or Tesla authorized Qazi or Smick to act on their behalf, or that they acted

14   in a manner that might reasonably lead an observer to believe this were the case.  *See, e.g.*,

15   *Valentine v. Plum Healthcare Grp., LLC*, 37 Cal. App. 5th 1076, 1086-87 (2019); *J.L. v.*

16   *Children's Inst., Inc.*, 177 Cal. App. 4th 388, 403-04 (2009).  Tweeting "awesome" at a Tesla

17   enthusiast falls well short of the mark.

18             The claims for civil stalking against Tesla and Musk are equally inadequate.  At a

19   minimum, these claims required allegations plausibly establishing that Musk or Tesla "violated a

20   restraining order," or made a "credible threat" against Greenspan, with the "intent" to place him

21   "in reasonable fear" for his safety, or for the safety of a family member.  Cal. Civ. Code §

22   1708.7(a)(3).  Nothing in the TAC comes remotely close to pleading these elements.

23             The defamation claims against Musk and Tesla are also dismissed.  To be sure, false

24   statements of fact about a person may qualify as defamation if they tend to harm that person's

25   reputation, but statements of opinion are only actionable if they imply false facts.  *See, e.g.*,

26   *Rodriguez v. Panayiotou*, 314 F.3d 979, 985 (9th Cir. 2002); *John Doe 2 v. Superior Ct.*, 1 Cal.

27   App. 5th 1300, 1312 (2016).  Whether an allegedly defamatory statement could reasonably be

28   taken as implying an underlying factual basis is a question of law.  *See Gregory v. McDonnell*

United States District Court
Northern District of California

8

*Douglas Corp.*, 552 P.2d 425, 428 (Cal. 1976).  Relevant considerations include (1) the statement's "broad context," including its "general tenor," "subject," "setting," and "format;" (2) the "specific context and content of the statements," including "the extent of figurative or hyperbolic language used and the reasonable expectations of the audience;" and (3) "whether the statement itself is sufficiently factual to be susceptible of being proved true or false."  *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

The TAC does not plausibly allege any defamatory statements by Tesla or Musk.  Even crediting the allegations that Musk publicly referred to Greenspan as a "nut," and "crackers, bananas, barky & ten cards short of a full deck," and that Musk responded to Greenspan's notice of suit by suggesting that he belong in a "psych ward," Dkt. No. 103 ¶ 182, issue ## 39, 41-42, no reasonable observer would conclude that these words were intended to convey anything other than a personal opinion about Greenspan, in colorful and figurative language.  They are not statements of fact capable of verification.  *See Lieberman v. Fieger*, 338 F.3d 1076, 1080 (9th Cir. 2003) (defendant's statements that plaintiff was "Looney Tunes," "crazy," "nuts", and "mentally imbalanced" were "colorful expressions" not subject to true-false analysis).  The TAC's allegation that Musk's "psych ward" remark was "interpreted as factual" by some, Dkt. No. 103 ¶ 185, is merely conclusory, and is not plausibly supported by specific facts.  *See Iqbal*, 556 U.S. at 678.

So too for Musk's comment that Greenspan was "the same nut . . . that claimed he was the founder of Facebook," and "sued" Facebook's CEO.  Dkt. No. 103 ¶ 182, issue # 41.  Greenspan himself alleges in the TAC that he helped create Facebook, was involved in legal proceedings over the validity of the Facebook trademark, and reached a confidential settlement with Facebook and its CEO.  *See id.* ¶ 161, issue #6; *id.* ¶¶ 194, 227.  The TAC does not plausibly allege that Musk's statements were false with respect to a fact.  *See, e.g.*, *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516-17 (1991) (libel law "overlooks minor inaccuracies and concentrates upon substantial truth," and citing California authorities applying this principle).

Greenspan says that Musk referred to him as an "online bully" who runs a "fake charity" in a tweet criticizing a journalist for donating to Greenspan's Think Computer Foundation.  *Id.* ¶ 182, issue #40.  Greenspan does not contend that "online bully" was defamatory, but says that the "fake

charity" remark was a statement of fact to the effect that the Think Computer Foundation was not a properly registered tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), *see, e.g.*, Dkt. No. 103 ¶¶ 82, 189, and that Greenspan was engaged in criminal conduct, *see e.g., id.* ¶ 188.  What's missing in the TAC are facts that might make such inferences plausible.  The comment appears to be nothing more than another tart remark about Greenspan by Musk.  Nothing in the TAC plausibly indicates that the words "fake charity" constituted a statement of fact about potential criminal conduct by Greenspan, or the tax status of his organization.  This all the more true because the comment was made in social media, which is a place "where readers expect to see strongly worded opinions rather than objective facts." *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 697 (2012).  California courts have reached the same conclusion on similar facts.  *See, e.g., Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1177 (2008) (statement that plaintiff had a "'fake medical degree' was only the latest entry in a protracted online debate about whether plaintiff's medical degree from Spartan Health Sciences University in the West Indies justified her use of the 'M.D.' title in company documents.  No reasonable reader would have taken this post seriously; it obviously was intended as a means of ridiculing . . . [the] plaintiff.").

### C.    The Federal Securities Claims

The securities claims cannot go forward in their current form.  "To plead a claim under Section 10(b) and Rule 10b-5, the plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 603 (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  A statement is false "when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018).  Misleading statements "must be capable of objective verification." *Id.* (internal quotation marks omitted) (quoting *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)).  "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5

must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the

PSLRA." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).  These

requirements are demanding.  *See, e.g.*, *In re Invensense*, 2016 WL 1182063, at *4 (securities

fraud claim satisfied ordinary pleading standards, but not PSLRA and Rule 9).

The TAC does not satisfy these standards.  Many of the 35 issues pleaded in the TAC do

not "specify" with particularity a "statement alleged to have been misleading," or "the reason or

reasons why the statement is misleading," as required by the PSLRA, 15 U.S.C. § 78u-4(b)(1), or

otherwise satisfy Rule 9's requirement to plead with clarity the circumstances of the alleged fraud,

*see Vess*, 317 F.3d at 1106.  For example, the TAC says Tesla secretly "conspired" with vendors

to "artificially inflate" the prices of its used vehicles. Dkt. No. 103 ¶ 269, issue # 10.  This is said

to have rendered misleading "[a]ll mentions of and figures associated with 'residual value' in

investor disclosures."  *Id.*  Why that is the case or what precisely this might mean is not at all clear

in the TAC.  The principal factual allegation is that a former Tesla employee worked at a car

vendor that listed ten Tesla vehicles at high prices on its website, and that this "likely" would be

useful for inflating income-related metrics that in turn "may" influence the cars' "Kelley Blue

Book values."  *Id.*  This is entirely too vague and speculative to support an allegation of securities

fraud, particularly one grounded in a claim of conspiracy.  *See Twombly*, 550 U.S. at 554-55

(plausible inference of conspiracy requires factual allegations making its existence more than

speculative).  So too for the broad assertions that "[a]ll mentions" of residual value in Tesla's

investor disclosures were fraudulent.

The allegations that Musk "conspired" with "ex-CIA and ex-NSA officials," "convicted

felons," "social media influencers," and others "to unlawfully disseminate false and misleading

news stories, and to discredit or silence critics," *id.* ¶ 271, issue #15, lack a plausible factual basis.

The fact that "social media influencers" and Tesla "super-fan[s]" publicly discussed Tesla's

financials and criticized those promoting Tesla "conspiracy theories" is not enough to imply an

organized scheme to "unlawfully" silence critics.  *Id.*; *see also Twombly*, 550 U.S. at 554-55.

These allegations also are not clearly connected to an actionable false or misleading statement.

The TAC mentions only a tweet by Musk to the effect that he appreciates critical feedback as the

statement rendered misleading by non-disclosure of Tesla's conspiracy.  *See id.*  This kind of statement "cannot provide the basis for a securities violation" because it is not "objectively verifiable" in any meaningful sense.  *In re Terravia Holdings, Inc. Sec. Litig.*, No. 16-CV-06633-JD, 2020 WL 553939, at *5 (N.D. Cal. Feb. 4, 2020) (citing *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606).  The same goes for several other statements identified in the TAC, such as a tweet from Tesla's official account saying that "[t]here is no safer car in the world than Tesla," Dkt. No. 103 ¶ 270, issue # 18, and a tweet by Musk that "max safety" and "fun" were high priorities, *id.* ¶ 272, issue # 34.  *See, e.g.*, *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042-43 (9th Cir. 2010) (company's claim that it provided "all the advantages only the nation's largest wireless company can provide" was non-actionable "puffery"); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1015 (9th Cir. 2003) (same for claim that product development was a "high priority").

The allegation about Tesla's failure to disclose interactions with family members of Latin American drug lords is difficult to follow.  *See* Dkt. No. 103 ¶ 272, issue # 33.  Greenspan appears to say that this alleged omission made the following statement by Tesla misleading: "Risks and uncertainties not currently known to us or that we currently deem immaterial also may materially adversely affect our business, financial condition and operating results."  *Id.*  All of this is inherently implausible, and to be credible, such atypical allegations demand a fair showing of the facts about the alleged visits and their link to the risk disclosure.  The TAC provides nothing of the sort, and offers only speculation untethered to any facts.  *See, e.g., id.* (there are "reports" that Musk told a Tesla engineer "to travel to Mexico on Tesla business for the benefit of the Escobar family," and "[a]dditional sources allege a connection" between Musk, Tesla, and El Chapo Gúzman).  None of this supports a plausible claim that Tesla's risk disclaimer was misleading. *See Gompper v. VISX*, Inc., 298 F.3d 893, 895 (9th Cir. 2002) (plausible "link" between omission and allegedly misleading statement required for securities fraud claim under PSLRA).

In addition, even crediting the drug lord allegation just for argument's sake, the federal securities laws "prohibit only misleading and untrue statements, not statements that are incomplete."  *Huang v. Avalanche Biotechs.*, Inc., Case No. 15-cv-03185-JD, 2016 WL 6524401,

United States District Court
Northern District of California

at *4 (N.D. Cal. Nov. 3, 2016) (citing *In re Rigel Pharm, Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012)).  Section "10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information," unless failure to disclose would be misleading under the circumstances.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)).

The TAC alleges that it was misleading for Musk to say he received pay in the form of stock options, "which only matter if stock goes up & I sell," because Musk "deliberately exploit[ed] lighter trading volume" in "extended market trading hours." Dkt. No. 103 ¶ 271, issue # 14.  There is no obvious connection between the truth of Musk's statement about his compensation structure and his trading habits.  It is also noteworthy that the TAC itself cites Musk's disclosures about the prices at which he sold his shares on a particular day in the footnote of an SEC filing, and then discusses evidence suggesting that this must have included transactions taking place outside of standard trading hours.  *See id.*  This further dilutes the plausibility of the claim in the TAC that the Tesla defendants misled investors in that it indicates that Musk was reasonably transparent in disclosing the salient details of his sales of Tesla securities, and did not omit his extended-hours trades from SEC filings.

The TAC also goes astray in criticizing Tesla's financial statements as a whole in the section alleging that the Tesla defendants misled investors about the company's cash position.  *See, e.g.*, Dkt. No. 103 ¶ 268, issue # 1 (identifying "[a]ll balance sheet, income statement and statement of cash flows . . . figures and references thereto associated with "cash and cash equivalents" in disclosures" as fraudulent); *id.*, issue ## 2-3, 5-6.  This is an excessively general attack devoid of any factual particularity.  So too for the allegation that Tesla failed to disclose its "refusal to pay vendors and/or government agencies in a timely manner as evidenced by numerous undisclosed lawsuits," and "forge[d] vendor-related paperwork."  *Id.* ¶ 268, issue # 3.  The TAC says that Tesla has been involved in "30 lawsuits and criminal cases," including one in which involved a payment of $9.3 million to the wrong vendor as a result of a forged signature by an employee.  *Id.*  But none of this is linked to any specific statement about Tesla's cash or accounts receivable balances.

Similar deficiencies run through all 35 securities fraud issues raised in the TAC. Overall, the TAC has not identified actionable false or misleading statements with the requisite level of particularity, and so dismissal of the securities fraud claim is warranted.

For the sake of completeness, the Court also concludes that the TAC does not adequately plead scienter. The TAC was required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) ("The PSLRA's 'strong inference' requirement has teeth. It is an exacting pleading obligation that presents no small hurdle for the securities fraud plaintiff." (cleaned up)). The state of mind required to meet the scienter element is an intent to defraud or deliberate recklessness regarding the falsity of the challenged statements. *See Nguyen*, 962 F.3d at 414. This requires far more than ordinary negligence, or even "*mere* recklessness," and simply establishing a "motive to commit fraud" is insufficient. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (emphasis in original) (quoting *Zucco*, 552 F.3d at 991).

The TAC falls short of this requirement by making only conclusory and speculative allegations about the Tesla defendants' fraudulent intentions. *See, e.g.*, Dkt. No. 103 ¶ 268, issue # 6 ("Defendant Tesla knew that its practices were illegal and likely to cause its customers to break various state laws"); *id.* ¶ 269, issue # 7 ("The choice not to report sales is clearly deliberate on behalf of Defendants Musk and Tesla. Every other publicly traded automobile manufacturer reports sales."); *id.* ¶ 270, issue # 12 ("Defendant Tesla has been sued by vendors and tax agencies at least 30 times for failure to pay, but has not disclosed these lawsuits."); *id.* ¶ 271, issue # 23 ("after lying yet again" about autonomous driving capabilities, Tesla defendants announced intent to raise additional capital "on the basis of these claims that Defendants knew to be false"); *id.* ¶ 271, issue # 26 ("Defendant Musk's numeric tweets were deliberately free of any context to promote the most optimistic and misleading interpretation of the data possible to investors and the media.").

Many of the statements about scienter also lack particularity. *See, e.g.*, *id.* ¶ 269, issue # 10 ("Defendant Musk has made numerous false statements about Tesla vehicles appreciating in

14

value."); *id.* ¶ 271, issue # 21 ("Defendant Musk routinely makes up false figures and has a notable tendency to rely on the number '500,000' when he actually has no reliable data."); *id.* ¶ 272, issue # 30 (unspecified emails were "deliberately modified to minimize the appearance of any problems"); *id.* ¶ 272, issue # 32 ("Defendants Musk and Tesla were charged with securities fraud."). Others lack a clearly discernable logical connection with scienter. *See, e.g.*, *id.* ¶ 271, issue # 16 (defendant Musk received advice on avoiding negative publicity, and "appeared on the popular Joe Rogan podcast . . . where he smoked marijuana on video").

Greenspan's main argument for scienter is that the Tesla defendants have "already been found to have acted with scienter." Dkt. No. 110 at 11 (opposition brief) (emphasis removed); *see also* Dkt. No. 103 ¶ 279(a). He cites *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903 (N.D. Cal. 2020), which involved allegations that Musk misled investors in August 2018 by falsely tweeting that he was "considering taking Tesla private at $420," and that funding for this venture had been "secured." *Id.* at 910 (emphasis removed).

*In re Tesla* is of no help to Greenspan here. To start, the court did not find as a factual matter that Tesla or Musk acted with scienter. It concluded only that the investor-plaintiffs had alleged scienter with sufficient particularity under the PSLRA to survive a motion to dismiss under Rule 12(b)(6). *See id.* at 931 ("Accordingly, this Court finds that Plaintiff's Consolidated Complaint adequately pleads scienter."). "A motion to dismiss under Rule 12(b)(6) is directed to the adequacy of the complaint as it is pleaded," *Heidingsfelder v. Ameriprise Auto & Home Ins.*, No. 19-CV-08255-JD, 2020 WL 5702111, at *1 (N.D. Cal. Sept. 24, 2020), not to the actual truth of the pleadings. That is a determination to be made on a full record at trial or in another dispositive proceeding.

*In re Tesla* is also distinguishable on the facts. It involved statements and circumstances entirely different from those at issue here. Greenspan acknowledges that he was already aware that "Musk's August 2018 'funding secured' tweet" was false before purchasing any Tesla securities, Dkt. No. 103 ¶ 24, and that he began purchasing put options only at the end of September 2018, *see id.* ¶ 283. The plaintiffs' allegation of scienter in *In re Tesla* was also supported by allegations that Musk sent and received emails clearly indicating that, contrary to

repeated public statements, no funding had been secured to take Tesla private, and by the fact that Musk quickly settled a lawsuit against him by the SEC based on the August 2018 tweet. *See In re Tesla*, 477 F. Supp. 3d at 928-30. The TAC contains no such facts. Musk's use of Twitter in that case certainly does not, in itself, raise an inference that Musk or Tesla acted with scienter here, as Greenspan would have it.

The TAC's other allegations of scienter, such as Musk's known lack of respect for the SEC and affinity for t-shirts bearing subversive slogans, *see* Dkt. No. 103 ¶ 279, are equally misdirected. They do not raise an inference that the Tesla Defendants intended to defraud investors, or behaved with deliberate recklessness.

Consequently, Count VII of the TAC is dismissed. Greenspan's remaining securities fraud claim under Section 10(b) and Rule 10b-5, Count VIII, is dismissed because it relies on conclusory allegations that Tesla and Musk were acting "in concert" with the Smick defendants, Dkt. No. 103 ¶ 285, and, as discussed, it has not been established that Qazi or Smick were acting as Tesla's agents. *See Twombly*, 550 U.S. at 556-57 (conclusory allegations of agreement insufficient to establish conspiracy). Because Greenspan has not adequately pleaded a violation of Section 10(b), his market-manipulation claim under Section 20(a) (Count IX) must also be dismissed. *See In re Invensense*, 2016 WL 1182063, at *8.

## III.    THE CLAIMS AGAINST QAZI AND SMICK

Greenspan seeks to allege three federal copyright claims against the Smick Defendants: copyright infringement (Count IV), removal of copyright management information (CMI)[2] in violation of the DMCA (Count V), and DMCA misrepresentation (Count VI). The TAC also asserts a market manipulation claim against Qazi and Smick under the federal securities laws (Counts VIII). Supplemental jurisdiction is declined at this time for the California state law counts of defamation per se (Count I) and civil stalking (Count III).

---

[2] CMI refers to certain kinds of identifying information about a work, whether in digital form or otherwise, "conveyed in connection with copies or phonorecords of a work or performances or displays of a work." 17 U.S.C. § 1202(c).

United States District Court
Northern District of California

The copyright claims arise out of Qazi's and Greenspan's online feud.  The TAC alleges that Qazi posted large portions of Greenspan's autobiography on Twitter and other online platforms.  *See* Dkt. No. 103 ¶¶ 225-28.  These were mostly in the form of "fake reviews" that included comments such as "I read Aaron Greenspan's life story so you don't have to" and "[i]magine having Aaron Greenspan as your son." Dkt. No. 103 ¶ 228.  Qazi is also said to have posted a photograph of Greenspan wearing a purple shirt (the Purple Shirt Photo) after removing required CMI, and to have made false claims in three DMCA notices and one DMCA counternotice directed at Greenspan.  *See id.* ¶¶ 240, 244, 253-54.[3]

The copyright infringement claim is foreclosed by the doctrine of fair use.  Fair use is "not a mere defense to copyright infringement, but rather is use that is not infringing at all." *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 883 (N.D. Cal. 2020).  It "allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *see also Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984) (copyright law "has never accorded the copyright owner complete control over all possible uses of his work").  Congress codified four factors in the Copyright Act to guide the determination of fair use of copyrighted works:  "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107 (Section 107).  These factors are to be applied in a non-mechanistic fashion, and the crucial inquiry is whether the defendant's use of copyrighted material "would stifle the very creativity which that law is designed to foster." *In re DMCA Subpoena*, 441 F. Supp. 3d at 884 (cleaned up) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994)).

[3] Generally, the DMCA allows online service providers to avoid liability for hosting infringing content if they remove it in response to a notice from the copyright holder.  *See* 17 U.S.C. § 512(c).  The person who posted the content can contest removal through the use of a counternotice.  *See* 17 U.S.C. § 512(g)(2)-(3).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    With respect to the first factor, the allegations in the TAC are far more consonant with fair

2    use for purposes of commentary and criticism than they are with an unlawful usurpation of

3    another's creative works for commercial gain.  The TAC itself acknowledges this by stating that

4    Qazi used the works in "fake reviews" to mock Greenspan.  Dkt. No. 103 ¶ 228.  This also

5    answers the question of whether Qazi's use was "transformative" in the sense that it added some

6    new purpose or meaning to Greenspan's originals.  *See Campbell*, 510 U.S. at 579.  This does not

7    require major changes to the work, and it permits copying portions of the work in its "original and

8    unaltered" state, so long as the defendant expressed something new such as criticism or

9    commentary.  *In re DMCA Subpoena*, 441 F. Supp. 3d at 884-85; *see also Supermarket of Homes,*

10   *Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1408 (9th Cir. 1986).  The TAC

11   indicates that Qazi did just that, which may have offended Greenspan, but not the copyright

12   statute.  *See* 17 U.S.C. § 107 (criticism and commentary qualify as fair use); *In re DMCA*

13   *Subpoena*, 441 F. Supp. 3d at 885 (citing *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756

14   F.3d 73, 83 (2d Cir. 2014); *Kelly v. Arriba Soft Corp.*¸ 336 F.3d 811, 818-20 (9th Cir. 2003)).

15   Leaving the TAC's purely speculative comments aside, there are no facts indicating that Qazi

16   copied sections of Greenspan's autobiography for "commercial use."  *In re DMCA Subpoena*, 441

17   F. Supp. 3d at 885 (treating lack of commercial purpose as supporting fair use).  Consequently, the

18   first factor tips in favor of fair use.

19   The second factor -- the nature of the work -- also points toward fair use.  Greenspan's

20   autobiography is a work of non-fiction, as it is mainly directed to discussing his claimed role in

21   developing Facebook and life at Harvard College.  *See* Dkt. No. 103 ¶¶ 225, 227.  "In general, fair

22   use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495

23   U.S. 207, 237 (1990); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S.

24   539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works," such

25   as a "historical narrative or autobiography," than "works of fiction or fantasy").  This distinction

26   has less force when an unpublished manuscript rather than a published work has been copied, in

27   part because of "the author's right to control the first public appearance of his expression."

28   *Harper & Row Publishers*, 471 U.S. at 563.  While the TAC is not entirely clear on this point,

1    Greenspan's autobiography does not appear to have been in this form, and it is unclear how Qazi

2    might have copied an unpublished manuscript.

3           With respect to the third factor -- extent of use -- Qazi is said to have copied "more than

4    10% of the book, and far in excess of 1,000 words."  Dkt. No. 103 ¶ 236.  This allegation is

5    neutral with respect to fair use because the TAC does not provide enough facts about what Qazi

6    did with this material to determine whether this was more than "reasonably necessary" for Qazi to

7    get his message across.  *See In re DMCA Subpoena*, 441 F. Supp. 3d at 885.

8           The final factor looks at whether the new use has an effect on the potential market for or

9    value of the copyrighted works.  *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir.

10   2013).  This factor has been called the most important fair use element because it protects the

11   incentive to create.  *See Harper & Row*, 471 U.S. at 566; *Sony Corp.*, 464 U.S. at 450-51.  A "use

12   that has no demonstrable effect upon the potential market for, or the value of, a copyrighted work

13   need not be prohibited" to protect that incentive.  *Sony Corp.*, 464 U.S. at 450.

14          TAC falls well short on this score.  It alleges only that Greenspan suffered "damages to his

15   reputation and goodwill" as a result of Qazi's copying.  Dkt. No. 103 ¶ 237.  Even if taken as true,

16   this is not the measure of damages contemplated by the copyright statute.  The TAC does not

17   plausibly allege that there is a market for Greenspan's autobiography, or that his commercial

18   interests were harmed by lost book sales and the like.  The copyright damages allegations also

19   collide with the "principle of law that a diversion or suppression of demand from criticism is not a

20   cognizable copyright harm."  *In re DMCA Subpoena*, 441 F. Supp. 3d at 886; *see also Campbell*,

21   510 U.S. at 592 (distinguishing suppression of demand because of criticism from copyright

22   infringement).

23          Consequently, the TAC does not plausibly allege copyright infringement by Qazi.  Count

24   IV is dismissed.

25          The remaining federal claims against Qazi and Smick require only a brief discussion.

26   Count V alleges improper removal of CMI from the Purple Shirt Photo under 17 U.S.C. § 1202(b).

27   To state a claim, the TAC was required to show that the Smick defendants knew or had

28   "reasonable grounds to know" that posting the Purple Shirt Photo without CMI would "induce,

19

1    enable, facilitate, or conceal" copyright infringement.  17 U.S.C. § 1202(b).  This element is not

2    addressed in the TAC, which does not present any factual allegations that might satisfy it.  *See*

3    *generally* Dkt. No. 103 ¶¶ 238-247.

4         The same goes for the Count VI claims that Qazi made misrepresentations in DMCA

5    notices and counternotices in violation of 17 U.S.C. § 512(f).  As relevant here, the TAC was

6    required to show that Qazi "knowingly" and "materially" misrepresented that Greenspan posted

7    infringing material, or that material taken down as a result of a DMCA takedown notice by

8    Greenspan "was removed or disabled by mistake or misidentification."  17 U.S.C. § 512(f)(2).

9    The statute suggests that this mental state is lacking so long as the issuer of the notice or

10   counternotice had a subjective good-faith belief that the material in question was infringing (in the

11   case of a notice) or non-infringing (in the case of a counternotice).  *See* 17 U.S.C. §

12   512(c)(3)(A)(v) & (g)(3)(C) (requiring sworn declaration to this effect for DMCA notice or

13   counternotice).

14        The TAC does not plausibly state that Qazi knowingly lied about the protected status of

15   any copyrighted material.  For example, after Greenspan attempted to have portions of his

16   autobiography taken down, Qazi claimed in a DMCA counternotice that removal was

17   inappropriate because he was engaged in fair use.  *See* Dkt. No. 103 ¶ 255.  For reasons already

18   discussed, this was not such an unreasonable claim as to warrant an inference of deception.

19   Greenspan says Qazi's attempts to have a video about Tesla's autopilot technology taken down

20   were improper because Greenspan was engaged in fair use as a journalist.  *See id.* ¶ 251.  But the

21   TAC does not state facts showing that Qazi might have acted in bad faith.

22        The TAC does not state a claim for market manipulation under Section 10(b) and Rule

23   10b-5 against Qazi or Smick.  The TAC says they "posted thousands of social media messages

24   addressed to TESLA SHAREHOLDERS such as, Buy FSD.  Buy acceleration boost.  Buy

25   accessories for your car.  Place a $100 order for a Cybertruck or other new vehicle.  Buy solar,

26   powerwall, a freaking t-shirt I don't care! Let's push Tesla over the edge to profitability!!!  Other

27   such messages generally promoted TSLA stock."  Dkt. No. 103 ¶ 286 (internal quotations and

28   citation omitted).

United States District Court
Northern District of California

1    It is questionable that an enthusiastic promotion of a company and its products by an

2    outside admirer could, by itself, constitute market manipulation.  To conclude otherwise would put

3    a sizeable number of third-party Amazon and Yelp reviewers under the specter of a federal

4    securities violation, a result that Congress did not contemplate in the securities laws, and for which

5    Greenspan cites no good authority.  It is certainly true that a different conclusion might flow from

6    facts indicating that an ostensible outsider was a shill, but that is not plausibly alleged in the TAC.

7    The TAC also does not adequately allege that Qazi or Smick acted with the necessary fraudulent

8    intent, or a comparable state of mind.  *See* 17 C.F.R. § 240.10b-5(a) (requiring a "device, scheme,

9    or artifice to defraud"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (market

10   manipulation "refers generally to practices, such as wash sales, matched orders, or rigged prices,

11   that are intended to mislead investors by artificially affecting market activity").  To the contrary,

12   the TAC establishes that they were quite transparent about their dreams of a profitable Tesla.

13   This resolves the federal claims against Qazi and Smick.  The Court has dismissed all of

14   the federal claims that are the basis of its jurisdiction over Qazi and Smick, and declines to

15   exercise supplemental jurisdiction over the state claims until a federal question is plausibly

16   alleged.  *See* 28 U.S.C. § 1367(c)(3); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir.

17   2010).  The anti-SLAPP motion is terminated without prejudice to renewal, as warranted.

## CONCLUSION

19   All of the federal claims in the TAC are dismissed, as are the state law claims against

20   Musk and Tesla.  The dismissals are without prejudice and with leave to amend.  It is true that

21   Greenspan has already had three opportunities to amend his allegations, *see* Dkt. Nos. 20, 70, 103,

22   and two of the amendments were in response to motions to dismiss that put him on notice of

23   potential deficiencies with his pleadings, *see* Dkt. Nos. 56, 65, 75, 76.  Even so, this is the Court's

24   first order on the adequacy of the complaint, and leave to amend is warranted in this circumstance.

25   *See Lopez v. Smith*, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc).

26   A fourth amended complaint consistent with this order may be filed by **July 16, 2021**.  If

27   Greenspan chooses to amend, he may file a complaint of no more than 50 pages inclusive of

28   exhibits.  The massive complaints filed to date are wholly inconsistent with Rule 8, and have

United States District Court
Northern District of California

imposed undue and unnecessary burdens on the Court and the defendants.  No new parties or claims may be added without the Court's prior approval.  A failure to meet the filing deadline or adhere to the requirements stated here will result in a dismissal with prejudice under Rule 41(b).

A motion to dismiss the fourth amended complaint should be directed only to the amended federal claims on which the Court's jurisdiction depends.  The state law claims will be taken up later as warranted.  Pending further order, the discovery stay remains in effect.

**IT IS SO ORDERED.**

Dated:  June 23, 2021

_____
JAMES DONATO
United States District Judge