Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

AARON GREENSPAN,

    Plaintiff,

       v.

OMAR QAZI, SMICK ENTERPRISES, INC.,
ELON MUSK, and TESLA, INC.,

    Defendants.

Case No. 3:20-cv-03426-JD

**FOURTH AMENDED
COMPLAINT FOR:**

1.  Defamation Per Se
2.  Violation of Anti-Stalking Statute,
    Civil Code § 1708.7, *et seq.*
3.  Copyright Infringement
4.  Violation of the DMCA (CMI
    Removal, Misrepresentation)
5.  Violation of Federal Securities
    Laws

DEMAND FOR JURY TRIAL

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

### INTRODUCTION

1.      Defendant Elon Musk is the centi-billionaire, self-declared "Technoking" of Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy and battery products.  He has attracted a literal cult following, both among his customer base and on the Twitter social network, where Defendant Musk has in excess of 59 million followers.

2.      Defendant Tesla has never earned an annual profit despite the company's false claims to the contrary.  No company run by Defendant Musk has ever earned an annual profit while he has been in charge.  Instead, Tesla has relied upon accounting tricks and fantasy narratives to boost its stock price and cement inclusion in the S&P 500.



3.      Such deceptive devices were necessary to distract investors from the fact that Defendant Tesla is the largest Ponzi scheme in history—one that just happens to produce cars. New investors cash out the old while executives, such as Defendant Musk, are rewarded ever more handsomely through stock-based compensation as the company loses ever more money and covers it up.  In effect, Defendant Tesla's main product *is* its stock, which by 2018 made it of particular interest to Defendant Musk's collective arch-nemesis: short-sellers.

4.      On July 14, 2021, under oath, Defendant Musk's brother and Tesla Director Kimbal Musk summarized his family's approach to business, stating, "If you are the CEO of a company, you have relentless optimism or go find another job."  The Musks' "relentless optimism" often veered into outright falsehood, however.

5.      Musk's lies also attracted the government's interest.  In 2018, the United States Securities and Exchange Commission ("SEC") charged Defendant Musk with securities fraud. Defendants Musk and Tesla signed binding Consent Decrees and each paid a $20 million fine.

6.      By scapegoating short-sellers to distract from his fraudulent acts, Defendants Musk and Tesla were able to weave a narrative that led to a precipitous increase in Tesla's stock price throughout 2020, briefly making Defendant Musk the wealthiest person in the world with a net worth of over $200 billion.  It was therefore shocking when he admitted on the record in late 2020 that the short-sellers had been right all along: that Tesla had been on the verge of bankruptcy from "mid 2017 to mid 2019," rendering its investor disclosures, showing adequate

cash, and lacking any "going concern" statements, totally fraudulent.  In sum, Defendant Musk fed investors non-stop lies to avoid a "self-fulfilling prophecy" that would cause Tesla's "death."

7.     Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick"), has served as a ferocious propagandist for Defendants Musk and Tesla, authoring and/or coordinating over 160,000 tweets praising Tesla and scapegoating its critics—plus essays, podcasts, and promotional videos.  For the sake of comparison, Yevgeny Prigozhin ("Putin's Chef") employed a "troll-factory" that "generated one of the largest known online disinformation campaigns, churning out 71,000 tweets" according to Bellingcat in 2020.

8.     Defendant Musk is an officer, director and employee of Defendant Tesla.  Under *respondeat superior* doctrine, Defendant Tesla is liable for the actions of Defendant Musk performed in connection with its business.  Similarly, Defendant Smick is liable for Omar Qazi.

9.     Defendant Qazi, who has been criminally charged in at least two unrelated cases, is a Tesla shareholder, customer, and agent of Defendants Tesla and Musk.  Defendant Qazi's antics attracted a following of tens of thousands of Musk's supporters and numerous detractors before he was banned from and by Twitter for life.

10.    Internal Tesla documents corroborate that Defendants made false and misleading statements in SEC filings—inflating cash balances, promising futuristic "robotaxis," and glossing over hundreds of millions of dollars worth of factory waste, among other issues—to manipulate Tesla's share price skyward.  For his part, Defendant Musk has already generally admitted to market manipulation, having stated "I might pump but I don't dump" during a conference panel broadcast worldwide on July 21, 2021.

11.    Social media has been instrumental to Musk's unprecedented "pump" of Tesla's stock price, which has so far culminated in a market capitalization of over $850 billion at its peak: well more than ten times the peak worth of Enron, and more than the *combined* valuation of the rest of the automotive industry, e.g. Toyota, Volkswagen, Mercedes, General Motors, BMW, Honda, Fiat-Chrysler, Ford, Nissan and Suburu.  The SEC recognizes social media as a potential manipulative "device" pursuant to the Securities and Exchange Acts.

12.     Especially after Defendant Musk disbanded Defendant Tesla's formal Public Relations team in late 2019, Defendant Qazi filled in for its role, often working as a tag team with Defendant Musk to hurl accusations and falsehoods concerning Plaintiff, among other topics, in order to discredit Plaintiff's document-based research on Defendants Tesla and Musk.

13.     After being banned from Twitter, Defendant Qazi returned under the guise of a new shared account, still acting as an agent of Defendants Musk and Tesla, until his further provocations triggered a backlash in the same community of zealots that had previously been so supportive of his at-times-criminal harassment.  So he appropriated another Twitter account.

14.     Through thousands of false and misleading statements and material omissions broadcast directly to millions, and indirectly to millions more through the media, Defendants successfully and unlawfully "pumped" the stock price of TSLA common shares from an average of $167.66 per share during the period of June 29, 2010 (the date of Defendant Tesla's Initial Public Offering) through September 23, 2018 (the day before Plaintiff first purchased put options) to $4,502.00 per share (split-adjusted) as of January 25, 2021, a 2,585% increase.

15.     Especially after Defendants Musk and Tesla manipulated successive quarterly financial statements to make it appear as though Tesla had turned a profit, which then qualified Tesla for inclusion in the S&P 500 index on December 21, 2020, Tesla's stock began to fall starting in 2021.



16.     Despite its enterprise value of approximately $1 trillion, as of the date of filing, Defendant Tesla has no permanent General Counsel.  Three of its prior General Counsels and an Acting General Counsel resigned from November 2018 through mid-2021, as did two prior Chief Financial Officers and two Chief Accounting Officers.

17.     Defendants' collective actions are part of an overt and disturbing pattern in which Defendant Musk has repeatedly incited an on-line mob against anyone who dares question or criticize him, smearing the target as mentally ill, a rapist, a pedophile and/or a likely murderer, all in service of the largest securities fraud in American history.

## PARTIES

18.     Plaintiff Aaron Greenspan is an individual residing in San Francisco County in the State of California, in this district.  Plaintiff is not a public figure.

19.     Defendant Omar Qazi is an individual residing at least part-time in San Francisco County in the State of California and doing business in Santa Clara and San Francisco Counties in the State of California, in this district.

20.     Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the California Secretary of State or Franchise Tax Board, but nevertheless operating in Santa Clara and San Francisco Counties in the State of California, in this district.

21.     Defendant Elon Musk is an individual working in Santa Clara and Alameda Counties, in this district.  Defendant Musk is a public figure whose statements on Twitter and otherwise make national news and materially affect financial markets on a near-daily basis.

22.     Defendant Tesla, Inc. is a corporation based in Santa Clara County in the State of California, in this district.  Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, 1338(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

24.     Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367

over the state law claims that are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

25.     The securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

26.     Personal jurisdiction and venue are proper because at least one defendant is a corporation headquartered in this district and/or because the improper conduct alleged herein occurred in, was directed from, and/or emanated or exported from California.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## FACTUAL BACKGROUND

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

27.     Plaintiff is an investor who has held put options in Tesla, Inc. common stock. Plaintiff invested in TSLA put options because he believed that Defendant Tesla's business was fundamentally overvalued by the market.  When Plaintiff began purchasing Tesla, Inc. securities he had no knowledge of any alleged fraud involving Defendant Tesla except for limited knowledge from news reports of Defendant Musk's August 2018 false "funding secured" tweet.

28.     Plaintiff is also a data journalist who runs a legal information service called PlainSite, which hosts tens of millions of court and agency dockets, government documents, and profiles.  PlainSite handles privacy requests on a case-by-case basis.  Consequently, a variety of individuals are occasionally upset that their information is in the public domain.

29.     One individual, Diego MasMarques, Jr., convicted of murder and attempted murder in Spain and charged with other crimes domestically, made death threats directed at Plaintiff over the fact that his convictions were public to the point where Plaintiff applied for and was granted a two-year restraining order against him.  *See Greenspan v. MasMarques*, Santa Clara County Superior Court Case No. 18CH008067 (the "Civil Harassment Case").

30.     On various websites, Mr. MasMarques, who has a documented history of mental illness, also posted thousands of libelous fabrications falsely alleging that Plaintiff and his family

members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to extortion, to the hacking of his e-mail account.

31.     On January 13, 2019, Plaintiff posted on Twitter from the @PlainSite account warning Defendants Musk and Tesla that a customer had recorded a video of a Tesla Model 3 center console that was unresponsive while driving.  Defendants Musk and Tesla did not respond, but the next day, January 14, 2019, a Twitter account, "@tesla_truth" (posing as "Steve Jobs") did, falsely writing, "Aaron, the center touch screen has nothing to do with driving the car," and ending with, "Good luck in court on Tuesday for violating that restraining order," even though Plaintiff had not violated any order.

32.     Upon information and belief, on January 14, 2019, Mr. MasMarques and/or one of his sympathizers began feeding Defendant Qazi false information concerning Plaintiff on Twitter, and the @tesla_truth account amplified that misinformation without bothering to verify its accuracy.  At approximately the same time as @tesla_truth first responded, a since-deleted Twitter account, @Tom34079930, replied to a @tesla_truth post falsely stating in part, "Aaron Greenspan went last year to a judge and lied to get a restraining order on Diego.  The judge was pissed when she found out he lied.  Now the restraining order is on Aaron and he violated it."  The @Tom34079930 account also falsely wrote to @tesla_truth, "Greenspan is a tax cheat."

33.     Plaintiff did not at any point solicit feedback from @tesla_truth.  Its owner attacked Plaintiff over a public safety concern, much as it had previously attacked journalists.

34.     The @tesla_truth account then began re-posting and linking to many more of the libelous and deranged posts that were the subject of the unrelated Civil Harassment Case.

35.     The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

36.     An attempt via Direct Message ("DM") to discuss the seriousness of the matter and the associated safety concerns with @tesla_truth's owner was not fruitful.  The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," echoing Defendant Musk's notorious scapegoating of short-sellers.

37.     Plaintiff sent a link via DM to the @tesla_truth account owner to a PDF file hosted on his personal website of Twitter posts concerning the Civil Harassment Case.  When the account owner clicked on the link, Plaintiff's server logs yielded the account owner's DNS hostname and IP address: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively. Given the alarming safety concerns associated with the Civil Harassment Case, Plaintiff searched PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "smick enterprises," a company run by Defendant Qazi.

38.     Plaintiff took the further exceptional step of publicizing a redacted form of this information, to warn of the danger Defendant Qazi posed and to expose his harassing conduct.

39.     Defendant Qazi later admitted to using the @tesla_truth Twitter account.

40.     The same day, still concerned about the danger posed to his family and others at synagogues mentioned in some of the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him.  Plaintiff informed an unknown female supervisor that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous.  At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually Qazi's father's company.  Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called. Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately.

### *Omar Qazi Steps Up His Campaign of Criminal Harassment*

41.     The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number.  The anonymous male caller impersonated a service technician who initially only said he was calling from "the phone company," and asked for Plaintiff's home address.  Since the caller refused to identify "the phone company," and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information. Defendant Qazi later admitted to placing this harassing phone call both privately and publicly.

42.     The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually

suspended by Twitter for violating its terms of service.  It was permitted to continue operating only by renaming itself to "Steve Jobs *[sic]* Ghost" and by falsely identifying as a so-called "parody" account, even though the account's primary purpose was not to parody Steve Jobs, but to promote Defendants Musk and Tesla by abusing the imprimatur of Apple, Inc.'s co-founder.

43.     In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and the Civil Harassment Case.  Such posts continued through late October 2019 and inspired harassment from others.

44.     On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff reported on a public video posted by Defendant Qazi on the @tesla_truth account advertising Tesla's so-called "Autopilot" functionality.  The video depicted a black Tesla Model 3 driving through a red stoplight on Autopilot without the driver's hands on the steering wheel as required (the "Autopilot Moving Violation Video").  Although Defendant Qazi later claimed not to be the driver, he has not denied that the vehicle was his, and he claimed to own the video's copyright.

45.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net in or around Rancho Palos Verdes, California accessed documents hosted on PlainSite from the Civil Harassment Case.

46.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's Civil Harassment Case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child).  The altered document also contained Plaintiff's phone and fax number alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them.  Should've known they would fight back."

47.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer and threatened to "call the police" accordingly.

48.     Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047, purporting to be from "Kids R Us" with a cover page message of, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.  Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation ("FBI").

49.     Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

50.     A similar anonymous fax from the same fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat purporting to be from "Elon Musk."

51.     In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with questions and concerns about Defendant Tesla's relationship with Defendant Qazi.  Plaintiff never received a response.

52.     On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

53.     In a DM conversation with a third party from September 27, 2019, Defendant Qazi admitted, "[I] take responsibility for what my followers do too and [I] take it seriously."

54.     On August 8, 2019 at 11:13 P.M., Defendant Musk responded to e-mailed, on-the-record questions from Plaintiff with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

55.     Especially after Plaintiff was able to obtain previously confidential court documents from Delaware Court of Chancery Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation* (the "SolarCity Case"), including deposition transcripts of Defendant Musk, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff, his family, and his non-profit organization.  These harassing statements were read by a wide audience of at least 10,000-35,000 followers.  Virtually all were published to promote Defendant Tesla's stock, its products, and Defendant Musk.

56.     On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

57.     On the morning of October 9, 2019, *Bloomberg Businessweek* published an article by Zachary Mider referring to Defendant Musk, profiling Defendant Qazi, and stating:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi via e-mail] the same day [in August 2019]. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack *[sic]* you with a baseball bat.'  Musk cc'd me on the message.  Tesla also declined to comment."

The article contained a photograph of Defendant Qazi next to his black Tesla Model 3 and referred to the @tesla_truth account as a "bottomless font of Muskolatry."

58.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though Defendant Qazi misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to an unknown "Jim" who had contributed to or provided input for the @tesla_truth account in January 2019.

59.     To the extent that Defendant Qazi at any point denies having authored statements

attributed to him on @tesla_truth or other social media accounts, they were authored by other employees and/or agents of Defendant Tesla with Defendant Qazi's supervision and approval.

60.     On October 9, 2019 at 3:09 P.M., the @tesla_truth Twitter account posted:  "All Aaron Greenspan had to do was shut up and I would have forgotten all about that clown.  Now i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is  After he dies I'll keep telling people he sucked."

61.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, attorneys at Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider.

62.     Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant Qazi's response, with two laugh/crying emojis.  None of the responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter then under review.

63.     Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

64.     At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely suggesting that Plaintiff resided in a "psych ward."

65.     At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

66.     As a result of Defendants' actions, Plaintiff received unwanted telephone calls, e-mails and messages, and hundreds of additional libelous messages were posted publicly.

*Omar Qazi Targets Plaintiff's Family for Further Harassment*

67. The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan.  The Twitter account's handle, deliberately intended to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account and was not a parody account.

68. Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps (since renamed to G Suite and Google Workspace) to receive all e-mails addressed to smick.com, including e-mails connected to numerous fake accounts on Twitter.

69. Defendant Smick uses and/or owns the domain name smick.com.

70. On Thursday, October 10, 2019, Plaintiff filed a Digital Millennium Copyright Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph Mr. Qazi used to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph.  Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled brother and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.  Plaintiff reported Defendants' harassment to the San Francisco Police Department ("SFPD").  The SFPD desk officer decided of his own volition to focus on the pornographic fax sent to Plaintiff and accordingly classified his police report as relating to child pornography.

71. On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan."  In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a parody or actually his brother?" Defendant Qazi wrote, "yeah I'm his little brother haha."

72. Plaintiff's brother is not active on Twitter and never has been.

73. On October 11, 2019, Defendant Qazi created websites using servers owned or leased by Defendant Smick Enterprises, Inc., at http://www.plainshit.com, http://www.plainshit.org, and http://www.plainsiite.org (the "Smick Sites") containing copyrighted photographs of Plaintiff and his family members with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT."  The text continued in part:

"Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil Greenspan or Judy Greenspan? You are not alone."

The website's source code contained the hidden HTML, "<!-- fuck you aaron -->".

74.     The Smick Sites mainly echoed Mr. MasMarques's allegations: that Plaintiff's non-profit organization was a "fraudulent charity" and that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals.  Defendant Qazi claimed to have engaged "Lantham & Watkins" and wrote "56 people" had submitted "verified testimonies" to the site(s).

75.     On October 15, 2019, the Smick Sites were updated to copy the appearance of the PlainSite website and the misspelled reference to Latham & Watkins was removed.  Defendant Qazi updated the bold headline to: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice."  The supposed "Victims of Aaron Greenspan Foundation" does not exist and never has.  Defendant Qazi changed the false number of people who had submitted "testimonies" to "956," corresponding to Plaintiff's home address.

76.     Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting [sic] Securities Fraud" and included other libelous hidden comments.

77.     On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi contacted Plaintiff's disabled brother via Facebook Messenger.

78.     On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

79.     On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

80.     On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail

stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later falsely claiming in public that Plaintiff had failed to engage.

81.     On Friday, October 25, 2019 at approximately 6:30 P.M., Defendant Qazi registered a new domain name, vagfoundation.org, via Amazon.com.

82.     Defendant Qazi solicited information about Plaintiff's supposed "crimes" from thousands of followers, but only two "testimonies" initially appeared on the Smick Sites: "M's TESTIMONY," and "P'S TESTIMONY," a haphazard PDF compilation of Mr. MasMarques's false allegations submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia, but posted anonymously.  Neither of these posts described any actual crime committed by Plaintiff or his family members, let alone any actual "victim" of Plaintiff, as none exist.

*Even With Omar Qazi Banned From Twitter, His Libel and Harassment Continues*

83.     Defendant Qazi's harassment of Plaintiff led to the temporary suspension of Defendant Qazi's accounts.  On or around October 22, 2019, Defendant Musk wrote an e-mail to Twitter, Inc. CEO Jack Dorsey in support of Defendant Qazi while disparaging Plaintiff.

84.     On or about October 24, 2019, Twitter permanently banned Defendant Qazi, disabling @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil, and @SmickTrump.

85.     On October 31, 2019, Defendant Qazi posted an essay on wholemars.org, a domain name and server controlled by Defendant Smick, entitled, "Steve Jobs is dead."  In it, Defendant Qazi admitted that his @tesla_truth account was suspended repeatedly for various legal violations including impersonation, and that it was registered to teslatruth@smick.com.

86.     In response, Defendant Qazi set up open-source software called Mastodon on a server belonging to Defendant Smick.  On November 1, 2019, Defendant Qazi published an essay on wholemars.org thanking his supporters and inviting them to use Mastodon, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening.  (At

various points in time, Smick's "wholemars" domain names have redirected to each other.)

87.     On Saturday, November 2, 2019, Sascha Pallenberg, formerly of Daimler AG, wrote from his Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!"  Pallenberg is one of several automotive industry consultants and professional journalists who contacted Plaintiff to confirm that Defendant Qazi had harassed them as well.  One journalist informed Plaintiff that Defendant Qazi had been banned from physically entering a building by corporate security.

88.     Also on November 2, 2019, an unknown individual created a profile using Plaintiff's name and e-mail address without permission on the pornographic website Pornhub.

89.     On November 6, 2019, an unknown individual using the Wikipedia username "Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of an article about Plaintiff, in order to supposedly "be more impartial and includ[e] additional details."  In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting his false claims about Plaintiff.

*The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff*

90.     On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant Tesla's Q1 2020 earnings call, calling local public health officials "fascist."  At one point, Defendant Musk was disconnected from his own earnings call, possibly by his own lawyers.

91.     On May 9, 2020, Defendant Musk ignited further controversy by threatening to sue, and days later suing, Alameda County over its implementation of the multi-county Shelter-In-Place Order concerning COVID-19, which curtailed Tesla's manufacturing in Fremont. Defendant Musk then instructed his employees to violate the Shelter-In-Place Order and return to work and risk death, or in the alternative, risk losing unemployment benefits.  Soon after, Musk posted an image on Twitter falsely implying that he had defied the Shelter-In-Place Order.

92.     Many supporters of Defendants Musk and Tesla were, for once, appalled by Musk's erratic behavior and disregard for human life.  On May 12, 2020, *Electrek* editor Frederic Lambert wrote an editorial critical of Musk and the "toxic" Twitter account @thirdrowtesla: a

video podcast led by Defendant Musk's most ardent supporters, including Defendant Qazi.

93.    Signaling the vital importance of his work harassing Tesla's critics, Defendant Musk appeared with Defendant Qazi in a 3.5-hour Third Row Tesla video interview filmed at one of Defendant Musk's Los Angeles homes and published on February 9, 2020.  The below photograph depicts Defendant Qazi (far right) with Defendant Musk (far left) and Tesla Director Kimbal Musk (second from right with cowboy hat) at the recording session:



94.    Defendant Qazi ultimately admitted authorship of Third Row Tesla's Twitter posts, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.

95.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as cheerleaders for Defendant Tesla, led Defendant Qazi to author a 17,600-word screed on his website hosted by Defendant Smick, published on May 17, 2020 (the "Qazi Screed").  Entitled "Response to Frederic," it invoked *Plaintiff*'s name at least 47 times.

96.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading.  In some cases, Defendant Qazi cropped images to deliberately mislead his readers. Defendant Qazi also linked events that were chronologically impossible and omitted key facts.

97.    On or around May 23, 2020, Defendant Qazi returned to Twitter once more via a proxy account, @WholeMarsLog, later renamed @WholeMarsBlog, set up for him by Tesla fan Scott Woods to assist with evasion of his lifetime ban.  Defendant Qazi repeatedly made half-baked attempts to deflect blame onto Mr. Woods for his posts in the months that followed.

98.    On May 24, 2020, Third Row Tesla published "Episode 17" recorded on May 15, 2020, depicting Defendant Qazi wearing a shirt imprinted with a graph of TSLA's share price next to the text "Tesla $420.00," referring to Defendant Musk's false "funding secured" claim.



99.     On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID.  The male caller identified himself only as working for the law firm Quinn Emanuel in connection with the instant lawsuit and calling on behalf of Defendants Musk and Tesla.  The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his address.

100.    Upon information and belief, the caller was Defendant Qazi impersonating a lawyer in an attempt to extract information.  At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant Qazi's @WholeMarsLog Twitter account had posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

101.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short-sellers, he had decided to become one himself because Nikola's purported hydrogen-powered truck competed with Tesla's purported electric truck.

102.    On July 16, 2020, Defendant Qazi referred to the mugshot (below right) associated with his arrest in Brevard County, Florida in connection with Case No. 05-2018-CF-010519-AXXX-XX for felony possession of a controlled substance (LSD) and misdemeanor possession of cannabis—as "my photo" from the @WholeMarsBlog account (below left), which established that Defendant Qazi controlled @WholeMarsBlog, and not Scott Woods.





103.     On or around July 25, 2020, Defendant Qazi posted a third document entitled "F'S TESTIMONY" and a link thereto on his Smick Sites purporting to be "testimony" from a "victim" of Plaintiff.  The document was yet another compilation of Diego MasMarques, Jr.'s posts authored once again by Amelia Tracey, who had also fabricated "P'S TESTIMONY."

104.     In or around August 2020, Defendant Qazi interviewed Nikola Corporation former CEO Trevor Milton and toured Nikola's headquarters in order to report insights back to Defendants Musk and Tesla on one of their potential competitors.

105.     On August 5, 2020, Defendant Qazi falsely and publicly accused Plaintiff of posting Defendant Qazi's phone number and e-mail address on the "Dark Web."

106.     On August 22, 2020, in order to cause Plaintiff worry and anxiety, Defendant Qazi began posting by name on his @WholeMarsBlog account about a female Harvard University dean who Defendant Qazi erroneously believed was a college classmate of Plaintiff's.

107.     On August 25, 2020, Defendant Qazi made a photograph of Plaintiff's parents from a newspaper article the banner image for his @WholeMarsBlog account.

108.     After Plaintiff filed his Second Amended Complaint in this action on August 26, 2020, Defendant Qazi began a full-scale assault on Plaintiff's reputation to "drag his name through the mud" as promised, using at least twelve different websites over the next several months: among them, Twitter, Hacker News, Mastadon, Quora, Reddit, Wikipedia, Amazon.com, SoundCloud, Anchor.fm, wholemars.net, vagfoundation.org, and heyamifat.com.

109.     On August 28, 2020, Defendant Qazi appeared on the "Inside Transportation" podcast.  As of July 31, 2021, the podcast had been listened to approximately 1,700 times.  The interview contained a litany of lies about Plaintiff and the admission at 13:30 that Defendant Musk was "very pissed" about Defendant Qazi being banned by Twitter in October 2019.

110.     On September 19, 2020, attempting to cause Plaintiff worry and anxiety, Defendant Qazi posted threats concerning law enforcement on his @WholeMarsBlog account, warning that Plaintiff's house was "completely bugged" due to a "warrant for a wiretap."

111.     On September 22, 2020, Defendant Qazi referred to Plaintiff as "twice as evil as

Trevor [Milton]" on the @WholeMarsBlog account, twelve minutes after he had referred to Milton as someone who had "mollested *[sic]* his 15 year old cousin after a funeral."

112.    On September 24, 2020, Defendant Qazi posted links on his @WholeMarsBlog Twitter account to content authored by Diego MasMarques, Jr. and others on various gripe sites. Plaintiff had previously informed both Defendant Qazi and his counsel of the serious danger associated with the Civil Harassment Case, and again notified counsel accordingly.

113.    On September 26, 2020, the @WholeMarsBlog Twitter account wrote "what aaron does to people is worse than murder IMHO", followed by a suggestion that Defendant Qazi was contemplating suicide.  Three days later, another cryptic suggestion appeared on @WholeMarsBlog falsely stating that Plaintiff would be responsible for Defendant Qazi's death.

114.    On October 1, 2020, a photograph of Plaintiff's mother appeared as the background image on the @WholeMarsBlog Twitter account.

115.    On October 2, 2020, Plaintiff reported Defendant Qazi to SFPD a second time for internet harassment as the frequency of his harassing posts increased.

116.    On October 4, 2020, Defendant Qazi wrote that Plaintiff was "10x worse than [alleged child molester] Trevor Milton" and called him a "Truly sick person."  Defendant Qazi's Third Row Tesla colleague and confidant, Kristen Yamamoto, echoed Defendant Qazi's false allegations, writing, "—so you're *[sic]* daughter comes to you saying Trevor molested her & you tell her 'I have a bigger problem, Aaron Greenspan.' 😐."  Defendant Qazi also posted a photograph of Plaintiff's disabled brother as the banner image of his @WholeMarsBlog account.

117.    On October 6, 2020, it was widely reported that at the direction of Defendant Musk, Defendant Tesla had shut down its entire Public Relations department months prior, leaving Defendant Musk and Qazi's Twitter accounts as the primary sources of information on social media about Defendant Tesla, nominally valued at hundreds of billions of dollars.

118.    On October 8, 2020, Ms. Yamamoto and Defendant Qazi recorded a podcast on the Anchor.fm platform in which Defendant Qazi referred to Plaintiff as "a giant piece of shit," "just insane," "crazy stalker guy," "delusional" and "loser."

119.     On October 9, 2020 at 11:43 P.M., from the @WholeMarsBlog Twitter account, Defendant Qazi wrote, "So it turns out nobody is really suspicious of a Tesla driving around Fremont / someone actually nodded and waved from security" as he photographed Defendant Tesla's factory, which is private property.  In contrast, on April 19, 2019, Randeep Hothi, a researcher of similar age and skin tone to Defendant Qazi, was subject to a Workplace Violence Civil Harassment Order filed by Defendant Tesla for observing the exact same factory by day.

120.     On October 17, 2020, Defendant Qazi retweeted a post by the @OfficialABQ Twitter account containing the text "Here's a message for Greenspam" above a cartoon image of one stick figure kicking another in the groin, causing it to collapse.  Twitter later removed this post for violating its rules prohibiting users from advocating violent conduct.

121.     On October 19, 2020, an unknown party created an unverified Anchor.fm account in Plaintiff's name using Plaintiff's e-mail address, and then used the unverified account to send Defendant Qazi a recorded message *not* from Plaintiff, which Defendant Qazi then falsely and publicly cited as evidence of "harassment" by Plaintiff on his @WholeMarsBlog account.

122.     On October 26, 2020, Defendant Qazi retweeted a post referring to Plaintiff by @tesla_grl stating, "His rants are starting to sound like that of a Mass Shooter *[sic]*."

123.     In late October 2020, Twitter, Inc. published a "Ban evasion policy" at https://help.twitter.com/en/rules-and-policies/ban-evasion, clarifying that Defendant Qazi was violating the Twitter Terms of Service by continuing to use the platform, directly or indirectly.

124.     On December 6, 2020, Defendant Qazi attempted to contact a friend of Plaintiff's via LinkedIn for an unknown reason.

125.     Upon information and belief, on December 8, 2020, Defendant Qazi used the Cihwcihw Wikipedia account to exclusively edit three pages involving Plaintiff.  The edits contained a misspelling that consistently appears in Defendant Qazi's writing.

126.     Also on or about December 8, 2020, Defendant Qazi created a new page on his personal website for "The Story," referring to his involvement with Plaintiff.  He promised readers that the saga would be told in installments, starting with an introduction that he published

on December 15, 2020.  Between December 8th and 15th, Defendant Qazi published nine additional posts he referred to as "Apetizers" *[sic]* containing false and misleading statements about Plaintiff.  Each post, whether an "Apetizer" or formally part of "The Story," contained banner advertisements intended to produce financial gain for Defendant Qazi, as well as prominent links encouraging readers to donate to Defendant Qazi's legal defense funds via GoFundMe and PayPal.  The "Apetizers" alone were collectively 200 printed pages long.

127.     From December 9-11, 2020, the Cihwcihw Wikipedia account continued to smear Plaintiff on various Wikipedia articles by inserting false and misleading changes.

128.     On December 13, 2020, Defendant Qazi began publishing his series, "The Story," full of innumerable false and misleading statements and material omissions concerning Plaintiff. By January 11, 2021, the existing portions of "The Story" required 303 pages to print.

129.     Above and beyond those already enumerated, Defendant Qazi wrote over 100 pages of *additional* essays containing countless false statements about Plaintiff, including but not limited to the grotesque falsehood that Plaintiff incited violence against Defendant Qazi.

130.     On January 7, 2021, with the price of TSLA common shares at or near all-time highs, Defendant Qazi celebrated his work, posting, "holy fucking shit we're all rich as fuck!!!"

### CLAIMS FOR RELIEF

### COUNT I
### Defamation Per Se
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

131.     Plaintiff incorporates by reference the foregoing allegations.

132.     Starting on January 14, 2019 and even after the date of his ban by and from Twitter, Defendants Qazi and Smick made use of several Twitter accounts to publish constant, deliberate misinformation about Plaintiff and Plaintiff's family.

133.     From October 11, 2019 through present day, Defendants Qazi and Smick employed a variety of domain names and websites including plainshit.com, plainshit.org, plainsiite.org, wholemars.com, wholemars.net, wholemars.org, vagfoundation.org, and heyamifat.com to publish deliberate misinformation about Plaintiff and Plaintiff's family.

134.   Defendant Qazi made these false statements thousands of times with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-party court filings located by Plaintiff would increase or prevent any decrease in the value of TSLA shares.  He was successful: TSLA shares increased in value, he was profiled in a major financial publication in connection with Defendant Musk, many of his followers began repeating his false claims about Plaintiff, and many refused to believe anything published by Plaintiff or PlainSite.

135.   Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. explicitly encouraged others to spread false statements and disinformation about Plaintiff.

136.   Defendant Qazi explicitly encouraged others to "harass" and "prank" Plaintiff.

137.   Defendant Qazi threatened, "any attempts to silence us will only make us louder."

138.   Defendants Qazi and Smick placed banner advertisements alongside their libelous statements about Plaintiff in order to derive further profits from their lies.

139.   Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging accusations over a period of more than two years such that it is impossible to enumerate each and every one, select representative examples include:

| Statement No. / Date / Location | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1<br><br>January 14, 2019 | "Strange how Aaron mentions that he think *[sic]* Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium.  This statement falsely suggested a sexual attraction to Plaintiff's stalker.  That "Aaron mention[ed]" this statement on the particular website discussed in the post is provably false. |
| 2<br><br>August 8, 2019 | "How did Aaron Greenspan of Plainsite manage to qualify for non-profit status and avoid paying the government taxes? Is it legal to use a non-profit to stalk and harass people?" | This statement, posed as a question, falsely suggested that Plaintiff is guilty of criminal conduct.  Plaintiff pays taxes.  PlainSite's revenue is taxable and taxes are paid by Think Computer Corporation, which is a for-profit corporation.  By posting public records, Think Computer Foundation did not "stalk and harass people." |
| 3<br><br>September 28, | "I don't even have a fax machine.  The only thing that has been revealed here is that | This statement explicitly and falsely accused Plaintiff of possessing child pornography, which would be a crime. |

| | | |
|---|---|---|
| 2019 | "Aaron Greenspan has child pornography at his house. I do not." | The statement is provably false. |
| 4<br><br>September 30, 2019 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentioned Plaintiff and falsely accused him of fraud, and by referring to short-sellers including Plaintiff, "serious crimes." This statement also falsely stated that Plaintiff suffers from a medical condition. Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. Defendant Qazi twisted a lone remark Plaintiff made at a memorial service for his deceased friend, Aaron Swartz. |
| 5<br><br>October 9, 2019 | "I welcome the chance to discuss Aaron Greenspan's conduct and crimes in front of a court and / or jury." | This post explicitly mentioned Plaintiff and falsely accused him of "crimes." |
| 6<br><br>October 9, 2019 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentioned Plaintiff and stated that he is a "criminal guilty of felony tax fraud," which is false. Plaintiff has hired lawyers in various contexts over many years. |
| 7<br><br>October 9, 2019 | "no, likely just his learning disability due to aspergers" | This post was in a thread explicitly referring to Plaintiff by name. Plaintiff has never been diagnosed with Asperger syndrome or a learning disability. |
| 8<br><br>October 14, 2019 | "Today I received an identity theft alert from Experian.<br><br>An employee also alerted me to the fact that @AaronGreenspan's fake charity has been sending email to our mail servers.<br><br>Presumably this is some kind of retaliation attempt. Aaron, remember that if you break the law…" | From the @tesla_truth account, this post falsely implied that Plaintiff had committed "identity theft" and again accused him of running a "fake charity." Plaintiff sent three blank test e-mails to arbitrary addresses at the smick.com domain name to see if they would bounce in order to determine if Defendant Qazi was behind various fake accounts on Twitter. The test messages confirmed that he was. Sending these e-mails broke no laws. |
| 9<br><br>October 14, 2019 | "hey @IRSnews @IRStaxpros @SEC_Enforcement is it normal for a 501(c)(3) non-profit that is pooling donations from Tesla short sellers to retaliate against critics by | From the @tesla_truth account, this post appeared in a thread specifically mentioning Plaintiff. It falsely accused Plaintiff of stealing Department of Defense documents and committing wire fraud. This statement is provably |

| | | |
|---|---|---|
| | committing wire fraud? | false. |
| | am surprised this organizations *[sic]* gets a tax exemption. Owner previously stole DoD documents" | |
| 10<br><br>October 15, 2019 | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?<br><br>You are not alone.  The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice" | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes.  The Smick Sites have *zero* actual accounts of Plaintiff committing any of the listed crimes because Plaintiff never committed them. |
| 11<br><br>November 1, 2019 | "he extorted $250,000 from Mark Zuckerburg *[sic]*" | This statement is part of an essay on Defendant Qazi's website that explicitly names Plaintiff.  Plaintiff did not extort Mark Zuckerberg or anyone else, making this statement provably false. |
| 12<br><br>May 25, 2020 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @WholeMarsLog Twitter account, this statement falsely accused Plaintiff and his parents of various crimes. |
| 13<br><br>June 23, 2020 | "Aaron Greenspan abuses his charity to inure private benefit to himself.<br><br>His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | From the @WholeMarsBlog Twitter account, where Defendant Qazi again falsely alleged that Plaintiff has committed tax crimes.  The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation, making the statement provably false. |
| 14<br><br>June 23, 2020 | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff.  That Plaintiff has ever threatened Defendant Qazi with anything other than the instant |

| | | |
|---|---|---|
| | false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | litigation is provably false. |
| 15<br><br>July 10, 2020 | "I'm sad. Greenspan has stalked me and tried to hurt me so much, it can't even fit in a tweet. He rapes his victims, entering their mind and shattering their peace when they least expect it. You can't imagine it unless you've seen it first hand." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a rapist. |
| 16<br><br>July 11, 2020 | "Huh, interesting.<br><br>Aaron Greenspan had servers in New Jersey.<br><br>The same place the death threat @JohnnaCrider0 got this week came from." | Here, Defendant Qazi falsely implied that Plaintiff had sent a Tesla super-fan a death threat across state lines, a criminal act, because Plaintiff's company once maintained a co-located server in New Jersey *in 2003*, which was provably de-commissioned and disconnected in March 2007. |
| 17<br><br>July 12, 2020 | "Even though Greenspan himself published the book, he didn't like people reading what he has to say because it establishes that he's been angry at the world and suffering from paranoid delusions since high school (or perhaps earlier)." | From Defendant Qazi's personal website in his "Aaron Greenspan Tries To Remove Book Review: How Evil People Abuse The DMCA To Silence Critics" post, in which he falsely describes Plaintiff as mentally ill. |
| 18<br><br>July 17, 2020 | "Aaron Greenspan is a serial rapist.<br><br>He enters his victims *[sic]* lives unannounced and unexpected, and rapes them while they're going about their lives, with their friends<br><br>You can't understand it unless you've been targeted by him. I will fight for all his victims — past and future." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a serial rapist. |
| 19<br><br>July 17, 2020 | "saying that he harasses and threatens people just doesn't communicate the kind of person | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely claimed that Plaintiff is a rapist and |

| | he is | insisted that it was the "truth." |
|---|---|---|
| | he's a rapist | |
| | and the world will know the truth, no matter how hard he fights to keep it quiet" | |
| 20<br><br>July 18, 2020 | "Aaron Greenspan stalks and harasses colleged [sic] aged girls!  Creepy!  Leave her alone!<br><br>@jack @Twitter Safety" | In this post, Defendant Qazi accused Plaintiff of harassment and stalking and flagged Twitter's safety team because Plaintiff wrote a single comment on the absurdity of a Third Row Tesla member publicly defending billionaire Jack Dorsey against outrage over Twitter (and @ElonMusk) being hacked. |
| 21<br><br>August 3, 2020 | "Scary. someone tried to hack into Omar's iCloud account, so it got locked and he had to reset the password.<br><br>Added to the Greenspan criminal activity file…" | Defendant Qazi falsely accused Plaintiff of breaking into his iCloud account and of being a "criminal" as a result. Plaintiff has never made any attempt of any kind to break into Defendant Qazi's accounts on any platform.  This statement is provably false based upon server log evidence. |
| 22<br><br>August 21, 2020 | "Motives and profile of a Cyberstalker like Aaron Greenspan" [image of excerpt from "Motives and profile" section of Wikipedia article at https://en.wikipedia.org/wiki/Cyberstalking] | In this post, Defendant Qazi again falsely accused Plaintiff of the crime of "stalking" for a variety of completely inapplicable reasons.  This is yet another example of Defendant Qazi projecting his own pathological obsession with and stalking of Plaintiff. |
| 23<br><br>August 21, 2020 | "Based on his cyberstalking and false police reports we have a good case to put him away for 5 and a half years" | In this post, Defendant Qazi again falsely accused Plaintiff of the crimes of "stalking" and filing a false police report, suggesting that Plaintiff would be incarcerated as a result.  No criminal case against Plaintiff even exists. |
| 24<br><br>November 30, 2020 | "Recently Martin Tripp has been working with Aaron Jacob Greenspan to threaten, harass and doxx Tesla customers." | This statement is baseless and false in several ways: Plaintiff has not ever "worked" with Martin Tripp, nor has Plaintiff ever taken any action against "Tesla customers." |
| 25<br><br>December 7, 2020 | "While researching the Aaron Greenspan story we've uncovered shocking evidence of massive fraud." | In two separate posts, both of which readers understood to refer to Plaintiff, Defendant Qazi falsely accused Plaintiff of unspecified "major organized criminal activity" and "massive fraud." |

| | | |
|---|---|---|
| | "we're talking about major organized criminal activity… this is some messed up stuff" | |
| 26<br><br>December 8, 2020 | "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" | Defendant Qazi falsely claimed that Plaintiff was stealing passwords, a possible violation of 18 U.S.C. § 1030, and that Harvard shut down Plaintiff's product.  In reality, the product was secure and the university did not shut it down.  Harvard administrators were misinformed by an overzealous student. |
| 27<br><br>December 8, 2020 | "I am trying to diagnose his various mental conditions, and believe he may have narcissistic personality disorder…"<br><br>"What a psychopath."<br><br>"Aaron Greenspan clearly has serious mental health and anger issues that continue to this day." | From Defendant Qazi's personal website in his "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" post, in which Defendant Qazi, who is neither a doctor nor qualified to offer a diagnosis in any way, again falsely portrays Plaintiff as mentally ill. |
| 28<br><br>December 8, 2020 | "Given what we know about Aaron obsessively logging and storing all activity on his servers to try and use as blackmail, you can bet students were compromised the minute they signed up." | In this post, Defendant Qazi falsely accuses Plaintiff of having committed the crime of blackmail. |
| 29<br><br>December 9, 2020 | "Greenspan has also admitted to anger issues that are completely out of control, driving him to seek revenge for even small or imagined slights." | In this post, Defendant Qazi again falsely portrays Plaintiff as mentally ill. This is textbook projection based on Defendant Qazi's self-described "out of control revenge impulse."  There was no such admission by Plaintiff. |
| 30<br><br>December 9, 2020 | "Well Aaron…FaceCash was shut down for violating financial regulations." | Here, Defendant Qazi falsely suggests that Plaintiff violated 18 U.S.C. § 1960. In fact, Plaintiff's company voluntarily shut down FaceCash *before* any violation could occur to ensure compliance with the law. |
| 31<br><br>January 13, 2021 | "Aaron Greenspan has admitted that he is willing to resort to violence to silence us if his attempts at non-violent retaliation fail." | This assertion is completely false as no such admission or anything resembling such an admission was ever made. |
| 32 | "Aaron Greenspan…  He's like, | Defendant Qazi made this false verbal |

| | | |
|---|---|---|
| April 6, 2021 | you know, this very mentally ill guy…" | statement on a YouTube video podcast viewed approximately 1,700 times and hosted by a 13-year-old child. |
| 33<br><br>June 13, 2021 | "Aaron Greenspan: 'Adolph [sic] Hitler was a great founder'" | Plaintiff is Jewish and does not believe that Adolf Hitler was "great" in any way.  This quotation fabricated by Defendant Qazi falsely summarized a satirical post by Plaintiff highlighting the "just following orders" mentality pervasive in technology companies. |
| 34<br><br>June 14, 2021 | "that's what a lot of people are concerned about" | This statement from the @WholeMarsBlog Twitter account affirming "He sounds like a future mass murderer" in response to the above post about Hitler falsely suggests Plaintiff's intent to commit murder. |
| 35<br><br>July 18, 2021 | "Aaron Greenspan has gone to insane lengths to make sure nobody learns the truth about the Greenspan crime family and their fraudulent charity. They're ready to harass Omar for years if they have to. Telling people what's happening is the only thing keeping them from killing him" | This statement from the @WholeMarsBlog Twitter account falsely suggests Plaintiff's involvement in a conspiracy to commit murder. |

140.    Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plaintiff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

141.    Defendant Qazi's persistent lies kicked off a chain of libel by his followers, who publicly referred to Plaintiff as a "psychopathic incel" and a likely "mass shooter."

142.    Defendant Qazi's written and verbal false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of this action.

143.    On October 19, 2019, Defendant Qazi stated, "I want everyone to know the true facts about who he really is," and on August 24, 2020, Defendant Qazi admitted that he

frequently posts material on his Twitter accounts intended to be interpreted as fact, writing, "I trust you guys to be smart enough to figure out what's fact and speculation."

144.    Defendant Qazi's thousands of aspersions demonizing Plaintiff—none of which addressed a single one of Plaintiff's substantive concerns regarding Defendant Tesla's business practices—were interpreted by readers statements of fact.  On October 9, 2020, one reader even replied to a @WholeMarsBlog post with a video clip of man holding up a sign that simply reads "#FACTS."  In addition to using a Twitter account containing the word "truth" to make statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on Twitter and via the Smick Sites to complete IRS Form 13909 in order to file false reports echoing the conspiracy theories already submitted by Diego MasMarques, Jr.

145.    Communications with the IRS are regulated by federal law and are required to be factual.  Defendant Qazi also frequently tagged law enforcement Twitter accounts in posts.

146.    On January 29, 2021, Defendant Qazi posted a heavily altered photograph of Plaintiff with a modified nose, mouth, eyes, and eyebrows that elicited replies from readers such as "ugly as shit" and "Stay safe out there!"

147.    From Twitter and his Smick Sites, Defendant Qazi published links to libelous and/or pornographic material with the intent of poisoning search results concerning Plaintiff.

148.    Defendant Qazi's false and misleading statements concerning Plaintiff, whether written or verbal, were not in service of and failed to further any public debate.

149.    Defendant Qazi's false and misleading statements, written and verbal, have irreparably harmed Plaintiff's reputation by providing disinformation for others to re-post in an endless loop of defamation.

**COUNT II**
**Defamation Per Se**
**Against Defendants Elon Musk and Tesla, Inc.**

150.    Plaintiff incorporates by reference the foregoing allegations.

151.    Since 2019, Defendants Musk and Tesla have treated Defendant Qazi in such a manner as to cause any reasonable observer to believe that Qazi is an actual or ostensible agent

of Defendants Musk and/or Tesla, and more than just a casual friend, as exhibited by:

a) Defendant Musk authorizing and endorsing Qazi's harassing conduct toward his critics, including but not limited to Plaintiff, by e-mailing Qazi, "Your Twitter is awesome!" alongside advice for handling journalists (as a Tesla Public Relations employee would) in an August 2019 e-mail to Qazi after the Tesla Board of Directors, including Defendant Musk, had been warned about Qazi's harassment;

b) having reportedly shut down Tesla's Public Relations department, and out of his over 59 million followers, Defendant Musk consistently using Defendant Qazi's Twitter accounts as springboards to make material disclosures to investors;

c) Defendant Qazi admitting from the @WholeMarsBlog Twitter account, "Many people don't know that Tesla actually reads everything we post on Twitter.  Even if Elon doesn't respond to you, they will get the feedback to the appropriate team. It's someone's job I think," prompting a former Tesla employee to write "Can confirm" and another observer to write, "They have this instead of a pr team.";

d) permitting Defendant Qazi to attend exclusive, invite-only Tesla events where Defendant Musk presented new products;

e) granting Defendant Qazi early access to Tesla "Full Self-Driving" ("FSD") beta software—an honor bestowed upon only "25…non-employees" globally "based on…their safe driving record" according to Tesla attorney Eric C. Williams's December 14, 2020 letter to the California Department of Motor Vehicles—despite Defendant Qazi's history of criminal charges for violating the California Vehicle Code, including an alleged but later dismissed violation of § 23222(B): Possession of Marijuana While Driving, as well as Defendant Qazi publicly posting to Twitter images of substantial amounts of alcohol reportedly consumed before driving his Tesla vehicle;

f) signing a written contract with Defendant Qazi that restricts his discussions with the media about Tesla beta software;

g) allowing Defendant Qazi access to Tesla's private property in the same fashion that has resulted in Tesla filing for restraining orders against others;

h) permitting Defendant Qazi to use the TESLA registered trademark in his @tesla_truth Twitter handle with no legal consequence;

i) granting Defendant Qazi over three hours of Defendant Musk's time to conduct an in-person interview promoting Defendant Tesla's products and narratives;

j) providing Defendant Qazi with access to material non-public information (MNPI) and other leaked news tips from inside Tesla;

k) Defendant Musk autographing the interior of Defendant Qazi's Model 3;

l) encouraging and/or allowing Tesla management, such as Senior Global Director, Public Policy and Business Development Rohan Patel, to follow and "like" Defendant Qazi's Twitter posts regardless of the substantial controversy surrounding Qazi's misconduct;

m) Defendant Musk petitioning Twitter, Inc. CEO and fellow billionaire Jack Dorsey for special treatment for Defendant Qazi after Qazi was suspended from Twitter so that he could continue to promote Defendant Tesla's stock and products;

n) promoting Defendant Qazi's legal defense fund for this action;

o) allowing Defendant Qazi to correspond with Defendant Musk's preferred attorney, Alex Spiro;

p) relying on Defendant Qazi for intelligence regarding competitors obtained at meetings and tours where official Tesla employees would not be permitted;

q) Defendant Musk regularly corresponding with Defendant Qazi about business matters via e-mail and Twitter DM through present day;

r) actively ignoring written concerns expressed to the Board of Directors about Defendant Qazi's conduct;

s)  Defendant Qazi admitting on video that he performs work, compensated through stock ownership and referral bonuses, for Defendant Tesla, by exclaiming, ""I'll sell them all fuckin' Teslas.  I'll pull in those referrals!"

t)  Defendant Qazi appearing to work nearly 24 hours per day, every day, to exclusively promote the interests of Defendants Musk and Tesla on social media;

u)  Defendant Qazi admitting that he is a Tesla shareholder.

152.    Defendants Musk and Tesla are vicariously liable for all defamatory statements published by Defendant Qazi concerning Plaintiff from at least as early as 2019.

153.    Had Defendants Musk or Tesla instructed Defendant Qazi to stop defaming Plaintiff, Defendant Qazi would have obeyed and stopped because his defamatory statements were made in service of Defendants Musk and Tesla.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

154.    In his December 9, 2018 CBS *60 Minutes* interview (the "60 Minutes Interview"), Defendant Musk admitted on air to journalist Lesley Stahl that he did at times "use [his] tweeting to kind of get back at critics" and that "I guess we might make some mistakes.  Who knows?"

155.    To the extent that Defendant Musk was unaware that his communications with Defendant Qazi would be quoted in *Bloomberg Businessweek*, he was given the opportunity to comment by journalist Zachary Mider.  As Mider's article states, "Tesla has legions of die-hard fans, many of them well-to-do, tech-obsessed, and male.  Qazi is pretty close to the archetype. His Twitter handle, @tesla_truth, is a bottomless font of Muskolatry.  Before we met in August, he'd emailed Musk to give him a heads-up and encourage him to speak with me."  Therefore, Defendant Musk was aware that a potential article would involve Defendant Qazi and at least one of Defendant Qazi's libel-spewing Twitter accounts, @tesla_truth.  Yet Defendant Musk made no effort to distance himself from Defendant Qazi's statements or to qualify them.

156.    The @ElonMusk Twitter account is disclosed as a source of factual "material information" in Defendant Tesla's SEC Form 8-K filed November 5, 2013.

157.    In addition to those statements for which Defendant Musk is vicariously liable,

Defendant Musk himself published the following libelous statements about Plaintiff:

| Statement No. / Date / Medium | Written Statement by Defendant Musk | Pending Legal Review | Public Forum / Interest |
|---|---|---|---|
| 36<br><br>October 9, 2019 / E-Mail and Twitter via Qazi | "Does the psych ward know you have a cell phone? Just curious." | No | Twitter Only / No |
| 37<br><br>July 3, 2020 / Twitter | "Greenspan is crackers, bananas, barky & ten cards short of a full deck" | No | Yes / No |

158.     Defendant Musk's false and misleading statements, disseminated to his tens of millions of Twitter followers, have irreparably harmed Plaintiff's reputation.

159.     Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever been diagnosed with any mental disorder.  Plaintiff provably does not live in and has never been admitted to a psychological unit for clinical evaluation, nor has Plaintiff ever visited with a mental health professional in a clinical setting except to assist with his brother's acute condition.

160.     *The Verge* has described Defendant Musk's followers as an "army of irregulars waiting to be marshaled," and Defendant Musk exploits this fact.  If he tweets about a cryptocurrency or a stock, his followers buy it.  When he tweets about a person he dislikes, they attack.

161.     Defendant Musk authored and sent Statement 36 on behalf of himself and Defendant Tesla to numerous parties including government employees and Defendant Qazi, who Defendant Musk knew or should have known would republish his message publicly.

162.     On December 4, 2019, Defendant Musk testified under oath at trial that he expects his tweets to get widespread publicity both on and off of Twitter:

"Q.     So, you expected with both the 'pedo guy' tweet on Twitter, you knew at the time you made it then, and you expected at the time you made the apology that your tweets were going to get widespread publicity.  True?

A.     They're going to get some publicity, yeah.

Q.     Well, more publicity than they would get in terms of just the Twitter world, true?

A.    Yes.

Q.    You expected they would get publicity beyond the people on Twitter, true?

A.    Yes."

163.    In accordance with Defendant Musk's expectations, the tweets about Plaintiff were interpreted as factual by an enormous number of his and Defendant Qazi's followers, who have continued to harass Plaintiff and repeat false claims calling Plaintiff's mental health into question ever since.  Many individuals reading Defendant Musk's July 3, 2020 post interpreted it as a statement of fact meaning that Plaintiff is mentally ill.  Responses included "He needs medical help," references to Plaintiff as "psychotic," and multiple suggestions that Plaintiff should be used as "practice" for Defendant Musk's non-FDA approved, non-peer-reviewed Neuralink brain implant device.  In addition, Defendants Qazi and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded threats, hatred and ridicule by countless individuals with whom Plaintiff had no prior relationship.  For example:

a)    On October 9, 2019, @PandraKaka13 wrote, "Sadly Aaron's parents have let him have this sort of support for his revenge tactics. I'm concerned when they die that Aaron will have no one to support his psycho ways and may become even more volatile. Hope he doesn't own any guns. Mass shooter profile."

b)    On October 9, 2019, @CleanRevelry wrote, "Yo @AaronGreenspan, see you on a dark night," using a song lyric authored by Defendant Musk's girlfriend as a warning.  Plaintiff interpreted this as a threat of violence, as did another user.

c)    On May 17, 2020, @BarkMSmeagol wrote, "Yep. He belongs in an asylum."

d)    After July 3, 2020, a search for Plaintiff's name on Twitter began yielding one auto-complete suggestion other than his name itself: "aaron greenspan crazy." This indicated that other Twitter users were searching for this phrase.

164.    Defendant Musk's Twitter account is "verified."  As a result, the account and its posts feature a small white check mark in a blue seal wherever it appears.  Many Twitter users incorrectly interpret this icon to mean that an account's content is factually accurate.

165.     Defendant Musk's provably false and misleading statements concerning Plaintiff were not in service of and failed to further any public debate, or part of any debate at all.

166.     Defendant Musk's false statements were made with actual malice because Musk knew the statements were false and/or made the statements with reckless disregard for the truth.

167.     On or around August 21, 2018, Defendant Musk e-mailed his former public relations consultant, Juleanna Glover—CCing his brother and co-Director Kimbal and former Global Communications Director Dave Arnold—"Will Tweet as I wish and suffer the consequences. So it goes."  Defendant Musk thus affirmed his reckless disregard for the truth.

168.     None of Defendant Musk's statements concerning Plaintiff were ever deleted, retracted, or the subject of an apology.

### COUNT III
### Violation of the California Civil Anti-Stalking Statute
### (California Civil Code § 1708.7, et seq.)
### Against Defendants Omar Qazi, Elon Musk and Tesla, Inc.

169.     Plaintiff incorporates by reference the foregoing allegations.

170.     Starting on January 14, 2019, Defendant Qazi began following, alarming, and harassing Plaintiff through a pattern of conduct involving his use of multiple Twitter accounts, prank telephone calls, false accusations regarding rape and possession of child pornography, and republication of deliberately altered court documents.  These actions also led to the transmission of additional false allegations regarding child pornography via text message and fax to Plaintiff.

171.     As early as January 14, 2019, Plaintiff requested that Defendant Qazi stop his harassing conduct, writing "Please stop." at 12:36 P.M.  Plaintiff also asked Defendant Qazi to stop by leaving a message for him to stop at his nominal employer's office on the same day.

172.     As early as January 17, 2019, Defendant Qazi admitted his intent to "fuck with" Plaintiff to an unknown third party.

173.     On February 9, 2021, Twitter found that the @WholeMarsBlog account had violated the Twitter Rules "against promoting or encouraging suicide or self-harm" regarding Plaintiff.  Previously, Twitter had removed content the account posted as it advocated violence.

174.     From 2019 through present day, Defendant Qazi posted credible threats directed

at Plaintiff suggesting that he and/or Defendants Musk and Tesla ("we," as written on the @WholeMarsBlog account) had referred Plaintiff to law enforcement and that based on these "criminal referrals," "the FBI and law enforcement" were "very interested."

175.     These threats were credible because law enforcement tends to respond far more quickly to complaints from wealthy individuals and large corporations such as Defendants Musk and Tesla whether or not the underlying substance is true or false.  Furthermore, Defendants Musk and Tesla have a documented history of referring their critics to criminal law enforcement as a means of squelching criticism.  On or around June 25, 2018, working on behalf of Defendants Musk and Tesla, Hueston Hennigan LLP submitted a "[Redacted] CRIMINAL REFERRAL" labeled "Privileged & Confidential" and "Attorney-Work Product" to the Office of the Nevada Attorney General regarding a former employee who had leaked accurate information to the press critical of Defendants Musk and Tesla.  The same baseless referral was also submitted to the FBI and the United States Attorney's Office for the District of Nevada.  Representatives of Defendants Musk and Tesla further met personally with the Attorney General of Nevada to encourage criminal prosecution of a critic.

176.     Criminal prosecution would pose a significant threat to Plaintiff's health and safety for a variety of reasons, including but not limited to increased COVID-19 risk.

177.     On August 2, 2021, counsel for Defendant Qazi e-mailed Plaintiff, stating in part, "I caution you against keeping Omar as a defendant in this case. I don't want you to claim later that I did not warn you."

178.     On August 5, 2021 at 10:15 A.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, writing, "Please write to Case Western university *[sic]* and Neil Greenspan to ask him to stop this harassment…  I worry he's a danger to students at Case." He later repeated this false claim against Dr. Greenspan on August 7, 2021.

179.     On August 5, 2021 at 10:20 A.M., Plaintiff's father received a harassing e-mail from johndoe510150@gmail.com also addressed to the general e-mail account for his employer, the Case Western Reserve University School of Medicine.  The e-mail stated in part, "STOP

HARRASSSING *[sic]* WHOLEMARSBLOG and DOXXING PEOPLE online!!!"

180.    On August 7, 2021 at 12:59 P.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, "If Greenspan files a fifth revision of his lawsuit on Friday, Chapter 8 will be published continuing the story" in an attempt to intimidate Plaintiff into withholding this document from the Court in violation of 18 U.S.C. § 1512(b).  Defendant Qazi repeated this threat on August 10, 2021 on his personal website.

181.    Defendant Qazi's conduct caused Plaintiff and Plaintiff's family members to suffer substantial emotional distress due to the real threat of malicious prosecution and/or firing from deliberate smearing of Plaintiff as a supposed likely mass murderer harboring child pornography, and of Plaintiff's father as supposedly posing a "danger to students."

182.    As a result of Defendant Qazi's public conduct and his apparent contact with the restrained party in the Civil Harassment Case, Plaintiff reasonably feared for his and his family's safety after receiving messages, text messages and calls that he and others perceived as threats. As a result, Plaintiff reported Defendant Qazi to the FBI and to SFPD twice.

183.    Defendant Qazi facilitated the violation of Plaintiff's civil harassment restraining order against Diego MasMarques, Jr., which prohibits direct and indirect harassment, of which he was aware as early as January 14, 2019, and further admitted to altering, misconstruing and publicly posting Form CH-100 from the Civil Harassment Case for the express purpose of harassing Plaintiff.

184.    Even after Plaintiff restricted his personal Twitter account in July 2020 due to Defendant Qazi's ceaseless harassment—the digital equivalent of locking a door—Defendant Qazi still used a proxy to follow it and to post screenshots and metadata to his followers, brazenly displaying the padlock icon next to Plaintiff's name in numerous images.

185.    Defendant Qazi posted harassing messages on social media regarding Plaintiff and Plaintiff's family on the order of 1,000 times from different accounts, causing a cascade of harassment that has yet to cease.  For example, on October 1, 2019, @HaidarAns wrote, "@AaronGreenspan you sure have a very punchable face [laugh/crying emoji]".  With tens of

millions of followers, Defendant Musk cemented the effect with only a few posts.

186.    Defendant Qazi has admitted that he thinks harassing Plaintiff is "funny."

187.    Defendants Musk and Tesla are vicariously liable for Defendant Qazi's harassing conduct since at least as early as 2019.

188.    Had Defendants Musk or Tesla instructed Defendant Qazi to stop harassing Plaintiff, Defendant Qazi would have obeyed and stopped.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

189.    Defendants Musk and Tesla have a history of relying upon private investigators, fans with no formal corporate affiliation, and even convicted felons to provide "intelligence" on critics—often fabricated nonsense—to Defendant Musk and the company's legal team.

190.    Upon information and belief, Defendants Musk and/or Tesla have asked that Plaintiff be surveilled and investigated.  Such surveillance is why Defendant Qazi initially replied to Plaintiff's post tagging only @Tesla and @ElonMusk.

191.    Plaintiff seeks equitable relief, including but not limited to damages in the form of general damages, special damages and punitive damages pursuant to Cal. Civil Code § 3294.

192.    Plaintiff respectfully requests an injunction requiring: a) all Defendants to cease and desist making and/or publishing further harassing statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; b) all Defendants to cease and desist contacting or trying to contact Plaintiff, his family members, his friends, and any person mentioned by name as having known Plaintiff in Plaintiff's public writing; c) all Defendants to cease and desist impersonating others; d) the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Site domain names to Plaintiff; e) Defendant Qazi to cease and desist using Twitter, directly or indirectly; and f) Defendant Qazi to permanently remove any and all of his content mentioning Plaintiff from any and all websites under his control.

### COUNT IV
### Copyright Infringement (17 U.S.C. § 501, *et seq.*)
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

193.    Plaintiff incorporates by reference the foregoing allegations.

194.     In 2008, Plaintiff authored a hardcover book, *Authoritas*, ISBN 978-1-60669-000-0 ("Authoritas"), also available as an e-book, ISBN 978-1-60669-002-4.  Authoritas is an original, creative, copyrighted work whose copyright was registered with the United States Copyright Office on June 7, 2008 and assigned Registration No. TX 6-890-602.

195.     Authoritas was published and sold in bookstores such as Barnes & Noble, was and is sold on websites such as Amazon.com, and is available in public libraries worldwide.

196.     Without permission, Defendant Qazi posted photographs of pages and extended passages from Authoritas on his Twitter accounts and websites, taken from the most important parts of Authoritas, with the intent of harming Plaintiff and harming the market for the book.

197.     The heart of Authoritas is the portion of the book that focuses on Plaintiff's time at Harvard College, approximately covering pages 146-285 in the hardcover edition.

198.     Defendant Qazi infringed Plaintiff's rights in Authoritas willfully and repeatedly:

| Date / Medium | Defendant Qazi's Actions |
| --- | --- |
| October 4, 2019<br><br>Twitter | Posted at least six photographs of pages 149, 150, 151, and 187, as well as about a dozen quotes, mostly verbatim, from pages 9 (three quotes), 20, 31, 33 (two quotes), 34 (two quotes), 39, 194, 203, and 271. |
| July 10, 2020<br><br>Twitter | Posted at least 14 images of full pages or parts of pages from the Kindle edition of the book with non-transformative commentary on each, such as, "Imagine having Aaron Greenspan as your son." |
| July 11, 2020<br><br>Website | Posted an article entitled, "Choice Moments from Aaron Greenspan's Autobiography" and shared a link on Twitter with the caption, "I read Aaron Greenspan's life story so you don't have to.  Here are the best moments: @elonmusk".  The article consisted of 31 screenshots of Authoritas, some containing 1-2 entire pages, with a photograph of Plaintiff at the top.  The article constituted about 10% of Authoritas's pages. |
| December 8, 2020<br><br>Website | Posted a false and misleading 8,524-word essay on his personal website entitled, "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" containing over 30 verbatim passages—over 5,000 words, or approximately 60% of the essay—copied and pasted from the heart of Authoritas. |
| January 11, 2021<br><br>Website | Published a false and misleading 45,406-word essay entitled, "Chapter 7: Who Is Aaron Greenspan?" containing 93 mentions of "Authoritas" and 73 block quote citations, many spanning several paragraphs from the book, such that readers would find its purchase completely unnecessary. |

199.     Defendant Qazi's posts containing Authoritas on his personal website were and are part of a commercial endeavor.  Each post was and is adorned by Google AdSense banner

advertisements under the heading, "SPONSORED," which indicate that Defendant Qazi stands to profit from his infringement.

200.     Defendant Qazi did not merely copy factual material from Authoritas, which is a creative work beyond a list of dry facts.  He copied such an immense volume so as to include Plaintiff's interpretation and expression, such as "he offered back gruffly with a handshake," "from the way the President's jowls were slowly twisting," and "When I left, we both knew who was the adult in the room."  Such copying far exceeded the amount necessary to convey facts.

201.     The goal of Defendant Qazi's articles was not legitimate and permissible criticism by a scholar or disinterested party, but circulating libelous statements about Plaintiff as part of an unlawful harassment campaign, which is not "fair" by definition and in the context of Defendant Qazi's overall conduct described herein, violates the principles of good faith and fair dealing.  In addition to making false statements about Plaintiff based *on* the book, he also attempted to harass people mentioned *in* the book simply for having a connection to Plaintiff, including the aforementioned female Harvard University dean who merely shares a common name with Plaintiff's former classmate but is not the same person.  This is something other than "criticism."

202.     Defendant Qazi's statement that he would "drag [Plaintiff's] name through the mud until the day he [dies]" demonstrates both that his actions were willful and not "fair" use.

203.     Defendant Qazi's infringing content was not parody, not written in the style of Authoritas, often barely engaged at all with any of the book's content, was not in any way transformative, and was not in any way intended for educational use as evidenced by his use of expletives.  It was merely a vehicle to attack and attempt to shame Plaintiff, reflecting Defendant Qazi's desire to do as little creative work as possible and to harm the market for Authoritas.

204.     Plaintiff has not licensed use of Authoritas to Defendants or assigned any of his exclusive rights in his copyrights to Defendants Qazi or Smick.

205.     Defendant Qazi willfully moved his infringing content outside of the United States to evade compliance with copyright law, reflecting bad faith.  In sequence, his articles were hosted on servers owned by Automattic, Inc.; Linode LLC; hostkey.ru in Moscow, Russia

("protected" by Cloudflare); and Neterra Telecommunications, a Bulgarian company.

206.    Defendant Qazi re-published material from at least pages 9, 20, 30, 31, 33, 34, 39, 40, 89, 90, 100, 101, 121, 130, 131, 132, 137, 149, 150, 151, 187, 194, 203, 204, 239, 240, 271, 290, 291, 300, 302, 303, 306, 311, 314, and 315 of Authoritas (as measured by the hardcover edition)—36 pages in all, more than 10% of the book, and far in excess of 1,000 words.  Had Defendant Qazi simply been trying to make the point that he found Plaintiff untrustworthy or unlikeable, he could have made his viewpoint clear with simply one or two passages.  If he wanted to explain a timeline of events, he could have paraphrased as any actual scholar would, instead of copying page after page after page verbatim.  Instead, he helped himself to an enormous portion of the book in order to maximize the use of Authoritas as part of Defendants' campaign of harassment and baseless character assassination, to deny Plaintiff the benefits of the monopoly on his own work granted by Congress, and to secure profits for himself through discrediting Plaintiff (in turn lowering the chance of any negative impact from Plaintiff's research on Tesla's stock, in which he was invested,) and via his own advertising revenues.

207.    In keeping with Defendant Qazi's explicit statement of intent to usurp book sales, "I read Aaron Greenspan's life story so you don't have to," Plaintiff suffered damage to the market for Authoritas as a result of his infringement.  According to data from Amazon.com's Kindle Direct Publishing (KDP) program, Authoritas frequently sold between 1-4 e-book units per month from April 2008 through June 2020, with the maximum being 14 e-book units sold in one month.  Since Defendant Qazi posted his infringing articles in July 2020, Authoritas has sold only 1 e-book unit total to date aside from the unit purchased for the purpose of infringement by Defendant Qazi himself.  From September 2020 through present, no Authoritas e-book units were sold.  Nor has Amazon.com placed any orders for hardcover copies of Authoritas since Defendant Qazi's infringing articles were posted, which it regularly has in the past.

208.    On December 10, 2020, Defendant Qazi left a comment on a third-party Amazon.com review of Authoritas stating in part, "The author of this book is completely nuts," further reflecting his willful intent to harm the market for the book.

209.   Plaintiff is entitled to statutory damages pursuant to 17 U.S.C. § 504(c), which should be enhanced in accordance with 17 U.S.C. § 504(c)(2) on account of willful conduct.

### COUNT V
### Removal of Copyright Management Information in Violation of the DMCA
### (17 U.S.C. § 1202(b))
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

210.   Plaintiff incorporates by reference the foregoing allegations.

211.   17 U.S.C. § 1202(b) prohibits removal or alteration of copyright management information ("CMI").  CMI includes "[t]he name of, and other identifying information about, the author of a work," as well as "links to such information." 17 U.S.C. § 1202(c).

212.   Without permission, and after receiving several DMCA takedown notices, Defendant Qazi repeatedly posted a photograph of Plaintiff wearing a purple shirt (the "Purple Shirt Photograph") without the copyright notice clearly found where he obtained it.  Each republication of the photograph constituted a separate violation of the DMCA.

213.   The Purple Shirt Photograph is an original copyrighted work whose copyright was registered with the United States Copyright Office on July 18, 2020 and assigned Registration No. VA-2-215-227.

214.   Defendant Qazi was on notice of the Purple Shirt Photograph's copyrighted status at least as of October 10, 2019 when Plaintiff first filed a DMCA request with Twitter, Inc. about his abuse of the image.  He proceeded to continue willfully posting the image to induce, enable, and encourage others to infringe.

215.   At all times, the copyright notice at http://www.aarongreenspan.com/about/ read "Copyright © 2001-2017 Aaron Greenspan. All Rights Reserved."  This notice constituted CMI and was omitted from Defendant Qazi's unlawful reproduction of the photograph.

216.   As of July 19, 2020, the Purple Shirt Photograph itself posted at http://www.aarongreenspan.com/about/ contained a small text block in the bottom right corner of the photograph itself reading "Copyright © 2016 Aaron Greenspan." and International Press Telecommunications Council (IPTC) XMP metadata concerning the image's copyright status reading, "Copyright Notice: Copyright © 2016 Aaron Greenspan. All Rights Reserved."

217.     On July 29, 2020, Defendant Qazi willfully re-posted the Purple Shirt Photograph without any CMI on a server and WordPress-powered website hosted in or around Kiev, Ukraine at http://kidneystone.vagfoundation.org.  Defendant Qazi chose this DNS hostname in an attempt to shame Plaintiff for once having had a medical issue discussed in Authoritas, and deliberately configured the Hypertext Markup Language (HTML) IMG tag referencing the Purple Shirt Photograph's file, which he titled "loser.jpg," to be displayed 1,250 pixels wide at the top of the page.  This was more than three times the size of the 400-pixel-wide source image.  In so doing, Defendant Qazi ensured that the photograph would completely fill the screen of many laptop computers, which have a default display width of 1,280 pixels.  By making the photograph so prominent, Defendant Qazi encouraged his tens of thousands of followers, with whom he shared the link on Twitter at least three times throughout 2020, to download and re-publish the image.

218.     WordPress presents website publishers with fields for image metadata, including a field called "copyright."  These fields are presented on many WordPress sites, including Defendant Qazi's sites, in an HTML attribute called "data-image-meta."  That attribute at http://kidneystone.vagfoundation.org included a "copyright" field set to an empty string.

219.     On January 6, 2021, Defendant Qazi willfully published additional, deliberately enlarged copies of the Purple Shirt Photograph on his website without any CMI on two pages: one page entitled, "Aaron Greenspan Wearing A Purple Shirt" using the deliberately chosen image file name "aaron-greenspan-is-the-worlds-bigget-loser-has-kidney-stones-and-is-a-40-year-old-virgin.jpg" and another entitled "Worst Guy Ever."  These pages were also intended to induce, enable and facilitate further infringement as evidenced by the fact that on the former page, Defendant Qazi wrote, "Share this blog post far and wide."

220.     Each post on Defendant Qazi's websites featured buttons to "SHARE THIS" on Twitter, Facebook, Reddit, LinkedIn, and via e-mail.  Defendant Qazi knew or should have known that sharing his posts on social media would induce, enable and facilitate infringement by automatically reproducing the largest image on the page in a preview lacking CMI.

221.     By definition, Defendant Qazi's use of the Purple Shirt Photograph could not

have been "fair use" because its posting was part of a bad faith, unlawful smear and harassment campaign that violates the principles of good faith and fair dealing.

222.     On or about January 9, 2021, and again on January 13, 2021, Defendant Qazi willfully re-posted the Purple Shirt Photograph without any CMI on servers outside the United States in an attempt to evade this Court's jurisdiction.

**COUNT VI**
**DMCA Misrepresentation (17 U.S.C. § 512(f))**
**Against Defendant Omar Qazi**

223.     Plaintiff incorporates by reference the foregoing allegations.

224.     Acting as an agent of Defendants Musk and Tesla, Defendant Qazi abused the DMCA in bad faith to attempt to hide evidence of Tesla's "Autopilot" failing to function properly and violating the California Vehicle Code by driving through a red traffic light.

225.     On November 4, 2019, as CEO of Defendant Smick, Defendant Qazi submitted a false DMCA Takedown Notice issued under the authority of 17 U.S.C. § 512 to Twitter, Inc. regarding an August 7, 2019 post authored by Plaintiff on the @PlainSite Twitter account.  The post contained a hyperlink to the Autopilot Moving Violation Video.

226.     Defendant Qazi created a website also on November 4, 2019 to purportedly show that the Autopilot Moving Violation Video was subject to copyright.  In his false DMCA Takedown Notice he stated in part, "This user has been cyberstalking and harassing me since January. In the linked tweet, he admits to illegally downloading and redistributing my copyrighted work."  This statement was false in every respect.

227.     Plaintiff's hyperlink on Twitter to the Autopilot Moving Violation Video was part of a journalistic endeavor that falls squarely under fair use doctrine, consistent with Plaintiff's prior reporting on and Freedom of Information Act requests involving Tesla Autopilot.

228.     Defendant Qazi's false November 4, 2019 DMCA Takedown Notice contained an invalid physical address, contained a false characterization of Plaintiff's post, and falsely stated, "I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law" as well as, "The information in this notification is

accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner," even though the information was not accurate for all of the above reasons.

229.    Plaintiff sent DMCA Notices regarding Defendant Qazi's willful re-publication of Authoritas on a server controlled by Automattic, Inc. on or around July 12, 2020; and on a server controlled by Linode LLC on or around July 17, 2020.  Defendant Qazi sent Counter-Notices.  In his July 16, 2020 DMCA Counter-Notice delivered via Automattic, Inc. pursuant to 17 U.S.C. § 512, Defendant Qazi knowingly and materially misrepresented under penalty of perjury that he had a "good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled."

230.    Defendant Qazi's July 18, 2020 DMCA Counter-Notice delivered via Linode LLC, issued under the authority of 17 U.S.C. § 512, knowingly and materially misrepresented under penalty of perjury that the publication of his infringing content was "fair use."

231.    On September 18, 2020, as CEO of Defendant Smick, Defendant Qazi again filed a false DMCA Takedown Notice with Twitter, Inc. involving the Autopilot Moving Violation Video.  He claimed that "A photograph of my car" posted on the @PlainSite account on August 2, 2019—over a year prior—was suddenly subject to copyright despite no notice to that effect.

232.    Defendant Qazi, who by this point was familiar with the concept of fair use, did not suddenly remember that a single, year-old use of a photograph of his car, to make the point that it appeared to be the same car in the Autopilot Moving Violation Video, infringed copyright law.  Based on his posts from that morning, he was angry about a confidential settlement offer Plaintiff had sent to Defendant Qazi's counsel and was actively contemplating a "counter suit." Unable to control his "out of control revenge impulse," he retaliated by seeking out a pretext for a counterclaim on the @PlainSite Twitter account, however dated.  Defendant Qazi viewed the DMCA as an expedient tool to achieve these ends, and used it in bad faith to exact revenge.

233.    As before, Plaintiff's re-publication of the photograph of Defendant Qazi's Tesla Model 3, which matched the vehicle depicted in the Autopilot Moving Violation Video, was a journalistic endeavor regarding public safety that falls squarely under fair use doctrine.

234.   Defendant Qazi's September 18, 2020 DMCA Takedown Notice falsely stated, "I have good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law" as well as, "The information in this notification is accurate, and I state under penalty of perjury that I am authorized to act on behalf of the copyright owner," even though the information was not accurate for all of the above reasons.

235.   On January 5, 2021, as CEO of "Whole Mars Catalog," Defendant Qazi filed a false DMCA Takedown Notice with Twitter, Inc.  The image, depicting a shareholder fundraising website for Defendant Smick, contained no copyright notice and is not registered with the United States Copyright Office.  The false DMCA Takedown Notice, stated in part:

> "I am providing this notice in good faith and with the reasonable belief that rights I own are being infringed.
>
> Under the penalty of perjury I certify that the information contained in the notification is both true and accurate, and I have the authority to act on behalf of the owner of the copyright(s) involved."

236.   Yet again, Plaintiff's publication of news concerning Defendant Qazi's attempt to raise funds for Defendant Smick fell squarely under fair use doctrine, with which Defendant Qazi was familiar because he had attempted to shield his own numerous bad-faith acts with it.

237.   Defendant Qazi's aforementioned works were not copyrighted, or if they were, their copyright was not infringed, making his certifications under penalty of perjury false.

238.   On multiple occasions, Twitter, Inc. removed content from the @PlainSite account based on Defendant Qazi's false representations and failed to process Counter-Notices.

239.   Plaintiff seeks statutory damages for Defendants' DMCA violations.

### COUNT VII
**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against Defendants Elon Musk, Tesla, Inc. and Omar Qazi**

240.   Plaintiff incorporates by reference the foregoing allegations.

241.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: a) defendants made public misrepresentations or failed to disclose facts; b) the omissions and misrepresentations were material; c) TSLA securities were

and are traded in efficient markets; d) TSLA shares were and are liquid and trade with moderate to heavy volume, with an average volume of over 40 million shares traded daily according to NASDAQ; e) Defendant Tesla traded and trades on the NASDAQ, and was and is covered by multiple analysts; f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of TSLA securities; and g) Plaintiff purchased, sold, or endured the expiration of TSLA securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed (if ever), without knowledge of the omitted or misrepresented facts.

242.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tesla who knew that those statements were false when made.

243.   On a quarterly basis, Defendant Musk and/or Tesla's Chief Financial Officer signs SEC Forms 10-Q and 10-K, including financial statements issued by Defendant Tesla. These forms also contain certifications pursuant to the Sarbanes-Oxley Act of 2002, stating that the financial information contained therein is accurate and discloses any material changes to Defendant Tesla's internal control over financial reporting.

244.   Nonetheless, Tesla's financials are unreliable overall.  Figures from one period's financial statements often differ when reported as "prior period" figures on the next statement:

a)   In Q3 2018, Defendant Tesla reported "Selling, general and administrative"

(SG&A) expenses of "113,973" thousand dollars, or about $114 million.  In Q4 2018, the Q3 2018 number was implicitly revised to $109 million.

    b)   In Q3 2018, "Cost of sales" (COGS) was reported as "25,037" thousand dollars, or about $25 million.  By Q4 2018, that same number for Q3 2018 was implicitly revised to $30 million.  The shift from SG&A to COGS appears to take place every quarter from Q2 2018 through at least Q1 2019.

    c)   On page 88 of its 2018 SEC Form 10-K, Defendant Tesla disclosed "marketing, promotional and advertising costs of $70.0 million, $66.5 million and $48.0 million in the years ended December 31, 2018, 2017 and 2016, respectively."  On page 80 of its 2019 SEC Form 10-K, it disclosed "marketing, promotional and advertising costs of $27 million, $32 million and $37 million in the years ended December 31, 2019, 2018 and 2017, respectively, of which the majority is related to promotional activities."  The figures for 2017 and 2018 do not match.

245.    Defendants have repeatedly misled investors by:

| Issue No. / Dates / Medium / Speaker(s) | False and Misleading Statements / Reasons Why Statements Were False and Misleading When Made / Facts Giving Rise to a Strong Inference of Scienter |
| --- | --- |
| 1<br><br>November 2, 2018<br>(Q3 2018 10-Q),<br>February 19, 2019<br>(2018 10-K),<br>April 29, 2019<br>(Q1 2019 10-Q),<br>July 29, 2019<br>(Q2 2019 10-Q),<br>October 29, 2019<br>(Q3 2019 10-Q),<br>February 13, 2020<br>(2019 10-K),<br>April 29, 2020, | *False and Misleading Statements:*<br><br>1. "Cash and cash equivalents" of "2,967,504" [thousand dollars] in the Tesla, Inc. Q3 2018 SEC Form 10-Q dated November 2, 2018, page 4<br>2. "Cash and cash equivalents" of "3,685,618" [thousand dollars] in the Tesla, Inc. 2018 SEC Form 10-K dated February 19, 2019, page 72<br>3. "Cash and cash equivalents" of "2,198,169" [thousand dollars] in the Tesla, Inc. Q1 2019 SEC Form 10-Q dated April 29, 2019, page 4<br>4. "Cash and cash equivalents" of "4,954,740" [thousand dollars] in the Tesla, Inc. Q2 2019 SEC Form 10-Q dated July 29, 2019, page 4<br>5. "Cash and cash equivalents" of "5,338" [million dollars] in the Tesla, Inc. Q3 2019 SEC Form 10-Q dated October 29, 2019, page 4<br>6. "Cash and cash equivalents" of "6,268" [million dollars] in the Tesla, Inc. 2019 SEC Form 10-K dated February 13, 2020, page 65<br>7. "Cash and cash equivalents" of "8,080" [million dollars] in the Tesla, Inc. Q1 2020 SEC Form 10-Q dated April 30, 2020, page 4<br>8. "Yeah.  It's a fair question.  I don't have any additional color to provide.  So $8.1 billion in cash and cash equivalents at the end of Q1, |

| | |
|---|---|
| April 30, 2020 (Q1 2020 10-Q), July 28, 2020 (Q2 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | we're managing it very closely," stated by Zachary Kirkhorn on the April 29, 2020 Q1 2020 Tesla, Inc. earnings call<br>9. "Cash and cash equivalents" of "8,615" [million dollars] in the Tesla, Inc. Q2 2020 SEC Form 10-Q dated July 28, 2020, page 4<br><br>_Reasons Why Statements Were False and Misleading When Made:_<br><br>According to a March 5, 2019 _Financial Times_ article, the actual cash interest yield reported in Defendant Tesla's financial statements indicates that the company began exaggerating its cash balances starting in Q4 2016 and continued exaggerating them up to roughly $1.5 billion by the end of 2018. These conclusions are supported by Defendant Musk's videotaped admission to _Axios_ on November 26, 2018 that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die"—disclosures totally absent from the Q3 2018 SEC Form 10-Q filed just 26 days prior, which misleadingly reported an ample $"2,967,504[,000]" of unrestricted cash on hand. Furthermore, a company facing a severe threat of death should have issued a "going concern" warning, which Defendant Tesla never did.<br><br>On November 3, 2020, _**Defendant Musk further admitted via Twitter that the closest Defendant Tesla had come to bankruptcy "was about a month" from "mid 2017 to mid 2019"**_—an admission that Defendant Tesla filed and Defendant Musk signed false financial statements in violation of the Sarbanes-Oxley Act of 2002. On December 22, 2020, Defendant Musk also admitted via Twitter that "[d]uring the darkest days of the Model 3 program" he had even e-mailed Apple, Inc. CEO Tim Cook offering to sell Tesla to Apple—a fact also never disclosed to investors—but that Defendant Musk never received a response.<br><br>Starting in 2020, Tesla's reported cash figures also failed to distinguish between cash accessible for use in the United States and cash restricted for use only within the People's Republic of China, subject to strict loan agreements with the Chinese government. The December 18, 2019 "English Convenience Translation" of the Tesla (Shanghai) Co., Ltd. Fixed Asset Syndication Loan Agreement with numerous Chinese banks (filed as Exhibit 10.85 attached to the 2019 SEC Form 10-K filed February 13, 2020) includes clause 11. This clause is translated as "Revenue Collection Account Management," which restricts transfers of revenue collected in China to any other account unless the "transfer is used for the purpose of repaying any of its working capital loans" from the Chinese banks. In effect, Defendant Tesla cannot move cash collected in China to the United States until the loans are repaid unless the Chinese bank lenders pre-approve such a transfer. Yet its cash disclosures in SEC filings make it impossible to tell how much cash is subject to such material constraints. |

*Facts Giving Rise to a Strong Inference of Scienter:*

Defendants Musk and Tesla knew or should have known that they were reporting false and misleading information regarding cash holdings.  Based on earned interest, average cash balances were approximately 90% lower than reported throughout 2019 and part of 2020:

| | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 |
|---|---|---|---|---|---|---|---|---|
| **Cash & Equivalents** | $2,198 | $4,955 | $5,338 | $6,268 | $8,080 | $8,615 | $14,531 | $19,384 |
| Cash in US Money Market Funds | $812 | $1,723 | $1,413 | $1,606 | $5,293 | $4,002 | $9,147 | $13,905 |
| Cash in US Banks | $1,788 | $4,357 | $4,722 | $5,008 | $6,030 | $5,015 | $10,681 | $12,624 |
| Cash in Foreign Currencies | $410 | $598 | $616 | $1,260 | $2,050 | $3,600 | $3,850 | $6,760 |
| | | | | | | | | |
| SPAXX (Fidelity)  3-Month Avg Yield | 0.269% | 0.483% | 0.418% | 0.296% | 0.352% | 0.003% | 0.002% | 0.002% |
| Implied Interest Income (A) | $2 | $8 | $6 | $5 | $19 | $0 | $0 | $0 |
| | | | | | | | | |
| Federal Funds Rate Quarterly Avg Yield | 2.401% | 2.398% | 2.198% | 1.656% | 1.261% | 0.060% | 0.093% | 0.089% |
| Implied Interest Income (B) | $43 | $104 | $104 | $83 | $76 | $3 | $10 | $11 |
| | | | | | | | | |
| Implied Interest Income (A + B) | $45 | $113 | $110 | $88 | $95 | $3 | $10 | $12 |
| Reported Interest Income (C) | $8.8 | $10.4 | $15.0 | $9.9 | $10.0 | $8.0 | $6.0 | $6.0 |
| % Difference in Reported Vs Implied Interest Income | -81% | -91% | -86% | -89% | -89% | 158% | -40% | -48% |

Defendant Musk was Chairman of SolarCity's Board of Directors.  When SolarCity had a cash crisis in 2015 and 2016, corporate management scheduled weekly in-person meetings, made weekly cash flow forecasts shared among employees in "datarooms," and informed the Board of Directors as to the company's cash position.  Under oath at trial in the SolarCity Case, Defendant Musk testified on July 12, 2021 that, "We had weekly cash meetings at Tesla too."  Defendant Musk did not explicitly deny attending these meetings, claiming he could not recall attendance. Investors were left in the dark with no knowledge of Tesla's cash crisis, while Defendants Musk and Tesla always had knowledge of Tesla's true cash position with weekly resolution at least.  Just as with SolarCity, Defendant Musk was ready to sell Tesla to another company, but did not inform investors, indicating that he knew exactly how dire the situation was but actively chose to conceal that fact.

At many companies, quarter-end and year-end cash balances are manipulated through the use of credit lines to make accounts appear for a brief moment to have more funds in them than they normally do.  When Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Zachary Kirkhorn about the **present-day** cash balance, not the quarter-end balance, on the Q1 2020 earnings call, the statement that, "I don't have any additional color" was false given that as CFO he had full access to Defendant Tesla's financials.  Kirkhorn's unwillingness to elaborate is suggestive of aggressive quarter-end cash balance manipulation.

| 2 | *False and Misleading Statements:* |
|---|---|
| February 13, 2020 (2019 10-K), April 30, 2020 (Q1 2020 10-Q), | 1.  "Customer deposits" of "726" [million dollars] in the Tesla, Inc. 2019 SEC Form 10-K dated February 13, 2020, page 65 <br> 2.  "Total revenues of "24,578" [million dollars] in the Tesla, Inc. 2019 SEC Form 10-K dated February 13, 2020, page 66 <br> 3.  "Customer deposits" of "788" [million dollars] in the Tesla, Inc. Q1 |

| July 28, 2020<br>(Q2 2020 10-Q)<br><br>Elon Musk,<br>Zachary<br>Kirkhorn | 2020 SEC Form 10-Q dated April 30, 2020, page 4<br>4.  "Total revenues of "5,985" [million dollars] in the Tesla, Inc. Q1 2020 SEC Form 10-Q dated April 30, 2020, page 5<br>5.  "Customer deposits" of "713" [million dollars] in the Tesla, Inc. Q2 2020 SEC Form 10-Q dated July 28, 2020, page 4<br>6.  Total revenues of "6,036" [million dollars] in the Tesla, Inc. Q2 2020 SEC Form 10-Q dated July 28, 2020, page 5<br><br>*Reasons Why Statements Were False and Misleading When Made:*<br><br>Defendant Tesla stole money from customers without their knowledge or consent, called the funds "deposits" and recognized the cash flow as "revenue."  Funds were taken from customers' credit cards and/or bank accounts via the Tesla mobile app, which was intentionally designed to encourage accidental one-tap purchases of extremely expensive software add-ons, such as "Full Self-Driving" for approximately $4,000 or more. Once purchased, Tesla typically refused to refund these amounts.<br><br>This dynamic was described by several Tesla customers on social media. On January 15, 2020, Nassim Nicholas Taleb wrote in a Twitter post: "The purchase was non-intentional. I unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with[out] confirmation/password or something of the sort."  Although Taleb, who is famous, reportedly received a refund after complaining publicly, many less-famous Tesla customers did not. @CamBirch wrote on January 28, 2020, "I just had this happen. Called Tesla (hard to do) and talked to a support person. It took them a week and the refund is now displayed on my card. Getting the free mud flaps had more confirmations and proof of purchase than a nearly $10k purchase." @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us."  Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund."  At least one other similar public request was deleted as a condition of receiving a refund.<br><br>*Facts Giving Rise to a Strong Inference of Scienter:*<br><br>These purchases took place because Defendant Tesla updated its mobile app to add the expensive software "upgrades" to each user's shopping cart *by default*, and further because Defendant Tesla designed the "purchase" button not to look like a button at all.  The product being paid for, "Full Self-Driving," does not actually exist as described.  *See* Issue 7.  On August 19, 2020, Defendant Musk admitted that despite starting to accept |

| | |
|---|---|
| | customer deposits in 2016, "Dojo V1.0 isn't done yet. About a year away. Not just about the chips. Power & cooling problem is hard."<br><br>Even since this issue was first raised in these proceedings, Tesla has refused to address the problem. As recently as August 3, 2021, *The Verge* wrote about yet another Tesla customer being charged "$14,186.25, for Autopilot and Full Self-Driving plus tax" to their father-in-law's credit card without permission. |
| 3<br><br>November 2, 2018<br>(Q3 2018 10-Q),<br>February 19, 2019<br>(2018 10-K),<br>April 29, 2019<br>(Q1 2019 10-Q),<br>July 29, 2019<br>(Q2 2019 10-Q),<br>October 29, 2019<br>(Q3 2019 10-Q),<br>February 13, 2020<br>(2019 10-K),<br>April 30, 2020<br>(Q1 2020 10-Q),<br>July 28, 2020<br>(Q2 2020 10-Q)<br><br>Elon Musk,<br>Zachary Kirkhorn,<br>Deepak Ahuja | *False and Misleading Statements:*<br><br>1. "Cost of revenues: Automotive sales" of "4,405,919" [thousand dollars] in the Tesla, Inc. Q3 2018 SEC Form 10-Q dated November 2, 2018, page 5<br>2. "Cost of revenues: Automotive sales" of "13,685,572" [thousand dollars] in the Tesla, Inc. 2018 SEC Form 10-K dated February 19, 2019, page 73<br>3. "Cost of revenues: Automotive sales" of "2,856,209" [thousand dollars] in the Tesla, Inc. Q1 2019 SEC Form 10-Q dated April 29, 2019, page 5<br>4. "Cost of revenues: Automotive sales" of "4,253,763" [thousand dollars] in the Tesla, Inc. Q2 2019 SEC Form 10-Q dated July 29, 2019, page 5<br>5. "Cost of revenues: Automotive sales" of "4,014" [million dollars] in the Tesla, Inc. Q3 2019 SEC Form 10-Q dated October 29, 2019, page 5<br>6. "Cost of revenues: Automotive sales" of "15,939" [million dollars] in the Tesla, Inc. 2019 SEC Form 10-K dated February 13, 2020, page 65<br>7. "Cost of revenues: Automotive sales" of "3,699" [million dollars] in the Tesla, Inc. Q1 2020 SEC Form 10-Q dated April 30, 2020, page 5<br>8. "Cost of revenues: Automotive sales" of "3,714" [million dollars] in the Tesla, Inc. Q2 2020 SEC Form 10-Q dated July 28, 2020, page 5<br><br>*Reasons Why Statements Were False and Misleading When Made:*<br><br>Defendant Tesla has been counting revenues from vehicle sales while pushing associated expenses, including taxes due, into later quarters by neglecting to register cars with state Departments of Motor Vehicles. This artificially decreases costs, thereby inflating perceived profits.<br><br>Each quarter, according to vehicle registration data, the vast majority of Defendant Tesla's vehicle sales take place in the last two weeks of the third month of the quarter (at the very end). Widespread consumer complaints on Defendant Tesla's own on-line forums and on social media document vehicle buyers initially receiving temporary registration documents in lieu of permanent registration documents. In many cases, Defendant Tesla has offered to reimburse consumers for any citations |

caused by driving with an expired registration, as temporary registration documents expire quickly.  In addition, the New Jersey Motor Vehicle Commission ("NJMVC") investigated Defendant Tesla's operations in New Jersey repeatedly and found that numerous customers had received temporary registrations "improperly" and that Tesla was routinely misrepresenting the locations where transactions were taking place.

*Facts Giving Rise to a Strong Inference of Scienter:*

Defendant Tesla knew that its practices were illegal and likely to cause its customers to break various state laws, which is why it had to promise to cover the expenses associated with citations and also why it signed a settlement agreement with the NJMVC.  Notably, in 2015, 2016, and 2017, the NJMVC cited Tesla for violations of the following:

- N.J.A.C. 13:21-15.9(g), a second temporary registration may be issued to the same registrant for the same vehicle only for the following reasons: 1. Original title is lost; or 2. Lien holder has delayed in providing the original title
- N.J.A.C. 13:21-15.10(g), a second nonresident temporary registration shall not be issued to the same resident for the same vehicle
- N.J.A.C. 13:21-15.9(a), a resident temporary registration may be issued only to a person or entity that has purchased or leased a vehicle from the dealer
- N.J.A.C. 13:21-15.10(a), a nonresident temporary registration may be issued only to a person or entity that has purchased or leased a vehicle from the dealer

| 4 | |
|---|---|

4

October 2, 2018 (press release), January 2, 2019 (press release), April 3, 2019 (press release), July 2, 2019 (press release), October 2, 2019 (press release), January 3, 2020 (press release), April 2, 2020 (press release), July 2, 2020 (press release)

Zachary

*Omission:* failing to report sales at all.  Instead, Tesla has reported "deliveries," an undefined, proprietary, non-GAAP term that the market has misinterpreted as equivalent to sales, with Defendants Musk and Tesla encouraging that misinterpretation through its passive and active silence, such as by refusing to answer related inquiries from journalists. "Deliveries" and sales are not the same.  Defendants Musk and Tesla refuse to specify with any degree of precision what "deliveries" actually are, whether the figures include sales to Tesla's own legal entities worldwide, and whether payment is required for a "delivery" to occur.

*Statement(s) Made Misleading:*

1. "Q3 deliveries totaled 83,500 vehicles" in the October 2, 2018 "Tesla Q3 2018 Vehicle Production and Deliveries" press release
2. "Q4 deliveries grew to 90,700 vehicles" in the January 2, 2019 "Tesla Q4 2018 Vehicle Production & Deliveries, Also Announcing $2,000 Price Reduction in US" press release
3. "Deliveries were approximately 63,000 vehicles" in the April 3, 2019 "Tesla Q1 2019 Vehicle Production & Deliveries" press release
4. "record deliveries of approximately 95,200 vehicles" in the July 2,

| Kirkhorn, Deepak Ahuja | 2019 "Tesla Q2 2019 Vehicle Production & Deliveries" press release |
|---|---|

5. "record deliveries of approximately 97,000 vehicles" in the October 2, 2019 "Tesla Q3 2019 Vehicle Production & Deliveries" press release
6. "record deliveries of approximately 112,000 vehicles" in the January 3, 2020 "Tesla Q4 2019 Vehicle Production & Deliveries" press release
7. "we…delivered approximately 88,400 vehicles" in the April 2, 2020 "Tesla Q1 2020 Vehicle Production & Deliveries" press release
8. "we…delivered approximately 90,650 vehicles" in the July 2, 2020 "Tesla Q2 2020 Vehicle Production & Deliveries" press release

_Reasons Why Statements Were False and Misleading When Made:_

Tesla leads investors to think "delivered" means "sold." It does not.

The only hint contained in Tesla's quarterly press releases as to the definition of "deliveries" is the statement, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," though the customer could be Tesla itself with paperwork correctly reflecting a vehicle purchase for $0.01 or $0.00. A returned vehicle could be "delivered" multiple times per quarter. According to public records, Tesla Norway A/S has registered over 1,350 cars to itself. Tesla has also registered hundreds of its own vehicles to itself in Sweden. The _Vancouver Sun_ reported that Defendant Tesla purchased at least one of its own cars to qualify for a tax rebate. All of these scenarios, in which Tesla purchases its own cars, would be counted as "deliveries" per the "paperwork is correct" requirement, yet reflect no actual sales. Similarly, vehicles dropped off at a customer site, paid for, and subsequently returned and refunded according to a prior plan would be considered "deliveries."

_Facts Giving Rise to a Strong Inference of Scienter:_

Based on a 2015 audit, the NJMVC cited Defendant Tesla for legal violations such as, "Temporary registration number J427133 was issued to a vehicle that was not sold but, in fact, continued to be owned by Tesla" regarding multiple registration numbers. This was part of the basis for the NJMVC sending Defendant Tesla a Notice of Proposed Suspension of its dealer license on June 8, 2017.

In early 2020, Plaintiff repeatedly pressed Defendant Musk and the Tesla Board of Directors to define the term "delivery." Defendants Musk and Tesla refused. The choice not to report sales is deliberate, as every other publicly traded automobile manufacturer reports sales.

Defendant Tesla's "delivery" figures have at times been overstated relative to sales by tens of thousands of vehicles per quarter and grouped in a manner that makes it impossible to discern details regarding sales by

specific product lines or geographic regions.  Public record vehicle registration data from state Departments of Motor Vehicles and international sources covering 8 of the 10 states where Tesla sells the most cars (CA, FL, TX, NJ, WA, NY, CO, and MA), plus 7 more through at least Q1 2020, support the finding that Defendant Tesla has disclosed inflated "deliveries" relative to recorded vehicle registrations by roughly 100,000 total vehicles since Q3 2017, with significant overstatements beginning in Q3 2018.  In addition, on June 17, 2019, in an article entitled, "Tesla's delivery numbers change multiple times between filings," journalist Francine McKenna noted, "Tesla, Inc. publicizes updated vehicle production and delivery data more than once at the end of each quarter and those numbers change frequently, raising questions about the quality of the company's accounting function amid a wave of turnover in the department."

The figures are also misleading in that they imply that each "delivered" vehicle is a finished product.  Yet in December 2020, China-based *PingWest* noted, "Tesla is doing whatever it can to hit the production goal, including lowering its quality standards," by loading "defective parts…onto production vehicles."  "'Let's say, in the past, our vehicles need 80 points in order to leave the factory, now it's only 60.'"

| 5 | *False and Misleading Statements:* |
|---|---|
| October 24, 2018, November 2, 2018 (Q3 2018 10-Q), December 2019, July 22, 2020<br><br>Deepak Ahuja, Martin Viecha, Zachary Kirkhorn | 1. "We reduced our inventory in Q3, which helped.  And although we had higher payables because—sorry, higher receivables because the quarter ended on a weekend, we won't have that in Q4.  So all of this should continue to help us in Q4 and beyond, the working capital gain," per former CFO Deepak Ahuja on the October 24, 2018 Tesla, Inc. Q3 2018 earnings call<br>2. "Accounts receivable, net" of "1,155,001" [thousand dollars] in the Tesla, Inc. Q3 2018 SEC Form 10-Q dated November 2, 2018, page 4<br>3. "Tesla went over why its accounts receivable has been elevated, attributing it to a large gap in timing between vehicle delivery and cash received from banks in Europe" per Deutsche Bank analyst Emmanuel Rosner summarizing statements made by Defendant Tesla's Head of Investor Relations Martin Viecha (in a non-public manner, in violation of Regulation FD) in December 2019<br>4. "While our AR balance is usually about 20 per cent of revenue, it can fluctuate depending upon a number of factors.  First, overall, less than 30 per cent of our receivables is associated with new car sales.  Second, due to payment terms associated with financing and enterprise customers, settlement times for certain methods of cash payments and geographic mix of our deliveries, our cash balance and associated receivables are impacted significantly by how many cars are delivered in the final weeks and days of the quarter.  Third, roughly 40 per cent of the balance is attributed to payment terms on regulatory credit sales |

and statutory EV incentive programs, both of which have been increasing," per CFO Zachary Kirkhorn on the Tesla, Inc. Q2 2020 earnings call on July 22, 2020

*Reasons Why Statements Were False and Misleading When Made:*

Defendant Tesla has provided at least five different explanations over time (and only four in public) for why it had and has an extremely large accounts receivable balance of over $1 billion, none of which are consistent with each other or with reality.

Given Defendant Tesla's business model, which involves up-front cash payments for physical products, this unusually high and persistent balance has attracted considerable notice from prominent investors such as David Einhorn, who has publicly questioned Defendant Musk about it twice without ever receiving a clear answer, and from journalists with accounting degrees and experience, such as Francine McKenna.  In Ms. McKenna's words, given that Tesla sells cars that are typically paid for up-front, "They should not have this big of an accounts receivable balance."

*Facts Giving Rise to a Strong Inference of Scienter:*

Defendant Tesla's accounts receivable balance began to balloon in Q3 2018 (having increased about half a billion dollars from Q2 2018), at the same time that its self-reported "delivery" figures began to diverge from registration data reported by Departments of Motor Vehicles.  This would suggest that Tesla reported to investors that it expected to be paid for cars that it never actually sold.

| 6 | *False and Misleading Statements:* |
|---|---|
| November 2, 2018 (Q3 2018 10-Q), February 19, 2019 (2018 10-K), April 29, 2019 (Q1 2019 10-Q), July 29, 2019 (Q2 2019 10-Q), October 29, 2019 (Q3 2019 10-Q), February 13, 2020 (2019 10-K), April 28, 2020 | 1.  "Warranty costs incurred" of "(54,089)" [thousand dollars] in the Tesla, Inc. Q3 2018 SEC Form 10-Q dated November 2, 2018, page 18<br>2.  "Warranty costs incurred" of "(209,124)" [thousand dollars] in the Tesla, Inc. 2018 SEC Form 10-K dated February 19, 2019, page 94<br>3.  "Warranty costs incurred" of "(54,189)" [thousand dollars] in the Tesla, Inc. Q1 2019 SEC Form 10-Q dated April 29, 2019, page 15<br>4.  "Warranty costs incurred" of "(61,237)" [thousand dollars] in the Tesla, Inc. Q2 2019 SEC Form 10-Q dated July 29, 2019, page 16<br>5.  "Warranty costs incurred" of "(59)" [million dollars] in the Tesla, Inc. Q3 2019 SEC Form 10-Q dated October 29, 2019, page 17<br>6.  "Warranty costs incurred" of "(250)" [million dollars] in the Tesla, Inc. 2019 SEC Form 10-K dated February 13, 2020, page 65<br>7.  "Warranty costs incurred" of "(81)" [million dollars] in the Tesla, Inc. Q1 2020 SEC Form 10-Q dated April 30, 2020, page 14<br>8.  "Warranty costs incurred" of "(62)" [million dollars] in the Tesla, Inc. Q2 2020 SEC Form 10-Q dated July 28, 2020, page 17 |

| | |
|---|---|
| (2019 10-K/A), April 30, 2020 (Q1 2020 10-Q), July 28, 2020 (Q2 2020 10-Q)<br><br>Elon Musk, Zachary Kirkhorn, Deepak Ahuja | _Reasons Why Statements Were False and Misleading When Made:_<br><br>Defendant Tesla has engaged in a scheme to record warranty repairs as "goodwill" for years, thereby artificially reducing reported warranty costs and the associated required warranty reserve, and in turn artificially inflating gross margin and net income. This scheme is apparent in at least 30 lemon lawsuits and state agency complaints filed by Tesla customers across the United States from 2017-2021 that happen to include copies of Tesla vehicle service invoices. These documents consistently note warranty repairs billed to "goodwill," which should actually be billed to the warranty reserve. Defendant Tesla's disclosures in its SEC filings fail to note that warranty repairs are frequently misclassified as "goodwill," rendering the stated numbers fraudulent.<br><br>_Facts Giving Rise to a Strong Inference of Scienter:_<br><br>Defendant Tesla knows that its reserves _are_ "insufficient" because the company took deliberate and material measures to reduce them, but merely disclaimed that they "may" be insufficient. The billing designation on service invoices is determined at each Tesla service center at the time of repair. Technicians must have received deliberate instruction from Defendant Tesla to use the unusual designation of "goodwill" instead of "warranty service" for warranty repairs with the frequency observed. |
| 7<br><br>April 22, 2019, May 2, 2019<br><br>Elon Musk | _False and Misleading Statements:_<br><br>1. "[T]here will be autonomous robotaxis from Tesla next year…next year for sure, we'll have over a million robotaxis on the road," stated by Elon Musk at "Autonomy Investor Day" on April 22, 2019<br>2. "When I say feature complete, I mean it will work in Downtown San Francisco and Downtown Manhattan this year," stated by Elon Musk at "Autonomy Investor Day" on April 22, 2019<br>3. "Yes," stated by Elon Musk at "Autonomy Investor Day" on April 22, 2019 in response to the question, "It sounds like you're talking level 5 no geofence. Is that what's expected by the end of the year just so we're all on the same page?" posed by Colin Langan, UBS Investment Bank, Research Division<br>4. "Musk confidently told investors on the call that autonomous driving will transform Tesla into a company with a $500 billion market cap, these people said. Its current market cap stands around $42 billion. He also said that existing Teslas will increase in value as self-driving capabilities are added via software, and will be worth up to $250,000 within three years," per CNBC reporting on May 2, 2019 regarding a non-public call with certain investors in violation of Regulation FD |

*Reasons Why Statements Were False and Misleading When Made:*

Tesla has produced *zero* "robotaxis" to date and has told regulators it has no plans to create an SAE Level 5 autonomous driving system by any point in time, having described its current systems, marketed as "Autopilot" and "Full Self-Driving," as *not* autonomous and SAE Level 2 to the CADMV.

There were no "forward-looking statement" disclosures or meaningful cautionary statements at "Autonomy Investor Day," only a passing reference to the *idea* of disclosures in a joke that Defendant Musk used to falsely suggest that his predictions always come true.  Yet by April 11, 2020, it was clear that COVID-19 rendered public "robotaxis" practically impossible.  On December 1, 2020, Defendant Musk admitted at the Alex Springer Award 2020 ceremony in Berlin that he was "extremely confident of achieving full autonomy and releasing it to the Tesla customer base *next* year."  Indeed, by December 31, 2020 ("next year for sure" from his 2019 promise), Defendant Tesla had not produced even a single "autonomous robotaxi" anywhere in the world, let alone secured any kind of regulatory approval in California, let alone enabled "a million on the road."

*Facts Giving Rise to a Strong Inference of Scienter:*

On May 2, 2021, two weeks after lying yet again about Defendant Tesla's autonomous driving abilities at "Autonomy Investor Day," the company filed SEC Form 424B5 announcing its intent to raise $2.0 billion, later increased to $2.7 billion, of fresh capital from investors on the explicit basis of claims about autonomy that Defendants knew to be false.

In a June 3, 2020 e-mail to Plaintiff, the CADMV confirmed that Defendant Tesla had never actually raised the matter of "robotaxis" with its autonomous driving regulators.  In a December 14, 2020 letter to the CADMV not disclosed to investors, Tesla attorney Eric C. Williams wrote, "we made abundantly clear [to employee and limited non-employee beta testers] that City Streets ***does not make the vehicle autonomous*** and that the driver is responsible for being fully attentive at all times" and "a final release of City Streets will continue to be an SAE ***Level 2***, advanced driver-assistance feature" (emphasis added).  On May 19, 2021, an e-mail from the CADMV to Tesla attorney Eric C. Williams summarized a May 18, 2021 phone call with, "Additionally, you stated that the upcoming v9 software release continues to be an SAE ***Level 2*** ADAS feature" (emphasis added).  The CADMV also informed Defendant Tesla that the CADMV was "conducting a review of Tesla's advertising pursuant to [13] CCR 228.28," which prohibits falsely marketing autonomous driving features.

Defendant Musk insisted that the Model Y be designed without a steering wheel because he wanted the car to rely purely on its "Full Self-Driving"

abilities.  Former Tesla engineer Doug Field reportedly ignored Defendant Musk's demand and designed a steering wheel anyway because he was aware that such features were not reliable or ready for production.

On the June 30, 2021 Q2 2021 Tesla, Inc. earnings call, Defendant Musk admitted, "***We need to make Full Self-Driving work*** in order for it to be a compelling value proposition" (emphasis added).  The call ended soon thereafter with no further questioners permitted.  Despite the admission that Tesla's FSD features do not yet "work," Tesla has recognized tens of millions of dollars of deferred revenue on the basis of their functionality.

| 8 | *False and Misleading Statements:* |

July 29, 2019,
January 29, 2020

Elon Musk

1. "Spooling up production line rapidly. Hoping to manufacture ~1000 solar roofs/week by end of this year" per Elon Musk on the @ElonMusk Twitter account on July 29, 2019
2. "Solarglass tiles are made in our Gigafactory New York." on page 9 of Defendant Tesla's "Q4 '19 Update" investor slide deck dated January 29, 2020 and filed as part of SEC Form 8-K on the same day

*Reasons Why Statements Were False and Misleading When Made:*

Federal import records show that Defendant Tesla had started importing solar roof tiles from Changzhou Almaden Co. Ltd. in China by July 2019, leaving little to manufacture or "make" in the United States.  According to United States Department of Labor Form ETA-9042 submitted by Tesla "Gigafactory New York" partner Panasonic Solar North America, "Because of the decline in demand and Tesla's switch to purchasing solar products from China, 403 employees will be displaced."  In early 2020, Defendant Tesla boxed up the manufacturing equipment in its Buffalo factory and put it in storage due to COVID-19.  In May 2020, Tesla began informing certain solar roof customers that their orders were cancelled.

Photographs from Tesla work sites show tiles imported from China and shipped directly to Tesla in Hayward, California, not New York:



|   | |
|---|---|
| | *Facts Giving Rise to a Strong Inference of Scienter:* |
| | Defendants Musk and Tesla knew that they were importing materials from China, but have consistently represented that the Tesla Solar Roof is manufactured in New York.  According to a Confidential Witness (CW-1), through 2020, Defendant Tesla never manufactured any product in Buffalo that was actually for sale on the market at all. |
| | On or around August 21, 2020, the Office of the New York State Comptroller released Audit Report 2017-S-60, detailing the manner in which Defendant Tesla has defrauded the State of New York, financed Tesla's Buffalo factory.  It states in part, "Since 2017, publicly available Tesla reports have indicated potential setbacks with Tesla's solar roof… However, in November 2018, Tesla reported it was still refining the product design and installation processes and, as a result, production would not significantly increase until the first half of 2019." |
| | Version 2 of the Tesla Solar Roof was never released.  Instead, the company skipped ahead to Version 3, the imported Chinese version. |
| 9<br><br>November 16, 2017<br>April 24, 2019<br><br>Elon Musk, Jerome Guillen | *False and Misleading Statements:*<br><br>1. "PRODUCTION BEGINS 2019" on a Tesla, Inc. banner above Elon Musk on November 16, 2017<br>2. "Tesla Semi delivering Tesla cars" written in an @ElonMusk Twitter post with accompanying photograph dated March 30, 2019<br>3. "This is Jerome.  Next year we will start production.  We're very happy.  We're driving the trucks extensively with, I think, so far quite amazing success.  Yeah." per Jerome Guillen on the April 24, 2019 Tesla, Inc. Q1 2019 earnings call<br>4. "we are on track to produce limited volumes of the Tesla Semi in the second half of 2020" in an e-mail from the "Tesla Truck Team" dated on or about January 9, 2020<br><br>*Reasons Why Statements Were False and Misleading When Made:*<br><br>Defendant Tesla lacked the battery technology to produce an electric semi truck when the above statements were made, and still does.  On September 21, 2020, Elon Musk posted on Twitter, "Important note about Tesla Battery Day unveil tomorrow. This affects long-term production, especially Semi, Cybertruck & Roadster, but what we announce will not reach serious high-volume production until 2022."  On March 31, 2021, he wrote, "near-term cell supply makes it hard to scale Semi."  There is no "supply" of the necessary cells because they do not yet exist.<br><br>As a result, the Tesla Semi's production schedule has been pushed back for years.  When announced in 2017, Defendant Musk stated that it was |

scheduled to begin production in 2019. It did not. It was then supposed to begin production in the second half of 2020. Again, it did not. In September 2020, Dorian West, the lead engineer on the Tesla Semi team, left Tesla, noting on his LinkedIn profile that the team had been "[r]edeployed…as needed to support urgent hands-on efforts" that had no connection whatsoever to the Tesla Semi. Jerome Guillen was promoted to President, Tesla heavy Trucking, and then departed the company on June 3, 2021 with no replacement.

*Facts Giving Rise to a Strong Inference of Scienter:*

Two demo Semi trucks exist, yet no one is in charge of building the real thing. The persistent promise of the future product has been used to pump Defendant Tesla's stock price and secure large deposits from interested customers. In addition, Defendant Musk has used deliberately "leaked" e-mails to intentionally disseminate false, positive narratives about the Semi's prospects in order to manipulate the price of TSLA shares.

| 10 | *False and Misleading Statements:* |
| November 28, 2018, April 5, 2019, April 24, 2019, June 17, 2019, August 7, 2019, April 7, 2020<br><br>Elon Musk, Omar Qazi | 1. "Over the past quarter, we've registered one accident or crash-like event for every 3.34 million miles driven in which drivers had Autopilot engaged. For those driving without Autopilot but with our active safety features, we registered one accident or crash-like event for every 1.92 million miles driven. For those driving without Autopilot and without our active safety features, we registered one accident or crash-like event for every 2.02 million miles driven. By comparison, NHTSA's most recent data shows that in the United States there is an automobile crash every 492,000 miles." per the Tesla, Inc. Q3 2018 "Tesla Vehicle Safety Report"<br>2. "As of today Tesla owners have driven 1 billion (!) miles with Autopilot engaged." per Defendant Tesla on the @Tesla Twitter account on November 28, 2018<br>3. "We recently hosted our first ever Autonomy Investor Day, showcasing our new in-house designed full self-driving (FSD) computer and our AI-based software trained by more than 400,000 Tesla vehicles" in a Tesla, Inc. SEC Form 8-K filed April 24, 2019, Exhibit 99.1<br>4. "'…drivers in this dataset use Autopilot for 34.8% of their driven miles, and yet appear to maintain a relatively high degree of functional vigilance.'" per Elon Musk from his @ElonMusk Twitter account on April 5, 2019, citing a paper by Lex Fridman<br>5. "I wish I had the words to describe how amazing AutoPilot is. It's the eighth *[sic]* wonder of the world" per Omar Qazi via the @tesla_truth Twitter account on June 17, 2019<br>6. "So did Tesla lie about having the lowest probability of injury of any car? No, it didn't, and nobody is saying it did. The Government's own numbers above confirm what Tesla is saying. The NHTSA just only |

wants people to use the star rating.  But Teslas are more safe" per Omar Qazi via the @tesla_truth account on August 7, 2019

7. "Humans drive using 2 cameras on a slow gimbal & are often distracted. A Tesla with 8 cameras, radar, sonar & always being alert can definitely be superhuman." per Elon Musk via the @ElonMusk Twitter account in response to Omar Qazi via the @thirdrowtesla Twitter account on April 7, 2020

### Reasons Why Statements Were False and Misleading When Made:

For years, Defendant Tesla has cultivated the myth that each mile driven in an "Autopilot"-enabled Tesla vehicle helps "train" Tesla's "neural network" in a process akin to real-time machine learning, and that as a result, the more people drive Teslas, the safer the car becomes.  For example, on November 28, 2018, *Bloomberg* reported, "The resulting trove of real-world miles acts as a feedback loop to the algorithms that are constantly training the fleet of Tesla vehicles..."  In fact, Tesla vehicles do not learn anything when an additional mile is driven.

Tesla vehicles are equipped with cameras to monitor their surroundings, but it is not the case that every frame of every camera view in every vehicle is always uploaded back to Tesla's servers for analysis, nor is it possible for a single vehicle to ascertain updated information from all other vehicles and "learn" from that information in real-time or near real-time.

Defendant Tesla's quarterly "Vehicle Safety Report" is flawed because accidents involving "Autopilot" tend to take place seconds after the system shuts itself off due to the detection of an impending accident or the press of the brake pedal, artificially reducing the perceived number of "Autopilot" accidents per mile driven.  "Autopilot" also performs differently in different contexts, climates and times of day, which the report does not take into account, as most "Autopilot" miles are highway miles.

### Facts Giving Rise to a Strong Inference of Scienter:

The government of Germany ordered Tesla to stop using the term "Autopilot" because it was determined to be misleading to consumers.

There is no indication in any investor disclosure or other public source that driving in a Tesla vehicle actually sends continuous video data back to Defendant Tesla to help train neural networks.  Nor is there any evidence that algorithmic behavior in one vehicle is affected in real-time—or without a manual software update, ever—by driving in other vehicles. Manual (human) feature tagging is necessary to utilize much of the still-image data needed for training algorithms, and Defendant Tesla has posted job listings for manual human trainers responsible for tagging images.

| | |
|---|---|
| | The widely-criticized Fridman paper cited by Defendant Musk, entitled "Human Side of Tesla Autopilot: Exploration of Functional Vigilance in Real-World Human-Machine Collaboration," was removed from MIT's websites on an unknown date after May 2020.  All references were removed from Fridman's personal website between May 12, 2020 and August 11, 2020.  The Fridman paper's findings were contradicted by subsequent MIT research, which Defendant Musk did not share. |
| 11 <br><br> November 2, 2018 (Q3 2018 10-Q), internal e-mails (various dates) <br><br> Elon Musk, Zachary Kirkhorn, Deepak Ahuja, Swapnil Bhatnagar | *Omission:* disclosures concerning the amount of scrap, waste and theft of raw materials at Tesla's factories in Nevada and California since 2018, which have since been highlighted by whistleblowers Martin Tripp, Karl Hansen and Lynn Thompson, and explicitly describe $197,835,756.89 of scrapped parts separate and apart from stolen raw materials.  Internal documents describe: <br> a)   that in 2018, Defendant Tesla scrapped 314,504 bandoliers worth $114,630,417.92; 11,405 modules worth $31,477,001.65; 330,515 stators worth $42,305,920.00; 1,064 drive units worth $622,844.32; and 8,453 inverters worth $8,799,573.00, ***for a grand total of $197,835,756.89 of scrapped parts not disclosed to investors***. <br> b)   containment AR622 (Tesla "Thing Name" AR0000000622), where a training pin left in a picker robot led to battery cells being punctured, affecting 1,173 battery modules that were ultimately "reworked" and knowingly placed into 723 Model 3 vehicles in February 2018; <br> c)   the poor design of Defendant Tesla's internal database systems used to "virtually scrap," or record, Non-Conforming Material (NCM) that could not be used in production, leading to discrepancies between actual scrap on the factory floor and financial reporting; <br> d)   the practice of using MySQL Workbench and/or similar software to directly edit databases, thereby bypassing internal financial controls; <br> e)   the practice of changing status flags for materials from "SCRAP" to "TEST" to artificially reduce totals for NCM financial reports; <br> f)   the practice of requiring approval from the finance team before being permitted to "virtually scrap" actual NCM material; <br> g)   the practice of deliberately hiding NCM figures from Tesla's CFO; <br> h)   each Model 3 generating $1,920 worth of NCM per vehicle as of April 2018 according to internal documents; <br> i)   internal financial analyst Scott Smith asking "Is this real?" on July 5, 2018 and generally disbelieving Defendant Tesla's own financial reports when presented with overly optimistic NCM figures; <br> j)   current Vice President of Internal Audit Swapnil Bhatnagar stating on April 17, 2018 that Defendant Tesla's inventory accuracy was "very concerning;" <br> k)   storing volatile materials and parts, including lithium-ion batteries, in unrefrigerated trailers in the Nevada desert. |

| | | *Statement(s) Made Misleading:* |
|---|---|---|
| | | "Raw materials" of "997,476" [thousand dollars], "Work in process" of "358,113" [thousand dollars], "Finished goods" of "1,657,339" [thousand dollars], "Service parts" of "301,199" [thousand dollars], and Note 5 – Inventory "Total" of "3,314,127" [thousand dollars] in the Tesla, Inc. Q3 2018 SEC Form 10-Q dated November 2, 2018, page 22. |
| | | *Reasons Why Statements Were False and Misleading When Made:* |
| | | Deposition testimony from former employees Tripp and Hansen and former contractor Thompson indicates that the amounts of NCM, waste and stolen items were financially material, multi-million dollar figures that were important enough to attract Defendant Musk's direct awareness and involvement. |
| | | *Facts Giving Rise to a Strong Inference of Scienter:* |
| | | Tesla's own employees expressed concern in writing more than once that the company's numbers were false, misleading, and could not be trusted. |
| | | On January 3, 2021, Goldman Sachs published an investor briefing noting Defendant Tesla's "internal control environment" as a risk factor. Consistent with this concern, e-mails marked "Attorneys' Eyes Only" reveal that NCM reports for CFO Deepak Ahuja were deliberately modified to minimize the appearance of any problems. |
| | | Punctured battery cells made their way into vehicles without Defendant Tesla disclosing anything to customers or investors regarding NCM or safety issues at any time, while Defendant Musk publicly promised concern for "max safety." |
| 12<br><br>February 19, 2019 (2018 10-K), February 13, 2020 (2019 10-K),<br><br>Elon Musk | | *Omission:* disclosures concerning "Project Titan," an internal Tesla project that amounted to a stealth recall of fire-prone solar panel connector and optimizer parts used in Tesla products already installed at customer sites. |
| | | *Statement(s) Made Misleading:* |
| | | "Our risks in this area are particularly pronounced given the relatively limited number of vehicles and energy storage products delivered to date and limited field experience of our products" in the section entitled "***We may become subject to product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.***" in the Tesla, Inc. 2018 SEC Form 10-K dated February 19, 2019, page 22 and 2019 SEC Form 10-K dated February 13, 2020, page 21. |

| |
|---|
| _Reasons Why Statements Were False and Misleading When Made:_<br><br>The "field experience" of Tesla's solar products, many inherited from its acquisition of SolarCity, was not in any way "limited."  Defendant Tesla had delivered more than enough energy storage products by February 2019 to know that they were hazardous, potentially deadly, and in need of a recall.  Yet those facts were concealed from the public, placing customers in danger.  In fact, some fires did break out, over which Defendant Tesla faced lawsuits.<br><br>Project Titan was revealed to the public by _Business Insider_ reporter Linette Lopez.<br><br>_Facts Giving Rise to a Strong Inference of Scienter:_<br><br>On November 9, 2020, former SolarCity/Tesla Field Quality Manager (M3) Steven Henkes filed a lawsuit, Alameda County Superior Court Case No. RG20080233, against a subsidiary of Defendant Tesla alleging that he had filed (1) "internal reports to TESLA management and attorneys" in April 2019 regarding "the fire risks associated with continued use of the defective solar systems;" (2) a formal complaint to the United States Consumer Product Safety Commission ("USCPSC") on April 19, 2019; and (3) a formal complaint to the SEC in May 2019.  In response, Defendant Tesla fired Mr. Henkes.  The lawsuit explicitly refers to "Project Titan."  A USCPSC investigation, never disclosed by Defendant Tesla, is ongoing. |

246.     As of October 31, 2019, Tesla listed only two names as company "Management" on the Corporate Governance section of its Investor Relations website: Elon Musk and Zachary J. Kirkhorn.  At all times since approximately March 2019 when Mr. Kirkhorn became Tesla's CFO, both of these individuals have had complete access to Tesla's financials and sales records.  Accordingly, Defendant Musk knew that his statements herein were false and/or misleading.

247.     Defendants Musk and Tesla have acted with scienter.  In its roughly seventeen years of existence, Defendant Tesla has required over $20 billion of investor capital to survive.  Defendant Tesla's constant need for outside cash has created a clear incentive for Defendant Musk—who has admitted that Tesla is barely profitable—to defraud the market.

248.     Such scienter was motivated by several factors: Defendant Tesla's constantly precarious cash situation; Defendant Musk's belief that laws and rules do not apply to him; his

belief that lying is necessary for survival; his animosity toward short-sellers; and his executive compensation package worth tens of billions of dollars based almost entirely upon stock options that depend upon TSLA's share price being elevated for certain periods of time.

249.   Defendant Musk and Tesla's scienter is evidenced by:

a)   Defendant Musk's August 2018 famous lie that funding had been "secured" to take Tesla private at $420/share when in fact funding had not been secured, leading to the finding by District Judge Edward M. Chen in Case No. 3:18-cv-04865-EMC, *In Re Tesla, Inc. Securities Litigation*, that facts existed to plausibly allege that Defendants Musk and Tesla acted with scienter;

b)   the SEC's letter to Defendant Tesla on August 12, 2019 that "we continue to have significant concerns about whether the Company is in compliance with the Court's Judgment," which was never disclosed to investors;

c)   the SEC's letter to Defendant Tesla on May 8, 2020 that,

> "The SEC staff continues to have serious concerns regarding Tesla's ongoing failure to diligently comply with the Court's order in this matter. As you know, to resolve this matter, the Court ordered Tesla to implement mandatory procedures and controls governing Elon Musk's covered communications.  By consistently declining to enforce these procedures and controls despite repeated violations by Mr. Musk, Tesla has abdicated the duties required of it by the Court's order,"

which was never disclosed to investors;

d)   the SEC's letter to Defendant Tesla on May 20, 2020 castigating Tesla/Musk attorneys Alex Spiro and Michael Liftik, who the SEC alleges "did not provide any requested information" while accusing Tesla of "neglecting its obligations under the Court's order" and again failing "to implement mandatory procedures and controls," which was never disclosed to investors;

e)   the SEC's letter to Defendant Musk on June 3, 2020 "regarding two written communications [he] published on Twitter that appear to violate the amended Final Judgment in *SEC v. Musk*, 18-cv-08865-AJN, Dkt. No. 47, at 1-2 (Apr. 30, 2019)," which was never disclosed to investors;

f) the SEC's letter to Defendant Tesla on June 3, 2020 noting "Tesla has violated the Court's order on two occasions," "Tesla has encouraged investors to follow Mr. Musk's Twitter account as a source of material information," and "when Mr. Musk speaks about Tesla, he speaks for the company," which was never disclosed to investors;

g) SEC investigation number SF-4322, *In the Matter of Tesla, Inc.*, for which subpoenas were issued to Elon Musk, Sam Teller, Jared Birchall, Excession LLC, and the Elon Musk Revocable Trust in or around December 2019, which was never disclosed to investors;

h) Defendant Musk's National Press Club statements regarding the collapse of Solyndra, e.g. "it would have become a self-fulfilling prophecy of—as soon as a CEO says 'I'm not sure if we'll survive,' [slit throat gesture] you're dead.";

i) Defendant Musk's statement that it was "not realistic" for him to abide his SEC consent decree because "I am the largest shareholder in the company. And I can just call for a shareholder vote and get anything done that I want," and his statement that paying the SEC fines was "worth it;"

j) Defendant Musk hanging up on the Chairman of the National Transportation Safety Board, showing disdain for customer safety;

k) the fact that Defendant Musk personally approves every Tesla purchase order;

l) Defendant Musk's admission in a sworn deposition on August 22, 2019 to frequently changing, discarding and destroying mobile devices;

m) Defendant Musk's statements such as his May 4, 2018 Twitter post, "Oh and uh short burn of the century comin soon.  Flamethrowers should arrive just in time," as well as his referring to the SEC as the "Shortseller Enrichment Commission" on October 4, 2018 and "[Suck] Elon's [Cock]" on July 2, 2020 (after receiving the letters from the SEC described above).

250.   Defendants Musk and Tesla disseminated, encouraged or approved the false

statements and/or material omissions specified above, with knowledge of or reckless disregard for their false or misleading nature, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

251.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by: a) employing devices, schemes, and artifices to defraud; b) making untrue statements of material facts or failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of TSLA securities.

252.   Plaintiff has suffered damages in that, by defrauding the market, Defendants were able to keep the share price of TSLA common stock artificially inflated for years, causing the expiration of TSLA put options that otherwise would have been valuable.

253.   Plaintiff would not have purchased TSLA put options at the prices he did had he been aware that the market price for Tesla stock would be artificially and falsely inflated by Defendants' false and misleading statements and/or actions.  Plaintiff's knowledge of the above Issues was acquired gradually over time.  At no time when Plaintiff purchased TSLA put options was Plaintiff fully aware of Defendants' fraudulent acts.

## COUNT VIII
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 For Market Manipulation Against All Defendants

254.   Plaintiff incorporates by reference the foregoing allegations.

255.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in manipulative acts that drove the price of TSLA shares to artificially high levels beginning in 2018, when the stock traded near an already-elevated $250.00 per share, and continuing through the present day, when it trades at or near $3,500.00 per share (split-adjusted), having achieved an all-time high of $4,250.00 per share (split-adjusted).

256.    Defendants employed a "flood the zone" strategy by posting approximately 160,000 social media messages full of false and misleading information promoting Tesla products, TSLA stock, and most of all, denigrating short-sellers who accurately identified the myriad problems, casually referred to as "FUD" for "Fear, Uncertainty and Doubt," that Defendant Musk has now twice admitted would have led to Defendant Tesla's bankruptcy were it not for Defendants' fraudulent and manipulative conduct.

257.    In the SEC's Complaint in Case No. 1:21-cv-06445, *U.S. Securities and Exchange Commission v. Milton* (S.D.N.Y July 29, 2021), the SEC considered a "media blitz" of 2,508 tweets "closely connected with [Milton's] fixation on, and desire to increase and maintain, Nikola's stock price" to be material in the context of securities fraud—whereas Defendants' campaign to "pump" TSLA shares was more than 60 times larger.

258.    Defendant Qazi confirmed that his primary motives were to influence investors and inflate Tesla's stock price by admitting "this is why we do it" in response to a comment on his private Mastadon network that thanked him for his "funny, informative, thought provoking, & aggressive tweets against Tesla FUD [that] inspired me to purchase Tesla shares in April & May of 2019."

259.    On August 10, 2021, convicted felon Shawn Anthony Joyce, also known as Shawn Wylde, wrote on Twitter, "@WholeMarsBlog is a significant reason I learned about Tesla and why I invested in 2019."

260.    The harassment campaign orchestrated by Defendants Qazi and Smick against Plaintiff and various journalists covering Tesla is evidence that they have acted with scienter.

261.    Defendants all acted with scienter by persistently and willfully ignoring the truth in social media posts and by deliberately hiding the connections between Defendants Musk, Tesla, Qazi, and Smick, including the identities of all of the authors of the @tesla_truth and @WholeMarsBlog accounts, because were those connections known, they would indicate that Defendant Qazi is for all intents and purposes an agent of Defendants Musk and Tesla.

262.    Defendants Musk and Tesla were charged with securities fraud by the SEC, and

the SEC continues to believe that Defendants Musk and Tesla have violated their respective

consent decrees by continuing to engage in fraudulent and manipulative conduct.

263.    Defendant Musk has disclosed via at least one SEC Form 4 submission admitting

that he trades TSLA shares during non-standard market hours when trading volumes are

relatively light, making it far easier to rig prices.

264.    Defendant Tesla, through its representative Martin Viecha, has routinely

manipulated markets by circulating internal projections to Wall Street analysts in advance of

public disclosure, in violation of Regulation FD, which have altered analyst expectations.

265.    On January 31, 2021, in a discussion on Clubhouse, Defendant Musk admitted, "I

gotta watch what I say here because some of these things can really move the market."  On July

21, 2021, Defendant Musk further admitted, "I might pump but I don't dump" at an event.

266.    Defendants' market manipulation caused Plaintiff's losses.

267.    At the time of each instance of Defendants' manipulation, Plaintiff was ignorant

of those manipulative acts.

268.    Defendants had actual knowledge of the material facts alleged herein, and

knowingly intended to deceive investors in order to manipulate the price of Tesla securities.

<div align="center">

**COUNT IX**
**For Violation of Section 20(a) of the Exchange Act**
**Against Defendant Elon Musk**

</div>

269.    Plaintiff incorporates by reference the foregoing allegations.

270.    Defendant Musk acted as a controlling person of Tesla within the meaning of

Section 20(a) of the Exchange Act.  By virtue of his position and his power to control public

statements, Defendant Musk had the ability to control the actions of Tesla and its employees.

Accordingly, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act.

271.    Defendant Musk demonstrated his power to unilaterally control the Tesla Board

of Directors by pushing through the acquisition of SolarCity Corporation even when it was

rejected by the Board and disfavored by multiple investment banks and major investors.

272.    As an officer and director of a publicly owned company, Defendant Musk had a

duty to disseminate accurate and truthful information with respect to Defendant Tesla's financial condition and results of operations, and to correct promptly any public statements issued by Tesla that had become materially false or misleading.

273.     Because of his position of control and authority as a senior officer, Defendant Musk was able to, and did, control the contents of the various reports, press releases and public filings which Tesla disseminated in the marketplace concerning Tesla's financial prospects. Defendant Musk exercised his power and authority to cause Tesla to engage in the wrongful acts complained of herein.  Defendant Musk therefore, was a "controlling person" of Tesla within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of TSLA securities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Judgment against Defendants on all counts of the Complaint;

B.  A permanent injunction enjoining all Defendants from making further libelous statements, contacting Plaintiff or his family, impersonating others, and requiring the immediate cessation of the operation of and/or transfer of the Smick Sites to Plaintiff;

C.  Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount not yet known, to be assessed at the time of trial;

D.  Statutory damages, enhanced to a sum of not more than $150,000 per work infringed, for willful infringement of copyrights pursuant to 17 U.S.C. §§ 504(c) and 1202(b);

E.  Actual and punitive damages, including costs and attorneys' fees (should Plaintiff engage counsel), pursuant to 17 U.S.C. § 512(f);

F.  Compensatory, consequential and punitive damages resulting from Defendant's violation of California Civil Code §§ 1708.7 and 3294;

G.  Punitive damages stemming from Defendants' disregard for state and federal laws;

H.  Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs (should Plaintiff engage counsel), in accordance with applicable law;

I.  Such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 13, 2021

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org