Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON GREENSPAN,<br><br>  Plaintiff,<br><br>  v.<br><br>OMAR QAZI, SMICK ENTERPRISES, INC., ELON MUSK, and TESLA, INC.,<br><br>  Defendants. | Case No. 3:20-cv-03426-JD<br><br>**PLAINTIFF'S OPPOSITION TO QAZI DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FOURTH AMENDED COMPLAINT**<br><br>Date: January 13, 2022<br>Time: 10:00 A.M. PST<br>Courtroom: 11, 19th Floor<br><br>Judge: Hon. James Donato<br>Complaint Filed: May 20, 2020<br>4AC Filed: August 13, 2021 |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................1

II. STATEMENT OF ISSUES ..........................................................................................2

III. FACTUAL BACKGROUND .......................................................................................2

IV. ARGUMENT ................................................................................................................2

    A. Legal Standard ..................................................................................................2

    B. Defendants Omar Qazi And Tesla, Inc. Have Concealed Material Facts Regarding Their Relationship Since The Outset Of This Litigation ..................2

        1. Defendant Qazi Signed An "Early Access Program" Contract With Defendant Tesla To Test "Full Self-Driving" Beta Software, Accompanied By Written Instructions To Attack Critics ..................2

        2. Defendant Qazi's "Third Row Tesla" Colleague Vivien Hantusch Has Secretly Worked For Defendant Tesla As A Full-Time Employee In Defendant Musk's "Office Of The CEO" Since 2020 ..............................3

        3. Defendant Musk Promotes A Culture Of Harassment At Tesla ...............5

    C. Qazi Defendants' Only Defense To Copyright Infringement, Fair Use Doctrine, Is Unavailable To Bad Faith Actors and Fails Regardless ..................5

    D. Plaintiff Has Adequately Alleged That Qazi Defendants Intended To Remove Copyright Management Information In Order To Infringe ..................9

    E. Defendant Qazi's Unlawful DMCA Requests And Responses Were An Integral And Intentional Part Of Their Bad Faith Smear Campaign ...............10

    F. Plaintiff Has Adequately Alleged That Defendant Qazi Committed Securities Fraud ....11

    G. Plaintiff Has Adequately Alleged That Defendant Qazi Committed Market Manipulation ....................................................................................................12

    H. The Court Must Preclude Qazi Defendants From Wasting Judicial Resources With Another Prohibited And Counter-Factual Anti-SLAPP Motion ..............13

V. CONCLUSION ...........................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Block v. Bramzon*, Case Nos. B292129, B297198, Cal. App. 2d (January 22, 2021) ...................14

*Di-az v. Tesla, Inc.*, Case No. 3:17-cv-06748-WHO (N.D. Cal. 2021) .........................................5

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997) ....8

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991) .............................8

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562-563 (1985) ............6, 8

*Lenz v. Universal Music Corp.*, 19 815 F.3d 1145, 1154 (9th Cir. 2016) ..................................... 10

*Oracle America, Inc. v. Google LLC*, 886 F. 3d 1179, 1202 (Fed. Cir. 2018) ............................... 7

*Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1164 n.8 (9th Cir. 2007) ............................ 7

*Planned Parenthood Federation of Am., Inc. v. Center for Medical Progress*, 890 F.3d 828, 833-834 (9th Cir. 2018) .................................................................................................................. 14

*Quiroz v. ADS-MYERS, Inc.*, Case No. 3:20-cv-01755-JD (N.D. Cal. September 24, 2021) ....... 11

*SellPoolSuppliesOnline.com, LLC v. Ugly Pools Arizona, Inc.*, 804 F. App'x 668, 670–71 (9th Cir. 2020) ................................................................................................................................. 9

*Time Inc.* v. *Bernard Geis Associates*, 293 F. Supp. 130, 146 (SDNY 1968) ................................ 6

*USA v. Milton*, Case No. 1:21-cr-00478-ER (S.D.N.Y. July 28, 2021) ................................. 12, 13

*Wainwright Securities Inc.* v. *Wall Street Transcript Corp.,* 558 F. 2d 91 (2d Cir. 1977) ............. 6

*Warner Bros. Entertainment Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ............... 9

**Statutes**

17 U.S.C. § 1202 ........................................................................................................................... 10

17 U.S.C. § 1204 ........................................................................................................................... 10

17 U.S.C. § 512(c)(3) .................................................................................................................... 10

17 U.S.C. § 512(f) ................................................................................................................... 10, 11

California Code of Civil Procedure § 425.16 ................................................................... 13, 14, 15

Private Securities Litigation Reform Act ............................................................................ 1, 2, 14

**Other Authorities**

3 Nimmer § 13.05[A] ..................................................................................................................... 5

House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 8, pt. 3, p. 1706 (1966) (statement of John Schulman) ....................................................................................................................... 6

Schulman, Fair Use and the Revision of the Copyright Act, 53 IOWA L. REV. 832 (1968) ........... 6

**Rules**

Federal Rule of Civil Procedure 12(b) ......................................................................................... 11

**Regulations**

17 C.F.R. § 240.10b-5(a) .............................................................................................................. 12

## I.  INTRODUCTION

Since the outset of this litigation, Defendant Omar Qazi and his company, Defendant Smick Enterprises, Inc. ("Smick", and together "Qazi Defendants") have actively and provably misled the Court on a range of facts while engaging in behavior that meets the statutory definition of federal witness intimidation, all in violation of the Court's various Orders.  Now, Qazi Defendants hope to evade accountability for their depravity with a swift dismissal of all claims against them, having benefitted thus far from an overly broad PSLRA discovery stay.

At the root of Plaintiff's claims against Qazi Defendants is the plain fact that a trillion-dollar corporation has contracted with Defendant Qazi to weaponize his rage.  With the determination of a cartoon villain, Defendant Qazi has persistently engaged in conduct that is part "Joker" (the Batman villain), part "Infowars" (the Alex Jones conspiracy show).  Notably, in recent weeks, this conduct escalated from the incomplete recitation of allegations in the instant motion to inspiring death threats against an official appointed by President Biden who has been critical of Defendants Tesla, Inc. and Elon Musk ("Tesla Defendants").  Such behavior, however shocking, only serves to confirm what Plaintiff has argued all along: that Defendant Qazi is a social media foot soldier working in a complex, shadowy, multi-company operation whose goal is to discredit and neutralize any and all critics of Tesla Defendants.

Legal consequences necessarily follow from this admittedly somewhat unbelievable reality.  The first is that Qazi Defendants, whose provocations have ranged from the merely juvenile to the obviously criminal, cannot be granted the benefit of the doubt in the context of any legal doctrine that rests upon the principle of good faith and fair dealing, which have both been conspicuously absent since Defendant Qazi first forfeited the opportunity to speak with Plaintiff to sort out their differences.  Second, Defendants have no credibility and cannot be believed.  Their selective presentation of "facts," even where partially true, is framed in such a manner as to contradict and obscure reality.  Plaintiff, in contrast, offers a different, documented set of actual facts.  The result is that Plaintiff's claims cannot be dismissed at this early stage, when discovery has not even begun, as numerous factual conflicts remain.

## II. STATEMENT OF ISSUES

The issue raised is whether Plaintiff has stated a claim against Qazi Defendants for Fourth Amended Complaint ("4AC") Counts I, III, IV, V, VI (Defendant Qazi), VII, and VIII.

## III. FACTUAL BACKGROUND

The Complaint in this case was filed May 20, 2020. ECF No. 1. The First Amended Complaint was filed on July 2, 2020. ECF No. 20. On August 3, 2020, Plaintiff filed a motion to clarify the applicability of the Private Securities Litigation Reform Act ("PSLRA") and lift any discovery stay. ECF No. 60. On August 7, 2020, the Court ordered that the PSLRA automatic discovery stay shall apply until any motions to dismiss are decided. ECF No. 63. Plaintiff filed the Second Amended Complaint on August 26, 2020, the Third Amended Complaint on February 12, 2021, and the instant 4AC on August 13, 2021. ECF Nos. 70, 103, 131. Qazi Defendants filed their latest Motion to Dismiss on November 11, 2021. ECF No. 144.

## IV. ARGUMENT

### A. Legal Standard

Plaintiff does not contest Qazi Defendants' recitation of the legal standard outlined in the Court's June 23, 2021 Order Re Motions To Dismiss And Motion To Strike. ECF No. 125 at 6.

### B. Defendants Omar Qazi And Tesla, Inc. Have Concealed Material Facts Regarding Their Relationship Since The Outset Of This Litigation

#### 1. Defendant Qazi Signed An "Early Access Program" Contract With Defendant Tesla To Test "Full Self-Driving" Beta Software, Accompanied By Written Instructions To Attack Critics

Plaintiff alleges that Defendant Qazi signed a written contract with Defendant Tesla, aside from routinely communicating with Defendant Musk by e-mail.[1]  4AC ¶ 151(f). Recent reporting indicates that Defendant Qazi digitally signed an "Early Access Program" ("EAP") contract, which allowed him access to "Full Self-Driving" ("FSD") beta software before the general public. E-mail communications surrounding this contract explicitly instructed that signatories, "Do remember that there are a lot of people that want Tesla to fail; ***Don't let them***

---

[1] Previously, the Court erroneously described Defendant Musk personally e-mailing Defendant Qazi as "Tweeting 'awesome' at a Tesla enthusiast." ECF No. 125 at 8:16-17.

*mischaracterize your feedback and media posts*" (emphasis added).  Greenspan Declaration Exhibit C.  At least as early as the moment he signed the EAP contract, Defendant Qazi was acting on orders from Tesla Defendants as their agent and would conceivably have breached the terms of his contract by *not* attacking Plaintiff.  That Defendant Tesla directs its EAP contractors regarding social media content was separately confirmed by Third Row Tesla member and EAP contractor Galileo Russell, who admitted as much on camera on September 19, 2021, after the 4AC was filed.[2]  As of October 12, 2021, Defendant Tesla's EAP contracts are the subject of a federal investigation by the National Highway Traffic Safety Administration ("NHTSA").

### 2. Defendant Qazi's "Third Row Tesla" Colleague Vivien Hantusch Has Secretly Worked For Defendant Tesla As A Full-Time Employee In Defendant Musk's "Office Of The CEO" Since 2020

In 4AC ¶¶ 93-98, 116 and 139 (Statement No. 20), Plaintiff describes a number of nominally objective Tesla promoters, including Defendant Qazi, who began to identify as a group called "Third Row Tesla" in early 2020.  This group established a social media presence on Twitter and YouTube and was subsequently invited to Defendant Musk's then-home in Los Angeles to interview Musk at considerable length—an honor bestowed upon no other media organization.  Of the eight people sitting at the table in the photograph below 4AC ¶ 93, the 4AC explicitly discusses four: Defendant Elon Musk, Defendant Omar Qazi, Defendant Musk's brother and Tesla, Inc. Director Kimbal Musk (seated to Defendant Qazi's left), and Kristen Yamamoto (seated to Defendant Qazi's right).  In 4AC ¶ 151(s), Plaintiff also refers to a separate YouTube video in which a fifth Third Row Tesla member, the aforementioned Galileo Russell (seated to Defendant Musk's left), is the party that Defendant Qazi is speaking to when he exclaims that he will "sell them all fuckin' Teslas" and "pull in those referrals."

Also visible in the photograph but not referred to in the 4AC are (counter-clockwise from Defendant Musk) Vivien Hantusch, Vincent Yu, and Sofiaan Fraval.  Ms. Hantusch is a graphic designer and former public relations intern from Düsseldorf, Germany who at present identifies

---

[2] On camera, Russell admitted, "But yeah, Tesla doesn't want us sharing all of the clips of the videos.  Just like, when it looks good.  Because they know people take it out of context." *See* https://www.youtube.com/watch?v=gvgsoRPiWA8&t=132s.

herself on Twitter merely as a "[r]eal-life girl living in a dream world."  In fact, ***Ms. Hantusch is secretly a full-time Tesla employee*** who has worked closely with Defendant Qazi for years.  Ms. Hantusch has a tesla.com e-mail address, is listed in the internal company directory by name and photograph, does not have a "[C]" marking next to her name that would identify her as a contractor, and specifically reports to Omead Afshar, Defendant Musk's newest Chief of Staff in the "Office of the CEO."  Greenspan Declaration Exhibit B.  Ms. Hantusch's Twitter presence, which constantly promotes Tesla and SpaceX, clearly violates Tesla's internal Communications Policy, which instructs employees to, "Identify Yourself in Endorsements – If your social media activity endorses Tesla's products or services, i.e., expresses opinions, beliefs, findings or experiences concerning Tesla's products or services, you must disclose your name and position with Tesla."  Ms. Hantusch has not done so for over a year, even with litigation pending before this Court on the very topic of social media influencers working for Defendants Tesla and Musk.

Nor have Defendants' counsel ever seen fit to identify the relationship between Third Row Tesla or Ms. Hantusch and Defendant Tesla itself.  This deliberate concealing of material facts by Defendants—which should merit sanctions—has several ramifications.  First, it is clear that Defendant Tesla's "policies" are worthless documents with no actual meaning.  Second, it is clear that on a number of occasions where Defendant Qazi publicly accused Plaintiff of harassing "Tesla customers" (by merely asking questions about their odd fixation on Defendant Musk), Defendant Qazi very likely already knew that one of the "customers" he was referring to was, in fact, a Tesla employee, secretly working in Defendant Musk's "Office."  Third, the fact that nine of the ten people in the Third Row Tesla video at Defendant Musk's home were officers, directors, employees and/or contractors of Defendant Tesla—all except for Elon Musk's mother, a likely beneficiary of the Elon Musk Revocable Trust—raises the question about the true relationship between Defendant Musk's complex network of entities (e.g. Space Exploration Technologies Corporation, Excession LLC, Europa 101 LLC, Horse Ranch LLC, etc.) and the others present.  Fourth, the fact that Mr. Afshar is visible in segments of the Third Row Tesla video at issue (sitting on a nearby couch, not at the table) highlights the disingenuousness of

opposing counsel's prior argument that Defendants Qazi and Musk were merely "friendly." The interview was a corporate propaganda piece in which Ms. Hantusch's and Defendant Qazi's boss was literally sitting feet away—with his boss, Defendant Musk, sitting right at the table.

### 3. Defendant Musk Promotes A Culture Of Harassment At Tesla

Since the filing of the 4AC, Defendant Musk has publicly made sexually charged comments at one sitting United States Senator (Senator Ron Wyden, D-OR), openly insulted another (Senator Bernie Sanders, D-VT), made sexually disparaging jokes on Twitter, and fired Defendant Tesla's former "Vice President, Legal" and the entire law firm of Sheppard Mullin LLP over a loss at trial in *Di-az v. Tesla, Inc.* which resulted in a $136.9 million jury verdict against Defendant Tesla for civil harassment. In addition to these notable events, on October 19, 2021, Defendant Qazi publicly threatened to "riot so hard January 6 will look like a day at Disneyland" because of the possibility of federal regulators taking action against Defendant Tesla. Defendant Qazi then authored a defamatory change.org "petition" under a false name against a newly appointed federal official, Dr. Mary Louise Cummings, which resulted in Dr. Cummings receiving death threats. The petition was removed, with change.org citing the fact that it had defamed Dr. Cummings.[3] Collectively, these facts demonstrate that Tesla has a serious harassment problem. Greenspan Declaration Exhibits D, E, F, G.

### C. Qazi Defendants' Only Defense To Copyright Infringement, Fair Use Doctrine, Is Unavailable To Bad Faith Actors and Fails Regardless

Qazi Defendants offer only one defense against Plaintiff's claim of copyright infringement: fair use. Yet a party acting in bad faith cannot claim that their infringement is "fair use." The Court has already established that "[t]he copyright claims arise out of Qazi's and Greenspan's online feud." ECF No. 125 at 17. Virtually no further analysis is needed.

"Also relevant to the 'character' of the use is 'the propriety of the defendant's conduct.' 3 Nimmer § 13.05[A], at 13-72. 'Fair use presupposes `good faith` and `fair dealing.`'" *Time*

---

[3] The "petition" was one of two change.org petitions authored by Defendant Qazi that defamed Plaintiff by name as well. Both were removed by change.org. Plaintiff may seek to include the libelous statements in these petitions in a subsequent supplementary complaint or new lawsuit.

*Inc*. v. *Bernard Geis Associates*, 293 F. Supp. 130, 146 (SDNY 1968), quoting Schulman, Fair Use and the Revision of the Copyright Act, 53 IOWA L. REV. 832 (1968)." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562-563 (1985). "Fair use 'distinguishes between `a true scholar and a chiseler who infringes a work for personal profit.`' *Wainwright Securities Inc*. v. *Wall Street Transcript Corp*., 558 F. 2d, at 94, quoting from Hearings on Bills for the General Revision of the Copyright Law before the House Committee on the Judiciary, 89th Cong., 1st Sess., ser. 8, pt. 3, p. 1706 (1966) (statement of John Schulman)." *Id*. at 563.

Defendant Qazi is no "true scholar," and does indeed resemble the type of "chiseler" referenced by the Supreme Court. To begin with, Qazi, who has been arrested repeatedly on a variety of criminal charges, is a defendant in this matter alongside his tax-evading, unregistered corporation, through which he "work[s] for personal profit." The list of bad faith acts he has engaged in is too long to comprehensively enumerate in this brief, as it requires dozens of pages to describe in the 4AC. To recount only the highlights, for years, Defendant Qazi has personally directed and publicly encouraged the harassment of Plaintiff and Plaintiff's family; has worked tirelessly to smear Plaintiff's reputation, threatening to do so "until the day [Plaintiff] d[i]es" and beyond; has falsely accused Plaintiff of grotesque crimes such as serial rape and possession of child pornography; has admitted to modifying court documents involving real threats of physical violence; has portrayed Plaintiff as a person likely to commit mass murderer; has published anti-Semitic photographs of Plaintiff altering his nose and face, aside from calling him a follower of Hitler; has lied with routine abandon about Plaintiff's attempts to *avoid* litigation and about the proceedings in this Court; and along with Defendant Musk has generally vilified Plaintiff before an audience of *tens of millions*. 4AC ¶¶ 60, 75, 139, 140, 141, 202. All too aware that his infringement was and is unlawful, Defendant Qazi even made sure to host his copies of Plaintiff's copyrighted content on servers in Eastern Europe, where he believed he would escape the reach of the Copyright Act and the Digital Millennium Copyright Act ("DMCA"). 4AC ¶¶ 205, 217. These actions had Tesla Defendants' stamp of approval, and were carried out both to further Defendant Qazi's personal profits from ownership of TSLA stock, and to help "pump"

the price of TSLA for his true masters, Defendants Tesla, Inc. and Elon Musk. 4AC ¶¶ 151, 258.

Given that "a party claiming fair use must act in a manner generally compatible with principles of good faith and fair dealing,"[4] fair use is accordingly not a defense available to Qazi Defendants. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1164 n.8 (9th Cir. 2007). "[A]s the Ninth Circuit has said, one who acts in bad faith should be barred from invoking the equitable defense of fair use. *Fisher*, 794 F.2d at 436 (calling the principle of considering the alleged infringer's 'bad conduct' as a 'bar [to] his use of the equitable defense of fair use' a sound one)." *Oracle America, Inc. v. Google LLC*, 886 F. 3d 1179, 1202 (Fed. Cir. 2018).

Even if Qazi Defendants could claim that in the context of the acts described above, re-publishing extended, verbatim passages from *Authoritas* in the guise of "book reviews" qualifies as fair use—which they cannot—such a claim creates a genuine issue of material fact involving who published what, which militates against dismissal at this early stage of litigation.

Furthermore, an objective analysis of the Copyright Act's four fair use factors as applied to these circumstances would still not work in Qazi Defendants' favor. First, the re-publication of *Authoritas* at various points on Qazi Defendants' websites was undertaken in every instance exclusively for profit-making and commercial purposes. Defendant Qazi sought to use Plaintiff's own writing as a weapon to discredit Plaintiff's research on Defendant Tesla, specifically so that participants in capital markets would disbelieve anything published by Plaintiff. Outside of their fundamental disagreement over Tesla's business practices, Defendant Qazi and Plaintiff have never met or communicated on any other topic. Defendant Qazi's interest in denigrating and defaming Plaintiff has been *exclusively* driven by Defendants' commercial interests, both with regard to TSLA stock and covering the cost of defending this lawsuit over TSLA stock. That Defendant Qazi has sprinkled a few extremely concise words on certain pages where Plaintiff's book is re-published does not in any way "transform" the work, as

---

[4] Along with the DNS hostname "kidneystone.vagfoundation.org," chosen by Defendant Qazi to attempt to humiliate Plaintiff for once suffering from a common medical condition as described in *Authoritas*, the choice of "loser.jpg" as the filename for an unauthorized reproduction of the copyrighted Purple Shirt Photograph—placed directly above infringing material from *Authoritas*—only serves to reinforce that copyright infringement was merely one component of Defendants' sprawling harassment campaign directed at Plaintiff. 4AC ¶¶ 108, 217.

that extremely limited verbiage amounts only to unprotected satire.

Second, although *Authoritas* is a non-fiction work, a memoir is not the same as a telephone book. Phrases such as "a monsoon, though of the type that preferred to consume a light snack of milk and cookies before doing anything else," "from the way the President's jowls were slowly twisting" and "'I'm getting boot points for this?'" are original creative expression. "Originality remains the *sine qua non* of copyright." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991). Qazi Defendants copied those original phrases and others in their extensive infringing re-publication. 4AC ¶ 200. "Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them." *Id*.

While *Authoritas* is a published work available for purchase on Amazon.com in hardcover and e-book formats, it is also self-published.[5] The lack of a marketing campaign or professional "book tour" renders it akin to an unpublished manuscript for purposes of the Copyright Act, as most of Qazi Defendants' readers would have never encountered it prior to reading the infringing re-publication, affecting "the author's right to control the first public appearance of his expression." *Harper & Row Publishers*, 471 U.S. at 563.

Third, the extent of Defendant Qazi's use was far more than necessary to make a "fair" critique of Plaintiff and/or Plaintiff's writing. 4AC ¶ 206. With over 30 excerpts of full pages and almost 100 more copied-and-pasted excerpts, Qazi Defendants copied a great deal more than a few illustrative examples of why they disliked Plaintiff. In the Ninth Circuit, a "parodist is permitted a fair use of a copyrighted work if it takes no more than is necessary to 'recall' or 'conjure up' the object of his parody." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1400 (9th Cir. 1997). Qazi Defendants cannot even claim to "add[] a productive purpose to the original material." *Warner Bros. Entertainment Inc. v. RDR Books*, 575 F. Supp.

---

[5] In 2007, major publishers were uninterested in any critique of Facebook when Plaintiff approached New York publishers with his then-literary agent (now deceased). Today, much has changed and there is a sizable market for criticism of Facebook and its CEO Mark Zuckerberg.

2d 513 (S.D.N.Y. 2008). Qazi Defendants also re-published the heart of the work concerning Harvard College and Facebook in 2002-2004. 4AC ¶¶ 197, 206.

Fourth, although the market for *Authoritas* has historically not been large, the size of the market that exists is largely a function of the goodwill ascribed to Plaintiff's name. By willfully and intentionally destroying that goodwill, Qazi Defendants' campaign of libel and harassment undeniably had a disproportionate and negative effect on the market for *Authoritas*, which is consistent with sales of the book stopping simultaneous with Qazi Defendants publishing their infringing copies of Plaintiff's protected content. 4AC ¶ 207.

In sum, Qazi Defendants cannot escape liability under the Copyright Act on account of fair use doctrine, even assuming for the stake of argument that they had not already rendered themselves ineligible for its application through their persistently outrageous bad faith acts.

### D. Plaintiff Has Adequately Alleged That Qazi Defendants Intended To Remove Copyright Management Information In Order To Infringe

Forgetting their prank calls, impersonations, and websites defaming a disabled bystander (among other antics), Qazi Defendants also rely upon fair use doctrine to excuse their infringement of the Purple Shirt Photograph and the removal of Copyright Management Information ("CMI") therefrom. As described above, the fair use defense is unavailable. Qazi Defendants' citation to *SellPoolSuppliesOnline.com, LLC v. Ugly Pools Arizona, Inc.*, 804 F. App'x 668, 670–71 (9th Cir. 2020) is inapposite, as that case involved a *false* copyright disclaimer offered by the secondary user of protected materials, as opposed to none at all.

Plaintiff's relevant CMI was located as text below the Purple Shirt Photograph up through July 19, 2020, and thereafter, as text below the Purple Shirt Photograph, visible text directly embedded in the Purple Shirt Photograph, and invisible metadata embedded in the associated filed. Before and after the change on July 19, 2020, Qazi Defendants included *none* of this CMI in any copy of the Purple Shirt Photograph he used personally or encouraged others to use. The 4AC alleges that Qazi Defendants "willfully re-posted the Purple Shirt Photograph without any CMI" repeatedly, even after the filing of the First Amended Complaint in this action. On several occasions, Defendant Qazi used a virtual private network to visit Plaintiff's

personal website, hoping to evade detection, but whether he re-downloaded the Purple Shirt Photograph is irrelevant. Qazi Defendants' decision to deliberately omit CMI that they knew was both present and legally required after July 19, 2020, simply by leaving in place an already-infringing digital file, does not excuse them from liability under 17 U.S.C. § 1202(b)(2) or (3), which hinges on "knowing" or "having reasonable grounds to know" that CMI has been removed or altered. Qazi Defendants' actions with regard to the Purple Shirt Photograph, which they discussed incessantly on social media as a copyrighted work (reflecting knowledge), were intended to make the specific point that Qazi Defendants were above the law. They are not.

Qazi Defendants' unsubstantiated argument that each separate infringement under the DMCA should be considered as "one continuing infringement" is belied by the reality of how Congress implemented the DMCA. Each notification of each infringing act is separate. 17 U.S.C. § 512(c)(3). As Qazi Defendants admit, there is no precedent suggesting otherwise in the Ninth Circuit or anywhere. Quite to the contrary, 17 U.S.C. § 1204 sets out criminal offenses and penalties for violations of 17 U.S.C. § 1202 which are explicitly structured based upon "the first offense" ("fined not more than $500,000 or imprisoned for not more than 5 years") and "any subsequent offense" ("fined not more than $1,000,000 or imprisoned for not more than 10 years"). Clearly, Congress never intended for all CMI-related offenses to be lumped together.

### E. Defendant Qazi's Unlawful DMCA Requests And Responses Were An Integral And Intentional Part Of Their Bad Faith Smear Campaign

Plaintiff explicitly alleges that Defendant Qazi submitted DMCA Takedown Notices as retribution for Plaintiff's reporting on public safety matters and even for this litigation (*see* 4AC ¶ 232, "Based on his posts from that morning, he was angry about a confidential settlement offer"). Such acts are *prima facie* abuses of the DMCA. "To be clear, if a copyright holder ignores or neglects our unequivocal holding that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f)." *Lenz v. Universal Music Corp.*, 19 815 F.3d 1145, 1154 (9th Cir. 2016). The timing of these false DMCA Takedown Notices makes clear that Defendant Qazi did not simply make an "unknowing mistake" when he decided to leverage the DMCA to disappear content that highlighted his own violations of law. "A

copyright holder who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability." *Id*.

Plaintiff also explicitly alleged that he was injured, stating, "On multiple occasions, Twitter, Inc. removed content from the @PlainSite account based on Defendant Qazi's false representations and failed to process Counter-Notices." 4AC ¶ 238. The actual, forced removal of content based upon a false pretext is a *de facto* injury.

To the extent that Defendant Qazi relies on the fair use doctrine as a defense for his DMCA Counter-Notice involving his infringing copies of *Authoritas*, it is not available to him for the variety of reasons described above.

### F. Plaintiff Has Adequately Alleged That Defendant Qazi Committed Securities Fraud

Defendant Qazi argues[6] that Plaintiff has not alleged a material misrepresentation or scienter under Section 10(b) and Rule 10b-5, and that therefore he should have no liability for his pivotal role in the largest pump-and-dump scheme in the history of capital markets. Not so. The two misrepresentations cited in the 4AC attributed to Defendant Qazi are both highly material, and the allegations of scienter against Defendant Qazi can only be described as overwhelming.

The first statement, attempting to call Tesla Autopilot "the eigth *[sic]* wonder of the world" on June 17, 2019, is not mere puffery. First, Defendant Qazi's own experiences with Autopilot (running stoplights) and his Tesla vehicle (constantly requiring service) *contradict* the positive content he shared on social media. 4AC ¶ 44. Second, automotive analysts on Wall Street such as Adam Jonas of Morgan Stanley place billions of dollars of value on Tesla's "autonomy" features. In Jonas's words from May 2, 2019, less than a month before Defendant

---

[6] Counsel appears to be confused, as the 4AC only alleges that Count VII is "Against Defendants Elon Musk, Tesla, Inc. and Omar Qazi." Defendant Smick Enterprises, Inc. is plainly not listed. The suggestion that Plaintiff added any "new claims or parties" in the 4AC is objectively false. The Third Amended Complaint included the same claims, the same parties, and the same argument that Defendant Qazi is an agent of Defendants Tesla and Musk. ECF No. 103. To the extent that Defendant Qazi is arguing that Count VII should not apply to him because he is not an agent of Tesla Defendants, "This is a quintessential dispute of fact that the Court [should] decline[] to resolve in the Rule 12(b) context." *Quiroz v. ADS-MYERS, Inc.*, Case No. 3:20-cv-01755-JD (N.D. Cal. September 24, 2021). His signed digital EAP contract indicates that he is.

Qazi's statement, "we value Tesla autonomy at around 45 bucks a share." 4AC ¶ 245, Issue No. 7, Statement No. 4 (stated on secret-but-later-public call). Today, that amounts to about 20% of Defendant Tesla's market capitalization, or over $200 billion. Clearly, reasonable investors *do* consider statements like Defendant Qazi's when making investment decisions, which is why one such investor wrote to him thanking Defendant Qazi for his, "funny, informative, thought provoking, & aggressive tweets against Tesla FUD [that] inspired me to purchase Tesla shares in April & May of 2019." 4AC ¶ 258. In August 2019—after the statement was posted—another investor credited Defendant Qazi's non-stop stream of lies as "a significant reason I learned about Tesla and why I invested in 2019." 4AC ¶ 259. It is plain to see that investors actually pay attention to Defendant Qazi's statements regarding Defendants Tesla and Musk, no matter what a twenty-year-old, non-binding citation in a legal brief might suggest.

The second statement, concerning Defendant Tesla's safety record, is directly contradicted by federal officials at NHTSA who referred Defendants Tesla and Musk to the Federal Trade Commission for false advertising. Defendant Qazi was responding to this when he made the statement and knowingly misrepresented NHTSA's position in an attempt to diffuse fear that government action might have a negative impact on Tesla's stock price.

As to scienter, Defendant Qazi implicitly admits in his motion that the 4AC pleads scienter insofar as "deliberate recklessness regarding the falsity of the challenged statements" is concerned. Defendant Qazi is silent on "deliberate recklessness," only suggesting that the 4AC "contains no allegations that Qazi acted with an intent to defraud in making the two statements," but even this is not true. 4AC ¶ 14, which is incorporated in the claim by reference, as well as 4AC ¶ 258, speak to Defendant Qazi's fraudulent motive.

### G. Plaintiff Has Adequately Alleged That Defendant Qazi Committed Market Manipulation

Market manipulation can refer to a wide range of activities that constitute a "device, scheme, or artifice to defraud" under 17 C.F.R. § 240.10b-5(a). The federal government has recently begun to include social media in the long list of such devices, schemes and artifices that can manipulate markets. In *USA v. Milton*, where Nikola Motors ex-CEO Trevor Milton was

indicted for securities and wire fraud this year, the government alleged in the first paragraph of the indictment as follows: "MILTON's scheme targeted individual, non-professional investors — so-called 'retail investors' — by making false and misleading statements directly to the investing public through social media and television, print, and podcast interviews."[7] *USA v. Milton*, Case No. 1:21-cr-00478-ER (S.D.N.Y. July 28, 2021). This perfectly describes the scheme perpetrated by Defendants in this case, except that here, it is much larger in scale and longer in duration. In fact, Defendants likely inspired Milton to run Nikola the way that he did.

The fact alone that Defendant Qazi has made herculean efforts to evade Twitter's lifetime ban on his access—by sharing the @WholeMarsBlog account with others, identifying directly with the account when convenient and then completely denying ownership at other times[8]—is indicative of his scienter. In fact, even while denying a true explanation of his Twitter use to Plaintiff, Defendant Qazi offered "a supplemental declaration or briefing on these factual issues" to the Court on September 2, 2020, which was never forthcoming.[9] ECF No. 73 at 6-7, n. 3.

Plaintiff has clearly alleged that Defendant Qazi, who already admits authorship of many @WholeMarsBlog posts, was instrumental to a campaign by Defendants to mislead investors regarding Defendant Tesla's dangerous "Autopilot" and "Full Self-Driving" features. As mentioned previously, his role—not a product of serendipity, but rather, a signed contract—is now part of a federal investigation. Greenspan Declaration Exhibit K.

### H. The Court Must Preclude Qazi Defendants From Wasting Judicial Resources With Another Prohibited And Counter-Factual Anti-SLAPP Motion

Already in this litigation, Qazi Defendants have filed three Special Motions to Strike under California's Anti-SLAPP statute, California Code of Civil Procedure § 425.16 ("Section 425.16"), as part of an attempted cash grab via mandatory fee shifting. Yet their bid to employ

---

[7] In his motion to dismiss, Milton did not even contest that social media could be a deceptive device, only challenging the indictment on grounds of improper venue.

[8] On July 30, 2020, counsel for Qazi Defendants brazenly lied when he wrote, "Mr. Qazi does not have a Twitter account, so any assertion that Mr. Qazi has made statements on Twitter are questionable." *See* ECF No. 55-1. Counsel should be sanctioned accordingly.

[9] Qazi Defendants and their counsel have lied throughout these proceedings, both to Plaintiff and to the Court under oath. Under Defendant Qazi's direction, Defendant Smick Enterprises, Inc. has never been in good standing in California. These facts are material to the issue of scienter.

Section 425.16 is precisely backwards, for Defendant Qazi has never once bothered to substantively engage with Plaintiff on any matter of public interest, choosing to lob insults and falsehoods from a mysterious Twitter account instead. The relief Qazi Defendants seek under Section 425.16 is precluded twice over: first, because Section 425.16 motions cannot be heard in federal court due to conflicts with the Federal Rules of Civil Procedure; and second, because of the recent decision in *Block v. Bramzon*, Case Nos. B292129, B297198, Cal. App. 2d (January 22, 2021). Any similar anti-SLAPP motion filed by Qazi Defendants must be denied as "'[A]nonymous internet trash talk' does not warrant anti-SLAPP protection." *Id*.

The circumstances in *Block*, a case involving Twitter harassment by an individual[10] hiding behind a self-styled "parody" account, are nearly identical to those here. *Block* clarifies that a "decade-old newspaper article" does not place one in the "'public eye' for purposes of the anti-SLAPP statute" and that regardless, "not every statement about a person in the public eye implicates a public issue [citations omitted]." *Id*. *Block* also makes clear that not every "warning" about someone is "provided to assist consumers choosing among" goods or services. "To hold otherwise would turn every insult of a businessperson into a 'consumer protection' matter subject to anti-SLAPP protection. We do not believe the Legislature intended that result."

| Qazi Defendants' Arguments Thus Far | 3-0 Appellate Opinion in *Block v. Bramzon* Affirming Denial of Anti-SLAPP Motion |
|---|---|
| "while the Statements may not be tasteful to some, making fun of, criticizing, and satirizing vocal critics of Tesla and Musk have become topics of widespread public interest." ECF No. 107 at 12:6-8. | "Assuming Block's 'trustworthiness' is an issue of public interest, once again, it is too tangentially related to the specific content of the allegedly libelous statements here. A majority of the statements consist of vulgar and/or adolescent personal insults, misogynistic, racist, and xenophobic |

---

[10] Defendant Qazi seeks the protection of Section 425.16 for numerous posts he alleges he is not responsible for authoring. This factual dispute transforms his motions under Section 425.16 into impermissible summary judgment motions, especially because due to the PSLRA's involvement in this action, Plaintiff has not had the mandatory opportunity to conduct discovery. "Requiring a presentation of evidence without accompanying discovery would improperly transform the motion to strike under the anti-SLAPP law into a motion for summary judgment without providing any of the procedural safeguards that have been firmly established by the Federal Rules of Civil Procedure. That result would effectively allow the state anti-SLAPP rules to usurp the federal rules. We could not properly allow such a result." *Planned Parenthood Federation of Am., Inc. v. Center for Medical Progress*, 890 F.3d 828, 833-834 (9th Cir. 2018).

| | |
|---|---|
| | comments, and other slurs having nothing to do with any reasoned discussion of trustworthiness, competence, or any other 'public issue or an issue of public interest.'" |
| "While the Smick Defendants dispute Plaintiff's factual allegations, including claims that Qazi posted certain statements…" ECF No. 107 at 8:2-3. | "The complaint alleges BASTA, Bramzon, and Schulte conspired together and participated in creating the tweets at issue." |
| "…the Court should dismiss all claims against the Smick Defendants, which are not stricken, pursuant to Rule 12(b)(6) for failure to state a claim because they are based on the same, non-actionable rhetoric, hyperbole, and parody." ECF No. 75 at 2:20-22. | "in support of their argument that the Twitter account is a parody (and thus, they contend, nonactionable)" |
| "While such language may be distasteful to some, no reasonable reader would understand these statements as assertions of fact." ECF No. 107 at 1:14-16. | "defendants claim 'only an unreasonably gullible person might believe that Block actually made any of the statements that appear in the Not Dennis Block Twitter feed because those statements are too ludicrous to be true or too critical to have been made by Block.'" |
| "Because no reasonable person would understand the Statements as assertions of fact, they do not support a defamation claim." ECF No. 107 at 10:10-11. | |
| "…these 'false statements' marked an oversight, and one that the Smick Defendants addressed in detail in their reply brief." ECF No. 90 at 6:13-14. | "The case raises the issue whether the alleged participation of Bramzon (and/or other attorneys employed by or acting on behalf of BASTA) in the challenged tweets and other alleged conduct constitutes professional incivility, including expressions of gender bias and misogyny." |

Accordingly, the Court should not permit any future Special Motions to Strike under California Code of Civil Procedure § 425.16 to be filed by Qazi Defendants.

## V.    CONCLUSION

Newly disclosed evidence places Qazi Defendants at the heart of a carefully coordinated conspiracy to mislead consumers and investors on behalf of Defendants Tesla and Musk. Qazi Defendants' conduct renders them ineligible to shield themselves from copyright-related claims with fair use doctrine. Plaintiff respectfully requests leave to amend the 4AC if necessary to include facts that have arisen since its filing and to remedy any minor defects.

Dated: December 9, 2021              Respectfully submitted,

*Aaron Greenspan*
Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

PLAINTIFF'S OPPOSITION TO QAZI            16                       3:20-cv-03426-JD
DEFENDANTS' MOTION TO DISMISS FOURTH
AMENDED COMPLAINT