Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| AARON GREENSPAN,<br><br>    Plaintiff,<br><br>        v.<br><br>OMAR QAZI, SMICK ENTERPRISES, INC.,<br>ELON MUSK, and TESLA, INC.,<br><br>    Defendants. | Case No. 3:20-cv-03426-JD<br><br>**PLAINTIFF'S STATEMENT OF<br>RECENT DECISION**<br><br>Judge: Hon. James Donato<br>4AC Filed: August 13, 2021 |

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Plaintiff Aaron Greenspan lodges this Statement of Recent Decision in support of his opposition to Defendants' respective motions to dismiss the Fourth Amended Complaint, for which the hearing has been vacated.  ECF No. 158.  Attached hereto is:

1.  Exhibit A: *In Re Tesla, Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC, ECF No. 387 [SEALED] (N.D. Cal. April 1, 2022).  This opinion by Judge Chen, still under seal, finds that Elon Musk acted with scienter and that no reasonable juror could consider his "funding secured" post on Twitter not misleading or fraudulent.

2.  Exhibit B: *In Re Tesla, Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC, ECF No. 402 (N.D. Cal. April 22, 2022).  Since Exhibit A is not available to the public at this point in time, in lieu of the opinion itself Plaintiff is lodging the Defendants' Notice of Motion And Motion For Certification Under 28 U.S.C. § 1292(b); Memorandum Of Points And Authorities In Support, which is publicly available and quotes directly from the sealed order.

3.  Exhibit C: *United States Securities and Exchange Commission v. Musk*, Case No. 1:18-cv-08865-LJL (S.D.N.Y. April 27, 2022).  This opinion by Judge Liman states that "the SEC had information that tended to show that from at least November 5, 2021, Tesla and its officers engaged in conducted that violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Rule 13a-15 of the Exchange Act." *Id*. at 5.

Dated: April 27, 2022                    Respectfully submitted,

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

**<u>EXHIBIT A</u>**

*In Re Tesla, Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC, ECF No. 387
(N.D. Cal. April 1, 2022)

CM ECF

Civil ▾   Criminal ▾   Query   Reports ▾   Utilities ▾   Search   Help   Log Out

This document is currently Under Seal and not available to the general public.

## **EXHIBIT B**

*In Re Tesla, Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC, ECF No. 402
(N.D. Cal. April 22, 2022)

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Alex Spiro (*appearing pro hac vice*)
  alexspiro@quinnemanuel.com
51 Madison Avenue, 22nd Floor,
New York, New York 10010
Telephone: (212) 849-7000

  Kathleen M. Sullivan (Bar No. 242261)
  kathleensullivan@quinnemanuel.com
  Michael T. Lifrak (Bar No. 210846)
  michaellifrak@quinnemanuel.com
  Jeanine Zalduendo (Bar No. 243374)
  jeaninezalduendo@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000

  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000

*Attorneys for Defendants Tesla, Inc., Elon Musk,*
*Brad W. Buss, Robyn Denholm, Ira Ehrenpreis,*
*Antonio J. Gracias, James Murdoch, Kimbal Musk,*
*And Linda Johnson Rice*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TESLA, INC. SECURITIES LITIGATION | Case No. 3:18-cv-04865-EMC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: June 2, 2022<br>Time: 1:30 p.m.<br>Location: Courtroom 5, 17th Floor<br>Judge: Hon. Edward Chen |

## NOTICE OF MOTION AND MOTION FOR CERTIFICATION UNDER
## 28 U.S.C. § 1292(b)

Defendants Tesla, Inc., Elon R. Musk, Brad W. Buss, Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias, James Murdoch, Kimbal Musk, and Linda Johnson Rice (collectively, "Defendants") respectfully move for an order amending the Court's April 1, 2022 Order, issued April 10, 2022 (ECF 387), on Plaintiff's motion for partial summary judgment, for the purpose of certifying the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court has jurisdiction to issue the requested relief, and 28 U.S.C. § 1292(b) certification is appropriate because the Order involves controlling questions of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the Order may materially advance the ultimate termination of the litigation. *See also* Fed. R. App. P. 5 ("If a party cannot petition for appeal unless the district court first enters an order granting permission to do so or stating that the necessary conditions are met, the district court may amend its order, either on its own or in response to a party's motion, to include the required permission or statement."). The bases for Defendants' motion are set forth in greater detail in the accompanying Memorandum of Points and Authorities.

PLEASE TAKE FURTHER NOTICE that this motion is based on the Memorandum of Points and Authorities below, the arguments of counsel, and any other matters properly before this Court. Pursuant to Paragraph 11 of the Court's Civil Standing Order – General, Defendants also submit herewith a proposed order.

## ISSUES TO BE DECIDED

1.      Should the Court should grant certification on the controlling legal question whether the standard for the materiality of a statement is the same for purposes of falsity, scienter, and reliance?

2.      Should the Court grant certification as to the question whether a court must consider the forum in assessing falsity and scienter?

DATED: April 22, 2022    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Kathleen M. Sullivan*
  Kathleen M. Sullivan
  *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
  *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
  *James Murdoch, Kimbal Musk, And Linda Johnson Rice*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 7

I.    THE COURT SHOULD GRANT CERTIFICATION ON THE CONTROLLING
LEGAL QUESTION WHETHER THE STANDARD FOR THE MATERIALITY
OF A STATEMENT IS THE SAME FOR PURPOSES OF FALSITY,
SCIENTER, AND RELIANCE ................................................................................. 7

    A.    Whether The Standard For Assessing Materiality For Reliance Differs
From The Standard For Assessing Materiality For Falsity And Scienter
Presents A Controlling Question Of Law ...................................................... 7

    B.    The Court's Order Indicates Substantial Ground For Difference Of Opinion
On This Question Of Law ............................................................................ 10

    C.    Certification Of This Question Will Materially Advance The Termination
Of The Case ................................................................................................. 13

II.    THE COURT SHOULD GRANT CERTIFICATION AS TO THE QUESTION
WHETHER A COURT MUST CONSIDER THE FORUM IN ASSESSING
FALSITY AND SCIENTER ................................................................................... 14

    A.    Whether The Court Must Consider The Forum In Assessing Falsity And
Scienter Presents A Controlling Question Of Law ...................................... 15

    B.    There Is Substantial Ground For Difference Of Opinion On This Question
Of Law ........................................................................................................ 16

    C.    Certification Of This Question Will Materially Advance The Termination
Of The Case ................................................................................................. 19

III.    CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................................. 1, 9

*In re Am. Apparel, Inc. S'holder Litig.*,
   No. CV1006352MMMRCX, 2013 WL 10914316 (C.D. Cal. Aug. 8, 2013) ........................ 13

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*,
   568 U.S. 455 (2013) ................................................. 1, 2, 8, 9, 11

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
   105 F. Supp. 3d 1246 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) ........................ 12

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ................................................. 10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................. 8

*Burgess v. Premier Corp.*,
   727 F.2d 826 (9th Cir. 1984) ................................................. 9

*Casas v. Victoria's Secret Stores, LLC*,
   No. CV 14-6412-GW(VBKX),
   2015 WL 13446989 (C.D. Cal. Apr. 9, 2015) .................................. 10, 14, 16, 18, 19

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ................................................. 11, 12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
   632 F.3d 751 (1st Cir. 2011) ................................................. 9

*City of Philadelphia v. Fleming Cos., Inc.*,
   264 F.3d 1245 (10th Cir. 2001) ................................................. 12

*In re Convergent Techs. Sec. Lit.*,
   948 F.2d 507 (9th Cir. 1991) ................................................. 16, 17

*In re Discovery Lab'ys Sec. Litig.*,
   No. 06-1820, 2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ...................................... 12

*Dura Pharma, Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................. 1, 8

*FERC v. Vitol Inc.*,
   No. 2:20-CV-00040-KJM-AC, 2022 WL 583998 (E.D. Cal. Feb. 25, 2022) .......... 5, 13, 14, 19

*Flannery v. S.E.C.*,
   810 F.3d 1 (1st Cir. 2015) ................................................. 12

*Freeman v. Gonzales*,
   444 F.3d 1031 (9th Cir. 2006) ................................................. 10

DEFENDANTS' MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b)

*Ganske v. Mensch*,
   480 F. Supp. 3d 542 (S.D.N.Y 2020)...........................................................18

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   141 S. Ct. 1951 (2021)...........................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)............................................................................1, 8

*Hawaii ex rel. Louie v. JP Morgan Chase & Co.*,
   921 F. Supp. 2d 1059 (D. Haw. 2013).....................................................5, 6

*In re Intel Corp. Sec. Litig.*,
   No. 18-CV-00507-YGR, 2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)...............17

*Jang v. Bos. Sci. Corp.*,
   No. EDCV05426VAPMRWX, 2014 WL 12787228 (C.D. Cal. Apr. 18, 2014)............6, 11

*Jasin v. Vivus, Inc.*,
   No. 14-CV-03263-BLF, 2016 WL 1570164 (N.D. Cal. Apr. 19, 2016),
   *aff'd*, 721 F. App'x 665 (9th Cir. 2018)..................................................12

*Lies v. Farrell Lines, Inc.*,
   641 F.2d 765 (9th Cir. 1981)..........................................................10, 13, 16

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)................................................................................8

*McMahan & Co. v. Wherehouse Entm't*,
   900 F.2d 576 (2d Cir. 1990)....................................................................16

*Murray v. Pronto Installations, Inc.*,
   No. 8:20-CR-824-T-24AEP, 2020 WL 6728812 (M.D. Fla. Nov. 16, 2020)............18

*Nat'l Ass'n of Afr.-Am. Owned Media v. Charter Commc'ns, Inc.*,
   No. CV 16-609-GW(FFMX), 2016 WL 10647193 (C.D. Cal. Dec. 12, 2016)............5

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000).....................................................................11

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999)....................................................................12

*Reese v. BP Exploration (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011)...........................................................6, 14, 18

*Rollins v. Dignity Health*,
   No. 13-CV-01450-TEH, 2014 WL 6693891 (N.D. Cal. Nov. 26, 2014)................13

*S.E.C. v. Mercury Interactive, LLC.*,
   No. 5:07-CV-02822-JF, 2011 WL 1335733 (N.D. Cal. Apr. 7, 2011).................14

*S.E.C. v. Retail Pro, Inc.*,
   673 F. Supp. 2d 1108 (S.D. Cal. 2009).....................................................10

*T.P. by & through S.P. v. Walt Disney Parks & Resorts U.S., Inc.*,
   445 F. Supp. 3d 665 (C.D. Cal. 2020) ...................................5, 6, 10, 13, 16, 19

*Steering Comm. v. United States*,
  6 F.3d 572 (9th Cir. 1993) .................................................................. 5, 9, 16

*Sterk v. Redbox Automated Retail, LLC*,
  672 F.3d 535 (7th Cir. 2012) ...................................................................... 14

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) ........................................................................ 17

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................................ 18

*Wilson v. Bernstock*,
  195 F. Supp. 2d 619 (D.N.J. 2002) .............................................................. 12

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
  516 U.S. 199 (1996) ...................................................................................... 5

## Statutes

28 U.S.C. § 1292(b) ........................................................ 1, 2, 5, 6, 7, 9, 13, 14, 16, 19

## Other Authorities

C. Wright, A. Miller, & E. Cooper, 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. 2021) .......... 1, 5, 7

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This Court should certify its order granting in part Plaintiff Glen Littleton's motion for partial summary judgment (ECF 387, the "Order") for interlocutory review under 28 U.S.C. § 1292(b). The Order presents two controlling questions of law as to which substantial ground for difference of opinion exists, and the resolution of either question would materially advance the ultimate termination of the litigation.

*First*, the Court's grant of summary judgment for Plaintiff on falsity and scienter while denying summary judgment on reliance presents a controlling question of law as to whether the same standard for assessing materiality applies to each of these three elements. Specifically, in denying summary judgment on reliance, which Mr. Littleton sought pursuant to a fraud-on-the-market theory, the Court correctly ruled that triable issues of fact exist with respect to whether the August 7 tweets "actually affect[ed] the market price" of Tesla shares (ECF 387 at 32). While the Court assumed, without ruling on, the materiality of the statements for purposes of its price impact ruling, there can be no doubt that a factual dispute as to price impact means that materiality is also in factual dispute. *See Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 464 (2013) (It is "uncontroversial" that the "definition" of "immaterial misrepresentations and omissions" are misrepresentations and omissions that do "not affect . . . stock price[s] in an efficient market.") (internal quotations omitted); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 278 (2014). Accordingly, the Court's ruling necessarily decided that the materiality of the August 7 statements is in factual dispute for purposes of reliance.

But materiality also is necessary to establish falsity and scienter. The Supreme Court has held that the element of falsity is satisfied only by "a *material* misrepresentation or omission." *Dura Pharma, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (emphasis added). Likewise, numerous courts have held that knowledge that a statement is false is insufficient to establish scienter, which requires knowledge or reckless disregard of purported misstatements or omissions of "*material* facts." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) (scienter satisfied by "a reckless omission of *material* facts"). And the Supreme Court has instructed that the standard of

materiality is the same for the falsity element and the reliance element in a case employing the fraud-on-the-market presumption, *see Amgen*, 568 U.S. at 459-60, 467, and the same follows necessarily for the scienter element.

Accordingly, this Court's determination that Mr. Littleton has established falsity and scienter as a matter of law cannot be reconciled with its determination that a question of fact exists as to price impact and thus as to materiality for purposes of reliance. Interlocutory review is thus appropriate on the controlling question of law whether falsity and scienter encompass the same materiality requirement as reliance in a Section 10(b) case. Resolution of this issue is needed to ensure the Court's Order accords with the weight of authority, including Supreme Court and Circuit precedent. That the Court's Order directly conflicts with the holdings of numerous courts of appeals and district courts that scienter and falsity require a finding of materiality indicates a substantial ground for disagreement on this issue. And resolution of this controlling legal question now would significantly advance the termination of the litigation because it would prevent the waste of judicial and party resources that would occur if the case is tried on a legally incorrect theory, only to result in an appeal and potential retrial after final judgment.

*Second*, an independent, controlling question of law exists as to whether the Court must consider the forum of the statement (in this case Twitter) when assessing whether the statement was materially misleading. Here, in assessing falsity, the Court parsed the individual phrases of the various tweets and indicated certain other information should have accompanied the tweets, even though the short-form Twitter medium limits the number of characters per tweet. There exists not only substantial ground for difference of opinion here, given that courts generally have held that context must be considered when determining falsity, but also a novel and difficult question of first impression as to whether the fact that a purported misstatement was made on social media (as opposed to, for example, in regulatory filings) must be considered as part of the context in analyzing whether a statement was materially misleading under the federal securities laws. This question satisfies the requirements for Section 1292(b) review for all the same reasons as stated above for the first question.

1     Defendants are concurrently filing with the Court a motion pursuant to Civ. L.R. 7-9 for

2  leave to seek reconsideration of the Court's Order, ECF 401, that, if granted, may well address the

3  inconsistency between the reliance ruling and the falsity and scienter ruling and thus moot

4  Defendants' request for interlocutory appellate review.  If the Court does not grant reconsideration

5  of its Order, however, the above controlling legal issues should be resolved on interlocutory appeal

6  before trial to avoid unnecessary expense and waste of the Court's and the parties' time.

7     Defendants do not seek interlocutory appeal for purposes of delay; to the contrary,

8  Defendants are not seeking a stay of the scheduled January 2023 trial, and anticipate proceeding

9  expeditiously to obtain resolution from the Ninth Circuit before trial, such that the parties may

10 continue with their pre-trial preparations while the interlocutory appeal is pending.

11                                  **BACKGROUND**

12    In its Order granting in part Mr. Littleton's motion for partial summary judgment, the Court

13 ruled that Mr. Littleton had established falsity and scienter as a matter of law for three of Mr.

14 Musk's statements on Twitter but denied the Plaintiff's motion for summary judgment as to a fourth

15 statement and the element of reliance.  Specifically, the Order concluded that the statements

16 contained in three August 7 tweets—"funding secure," "investor support is confirmed," and "only

17 reason why this is not certain is that it's contingent on a shareholder vote"—were, as a matter of

18 law, false and misleading and made with the requisite scienter.  (ECF 387 at 21-30.)  In granting

19 summary judgment as to falsity, the Court parsed each tweet into separate phrases and analyzed

20 those phrases apart from the remainder of the individual tweet, (*id*. at 21-30), as it had determined

21 was appropriate at the motion to dismiss stage, (ECF 251 at 21-24).

22    In granting summary judgment as to scienter for each purported misrepresentation, the

23 Court determined that "a reasonable jury could reach only one conclusion—*i.e.*, that Mr. Musk

24 recklessly tweeted to the public." (ECF 387 at 26.)  The Court based this determination on the fact

25 that "Mr. Musk knew all of the facts relating to Tesla's interaction with the PIF … [a]nd when a

26 defendant is aware of the facts that made the statement misleading, he cannot ignore the facts and

27 plead ignorance of the risk of misleading others." (*Id.*)  This Court thus concluded that a reasonable

28 jury would be compelled to find that Mr. Musk acted with scienter because Mr. Musk knew the

1    statements to be false.  The Court did not specifically analyze in connection with its falsity and

2    scienter findings whether the tweets contained misstatements or omissions of a *material* fact.

3         Only later, in the context of the reliance element, did the Court specifically assess

4    materiality.  There, the Court stated that, "[f]or purposes of the pending motion, the Court assumes

5    that the three statements at issue were material" (*id.* at 32)—indicating that the Court had not

6    decided whether the three statements as to which it granted summary judgment on falsity and

7    scienter were material.  Then, the Court denied Mr. Littleton's motion for summary judgment on

8    reliance, concluding that "there is a question of fact precluding summary judgment because, as

9    Defendants have noted, there is evidence suggesting that the misrepresentations did not actually

10   affect the market price."  (*Id.*)  Thus, in the context of reliance, the Court ruled that a triable issue

11   of fact exists as to the price impact of the August 7 tweets:  "Specifically, there is evidence that,

12   after the 8/13/2018 blog post, which served as a partial corrective disclosure, there was no decline

13   or at least not a significant decline in stock price; thus, arguably, the reaction to the tweets on

14   8/7/2018 was a response to Mr. Musk contemplating taking Tesla private and not to statements that,

15   *e.g.*, funding was secured or investor support confirmed."  (*Id.*)  The Court did not address

16   controlling law holding that price impact and materiality are virtually synonymous in a securities

17   case employing the fraud-on-the-market presumption.

18        As set forth in Defendants' concurrently filed motion for reconsideration, (ECF 401), the

19   Court's denial of summary judgment on reliance, which necessarily finds a triable issue of fact on

20   materiality for reliance purposes, also means that a triable issue of fact exists as to the materiality

21   portion of the first element (misstatement or omission of a material fact) and the second element

22   (scienter, that is knowledge or reckless disregard as to the falsity of a material fact).[1]

23                                   **LEGAL STANDARD**

24        A district court may certify an order for interlocutory appeal where the order involves "a

25   controlling question of law," "as to which there is substantial ground for difference of opinion,"

26

---

27   [1]  As addressed in Defendants' concurrently filed motion for reconsideration (ECF 401), to the
     extent the Court granted summary judgment on falsity and scienter *without* having determined
28   materiality as to those elements, such grant of summary judgment is legal error that requires
     reconsideration.

such "that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). When a party requests certification on several bases, the Court "need not" decide whether each ground meets the Section 1292(b) standard; rather "if there is one question supporting certification, then the entire order is certified for appeal." *Nat'l Ass'n of Afr.-Am. Owned Media v. Charter Commc'ns, Inc.,* No. CV 16-609-GW(FFMX), 2016 WL 10647193, at *4 (C.D. Cal. Dec. 12, 2016) (emphasis in original) (citing *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996)).

"A controlling question of law" exists where there is a legal question that the appellate court can decide. *Steering Comm. v. United States*, 6 F.3d 572, 575–76 (9th Cir. 1993); *see also Hawaii ex rel. Louie v. JP Morgan Chase & Co*., 921 F. Supp. 2d 1059, 1065 (D. Haw. 2013) (collecting cases) (granting certification where "legal issues are at the heart of Plaintiff's proposed interlocutory appeal"). Even where the district court "received evidence" related to factual issues or the order concerns mixed questions of law and fact, a controlling issue of law exists where the order "implicate[s] fundamental legal questions." *T.P. by & through S.P. v. Walt Disney Parks & Resorts U.S., Inc.*, 445 F. Supp. 3d 665, 670 (C.D. Cal. 2020) (certifying question "whether it is 'necessary' under the ADA for an amusement park to accommodate customers with cognitive disabilities by substantially reducing wait times that cause stress and anxiety," and rejecting argument that the question was one of fact).

"A question of law is 'controlling' if the resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *FERC v. Vitol Inc.*, No. 2:20-CV-00040-KJM-AC, 2022 WL 583998, at *2 (E.D. Cal. Feb. 25, 2022) (quotation omitted). "There is no doubt that a question is 'controlling' if its incorrect disposition would require reversal of a final judgment, either for further proceedings or for a dismissal that might have been ordered without the ensuing district-court proceedings." C. Wright, A. Miller, & E. Cooper, 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. 2021). And a question can be "controlling" even if dismissal would not automatically result from reversal of the order; certification is warranted "if interlocutory reversal might save time for the district court, and time and expense for the litigants." *Id.*; *see also Nat'l Ass'n.*, 2016 WL

DEFENDANTS' MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b)

10647193, at *4 ("[R]eversal of the underlying order need not terminate the litigation in order to satisfy this requirement.").

There exists "substantial ground for difference of opinion" as to an identified controlling question of law where "reasonable jurists might disagree on an issue's resolution, not merely where they have already disagreed," and such "uncertainty provides a credible basis for a difference of opinion" on the issue. *Reese v. BP Exploration (Alaska) Inc*., 643 F.3d 681, 688 (9th Cir. 2011) (quotation omitted) (holding Section 1292(b) certification in securities class action proper). Thus, "[c]ourts traditionally will find that a substantial ground for difference of opinion exists where ... novel and difficult questions of first impression are presented." *Id*. (quotation omitted). "[W]hen novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent." *Id*.; *see also Jang v. Bos. Sci. Corp*., No. EDCV05426VAPMRWX, 2014 WL 12787228, at *6 (C.D. Cal. Apr. 18, 2014) (granting certification, holding there can be a substantial ground for difference of opinion where there is "paucity of law surrounding the issue") (citation omitted).

There is also substantial ground for difference of opinion where "controlling law is unclear," for example "where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Hawaii ex rel. Louie*, 921 F. Supp. 2d at 1066–67 (citation and quotation omitted). "In sum, [where] there are legal issues that are neither easy to decide nor well-settled … [the court will] find[] that there is substantial ground for a difference of opinion regarding the questions of law." *Id*.; *see also Jang*, 2014 WL 12787228, at *6 ("Substantial grounds for difference of opinion may also exist where there can be two different, but plausible, interpretations of a line of cases.") (quotation omitted).

A party may show "that an immediate appeal from the order may materially advance the ultimate termination of the litigation" where failing to certify the order "would result in wasted litigation and expense." *T.P. by & through S.P.*, 445 F. Supp. 3d at 668. "[N]either § 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive

effect on the litigation, only that it 'may materially advance' the litigation." *Reese*, 643 F.3d at 688. Rather, where "[r]egardless of the outcome, an interlocutory appeal will expedite future proceedings," certification is appropriate. *T.P. by & through S.P.*, 445 F. Supp. 3d at 671 ("It would be a significant and needless waste of the Court and the parties' resources to proceed through additional bellwether phases only to face reversal on a common issue of law. The Court would be forced to re-adjudicate every phase of this action, which could easily take another five years. The Court hopes to avoid this risk of unnecessary litigation."); *see also* 16 C. Wright & A. Miller, Fed. Prac. & Proc. § 3930 (3d ed. 2018) ("The requirement that an appeal may materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law.").

## **ARGUMENT**

## **I.    THE COURT SHOULD GRANT CERTIFICATION ON THE CONTROLLING LEGAL QUESTION WHETHER THE STANDARD FOR THE MATERIALITY OF A STATEMENT IS THE SAME FOR PURPOSES OF FALSITY, SCIENTER, AND RELIANCE**

This Court should grant interlocutory review of its Order because the Court's conclusions on scienter and falsity cannot be reconciled with its reliance ruling and the law of courts in this district, other circuits, and the Supreme Court. Both falsity and scienter require the existence of a *material* misstatement. If the same standard for assessing materiality applies to falsity, scienter, and reliance, then a court should not grant summary judgment as to falsity and scienter while a dispute as to materiality still exists affecting the reliance element. The issue whether the materiality standard is the same across all three elements thus presents "a controlling question of law as to which there is substantial ground for difference of opinion," such that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

### **A.    Whether The Standard For Assessing Materiality For Reliance Differs From The Standard For Assessing Materiality For Falsity And Scienter Presents A Controlling Question Of Law**

At the threshold, whether the same standard for assessing materiality applies to the elements of falsity, scienter, and reliance in the context of a Section 10(b) claim presents a pure issue of law appropriate for interlocutory review.

The Order's denial of Plaintiff's motion for summary judgment on reliance necessarily recognized a dispute of fact as to materiality.  Specifically, Plaintiff sought summary judgment on reliance on the fraud-on-the-market theory (*see* ECF 387 at 30-31), which requires Plaintiff to establish materiality, *see Amgen*, 568 U.S. at 466-67 ("materiality is an essential predicate on the fraud-on-the-market theory").  The Supreme Court has instructed that the materiality showing necessary to establish falsity is identical to the materiality showing necessary to establish the fraud-on-the-market theory.  *Id.* at 459-60.  The same necessarily follows for scienter.

Here, the Order denied summary judgment on reliance because "there is evidence suggesting that the misrepresentations did not actually affect the market price."  (ECF 387 at 32.)  While the Court reserved explicit decision on the question of materiality (*id.*), the Court's denial of summary judgment on reliance on the basis of evidence disproving price impact amounts to a determination that the materiality component of the fraud-on-the-market theory was not satisfied as a matter of law.  That is because, as the Supreme Court has explained, the requirement to show materiality for purposes of invoking the fraud-on-the-market presumption is "directed at price impact—whether the alleged misrepresentations affected the market price in the first place." *Halliburton*, 573 U.S. at 278 (internal quotation marks omitted).  The Order thus necessarily recognized a dispute of fact as to materiality in the context of reliance.  (*See also* ECF 387 at 32 ("[T]here is evidence to support materiality.").)

Although the Order did not address the materiality of the purported misstatements and omissions in granting summary judgment on falsity and scienter as to the three August 7 tweets, *see id.* at 21-30, a grant of summary judgment as to both elements for the three August 7 tweets necessarily requires the Court to conclude the alleged misstatements were material to investors.  The element of falsity can be satisfied only by "a *material* misrepresentation or omission," *Dura*, 544 U.S. at 341, and thus a plaintiff must show that "the defendant made a statement that was 'misleading as to a *material* fact,'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (emphasis added)).  Scienter likewise requires materiality:  under governing law, "[a] person possesses the requisite scienter if the person either deliberately misrepresents or omits *material* information, or acts recklessly, *i.e.*, if the person

1   had reasonable grounds to believe *material* facts existed that were misstated or omitted, but

2   nonetheless failed to obtain and disclose such facts although they could have done so without

3   extraordinary effort." *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (emphasis

4   added) (citation and quotation omitted); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 701

5   (scienter satisfied by "a reckless omission of *material* facts" (quotation omitted)). Accordingly, to

6   establish falsity and scienter, "[a] plaintiff must provide evidence showing not only that a statement

7   or omission was false or misleading, but also that it was made in reference to a matter of material

8   interest to investors." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,

9   632 F.3d 751, 753 (1st Cir. 2011) ("If it is questionable whether a fact is material … that tends to

10  undercut the argument that defendants acted with the requisite intent.").

11          Under any interpretation of this Court's Order—either that (i) the Court found materiality

12  in deciding falsity and scienter as a matter of law but applied a different standard of materiality in

13  the context of reliance or that (ii) the Court did not find materiality but nonetheless found falsity

14  and scienter established as a matter of law—a controlling question of law exists under Section

15  1292(b). Specifically, the Supreme Court held in *Amgen* that proving a material misrepresentation

16  or omission under the falsity element requires the very same proof as is needed to invoke the fraud-

17  on-the-market presumption under the reliance element. *See Amgen*, 568 U.S. at 459-60, 466-67. It

18  was on that basis that the Court held that materiality need not be proved at the class-certification

19  stage: Because a failure of proof on materiality will defeat the Section 10(b) claim on the merits

20  under the first element of falsity, there is no risk that a failure to prove materiality as a prerequisite

21  to the fraud-on-the-market theory would cause individual reliance issues to predominate at trial.

22  *Id.*

23          The question of whether the same materiality standard applies to all three elements—falsity,

24  scienter, and reliance— thus constitutes a controlling question of law. If the Ninth Circuit were to

25  hold that this Court improperly distinguished between the materiality necessary to establish scienter

26  and falsity and the materiality necessary for a plaintiff to avail itself of the fraud-on-the-market

27  theory, the Order's grant of summary judgment on scienter and falsity would be reversed. The

28  Ninth Circuit has recognized that similar potential errors regarding the legal definition of an

element of a claim constitute controlling questions of law.  *See, e.g.*, *Steering Comm.*, 6 F.3d at 575 ("Whether the district court failed to articulate the appropriate standard of conduct for pilots under the federal aviation regulations is a question of law appropriate for interlocutory appeal.").  That is because errors in formulating the correct legal standard at summary judgment often will result in reversal after final judgment and then require a new trial.  *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 773 (9th Cir. 1981) ("Having concluded that the district court erred in granting summary judgment … it is necessary to remand for a new trial.").  This alone compels a finding of a controlling question of law.  *Casas v. Victoria's Secret Stores, LLC*, No. CV 14-6412-GW(VBKX), 2015 WL 13446989, at *2 (C.D. Cal. Apr. 9, 2015) (controlling question of law exists where issue, "if wrongly decided by this Court, will require at least partial reversal").  Moreover, the question of the correct standard for assessing materiality in connection with a Section 10(b) claim "implicate[s] [a] fundamental legal question[]," *T.P. by & through S.P.*, 445 F. Supp. 3d at 670, and therefore qualifies as a controlling issue of law.

Thus, the question of whether falsity and scienter must encompass a finding of materiality under the same standard as materiality for purposes of reliance presents a pure issue of law appropriate for interlocutory review.  *See, e.g.*, *S.E.C. v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108, 1132 (S.D. Cal. 2009) ("The primary issue in dispute is whether, as a matter of law, Furman made material misrepresentations or omissions with scienter.").  Although the application of the standard to a particular case is "fact-specific" and "should ordinarily be left to the trier of fact," *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir. 1989), the legal framework for analyzing materiality within the elements of scienter, falsity, and reliance is a pure and here controlling question of law, *see Freeman v. Gonzales*, 444 F.3d 1031, 1037 (9th Cir. 2006) (the proper definition of statutory term is a "purely legal question[]").

### B. The Court's Order Indicates Substantial Ground For Difference Of Opinion On This Question Of Law

The Court's interpretation of the applicable legal standard for materiality indicates substantial ground for difference of opinion as to whether the existence of a triable issue of fact as to materiality in the context of reliance precludes the Court's finding of scienter and falsity as a

matter of law. This Court's grant of summary judgment in favor of Mr. Littleton on falsity and scienter as to three statements—notwithstanding its later conclusion that such statements may not have been material—indicates a disagreement with other courts in this district and across the country.

At a minimum, the Supreme Court's decision in *Amgen* strongly suggests that materiality must be defined in the same way across elements of a Section 10(b) claim, such that a finding of materiality in the context of one element but not another would be internally inconsistent. 568 U.S. at 459-60. As the Supreme Court has observed, it is "uncontroversial" that the "definition" of "immaterial misrepresentations and omissions" are misrepresentations and omissions that do "not affect … stock price[s] in an efficient market." *Amgen*, 568 U.S. at 464 (internal quotation marks omitted) (describing Ninth Circuit's opinion approvingly); *see Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Alito, J.) ("[I]f a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed … was immaterial as a matter of law.'"). And, the Supreme Court has described the concepts of price impact and materiality as "overlapping," such that "the evidence relevant to one will almost always be relevant to the other." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 n.2 (2021).

To the extent this Court disagrees with such a reading of Supreme Court precedent, that disagreement only further evinces substantial ground for difference of opinion warranting interlocutory review. *See Jang*, 2014 WL 12787228, at *6 ("Substantial grounds for difference of opinion may also exist where there can be two different, but plausible, interpretations of a line of cases."). Uncertainty over the correct reading of the Supreme Court's line of cases addressing the relationship between materiality in the context of reliance under a fraud-on-the-market theory and in the context of falsity and scienter warrants certification under Section 1292(b).

Additionally, even if a court could determine at summary judgment that statements were false (that is, decide only a portion of the first element) and leave for trial any determination of materiality, such an approach still would not permit a grant of summary judgment as to scienter. Because the state of mind necessary to establish scienter also must encompass knowledge of or recklessness as to the *materiality* of the alleged misstatements, courts in this district have held on

DEFENDANTS' MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b)

multiple occasions that scienter cannot be established as a matter of law absent materiality. *See Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1143 (N.D. Cal. 2013) ("Plaintiff has … inadequately alleged the scienter requirement, because nothing suggests that [defendant] thought that he could mislead investors with the statements the Court finds were immaterial."); *Jasin v. Vivus, Inc.*, No. 14-CV-03263-BLF, 2016 WL 1570164, at *15 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018) ("Defendants argue that the SAC also fails to plead scienter … and the Court agrees …. [I]f the materiality of a particular fact is in question, that 'tends to undercut' an inference that a defendant acted with the requisite scienter.").

The law of other trial and appellate courts is in accord. *See, e.g.*, *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 639 (D.N.J. 2002) ("Knowledge or reckless disregard of the potential materiality of the information misstated or omitted is an element of scienter."); *Flannery v. S.E.C.*, 810 F.3d 1, 11-12 (1st Cir. 2015) ("This thin materiality showing cannot support a finding of scienter …."); *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001) ("The requirement of knowledge … may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999) ("When, as here, a court determines that the complaint 'fails adequately to allege that defendants' statements were [materially] false (affirmatively or through omissions), the [c]omplaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making statements.'") (alterations in original); *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1263 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016) ("[I]f it is questionable whether an omitted fact is material or its materiality is marginal, that undercuts the argument that Defendants acted with recklessness."); *In re Discovery Lab'ys Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *15 (E.D. Pa. Nov. 1, 2006) ("[T]he very fact that we were able to find the statements immaterial should demonstrate that they are not 'so obviously material' as to allow a finding of recklessness.")).

These cases all conflict with this Court's determination of scienter absent a determination as to materiality, and this Court is not alone in failing to follow this law to the contrary.[2]  Such disagreement supports Section 1292(b) certification because "[o]ne of the best indications that there are substantial grounds for disagreement on a question of law is that other courts have, in fact, disagreed."  *Rollins v. Dignity Health*, No. 13-CV-01450-TEH, 2014 WL 6693891, at *3 (N.D. Cal. Nov. 26, 2014); *see also FERC*, 2022 WL 583998, at *3 ("[T]he clear disagreement between and among the Fifth and the First and Fourth Circuits does support the defendants' motion, especially in combination with a district-court split.").  Likewise, such decisions demonstrate the need for authoritative guidance from the Ninth Circuit.  Indeed, as evidenced by the extensive body of law addressing this frequently litigated question, the "opportunity to achieve appellate resolution of an issue important to other cases" in the Ninth Circuit "provide[s] an additional reason for certification."  C. Wright, A. Miller, & E. Cooper, 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. 2021).

## C.  Certification Of This Question Will Materially Advance The Termination Of The Case

Because the Court's summary judgment decision will dictate the contours of the January 2023 trial, certification to allow the Ninth Circuit to address whether materiality may be found as to scienter and falsity but not reliance also would significantly advance the ultimate termination of the litigation.

To start, if the Ninth Circuit were to determine this Court's grant of summary judgment constituted legal error, any ensuing jury verdict in Mr. Littleton's favor would be vacated, and a new trial would be required.  Indeed, because there exists significant overlap between scienter, falsity, and the other elements of a Section 10(b) claim, a new trial as to all issues could be required.  *Lies*, 641 F.2d at 774 ("If the issues are interwoven, then a new trial as to all of the issues should be ordered.").  Thus, certification will avoid the "wasted litigation and expense" that would occur if a final judgment were to issue in Mr. Littleton's favor, only to be vacated for retrial due to the improper grant of summary judgment.  *T.P. by & through S.P.*, 445 F. Supp. 3d at 668 (quotation

---

[2]  *See, e.g.*, *In re Am. Apparel, Inc. S'holder Litig.*, No. CV1006352MMMRCX, 2013 WL 10914316, at *16 (C.D. Cal. Aug. 8, 2013) (scienter exists where "press release[s] were false and that, based on the totality of the circumstances, management would have known they were false").

omitted); *see also FERC*, 2022 WL 583998, at *4 ("An interlocutory appeal materially advances the ultimate resolution of litigation if it avoids protracted and expensive litigation."). Moreover, resolution will "alter the direction of the current proceedings" because the arguments that the parties will present at trial, and the Court's trial rulings and instructions to the jury, will turn on the scope of the summary judgment order, which further favors certification. *Casas*, 2015 WL 13446989, at *5.

Finally, a definitive ruling from the Ninth Circuit on the scope of Mr. Littleton's burden as to materiality in the context of falsity and scienter is particularly likely to advance the ultimate termination of this class action litigation because, "in class actions, uncertainty over a key claim's status may delay settlement [and] almost all class actions are settled." *Id.* at *3 (quoting *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012)). "That is enough to satisfy the 'may materially advance' clause of section 1292(b)." *Id.* (quotation omitted); *see also S.E.C. v. Mercury Interactive, LLC.*, No. 5:07-CV-02822-JF, 2011 WL 1335733, at *3 (N.D. Cal. Apr. 7, 2011) (granting certification where "final resolution as to the scope of the statute would have a significant effect on the trial of this action, and perhaps upon the parties' efforts to reach settlement"); *FERC*, 2022 WL 583998, at *4 ("[E]ven if a decision in [defendants'] favor on appeal does not end the litigation, it would "dramatically alter the stakes," such that "a finding may increase the chance of settlement, which would resolve the litigation.").[3]

## II.   THE COURT SHOULD GRANT CERTIFICATION AS TO THE QUESTION WHETHER A COURT MUST CONSIDER THE FORUM IN ASSESSING FALSITY AND SCIENTER

Independently, a controlling question of law exists as to whether a court must consider the forum in which a statement was made as part of the context for assessing falsity. Although courts generally have held that context must be considered in analyzing falsity, courts thus far have not addressed how, if at all, statements made on social media should be weighed in comparison to formal statements made in, for example, in regulatory filings. This issue is of critical importance

---

[3]   That the litigation would proceed to trial even if the Ninth Circuit reverses this Court's grant of summary judgment does not preclude certification. Neither "§ 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive effect on the litigation." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011).

1    in this case because the challenged statements appeared on Twitter where users are limited to a

2    certain number of characters per tweet.  Whether social media posts fundamentally differ from

3    more formal methods companies use to disclose information about their securities, *e.g.*, regulatory

4    filings, and therefore whether courts must consider the forum on which statements are made as part

5    of the context analysis is an open legal question that the Ninth Circuit should resolve.

### A.   Whether The Court Must Consider The Forum In Assessing Falsity And Scienter Presents A Controlling Question Of Law

8         Whether and to what extent courts must consider the forum (in particular, that an allegedly

9    false statement was made on social media as opposed to in a regulatory filing or other traditional

10   means of communicating information to investors about a security) when determining falsity and

11   scienter for the purposes of a Section 10(b) claim presents a controlling question of law.  The Court

12   granted summary judgment to Mr. Littleton on the element of falsity and scienter as to three of the

13   statements at issue:  (1) the "Funding secured" portion of Mr. Musk's August 7, 2018 tweet stating

14   "Am considering taking Tesla private at $420. Funding secured."; (2) the portion of another of Mr.

15   Musk's August 7, 2018 tweets stating "Investor support is confirmed."; and (3) another portion of

16   that same tweet stating "Only reason why this is not certain is that it's contingent on a shareholder

17   vote."  (ECF 387 at 23-29.)  The Court determined that no reasonable jury could find these

18   statements were not false, and thus concluded that the statements are false as a matter of law.  (*Id.*)

19   The Court did not conduct any analysis as to how the fact that these statements were made on

20   Twitter affects the falsity analysis, or consider more broadly whether the forum where an allegedly

21   false statements is made is properly part of the context analysis, having rejected such arguments at

22   the motion to dismiss stage.  (ECF 251 at 23 (holding "[t]hat funding was 'secured' may reasonably

23   be interpreted as a standalone representation")).)  The Court reached a similar conclusion as to

24   scienter, finding that "a reasonable jury could reach only one conclusion – *i.e.*, that Mr. Musk

25   recklessly tweeted to the public" as to all three tweets.  (ECF 387 26; *see id.* at 27, 29.)  Again, the

26   Court omitted to consider how the Twitter context bears on scienter.

27        The question of the manner in which the forum should be incorporated into the falsity and

28   scienter analysis presents a purely legal question that does not depend on the facts of this particular

case, but the resolution of which could have an immediate impact on this case.  *Steering Comm.*, 6 F.3d 572, 575-76.  Whether courts must consider the forum in which an allegedly false statement was made—in particular whether courts must consider unique features of social media and/or Twitter posts when considering context for the purpose of a falsity and scienter determination in a securities fraud case—establishes the standard by which the falsity and scienter of such statements should be assessed.  If the question is certified and the Ninth Circuit decides the falsity analysis must consider the different characteristics of social media as a means for conveying information and the public's receipt of such information, the Court will at a minimum be required to reconsider its summary judgment order, which could lead to the Court returning the questions of falsity and scienter to the jury.  This question thus "implicate[s] fundamental legal questions."  *T.P. by & through S.P.*, 445 F. Supp. 3d at 670.  Moreover, if the Ninth Circuit holds after any final judgment that the standard for assessing falsity and scienter differs for statements made on social media, such a holding potentially would require vacatur and the expense and burden of a new trial.  This is sufficient to satisfy the "controlling question of law" prong of Section 1292(b)'s requirements.  *See Lies*, 641 F.2d at 773 ("Having concluded that the district court erred in granting summary judgment … it is necessary to remand for a new trial."); *Casas*, 2015 WL 13446989, at *2 (controlling question of law exists where issue, "if wrongly decided by this Court, will require at least partial reversal").

**B.**     **There Is Substantial Ground For Difference Of Opinion On This Question Of Law**

This question meets the requirement of substantial ground for difference of opinion because it presents an issue of first impression.  As the Court correctly explained in the Order, courts "must first take into account the full context" of the statement at issue when determining falsity.  (ECF 387 at 27 (relying on *McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576, 579 (2d Cir. 1990), as "indicating that statements should not be taken in isolation; asking 'whether defendants' representations, taken together and in context, would have mislead a reasonable investor,'" and *In re Convergent Techs. Sec. Lit.*, 948 F.2d 507, 512 (9th Cir. 1991), as "noting that '[s]ome statements, although literally accurate, can become, through their context and manner of

presentation, devices which mislead investors.").)  The same contextual inquiry is required for scienter.  But reasonable jurists may well disagree whether and to what extent a court must consider as part of the context for assessing falsity and scienter the fact that the allegedly false statement was posted on social media.

As an initial matter, it is clear, and this Court agrees (ECF 387 at 27), that that context generally is a necessary part of the falsity analysis.  *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) (holding statements non-actionable where the "statement in full and in context at the time" acknowledged uncertainty); *In re Convergent*, 948 F.2d at 512 (holding "the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression"); *In re Intel Corp. Sec. Litig.,* No. 18-CV-00507-YGR, 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019) ("plaintiff must demonstrate that a particular statement, when *read in light of all the information then available* to the market ... conveyed a false or misleading impression" and finding the "relevant context undermines plaintiff's allegations of falsity") (quotations omitted; emphasis in original).

A statement made in a social media post is clearly different from a statement made in a formal regulatory filing.  Twitter is an informal social media platform offering users only a few hundred characters within which to make a statement.  Users frequently engage in casual back-and-forth dialogue via these short messages, share memes and photos, and connect with other users with similar interests.  Yet, in its Order, the Court suggested that more detailed information would have been required to render the statement not false and misleading, such as information concerning the meaning of funding secured and the details of the state of funding, details as to what support from the Saudi PIF had been obtained, and details as to all of the various contingencies that had to be addressed before taking Tesla private.  (ECF 387 at 25-29.)  While such inquiries might be appropriate for a regulatory filing, it is an open question whether requiring such detailed information is consistent with the short-form format of Twitter, and whether Twitter users would expect such detailed information to be contained in a tweet.  Such considerations weigh in favor of

an appellate determination whether to adopt a standard that specifically includes the forum as part of the context analysis for assessing the falsity element of a Section 10(b) claim.

In other legal contexts, such as in defamation jurisprudence, courts have recognized the unique nature of social media posts. For example, in *Ganske v. Mensch*, the court explained that, "[i]n analyzing the unique context of statements made on Internet fora, courts have emphasized the generally informal and unedited nature of these communications." 480 F. Supp. 3d 542, 553 (S.D.N.Y 2020) ("Like the other Internet fora discussed in the above-cited cases, Twitter's forum is equally—if not more—informal and freewheeling.") (quotation omitted); *see also Murray v. Pronto Installations, Inc.*, No. 8:20-CR-824-T-24AEP, 2020 WL 6728812, at *5 (M.D. Fla. Nov. 16, 2020) (considering the "informal nature of social media pages, like Facebook" in dismissing defamation claim). In contrast, courts generally have recognized the "formality and legal weight of documents filed with the SEC." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (affirming dismissal of Section 10(b) claims). Thus, the Ninth Circuit could well conclude that, as part of the falsity and scienter analysis for Section 10(b) claims, courts similarly should consider the "unique context of statements made on Internet fora," including that "Twitter's forum is … informal and freewheeling." *Ganske*, 480 F. Supp. 3d at 553 (quotation omitted).

Defendants have not identified any cases directly addressing the question whether a statement's social media forum must be considered as part of the context analysis in Section 10(b) claims, which is precisely why the Court's Order should be certified for interlocutory appeal. "[C]ourts traditionally will find that a substantial ground for difference of opinion exists where [] novel and difficult questions of first impression are presented, as is the case here." *Reese*, 643 F.3d at 688 (quotations omitted). Thus, "[c]ourts traditionally will find ... a substantial ground for difference of opinion" if the controlling question presents a "novel and difficult question[] of first impression[.]" *Id.* Put another way, a "substantial ground for difference of opinion exists where reasonable jurists *might* disagree on an issue's resolution, not merely where they have *already* disagreed." *Id.* (emphasis added); *see also Casas*, 2015 WL 13446989, at *2 ("[N]ovel question" for which "neither the parties nor the Court located a single on-point case" presents "an issue upon which reasonable jurists could differ."). So too here: it is obvious that

context matters for Section 10(b) claims; however, it is an open question whether and to what extent the forum of the alleged misstatement (namely, a social media post as opposed to a formal securities filing) must be considered when determining the falsity and scienter in a securities fraud case.

## C.  Certification Of This Question Will Materially Advance The Termination Of The Case

Resolution of this issue will materially advance the termination of this litigation because, if the Ninth Circuit determines that the standard that applies to the Court's analysis must account for the fact that the statements were made on Twitter, such a ruling would potentially require reversal and retrial where the questions of falsity and scienter are considered specifically in the Twitter context.  Resolving this issue now will properly delineate the scope of the case and will allow the parties to try the case properly the first time.  *Casas*, 2015 WL 13446989, at *5 (certification appropriate where resolution will "alter the direction of the current proceedings" because the arguments that the parties will present at trial turn on the scope of the summary judgment order).  Forcing the parties to try the case with this open question, only to retry the case in several years' time should the Court improperly bar references to the Twitter context, would be a waste of resources and a waste of this Court's time.  *T.P. by & through S.P.*, 445 F. Supp. 3d at 668; *see also FERC*, 2022 WL 583998, at *4 ("An interlocutory appeal materially advances the ultimate resolution of litigation if it avoids protracted and expensive litigation.").  Finally, that this is a class action further favors certification for interlocutory review, because most class actions settle and settlement is far more likely to occur where the parties have received clear instruction on the status of key claims.  *See supra*, at 14.

## III.  CONCLUSION

For the reasons set forth above, Defendants respectfully requests that the Court grant the motion to certify the Order for interlocutory appeal under 28 U.S.C. § 1292(b), unless the Court grants reconsideration and modifies its Order pursuant to Defendants' concurrently filed request in ECF 401.

DATED:  April 22, 2022          Respectfully submitted,

                                QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                By: */s/ Kathleen Sullivan*
                                    Kathleen M. Sullivan
                                    *Attorneys for Tesla, Inc., Elon Musk, Brad W. Buss,*
                                    *Robyn Denholm, Ira Ehrenpreis, Antonio J. Gracias,*
                                    *James Murdoch, Kimbal Musk, And Linda Johnson Rice*

**EXHIBIT C**

*United States Securities and Exchange Commission v. Musk*, Case No. 1:18-cv-08865-LJL
(S.D.N.Y. April 27, 2022)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                    :

UNITED STATES SECURITIES AND      :
EXCHANGE COMMISSION,                :
                                      :

                     Plaintiff,       :           18-cv-8865 (LJL)
                                      :

          -v-                   :         OPINION AND ORDER
                                      :

ELON MUSK,                     :
                                      :

                    Defendant.     :
                                      :
------------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: _04/27/2022__            │
└─────────────────────────────────────┘
```

LEWIS J. LIMAN, United States District Judge:

      Defendant Elon Musk ("Musk") moves for an order quashing certain portions of an

administrative subpoena issued by Plaintiff, the United States Securities and Exchange

Commission ("SEC") and terminating the consent decree he previously entered into with the

SEC.  Dkt. No. 70.

      For the following reasons, the motion is denied.

## BACKGROUND

### I.    The SEC Action and the Consent Decree

      Defendant Musk is a party to a final judgment entered by the Court on October 16, 2018,

Dkt. No. 14, after the SEC charged him in a complaint filed on September 27, 2018 with

violating Section 10(b)(5) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15

U.S.C. § 78u, and Rule 10b-5 promulgated thereunder, Dkt. No. 1.  The complaint alleged that

Musk published a series of false and misleading statements to millions of people, including

members of the press, using the social media platform Twitter.  In particular, the SEC alleged

that in August 2018, Musk tweeted to his then over twenty-two million Twitter followers that he

could take Tesla, Inc. ("Tesla") private at $420 per share (a substantial premium to its trading price at the time), that funding for the transaction had been secured, and that the only remaining uncertainty was a shareholder vote.  The tweet allegedly was false:  Musk had not discussed specific deal terms with any potential financing partners, and he knew the potential transaction was uncertain and subject to numerous contingencies.  His tweets caused Tesla's stock price to jump by over six percent on August 7, 2018 and led to significant market disruption.

The judgment, which was filed with Musk's consent, permanently enjoined him from violating Section 10(b) of the Exchange Act and Rule 10b-5 and ordered him to pay a civil penalty of $20 million.  Dkt. No. 14 (the "Musk Consent") ¶¶ 2(a)–(b).  It also ordered him to comply with a series of undertakings.  *Id.* ¶ 2(c).  In particular, Musk agreed to resign from his role as Chairman of the Board of Directors of Tesla and not to seek or accept an appointment as Chairman for a period of three years thereafter, *id.* ¶ 5(a); to comply with all mandatory procedures implemented by Tesla regarding (i) the oversight of communications relating to Tesla made in any format including posts on social media (*e.g.*, Twitter) and on Tesla's website; and (ii) the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders, *id.* ¶ 5(b); and to certify in writing his compliance with the first undertaking set forth above, *id.* ¶ 5(c).[1]  The judgment recited that Musk "enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the [SEC] or any member, officer, employee, agent, or representative of [the SEC] to induce [Musk] to enter into this Consent."  *Id.* ¶ 8.  The Musk Consent reflected the mutual understanding that it "resolve[d] only the claims asserted against

---

[1] The judgment also permits the SEC to "make reasonable requests for further evidence" that Musk has complied with his obligations and requires Musk to provide such evidence.  *Id.* ¶ 5(c).

[Musk] in th[e] civil proceeding." *Id.* ¶ 12. Further, as part of the settlement, Musk agreed not to "take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis" as well as not to "make or permit to be made any public statement to the effect that [Musk] d[id] not admit the allegations of the complaint, or that th[e] Consent contains no admission of the allegations, without also stating that [Musk] d[id] not deny the allegations." *Id.* ¶ 13. In the common vernacular, Musk agreed not to deny the allegations of the complaint.

At the same time, Tesla agreed to a consent judgment against it (the "Tesla Consent"). *Securities and Exchange Commission v. Tesla, Inc.*, 18-cv-08947-LJL (S.D.N.Y.), ECF No. 14. The Tesla Consent contained the requirement that Tesla implement mandatory procedures to oversee and pre-approve Musk's Tesla-related written communications made in any format including but not limited to Twitter posts that reasonably could contain information material to the company or its shareholders. *Id.* ¶ 6(d). The judgment further required that Tesla set forth in its disclosure policies and procedures "the definition of, and the process to determine, which of [Musk's] communications contained or reasonably could contain, information material to [Tesla] or its shareholders." *Id.*

In February 2019, within months of the entry of the consent judgments and on the SEC's application, the Court issued an order requiring Musk to show cause why he should not be held in contempt of the Court's judgment, Dkt. No. 19, after Musk tweeted: "Tesla made 0 cars in 2011, but will make around 500k in 2019," without seeking or receiving pre-approval, Dkt. No. 18 at 5. The tweet had to be corrected by a second, pre-approved tweet several hours later: "Meant to say annualized production rate at end of 2019 probably around 500k, ie 10k cars/week. Deliveries for year estimated to be about 400k." *Id.* The SEC alleged that the first

statement was inaccurate and that it was disseminated to over twenty-four million people.  *Id.* at
1.  Approval of the tweet was required by Tesla's Senior Executives Communications Policy
(Dec. 11, 2018), which defined the written communications requiring approval to include
"projections, forecasts, or estimates regarding Tesla's business."[2]  Dkt. No. 18-1 at 1.  The Court
ordered the parties to meet and confer in an effort to resolve the pending motion and to agree
upon modifications to the consent judgment and Tesla's Senior Executives Communications
Policy, Dkt. No. 39; the parties then submitted a consent motion to modify the final judgment to
require Musk to obtain pre-approval by an experienced securities lawyer employed by the
Company of any one of a series of types of written communications, including "events regarding
the Company's securities (including Musk's acquisition or disposition of the Company's
securities)" and "any event requiring the filing of a Form 8-K by the Company with the
Securities and Exchange Commission."  Dkt. No. 46.

## II.    The Instant Dispute

On November 6, 2021, Musk tweeted several times concerning his potential sale of a
large portion of his holdings in Tesla without obtaining pre-approval for the tweets.  The first
tweet, at 12:17 pm PT, asked:  "Much is made lately of unrealized gains being a measure of tax
avoidance, so I propose selling 10% of my Tesla stock.  Do you support this?"  Dkt. No. 71 at 3.
Six minutes later, at 12:23 pm PT, he tweeted:  "I will abide by the results of this poll, whichever
way it goes."  *Id.*  Ultimately, over seven million votes were cast—57.9% of the votes, or

---

[2] Musk took the position that his tweet was immaterial and was merely "celebratory"—"a
statement of pride and optimism."  Dkt. No. 27 at 11.  The position bordered on the risible.  A
reasonable observer could certainly conclude that when the CEO of a Fortune 100 company tells
millions of followers that his company "will make" a specific production volume in the next
year, the statement is not a casual one.

3,519,252 in total, answered yes.  *Id.*  The record does not reflect whether Musk abided by his public commitment.

The SEC served subpoenas on Musk and Tesla seeking, among other things, information about the tweets and the process that was employed before they were disseminated to the public. Specifically, on November 16, 2021, the SEC served a subpoena on Tesla requiring it to produce ten categories of documents, including all documents and communications concerning the two tweets as well as documents sufficient to determine whether the two tweets were submitted to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-2.  On November 21, 2021, the SEC served a subpoena on Musk requiring him to produce five categories of documents, including all documents and communications concerning the two tweets as well as documents related in any way to the submission of the tweets to Tesla's General Counsel or Securities Counsel for pre-approval or review before they were published.  Dkt. No. 69-1.  Both were served pursuant to a SEC Formal Order of Investigation (the "Formal Order") dated November 16, 2021, which stated that the SEC had information that tended to show violations of the federal securities laws.  In particular, the Formal Order, entitled "*In the Matter of Tesla, Inc.* (SF-4496)," and labeled with a non-public SEC filing number, recited that the SEC had information that tended to show that from at least November 5, 2021, Tesla and its officers engaged in conducted that violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Rule 13a-15 of the Exchange Act.  Dkt. No. 69-3.  It therefore ordered and authorized its staff to conduct a private investigation to determine whether any persons or entities had violated those provisions of the federal securities laws and to subpoena

witnesses and compel the production of "books, papers, correspondence, memoranda, or other

evidence deemed relevant or material to the inquiry."  *Id.*

On March 8, 2022, Musk filed this motion to quash certain portions of the SEC subpoena

and to terminate the consent decree.  Dkt. No. 70.  The SEC filed a memorandum in opposition

on March 22, 2020, Dkt. No. 78, and Musk filed a reply memorandum in further support of his

motion on March 29, 2022, Dkt. No. 80.[3]

## DISCUSSION

Musk moves for two forms of relief: (1) an order quashing the subpoena served upon

him, and (2) an order terminating the consent decree.  The Court discusses each in turn.

## I.      Motion to Quash the Administrative Subpoenas

Musk moves to quash portions of the subpoena served upon him, arguing that the SEC

lacks legal authority to issue those demands under the purview of either the securities laws or the

judgments in this case and arguing that the subpoena was issued in bad faith.  Dkt. No. 70.  This

proceeding, however, is not the proper forum for such a motion.

The SEC enjoys broad power under Section 21(b) of the Exchange Act, 15 U.S.C. § 78u,

to "make such investigations as it deems necessary to determine whether any person has

violated, is violating, or is about to violate" any provision of the federal securities laws, and to

"require the production of any books, papers, correspondence, memoranda, or other records

---

[3] Musk's motion followed a series of letters filed by Musk and the SEC, beginning with a
February 17, 2022 letter filed by Musk in which his counsel state that they "write to alert the
Court to a pattern of conduct by the [SEC] that has gone beyond the pale," including "devoting
its formidable resources to endless, unfounded investigations into Mr. Musk and Tesla," and
argue that Musk and Tesla "never agreed to a settlement that allows the SEC to issue subpoenas
absent oversight and approval from this Court."  Dkt. No. 61.  The Court issued an Order
responding that "to the extent that the Defendants have a non-frivolous basis to quash a subpoena
in light of the Court's prior orders in this case, the Defendants may make a motion, supported by
briefing, that requests specific relief from the Court," Dkt. No. 65.  Tesla apparently is
cooperating with the subpoena issued to it.  *See* Dkt. No. 78 at 5.

which the Commission deems relevant or material to the inquiry." Under Section 78u(c), if someone refuses to obey a subpoena issued by the SEC, it "may invoke" judicial aid "in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, and other records." A parallel provision exists under Section 19 of the Securities Act of 1933. *See* 15 U.S.C. § 77s.

The review authorized by Section 78u(c) is limited precisely to preserve the SEC's investigative prerogatives and to ensure that it can accomplish its investigative goals on a timely basis. First, the process can be initiated only by the SEC and only in the case of "contumacy by, or refusal to obey a subpoena issued to," a person. 15 U.S.C. § 78u(c). If the SEC chooses not to enforce a subpoena, the recipient of the subpoena cannot demand what is, in effect, an advisory opinion. Second, "[c]ommission enforcement proceedings may be summary in nature." *Securities and Exchange Commission v. Knopfler*, 658 F.2d 25, 26 (2d Cir. 1981). The court need not grant the opponent of a subpoena an evidentiary hearing and he or she "has a heavy burden if he [or she] seeks denial of enforcement on the ground that the subpoena is sought for an invalid purpose." *Id.* The opponent of the subpoena "must prove that the improper purpose is that of the Commission, not merely that of one of its investigators, and the burden may not be met by the presentation of conclusory allegations. An evidentiary hearing is not required in the absence of a meaningful and substantial factual showing." *Id.* Section 78u(c) grants the SEC wide-ranging investigative discretion. 15 U.S.C. § 78u(a). It endows the SEC with "broad powers to conduct investigations in support of its statutory mandate to protect the public interest through prompt and effective enforcement of the federal securities laws." *Treats Int'l Enters., Inc. v. Securities and Exchange Commission*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993) (internal quotation marks omitted) (quoting H. Rep. No. 1321, 96th Cong., 2d Sess. 4 (1980), *reprinted in*

1980 U.S.C.C.A.N. 3874, 3878). The Section 78u(c) summary proceeding is designed to allow some judicial review without "contraven[ing] . . . Congress's decision to confide the investigative determination to the SEC." *Id.*; *cf. Securities and Exchange Commission v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 750–51 (1984) (declining to impose a notice requirement on the SEC for investigations because such a requirement "'would cast doubt upon and stultify the Commission's every investigatory move,'" and because imposing such a requirement would mean that, if someone objected to such notification, "a district court would be obliged to conduct some kind of hearing to determine the scope and thrust of the ongoing investigation," which "would drain the resources of the judiciary as well as the Commission" (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971))). As *Knopfler* makes clear, except in very limited circumstances, the SEC, when it is conducting an investigation, is not subject to the time-consuming procedures of discovery and a hearing incident to ordinary litigation.

The Second Circuit has squarely held "that Section 78u(c) is the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts." *Sprecher v. Graber*, 716 F.2d 968, 975 (2d Cir. 1983). "The exclusive method for testing the validity of the SEC's investigatory motives or methods is a contested subpoena enforcement proceeding under 15 U.S.C. § 78u(c)." *Sprecher v. Von Stein*, 772 F.2d 16, 18 (2d Cir. 1985). In other words, the only mechanism for a party to challenge a subpoena issued to him by the SEC is a proceeding brought by the SEC under Section 78u(c) to enforce that subpoena. The SEC has not commenced any such proceeding to date to compel Musk's compliance with the subpoena. Dkt. No. 78 at 5. While "[p]arties who are the subject of such subpoenas are free in a proceeding under [Section 78u(c)] to raise claims of abuse of process," they are barred by the doctrine of sovereign immunity from bringing their own actions against the SEC. *Graber*, 716 F.2d at 974.

8

That principle has been applied time and again in this Circuit as well as elsewhere in response to efforts to circumvent the summary procedures authorized under the federal securities laws. *See, e.g.*, *Arjent LLC v. SEC*, 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014) (holding that Section 702 did not waive sovereign immunity in collateral suit for injunctive relief against SEC, reasoning that "[b]ecause . . . the subpoena enforcement proceeding provides an opportunity for judicial review of both an investigation's legitimacy, and a subpoena's legitimacy, the proceeding [pursuant to Section 78u(c)] 'is the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts'" (quoting *Graber*, 716 F.2d at 975)); *Finazzo v. SEC*, 2008 WL 3521351, at *3 (S.D.N.Y. Aug. 8, 2008) (Sullivan, J.) (same); *Treats*, 828 F. Supp. at 19 (denying plaintiff's motion for a preliminary injunction and granting SEC's motion to dismiss for lack of subject matter jurisdiction, concluding that the "complaint seeking to enjoin the SEC's investigation is beyond the limited scope of review available in this court"); *see also, e.g.*, *Gentile v. Securities and Exchange Commission*, 2019 WL 2098832 (D.N.J. May 14, 2019); *Cook v. SEC*, 664 F. Supp. 2d 997, 999 (D. Minn. 2009) (denying motion to stay SEC investigation for lack of subject matter jurisdiction, explaining that "[a] subpoena enforcement action is the exclusive method by which the validity of [an SEC] investigation may be challenged").

In *Graber*, as here, the defendant, Sprecher, had been a party to a prior action where he was sued by the SEC for securities fraud; that action that was settled pursuant to a written stipulation in which he agreed not to engage in certain securities transactions for specific periods of time. *Graber*, 716 F.2d at 970. Just one year later, the SEC entered a Formal Order of Investigation authorizing the issuance of subpoenas, pursuant to which a subpoena was issued to him. Sprecher initiated a separate proceeding against the SEC, arguing, much like Musk does

here, that the investigation "was improperly motivated by . . . bias"—in his case by religious bias and in Musk's case allegedly by political bias—"and a desire to harass him, that the subpoena violated [the agreement he reached in connection with the earlier SEC action], and that it sought to compel him to divulge materials protected by the attorney-client privilege." *Id.* Judge Winter made short shrift of those arguments. Sprecher's "complaint allege[d] actions which are either committed to the SEC's discretion or are subject to a statutory provision [Section 78u(c)] which provides the exclusive relief available." *Id.* at 974. While it is true "that the procedures and scope of judicial security under Section 78u(c) differ considerably from those which would be available" in an alternative judicial proceeding, *Graber*, 716 F.2d at 975, the nature of a Section 78u(c) proceeding is summary by design, *see id.* (stating that the differences in the scope of judicial scrutiny is "of little moment" because Congress in passing Section 78u(c) intended subpoena enforcement to be "the exclusive method by which the validity of SEC investigations and subpoenas may be tested in the federal courts").

Musk seeks to avoid the impact of *Graber* and the long line of cases applying the same principle on the theory that, because he is a party to a SEC consent judgment that restricts him from violating various provisions of the federal securities laws and because the subpoena refers to the judgments in this case, the SEC is limited as a matter of law to following the procedures for enforcement of the judgment in this case, including obtaining permission of the Court for discovery in connection with a contempt proceeding. He argues that the *Graber* line of cases is distinguishable because the SEC, having initiated this lawsuit, has waived any argument based on sovereign immunity.

But *Graber* is not so easily distinguished. It may be that in *Graber* and the cases that followed it, a subpoena recipient sought to avoid the summary procedures under Section 78u(c)

by the expedient of filing a new lawsuit, whereas here Musk seeks to limit the SEC's authority by making a motion in a lawsuit that the SEC has already filed, but that is a distinction without a difference. *Graber* did not turn alone or even primarily on the extent of the waiver of sovereign immunity granted under Section 702 of the Administrative Procedure Act ("APA")—which provides for a limited waiver of sovereign immunity—but instead on the Circuit's conclusion that Section 78u(c) of the Exchange Act, and the parallel provision under the Securities Act, expressed a "limitation on judicial review" and that therefore, as a result of the proviso to Section 702 stating that the waiver of immunity does not affect other limitations on judicial review, that restriction remained intact. *Graber*, 716 F.2d at 974. In other words, the Circuit concluded that Congress intended in Section 78u(c) itself, as it preexisted and survived the APA, to channel all challenges to SEC investigations and subpoenas to subpoena enforcement proceedings under that Section and not to allow any alternative channels for judicial review. The Circuit, honoring congressional intent, concluded without reservation that Section 78u(c) is the only mechanism to bring motions like this.

Moreover, the mere fact that SEC brought an action against Musk and a related action against Tesla for Musk's tweets in August 2018 does not waive the SEC's sovereign immunity with respect to an investigation the SEC launched in late 2021 regarding conduct that occurred in late 2021, after the 2018 case was settled. Courts repeatedly have held that the filing of a lawsuit by the federal government or one of its agencies does not waive sovereign immunity with respect to counterclaims that the defendant might assert against the government or one of those agencies. There must be an independent basis to infer the waiver of sovereign immunity. *See, e.g.*, *United States v. All Right, Title & Interest*, 82 F. Supp. 893, 899 (S.D.N.Y. 1993) ("It is well established that the United States Government has sovereign immunity and, consequently, can be sued only

to the extent it consents to be sued, and only in the manner established by law. Thus, counterclaims against the United States can be maintained only where the Government has consented or waived its immunity from suit on that claim."); *United States v. $10,000.00 in U.S. Funds*, 863 F. Supp. 812, 816 (S.D. Ill. 1994) ("[T]he mere fact that the government is the plaintiff and has brought the forfeiture action does not constitute a waiver of sovereign immunity and authorize the bringing of a counterclaim."); *United States v. Krieger*, 773 F. Supp. 580, 589 (S.D.N.Y. 1991) ("[A]ny counterclaim in an action brought by the United States must show the authority by which the claim against the United States may be maintained in order for the court to be able to exercise its jurisdiction.").

It follows necessarily that the fact that the SEC previously brought an action against Musk (that was settled in a judgment filed with the court) also does not effect a waiver as to the sovereign immunity conferred by Section 78u(c) or give him an alternative means to challenge a SEC administrative subpoena issued pursuant to a formal Order of Investigation. The judgment against Musk expressly stated that it was to settle "only the claims asserted against [Musk] in th[e] civil proceeding." Musk Consent ¶ 12. It did not give Musk any broader immunity from other SEC investigations or proceedings—including related ones. It thus preserved the SEC's authority to investigate Musk for additional securities violations or to ask for documents and records from him in connection with an investigation of others should the SEC receive information that suggested he or others violated the securities laws again. Musk may wish it were otherwise, but he remains subject to the same enforcement authority—and has the same means to challenge the exercise of that authority—as any other citizen. Indeed, to conclude otherwise would be to hold that a serial violator of the securities laws or a recidivist would enjoy greater protection against SEC enforcement than a person who had never even been accused of a

securities law violation.  Musk points to nothing in the law or the language of the statute that would suggest that Congress intended such a perverse result.

The additional fact that the SEC subpoena calls for documents regarding Musk's adherence to the judgment and, in particular, information regarding whether his communication was pre-approved by counsel, does not entitle him to the independent judicial review in this proceeding that would be denied to any other person who had not been a defendant in a prior SEC enforcement action or the subject of a consent decree with the SEC.  The administrative subpoena was issued pursuant to authority granted the SEC under a Formal Order of Investigation.  The Formal Order recites that the SEC has information tending to show a violation of the securities laws and authorizes the SEC to investigate potential violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 13a-15 under the Exchange Act, not possible violations of the Musk Consent or the Tesla Consent.

That the consent decree permits the SEC to make "reasonable requests" of Musk to investigate his compliance, that Musk is required to comply with those, and that the production of such evidence might support a finding of contempt in this Court does not limit the SEC's power to independently investigate whether Musk's activity in 2021 violated securities laws— even if the same activity could constitute a violation of the consent decree—nor does it undermine the validity or lawfulness of its current investigation.  *See, e.g.*, *Grenda v. SEC*, 2017 WL 4053821, at *3 (W.D.N.Y. Sept. 14, 2017) (holding that the SEC's investigation of a potential violation of a prior settlement was "a legitimate inquiry, plain and simple").  It is not uncommon, for example, that the SEC will issue so-called "obey the law" injunctions.  *See U.S. S.E.C. v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *11 n.12 (S.D.N.Y. Mar. 11, 2013)

(citing David M. Weiss, Reexamining the SEC's Use of Obey-the-Law Injunctions, 7 U.C. Davis Bus. L.J. 6 (2006)). It also might issue more tailored injunctions. But the provisions in the consent decree for the SEC to investigate noncompliance with that decree and to seek a contempt order against Musk if there is such a violation are provided as enforcement mechanisms for the consent decree itself, not for the securities laws writ large. They do not replace or derogate from the power that the SEC has with respect to every person—whether or not that person was the subject of any previous SEC action—to investigate whether that person has violated the laws intended to protect investors and—if the facts support that the person has violated the law—the right to bring an action against them. Were it otherwise, the SEC could never settle with a wrongdoer nor could the courts ever safely issue an injunction even in a case that did not reach a settlement. The incorrigible securities violator could readily buy a form of protection from future investigation. By agreeing to settle at the earliest hint of a first violation and perhaps on the cheap, he would limit the SEC's ability independently to use its investigative tools to investigate any future wrongdoing.[4]

The Court has concluded that Section 78u(c) prevents it from reviewing whether the subpoena was properly issued pursuant to that Formal Order. But even if it were within this Court's province to address the issue, the Court would not find that the information sought is irrelevant to the SEC investigation. Documents that would address whether Musk followed

---

[4] Musk argues that "[b]y specifically referring to the judgments in this case in its subpoena to Tesla and seeking documents from Mr. Musk pertaining to review or pre-approval of his tweets, the SEC seeks to circumvent the jurisdiction of this Court as it unilaterally grasps for documents pertaining specially to the consent decree." Dkt. No. 71 at 14. But if the SEC engages in misconduct in its investigation and if that misconduct prejudices Musk's litigation rights, Musk can bring that challenge to the use of the evidence in a contempt proceeding—if the SEC brings one. The argument does not establish Musk's entitlement to any greater protection with respect to a new SEC action than that enjoyed by any other person whose conduct is being investigated by the SEC.

corporate policies with respect to the pre-approval of his tweet and received advice of counsel bear directly on his culpability. If he disseminated the tweets only after following Tesla's corporate policies, including those demanded by the consent decree, he might have powerful defenses at least at to some of the potential violations the SEC is investigating. If, on the other hand, he willfully bypassed those procedures, that evidence too would suggest a far greater level of culpability. The SEC plainly is entitled to probe the issue. As to Tesla, whether it followed its own internal practices in the case of these tweets and otherwise bears on whether its representation in its SEC filings to investors that it had policies and procedures that were addressed to all senior executives was truthful or whether, instead, that representation had a material and significant omission.

## II.     Motion to Terminate the Consent Decree

Musk also asks the Court to terminate the consent decree pursuant to Federal Rule of Civil Procedure 60(b)(5). That rule permits a court to relieve a party from a final judgment if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). It does not permit a court to relieve a party of the burden of a consent decree on the theory that "it is no longer convenient to live with the terms of a consent decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). "Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a *significant* change in circumstances warrants revision of the decree." *Id.* at 383. This "initial burden" may be met by showing "a significant change either in factual conditions or in law." *Id.* at 384. For example, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous" or "when a decree proves to be unworkable because of unforeseen obstacles." *Id.* In addition, a consent decree must be modified if "as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law" and

modification also "may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id.* at 388. "If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383; *see also id.* at 391. "A motion for relief from judgment is generally not favored," and "[t]he burden of proof is on the party seeking relief from judgment." *United States v. International Brotherhood of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief."). Particularly in a context involving a judgment against a private party, the Second Circuit has emphasized that the standard applied by courts should "promot[e] adherence to settlement agreements voluntarily entered into by parties to a litigation and ensur[e] that consent decrees are not so easily modifiable as to discourage parties from reaching constructive settlements." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995).

Thus, the party seeking relief must establish "'either a significant change in factual conditions or in law,'" including changes such as "'(1) changed factual conditions [which] make compliance with the decree substantially more onerous;' (2) 'a decree [which] proves to be unworkable because of unforeseen obstacles;' or (3) [a circumstance in which] 'enforcement of the decree without modification would be detrimental to the public interest.'" *Calderon v. Wambua*, 2012 WL 1075840, at *3 (S.D.N.Y. Mar. 28, 2012) (quoting *Rufo*, 502 U.S. at 383–84).

Musk argues that the consent decree in this case should be terminated because (1) it "intrudes on Mr. Musk's First Amendment right to be free of prior restraints," Dkt. No. 71 at 20; (2) "has been misused to launch endless, boundless investigation of his speech," *id.*; and (3) was

16

extracted from Musk through the exercise of economic duress, *id.* at 24.  None of the arguments hold water.

With regard to the First Amendment argument, it is undisputed in this case that Musk's tweets are at least presumptively "protected speech."  *Id.* at 21; *see also* Dkt. No. 78 at 13–14.  At the same time, however, even Musk concedes that his free speech rights do not permit him to engage in speech that is or could "be considered fraudulent or otherwise violative of the securities laws."  Dkt. No. 71 at 22–23.  The consent decree thus does not impose obligations that have "become impermissible under federal law."  *Rufo*, 502 U.S. at 384.

Moreover, to the extent that the consent decree imposes an additional restriction on Musk's speech by requiring him to obtain pre-approval of his communications about Tesla,[5] "parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings."  *SEC v. Romeril*, 15 F.4th 166, 172 (2d Cir. 2021).  In *Romeril*, the SEC brought a civil enforcement action against Romeril; the case ended in a settlement.  *Id.* at 169.  As part of that settlement, Romeril entered into a consent agreement with the SEC where he agreed "not to take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."  *Id.* at 170 (internal quotation marks omitted) (quoting J. App'x at 70).  Years later, Romeril moved for relief from the judgment; he argued that "the judgment was void because the provision barring public denials of the allegations against him – in his words a 'gag order' – constituted a prior restraint that infringes his First Amendment rights

---

[5] The parties dispute whether this pre-approval requirement burdens Musk's First Amendment rights.  For the reasons that follow, the Court need not reach the question whether the requirement that Musk's statements that may be material to Tesla's stockholders go through some form of review before they are disseminated to the public, including the investing public, would pass muster under the First Amendment.

and violated his right to due process." *Id.* The Circuit denied his motion, stating that "[t]he Judgment does not violate the First Amendment because Romeril waived his right to publicly deny the allegations of the complaint." *Id.* at 172. The Court added:

> In the course of resolving legal proceedings, parties can, of course, waive their rights, including such basic rights as the right to trial and the right to confront witnesses. The First Amendment is no exception, and parties can waive their First Amendment rights in consent decrees and other settlements of judicial proceedings. To the extent that Romeril had the right to publicly deny the SEC's allegations against him, he waived that right by agreeing to the no-deny provision as part of a consent decree.

*Id.* at 172–73 (citations omitted).[6] *Romeril*'s reasoning is squarely applicable here. Musk, by entering into the consent decree in 2018, agreed to the provision requiring the pre-approval of any such written communications that contain, or reasonably could contain, information material to Tesla or its shareholders. He cannot now complain that this provision violates his First Amendment rights.

Musk's argument that the SEC has used the consent decree to harass him and to launch investigations of his speech is likewise meritless and, in this case, particularly ironic. The Supreme Court has instructed that "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385. Musk could hardly have thought that at the time he entered the decree he would have been immune from non-public SEC investigations. The SEC has a historic mission to "achieve a high standard of business ethics in the securities industry," *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963), and to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation, *see* U.S. Securities and Exchange Commission, What We Do, *available at* https://www.sec.gov/about/what-we-do

---

[6] Musk argues that a petition for certiorari has been filed in *Romeril*, but it remains the law in this Circuit.

(last accessed Apr. 26, 2022); *see also* Statement of Robert J. Jackson, Jr., *Nominations of David J. Ryder, Hester M. Peirce, and Robert J. Jackson, Jr.: Hearing Before the S. Comm. On Banking, Housing and Urban Affairs*, 115th Cong. 74 (2017) ("[T]he SEC's three-part statutory mandate requires the agency to protect investors, maintain fair and efficient markets, and facilitate capital formation.").  That mission is essential to the protection of shareholders.  *See Capital Gains Research Bureau*, 375 U.S. at 186 ("The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's.  . . .  A fundamental purpose, common to these statutes [including the Securities Act of 1933 and the Securities Exchange Act of 1934] was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 150–51 (1972) (citing *Capital Gains Research Bureau* for the same proposition).

Particularly against that backdrop, the SEC cannot be faulted for the limited requests it has issued.  Far from the "sheer number of demands" that Musk claims the SEC has made, *see* Dkt. No. 71 at 17–18, the SEC has in fact made only limited requests.  It has made only three sets of inquiries: inquiries related to the original enforcement actions that led to the consent decree here; inquiries related to the investigation that led to the amended final judgments; and the inquiries at issue in the investigation here, which arose after Musk tweeted about selling ten percent of his shares.  *See* Dkt. No. 78 at 10–11.  It is unsurprising that when Musk tweeted that he was thinking about selling ten percent of his interest in Tesla and that he planned to relinquish control over that decision to the majority opinion expressed by voters on his Twitter poll (or those who could muster control over the majority), the SEC would have some questions.

Finally, Musk's claim that he was the victim of economic duress is wholly unpersuasive. Musk argues that "[a]t the time [he] signed the consent in this case, Tesla was in no position to weather a fight with the SEC," because it "was a less mature company and the SEC's action stood to jeopardize the company's financing." Dkt. No. 71 at 24. But, even accepting as true that Musk—who was already a multibillionaire in 2018 and one of the wealthiest individuals in the world, *see* Deniz Çam & Jennifer Wang, *The Biggest Billionaire Winners and Losers of 2018*, Forbes (Dec. 21, 2018), https://www.forbes.com/sites/denizcam/2018/12/21/the-biggest-billionaire-winners-and-losers-of-2018/?sh=1e88d2d8526e, as well as the CEO of Tesla, which was already a Fortune 500 company, *see* Mike Sorrentino, *Tesla Leaps Up Fortune 500 and Apple Slips, But Walmart Beats Them All*, CNET (May 21, 2018), https://www.cnet.com/culture/tesla-leaps-up-fortune-500-and-apple-slips-but-walmart-beats-them-all/—was truly worried that engaging in a protracted litigation with the SEC would be financially ruinous for Tesla and felt that settling the lawsuit was the best thing for the company, that does not establish a basis for him to get out of the judgment he voluntarily signed.

It is a known fact that the commencement of a SEC lawsuit—just like any major litigation—can cause the distraction of management, lead to litigation costs, and ultimately be considered an undesirable event from the perspective of the subject company's shareholders and other stakeholders. That is perhaps a reason why no single SEC attorney can authorize a lawsuit; it requires Commission approval. *See* Office of Chief Counsel, Securities and Exchange Commission Division of Enforcement, *Enforcement Manual* §§ 2.5.1–.2 (Nov. 28, 2017), *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. The lawsuit is a consequence of our federal securities regulator having information that the defendant has violated the securities laws. But the fact that a settlement can avoid those costs, and the negative

reaction by shareholders, does not mean that it is coercive or unenforceable.  It may simply mean that the executive is acting in the best interests of those for whom he is a fiduciary.  Were it otherwise, the SEC could never accept a settlement and a defendant thus would never be able to get the advantages of settlement.  The agreement by a company or its senior executive would always be subject to the option by the executive or the company—when obligation no longer was convenient or when executive or the company believed that the SEC might be hobbled in its litigative capabilities—to simply claim that they felt "forced" to agree to a settlement because they "perceived that the company and its shareholders would be placed at undue risk unless [they] settled the matter promptly."  *See* Dkt. No. 72 ¶ 4.

The doctrine of economic duress is far more limited.  As Musk states, "[e]conomic duress is an equitable doctrine which 'comes into play upon the doing of a *wrongful act* which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.'"  Dkt. No. 71 at 25 (alteration adopted and emphasis added) (quoting *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 1154, 1158 (1984)).[7] But Musk's argument that the SEC acted wrongfully amounts to one sentence:  "In 2018, the SEC took advantage of the position in which it put Mr. Musk."  *Id.* at 25.  That conclusory assertion is insufficient to sustain a finding of economic duress.  Musk was not forced to enter into the consent decree; rather, "for [his] own strategic purposes, [Musk], with the advice and assistance of counsel, entered into these agreements voluntarily, in order to secure the benefits thereof, including finality."  *Securities and Exchange Commission v. Conradt*, 309 F.R.D. 186, 187–88 (S.D.N.Y. 2015).  Musk cannot now seek to retract the agreement he knowingly and

---

[7] The parties assume that California law applies.  *See id.*; *see also* Dkt. No. 78 at 14.  The Court has no occasion to consider that issue.

willingly entered by simply bemoaning that he felt like he had to agree to it at the time but now—once the specter of the litigation is a distant memory and his company has become, in his estimation, all but invincible—wishes that he had not.

## CONCLUSION

The motion to quash the subpoena and to terminate the consent decree is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 70.


SO ORDERED.


Dated: April 27, 2022
      New York, New York

                                      LEWIS J. LIMAN
                             United States District Judge