Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON GREENSPAN,<br><br>    Plaintiff,<br><br>    v.<br><br>OMAR QAZI, SMICK ENTERPRISES, INC., ELON MUSK, and TESLA, INC.,<br><br>    Defendants. | Case No. 3:20-cv-03426-JD<br><br>**PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)**<br><br>Time: 10:00 A.M.<br>Date: July 21, 2022<br>Courtroom: 11, 19th Floor<br><br>Judge: Hon. James Donato<br>4AC Filed: August 13, 2021 |

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................... 1

II.  STATEMENT OF ISSUES ........................................................................................... 3

III. FACTUAL BACKGROUND ........................................................................................ 3

IV.  ARGUMENT ................................................................................................................. 4

    A.  Legal Standard ....................................................................................................... 4

    B.  Newly Discovered Evidence Substantiates Plaintiff's Securities Claims ........................ 5

        1.  The SEC's 2019 Cash Investigation Defendants Hid From The Court .................... 5

        2.  The SEC's Known 2022 Investigations Into Tesla Defendants ............................... 7

        3.  Internal Documents Provided by Confidential Witnesses ........................................ 7

        4.  Material Public Disclosures ..................................................................................... 11

    C.  The Court Ignored Persistent Misrepresentations By Defendants' Counsel ................. 12

    D.  The Court Repeatedly Made Errors and Denied Plaintiff Due Process ........................ 12

    E.  The Court Disregarded Judge Chen's April 1, 2022 Opinion Finding That Elon Musk Acted With Scienter ......................................................................................... 14

    F.  Judge Donato Was Required To Recuse Himself As Soon As His Wife's Firm's Paying Clients First Appeared As Counsel In This Case .............................................. 14

V.   CONCLUSION ............................................................................................................. 15

**TABLE OF AUTHORITIES**

**Cases**

*Casey v. Albertson's Inc.*, 362 F.3d 1254, 1260 (9th Cir. 2004) ................................................. 5, 6

*Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003) ............................ 5

*Federal Trade Commission v. AH Media Group, LLC et al*,
    Case No. 3:19-cv-04022-JD (N.D. Cal. November 1, 2021) ................................................... 12

*In re Center Wholesale, Inc.*, 759 F. 2d 1440, 1448 (9th Cir. 1985) ........................................... 14

*Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982) .............................................. 4

*Money v. Johnson & Johnson*, Case No. 3:15-cv-03213-LB (N.D. Cal. 2016) ............................ 2

*Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013) .................................................. 12

*Ratha v. Phatthana Seafood Co., Ltd.*, 26 F. 4th 1029, 1042-1043 (9th Cir. 2022) .................... 12

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) .............................................................. 2

*Tribe v. US Bureau of Rec.*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018) ........................................... 5

*Turner v. Alberto*, Case No. 3:20-cv-02980-JD (N.D. Cal. November 1, 2021) ............................ 5

*Warren v. Howmedica Osteonics Corp.*, No. 4:10 CV 1346 DDN, 2011 WL 1226975, at *5 (E.D. Mo. March 29, 2011) ................................................................................................ 2

*Winhoven v. United States*, 201 F.2d 174, 175 (9th Cir.1952) ..................................................... 14

**Statutes**

28 U.S.C. § 2072(b) ........................................................................................................................ 2

Private Securities Litigation Reform Act ............................................................................. 2, 3, 15

**Rules**

Civil Local Rule 7-3(d)(2) ............................................................................................................ 14

Federal Rule of Appellate Procedure 4(a)(4)(A)(vi) ...................................................................... 4

Federal Rule of Civil Procedure 15(a) ........................................................................................... 3

Federal Rule of Civil Procedure 59(b) ........................................................................................... 4

Federal Rule of Civil Procedure 60(b) ....................................................................................... 1, 4

Federal Rule of Civil Procedure 60(b)(1) .................................................................................... 14

Federal Rule of Civil Procedure 60(b)(2) ................................................................................. 4, 12

Federal Rule of Civil Procedure 60(b)(3) ................................................................................. 5, 12

Federal Rule of Civil Procedure 60(b)(4) .................................................................................... 14

Federal Rule of Civil Procedure 60(b)(5) .................................................................................... 14

Federal Rule of Civil Procedure 60(b)(6) .................................................................................... 15

**Other Authorities**

Canon 2 of the Code of Conduct for United States Judges .......................................................... 15

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 21, 2022 at 10:00 A.M., or as soon thereafter as the matter may be heard, in the above-titled Court, in Courtroom 11, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102—or in the alternative, via digital videoconference pursuant to this Court's General Order 78—Plaintiff Aaron Greenspan ("Plaintiff") will and hereby does move the Court for an Order granting Plaintiff relief from the Judgment entered in this action on May 19, 2022.

The Court should grant Plaintiff's motion primarily because evidence corroborating Plaintiff's claims has surfaced that was previously unavailable, because justice demands that the Court correct various errors made during the adjudication of the case, because of Defendants' persistent efforts to defraud and mislead the Court, because of at least one new legal opinion, and because Judge James Donato should have recused himself from this case at the first opportunity.

This motion is based on this notice of motion and motion, the supporting memorandum of points and authorities, the pleadings and other papers on file in this action, and any other evidence that may be offered at a hearing if necessary.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Pursuant to Fed. R. Civ. P. 60(b), Plaintiff Aaron Greenspan ("Plaintiff") moves the Court for an Order granting relief from its May 19, 2022 Order and Judgment dismissing the federal claims in this case with prejudice and the state claims without prejudice. ECF Nos. 171, 172. At its core, this lawsuit alleges that Defendants Tesla, Inc. ("Tesla") and its chief executive, Elon Musk, perpetrated a series of securities frauds unprecedented in scale with the assistance of a social media mob led by Tesla's contractor, Defendant Omar Qazi. Qazi in turn engaged his

company, Defendant Smick Enterprises, Inc., to spew libel about Plaintiff, interspersed with Plaintiff's copyrighted works, in order to neutralize a threat to Tesla's elevated stock price.

Between the hype around Tesla's stock, its nominal vehicle technology, and the rock star status of its founder, news around Defendants Tesla and its "Technoking" Elon Musk (together, "Tesla Defendants") moves quickly. Since the operative Fourth Amended Complaint ("4AC") was filed, and even since Plaintiff responded to Defendants' latest motions to dismiss, significant developments have come to light. The Court has effectively rendered its decision in the dark, reaching the surprising conclusion that there was no fire at all in a case involving the most notorious arsonist in the world and thick smoke everywhere. Re-evaluation is warranted.

No doubt, Plaintiff's *pro se* status has raised questions for the Court as no *pro se* Private Securities Litigation Reform Act ("PSLRA") lawsuit has ever successfully made it to trial since the law was passed in 1995.[1] Yet not every *pro se* claim is a conspiracy theory. Subsequent to the filing of the 4AC, multiple Confidential Witnesses approached Plaintiff with files from inside Tesla proving Plaintiff's claims. These documents also prove that Defendants and their counsel committed fraud on this Court by arguing against claims *they knew full well were true*.

There have also been new legal developments. Most notably, Defendant Musk was found to have acted with scienter, despite the prior stated concern of this Court that such a development had not yet transpired. ECF No. 125 at 15:14-15. Defendant Musk has also been recently accused in the press of using Twitter to harass, both directly and indirectly, Twitter's own executives, such as its General Counsel, Vijaya Gadde. The Gadde example is illustrative

---

[1] This fact alone is proof that the PSLRA sets out an unconstitutional impossible pleading standard. In non-securities cases, federal judges consider the Catch-22 mandated by the PSLRA—exacting specificity without the benefit of discovery—exactly that. "In sum…his allegations tied to the PMA are sufficiently specific to proceed to discovery. To hold otherwise would impose on Mr. Money an impossible pleading standard because he has not yet received the PMA (a confidential document). *See Warren v. Howmedica Osteonics Corp.*, No. 4:10 CV 1346 DDN, 2011 WL 1226975, at *5 (E.D. Mo. March 29, 2011)." *Money v. Johnson & Johnson*, Case No. 3:15-cv-03213-LB (N.D. Cal. 2016). *See also* 28 U.S.C. § 2072(b) and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002) (noting that "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits" and stating that changing pleading standards "must be obtained by the process of amending the Federal Rules").

of how anyone—even powerful business executives—can be harmed by Defendant Musk's recklessness. Defendant Musk, who settled SEC charges of securities fraud in 2018 and has likely been sued for securities fraud more than any other person in history, has also been sued three more times for securities fraud since the 4AC's filing.[2]

In sum, there is more than ample reason for the Court to grant relief from its 3.25-page final Order and Judgment, rendered without addressing any substantive facts one day shy of the litigation's two-year filing anniversary. Whether the Court's sparse decision was made in haste to avoid a blemish on an otherwise perfect Civil Justice Reform Act report, due to inadvertent error, or due to bias stemming from payments made by Tesla Defendants' counsel to Judge Donato's household through his wife's consulting firm, justice demands relief.

## II.  STATEMENT OF ISSUES

The main issue is whether relief should be granted from the May 19, 2022 Judgment.

## III.  FACTUAL BACKGROUND

The initial Complaint in this case was filed on May 20, 2020. ECF No. 1. The First Amended Complaint was filed pursuant to Federal Rule of Civil Procedure 15(a) on July 2, 2020. ECF No. 20. Citing no precedent, the Court issued a two-sentence order instructing that a PSLRA discovery stay would govern the case on August 7, 2020. ECF No. 63. With the consent of the parties, the Second Amended Complaint was filed on August 26, 2020. ECF No. 70. On January 15, 2021, the Court granted leave for Plaintiff to lodge a Third Supplemental and Amended Complaint, filed on February 12, 2021. ECF No. 103. On June 23, 2021, the Court issued its first substantive ruling on some of Plaintiff's claims, granting leave to amend. ECF No. 125. Plaintiff's 4AC was timely filed on August 13, 2021. ECF No. 131. Plaintiff was subsequently approached by multiple Confidential Witnesses, who provided Plaintiff with

---

[2] Specifically, Defendant Musk was sued on April 12, 2022 in the Southern District of New York in *Rasella v. Musk*; on May 6, 2022 in the Delaware Court of Chancery in *Orlando Police Pension Fund v. Twitter, Inc.*; and on May 25, 2022 in the Northern District of California in *Heresniak v. Musk et al.* Of course, this is an incomplete list of all of the lawsuits filed against Defendant Musk since August 13, 2021, which is considerably longer.

internal Tesla data. Plaintiff filed a motion to supplement the 4AC with additional facts on October 20, 2021. ECF No. 141. The Court denied that motion on October 26, 2021. ECF No. 142. Motions to dismiss the 4AC were granted with prejudice regarding federal claims and without prejudice regarding state claims on May 19, 2022, one day before the two-year filing anniversary of the case, and eight days after the six-month reporting trigger for pending motions under the Civil Justice Reform Act ("CJRA"). ECF No. 171. Judge Donato's most recent CJRA report for motions pending longer than six months lists zero pending, i.e. a perfect score.[3]

Consistent with Plaintiff's allegations, Defendant Tesla has lost nearly 50% of its market capitalization (about $600 billion) relative to its $1.2 trillion peak in November 2021.

## IV.  ARGUMENT

### A.  Legal Standard

Federal Rule of Civil Procedure ("Rule") 60(b) outlines several reasons why a Court may grant "relief from a Final Judgment, Order, or Proceeding." Fed. R. Civ. P. 60. In the Ninth Circuit, Rule 60(b) permits relief based upon an error of law by the Court. "The law in this circuit is that errors of law are cognizable under Rule 60(b)." *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982) (citation omitted). While the motion must be filed within "no more than a year after the entry of the [final] judgment or order," Federal Rule of Appellate Procedure 4(a)(4)(A)(vi) requires that a Rule 60 motion be filed "no later than 28 days after the judgment is entered" to toll the time allowed to file an appeal. Fed. R. App. P. 4.

Rule 60(b)(2) permits relief from a final Order and Judgment in the case of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60. To utilize Rule 60(b)(2), "The moving party must show that (1) 'the evidence relied on in fact constitutes `newly discovered evidence` within the meaning of Rule 60(b),' (2) it 'exercised due diligence to discover this evidence,' and (3) the newly discovered evidence is 'of such magnitude that production of it earlier would have been likely to change the disposition of the case.' *Feature Realty, Inc. v. City*

---

[3] *See* https://www.uscourts.gov/statistics/table/cjra-8/civil-justice-reform-act-cjra/2021/09/30.

*of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003) (internal quotation marks omitted)." *Tribe v. US Bureau of Rec.*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018).

As this Court has noted, "[t]o prevail under 60(b)(3), 'the moving party must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense.' *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1260 (9th Cir. 2004)." *Turner v. Alberto*, Case No. 3:20-cv-02980-JD (N.D. Cal. November 1, 2021).

### B. Newly Discovered Evidence Substantiates Plaintiff's Securities Claims

After the filing of the 4AC, multiple Confidential Witnesses stepped forward to provide Plaintiff with internal Tesla data. Once alerted to their existence and availability, Plaintiff exercised diligence in obtaining, organizing, researching, and protecting the documents involved.

Then, at 5:26 A.M. on May 19, 2022—the same day that the Court issued its final Order and Judgment—the United States Securities and Exchange Commission ("SEC") issued a response to a Freedom of Information Act ("FOIA") request that Plaintiff had previously appealed. The response contained over 250 pages of documents, including correspondence related to a subpoena issued to Defendant Tesla, Inc. Plaintiff had not even finished reading these material documents by the time the Court issued its final Judgment at 11:03 A.M.

#### 1. The SEC's 2019 Cash Investigation Defendants Hid From The Court

In December 2019, as part of SEC Investigation No. SF-4322, captioned "In the Matter of Tesla, Inc.," the SEC issued six subpoenas to Tesla, Inc. and other affiliates of Defendant Musk. On October 22, 2021, Plaintiff filed two SEC FOIA requests for any communications involving Defendant Musk's attorney, Alex Spiro, and his assistant, Hope Skibitsky. Plaintiff received a response of 85 pages to the Skibitsky request on November 15, 2021, and received another mostly overlapping 58 pages in response to the Spiro request on November 24, 2021. Two days later, Plaintiff filed an appeal. On May 19, 2022, the SEC responded again with 257 pages of mostly unredacted versions of five of the six subpoenas—the first SEC disclosure of subpoena documents regarding Tesla Defendants to Plaintiff or to any public requestor, as

contemplated by Rule 60(b)(2).  Plaintiff could not have obtained these documents any sooner.

The documents reveal that on December 19, 2019, a staff member of the SEC Division of Enforcement wrote to Attorney Spiro (as well as to Tesla/Musk Attorney Michael Liftak):

> "With respect to Item 3 of the subpoena to Tesla ('Tesla's cash balance (by day)'), you explained that until recently, Tesla's systems may not have automatically summarized cash balance information on a daily basis.  We asked you to keep us apprised of your efforts to identify documents responsive to Item 3."

Internal non-FOIA documents separately disclosed to Plaintiff indicate that it is patently untrue that Tesla's systems were incapable of "hav[ing] automatically summarized cash balance information on a daily basis."  For Attorneys Spiro and/or Liftak to have suggested as much to regulators suggests a deliberate intent to mislead.  Furthermore, the above message was written months before this action was filed, which means that *for the entire duration of this lawsuit, Tesla Defendants were aware that the SEC was actively investigating the exact same issue that Plaintiff raised in Issue 1 of his securities claims*: whether Defendant Tesla had lied to investors about its cash balances.[4]  Yet Tesla Defendants labeled Plaintiff "conspiratorial."

Aside from Rule 60(b)(2), Rule 60(b)(3) also allows for relief from a final judgment and/or order in such circumstances.  The SEC's communications with Attorney Spiro alone constitute "clear and convincing evidence."  *Casey*, *supra*.  Not only did Attorney Spiro deliberately mislead federal regulators, but he and his colleagues sought to mislead this Court—and succeeded.[5]  By making wholly disingenuous arguments about lack of "specificity" and "conclusory allegations" even as Plaintiff's 4AC specified the *exact figures* in SEC filings that were false, Plaintiff's claims were dismissed despite their obvious merit.  The Court adopted Defendants' deceitful position wholesale, totally unaware of the SEC's investigation into the exact same subject matter, or of Tesla Defendants' responses to the SEC's subpoenas.

---

[4] That the SEC has not yet filed charges over this issue does not mean that the concerns are not material and/or real.  Recent *Reuters* reporting published after the final Judgment in this case indicates that SEC personnel avoided filings against Defendant Musk due to concerns of court bias that have recently been alleviated since a different judge is now presiding in New York.

[5] The Court also ignored Spiro's failure to file his required *pro hac vice* motion.  ECF No. 166.

The SEC's investigation makes clear that Plaintiff's allegations are anything but "wildly speculative," in Tesla Defendants' parlance. In its "ORDER DIRECTING PRIVATE INVESTIGATION AND DESIGNATING OFFICERS TO TAKE TESTIMONY" dated November 18, 2019 and marked "NON-PUBLIC" (the "SEC Order"), the SEC stated in part:

> "In possible violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Tesla, SolarCity, their officers, directors, employees, partners, subsidiaries, and/or affiliates and/or other persons or entities, directly or indirectly, in connection with the purchase or sale of certain securities, may have been or may be employing devices, schemes, or artifices to defraud, making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were or are made, not misleading, or engaging in acts, practices or courses of business which operated, operate, or would operate as a fraud or deceit upon any person."

The SEC Order noted *thirteen* total possible violations of statutory sections and rules over which the SEC has enforcement authority. Notably, on November 16, 2021, the SEC issued *additional* subpoenas to Defendant Tesla and to Defendant Musk, authorized under *another* investigation. Defendant Musk attempted to have those subpoenas quashed in court, but failed.

### 2.    The SEC's Known 2022 Investigations Into Tesla Defendants

On or around January 24, 2022, the SEC opened yet another investigation into Defendant Tesla. This was based on information Plaintiff provided to the SEC derived from Plaintiff's analysis of data from Confidential Witnesses. This development alone contradicts the Court's opinion suggesting that Plaintiff's securities claims are without merit. Then, on February 24, 2022, *The Wall Street Journal* reported that the SEC had opened another investigation into Tesla Defendants regarding insider trading at the peak of Tesla's valuation by Defendant Musk and his brother, Tesla Director Kimbal Musk. Tesla Defendants have continuously acted with scienter.

### 3.    Internal Documents Provided by Confidential Witnesses

Internal data from Defendant Tesla provided to Plaintiff (the "Internal Documents") was not accessible to Plaintiff before it materialized unexpectedly.[6] These Internal Documents show:

---

[6] Tesla Defendants and Attorney Spiro have an extensive and documented history of putting the physical safety of whistleblowers at risk by deploying armed agents of law enforcement, as well

a) **"Cash and Cash Equivalents" (Issue 1).** Tesla uses Microsoft Dynamics 360 (previously Dynamics AX) to track its global cash balances in over 750 numbered accounts worldwide at Wells Fargo, HSBC, Key Bank, East West Bank, Citibank, ABC, ICBC Shanghai, and others. This software can report cash balances in all of Tesla's cash accounts as of any point in time. These facts directly contradict Attorney Alex Spiro's representations to the SEC. Exported data shows that for years, Tesla routinely and materially overstated its available cash to investors.

b) **"Customer Deposits" and "Revenue" (Issue 2).** Tesla designed its mobile application to steal money from hapless customers, labeled these converted funds "customer deposits," and then treated the funds as loans instead to address the company's cash flow imbalances. Many were not fooled and realized that the "Full Self-Driving" "upgrade" they had purchased was, in fact, a scam. The astronomically high refund rate of ***over 26%*** for two months in Q3 2021 reflects that many customers never wanted "FSD" or found its functionality lacking.[7]

c) **Registration Problems (Issue 3).** Registration status is tracked as part of Tesla's "Warp Deliveries Operations" system. The "Activity Stream" tab in that system allows Tesla employees to leave notes about a vehicle's registration. Tesla representatives have the ability to set legal requirements to a setting of "IGNORE," and often do. The system is therefore designed to permit a "delivered" vehicle to nonetheless lack proper registration.

d) **Vehicle Deliveries (Issue 4).** "Deliveries," widely misinterpreted as *new* vehicle *sales*, is the single most important metric that investors use to gauge Tesla's performance and future prospects. Yet Tesla has no consistent internal or public

---

as private investigators. Defendant Musk has also abused the criminal referral process regarding at least one whistleblower. Tesla Defendants even created a Tesla "Cyberwhistle" to intimidate potential Confidential Witnesses. *See* https://shop.tesla.com/product/cyberwhistle. Given this context, Plaintiff intends to refuse to identify his Confidential Witness sources if asked.

[7] Since Tesla policy is to only grant refunds within 48 hours of the initial charge, these figures represent conservative estimates of the total number of refunds and credit card chargebacks.

definition of "deliveries," and never has. Different database systems—some with conflicting columns named "Is Delivered" and "Is Delivered?" (with a question mark)—define the term differently at present, and those definitions have changed repeatedly over time. Multiple documents indicate that a "delivery" can mean a "New Order with *Used Vehicle*" or a vehicle "Scheduled *after current quarter*" or "S[cheduled ]D[elivery ]D[ate] in the past, *Not Delivered*" (emphasis added). The matter is further muddied by a database column added in or after 2017 called "Delivery Count Type" that allows Tesla personnel to *force a used vehicle to be counted as "New,"* highlighting the fundamental dilemma of whether to use automated routines or manual data entry to identify which cars have truly been sold. Delivery Count Type can and has been used to artificially inflate new vehicle deliveries. Yet Tesla's auditors do not appear to examine this thicket of conflicting, bug-riddled systems with constantly changing and overlapping functions and columns to yield these measurements, instead assessing only certain randomly-selected, scanned pieces of paper signed by customers upon physical delivery, later run through ABBYY Optical Character Recognition software and then stored in a completely separate database. Finally, multiple Tesla subsidiaries use a network of fake owners with Tesla-controlled GMail accounts. The "deliveries" metric is unreliable, fraudulent, and designed to mislead the public.

e) **Accounts Receivable (Issue 5).** Tesla's Accounts Receivable general ledger accounts have been broken down into sub-accounts for "Automotive Manual," "Storage," "Energy Trade Manual," "Pay Per Use," "Solar," "Solar Manual," "Non-Trade," and "Energy Storage Unapplied Accrual." This has never been disclosed and contradicts Tesla's previous explanations of the balance.

f) **"Goodwill" Warranty Repairs (Issue 6).** Tesla acknowledges the "legal and financial ramifications for the customer and the company" associated with "goodwill" repairs—even though it denied any linkage in this Court at the same

time. Tesla maintains a byzantine hierarchy of guides and knowledge base articles that technicians use in order to decide when the "Goodwill" designation is appropriate. Tesla instructs technicians to assign any warranty repairs mandated by any government policy as "Goodwill." The profusion of company regulations around its use have been motivated by its overuse in the past.

g) **"Robotaxis" (Issue 7).** The Internal Documents show no actual attempt to develop a "robotaxi" despite Defendant Musk's claims to the contrary.

h) **Status and Location of Solar Roof Production (Issue 8).** Changzhou Almaden Co. Ltd. in China has repeatedly invoiced Tesla's Netherlands subsidiary for Solar Roof tiles, even though the physical goods are shipped directly to California and have no nexus in Europe. These invoices contradict Tesla's SEC disclosures regarding supposed milestones reached at its Buffalo, New York factory.

i) **Tesla Semi Production (Issue 9).** Tesla and Musk have known for years that the Tesla Semi is dependent upon imaginary battery technology breakthroughs. Progress on yet another prototype was scheduled to be revealed on the same date as a filing deadline in this action, likely to give the false appearance of progress.

j) **"Autopilot" (Issue 10).** Customers often complain in writing about Autopilot being dangerous and non-functional. For example, "I was told my problems were normal for the Tesla Autopilot. It is completely impossible to use the cruise when it does emergency hard braking about once a mile on 2 lane roads. I am very disappointed. My other cars work perfectly on adaptive cruise control. I thought Tesla would be better or at least work. I am very disappointed." NHTSA is now investigating "unexpected brake activation" and is preparing an Autopilot recall.

k) **Scrap and Raw Materials (Issue 11).** For years, many decisions critical to customer and employee safety have been made not by Tesla's often absent "Technoking," but by its undisclosed, *de facto* CEO, Omead Afshar, a twenty-something employee in Defendant Musk's "Office of the CEO" with no prior

automotive experience whose last stock compensation bonus was $10 million.

l) **Product Liability Disclosures (Issue 12).** Just from 2019 through early 2021, Tesla tracked over 100 "thermal cases," or situations where its solar installations caught on fire. Every case was classified as having caused property damage.

m) **Omar Qazi.** While Qazi and his team were promoting Tesla vehicle and stock ownership, Qazi was reduced to repeatedly taking his own Tesla vehicles in for service for problems that he failed to disclose and that even began interfering with his work as a corporate propagandist. As Qazi repeatedly extolled Tesla on Twitter as an "Early Access Program" ("EAP") contractor, he complained that his vehicle's "screeching sound" was "so bad and just keeps getting worse and worse." During this litigation, he complained to Tesla, "trying to make videos of this new FSD software without the car making loud high pitched screeching noises." Defendant Qazi was also afflicted by a minor accident caused by FSD Beta, firmware issues, a dead 12V battery, popping noises, and Autopilot errors. Defendant Qazi failed to note these constant issues to his followers. Qazi was vacationing in Hawaii as he represented to this Court under penalty of perjury that he was on the brink of "significant financial hardship." ECF No. 136-1. This type of deceptive conduct is indistinguishable from the criminal conduct charged in *USA v. Beck*, Case No. 2:22-cr-00072 (C.D. Cal.), filed February 7, 2022.

Plaintiff and/or the Confidential Witnesses have reported relevant facts derived from the Internal Documents to the SEC, NHTSA, and other government authorities where appropriate.

4. **Material Public Disclosures**

On September 19, 2021, EAP contractor Galileo Russell, who regularly collaborates on and appears in Tesla-related videos with Defendant Qazi, posted a video of himself to YouTube in which he admitted that Tesla exercises direct control over its EAP contractors. In his words, "Um, but yeah, Tesla doesn't want us sharing all of the clips of the videos, um, just like when it looks good, because they know people take it out of context." This stark admission contradicts

the Court's finding that Defendant Qazi is not an agent of one or both Tesla Defendants. "An agent under California law is 'one who represents another, called the principal, in dealings with third persons.' Cal. Civ. Code § 2295. 'Agency requires that the principal maintain control over the agent's actions,' *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013)..." *Ratha v. Phatthana Seafood Co., Ltd.*, 26 F. 4th 1029, 1042-1043 (9th Cir. 2022). Like Russell, Defendant Qazi signed Defendant Tesla's EAP contract. Relief is justified under Rule 60(b)(2).

### C.   The Court Ignored Persistent Misrepresentations By Defendants' Counsel

Defendants and counsel for Defendants routinely lied to the Court, including under oath. ECF No. 86 at 2. The lies they told were material, yet they faced no repercussions at all. In another case, the Court referred to Attorney Karl Kronenberger as "disingenuous," "egregiously disingenuous," and "disingenuous" a third time, before calling out his "frequent distortions of the record." *Federal Trade Commission v. AH Media Group, LLC et al*, Case No. 3:19-cv-04022-JD (N.D. Cal. November 1, 2021). Qazi Defendants lied to and misled the Court at least about the fact that Defendant Qazi is Defendant Tesla's agent. Relief is merited pursuant to Rule 60(b)(3).

### D.   The Court Repeatedly Made Errors and Denied Plaintiff Due Process

Rule 60(b)(1) permits the Court to remedy the several dispositive errors in its final Order made by ignoring new facts present in the 4AC, which the Court is required to take as true. With regard to the role of Defendant Tesla's agent Omar Qazi, the Court failed to cite any of the facts in 4AC ¶ 151, including the most important: that Qazi signed Tesla's EAP contract governing his behavior.[8] The Court disregarded Plaintiff's Request for Judicial Notice regarding Tesla's hiring of Qazi's colleague, Vivien Hantusch, who then concealed her employment. ECF Nos. 148, 149-2. While ignoring Qazi's advertising profits, the Court mistakenly concluded that Plaintiff's book and photograph had "no known commercial value," which is provably false. ECF No. 176-1 at 3. It further ignored the portion of binding Supreme Court precedent that precludes Qazi Defendants' "fair use" defense. *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S.

---

[8] The Court's final Order disregarded Plaintiff's correction of its prior error. *See* ECF No. 148 at 2, n. 1. ECF No. 171 at 3:13-14 ("The suggestion that Musk on occasion tweeted favorably in relation to Qazi again does not plausibly indicate that the two had an agency relationship…").

539, 562-563 (1985) ("Fair use presupposes 'good faith' and 'fair dealing.'") The result is perverse. Qazi impersonated a utility company and Plaintiff's family members; helped frame Plaintiff for a supposed child pornography crime; repeatedly exploited Plaintiff's disabled brother; posted A) an altered, anti-Semitic image of Plaintiff with an enlarged nose, B) Plaintiff's phone number with instructions to make harassing calls, C) websites falsely labeling Plaintiff a sexual predator, D) tweets calling Plaintiff a "serial rapist" and a likely "mass shooter," and E) altered court documents—all while earning advertising dollars from the very pages where dozens of full-page images of *Authoritas* were also posted—only of interest to him because Plaintiff's original research threatened Qazi's profits from TSLA stock holdings. The Court sees no bad faith or profit motive here. An objective observer would fail to see anything else.

The Court's scant findings regarding the DMCA are similarly deficient, disregarding the new pleadings in the 4AC at ¶ 217-220. These facts answer the Court's prior call for additional information about how Qazi's actions "would 'induce, enable, facilitate, or conceal' copyright infringement." ECF No. 125 at 19-20. The final Order glosses over them entirely, stating only, "The FAC gives no grounds for reaching a different outcome." ECF No. 171 at 4:2-3.[9]

The Court did not allow for a single hearing to be held in this action, denying Plaintiff due process that might have averted these problems. The word "vacated" appears in the docket nine times in all with regard to hearings. The record is also peppered with one- and two-sentence rulings on significant questions of law—especially with regard to the PSLRA—that cite nothing whatsoever. ECF Nos. 63, 167. Refusing to explain legal reasoning or to allow clarification of facts in a case this complex are both due process violations. "We have previously acknowledged

---

[9] The Court's decision to decline supplemental jurisdiction may have been influenced by further errors. The Court improperly disregarded the amplifying effect of Defendant Musk's unprecedented Twitter following on his libelous statements, as well as evidence of widespread belief that those false statements were true. 4AC ¶ 163. The Court also incorrectly interpreted Cal. Civil Code § 1708.7(a)(3)(A), which hinges on ***"either"*** before enumerating part (ii): "reckless disregard for the safety of the plaintiff or that of an immediate family member." To be clear, Defendants' conduct met the standard for both parts (i) and (ii), putting Plaintiff in fear for his safety more than once. This was especially true because of Defendant Qazi's willingness to assist convicted murderer Diego MasMarques, Jr. with evasion of a then-active restraining order, implicating § 1708.7(a)(3)(B). They also ignored repeated written and verbal pleas to stop.

that a judgment may be set aside on voidness grounds under Rule 60(b)(4) for a violation of the due process clause of the Fifth Amendment. *Winhoven v. United States*, 201 F.2d 174, 175 (9th Cir.1952)." *In re Center Wholesale, Inc.*, 759 F. 2d 1440, 1448 (9th Cir. 1985).

### E. The Court Disregarded Judge Chen's April 1, 2022 Opinion Finding That Elon Musk Acted With Scienter

On April 1, 2022, Judge Edward M. Chen issued a sealed Order, unsealed May 11, 2022, finding that Defendant Musk had acted with scienter when he fraudulently told investors that he had "funding secured" to take Defendant Tesla private in August 2018. Plaintiff brought this Order to the Court's attention pursuant to Civil Local Rule 7-3(d)(2). ECF No. 170. The Court makes no reference to this material development in its final Second Order Re Motions To Dismiss, ECF No. 171, despite previously holding the lack of such a finding against Plaintiff. ECF No. 125 at 15:14-15 ("*In re Tesla* is of no help to Greenspan here. To start, the court did not find as a factual matter that Tesla or Musk acted with scienter."). Rules 60(b)(1) and (5) allow for relief from the Court's erroneous Judgment as it is based on outdated facts, such that "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

### F. Judge Donato Was Required To Recuse Himself As Soon As His Wife's Firm's Paying Clients First Appeared As Counsel In This Case

Judge Donato's wife, Rhonda Donato, works for a firm called Solutus Legal Search ("Solutus"), which is redacted in his Financial Disclosure Reports. On its website, Solutus's first listed law firm client—not first when ordered alphabetically, highlighting its importance—is Judge Donato's former employer, Cooley LLP. Cooley LLP also represented Tesla Defendants for the majority of the time this action has been litigated.[10] On a separate page listing all of Solutus's law firm clients, Tesla Defendants' current counsel, Quinn Emanuel Urquhart and Sullivan LLP, also makes an appearance. Solutus is not a large firm, and Rhonda Donato's photograph appears in the center of the homepage near the top. Her webpage specifically notes, "She is married to the Hon. James Donato of the Northern District of California federal court."

---

[10] For his part, Defendant Musk has now declared that Cooley LLP "thrive[s] on corruption." *See* https://twitter.com/elonmusk/status/1527774704018280448.

This arrangement calls the Court's impartiality into question. Throughout the entirety of this litigation, it would appear that the Donato household has been supported by income from Tesla Defendants' various counsel. Plaintiff previously asked Judge Donato to recuse himself. ECF No. 129. Judge Donato handled that motion himself, writing, "I have not worked at Cooley or with attorney Dwyer since 2009… A thoughtful and well-informed observer would not find cause for concern about the Court's impartiality based on a prior employment relationship that ended 12 years ago." ECF No. 130 at 2:7-12. Yet the Court knew then that a paid, professional relationship with Cooley LLP (at least) was ongoing via Judge Donato's wife, and concealed it.

A reasonable observer would interpret the Solutus website as an advertisement for firms seeking to buy influence with a federal judge. Whether or not fees do buy influence is irrelevant. Canon 2 of the Code of Conduct for United States Judges is entitled, "A Judge Should Avoid Impropriety and the Appearance of Impropriety in all Activities." Section 2(b) reads in part:

> "A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge."

There is no doubt that the Solutus website and the arrangement it reflects violates this section.

Combined with Judge Donato's fixation with the *aggregate* number of pages filed by Plaintiff—many of which are SEC filings reasonable to include in PSLRA action[11]—and his baseless accusation of unspecified "questionable behavior" in ECF No. 176-1, the Court's clear bias against Plaintiff requires relief from the final Order and Judgment under Rule 60(b)(6).

## V.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant relief from its erroneous and void final Order and Judgment, and assign the litigation to an unbiased judge.

---

[11] The Court also directed Plaintiff to use a single-spaced chart for the securities claims and then referred to it as a "contrivance," and invited Plaintiff to file Requests for Judicial Notice, which were then denied. *Compare* ECF No. 130 at 3:17-19 ("Greenspan may wish to file with the complaint a chart... An order from another case is attached that describes this approach and the contents of the [single-spaced] chart.") to ECF No. 171 at 1:21-22 ("complied with this expanded page limitation only through the contrivance of 24 single-spaced pages of charts").

Dated: June 15, 2022         Respectfully submitted,

_____
Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org